UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

─────────────────────────────────────────────

KHAILAIRE ALLAH,

                             Plaintiff,

                                              9:14-CV-0438

v.

                                              (GTS/TWD)

SGT. MURPHY, et. al.,

                             Defendants.

─────────────────────────────────────────────

APPEARANCES:                        OF COUNSEL:

KHAILAIRE ALLAH
Plaintiff *pro se*
01-B-0997
Marcy Correctional Facility
P.O. Box 3600
Marcy, New York 13403

HON. ERIC T. SCHNEIDERMAN       TIMOTHY P. MULVEY, ESQ.
Attorney General for the State of New York   Assistant Attorney General
Counsel for the Defendants
615 Erie Boulevard West
Syracuse, New York 13204

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER and REPORT-RECOMMENDATION

      This *pro se* civil rights action, commenced by Plaintiff Khailaire Allah pursuant to 42

U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Glenn

T. Suddaby, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.

L.R. 72.3(c).  Plaintiff claims that while he was in the custody of the New York State Department

of Corrections and Community Supervision ("DOCCS") and confined at Great Meadow

Correctional Facility ("Great Meadow C.F."), Defendants violated his First, Fourteenth, and

Eighth Amendments rights.  (*See generally* Dkt. No. 1-1.)  Plaintiff seeks declaratory relief, injunctive relief, and compensatory damages.  *Id.* at 13.

Defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Dkt. No. 47, 61.)  Plaintiff filed papers in opposition to the motion.  (Dkt. Nos. 57 and 58.)  For the reasons that follow, the Court recommends that the motion for summary judgment (Dkt. No. 47) be granted in its entirety.

## I.     FACTUAL BACKGROUND

From June 2013 until October 2013, Plaintiff was confined in the Behavioral Health Unit ("BHU") at Great Meadow C.F.[1]  (Dkt. No. 1, *generally*.)  On June 24, 2013, Plaintiff noticed "irregularities" in the frequency and amount of mail he received.  (Dkt. No. 1-1 at 2.)  Plaintiff discussed the issue with Defendant Sgt. Murphy ("Murphy") and Murphy responded that Plaintiff received "all of the mail that he will receive, at this time."  *Id*.  On June 25, 2013, Murphy gave Plaintiff one letter and told Plaintiff, "if [Murphy] got around to it, [Murphy would] bring the rest of [Plaintiff's] mail later."  *Id*.  Later the same day, Plaintiff walked by the officer's station and noticed a large, yellow envelope containing mail with Plaintiff's name and cell location.  *Id*.  Plaintiff asked Murphy why he had not received the large, yellow envelope and Murphy responded that Plaintiff, "received [his] mail for the night" and "don't worry about what's in the officers station."  (Dkt. No. 1-1 at 2.)

---

[1] The BHU is a program that includes a separate housing location within a correctional facility. The BHU provides services to a target population of incarcerated inmates who have a demonstrated history of treatment resistance and poor custodial adjustment/behavior and who would otherwise be serving a confinement sanction in a Special Housing Unit. This program has an emphasis on cognitive and behavioral interventions.  *See* http://www.docs.ny.gov (last visited May 6, 2016).

On June 26, 2013, Plaintiff addressed his concerns regarding his mail with C.O. Gordon and Sgt. Bottane. (Dkt. No. 1-1 at 3.) Bottane directed Gordon to issue Plaintiff's mail. *Id*. On the same day, Plaintiff wrote several grievances regarding his mail deprivation. (Dkt. No. 1-1 at 3; Dkt. No. 58 at 6.) Plaintiff also spoke to Defendants Captain Goodman ("Goodman") and A.D.S.P. Tynon ("Tynon"). (Dkt. No. 1-1 at 3; Dkt. No. 58 at 6.)

On July 5, 2013, Plaintiff received a misbehavior report charging him with lewd conduct and harassment. (Dkt. No. 57 at 12-13.) C.O. Londrigan ("Londrigan")[2] issued the report on July 4, 2013, and described the incident as follows:

> . . . while assisting in the BHU evening rec run, [I] witnessed inmate Allah Khalaire [sic] masterbating [sic] at his cell gate while blowing me kisses. I informed additional staff and the inmate retreated to the back of his cell. I entered the gallery and informed the area supervisor.

(Dkt. No. 57 at 12.)

After receiving the misbehavior report, Plaintiff met with an employee assistant to prepare for his disciplinary hearing related to the charges. (Dkt. No. 1-1 at 7.) Plaintiff asked the assistant to preserve video evidence for the hearing and to contact inmate/witnesses including Inmate Stanley, who agreed to testify on Plaintiff's behalf. (Dkt. No. 1-1 at 7.)

"Immediately" after the misbehavior report was issued, the Acting Deputy Superintendent of Security authorized an Exposer Control Order directing that a colored Exposer Placard be placed on Plaintiff's cell door from July 5, 2013, until August 5, 2013.[3] (Dkt. No. 57 at 17; Dkt.

---

[2] On November 20, 2014, Londrigan was terminated as a defendant.

[3] The Order is not dated and the record does not establish when the Order was executed. The name of the Captain/Acting DSS who issued the Order is not clearly legible but Plaintiff does not allege that any named defendant was responsible for issuing the Order.

No. 58 at 7.)  The Order also directed Plaintiff to wear an Exposer Control Suit (the "jumpsuit") for thirty days.  *Id*.  The jumpsuit was "thick, tear-proof material" that was secured at the back of a neck with a padlock and worn over Plaintiff's pants and shirt.  (Dkt. No. 1-1 at 8.)  Plaintiff was required to wear the jumpsuit while in group counseling sessions, during visits with family, during private interviews, in exercise areas and in the hospital.  (Dkt. No. 57 at 17.)  The Order was issued in response to the July 4, 2013, incident where Plaintiff "purposely exposed himself and masterbated [sic] outside his clothing at female staff."  *Id*.

On July 18, 2013, Defendant Steven E. Racette ("Racette"), Superintendent of Great Meadow C.F., forwarded a memorandum to Plaintiff regarding the Exposure Control Policy. (Dkt. No. 57 at 18.)  Racette indicated that, "[a]fter review by Central Office, the exposure control suits are being used appropriately by Great Meadow."  *Id*.  On the same day, the disciplinary hearing related to the July 2013, misbehavior report commenced with Tynon presiding over the proceedings.  (Dkt. No. 57 at 13.)  Londrigan testified outside of Plaintiff's presence, via speaker phone and Inmate Jason Lara was called to testify on Plaintiff's behalf. (Dkt. No. 1-1 at 8; Dkt. No. 58 at 7.)  Tynon did not review the video evidence and refused to permit Inmate Stanley to testify.  (Dkt. No. 1-1 at 8.)

On July 22, 2013, Plaintiff submitted a Disbursement Form (#2706), for Tynon's approval, in the amount of $400.00 for filing fees for a civil action in the United States District Court for the Northern District of New York.  (Dkt. No. 1-1 at 3.)  After Plaintiff submitted the request, Plaintiff made several inquiries about the form because he was concerned that officers were tampering with his mail.  *Id*. at 4.  On August 2, 2013, Plaintiff received his monthly statement which indicated that $400.00 was deducted from his account.  *Id.*

4

On August 8, 2013, after several extensions of the disciplinary hearing, Plaintiff was found guilty of lewd conduct and harassment and sentenced to forty-five days in the SHU. (Dkt. No. 1-1 at 8; Dkt. No. 57 at 13.) Plaintiff's SHU confinement was scheduled to begin on November 12, 2018, and terminate on December 22, 2018. (Dkt. No. 57 at 13.) The sentence also included a loss of recreation, package, and phone privileges. *Id.* The loss of recreation would commence on April 28, 2018, and expire on June 12, 2013. *Id.* The loss of packages was scheduled to begin on November 20, 2022 and terminate on January 4, 2023 and the loss of phone privileges extended from December 6, 2022, until January 23, 2023. *Id.*

On September 28, 2013, Defendant C.O. Fuller ("Fuller") conducted a search of Plaintiff's cell and filed a misbehavior report charging Plaintiff with "ripping state sheets." (Dkt. No. 1-1 at 6.) At a subsequent hearing related to the misbehavior report, the charges were dismissed. *Id.*

On October 1, 2013, Plaintiff received notification that his lawsuit in the United States District Court for the Northern District of New York, *Allah v. Karandy, et. al.*, No. 9:13-CV-0826 (FJS/TWD) ("*Allah I*") was dismissed for failure to timely remit filing fees. (Dkt. No. 1-1 at 4; Dkt. No. 57 at 2.) On October 4, 2013, Plaintiff provided the District Court with a letter enclosing a copy of his monthly statement with verification that the filing fees were deducted from his account. (Dkt. No. 1-1 at 4.) On October 7, 2013, Tynon provided Plaintiff with "another" Disbursement Form so that Tynon could mail "another" check to the Court for the filing fee. *Id.* On October 15, 2013, the Court received the appropriate filing fee for the action. *Id.*

On October 29, 2013, Tynon's disciplinary determination was reviewed and reversed by non-party Albert Prack ("Prack"), Director of Special Housing/Inmate Disciplinary Program.

(Dkt. No. 57 at 19.)  On October 31, 2013, Plaintiff received a Memorandum from non-party

Captain K. Brown ("Brown") advising Plaintiff that Tynon's decision was reversed.  *Id*. at 20.

Brown notified Plaintiff that he would be released from "special housing" on March 11, 2017.

*Id.*  In addition, recreation, package, and phone privileges would be restored on April 27, 2014,

November 19, 2018 and December 6, 2018, respectively, provided Plaintiff did not incur any

additional sanctions.  *Id.*

## II.    PROCEDURAL HISTORY

Plaintiff filed his Complaint and applied for leave to proceed *in forma pauperis* in this

action on April 17, 2014.  (Dkt. Nos. 1 and 9.)  In a Decision and Order filed on November 20,

2014 (the "November Order"), the Court reviewed the Complaint in accordance with 28 U.S.C.

§§ 1915(e)(2)(B) and 1915A.  (Dkt. No. 12.)  Upon review of the allegations, the Court directed:

(1) Fuller to respond to Plaintiff's retaliation claims related to a September 2013, misbehavior

report; (2) Tynon to respond to Plaintiff's due process claims; (3) Tynon, Racette, Goodman, and

J. Gleason ("Gleason"), BHU Chief, to respond to Plaintiff's Eighth Amendment claims related to

his conditions of confinement; and (4) Murphy and Tynon to respond to Plaintiff's First

Amendment mail claims.  (Dkt. No. 12 at 11, 13, 15 and 17.)  On November 25, 2015,

Defendants filed the motion for summary judgment now before me for Report and

Recommendation.  (Dkt. No. 47.)

## III.    APPLICABLE LEGAL STANDARD

Summary judgment may be granted only if the submissions of the parties taken together

"show that there is no genuine issue of material fact and that the moving party is entitled to

judgment as a matter of law."  Fed.R.Civ.P. 56; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 251-252 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). The nonmovant must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment. *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Salahuddin v. Coughlin*, 999 F. Supp. 526, 535 (S.D.N.Y. 1998) ("pro se parties are to be given special latitude on summary judgment motions.") (citations and internal

quotation marks omitted).  However, "a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment."  *Cole v. Artuz*, No. 93 Civ. 5981, 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).[4]

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). In opposing Defendants' summary judgment motion, Plaintiff failed to respond to the Statement of Material Facts filed by Defendants in the manner required under N.D.N.Y.  L.R.  7.1(a)(3).[5] Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under N.D.N.Y.  L.R. 7.1(a)(3), the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record,[6] and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of

---

[4]  Copies of unpublished decisions cited herein will be mailed to Plaintiff as a *pro se* litigant.  *See Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[5]  L.R. 7.1(a)(3) requires the opposing party to file a response to the movant's Statement of Material Facts.  Under the rule, the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs.  Each denial shall set forth a specific citation to the record where the factual issue arises."

[6]  L.R. 7.1(a)(3) provides that "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."  However, *see Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts].  It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

failing to respond to the motion.[7]  *See Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

However, the Second Circuit, acknowledging a court's broad discretion to determine whether to

overlook a failure to comply with local rules, has held that "while a court is not required to

consider what the parties fail to point out in their [local rule statements of material facts], it may

in its discretion opt to conduct an assiduous review of the entire record even where one of the

parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d

Cir. 2001) (citation and internal quotation marks omitted).  In deference to Plaintiff's *pro se*

status, I have opted to review the entire record in determining if there are material facts in

dispute.

A party opposing summary judgment is required to submit admissible evidence.  *See*

*Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining

the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible

evidence.") (citation and internal quotation marks omitted).  Where, as here, the Court elects to

conduct an independent review of the record on a motion for summary judgment, a plaintiff's

verified complaint should be treated as an affidavit.[8]  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d

Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be

considered in determining whether material issues of fact exist . . . .") (citations omitted).

Plaintiff's Sworn Affidavits (Dkt. No. 57 at 2-6; Dkt. No. 58 at 2-4), which were signed under

---

[7]  Defendants have complied with L.R. 56.2 by providing Plaintiff with the requisite notice of the consequences of his failure to respond to their summary judgment motion.  (Dkt. No. 47 at 1.)

[8]  Plaintiff's Complaint was properly verified by declaration under 28 U.S.C. § 1746.  *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65-66 (2d Cir. 1999) (use of the language "under penalty of perjury" substantially complies with 28 U.S.C. §1746).

penalty of perjury, also constitute admissible evidence that can be considered in opposition to Defendants' motion. *See* 28 U.S.C. § 1746 (authorizing the use of declarations made under penalty of perjury when an affidavit is required or permitted to be used).

Plaintiff's unsworn statements are generally inadmissible in opposition to a motion for summary judgment. *See, e.g.*, *Witzenburg v. Jurgens*, No. CV-05-4827, 2009 WL 1033395, at *11 (E.D.N.Y. April 14, 2009) (holding that unsworn declarations are inadmissible for purposes of Rule 56 and cannot be considered by the court in deciding the motion for summary judgment). Even so, on summary judgment motions involving *pro se* plaintiffs, courts have been known to consider unsworn submissions in opposition. *See, e.g., Hamm v. Hatcher,* No. 05 Civ. 503, 2013 WL 71770, at *7 (S.D.N.Y. Jan. 7, 2013) (to afford *pro se* plaintiff special solicitude, the court considered unsworn statements in his opposition papers but only to the extent based on personal knowledge or supported by other admissible evidence in the record, on the assumption that if the allegations were sufficient to raise an issue of fact, plaintiff would be given the opportunity to submit an affidavit properly attesting to the allegations); *Robles v. Khahaifa*, No. 09CV718, 2012 WL 2401574, at *7 (W.D.N.Y. June 25, 2012). In deference to Plaintiff's *pro se* status, the Court will consider Plaintiff's unsworn "Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion" and the Affidavit of Jason Lara. (Dkt. No. 57 at 9-11; Dkt. No. 58 at 5-7.)

## IV. ANALYSIS

Defendants move for judgment as a matter of law and dismissal of all of Plaintiff's allegations.[9] Defendants argue that the "de minimus" delay in delivering Plaintiff's mail did not

---

[9] In the Complaint, Plaintiff attempts to assert claims against "each defendant [. . .] in their individual and official capacity." (Dkt. No. 1-1 at 1.) Insofar as plaintiff seeks an award of money damages pursuant to Section 1983 against the state defendants in their official capacities,

constitute a First Amendment violation. (Dkt. No. 47-4 at 3.) Defendants move for summary

judgment and dismissal of Plaintiff's Eighth Amendment claims arguing that the use of an

exposure jumpsuit is not cruel and unusual punishment. *Id*. at 8. Defendants also contend that

Plaintiff did not suffer any due process violation related to the July 2013, misbehavior report

because no penalty was imposed as a result of the disciplinary hearing. *Id.* at 5-7. Finally,

Defendants move for dismissal of Plaintiff's retaliation claim against Fuller arguing that the

September 2013, misbehavior report was dismissed and thus, Plaintiff did not suffer from any

adverse action. *Id*. at 7.

### A.    First Amendment - Mail Interference

Plaintiff claims that from June 2013 through October 2013, Murphy "regularly" interfered

with his legal mail in violation of the First Amendment.[10] (Dkt. No. 1-1 at 2-3; Dkt. No. 57 at 2.)

Plaintiff also alleges that Tynon intentionally delayed processing Plaintiff's disbursement form

for filing fees and, as a result, *Allah I* was dismissed. (Dkt. No. 1-1 at 3-4; Dkt. No. 57 at 2.)

Defendants argue that summary judgment is warranted because one instance of mail interference,

within a forty-eight hour period, does not amount to a constitutional violation. (Dkt. No. 47-4 at

4.) Moreover, Defendants claim that summary judgment is appropriate because Plaintiff has not

established that he suffered any prejudice to any legal actions as a result of the alleged

interference. *Id*.

---

those claims are barred by the Eleventh Amendment. *See Will v. Mich. Dep't. of State Police*,
491 U.S. 58, 71 (1989).

[10] The record does not suggest that Plaintiff's mail was subject to a "mail watch" or any
other restrictions. (Dkt. No. 57 at 3.)

"[A] prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (citations omitted). A prisoner's right to receive and send mail may, however, be regulated. *See, e.g., Davidson v. Mann*, 129 F.3d 700, 702 (2d Cir. 1997). When challenges are brought to such regulations, "courts have consistently afforded greater protection to legal mail than to non-legal mail, as well as greater protection to outgoing mail than to incoming mail." *Davis*, 320 F.3d at 351. "[A]n isolated incident of mail tampering is usually insufficient to establish a constitutional violation." *Id.* (citation omitted). To establish a violation, the inmate must show that prison officials "regularly and unjustifiably interfered with the incoming legal mail." *Id*. (holding that two instances of mail interference were insufficient to state a claim because the plaintiff did not allege that the interference with his mail either constituted an ongoing practice of unjustified censorship, caused him to miss court deadlines, or prejudiced his legal actions.)

In the case at hand, the admissible evidence establishes that Plaintiff experienced a delay in receiving his mail from Murphy on June 24, 2013, and June 25, 2013. (Dkt. No. 1-1 at 2-3.) Nothing in the record supports a claim of regular mail interference. Indeed, the Complaint does not contain any allegations related to any interference or tampering at any time other than June 24, 2013, and June 25, 2013. Plaintiff's allegations of "regular" interference are belied by the docket for *Allah I*.[11] *See Allah I*, No. 9:13-CV-0826 (FJS/TWD) (N.D.N.Y.). From July 2013 through November 2013, Plaintiff filed a motion for injunctive relief, a motion to reopen the case, a motion to amend the complaint, and a notice of change of address in *Allah I*. These

---

[11] The Court may rely upon the *Allah I* docket because docket sheets are public records, "of which the court could take judicial notice." *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (citations omitted).

submissions do not suggest that Murphy tampered with Plaintiff's legal mail on a continuous and regular basis. Plaintiff's claim that the "build up of mail stored in a large manilla envelope" suggests that his mail was being tampered with "over some time," (Dkt. No. 57 at 3; Dkt. No. 1-1 at 2-3), amounts to nothing more than conjecture and speculation and is insufficient to establish a constitutional violation related to Plaintiff's legal mail. *See Myers v. Dolac*, No. 09-CV-6642, 2013 WL 5175588, at *14 (W.D.N.Y. Sept. 12, 2013) (finding that the plaintiff's testimony that, "on several occasions," his legal mail had tape on the envelope when it was delivered to him, was a conclusory allegation and insufficient to suggest a pattern of censorship) (collecting cases).

With respect to Tynon and the disbursement form, Plaintiff has not submitted evidence establishing how he submitted the disbursement form or to whom he provided the form. Moreover, while Plaintiff claims that he made several "inquiries" regarding the form, the record lacks facts establishing to whom or when he made those inquiries. Even assuming Plaintiff properly and timely submitted the form, the record also lacks evidence to create a triable issue of fact regarding actual harm as a result of any action or inaction by Tynon. Additionally, the docket for *Allah I* contradicts Plaintiff's claims. On September 27, 2013, Judgment was entered in *Allah I* and the case was dismissed as Plaintiff failed to comply with the filing requirements. *Allah I* (Dkt. No. 6) (Judgment). In October 2013, Plaintiff filed a motion to "reopen" the case and paid the filing fee. *Id*. (Dkt. No. 7.) In a Decision and Order filed on July 28, 2014, the Court vacated the Judgment, reopened the action and reviewed the complaint in accordance with 28 U.S.C. § 1915A. *Id*. (Dkt. No. 16.) Upon review of the allegations, the Court directed

13

Defendants to respond to some of the allegations in the Complaint.[12]  *Id.*   On April 20, 2015,

Defendants filed an Answer to the Complaint and on November 25, 2015, Defendants moved for

summary judgment.  *Allah I* (Dkt. No. 36, 47.)   The procedural history of *Allah I* does not

support Plaintiff's claim that he suffered an "actual injury" as a result of any interference with his

mail.  *See Singleton v. Williams*, No. 12 Civ. 02021, 2014 WL 2095024, at *5 (S.D.N.Y. May 20,

2014) (finding no constitutional violation where the evidence established that the plaintiff's

criminal case was not impacted as a result of the defendants "messing with his mail").

　　Upon review of the entire record, the Court recommends that Murphy and Tynon be

granted summary judgment on Plaintiff's First Amendment mail interference claims.

### B.　　Eighth Amendment - Conditions of Confinement

　　Plaintiff claims that Tynon, Racette, Goodman, and Gleason violated his Eighth

Amendment rights by confining him to the exposure jumpsuit.  (Dkt. No. 1-1 at 9; Dkt. No. 57 at

4-5.)  Plaintiff alleges that Goodman "instructed all subordinate staff not to remove the padlock"

of the jumpsuit.  *Id.* at 10.  Plaintiff contends that Gleason was aware of the mistreatment that

Plaintiff suffered but failed to intervene.  (Dkt. No. 1-1 at 10-11).  Plaintiff also claims that he

wrote and spoke with Racette concerning the "entire BHU treatment."  (Dkt. No. 1 at 2.)

　　The Eighth Amendment protects prison inmates from "cruel and unusual punishment" in

the form of "unnecessary and wanton infliction of pain" at the hands of prison officials.  *Wilson*

*v. Seiter*, 501 U.S. 294, 297 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  A claim

alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and

---

[12] The Court dismissed several causes of action and transferred portions of Plaintiff's
Complaint to the United States District Court for the Southern District of New York and the
United States District Court for the Western District of New York.

subjective requirement that the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that the prison officials acted subjectively with "deliberate indifference." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir.1998). The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir. 1994). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement. *Farmer*, 511 U.S. at 832. To satisfy their obligations under the Eighth Amendment, prison officials must "ensure that inmates receive adequate food, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates." *Id.* To establish an Eighth Amendment conditions of confinement claim, a plaintiff must prove both an objective and a subjective component. *Farmer*, 511 U.S. at 834. To satisfy the objective component, a prisoner must show that the defendant's "act or omission . . . result[ed] in the denial of the minimal civilized measure of life's necessities." *Id.* Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 at 837.

Based upon the record before the Court, Plaintiff has not demonstrated that the use of the jumpsuit deprived Plaintiff of basic human needs. The Exposer Control Order was issued due to

security concerns raised by Plaintiff's own misconduct and indecent exposure. *See Selby v. Martin*, 84 F. App'x 496, 498 (6th Cir. 2003) (finding no Eighth Amendment violation due to the use of leg irons and belly chains that the plaintiff was directed to wear after being found guilty of attempted escape). Moreover, the Order was subject to limitations. The Order expired thirty days after it was issued and did not restrict Plaintiff's movement. Indeed, Plaintiff was not prohibited from leaving his cell or precluded from attending programs or visits. *See Harris v. Horel*, No. C 06-7761, 2009 WL 2761339, at *4 (N.D. Cal., Aug. 31, 2009) (finding no Eighth Amendment violation as the exposure jumpsuit did not restrict the plaintiff from leaving his cell, but rather required the plaintiff to wear the jumpsuit when he was outside his cell).

Plaintiff attempts to persuade the Court that he suffered from inhumane conditions because, on two occasions, he was locked in the jumpsuit during visitation and forced to defecate and urinate on himself. (Dkt. No. 57 at 10.) Plaintiff summarily states that he was prevented from using the bathroom, "as needed." (Dkt. No. 57 at 3.) The record does not support Plaintiff's allegations. The evidence before the Court does not include any facts related to when and where the incidents occurred, who prevented him from using the bathroom, or how long bathroom privileges were withheld. Courts have held that the "temporary denial of a bathroom does not establish the existence of any objective injury for the purposes of an Eighth Amendment claim." *Phillips v. LaValley*, No. 9:12-CV-0609 (NAM/CFH), 2014 WL 1202693, at *13 (N.D.N.Y. March 24, 2014) (citations omitted); *see also Bourdon v. Roney*, No. 9:99-CV-0769(LEK/GLS), 2003 WL 21058177, at *11 (N.D.N.Y. Mar. 6, 2003) (finding that a three hour deprivation of bathroom privileges did not meet the objective component of the Eighth Amendment analysis). Based upon the record herein, the deprivation of the right to use the toilet was not of "sufficient

16

duration" or seriousness to amount to an Eighth Amendment violation. *Whitted v. Lazerson*, No. 96 Civ. 2746, 1998 WL 259929, at *2 (S.D.N.Y. May 21, 1998) (finding no Eighth Amendment violation where the plaintiff was prevented from using the toilet for ninety minutes without any serious injury or risk of contamination). Further, Plaintiff has not provided any proof that he suffered any serious or potential injury or that he was at risk of suffering from any contamination based upon the two alleged incidents. *See Barrow v. Buren*, No. 9:12-CV-01268 (MAD/CFH), 2015 WL 417084, at *15 (N.D.N.Y. Jan. 30, 2015) (holding that the physical discomfort of the padlock on exposure jumpsuit did not pose an excessive risk of serious injury).

Even assuming that Plaintiff suffered from an objectively serious condition, Plaintiff has failed to present any proof that Defendants acted with a culpable state of mind. The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior."). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis*, No. 9:11 CV 1317 (GTS/RFT), 2012 WL 651919, at *6 (N.D.N.Y. Feb. 28, 2012) (citing *McKinnon*, 568 F.2d at 934); *see also Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (a "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections . . . in a § 1983 claim") (citing *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)). Therefore, "a

plaintiff must . . . allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir.1986).

The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon*, 58 F.3d at 873.[13]

Here, there is no evidence establishing that Tynon, Racette, Goodman, or Gleason were involved in any decision related to the Exposer Control Order or the decision to confine Plaintiff to the jumpsuit. Moreover, the record evidence lacks any proof that Tynon, Racette, or Gleason were involved in the decision to deprive Plaintiff of bathroom privileges or that Defendants were even present during the instances where Plaintiff was allegedly compelled to urinate and defecate in the jumpsuit. While Racette responded to Plaintiff's inquiries regarding the use of the jumpsuit, the record lacks any evidence establishing that Racette was involved in or present during any decision related to bathroom privileges. With respect to Goodman, Plaintiff offers nothing more than speculation that Goodman "instructed" unidentified "subordinate staff not to

_____

[13] The Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) has arguably nullified some of the categories set forth in *Colon*. *See Sash v. U.S.*, 674 F. Supp. 2d 531, 543  44 (S.D.N.Y. 2009) (collecting cases). However, the Second Circuit has yet to issue a decision addressing *Iqbal*'s effect on the *Colon* categories, and I will assume for purposes of this motion that *Colon* remains good law.

remove the padlock." (Dkt. No. 57 at 10.) Plaintiff's conclusory allegations, without the requisite evidence to support them, are not sufficient to defeat summary judgment. *See Davis*, 316 F.3d at 100.

Given the foregoing, the Court recommends that Tynon, Racette, Gleason, and Goodman be granted summary judgment on this issue.

## C.    Fourteenth Amendment

The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as loss of good-time credit or special confinement that imposes an atypical hardship." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted); *see also J.S. v. T'Kach*, 714 F.3d 99, 106 (2d Cir. 2013) ("We have held that a prisoner has a liberty interest that is implicated by SHU confinement if it 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'") (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)); *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004). To make out a Section 1983 claim for denial of Fourteenth Amendment due process rights, a plaintiff must demonstrate: "(1) that he possessed a liberty interest and (2) that the defendants deprived him of that interest as a result of insufficient process." *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir.2001) (internal quotation marks omitted).

### 1.	Reversal of Determination

Defendants argue that Tynon's determination was reversed and expunged and thus, Plaintiff's due process rights were not violated.  (Dkt. No. 47-4 at 5-6.)  Plaintiff claims that while the charges in the July 2013 misbehavior report were dismissed, Plaintiff served penalties and was compelled to wear the exposure jumpsuit to programs, visits and recreation.  (Dkt. No. 57 at 3.)

Defendants cite to *Young v. Hoffman*, 970 F.2d 1154 (2d Cir. 1992), as support for their position.  In *Young*, the plaintiff alleged that he was deprived of due process in connection with a Tier III hearing related to a misbehavior report charging the plaintiff with harassing and threatening officers.  *Id*. at 1155.  The defendant refused to allow the plaintiff to be present during the hearing and denied the plaintiff's request to call witnesses.  *Id*.  The plaintiff was found guilty and sentenced to 180 days in the SHU.  *Young*, 970 F.2d at 1154.  Upon the plaintiff's appeal, the determination was reversed and the penalties were expunged.  *Id*.  The Court did not resolve the issue of whether the plaintiff suffered a denial of due process during his disciplinary hearing because, "the administrative reversal constituted part of the due process protection he received, and it cured any procedural defect that may have occurred." *Young*, 970 F.2d 1150.  The Court held, "on account of the administrative reversal of Hoffman's decision, Young was never penalized on the charges" and thus, "suffered no interference with a liberty interest and has no valid claim for relief."  *Id*. at 1156.

Similarly, Defendants rely upon *Chavis v. vonHagn*, 2009 WL 236060 (W.D.N.Y. Jan. 30, 2009).  In *Chavis*, the Court cited *Young* and reasoned, "[i]t is well-settled that where, as

here, a disciplinary determination has been reversed and expunged before an inmate begins to serve the penalty imposed, the inmate's due process rights have not been violated." *Id*. at 66. Applying *Young*, the *Chavis* Court held that because the determination was reversed and expunged before the plaintiff began serving the penalty imposed, the plaintiff suffered no interference with a liberty interest. *Id.* at 67.

In this matter, on August 8, 2013, Tynon issued a determination finding Plaintiff guilty of the charges. (Dkt. No. 57 at 13-14.) As a result of that decision, Plaintiff was sentenced to forty-five days of SHU confinement and a loss of privileges. *Id.* The period of SHU confinement was not scheduled to begin until November 12, 2018, and there is no evidence that any portion of Tynon's sentence was imposed prior to the decision on Plaintiff's appeal. *Id.* However, the undisputed evidence before the Court establishes that, as a result of the misbehavior report, Plaintiff was confined to the exposure jumpsuit from July 5, 2013, until August 5, 2013. (Dkt. No. 57 at 17.) Based upon the record, the Court finds that, unlike *Young* and *Chavis*, there are material issues of fact related to the penalties that Plaintiff was compelled to endure prior to the appeal and reversal of Tynon's decision on the charges in the July 2013, misbehavior report. These triable issues of fact preclude the Court from recommending summary judgment and dismissal of Plaintiff's due process claim based upon the reversal of Tynon's decision.

The aforementioned analysis does not absolve the Court from further examining the viability of Plaintiff's due process claims. To survive summary judgment, Plaintiff must establish that he possessed a liberty interest that he was deprived of without procedural safeguards.

## 2. Liberty Interest Related to Jumpsuit

As a result of the misbehavior report, Plaintiff was compelled to wear the jumpsuit to programs, visits and recreation and suffered humiliation and embarrassment. (Dkt. No. 57 at 3.) Plaintiff claims that he has a liberty interest in being free from restraints that impose atypical and significant hardships. (Dkt. No. 1-1 at 9.)

In *Sandin v. Conner*, 515 U.S. 472 (1995), the United States Supreme Court determined that to establish a liberty interest, a plaintiff must sufficiently demonstrate that (1) the State actually created a protected liberty interest in being free from segregation; and that (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84; *Tellier*, 280 F.3d at 80; *Hynes*, 143 F.3d at 658. To determine whether an inmate has suffered an "atypical and significant hardship," the conditions imposed upon the inmate must be compared with those imposed upon the rest of the general population of the facility as well as those in administrative and protective confinement. *See Welch v. Bartlett*, 196 F.3d 389, 393 (2d Cir. 1999); *see also Vega v. Lantz*, 596 F.3d 77, 83 (2d Cir. 2010) ("To be actionable, the liberty interest must subject the prisoner to 'atypical and significant hardship . . . in relation to the ordinary incidents of prison life.'") (quoting *Sandin,* 515 U.S. at 484). An inmate can show deprivation of a liberty interest under the due process clause when a prison condition imposes an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484 (1995); *see also Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004) (same). Even if an inmate's movement is restricted,

"restrictions of movement and/or access to privileges are quintessential to the nature of prison life." *See Smith v. Clary*, No. 12-1779, 2012 WL 4059977, at *2 (D.S.C. Aug. 16, 2012).

Plaintiff has failed to establish, with competent admissible proof, that he had a liberty interest in remaining free from the jumpsuit. Even assuming Plaintiff possessed such an interest, the undisputed record establishes that the "degree and duration" of the required use of the jumpsuit was not significant to amount to a due process violation. Plaintiff was not restricted from movement or subjected to significant hardship in relation to the ordinary incidents of prison life as a result of being compelled to wear the jumpsuit. Plaintiff concedes that he was able to participate in visitation. (Dkt. No. 57 at 10.) In *Barrow v. Van Buren*, No. 9:12-CV-1268 (MAD/CFH), 2015 WL 417084 (N.D.N.Y. Jan. 30, 2015), the Court held:

> [A]lthough [the plaintiff] was embarrassed by the jumpsuit and faced verbal harassment when he wore it, defendants were not physically restraining or otherwise limiting [the plaintiff's] movement. Therefore, [the plaintiff] failed to demonstrate that the jumpsuit imposed an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." (citation omitted)

*Barrow*, 2015 WL 417084, at *19.

Accordingly, I find that Plaintiff's confinement to the jumpsuit does not give rise to a protected liberty interest.

### 3. Liberty Interest Related to Bathroom Privileges

Plaintiff also contends that he was deprived of a liberty interest because while was confined to the jumpsuit, on two occasions, he was not permitted to use the bathroom, "as needed," and was forced to urinate and defecate on himself because staff would not remove the lock on the jumpsuit during visiting hours. (Dkt. No. 57 at 3.)

As discussed in Part IV(B) *supra*, the allegations herein amount to nothing more than a temporary deprivation of bathroom privileges. Moreover, the admissible record is void of facts establishing when Plaintiff was restricted from using the bathroom, where the deprivations occurred or the duration of the alleged bathroom deprivations. Thus, Plaintiff has not established, with admissible proof, that he suffered from conditions that were atypical or significant when compared to the ordinary incidents of prison life. *See Treat v. Central New York Psychiatric Ctr.,* No. 9:12-CV-0602 (GLS/DEP), 2013 WL 6169746, at *3 (N.D.N.Y. Nov. 20, 2013) (finding that, in certain circumstances, the restriction of bathroom privileges does not implicate the due process clause) (citation omitted); *see also Bourdon*, 2003 WL 21058177, at *11 (finding that the deprivation of bathroom privileges for three hours was a temporary deprivation). The record evidence lacks proof Plaintiff was "forced" to urinate and/or defecate in the jumpsuit.

Based upon the record before the Court, I find that the alleged deprivation of bathroom privileges does not give rise to a protected liberty interest.

### 4.    Liberty Interest Related to the Residential Mental Health Unit ("RMHU") and BHU

Plaintiff claims that he was prohibited from completing his program in the BHU and thus, could not be "promoted" to the RMHU. (Dkt. No. 57 at 4.) As a result, Plaintiff remained in the BHU from June 2013 until October 2013 and endured "extenuating conditions." *Id.*

An inmate does not have a liberty interest in specific unit assignment. *Richards v. Woods*, 66 F.3d 320 (5th Cir. 1995); *see also Jamison v. Hayden*, No. 9:03-CV-913(FJS/DRH), 2008 WL 907316, at *4 (N.D.N.Y. Mar. 31, 2008) (dismissing the plaintiff's due process claim as the plaintiff's removal from a therapeutic program was not a constitutional violation because inmates do not enjoy a protected liberty interest in being assigned to a particular program or job while incarcerated). Here, Plaintiff does not

allege any facts related to the "extenuating conditions" he allegedly endured in the BHU and the record lacks any evidence to suggest that the conditions were atypical or a significant hardship. *See Gonzales v. Carpenter*, No. 9:08-CV-629 (LEK/ATB), 2011 WL 768990, at *10 (N.D.N.Y. Jan. 3, 2011), *report and recommendation adopted*, 2011 WL 767546 (N.D.N.Y. Feb. 25, 2011) ("Nothing involving plaintiff's stay at the OMH satellite unit subjected him to cruel and unusual punishment under the Eighth Amendment."). The record does not suggest that Plaintiff was subjected to any atypical or significant deprivation in relation to ordinary prison life as a result of his extended confinement in the BHU.

Based upon the aforementioned, I recommend that Defendants be granted summary judgment dismissing Plaintiff's claims for denial of Plaintiff's Fourteenth Amendment due process rights.

### D.    Retaliation Claims

Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak*, 389 F.3d 379, 380 81 (2d Cir. 2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See id.* at 381 83.

Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds, Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even

25

those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkiewicz,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1.

To establish a First Amendment claim for retaliation, an inmate must present evidence showing that: (1) he was engaged in a constitutionally protected activity; (2) the defendants took "adverse action" against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Pidlypchak*, 389 F.3d at 380 (citing *Dawes*, 239 F.3d at 492). "Adverse action" in the prison context has been defined by the Second Circuit as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." *Pidlypchak*, 389 F.3d at 380.

Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions. *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y.2002) (citing *Colon*, 58 F.3d at 873). Those factors include: (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his or her motivation. *Id.* (citing *Colon*, 58 F.3d at 872 73). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.* A showing of temporal proximity,

without more, has been found insufficient to survive summary judgment. *See Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 370 (S.D.N.Y. 2011) (citations omitted).

Even if a plaintiff makes the appropriate showing of retaliation, a defendant may avoid liability if he demonstrates that he would have taken the adverse action even in the absence of the protected conduct. *See Scott v. Coughlin*, 344 F.3d 282, 287  88 (2d Cir. 2003) ("Regardless of the presence of retaliatory motive, . . . a defendant may be entitled to summary judgment if he can show . . . that even without the improper motivation, the alleged retaliatory action would have occurred.") (citation omitted); *Roseboro*, 791 F. Supp. 2d at 371.

### 1.    Claims Against Fuller

In the Complaint, Plaintiff alleged that Fuller filed the September 2013, misbehavior report in "retaliation to grievance complaints about the mail and law books." (Dkt. No. 1-1 at 6.) Defendants contend that Plaintiff was not punished as a result of the misbehavior report and, thus, did not suffer any adverse action to support a retaliation claim.[14]  (Dkt. No. 47-4 at 7.)  In support of that assertion, Defendants cite to *Bilal v. White*, 494 F. App'x 143, 147 (2d Cir. 2012). In *Bilal*, the plaintiff alleged that after he filed a grievance against White, the defendant fabricated a misbehavior report. *Bilal*, 494 F. App'x at 147.  The Court found that the plaintiff failed to produce evidence that he was "wrongly punished" based on the "purportedly false accusation" or that he was "subjected to unfair disciplinary proceedings." *Id*.

In this case, there is no evidence that Plaintiff was penalized as a result of the September 2013, misbehavior report.  After a disciplinary hearing, the charge set forth in the September 28,

---

[14] Plaintiff provided two submissions in opposition to Defendants' motion but failed to address the retaliation claim against Fuller in either submission.

2013, misbehavior report was dismissed. (Dkt. No. 1-1 at 6.) Consequently, Plaintiff has failed

to establish that he suffered any adverse action as a result of the misbehavior report and Fuller's

actions. *See Crenshaw v. Korbar*, No. 09-CV-6167, 2013 WL 1681833, at *3 (W.D.N.Y. April

17, 2013) (holding that the plaintiff did not suffer actual harm for the purposes of the First

Amendment as the misbehavior report was reversed before the plaintiff began serving his SHU

sentence on the report).

Based upon the record and relevant caselaw, the Court recommends that summary

judgment be granted and the retaliation claims against Fuller be dismissed.

### 2. Remaining Retaliation Claims

In opposition to Defendants' motion, Plaintiff asserts additional retaliation claims.

Plaintiff contends that: (1) Londrigan issued the July 2013 misbehavior report in retaliation for

Plaintiff's grievances related to his mail (Dkt. No. 57 at 4; Dkt. No. 58 at 6.); (2) Plaintiff was

placed in the jumpsuit in retaliation for his grievances (Dkt. No. 58 at 7.); (3) C.O. Rock

("Rock") confiscated Plaintiff's legal books in retaliation for grievances; and (4) Tynon and

Murphy tampered with and confiscated Plaintiff's mail in retaliation for filing

"grievances/lawsuits."[15] (Dkt. No. 1-1- at 6-7; Dkt. No. 58 at 3-4.)

Initially, the Court notes that the Complaint did not contain a cause of action for

retaliation against Londrigan or Rock and did not include any retaliation claim related to the

---

[15] In support of that argument, Plaintiff provided the Court with a video, dated July 13, 2015. (Dkt. No. 59.) The video is not supported by a declaration of any custodian of records and therefore, not properly admissible as a business record. *See* Fed. R. Evidence § 901; *but see Brown v. Outhouse*, 2010 WL 3862082, at 12, n. 5 (N.D.N.Y. July 9, 2010) (holding that video evidence supported by a declaration from the custodian of records at Cayuga County jail was admissible as a business record.)

jumpsuit.[16]  "[A] plaintiff may not use a memorandum of law or similar paper to assert a claim that is not contained in the complaint."  *Ribis v. Mike Barnard Chevrolet-Cadillac, Inc.*, 468 F. Supp. 2d 489, 495 (W.D.N.Y. 2007) (citing *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)).  Thus, these arguments are not properly before this Court.

Even assuming the claims were originally pled, as noted above, conclusory statements are not sufficient to support retaliation claims; the claims must be supported by specific facts. *Flaherty*, 713 F.2d at 13.  The record is devoid of evidence, admissible or otherwise, that supports Plaintiff's conclusory assertion that Londrigan issued the misbehavior report in retaliation for grievances Plaintiff filed against other corrections officers related to his mail. Similarly, there is no evidence that Rock, Murphy, or Tynon tampered with Plaintiff's legal mail in retaliation for "grievances/lawsuits."  Indeed, the record is void of any evidence related to any grievance.  The record does not include copies of any grievances or any information related to when Plaintiff filed grievances, against whom the complaints were made, the substance of any grievance or how Londrigan, Rock, Murphy, or Tynon were influenced by such grievances in filing the misbehavior report or tampering with Plaintiff's mail.  Further fatal to Plaintiff's claim is the omission of any evidence in the record identifying the individual(s) who utilized the jumpsuit in a retaliatory manner.  As discussed *supra*, the "Captain" who issued the Exposer Control Order is not a defendant herein.  Moreover, the record does not establish that Tynon, Rock, or Londrigan were personally involved in any decision related to Plaintiff's jumpsuit.

---

[16] In the November Order, the Court dismissed Plaintiff's "access to courts" claim against Rock for failure to state a claim and Rock was terminated as a defendant.  (Dkt. No. 12 at 16.)

Any grievances that Plaintiff filed were protected First Amendment conduct, and issuing a false misbehavior report constitutes adverse action. However, in light of the absence of record evidence establishing that Londrigan, Rock, Murphy, or Tynon acted in retaliation for Plaintiff's filing of any grievances, the Court recommends that summary judgment be granted on this issue.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 47) be **GRANTED**; and it is further

**ORDERED** that in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam), the Clerks Office provide Plaintiff with copies of the following unpublished decisions: *Cole v. Artuz*, No. 93 Civ. 5981, 1999 WL 983876 (S.D.N.Y. Oct. 28, 1999); *Witzenburg v. Jurgens*, No. CV-05-4827, 2009 WL 1033395 (E.D.N.Y. April 14, 2009); *Hamm v. Hatcher,* No. 05 Civ. 503, 2013 WL 71770 (S.D.N.Y. Jan. 7, 2013); *Robles v. Khahaifa*, No. 09CV718, 2012 WL 2401574 (W.D.N.Y. June  25, 2012); *Myers v. Dolac*, No. 09-CV-6642, 2013 WL 5175588 (W.D.N.Y. Sept. 12, 2013); *Singleton v. Williams*, No. 12 Civ. 02021, 2014 WL 2095024 (S.D.N.Y. May 20, 2014);  *Harris v. Horel*, No. C 06-7761, 2009 WL 2761339 (N.D. Cal., Aug. 31, 2009); *Phillips v. LaValley*, No. 9:12-CV-0609 (NAM/CFH), 2014 WL 1202693 (N.D.N.Y. March 24, 2014); *Bourdon v. Roney*, No. 9:99-CV-0769(LEK/GLS), 2003 WL 21058177 (N.D.N.Y. Mar. 6, 2003); *Whitted v. Lazerson*, No. 96 Civ. 2746, 1998 WL 259929 (S.D.N.Y. May 21, 1998); *Barrow v. Buren*, No. 9:12-CV-01268 (MAD/CFH), 2015 WL 417084 (N.D.N.Y. Jan. 30, 2015); *Groves v. Davis*, No. 9:11  CV  1317 (GTS/RFT), 2012 WL 651919 (N.D.N.Y. Feb. 28, 2012); *Chavis v. vonHagn*, 2009 WL 236060 (W.D.N.Y. Jan. 30, 2009); *Smith v. Clary*, No. 12-1779, 2012 WL 4059977 (D.S.C. Aug. 16, 2012); *Treat v. Central New*

*York Psychiatric Ctr.,* No. 9:12-CV-0602 (GLS/DEP), 2013 WL 6169746 (N.D.N.Y. Nov. 20, 2013); *Jamison v. Hayden*, No. 9:03-CV-913(FJS/DRH), 2008 WL 907316 (N.D.N.Y. Mar. 31, 2008); *Gonzales v. Carpenter*, No. 9:08-CV-629 (LEK/ATB), 2011 WL 768990 (N.D.N.Y. Jan. 3, 2011); *Crenshaw v. Korbar*, No. 09-CV-6167, 2013 WL 1681833 (W.D.N.Y. April 17, 2013); *Brown v. Outhouse*, 2010 WL 3862082 (N.D.N.Y. July 9, 2010).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a).

Dated: May 16, 2016
  Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

2015 WL 417084
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Vincent BARROW, Plaintiff,

v.

Diane Van BUREN, Deputy Commissioner;
Brian Fischer, Commissioner; Bryan Hilton,
Superintendent of Programs; Charles Kelly, Jr.,
Superintendent, Marcy Correctional Facility; Dr.
Farago, Psychiatrist; Anthony Devitto, Executive
Director of Special Programing; BOB Lewis,
OMH Therapist; Lisa Kalies, Unit Chief, OMH,
Residential Mental Health Unit; Joseph Bellnier,
Deputy Commissioner of Program Service; Lucien
Lechaire, Assistant Commissioner; Maureen
E. Boll, Deputy Commissioner and Counsel; E.
Lindquist, Assistant Commissioner; Karen Ballamy,
Director, Inmate Grievance Program; Jeff McKoy,
Deputy Commissioner; Maureen Bossco, Executive
Director, Central New York Psychiatric Center,
Office of Mental Health; B. McArdle, Deputy
Superintendent of Marcy Correctional Facility;
Donald Selskey, Deputy Commissioner, Captain
Harper, Lieutenant Cory; Holanchuck, Defendants.

No. 9:12–cv–01268 (MAD/CFH).
|
Signed Jan. 30, 2015.

**Attorneys and Law Firms**

Vincent Barrow, Romulus, NY, pro se.

Office of the New York State Attorney General, Gregory J.
Rodriguez, AAG, of Counsel, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

MAE A. D'AGOSTINO, District Judge.

**I. INTRODUCTION**

**\*1** Plaintiff *pro se* Vincent Barrow, an inmate in the
custody of the New York State Department of Corrections
and Community Supervision ("DOCCS"), brought this action
pursuant to 42 U.S.C. § 1983, alleging violations of his
constitutional rights under the First, Eighth and Fourteenth
Amendment, as well as under Title II of the American
with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et
seq. and section 504 of the Rehabilitation Act ("RA"),
29 U.S.C. § 794. *See* Dkt. No. 50. Defendants, twenty
DOCCS employees, have moved to dismiss Plaintiff's Second
Amended Complaint pursuant to Federal Rule of Civil
Procedure 12(b)(6). *See* Dkt. No. 67. Defendants have
also moved to dismiss pursuant to Federal Rule of Civil
Procedure 12(b)(1). *Id.* In a Report–Recommendation and
Order dated September 25, 2014, Magistrate Judge Hummel
recommended that the Court grant in part and deny in part
Defendants' 12(b)(6) motion and deny the Defendants' 12(b)
(1) motion. *See* Dkt. No. 70.

Currently before the Court are Plaintiff's objections to
Magistrate Judge Hummel's September 25, 2014 Report–
Recommendation and Order. *See* Dkt. No. 73.

**II. BACKGROUND**

The following facts are not in dispute. At all relevant
times, Plaintiff was incarcerated at Marcy Correctional
Facility ("Marcy"). Dkt. No. 50 at ¶ 2. During this time,
the Residential Mental Health Unit ("RMHU") at Marcy
implemented "The Lewd Conduct Program" for inmates who
engage in lustful and inappropriate behaviors. Dkt. No. 50
at ¶ 25. Inmates subject to the program are required to wear
a control suit, which consists of a neon-green jumpsuit that
has its only opening along the back, is laced with a heavy
string, and is fastened with a padlock at the neck. *Id.* Another
component of the program requires that a fiberglass sign
displaying the word "Exposer" be hung above the inmate's
cell door at all times. Dkt. No. 50 at ¶¶ 26, 30.

Plaintiff was required to wear the jumpsuit on several
occasions following the issuance of numerous misbehavior
reports for lewd conduct. *See id.* at ¶¶ 29–31. Plaintiff alleges
that several inmates and staff have verbally insulted and
ridiculed him for wearing the jumpsuit. *See id.* at ¶¶ 32–
33. As a result, Plaintiff has refused to wear the jumpsuit
out of his cell and has thus been unable to attend programs
and medical appointments. *See id.* at ¶ 36. Contrary to
Defendants' contentions that the lewd conduction program
has been implemented for security measures, Plaintiff argues
that the program is specifically targeted to humiliate and

lower the self esteem of inmates at Marcy. *See id.* at ¶¶ 34–35, 43.

Plaintiff commenced this civil rights action on August 13, 2012. *See* Dkt. No. 1. Upon leave of court, Plaintiff filed an Amended Complaint to include a description of new events that had taken place since the complaint's initial filing. *See* Dkt. No. 11, 12. On April 1, 2014, Plaintiff was permitted to submit a Second Amended Complaint for review. *See* Dkt. No. 50. In response, Defendants moved to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. *See* Dkt. No. 67. Plaintiff subsequently opposed the motion. *See* Dkt. No. 69.

**\*2** On September 25, 2014, Magistrate Judge Hummel filed a Report–Recommendation and Order recommending that Defendants' Motion to Dismiss be granted in part and denied in part. *See* Dkt. No. 70 at 40. Plaintiff filed written objections on October 10, 2014, objecting to Magistrate Judge Hummel's recommendations in full. *See* Dkt. No. 73 at 7.

### III. DISCUSSION

**A. Standard of Review**

When objections to a magistrate judge's report-recommendation and order are made, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). If, however a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the magistrate judge's recommendations are reviewed for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). The court will "ordinarily refuse to consider argument[s] that could have been, but [were] not, presented to the magistrate judge in the first instance." *Mosley v. Superintendent of Collins Corr. Facility,* No. 9:11–CV–1416, 2015 U.S. Dist. LEXIS 6985, \*5, 2015 WL 277133 (N.D.N.Y. Jan. 22, 2015) (citations omitted). Upon review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

**B. Analysis**

*1. Misapplication of Case Law*

Plaintiff contends that the cases cited in Magistrate Judge Hummel's Report–Recommendation and Order "could have been used in favor of Plaintiff" and "should be used in his favor." *Id.* Upon careful review, the Court finds that Magistrate Judge Hummel applied the appropriate legal standards, accurately recited the facts as presented by Plaintiff, and correctly applied the law to those facts.

Accordingly, Plaintiff's objection regarding the misapplication of case law is rejected.

*2. Misapplication of Rule 12(b)(6)*

Plaintiff further contends that Rule 12(b)(6) "should have been used in his favor" and that "legal conclusions," in these circumstances, should be sufficient to survive a motion to dismiss. *See* Dkt. No. 73 at 1. When a defendant files a 12(b)(6) motion to dismiss, the court must "accept all factual allegations as true and draw every reasonable inference from those facts in plaintiff's favor." *La. Wholesale Drug Co. v. Shire LLC,* 754 F.3d 128, 133 (2d Cir.2014) (internal quotation marks and citations omitted). Nevertheless, "this indulgence does not relieve the plaintiff from alleging 'enough facts to state a claim to relief that is plausible on its face.' " *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

Plaintiff admits that "the complaint is not without error," and that he "did his best to inform the court" of the alleged violations despite having been denied counsel. *See* Dkt. No. 73 at 6–7. The Second Circuit has stated, however, that *"pro se* status does not exempt a party from compliance with relevant rules of procedure and substantive law." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (internal quotation marks and citations omitted). Upon review, the Court finds that Magistrate Judge Hummel correctly applied Rule 12(b)(6) and surrounding case law to the facts presented. In his thorough and well-reasoned Report–Recommendation and Order, Magistrate Judge Hummel correctly determined that the allegations in the Second Amended Complaint were insufficient to plausibly suggest the personal involvement of Defendants Bossco, Fischer, Harper, McArdle, VanBuren, Holanchuck, Perlman, LeClaire, Boll, McKoy, Bellamy, and Lindquist. Additionally, Magistrate Judge Hummel also correctly determined that the Court should grant Defendants' motion as to Plaintiff's First Amendment claims because some of the speech was not constitutionally protected and, even when it was, Plaintiff's allegations regarding the alleged retaliation are entirely conclusory.

**\*3** As to Plaintiff's Eighth Amendment conditions of confinement claim, Magistrate Judge Hummel correctly determined that the alleged deprivations were not sufficiently serious to amount to an " 'excessive risk' to his safety and health.' " Dkt. No. 70 at 24 (citing *Farmer,* 511 U.S. at 837; *Jabbar v. Fischer,* 683 F.3d 54, 57 (2d Cir.2012)). The report also properly determined that Plaintiff has failed to plausibly allege claims of deliberate medical indifference regarding the denial of treatment for his foot arches and exhibitionism.

The Court has reviewed Plaintiff's remaining claims and finds them to be without merit; and, therefore, Magistrate Judge Hummel's September 25, 2014 Report–Recommendation and Order is adopted in its entirety.

### 3. Deliberate Indifference

Lastly, Plaintiff reiterates his concerns regarding the denial of necessary medical and mental health care. Dkt. No. 73 at 5. In this respect, the Court wholly agrees with Magistrate Judge Hummel's analysis governing Plaintiff's Eighth Amendment claim for medical indifference related solely to the denial of treatment for depression. *See* Dkt. No. 70 at 29. In order to have a valid claim under the Eighth Amendment for cruel and unusual punishment arising out of a claim for medical indifference, a plaintiff must show "that his medical condition is objectively a serious one" and that "[each] defendant acted with deliberate indifference to [the plaintiff's] medical needs." *Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003) (citations omitted). A finding of deliberate indifference requires the plaintiff "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

Plaintiff states that at the time he was admitted to RMHU he was diagnosed with "Major Depression Disorder." Dkt. No. 50 at ¶ 46. The Court is mindful that depression, in some circumstances, has been objectively deemed a serious medical need. *See Zimmerman v. Burge,* No. 06–CV–0176, 2009 U.S. Dist. LEXIS 88344, \*34–35, 2009 WL 9054936 (N.D.N.Y. Apr.20, 2009) (finding that depression is a "sufficiently serious" medical condition when it is not self-diagnosed). In light of these facts, the Court is satisfied that Plaintiff has met its burden under the first prong.

In or around May 2011, Plaintiff states that Defendant Farago stopped providing Plaintiff with depression medication and was instead "pretending" to treat him. Dkt. No. 50 at ¶¶ 47–48. Plaintiff had been taking this medication to treat his depression for over fifteen years. Dkt. No. 50 at ¶ 47. In his objections, Plaintiff attempts to substantiate his need for the medication by alleging "many 'crisis' situations,' " including two "attempted suicides" and a single occasion of hospitalization. Dkt. No. 73 at 4. Plaintiff does not, however, provide any specific dates or documentation regarding these events. Nevertheless, the Court agrees that "a complete ... cessation of medication that [Plaintiff] had been taking for fifteen years could pose a risk of serious harm to his mental well-being." Dkt. No. 70 at 29 (citing *Brock,* 315 F.3d at 162–63).

**\*4** Accordingly, the Court finds that Magistrate Judge Hummel correctly determined that the Court should deny Defendants' motion to dismiss as to this claim.

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that the September 25, 2014 Report–Recommendation and Order by Magistrate Judge Hummel is **ADOPTED** in its entirety for the reasons set forth therein; and the Court further

**ORDERS** that Defendants' motion to dismiss Plaintiff's Second Amended Complaint for lack of subject matter jurisdiction is **DENIED;** and the Court further

**ORDERS** that Defendants' motion to dismiss Plaintiff's Second Amended Complaint for failure to state a claim is **GRANTED** in part and **DENIED** in part; and the Court further

**ORDERS** that Plaintiff's following claims are **DISMISSED;** (1) all First Amendment claims; (2) all Eighth Amendment claims insofar as they allege inadequate prison conditions, inadequate treatment, and deliberate indifference to Plaintiff's exhibitionism and foot condition; (3) all Fourteenth Amendment claims; (4) the ADA claim; and (5) the RA claim; and the Court further

**ORDERS** that Defendants' motion to dismiss is **DENIED** with respect to Plaintiff's Eighth Amendment claim insofar as it alleges deliberate indifference to Plaintiff's depression; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED**

**REPORT–RECOMMENDATION AND ORDER** [1]

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff pro se Vincent Barrow ("Barrow"), an inmate currently in the custody of the New York State Department of Correctional and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, twenty DOCCS employees, violated his rights under the First, Eighth and Fourteenth Amendments as well as Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. and section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794. Second Am. Compl. (Dkt. No. 50), at 1–16. Presently pending is defendants' motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6) and FED. R. CIV. P. 12(b)(1). Dkt. No. 67. Barrow opposed. Dkt. No. 69. For the following reasons, it is recommended that (1) defendants' motion to dismiss under FED. R. CIV. P. 12(b)(6) be granted in part and denied in part and (2) defendants' motion to dismiss under FED. R. CIV. P. 12(b)(1) be dismissed.

## I. Background

The facts are related herein in the light most favorable to Barrow as the non-moving party. *See* subsection II(A) infra. At all relevant times, Barrow was an inmate at the Marcy Correctional Facility ("Marcy").

### A. Lewd Conduct Program

 **\*5** At Marcy, the Residential Mental Health Unit ("RMHU") had implemented "The Lewd Conduct Program" for inmates who had engaged in lewd behaviors. Second Am. Compl. ¶ 25. The program included use of a control suit, a neon-green jumpsuit that is laced up the back—its only opening—with heavy string and secured with a padlock at the neck. *Id.* Another component of the program is the placement of a sign that says "Exposer" above the inmate's cell door. *Id.* ¶¶ 26, 30.

Although Barrow was advised by defendants Joseph Bellnier, Deputy Commissioner of Program Service; Lieutenant Cory; Captain Harper; Bryan Hilton, Superintendent of Programs; Lisa Kalies, Unit Chief, Office of Mental Health, Residential Mental Health Unit; and B. McArdle, Deputy Superintendent of Marcy, that the lewd conduct program was imposed for security reasons, Barrow contends that he was discriminated against because other inmates who had smuggled in contraband by concealing it in their groin area were not placed into the program. Second Am. Compl. ¶¶ 27–28. Barrow has informed Bellnier; Hilton; and Bob Lewis, OMH Therapist of this claim. *Id.* ¶ 35. Barrow further alleges that the program participants are disproportionately minority inmates. *Id.* at 15. Hilton advised Barrow that the lock prevents him from ripping off the jumpsuit, but also serves to humiliate and "change" his "cognizence [sic]." *Id.* ¶¶ 42–43. Barrow argues that a lock at one's neck is a symbol of hate and oppression of minorities harkening back to times of slavery and racial segregation. *Id.* ¶ 42. Thus, Barrow states that the lewd conduct program is imposed not for security purposes, but to humiliate inmates and deter future exhibitionist conduct. *Id.* ¶¶ 34–35, 43.

On March 28, 2011, Barrow was made to the wear the jumpsuit after being issued a misbehavior report for lewd conduct. Second Am. Compl. ¶ 29. A disciplinary hearing was not held in connection with that report. *Id.* On or about November 10, 2011, Barrow was again ordered to wear the jumpsuit and have the exposer sign hang on his door for thirty days. *Id.* ¶ 30. A disciplinary hearing was held regarding this alleged violation. *Id.* More recently, Barrow was ordered to wear the jumpsuit in January 2013 and from July 17, 2013 to August 17, 2013. *Id.* ¶¶ 31, 71.

In December, 2011, Barrow notified RMHU staff that he had not had a hearing for the March 28, 2011 lewd conduct allegations. Second Am. Compl. ¶ 38. After submitting this complaint, Barrow began to receive more misbehavior reports for lewd conduct. *Id.* ¶ 39. Between September 2008 and May 2011, Barrow had received eighteen misbehavior reports for lewd conduct. Dkt. No. 50, at 23 (CORC Grievance Denial), 26 (same). Barrow also contends that he was issued misbehavior reports for repeatedly requesting a prison transfer and filing sexual harassment charges against staff members. Second Am. Compl. ¶ 41.

**\*6** Barrow complained to defendants Anthony Devitto, Executive Director of Special Programming; Hilton; Michael Hoagan, Deputy Commissioner, Office of Mental Health, DOCCS; Kalies; Charles Kelly, Jr., Superintendent of Marcy; and Lewis that the lewd conduct program violated his rights under the Eighth Amendment and the ADA. [2] Second Am. Compl. ¶ 33. Barrow contends his condition, which he claims to be exhibitionism, is confidential, and only inmates being treated for this condition should be privy to this information. *Id.* He suggests that the sign and jumpsuit deprive him of confidentiality. *Id.*

Barrow is also upset that other inmates and staff ridicule and use racial epithets against him when he is in the jumpsuit. Second Am. Compl. ¶¶ 32–33. Barrow alleged that, on one occasion, in Hilton and Bellnier's presence, several inmates verbally insulted him regarding the jumpsuit, but neither defendant intervened. *Id.* ¶ 32.

Barrow alleges that the lewd conduct program, as applied to him, is over broad because he is required to wear the jumpsuit even when there are no females present, despite the fact that he has no history of lewd conduct toward male employees. Second Am. Compl. ¶ 34. Because Barrow is made to wear the jumpsuit when no females are present, Barrow claims that the jumpsuit is not a security measure. *Id.*

Because he is embarrassed by the jumpsuit, Barrow refused to wear it out of his cell. Second Am. Compl. ¶¶ 39, 42. Barrow is concerned that his absence from programming has adversely affected his parole release date. Second Am. Compl. ¶ 39. He informed defendant Kenneth S. Perlman, Deputy Commissioner of Program Services, of his parole concerns. *Id.* ¶ 59. Due to his refusal to leave his cell in the jumpsuit, Barrow was unable to attend programs or his medical appointments. *Id.* ¶ 36; *see* Dkt. No. 50 at 17–26 (prison documents pertaining to grievances filed and rulings on them). Barrow also contends that because he lacks arches in his feet, he requires the use of a lift in his right shoe, "otherwise [he] is in severe pain up and down the right side of his back." Reply (Dkt. No. 69), at 2. Barrow has been unable to receive medical treatment for his foot because he would not go to his appointments while wearing the jumpsuit. *Id.*

### B. Mental Diagnoses and Treatment

Barrow first arrived at RMHU with diagnoses of major depression and anti-social disorder and has since been diagnosed with poly-substance abuse. Second Am. Compl. ¶ 46. Three of Barrow's urine tests came back positive for cannabis, but he has never tested positive for any other substance; thus, he does not believe that poly-substance abuse is an accurate diagnosis. *Id.* Barrow contends that defendant Dr. Farago, his psychiatrist, attempts to "intellectually badger" him into wearing the jumpsuit; thus, he "only wished to talk about issues related to his profession" during their sessions. *Id.* ¶ 47. Shortly after telling Dr. Farago that he did not wish to discuss the lewd conduct program, Barrow's depression medication, which has been administered to him for approximately fifteen years, was terminated. *Id.* Barrow has since been "begging" for medication. *Id.* ¶ 48.

**\*7** In or around May or June of 2011, Barrow filed a complaint against Dr. Farago to Kalies, stating that Dr. Farago was conducting meetings outside of his cell in violation of his right to privacy. *Id.* ¶ 49. [3] Although Barrow was told that in the future Dr. Farago would hold meetings in private, Dr. Farago would arrive at Barrow's cell, wait for him to get up, then walk away. *Id.* ¶ 50. Kalies indicated that the log book indicates that Barrow was seen by Dr. Farago; however, she did not permit Barrow review of the videotapes of those meetings. *Id.* ¶ 51. Barrow contends that, rather than treat him, Dr. Farago would turn away from the camera and make comical faces at him when he asked for his depression medication. *Id.* ¶ 52. Barrow alleges that defendants Devitto, Hoagan, Kalies, and Lewis were aware of his concerns regarding Dr. Farago because he wrote to them and spoke with them. *Id.* ¶¶ 53–56.

Barrow alleges that the remaining defendants were involved in the alleged constitutional violations in various ways. Bellnier and Hilton initiated the Lewd Conduct Program at Marcy. Second Am. Compl. ¶ 57. Brian Fisher, Commissioner; Holanchuck; and Perlman were aware of Barrow's situation because he sent them letters and spoke with them. *Id.* ¶¶ 58–59, 71. Boll and LeClaire were aware of Barrow's concerns because he talked with them about the lewd conduct program. *Id.* ¶¶ 60, 61. E. Lindquist, Assistant Commissioner in charge of the programs at RMHU, knew about the program. *Id.* ¶ 62. Bellamy affirmed grievance determinations. *Id.* ¶ 63. Maureen Bossco, Executive Director of Central New York Psychiatric Center, and Jeff McKoy, Deputy Commissioner, were aware of the alleged constitutional violations because they spoke with him about the sign. *Id.* ¶ 64. Diane VanBuren, Deputy Commissioner, knew of Barrow's issues at RMHU because of her supervisory status. *Id.* ¶ 70.

Most of the misbehavior reports issued against Barrow were written for exhibitionism, but Barrow was refused treatment for such. Second Am. Compl. ¶¶ 66–68. RMHU had demanded that Barrow attend a sex offender program, but Barrow thinks it is inappropriate for his disorder because the sex offender program focuses on pedophiles and rapists —conduct of which he was never convicted. *Id.* ¶ 69.

Barrow seeks both compensatory damages and injunctive relief. Second Am. Compl. at 16.

## II. Discussion [4]

Barrow contends that defendants violated his: (1) First Amendment rights by retaliating against him for his expression of protected speech; (2) Eighth Amendment rights by (a) subjecting him to cruel and unusual punishment, and (b) denying him medical treatment; (3) Fourteenth Amendment rights by (a) failing to provide him due process prior to imposing the lewd conduct program, (b) treating him differently from similarly-situated inmates, and (c) violating his right to privacy regarding his exhibitionism. Barrow also argues that defendants have violated the ADA and section 504 of the Rehabilitation Act. [5]

### A. Legal Standard

**\*8** Under FED. R. CIV. P. 12(b)(6), a defendant may move to dismiss a complaint for a plaintiff's "failure to state a claim upon which relief can be granted." When considering such a motion, a court must "construe plaintiff['s] complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiff['s] favor." *Selevan v. N.Y. Thruway Auth.,* 584 F.3d 82, 88 (2d Cir.2009). However, this "tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 664, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)) (internal quotation marks and alterations omitted).

Accordingly, to survive a motion to dismiss, a complaint must state a claim for relief that is "plausible on its face." *Iqbal,* 556 U.S. at 678 (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct] ."); *see also Arar v. Ashcroft,* 585 F.3d 559, 569 (2d Cir.2009) (holding that "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible ....") (internal citations omitted). Determining whether plausibility exists is "a content specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 680.

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a pro se litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not consistent with the pro se litigant's allegations or arguments that the submissions themselves do not suggest that we should not excuse frivolous or vexatious filings by pro se litigants, and that pro se status does not exempt a party from compliance with relevant rules of procedural and substantive law ....

*Id.* (internal quotation marks, citations, and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally." (internal citations omitted)).

### B. Personal Involvement

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501

(2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

> **\*9** (1) [T]he defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).[6] Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. *See e.g., Brown v. Artus,* 647 F.Supp.2d 190, 200 (N.D.N.Y.2009).

### 1. Bossco and Fischer

Here, Barrow alleged in a conclusory fashion that Bossco and Fischer were (1) aware at all times of his issues at Marcy and (2) that he spoke to them and sent several letters to them about such issues. Second Am. Compl. ¶¶ 58, 65. The gravamen of Barrow's complaints against these defendants is that they were in a position of power, thus, they were involved with all aspects of his incarceration. Nevertheless, attempts to establish personal involvement based upon the supervisory role that these defendants occupied is inappropriate. *Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003), quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) ("[M]ere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim.").

To the extent that Barrow seeks to establish defendants' knowledge of his complaints through letters, such an attempt must also fail. Until recently, a plaintiff's claim that he or she sent a letter or grievance to a defendant, where the defendant did not take action on the letter or respond, was generally insufficient at the pleading stage to establish notice and personal involvement. *Smart v. Goord,* 441 F.Supp.2d 631, 643 (S.D.N.Y.2006) ( "Commissioner ... cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff] ...."; *but see Boddie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004) ("While mere receipt of a letter from a prisoner is insufficient to establish individual liability ... [p]ersonal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint."). However, the Second Circuit recently concluded that,

> [a]t the pleading state, even if [plaintiff] had no knowledge or information as to what became of his Letter after he sent it, he would be entitled to have the court draw the reasonable inference—if his amended complaint contained factual allegations indicating that the Letter was sent to the Warden at an appropriate address and by appropriate means—that the [defendant] in fact received the Letter, read it, and thereby became aware of the alleged conditions of which [plaintiff] complained

**\*10** *Grullon v. City of New Haven,* 720 F.3d 133, 131 (2d Cir.2013); *see also Toliver v. City of New York,* 530 F. Appx. 90, 93 (2d Cir.2013) (citing *Grullon,* 720 F.3d at 141–42); *Ferrer v. Fischer,* No. 9:13–CV–0031, 2014 WL 1763383 (N.D.N.Y. May 1, 2014). Barrow does not provide sufficient factual detail to support his claim that the letters establish personal involvement. He does not allege that he sent the letters to the proper addresses by appropriate means or that defendants received the letters and read them. Thus, he has not established personal involvement through the sending of letters. *Grullon,* 720 F.3d 133 at 141–42.

Further, although Barrow alleged that he had spoken with the defendants, Barrow does not state when these conversations took place. *Eldridge v. Kenney,* No. 11–CV–6459, 2014 WL 2717982, at \*3 (W.D.N.Y. June 16, 2014) ("While Plaintiff's

Response ... contains references to the ... *Colon* factors, they suffer from the same fatal flaw: they contain nothing more than conclusory statements and formulaic recitations of the *Colon* factors and are wholly unsupported by facts."). Moreover, Barrow presents no factual allegations to support a claim that defendants created a policy or custom under which unconstitutional practices occurred, were grossly negligent in their supervision of subordinates, or exhibited deliberate indifference to Barrow's rights. *Colon,* 58 F.3d at 873. Thus, Barrow has failed to plausibly allege that Bossco or Fischer had personal knowledge of the alleged constitutional violations.

Accordingly, defendants' motion on this ground should be granted.

### 2. Harper, McArdle, and VanBuren

Barrow has also failed to establish personal involvement of Harper, McArdle, and VanBuren in the alleged constitutional violations. Barrow states that VanBuren was aware of the violations because she "was at all times aware of the actions and functions ... at the RMHU." Second Am. Comp. ¶ 70. Similarly, Barrow alleged that Harper knew about all programs at RMHU and, during a conversation, Harper told him that the lewd conduct program was implemented as a security measure. *Id.* ¶¶ 23, 27. Barrow contends that McArdle, as a "higher-up," advised him that the jumpsuit was imposed for security and failed to issue him a review notice for the lewd conduct program. *Id.* ¶¶ 27, 44.

With respect to the alleged conversations with Harper and McArdle, Barrow fails to provide details such as the date and manner of such conversations, rendering his claim insufficient to establish the requisite knowledge for personal involvement. *See Eldridge,* 2014 WL 2717982, at *3 (conclusory allegations are insufficient). Instead, Barrow merely contends that the lewd conduct program was discussed. *See Barnes v. Prack,* No. 11–CV–857, 2012 WL 7761905, at *5 (N.D.N.Y. Sept. 7, 2012) (same). To the extent that Barrow's complaint may suggest that Harper, McArdle, and VanBuren allowed for the continuance of a unconstitutional policy or custom, he does not demonstrate that defendants had investigated the program, were aware of his specific concerns and complaints regarding the jumpsuit and sign, or that they otherwise participated in decision making, policy making, or had any input relating to the alleged constitutional violations.

\*11  Furthermore, as noted, personal involvement cannot be established solely upon a defendant's supervisory role. *Wright,* 21 F.3d at 501. As such, Barrow has failed to plausibly allege the personal involvement of either Harper, McArdle, or VanBuren. Accordingly, defendants' motion on this ground should be granted.

### 3. Holanchuck, Perlman, LeClaire, Boll, and McKoy

Barrow has similarly failed to demonstrate the personal involvement of Holanchuck, Perlman, LeClaire, Boll, and McKoy. Barrow essentially argues that these defendants had personal knowledge of the alleged constitutional violations because (1) he spoke with them about the lewd conduct program and/or its negative effect on him and (2) they held supervisory positions at Marcy yet failed to address his concerns. Specifically, Barrow argues that Holanchuck had personal knowledge of the alleged violations because Barrow "had many talks with Defendant about the violation of plaintiff['s] rights, all to no avail." *Id.* ¶ 71. In response, Holanchuck told him that the lewd conduct program "was being done in other states." *Id.* Barrow also indicates that Holanchuck, as Deputy Commissioner, "was aware of all actions and functions here at the RMHU," and, thus, responsible due to his supervisory position. *Id.*

Barrow contends that LeClaire knew of the alleged violations because "Plaintiff talked to him about the "outright shocking racist presentment of this Lewd Conduct Program." Second Am. Compl. ¶¶ 22, 60. However, Barrow's reference to a conversation with LeClaire wherein he expressed his belief that the lewd conduct program was implemented in a racially-discriminatory manner does not demonstrate that LeClaire was aware of the personal affect the program had on Barrow.

Barrow states that Perlman "knew at all times [about the] situation" as he spoke to Perlman of "the need of programs to gain parole" and, in response, Perlman told him that "he should program in spite of the Control suit." Second Am. Compl. at 59. Barrow also argues that he spoke with Boll "upon visiting the RMHU" and that, as Deputy Commissioner, she "was in [a] position to stop and had the duty to stop the violation of plaintiff['s] 14th and 8th Amendments [sic]" *Id.* ¶ 61. Barrow additionally alleges that he spoke with McKoy about the "exposer" sign, yet McKoy allowed the sign to remain. *Id.* ¶ 64.

Barrow's passing references to conversations he alleges to have had with Holanchuck, Perlman, LeClaire, Boll, and McKoy are insufficient to establish their personal involvement. Barrow fails to specify when he had such discussions with defendants. Further, Barrow's attempts to establish personal involvement based upon the supervisory role the defendants occupied must fail. *Wright,* 21 F.3d at 501.

Accordingly, defendants' motion on this ground should be granted.

### 4. Bellamy

Barrow argues that Bellamy, as Director of the Inmate Grievance Program, violated and was "in gross deliberate indifference to [his] 8th and 14th Amendments [sic]." Second Am. Compl. ¶ 63. He contends that defendant Bellamy was aware of these alleged violations because he "appealed many grievances" to her, which she affirmed. *Id.* Merely affirming the denial of a defendant's grievance is insufficient to establish personal involvement, without more. See *Thomas v. Calero,* 824 F.Supp.2d 488, 505–11 (S.D.N.Y.2011) (concluding that affirming *and modifying* the penalty imposed in an allegedly constitutionally infirm disciplinary proceeding can satisfy the second Colon factor). Moreover, insofar as Barrow appears to claim personal involvement based on defendant's status as a director, this does not establish that she was personally involved with the alleged Eigth Amendment violations. *Wright,* 21 F.3d at 501.

**\*12** Accordingly, defendant's motion on this ground should be granted.

### 5. Lindquist

Barrow argues that Lindquist, due to his supervisory role as Assistant Commissioner, was aware of the Lewd Conduct Program and "the grave harm it was doing" to him. Second Am. Compl. ¶ 62. Inasmuch as Barrow suggests that Lindquist was aware of the alleged violations because of his supervisory position, as noted, attempts to establish personal involvement based upon the supervisory role defendant occupied is inappropriate. *Wright,* 21 F.3d at 501. Barrow further argues that the fourth *Colon* factor is implicated. He contends that Lindquist "was grossly negligent in that he did not adequately supervise the subordinates who violated Plaintiff['s] 14th and 8th Amendment [rights]."

Second Am. Comp. ¶ 62. However, Barrow does not provide any support for his claim that Lindquist negligently supervised his subordinates. Such a conclusory reference to a *Colon* factor is insufficient to support a claim of personal involvement. *Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) ("To the extent that the complaint attempts to assert a failure-to-supervise claim ... [that claim is insufficient where] it lacks any hint that [the supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights." (internal citations omitted)). Inasmuch as Barrow suggests that defendant was aware of the alleged violations because of his supervisory position, as noted, an attempt to establish personal involvement based upon the supervisory role defendant occupied is inappropriate. *Wright,* 21 F.3d at 501.

Accordingly, defendant's motion on this ground should be granted.

### C. Eleventh Amendment

Barrow brings all claims against all defendants in their official and individual capacities. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. AMEND. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21, 10 S.Ct. 504, 33 L.Ed. 842 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340–41, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (citing *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)). "Thus, while an award of damages against an

official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Insofar as Barrow demands money damages against defendants in their official capacities for acts occurring within the scope of their duties with DOCCS, these claims are barred by the Eleventh Amendment. *Id.* at 169.

**\*13** Accordingly, Barrow's claims for money damages pursuant to section 1983 against all defendants in their official capacities should be dismissed.

### D. First Amendment

Barrow argues that expressing his concern over the lewd conduct program, requesting prison transfers, and filing sexual harassment charges against staff members is protected speech, and defendants filed false misbehavior reports against him in retaliation for his exercise of this speech.

Courts are to "approach [First Amendment] retaliation claims by prisoners with skepticism and particular care." *See e.g., Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema, NA,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). A retaliation claim under section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. *Ashcroft,* 556 U.S. at 678; *South Cherry St. LLC v. Hennessee Group LLC,* 573 F.3d 98, 110 (2d Cir.2009). However, a retaliation claim may survive a defendant's motion to dismiss if a plaintiff alleges facts tending to establish that "(1) the speech or conduct that led to the allegedly retaliatory conduct is the sort of speech or conduct that is protected by the Constitution; (2) defendant(s) took adverse action against the plaintiff; and (3) there is a causal connection between the protected speech or activity and the adverse action." *See Jones v. Harris,* 665 F.Supp.2d 384, 398 (S.D.N.Y.2009). Adverse action has been defined objectively as retaliatory conduct "that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004). Further, an inmate has no general constitutional right to be free from being falsely accused in a misbehavior report. *Boddie v. Schenider,* 105 F.3d 857, 862 (2d Cir.1997). Thus, to the extent that a plaintiff seeks damages because "he was subjected to an accusation that turned out not to stand up under scrutiny," such would not be an actionable claim under section 1983. *Jones v. Harris,* 665 F.Supp.2d 384, 400 (S.D.N.Y.2009).

Thus, Barrow fails to present a prima facie claim for a violation of his First Amendment rights.

First, it does not appear that Barrow's transfer requests were constitutionally-protected speech as an inmate has no constitutional right to be housed in a facility of his choosing. *See generally, McMahon v. Fischer,* 446 Fed. Appx. 354 (2d Cir.2011) ("A prisoner has no right to housing in a particular facility"). Although complaining about the lewd conduct program and filing good-faith sexual harassment charges are constitutionally-protected activities (*Carl v. Dirie,* No. 9:09–CV–724, 2010 WL 3338566 at *5 (N.D.N.Y. Mar.29, 2010) (quoting *United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n,* 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967) ("The Supreme Court has noted that the right to petition government for redress of grievances is 'among the most precious of the liberties safeguarded by the Bill of Rights' ")), Barrow's claim is wholly conclusory. He does not state which of the named defendants filed misbehavior reports against him, when most of these alleged misbehavior reports were filed, the temporal proximity between the constitutionally-protected behaviors and the misbehavior reports, the prison rule violations with which he was charged, or whether any action was taken as a result of the misbehavior reports filed against him. Second Am. Compl. ¶ 41; *cf. Shaheen v. McIntyre,* No. 9:05–CV–0173, 2007 WL 3274835 at *9 (N.D.N.Y. Nov.5, 2007) (plaintiff demonstrated adverse action was taken by contending misbehavior reports were filed against him in retaliation of his exercise of speech, resulting in several days of keeplock confinement); *see also Mateo v. Fischer,* 682 F.Supp.2d 423, 435 (S.D.N.Y.2010) (filing of misbehavior report one day after prisoner filed sexual harassment grievance against corrections officer was sufficiently close in time to support causation element in retaliation claim). Furthermore, because Barrow does not specify which charges were filed against him in the misbehavior reports, he fails to demonstrate that the issuance of misbehavior reports was causally connected to his protected speech rather than an actual violation of prison rules. [7] *See Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (When it is undisputed that an inmate committed the prohibited conduct, no retaliatory discipline claim can be sustained)).

**\*14** Although Barrow contends that, "[w]hen and if [he] gets his day in Court, records of inmates misbehavior reports can easily inform the Courts of any information it may need," his conclusory claims as presented in his complaint are insufficient to withstand a motion to dismiss. Reply, at 3; *DeLeon v. Wright,* No. 10–CV–863, 2012 WL 3264932, at *7 (N.D.N.Y. July 5, 2012) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)* ("[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone")).

Accordingly, defendants' motion on this ground should be granted.

### E. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. CONST. AMEND. VIII. The prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834 & 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). A viable Eighth Amendment claim is twofold; the plaintiff must demonstrate both objective and subjective components. The objective question asks whether the deprivation of which the inmate complains was sufficiently serious. *Farmer,* 511 U.S. at 834. This component "requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk. Thus, the prisoner must show that "the risk of which he complains is not one that today's society chooses to tolerate." *Helling v. McKinney,* 509 U.S. 25, 36, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). The subjective component requires the inmate to show that the defendant demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Farmer,* 511 U.S. at 834.[8] Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

The Supreme Court has held that "[p]rison administrators ... be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security ." *Whitley v. Albers,* 475 U.S. 312, 321–22, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (internal quotation marks and citation omitted). However, although "the determination of what punishment is effective and fair considering the nature of the offense and the character of the offender ordinarily should be left to the informed judgment of prison authorities ... [d]isciplinary measures that violate civilized standards of human decency are proscribed." *LaReau v. MacDougall,* 473 F.2d 974, 978 (2d Cir.1972).

### 1. Conditions of Confinement

**\*15** Addressing the objective component of the analysis, the alleged deprivation Barrow raises appears to raise is his denial of right to be free from humiliation, shaming, and verbal harassment from other inmates and staff. Barrow argues that he was subjected to cruel and unusual punishment because defendants forced him to wear the jumpsuit and have the exposer sign positioned above his cell door as a means to humiliate him and to perpetuate racism, rather than for genuine security concerns. Second Am. Compl. ¶¶ 34, 43, at 15. Barrow also contends that the jumpsuit makes him a target for verbal assaults and racially-fueled remarks from other inmates and staff. *Id.* at 15; Reply at 4. Barrow appears to argue that because the lock symbolizes oppression of African–Americans, being forced to wear it causes him grave harm, such as stress, reduced self-esteem, and "depression brought on top of [the] normal depression Plaintiff suffers from." Second Am. Compl. ¶ 40. Finally, Barrow states that the weight of the lock on the back of the jumpsuit requires him to continuously adjust the collar of the jumpsuit to "keep from being slowly choked." Reply at 1–2.

Barrow does not provide the names of any staff members who have verbally assaulted him while he was in the jumpsuit. Although Barrow states that defendants Bellnier and Hilton failed to intervene on one occasion where he was being harassed by inmates in their presence (Second Am. Comp. ¶ 32), there is no constitutional right to be free from verbal assault. *Lunney v. Brureton,* No. 04–Civ.–2438, 2005 WL 121720, at *11 (S.D.N.Y. Jan.21, 2005) ("general allegations of threats and harassment are insufficient to state a claim because comments that are merely insulting or disrespectful do not give rise to a constitutional violation") (internal citations and quotation marks omitted); *see also Cuoco v. Mortisugu,* 222 F.3d 99, 109 (2d Cir.2000). Thus, although

infliction of mental anguish may sometimes rise to the level of cruel and unusual punishment (*see e.g. Hudson v. McMillian, 503 U.S. 1, 16, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)* (Blackmun, J., concurring)), it appears that the racially-fueled harassment Barrow has faced from fellow inmates and some staff while wearing the jumpsuit—even if it impacts his depression and lowers his self-esteem—does not amount to a disregard of an "excessive risk" to his safety and health. *Farmer,* 511 U.S. at 837; *Jabbar v. Fischer,* 683 F.3d 54, 57 (2d Cir.2012).

Further, the physical discomfort of the lock pulling on the collar of the jumpsuit appears to be little more than an annoyance that is easily alleviated by adjusting the collar. There is no evidence that the padlock poses an excessive risk of serious injury. A *de minimus* discomfort is not a violation of an inmate's Eighth Amendment rights. *See e.g. Kearney v. N.Y.S. D.O.C.S.,* No. 9:11–CV–1281, 2013 WL 5437372, at *12–13 (N.D.N.Y. Sept.27, 2013) (a long walk to recreational yard, which caused discomfort for mobility-impaired inmate, along with bathroom facilities that required the plaintiff to lean in uncomfortable manner while using them, were not sufficient to rise to Eighth Amendment violations).

**\*16** Accordingly, defendants' motion to dismiss on this ground should be granted.

## 2. Medical Indifference

Next, Barrow appears to contend that he was denied access to adequate medical care because (1) he was denied treatment for exhibitionism, (2) Dr. Farago refused to provide him with treatment for depression, (3) he was refused his depression medication, and (4) he was unable to attend medical appointments for a foot condition.

The Eighth Amendment extends to the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). " 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). What constitutes a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition

significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185. In claims for inadequate medical care, to satisfy the subjective component, the plaintiff must prove that defendant acted with deliberate indifference. Deliberate indifference requires the plaintiff "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance,* 143 F.3d at 703.

## a. Denial of treatment for Exhibitionism

Barrow contends that, despite the fact that most of the misbehavior reports filed against him are for exhibitionism, defendants have "refused to treat Plaintiff for the disorder." Second Am. Comp. ¶ 67. Assuming Barrow can establish that he suffers from exhibitionism, he must demonstrate that "a reasonable doctor or patient would find it important and worthy of comment," that the condition significantly affects his daily activities, or the condition causes him chronic and substantial pain. *Chance,* 143 F.3d at 702 (internal quotation marks and brackets omitted). Although Barrow alleges that being made to wear the jumpsuit significantly impacts his daily activities, he does not demonstrate that the condition of exhibitionism itself significantly affects his daily activities or causes him chronic and substantial pain. *Id.* Although Barrow suggests that exhibitionism is "a living hell," he alleges that he was able to attend medical appointments without having any incidents of exposure; does not display exhibitionist tendencies toward males, and notes that there are often no females near him; and that he functions in the prison community for months at a time without lewd conduct infractions. Second Am. Compl. ¶¶ 34, 41–42; Dkt. No. 50, at 17; *Id.* at 25. Moreover, Barrow does not contend what harm, if any, the alleged inadequacy in treatment has caused or will likely cause him, beyond noting that a lack of programming has negatively impacted his parole date. [9] *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006) (in determining whether a condition is sufficiently serious, a

court is to examine how the omission in medical treatment has caused, or will likely cause, harm to inmate).

**\*17** Even assuming exhibitionism is a sufficiently serious medical condition, Barrow fails to demonstrate that defendants acted with deliberate indifference to his exhibitionism. Although Barrow contends that he was intentionally denied programming and treatment for exhibitionism, as he was only offered sex offender programming, he did not demonstrate that the programming offered had no relevance to his alleged conditions. Further, insofar as could be discerned, at some point, defendant Farago attempted to discuss the jumpsuit and lewd conduct program with Barrow, but Barrow refused to discuss it. *Id.* ¶ 47. Disagreement over the appropriate programming is an insufficient basis for a section 1983 claim, so long as the treatment offered is adequate. *Chance,* 143 F.3d 698 at 703. Moreover, to the extent that Barrow contends that he was denied access to all programming at Marcy, Barrow refused to leave his cell because of the jumpsuit. Second Am. Compl. ¶ 39, 42. Thus, any denial of programming was a direct result of his refusal to leave his cell.

Accordingly, defendants motion, insofar as it seeks to dismiss the claim of medical indifference to Barrow's exhibitionism should be granted.

### b. Denial of treatment for depression

Barrow also contends that he was denied treatment for depression in violation of the Eighth Amendment. Little case law exists discussing whether depression is a sufficiently serious medical condition for Eighth Amendment purposes; however, it appears that mental disorders are considered serious medical needs. *See generally Zimmerman v. Burge,* No. 06–CV–80, 2009 WL 9054936, at \*6 (N.D.N.Y. Apr. 20, 2009), "treatment of mental disorders of mentally disturbed inmates is ... a serious medical need"; *Hamilton v. Smith,* No. 06–CV–805, 2009 WL 3199531, at \*14 (N.D.N.Y. Jan. 13, 2009) (same). Although Barrow provides little insight into the severity of his depression and how it impacts his daily activities, he contends that he received treatment and was medicated to alleviate these mental health symptoms for fifteen years. Second Am. Compl. ¶ 47. Taking these allegations as true, Barrow has alleged a sufficiently serious medical need as it necessitated medical and pharmacological intervention for a sustained and continuous period of time. Such a condition was clearly "perceived by a reasonable

physician as important and worthy of comment ...." *Randle v. Alexander,* 940 F. Supp 457, 481 (S.D.N.Y.2013) (internal quotation marks and citation omitted). Thus, Barrow has satisfied the first prong of the Eighth Amendment analysis.

Next, Barrow must demonstrate defendants' deliberate indifference to his depression. Barrow states that he was denied therapy because defendant Farago pretended to treat him cell-side. Farago would "come to [Barrow's] cell, wait for [him] to get up to come to the gate and then walk away." Second Am. Compl. ¶¶ 50–51. Further, Barrow states that Farago "changed" his diagnosis of Major Depressive disorder and Anti-social disorder to poly-substance abuse, despite having only three positive urinalysis tests for cannabis in the past 15 years. *Id.* at 46. Farago also stopped providing Barrow's depression medication, which he had been taking for over 15 years. *Id.* ¶ 46. When Barrow "begged" for his medication, Farago would make "comical faces" at him while facing away from the camera. *Id.* ¶ 52. Assuming Barrow has a current diagnosis of depression and that the allegations against Farago are true, a complete denial of therapy and sudden cessation of medication that he had been taking for fifteen years could pose a risk of serious harm to his mental well-being. *Brock,* 315 F.3d at 162–63.

**\*18** Accordingly, defendants' motion to dismiss the medical indifference claim relating to the denial of treatment for depression, should be denied.

### 3. Denial of treatment for foot arches

Insofar as Barrow argues that defendants denied his access to medical treatment for his foot arches, this claim must fail. Even assuming Barrow's need for use of a shoe lift is a serious medical condition, Barrow was not denied medical treatment for his foot condition due to defendants' deliberate indifference to the condition, but for his choice to remain in his cell, rather than attend his appointment in the jumpsuit. *See generally Hardy v. Diaz,* No. 9:08–CV–1352, 2010 WL 1633379, at \*6 n. 12 (N.D.N.Y. Mar.30, 2010) (noting that skipping medical appointments and failing to comply with treatment directions can undermine an Eighth Amendment medical indifference claim).

Accordingly, any claim against defendants for a denial of treatment for Barrow's foot condition should be dismissed.

### F. **Fourteenth Amendment**

#### 1. **Procedural Due Process Claim**

Barrow argues that he was denied procedural due process because he was required to wear the jumpsuit after a lewd conduct misbehavior report was filed against him, but before a disciplinary hearing was held. Insofar as can be ascertained from his complaint, although a disciplinary hearing was held on at least one of the misbehavior reports, the lewd conduct program was never discussed as a part of his punishment. Second Am. Comp. ¶ 30.

To prevail on a procedural due process claim, "a plaintiff must demonstrate that he possessed a protected liberty or property interest, and that he was deprived of that interest without due process." *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998). However, the Supreme Court has held that such liberty interests protected by the Fourteenth Amendment "will be generally limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Marino v. Klages,* 973 F.Supp. 275 (N.D.N.Y.1997).

Here, Barrow fails to demonstrate that he was deprived of a cognizable liberty interest. Although Barrow states that he was held in his cell for a collective period of at least three months, he concedes that he independently made the conscious decision to refuse to leave his cell even though defendants permitted him to leave his cell in the jumpsuit. Barrow does not allege that he was otherwise restrained while wearing the jumpsuit. Similarly, defendants did not prevent him from attending programs while he was wearing the jumpsuit. In his grievance, which is incorporated by reference, Barrow states that he was offered the option of being "bonded to the restart chair, in 4 points" as an alternative to attending programming in the jumpsuit; however, he rejected this option as a "baric [sic] medieval form of bondage and sadism." Dkt. No. 50, at 25. Any lack of access to programming or services was self-imposed. [10] Thus, although Barrow was embarrassed by the jumpsuit and faced verbal harassment when he wore it, defendants were not physically restraining or otherwise limiting Barrow's movement. Therefore, Barrow failed to demonstrate that the jumpsuit imposed an "atypical and significant hardship ... in

relation to the ordinary incidents of prison life." *Sandin,* 585 U.S. at 484.

**\*19** Additionally, although Barrow may not have been granted a hearing before the imposition of the lewd conduct program, it appears that the jumpsuit and sign were implemented as a necessary security measure. Here, defendants are charged with the responsibility of ensuring the safety of the prison staff, personnel, visitors, and inmates. "A prison regulation that inadvertently impinges on prisoners' constitutional rights is valid " 'if it is reasonably related to legitimate penological interests,' such as 'deterrence of crime, rehabilitation of prisoners, and institutional security' " *Davis v. City of New York,* 142 F.Supp.2d 461, 463 (S.D.N.Y.2001) (quoting *Turner v. Safley,* 482 U.S. 78, 79, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). Because the jumpsuit and sign serve to prevent inmates with a history of exposure and public masturbation from committing such acts, and Barrow has an extensive history of such conduct, Barrow fails to create an issue of fact as to whether defendants were deliberately indifferent to a serious risk of harm when requiring his participation in the lewd conduct program. *Whitley,* 475 U.S. at 319. Barrow admitted that he has exposed himself repeatedly, and that this is a "compolsive [sic] habit." Dkt. No. 50, at 25. Thus, even assuming that Barrow had a protected liberty interest, legitimate security concerns outweigh this interest. *Id.; Turner,* 482 U.S. at 79.

Accordingly, defendants motion to dismiss the complaint on these grounds should be granted.

#### 2. **Right to Privacy**

Finally, Barrow argues that defendants violated his right to privacy. The basis for Barrow's claim on this ground is that the jumpsuit and sign expose his medical condition to other inmates, visitors, and prison personnel. It is not clear whether he raises this claim under the Eighth or Fourteenth Amendment. Second Am. Compl. ¶ 33; Reply, at 4. Generally, the right to privacy is based on the "Fourteenth Amendment's concept of personal liberty and restrictions upon state action," (*Whalen v. Roe,* 429 U.S. 586, 598 n. 23 (1977); *Nolley v. County of Erie,* 776 F.Supp. 715, 729 (W.D.N.Y.1991)); however, claims relating to the disclosure of confidential medical information have also been reviewed under the Eighth Amendment. [11] *See generally Rodriguez v. Ames,* 287 F.Supp.2d 213, 218–21 (S.D.N.Y.2003). The Supreme Court has recognized "that there exists in the

United States Constitution a right to privacy protecting 'the individual interest in avoiding disclosure of personal matters,' " including " 'the right to protection regarding information about the state of one's health.' " *Powell v. Schriver,* 175 F.3d 107, 111 (2d Cir.1999) (quoting *Whalen,* 429 U.S. at 599). An inmate may prove a constitutional entitlement to protection from needless disclosure of a private medical condition if he demonstrates that (1) he suffers from an unusual or sensitive medical condition; and (2) if such condition were disclosed unnecessarily, he could be subjected to discrimination, intolerance, or violence. *Id.* at 111. The interest an inmate has in the privacy of his or her medical condition varies, depending on the condition. *Williams v. Perlman,* No. 9:06–CV–00936, 2009 WL 1652193, at *10–11 (N.D.N.Y. Feb.5, 2009) (citing *Rodriguez,* 287 F.Supp.2d at 229 (holding no qualified right to privacy in inmate's psychiatric condition and treatment)). Although disclosure of such a medical condition may, in some circumstances, be viewed as reasonably related to legitimate penological concerns, gratuitous disclosure may be a violation of privacy. *Id.* at 111–12 (discussing that disclosure of private medical condition for purpose of humor and gossip serves no legitimate penological interest and violates inmate's constitutional right to privacy).

### a. Fourteenth Amendment Right to Privacy

**\*20** Here, assuming Barrow can prove that he has been diagnosed with exhibitionism, he fails to demonstrate that exhibitionism is a condition on-par with HIV or transsexualism—conditions that other courts have found sufficient to trigger a constitutional right to privacy. *Compare Powell,* 175 F.2d at 112–13 (transsexualism protected); *Doe v. City of New York,* 15 F.3d 264, 266–67 (2d Cir.1994) (HIV-positive status protected); *Fleming v. State Univ. of New York,* 502 F.Supp.2d 324, 343 (E.D.N.Y.2007) (sickle cell amenia protected), *with Hamilton v. Smith,* No. 9:06–CV–805, 2009 WL 3199531, at *15 (N.D.N.Y. Jan.13, 2009), *adopted as modified by* 2009 WL 3199520 (N.D.N.Y. Sept.30, 2009) (Hepatitis A not protected), *and Wilson v. Brock,* No. 9:06–CV–528, 2008 WL 4239564, at *5 (participation in drug or alcohol rehabilitation not protected). Further, Barrow has not plausibly demonstrated that the prison community's knowledge of this condition could lead to discrimination, intolerance, or violence. *Powell,* 175 F.3d at 111. Although Barrow contends that he has suffered discrimination, harassment, and intolerance from fellow inmates, as noted, his complaint attributes this disparate treatment to the racist sentiment that the lock on the jumpsuit triggers, not the condition of exhibitionism itself. Second Am. Compl. at 15. Thus, although exhibitionism could arguably be considered sensitive medical information due to the nature of the condition, because Barrow has not demonstrated that he faced or would likely face harm as a direct result of public knowledge of his alleged condition, he has failed to plausibly argue that defendants violated a constitutional right by revealing this condition to others through use of the lewd conduct program. *Cf. Powell,* 175 F.3d at 112 (disclosure of inmate's status as transsexual and HIV positive could place inmate at risk "especially given that, in the sexually charged atmosphere of most prison settings, such disclosure might lead to inmate-on-inmate violence.").

Additionally, although the lewd conduct program reveals to the prison community the fact that the Barrow exposes himself, Barrow does not demonstrate that the program is needless. Defendants have demonstrated that there are significant penological interests in the sign and jumpsuit —to prevent Barrow from exposing himself and to warn others of his proclivity to do so, which, as Barrow stated, is a compulsive behavior. Dkt. No. 50, at 25. When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if reasonably related to legitimate penological interests. *Turner,* 482 at 89. *Turner* identified four factors to consider in making this determination:

> First, there must be a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it .... Moreover, the governmental interest must be a legitimate and neutral one .... A second factor ... is whether there are alternative means of exercising the right that remain open to prison inmates .... A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally .... Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation .... By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable ....

**\*21**  482 U.S. at 89–90 (quoting *Block,* 468 U.S. at 586).

Under the *Turner* analyis, it is clear that there is a valid and logical connection between mandating that offending inmates wear the jumpsuit—the inhibition and prevention of an inmate's ability to expose himself—and the prison's interest in maintaining institutional safety and security—preventing offending inmates from engaging in hostile, harassing, or sexually abusive behaviors in the prison community. *Id.* Next, there does not appear to be a less restrictive alternative to the jumpsuit. Absent the jumpsuit, in order to control compulsive acts of exposure and public masturbation, prisons would presumably have to resort to segregation or isolation of these inmates. *Id.* Segregation and isolation is not preferable to the lewd conduct program, which allows inmates to remain a part of the general prison population. In addition, the lewd conduct program as a *de minimus* impact on participating inmates. Although there exists a relatively minor discomfort for inmates, as discussed *supra,* the inmates are not restricted in their movement. Further, this ability to manage the conduct of inmates who demonstrate exhibitionist behavior, prison guards and other inmates would remain at risk of being subjected to this sexual misconduct. *Id.* Thus, for the reasons previously discussed, because the lewd conduct program is reasonable and there are no less restrictive "ready alternatives," the lewd conduct program is valid. *Id.* at 90.

Accordingly, defendants' motion to dismiss under the due process clause of the Fourteenth Amendment should be granted.

### b. Eighth Amendment Right to Privacy

Barrow also appears to argue that he was denied his right to privacy of his exhibitionism under the Eighth Amendment. As noted, it does not appear that Barrow's claim of exhibitionism demonstrates a sufficiently serious medical need. However, even if this condition constituted a serious medical need, the disclosure of the fact that Barrow exposes himself does not constitute deliberate indifference. As these measures were put in place to restrict Barrow's ability to expose himself and warn and protect others from being victimized this conduct, the lewd conduct program was limited enough in scope and purpose. *See generally Hamilton,* 2009 WL 3199531, at *15 (disclosure of medical condition was not deliberate indifference where disclosures were limited in scope and purpose and were necessary to investigate a grievance).

Accordingly, defendants motion to dismiss should be granted on this ground.

### 2. Equal Protection

Barrow argues that he was denied equal protection because (1) inmates who have smuggled in drugs or weapons in their groin did not have to wear the jumpsuit, (2) inmates who kick or spit on staff are not made to wear relevant restrictive devices, and (3) a disproportionate number of minorities were made to participate in the lewd conduct program.

**\*22**  To establish an equal protection violation, a plaintiff must show that "he was treated differently than others similarly situated as the result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). Barrow fails to demonstrate that similarly-situated inmates are treated differently. Despite Barrow's contention, inmates who have smuggled in drugs or weapons in their groin-area are not similarly situated to Barrow. Similarly, inmates who spit on or kick staff are also not similarly situated to him. Although inmates who smuggle in contraband by concealing it in their groin may pose a security risk, this risk differs from that presented by an inmate who compulsively exposes his genitals to staff, visitors, and other inmates. As such, those inmates do not necessarily require the same security measures to be taken. Because Barrow does not argue that other inmates who have exposed themselves were excused from participation in the lewd conduct program, he has failed to state a claim for an equal protection violation. *See Id.*

Finally, Barrow fails to plausibly argue that the lewd conduct program is intentionally made up of a disproportionate number of minorities. Reading the facts in the light most favorable to him, Barrow presents no evidence to support his argument that racial minorities who have exposed themselves are being treated differently from Caucasian or other inmates who have committed the same lewd conduct infractions. *See Id.* at 129 (2d Cir.2005) ("[t]o prove a violation of the Equal Protection Clause ... a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional discrimination").

Accordingly, defendants' motion to dismiss on this ground should be granted.

### G. Americans with Disabilities Act and Rehabilitation Act

Barrow argues that defendants violated the ADA and RA because the lewd conduct program improperly exposes his medical condition—exhibitionism—to members of the prison community. Second Am. Compl. ¶ 33. He contends that the lack of confidentiality regarding his exhibitionism has resulted in "scorn and ridicule and verbal assaults of all kind [sic]." *Id.* It appears that Barrow contends that the denial of programming or treatment for his exhibitionism also violates the ADA and RA.

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of ... a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To state a claim under Title II of the ADA, an inmate must demonstrate that:

> (1) he or she is a "qualified individual with a disability"; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) [the facility that] provides the service, program or activity is a public entity

**\*23** *Byng v. Campbell,* No. 907–CV–471, 2010 WL 681374, at \* 17 (quoting *Clarkson v. Coughlin,* 898 F.Supp. 1019, 1037 (S.D.N.Y.1995)); 42 U.S.C. § 12132. Similarly, the RA applies to any "qualified individual with a disability" and protects that individual from being "excluded from the participation in, ... [or] denied the benefits of," any federally-funded program "solely by reason of his or her disability ...." 29 U.S.C. § 794(a); *see also Clarkson,* 898 F.Supp. at 1037–38 ("The requirements for stating a claim under the ADA are virtually identical to those under § 504 of the Rehabilitation Act").

For multiple reasons, Barrow fails to plausibly state a claim. First, Barrow cannot satisfy the first prong of the analysis. Barrow contends that his disability is exhibitionism; however, Barrow presents no evidence that his exhibitionism is anything other than self-diagnosed. The complaint provides that his diagnosed conditions were major depressive disorder, anti-social disorder, and poly-substance abuse. Second Am. Compl. ¶ 46. Moreover, exhibitionism is specifically excluded from consideration as a disability under the ADA. 42 USC § 12211(b)(1). Thus, Barrow is not a qualified individual with a disability.

Further, Barrow does not establish the second prong—he does not allege that he was excluded from a service or program at Marcy due to his alleged exhibitionism or any of his diagnosed conditions. *Carrasquillo v. City of New York,* 324 F.Supp.2d 428, 443 (S.D.N.Y.2003). As noted, Barrow states that he was not denied access to programming and medical trips because of lewd conduct, but because he refused to leave his cell while wearing the jumpsuit. Second Amend. Compl. ¶ 39. [12] Barrow's choice not to participate in the programming and services made available to him cannot now be transformed into unlawful acts by defendants serving as a basis for liability.

Accordingly, defendants' motion to dismiss on these grounds should be granted.

### III. Conclusion

**WHEREFORE,** based on the findings set forth above, it is hereby:

1. **RECOMMENDED,** that Defendants' motion to dismiss for failure to state a cause of action (Dkt. No 67) be **GRANTED** as to plaintiff's:

a. First Amendment claims;

b. Eighth Amendment claim insofar as it alleged inadequate prison conditions;

c. Eighth Amendment claim insofar as it alleged inadequate treatment and deliberate indifference to plaintiff's exhibitionism and foot condition;

d. Fourteenth Amendment claims;

e. ADA claim;

f. RA claim; and

g. 11th Amendment claim;

2. Further **RECOMMENDED** that Defendants' motion to dismiss for failure to state a cause of action (Dkt. No. 7) be **DENIED** as to plaintiff's:

> a. Eighth Amendment deliberate indifference claim, regarding the condition of depression;

3. Further **RECOMMENDED,** that Defendants' motion to dismiss for lack of subject matter jurisdiction (Dkt. No. 67) be dismissed as no arguments were made in support of this motion.

**\*24 ORDERED,** that copies of this Report–Recommendation and Order be served on the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

**SO ORDERED.**

Dated: September 25, 2014.

**All Citations**

Slip Copy, 2015 WL 417084

Footnotes

1　This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2　Barrow also alleges that his rights were violated under the Patients' Bill of Rights. Second Am. Compl. ¶ 33. However, a violation of state law does not implicate a federal right for purposes of a section 1983 action. *Hanrahan v. Menon,* No. 07–CV–610, 2010 WL 6427650, at *13 (N.D.N.Y. Dec.15, 2010) (citations omitted) (finding claim of a violation under the Patients' Bill of Rights is not cognizable in a section 1983 action).

3　To the extent that it can be inferred that Barrow asserts a violation of the physician-patient privilege, such a claim cannot be sustained. Because Barrow commenced this case as a section 1983 action, federal law applies. As federal law does not recognize the physician-patient privilege, this claim would also fail. *Barnes v. Glennon,* 9:05–CV–0153, 2006 WL 2811821, at *4–*5 (N.D.N.Y. Sept.28, 2006).

4　Barrow does not specify which defendants have personal knowledge of each alleged constitutional violations. It appears that Barrow intends to argue that each defendant had personal knowledge of each alleged constitutional violation (*see* Second Am. Compl. at 15 ("All defendants mentioned in these papers ... has [sic] caused Plaintiff ... to be deprived of the 14th and 8th amendment rights secured by the U.S.A. [C]onstitution. Also, the A.D.A. [t]itle II and section 504 of the Rehabilitation Act")). Where Barrow does not identify which defendants he brings each cause of action against, unless otherwise indicated, this report assumes that Barrow is alleging personal involvement of each constitutional violation upon each defendant.

5　All unpublished decisions are attached to this Report and Recommendation.

6　Various courts in the Second Circuit have postulated how, if at all, the *Iqbal* decision has affected the five *Colon* factors which were traditionally used to determine personal involvement. *Pearce v. Estate of Longo,* 766 F.Supp.2d 367, 376 (N.D.N.Y.2011), *rev'd in part on other grounds sub nom., Pearce v. Labella,* 473 F. App'x 16 (2d Cir.2012) (recognizing that several district courts in the Second Circuit have debated *Iqbal's* impact on the five *Colon* factors); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175, 182 (W.D.N.Y.2010) (holding that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster ...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that *Iqbal* eliminated *Colon's* personal involvement standard).

7　Indeed, Barrow concedes that he has had incidents of exposure while incarcerated. Dkt. No. 50, at 18.

8　The United States Supreme Court has held that "[w]hether one characterizes the treatment received by [the prisoner] as inhumane conditions of confinement, failure to attend to his medical needs, or a combination of both, it is appropriate to apply the 'deliberate indifference' standard articulated in *Estelle [v. Gamble]." Wilson v. Seiter,* 501 U.S. 294, 303, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

9　Barrow did not include a claim regarding any of his parole concerns in the instant complaint. Even if he had, such claims should be dismissed. The Supreme Court has held that

while there is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence, a state's authority scheme, if it uses mandatory language, creates a presumption that parole release will be granted when or unless certain designated findings are made, and thereby gives rise to a constitutional liberty interest.

*Robles v. Dennison,* 745 F.Supp.2d 244, 263 (W.D.N.Y.2010) (citing *Greenholtz v. Inmates of the Nebraska Penal and Corr. Complex,* 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979); *Board of Pardons v. Allen,* 482 U.S. 369, 371, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987)). The Second Circuit has determined that because New York's parole scheme delegates discretion to the Parole Board in granting an inmate parole, that scheme does not create a due process liberty interest in parole. *Barna v. Travis,* 239 F.3d 169, 170–71 (2d Cir.2001) (citing *Greenholtz,* 442 U.S. at 11–13). Because Barrow cannot allege that he has a liberty interest in his parole, to the extent that he has attempted, he has failed to state a due process claim.

10   Insofar as Barrow complains that his failure to attend programming negatively impacted his parole date, as noted (*supra* n. 8), even if this statement were sufficient to raise a denial of a liberty interest claim, such claim must fail, as there is no due process interest in parole. *See Barna,* 239 F.3d at 170–71.

11   To avoid repetition or confusion, to the extent Barrow may raise privacy claims under both the Eighth and Fourteenth Amendment, they will both be discussed in this section of the Report.

12   Even assuming Barrow alleged sufficient facts to state a claim under the ADA or RA, the individual defendants cannot be held liable for a violation of the ADA or RA. *See Lee v. City of Syracuse,* 603 F.Supp.2d 417, 448 (N.D.N.Y.2009).

---

    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** Hart v. City of New York, S.D.N.Y., November 18, 2013

2003 WL 21058177
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Ronald D. BOURDON, Plaintiff,
v.
Frank RONEY, New York State Trooper;
Alfonso Ortega, New York State Trooper;
William McEvoy, New York State Trooper; Dean
Edwards, New York State Trooper; Anthony
Larock, New York State Trooper; and Jeffrey
Dorward, New York State Trooper; Defendants.

No. 9:99–CV–0769(LEK)GLS.
|
March 6, 2003.

**Attorneys and Law Firms**

Ronald Bourdon, Auburn Correctional Facility, Auburn, NY, Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General of the State of New York, Department of Law, The Capitol, Albany, New York, for the Defendants.

Roger W. Kinsey, Asst. Attorney General, of counsel.

*REPORT–RECOMMENDATION and ORDER*

SHARPE, Magistrate J.

**\*1** This matter was referred to the undersigned for Report–Recommendation by the Honorable Lawrence E. Kahn, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rules N.D.N.Y. 72.3(c).

Plaintiff, *pro se* Ronald Bourdon ("Bourdon") alleges in his amended complaint that the defendants conspired to fabricate false evidence against him for the purpose of obtaining an "unlawful search warrant," destroying exculpatory evidence, and conducting an illegal search of his property. Bourdon also claims that the defendants used excessive force against him in the course of his arrest and subsequent interrogation, all in violation of his constitutional rights (*Dkt. No. 9; Am. Compl.*). Bourdon seeks substantial monetary damages.

Presently before the court is the defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 (*Dkt. No. 48* ). Bourdon filed a response (*Dkt. No. 72* ). For the following reasons, this court recommends that summary judgment be granted in part and denied in part.

I. *Summary Judgment Standard*

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. Fed.R.Civ.P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see also, Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2502, 2510, 91 L.Ed.2d 202 (1986). At that point, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.*

II. *Background*

Bourdon filed the present action on May 14, 1999. By Order filed August 11, 1999 ("August order"), District Judge Lawrence E. Kahn dismissed this action unless Bourdon filed an amended complaint within thirty days of the August order (*Dkt. No. 4* ). Bourdon did not file an amended complaint. Bourdon appealed the August order to the Second Circuit Court of Appeals (*Dkt. No. 6* ).

On May 17, 2000, the Second Circuit affirmed the dismissal of Bourdon's complaint as to "the judge, the prosecutors, the appointed attorneys, Broome County, and the government informer" (*Dkt. No. 8 at 3* ). The Circuit held, however, that Bourdon was entitled to assert excessive force claims against the New York State Trooper defendants named in his original complaint as well as claims arising out of the search of his home and the seizure of property from his residence. *Id.*

In accordance with the decision of the Second Circuit, on August 11, 2000, Bourdon filed an amended complaint (*Dkt. No. 9* ).

A. *Bourdon's Allegations*

**\*2** On June 14, 1996, defendants Frank Roney ("Roney") and Alfonso Ortega ("Ortega") drafted an application to search Bourdon's home (*Am.Compl., ¶ 1* ). The application was based on information obtained from an informant whom Roney and Ortega "knew to be false and unreliable." The informant "harbored ill will against the plaintiff." *Id.* at ¶ 2. Roney and Ortega presented the application to Broome County Judge Patrick Mathews in bad faith and "intentionally misled the court with false information." *Id.* at ¶ 3. The search warrant application submitted by Roney and Ortega lacked "probable cause." *Id.* at ¶ 4. Thereafter, Judge Mathews issued a search warrant, without probable cause, permitting the search of Bourdon's home. The search of Bourdon's home was "motivated by malice and an intent to arrest and seize evidence." *Id.* at ¶ 9.

On June 14, 1996, Bourdon's home was searched pursuant to the warrant and Bourdon and another resident of the dwelling, John Verge, were arrested. *Id.* at ¶ 10. When Bourdon was arrested, "his wrists were cuffed with his palms facing outward to insure added pain and discomfort, the cuffs were [then] squeezed painfully tight." *Id.* at ¶ 13. Bourdon was placed in the back of a squad car which was parked in the sun. The car windows were closed and the inside of the car felt "like a greenhouse." *Id.* at ¶ 13. He remained in the hot car, in handcuffs, for three hours without water or the use of a toilet. *Id.* at ¶ 14.

At one point, Roney opened the car door and said that if Bourdon told him where the guns were he could have some water, use the toilet, have his handcuffs loosened, and sit outside on a bench near the house. *Id.* at ¶ 15. Bourdon denied having guns. Roney got angry and told Bourdon that he "could suffer until he was ready to talk." *Id.* at ¶ 15. At that point, Bourdon's wrists were blue, his right leg was numb, he had wet his pants, and he had severe pain in his lower back.

Defendants seized items not included in the warrant such as Bourdon's books, his daughter's photographs and family albums, and his father's hunting license. *Id.* at ¶¶ 17–18. Defendants searched Bourdon's red van, his jeep, and the wooded area surrounding Bourdon's home, all places not listed in the warrant. *Id.* at ¶ 20. Bourdon claims that the only vehicle mentioned in the search warrant was his white

van. Bourdon claims that the defendants removed a briefcase from his red van, moved it to the white van, and "staged a fraudulent photograph that depicted [the briefcase] as being originally found in the white van." Defendants also removed some items from the briefcase and placed them in Bourdon's home and then pretended that the items were originally found in the home. *Id.* at ¶ 20. Defendants later used the documents found in the briefcase to obtain an indictment against Bourdon. *Id.* The search ended at 9:35 p.m. Bourdon's home was left "in shambles." *Id.* at ¶ 21.

**\*3** During the search, defendants seized and improperly disposed of exculpatory evidence, specifically Bourdon's father's valid hunting license which was found in the same closet with the seized guns. The valid hunting license was never included in the inventory list of the items seized. *Id.* at ¶ 23.

After the search, Bourdon was taken to the state trooper barracks for interrogation. Bourdon's shoes were taken away and he was forced to stand barefoot on the cold cement floor "with one wrist painfully chained to a wall for another three hours." *Id.* at ¶ 22. Roney and Jeffrey Dorward ("Dorward") interrogated Bourdon, "inflicting pain and threats to obtain information." *Id* .

The defendants also "coerced" John Verge into providing information during an "unconstitutional interrogation." Based upon this information, the defendants returned to Bourdon's home three hours later and seized his father's guns from the rafters of the home. *Id.* at ¶ 24.

Bourdon claims that the defendants deliberately withheld evidence, conducted another illegal search of his home on the following day and seized more evidence, then "unlawfully combined all of the evidence as being seized on June 14, 1996." *Id.* at ¶ 25. Bourdon claims that the defendants violated his right to due process, to be free from unreasonable search and seizure and false arrest, and to be free from the use of excessive force in the course of an arrest.

B. *Defendants' Affidavits*

1. *Defendant Roney*

Roney states that on June 12, 1996, his barracks received a citizen's complaint against Bourdon that he had physically harassed two women and "brandished a handgun" (*Dkt. No. 49; Roney Aff. at ¶¶ 3–4* ). The complainants and Paul Mollis ("Mollis"), a friend of Bourdon's, each gave written

statements to the state police. *Id.* at ¶¶ 5–6; *see also, Ex. A (copy of the Investigation Report), pp. 6–11 & 29–37.* Mollis told the state police that he had been to Bourdon's home several times over the last year and had seen weapons there. Mollis stated that on June 13, 1996, he saw Bourdon near his white van with a pistol in his hand (*Roney Aff., Ex. A, pp. 13–16*). On June 13, 1996, Roney went to Bourdon's home and Bourdon identified himself as "John Verge" (*Roney Aff., ¶ 11*).

Based upon Roney's investigation and the statements given, Roney and Ortega prepared a search warrant application (*Roney Aff., ¶ 8; see also, Id., Ex. A, pp. 39–45*). Judge Mathews determined that probable cause existed and issued a search warrant on June 14, 1996 (*Roney Aff., ¶ 9; Id., Ex. A, pp. 65–67*).

On June 14, 1996, the defendants executed the search warrant at Bourdon's home. Bourdon again identified himself as "John Verge" and was thereafter arrested for second degree criminal impersonation. Defendant LaRock handcuffed Bourdon and placed him in a patrol car.

Roney states that at one point he asked Bourdon to tell him where the guns were located (*Roney Aff., ¶ 19*). At some point, McEvoy took Bourdon to the woods, removed the handcuffs and allowed him to urinate. McEvoy then reapplied the cuffs and placed Bourdon in another patrol car. *Id.* at ¶¶ 19–21. The search stopped when it became too dark to work, and LaRock was assigned to guard the site for the night. *Id.* at ¶¶ 24–25.

**\*4** Bourdon was brought to the police barracks and secured to a "bull ring" which Roney describes as a ring secured in the wall. One of Bourdon's handcuffs was attached to the bull ring. Bourdon was brought from the holding area to Roney's office several times. Each time, his shoes were removed because Bourdon was considered an escape risk. *Id.* at ¶¶ 27–28.

During Verge's interrogation on June 14, 1996, he told Dorward about a "secret compartment" in Bourdon's home. *Id.* at ¶ 29; *see also, Ex. A, pp. 22, 49–50.* McEvoy returned to the secured search area, located the secret compartment and found a shotgun, a rifle, and a handgun (*Roney Aff., ¶ 37; Id., Ex. A, pp. 23–26*). Bourdon was then arraigned on felony charges of criminal possession of a weapon and criminal possession of forged instruments (*Roney Aff., ¶ 38*).

### 2. *Defendants Edwards and LaRock*

Edwards and LaRock stated that on the day the search warrant was executed, Bourdon falsely identified himself as John Verge. He was arrested for second degree criminal impersonation (*Dkt. No. 51; Edwards Aff., ¶¶ 3–7; Dkt. No. 52; LaRock Aff., ¶¶ 1–7*). LaRock stated that after Bourdon's arrest, he handcuffed Bourdon and put him in a patrol car. LaRock was assigned to guard the search area overnight when it became too dark to continue. Later in the evening, McEvoy returned to the search site and located a secret compartment in Bourdon's home wherein he found a rifle, a shotgun, and a pistol (*LaRock Aff., at ¶¶ 15–17*).

### 3. *Defendant McEvoy*

McEvoy stated that about two hours after the search began, he escorted Bourdon to the woods and allowed him to urinate (*Dkt. No. 53; McEvoy Aff., ¶¶ 3–5; see also, Id., Ex. B, Bourdon's Dep. at 79:13*). McEvoy stated that after the search was stopped for the night, he returned to the site, located a secret compartment and found a shotgun, a rifle, and a pistol (*McEvoy Aff., ¶¶ 7–9*).

### 4. *Defendant Dorward*

Dorward stated that after the search stopped for the night, he interrogated John Verge who told him that there was a "secret compartment" in Bourdon's home (*Dorward Aff., at ¶ 15; Dkt. No. 54*). Verge signed, in Dorward's presence, a four page statement which included information about the secret compartment. *Id.* at ¶ 16; *see also, Id., Ex. A, pp. 22, 49–52.*

### 5. *Defendant Ortega*

Ortega stated that on June 14, 1996, he helped Roney prepare a search warrant application for Bourdon's home, vehicles and premises (*Dkt. No. 55; Ortega Aff., ¶ 3*). Ortega stated that on that same day, he was present when Roney "affirmed" the application in the presence of Judge Mathews.

### III. *Collateral Estoppel*

Under the full faith and credit statute, federal courts must give preclusive effect to state court judgments whenever the courts of the State in which the judgment was entered would do so. *Hickerson v. City of New York,* 146 F.3d 99, 103 (2d Cir.1998)(citing *inter alia Allen v. McCurry,* 449 U.S. 90, 96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980)). New York law provides that an issue may not be relitigated if the identical issue was "necessarily decided in a previous

proceeding, provided that the party against whom collateral estoppel is being asserted had a full and fair opportunity to litigate the issue in the prior action." *Id.* at 104 (citations omitted). The party opposing the application of collateral estoppel has the burden of proving that he was denied the full and fair opportunity to litigate the issue or issues in question. *Id.* at 109 (citing *In re Sokol,* 113 F.3d 303, 306 (2d Cir.1997); *Kaufmann v. Eli Lilly & Co.,* 65 N.Y.2d 449, 456, 482 N.E.2d 63–67, 492 N.Y.S.2d 584, 588 (1985)).

**\*5** A determination of whether the party opposing collateral estoppel had a full and fair opportunity to litigate involves considering the "realities of the prior litigation," including circumstances which may have had the practical effect of discouraging a party from fully litigating an issue. *Id.* (citing *Ryan v. New York Telephone Co .,* 62 N.Y.2d 494, 501, 467 N.E.2d 487, 491, 478 N.Y.S.2d 823, 827 (1984). The factors to be considered include the nature of the forum and the importance of the claim in the prior litigation, the incentive and initiative to litigate, the actual extent of the litigation, and the competence and expertise of counsel. *Id.*

A. *The Search Warrant*
The Fourth Amendment forbids "unreasonable searches and seizures" of a person's "papers [ ] and effects" and requires that any search warrant be supported by "probable cause." U.S. Const. Amend. IV. The existence of probable cause is a complete defense to a claim that plaintiff's Fourth Amendment rights have been violated because the search warrant was obtained unlawfully. *DeFelice v. Ingrassia,* 210 F.Supp.2d 88, 92 (D.Conn.2002).

Bourdon claims that the search warrant was not based upon probable cause and therefore the warrant was unreasonable and constitutionally infirm. Specifically, Bourdon claims that the search warrant application prepared by Roney and Ortega was (a) based upon information obtained from an unreliable informant that they knew to "harbor[ ] ill will against the plaintiff (*Am. Compl .,* ¶ 2); and, (b) presented to the Broome County Court "in bad faith" because it contained intentionally misleading and false information. *Id.* at ¶ 3.

As stated above, the party seeking the benefit of collateral estoppel has the burden of showing the identity of the issues, and the party opposing the application of collateral estoppel has the burden of showing that he did not have a full and fair opportunity to litigate the claims in the prior action. *D'Andrea v. Hulton,* 81 F.Supp.2d 440, 443 (W.D.N.Y.), *adopted by* 1999 U.S. Dist. LEXIS 20701 (W.D.N.Y. Dec. 17, 1999)

(citing *inter alia Khandhar v. Elfenbein,* 943 F.2d 244, 247 (2d Cir.1991)). In order to find identity of issues, the court must find that the issue to be decided in the second action was material to the first action and essential to the decision in the first action. *Id.* The court must also find that a different judgment in the second action would destroy or impair rights or interests established by the first action. *Id.* (citing *Schuylkill Fuel Corp. v. B. & C. Nieberg Realty Corp. Inc.,* 250 N.Y. 304, 307, 165 N.E. 456 (1929)).

Defendants argue that the validity of the search warrant and, in particular, the presence of probable cause to issue the warrant, have already been litigated twice by Bourdon in state court. First, at a suppression hearing and again, upon appeal of Bourdon's conviction; therefore, he may not litigate the issues again.

**\*6** Bourdon previously argued in state court that "the warrant was not supported by probable cause in that it relied upon an application from which there were material omissions, and which contained false statements by Roney, and information supplied by an informant who was not reliable." *See People v. Bourdon,* 258 A.D .2d 810, 811 (3d Dep't 1999). The state court determined that probable cause did exist to issue the warrant and thus, the warrant was properly issued. *Id.* at 812. Bourdon's attempt to relitigate the very same issues in this court must fail.

Because the state court has already decided that there was probable cause to issue the search warrant and Bourdon had a full and fair opportunity to argue this issue in state court, this court recommends that the defendants' motion for summary judgment be granted as to Bourdon's claim that the warrant was illegally issued.

B. *Search and Seizure*
The Fourth Amendment requires that search warrants "particularly describe[e] the place to be searched, and the persons or things to be seized."

Bourdon claims that the search conducted in accordance with the warrant was unreasonable because it exceeded the scope of the warrant. Bourdon argues that the search was unreasonable because the defendants searched places not specifically identified in the search warrant. The warrant permitted the defendants to search Bourdon's person, his residence and any unattached structures, a white 1983 GMC van registered to him, any vehicle that he is found to be present in, and any person in Bourdon's residence or in any

vehicle with Bourdon (*Dkt. No. 49 at 65–67* ). Bourdon claims that the defendants searched his "second van, his jeep, and property surrounding his home, and a trailer" and seized items not specifically listed in the search warrant.

Defendants argue in conclusory fashion that the issues concerning the actual search and seizure have been fully litigated in state court. They offer no evidence to support this argument.

This court is unable to determine the reasonableness of the search and seizure or whether this claim is barred by collateral estoppel. Accordingly, without addressing the merits of this claim, the court recommends that the defendants' motion for summary judgment be denied, without prejudice, as to Bourdon's claim that the search and seizure was unconstitutionally executed. Defendants are granted permission to file a renewed motion for summary judgment on this issue which must be filed within forty-five days following a final decision by the District Judge on this motion for summary judgment. Any renewed summary judgment motion filed by the defendants must include a full presentation of the record of Bourdon's underlying state court proceedings including, but not limited to, any state court decision made at Bourdon's suppression hearing, a complete transcript of Bourdon's suppression hearing, and any briefs or other relevant papers filed by him on appeal.

## C. *Fifth Amendment Claim*

 **\*7** The Fifth Amendment, made applicable to the states through the Fourteenth Amendment, provides in part that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. CONST. Amend. V. It guarantees "the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty ... for such silence." *Malloy v. Hogan,* 378 U.S. 1, 8, 84 S.Ct. 1489, 1493–94, 12 L.Ed.2d 653 (1964).

Bourdon claims that while subject to custodial interrogation, he was cuffed to the wall in a standing position for hours and forced to stand on a cold cement floor without shoes. Bourdon claims that he did not want to talk but the defendants continued to question him. At his deposition, he claimed that the defendants threatened him with "a long term incarceration" if he didn't reveal where his guns were. He also claimed that Dorward threatened that he "better cooperate with Roney, because Roney gets very upset" (*Dkt. No. 50, Dep. at 104* ). Bourdon asserts a claim for violation of the constitutional privilege against self-incrimination.

"Even if it can be shown that a statement was obtained by coercion, there can be no Fifth Amendment violation until that statement is introduced against the defendant in a criminal proceeding ... [t]o constitute a Fifth Amendment violation 'use of the [coerced] statement at trial is not required,' but that there must be some 'use or derivative use of a compelled statement at any criminal proceeding against the declarant." ' *Deshawn v. Safir,* 156 F.3d 340, 346–47 (2d Cir.1998) (internal citations omitted).

Since Bourdon admitted at his deposition that he made no statement to police during interrogation (*Dkt. No. 50, Dep. at 123* ), he cannot prove a necessary element of the Fifth Amendment violation, namely "use or derivative use of a compelled statement" against himself. Since Bourdon alleges no injury, this Court recommends the dismissal of Bourdon's Fifth Amendment claim.

## IV. *False Arrest*

"The right to be free from arrest or prosecution in the absence of probable cause is a long established constitutional right." *Ricciuti v. N.Y.C. Transit Authority,* 124 F.3d 123, 128 (2d Cir.1997). In order to state a claim for false arrest under the federal constitution, plaintiff must show that he was arrested without probable cause. *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 569 (2d Cir.1996) (citing *Broughton v. New York,* 37 N.Y.2d 451, 456, 335 N.E.2d 310, 313, 373 N.Y.S.2d 87, 93 (1975)). Probable cause exists when the arresting officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). In assessing the existence of probable cause, the court must consider the facts available to the officer at the time of the arrest and immediately before it. *Lowth,* 82 F.3d at 569. The existence of probable cause is a complete defense to an action for false arrest, even if the plaintiff is subsequently acquitted of the charges, because probable cause constitutes justification for the arrest. *Weyant,* 101 F.3d at 852 (citing *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994)). In deciding whether probable cause to arrest exists, a police officer is entitled to rely on the victim's allegations that a crime has been committed. *Martinez v. Simonetti,* 202 F.3d 625, 634 (2d Cir.2000) (citing *Singer v. Fulton County Sheriff,* 63 F.3d 110, 119 (2d Cir.1995)). A police officer is also entitled to rely on the allegations of fellow police officers. *Martinez,* 202 F.3d at 634 (citing *Bernard v. U.S.,* 25 F.3d 98, 102–03 (2d

Cir.1994)). The evidence needed to establish probable cause is less than that necessary to support a conviction. *Krause v. Bennett,* 887 F.2d 362, 370 (2d Cir.1989). Probable cause may be determined on the law on a motion for summary judgment if there is no dispute as to the pertinent events and the knowledge of the police officer. *Weyant,* 101 F.3d at 852.

**\*8** Bourdon contends that his arrest on the night of June 14, 1996, was without probable cause. Because this court finds that the defendants had probable cause to arrest Bourdon and that Bourdon was eventually convicted, the false arrest claim fails.

Roney states that on June 13, 1996, he went to Bourdon's home and spoke to a man who identified himself as John Verge (*Roney Aff., ¶ 11* ). Unbeknownst to Roney, the man was actually Bourdon. On June 14, 1996, the date of Bourdon's arrest and search of his home, Roney spoke to Bourdon who again identified himself as John Verge. Roney held out two photographs of Ronald Bourdon for Bourdon's inspection. Bourdon affirmed that the photos were of Ronald Bourdon but persisted in holding himself out to be John Verge. *Id.* at ¶¶ 12–14. Roney, knowing the man he was conversing with was actually Bourdon, arrested Bourdon for second degree criminal impersonation. *Id.* at ¶ 16; *see also, Edwards Aff., ¶¶ 4–7; LaRock Aff., ¶¶ 1–7; and Dorward Aff., ¶¶ 1–7* . In his own affidavit, Bourdon admits that when Roney spoke to him on June 13, 1996, Bourdon "lied and said that he [Bourdon] was not Mr. Bourdon, and that he [Mr. Bourdon] was not home" (*Dkt. No. 72; Bourdon Aff., ¶ 9* ). Bourdon admitted that when he was asked for identification, he produced "a New York State drivers license with his photo on the license, in the name of John Verge." *Id.* at ¶ 10. Bourdon further testified that "[d]efendants Roney and Dorward were unaware that they were being duped by him, and that he was really Mr. Bourdon and not John Verge." *Id.* at ¶ 11. Additionally, Bourdon testified at his deposition that (a) he possessed a driver's license in the name of John Verge which had his picture on it; and, (b) that on June 13, 1996, he falsely identified himself to Roney as John Verge and offered the false driver's license in support of his claim. *Dep. at 35–36 & 55–56.* Bourdon was arrested for second degree criminal impersonation following his second conversation with Roney.

New York Penal Law § 190.25(1) provides: "A person is guilty of criminal impersonation in the second degree when he [i]mpersonates another and does an act in such assumed character with intent to obtain a benefit or to injure or

defraud another." Conviction of this crime requires proof that the defendant impersonated a real person and not simply used some fictitious or assumed name. *People v. Sadiq,* 236 A.D.2d 638, 654 N.Y.S.2d 35 (N.Y.App.Div.), appeal denied sub nom., *People v. Sikandar,* 89 N.Y.2d 1100, 682 N.E.2d 995, 660 N.Y.S.2d 394 (1997). The "benefit" contemplated by the statute prohibiting criminal impersonation need not be monetary but may consist of the desire to avoid apprehension or prosecution. *People v. Sherman,* 116 Misc.2d 109, 455 N.Y.S.2d 528 (Rochester City Court, Monroe County 1982).

In light of Bourdon's own admission that on June 13, 1996, he willingly and knowingly identified himself as "John Verge", a real person, and produced a driver's license containing fraudulent information in support of this claim for the ostensible purpose of misleading the state police, it is absurd that he now argues that there was no probable cause to arrest him. Moreover, an officer is not required to make a full investigation of the surrounding circumstances prior to taking action. "Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti,* 124 F.3d at 128. Roney's version of the events is believable and his credibility is bolstered by the fact that Bourdon admitted to the very behavior for which he was arrested. Bourdon has not provided information or evidence to contest the defendants' allegations concerning probable cause. Under the circumstances, because probable cause is determined based upon the information available to the officer at the time of the arrest, the officers had a reasonable basis for believing there was probable cause to arrest Bourdon on June 14, 1996.

**\*9** In any event, Bourdon was ultimately convicted of second degree criminal impersonation. *See People v. Bourdon,* 258 A.D.2d 810 (3d Dep't 1999). The Second Circuit has held that a plaintiff's conviction prevents his recovery on a § 1983 claim for false arrest. *Cameron v. Fogarty,* 806 F.2d 380, 387 (2d Cir.1986). "Where the civil rights plaintiff has been convicted of the offense for which he was arrested, we have in effect accepted the fact of that conviction as conclusive evidence of good faith and reasonableness of the officer's belief in the lawfulness of the arrest." *Id.* at 388. Evidence of a conviction is a complete defense to a § 1983 action for false arrest. *Id.* at 388–89.

Since probable cause and Bourdon's conviction are each a defense to a false arrest claim, this court recommends the dismissal of Bourdon's false arrest claim.

### V. *Excessive Force Claim*

The Supreme Court has made it clear that excessive force used by officers during an arrest violates the Fourth Amendment which guarantees citizens the right to be free from unreasonable seizures of the person. *Graham v. Connor,* 490 U.S. 386, 394, 1098 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). "To establish a Fourth Amendment excessive force claim, a plaintiff must show that the force used by the officer was, in light of the facts and circumstances confronting him, 'objectively unreasonable' under Fourth Amendment standards." *Horton v. Town of Brookfield,* 98CV01834, 2001 WL 263299 (D.Conn.2001) (citing *Finnegan v. Fountain,* 915 F.2d 817, 823 (2d Cir.1990) (other citation omitted).

Bourdon complains that he was handcuffed for three hours while the search was conducted. He was also handcuffed, sometimes to a wall, at the police barracks for an additional two to three hours (*Dkt. No. 50; Dep. at 105–110* ). During his time in the patrol car, the defendants were actively involved in executing the search warrant and Bourdon was left alone in the car. The defendants admit that Bourdon was later cuffed to the wall at the police barracks. However, Roney explains that this is "the only holding area available in the Troop Barracks" (*Roney Aff. at 3* ). He also explains that this system, referred to as a bull ring, is commonly used at troopers' barracks throughout the state. *Id.* at 3.

Handcuffing has been found to give rise to a claim of excessive force where an individual suffers an injury as a result of being handcuffed. *Gonzales v. City of New York,* 98–CV–3084, 2000 WL 516682, at *4 (E.D.N.Y. March 7, 2000); *Simpson v. Saroff,* 741 F .Supp. 1073, 1078 (S.D.N.Y.1990). "Where the plaintiff does not allege that a prior injury existed or that an injury resulted from being handcuffed, however, courts have found that no constitutional violation exists and have dismissed the claims." *Horton,* 2001 WL 263299, at *7 (citing *Scott v. County of Nassau,* 94CV4291, 1998 WL 874840, at *5 (E.D.N.Y. Dec. 11, 1998) (granting summary judgment where there were no additional allegations of excessive force or allegations of prior injury); *Murphy v. Neuberger,* 94 Civ. 7421, 1996 WL 442797, at *8 (S.D.N.Y. Aug. 6, 1996) (granting motion to dismiss where plaintiff did not allege that he suffered any injury as a result of being handcuffed); *Foster v. Metropolitan Airports Comm'n,* 914 F.2d 1076, 1082 (8th Cir.1990) (affirming grant of summary judgment where plaintiff did not provide evidence of permanent injury).

**\*10** Bourdon has not alleged or provided any evidence of permanent injury as a result of being handcuffed. He does not claim to have had a pre-existing injury of which the officers were aware, or to have requested medical treatment while being handcuffed or immediately thereafter. The mere fact that Bourdon was uncomfortable for several hours is not enough to establish a constitutional violation. *See Miller v. Glanz,* 948 F.2d 1562, 1569–70 (10th Cir.1991) (plaintiff experienced only "momentary discomfort" when he was handcuffed in an "awkward position" for two hours). Thus, this court cannot find that handcuffing Bourdon, without more, constitutes a violation of his constitutional rights.

Bourdon also claims that he was subjected to physical and emotional abuse during his confinement at the police barracks. However, at his deposition, he admits that the defendants did not hit or strike him with anything (*Dep. at 105* ). He merely states that they threatened him with a lengthy incarceration. Bourdon further states that he was in pain and he was stiff after sitting in the car for three hours. Bourdon has alleged no injury and admits that there was no physical contact between himself and the defendants beyond the handcuffing. Bourdon has failed to allege any excessive force used at the police barracks. Accordingly, this court recommends that Bourdon's excessive force claim be denied.

### VI. *Conditions of Confinement*

Pretrial detainees may not be subjected to conditions and restrictions that amount to "punishment" without due process of law. *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Weyant,* 101 F.3d at 856.[1] A detainee's Fourteenth Amendment due process rights concerning the conditions of his confinement are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983) (citations omitted). The standard for analyzing a pretrial detainee's Fourteenth Amendment claim is the same as the Eighth Amendment standard. *See Weyant,* 101 F.3d at 856. Thus, a pretrial detainee's pleadings regarding the conditions of his confinement are sufficient if they meet both an objective and a subjective standard. To meet the objective standard, the claims must be "sufficiently serious"—the deprivation must deny minimal civilized measure of life's necessities. As to the subjective standard, plaintiff must allege that the defendants "had a sufficiently culpable state of mind amounting to at least deliberate indifference." *Dawes*

*v. Walker,* 239 F.3d 489, 493–94 (2d Cir.2001) (citations omitted); *see also,* Weyant, 101 F.3d at 856.

Bourdon alleges that the manner in which he was detained after his arrest violated his constitutional rights. Bourdon claims that immediately after his arrest, he was placed in a hot, unventilated car for three hours without water or bathroom privileges. Later at the barracks, he was required to stand, off and on, for three hours while handcuffed to a wall without shoes or socks.

 **\*11** At his deposition, Bourdon admitted that he was allowed to urinate in the woods at about 9:30 p.m. Since the search began at approximately 6:30 p.m., Bourdon went, at most, three hours without bathroom privileges and water (*Roney Aff. at 2* ).

This court finds that Bourdon has failed to allege or substantiate both the objective and subjective components necessary to establish that the defendants acted with deliberate indifference in their methods of confinement. He has failed to adequately allege that he was denied minimal necessities of civilized life for a substantial period of time. *See Whitted v. Lazerson,* 96 Civ. 2746, 1998 WL 259929, at \*3 (S.D.N.Y. May 21, 1998) ("temporary deprivation of the right to use the toilet, in the absence of serious physical harm or a serious risk of contamination, simply does not rise to the level of an Eighth Amendment violation"); *Warren v. Irvin,* 985 F.Supp. 350, 356 (W.D.N.Y.1997) (Depriving inmate of water for three days because he was using it to flood his cell did not amount to Eighth Amendment violation). In any event, because the defendants have stated a legitimate purpose in Bourdon's confinement – to secure Bourdon during the search and interrogation by the only means available – Bourdon has failed to establish that the defendants secured him in this manner merely as a form of punishment. Accordingly, this court recommends that the defendants' motion for summary judgment be granted as to Bourdon's conditions of confinement claim.

### VII. Heck v. Humphrey

In *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), the Supreme Court held that a § 1983 action seeking damages is not cognizable if a decision in favor of the plaintiff would necessarily invalidate a criminal conviction unless the conviction or sentence had been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal, or called into question by a federal habeas court. *Heck,* 512 U.S. at 486–87.

Bourdon's claims concerning the validity of the search warrant, the false arrest claim, and the Fifth Amendment violation have been recommended to be dismissed on the merits. Thus, this court need not analyze these claims under *Heck.*

Still remaining is Bourdon's claim that the defendants exceeded the scope of the search warrant. Because this court has determined that it cannot assess the validity of these claims without further development of the record by the defendants, this court also cannot consider at the present time whether *Heck* would invalidate these claims.

### VIII. *Qualified Immunity*

As an alternative basis to grant dismissal, the defendants argue that they are entitled to qualified immunity. Qualified immunity protects government officials who perform discretionary functions in the course of their employment. It shields them from liability for money damages where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). It also protects officials from "the burdens of costly, but insubstantial, lawsuits." *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir.1999)(quotation marks and internal citations omitted).

 **\*12** The question of whether qualified immunity will protect a public official depends upon " 'the objective legal reasonableness' of the action assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (citations omitted). Furthermore, the contours of the right violated must be sufficiently clear that a reasonable official might understand that his actions violate that right. *Id.* at 640, 107 S.Ct. at 3039; *Keane,* 196 F.3d at 332. The test for "evaluating whether a right was clearly established at the time a § 1983 defendant acted is: '(1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and, (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful." ' *African Trade & Information Center, Inc., v. Abromaitis,* 294 F 3d. 355, 360 (2d Cir.2002); *see also, Charles W. v. Maul,* 214 F.3d 350, 360 (2d Cir.2000).

Additionally, the Second Circuit has held that a court may dismiss a claim based upon qualified immunity without first deciding the substantive claims therein. *See Horne v. Coughlin,* 191 F.3d 244 (2d Cir.1999). Also within this decision, the Second Circuit suggested that the qualified immunity issue should be addressed before the substance of a claim. The court shall now consider the defendants' claim that they are entitled to qualified immunity.

In this case, it has been clearly established that persons have a right to be free from unreasonable search and seizure, false arrest, excessive force, inhumane conditions of confinement, and self-incrimination. However, this court finds that it was objectively reasonable for the defendants to believe that their conduct did not violate Bourdon's constitutional rights. The record reflects that the defendants could not have known that the statements provided in support of the search warrant were unreliable or that they lacked probable cause to arrest Bourdon. In fact, Bourdon admits to behavior which would amount to probable cause to arrest.

The record also reflects that Bourdon was handcuffed in a car for approximately three hours without water or the use of bathroom facilities. Bourdon makes no allegations that he told the defendants during this time that he was in pain or discomfort. Finally, the record reflects that while at the police barracks, Bourdon was handcuffed to a wall for approximately one and one-half hours on two separate occasions. Again, Bourdon does not allege that he complained of pain or discomfort to the defendants at this time. Bourdon also admits that he was never physically attacked by the defendants. Under these circumstances, it was reasonably objective to believe that Bourdon was not in pain or distress. Furthermore, this court finds that the defendants did not use excessive force upon Bourdon or confine him under inhumane conditions. Finally, since Bourdon made no statement during his interrogation, it was reasonably objective for the defendants to believe that they did not violate Bourdon's right to be free from self-incrimination.

**\*13** Accordingly, as an additional basis to grant summary judgment, this court recommends that the claims concerning the search warrant, false arrest, excessive force, unconstitutional conditions of confinement, and the Fifth Amendment be dismissed because the defendants are entitled to qualified immunity on these claims.

IX. *Stay of Discovery*

By Order of this court filed February 27, 2002, discovery in this action was stayed until a final decision was rendered on this motion for summary judgment. Because it is recommended that the defendants may file a renewed motion for summary judgment, the stay of discovery is continued until either (1) a decision by the District Judge on any renewed motion for summary judgment; or (2) absent any extensions of time granted by this court, the expiration of the time to file a renewed motion for summary judgment if no such motion has been filed.

WHEREFORE, based on the above, it is hereby

RECOMMENDED, that the defendants' motion be GRANTED (*Dkt. No. 48* ) to the extent that the following claims are dismissed on the merits as well as on the basis of qualified immunity:

a. Invalid search warrant;

b. False arrest;

c. Excessive force;

d. Illegal conditions of confinement; and

e. Fifth Amendment claim, and it is further

RECOMMENDED, that the defendants' motion be DENIED in all other respects, without prejudice, the defendants may file a renewed motion for summary judgment addressing Bourdon's claim involving the search and seizure issue. Any renewed motion must be filed within forty-five days following a decision by the District Judge on this summary judgment motion; and it is further

ORDERED, that the stay of discovery is continued until either: (1) a decision by the District Judge on any renewed motion for summary judgment; or (2) absent any extensions of time granted by this court, the expiration of the time to file a renewed motion for summary judgment if no such motion has been filed.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.* Roldan v. Racette, 984 F.2d 85 (2d

Cir.1993)(citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 21058177

Footnotes

1    Because plaintiff was a pre-trial detainee, his conditions of confinement is analyzed under the due process clause of the Fourteenth Amendment.

**End of Document**      © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3862082
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

KARO BROWN, Plaintiff,

v.

ROBERT OUTHOUSE, et al., Defendants.

No. 9:07–CV–1169 (GLS/GHL).
|
July 9, 2010.

**Attorneys and Law Firms**

Karo Brown, Canaan U.S. Penitentiary, Waymart, PA, pro se.

Office of Frank W. Miller, Frank W. Miller, Esq., Michael J. Livolsi, Esq., of Counsel, East Syracuse, NY, for Defendants.

### *REPORT–RECOMMENDATION and ORDER*

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Karo Brown alleges that Defendants Robert Outhouse (who at the time of the alleged incident was the Sheriff of Cayuga County), Deputy Scott Walborn of the Cayuga County Jail, and two or more unnamed officers violated his rights under the United States Constitution and New York state law by using excessive force on him, denying him prompt medical care, and conducting a procedurally flawed disciplinary hearing [1]. Currently pending before the Court is Defendants' motion for summary judgment. (Dkt. No. 39.) For the reasons that follow, I recommend that Defendants' motion be granted.

### I. FACTUAL AND PROCEDURAL HISTORY

In 2004, Plaintiff was detained at Cayuga County Jail pending trial on federal charges. [2] (Dkt. No. 1 at ¶ 5.) Cayuga County Jail has a rule prohibiting the harboring of food. (Dkt. No. 39–5 ¶ 6.) This rule is set out in the inmate handbook, which Plaintiff received prior to November 15, 2004. *Id.*

On November 15, 2004, Defendant Custody Deputy Scott Walborn was "made aware that [Plaintiff] had been recorded by security cameras hiding objects under the table at which he was eating lunch." (Dkt. No. 39–4 ¶ 4.) Along with several other officers, he entered the lunch room to investigate. *Id.* Defendant Walborn ordered Plaintiff to pack up his lunch tray and prepare to be removed from the area. (Dkt. No. 39–4 ¶ 5.) Defendant Walborn then investigated the table where Plaintiff had been sitting and discovered salt and pepper packets in the cracks underneath the table. (Dkt. No. 39–4 ¶ 6.) [3]

Defendant Walborn declares that Plaintiff "became verbally combative and turned toward me in a manner that I perceived as hostile." (Dkt. No. 39–4 ¶ 7.) According to Defendant Walborn, Plaintiff said "you don't mean shit to me ... you can't do nothing to me ... fuck you." (Dkt. No. 39–4 ¶ 8.) Defendant Walborn declares that Plaintiff was carrying a plastic food tray in his right hand and that he gripped and brandished an unidentified object in his left hand. (Dkt. No. 39–4 ¶ 9.) Defendant Walborn "decided that the situation called for restraining [Plaintiff] for his safety and the safety of the other officers." (Dkt. No. 39–4 ¶ 10.) Defendant Walborn declares that he "approached [Plaintiff] from behind and grabbed his left wrist. I then leaned him forward onto the lunch tray cart to apply handcuffs. However, the wheeled lunch tray cart rolled several feet [4] into the wall ahead. The cart approached the wall in a slow and steady manner, and at no point was [Plaintiff] thrown or shoved into the wall." (Dkt. No. 39–4 ¶ 11.) Defendant Walborn declares that "[a]fter the cart stopped rolling, using minimal force I put [Plaintiff] on the ground, rolled him onto his chest, and applied handcuffs." (Dkt. No. 39–4 ¶ 12.) As he was handcuffing Plaintiff, he determined that the object in Plaintiff's left hand was an eating utensil. (Dkt. No. 39–4 ¶ 14.) After Plaintiff was handcuffed, Plaintiff "rose to his feet" and was escorted away from the area. (Dkt. No. 39–4 ¶ 17.) As he was being moved, Plaintiff "continued to make verbal threats" against Defendant Walborn and the other officers, such as "I will get you all." (Dkt. No. 39–4 ¶ 18.)

**\*2** Defendant Walborn declares that he never physically struck or kicked Plaintiff, pushed his face into the wall, or injured his lip. (Dkt. No. 39–4 ¶¶ 15, 19.) Lt. John Mack, who observed the incident contemporaneously on a security camera, declares that he did not "witness any injury or force used against [Plaintiff] other than that which was necessary to accomplish placing handcuffs on him. At no time did I witness any other corrections officer push [Plaintiff]'s face into the wall or injure him in any way." (Dkt. No. 39–5 ¶ 8.)

Plaintiff's version of the events is quite different. He denies confronting Defendant Walborn or showing any signs of aggression. (Dkt. No. 43 at 3.) He testified at his deposition that Defendant Walborn "slammed" him into the cart once, "slammed" him onto the floor once, and then placed him against the wall so hard that he banged his head and "busted" his lip. (Dkt. No. 39–2 at 30:7–23.)

Defendants have submitted security video of the incident.[5] This video, which does not have audio, does not fully support either party's description of the incident. The video shows that Plaintiff had packed up his tray before Defendant Walborn approached, placing his trash and remaining food on a bottom tray and then covering it with another tray. He did not, however, place his brightly colored eating utensil on the bottom tray. Rather, he placed it on the table to the right of his tray. He then stood up and drank some milk. He was walking away from the table with the tray in his left hand and the eating utensil on top of the tray when Defendant Walborn approached. Defendant Walborn pointed in the direction of the tray cart and then proceeded to check under the table where Plaintiff had been sitting. Defendant Walborn, meanwhile, continued in the direction of the tray cart. He looked over his shoulder in Defendant Walborn's direction three times, apparently saying something to Defendant Walborn each time. The second time he looked and spoke, he transferred the tray to his right hand and the eating utensil from the top of the tray to his left hand. Although Lt. Mack declares that this constituted "brandishing" the eating utensil (Dkt. No. 46–1 ¶ 4), a reasonable juror could conclude that this characterization is not apt.[6] Plaintiff did not at any point stop moving toward the tray cart or turn his body in Defendant Walborn's direction. Immediately after the third time Plaintiff turned his head to look at him, Defendant Walborn approached Plaintiff from behind and bent him forward onto the tray cart. The cart moved forward several feet into a wall, sending Plaintiff's head into the wall. When the cart moved, Plaintiff was leaning forward onto the cart with Defendant Walborn's right hand on his neck and Defendant Walborn's left hand on his left shoulder. Defendant Walborn took several stutter steps when the cart first moved rather than maintaining a smooth walking flow as one would expect if he intended to move the cart.[7] When the cart came to a rest, Defendant Walborn and several officers moved Plaintiff to the floor, restrained him, and then pulled him to his feet again. The entire incident, from Defendant Walborn's first physical contact with Plaintiff to the time that Plaintiff was raised to his feet, lasted less than fifty seconds.

*3 Lt. Mack escorted Plaintiff to segregated housing ("the RHU"). (Dkt. No. 39–4 ¶ 20.) Lt. Mack declares that when he assumed custody of Plaintiff to escort him to the RHU, he "noticed no injury to his person" and did not "observe him to be in any pain or to be experiencing any significant discomfort." (Dkt. No. 39–5 ¶ 9.)

Plaintiff alleges that he "did not eat any food while he was in solitary confinement because he had requested ... medical attention." (Dkt. No. 1 at ¶ 20.) Plaintiff alleges that he did not receive any medical attention until two or three days later. (Dkt. No. 1 at ¶ 20.) However, Jackie Chadwick, a registered nurse employed at the Cayuga County Jail, declares that she personally examined Plaintiff at sick call on the day after the incident. (Dkt. No. 39–3 ¶ 4.) Plaintiff's medical records from the Cayuga County Jail support Nurse Chadwick's assertion. Plaintiff told Nurse Chadwick that he had been in an altercation with corrections officers on the previous day and that he had injuries to his left shoulder, right jaw area, the right side of his neck, and the back of his neck. (Dkt. No. 39–3 ¶¶ 5–6.) Upon examination, Nurse Chadwick noted a "small abrasion" above Plaintiff's right eye, a "very small scratch" on Plaintiff's right wrist, a "small scratch" on Plaintiff's left upper inner arm, and a "small scratch" on the back of Plaintiff's neck. (Dkt. No. 39–3 ¶ 7.) There was "minimal swelling" to Plaintiff's left jaw, just below his ear. There were no cuts, scrapes, or bruises in that area. (Dkt. No. 39–3 ¶ 9.) There was no obvious trauma, injury, or deformity to Plaintiff's left shoulder and no evidence of swelling or bruising. (Dkt. No. 39–3 ¶ 8.) Nurse Chadwick did not report any injury to Plaintiff's lip. Nurse Chadwick concluded that Plaintiff required only observation, not treatment. (Dkt. No. 39–3 ¶ 11.)

On December 14, 2004, Plaintiff was brought to the infirmary complaining of a dislocated left shoulder. (Dkt. No. 39–3 ¶ 13.) He said this had occurred due to contact with a metal cart. Id. Upon examination, the doctor found that Plaintiff's left shoulder exhibited full range of movement. Id. The doctor prescribed Advil as needed for discomfort. Id. Based upon her review of Plaintiff's medical file, Nurse Chadwick declares that Plaintiff "had no further medical complaints between December 14, 2004, and his transfer out of [Cayuga County Jail] the following year." (Dkt. No. 39–3 ¶ 14.)

As a result of the incident, Defendant Walborn issued a misbehavior report charging Plaintiff with failing to follow orders, physically and verbally obstructing or interfering with

staff, storing or hoarding food, and making threats to staff. (Dkt. No. 39–4 at 7.) As Plaintiff notes in his opposition (Dkt. No. 43 at 4), although the misbehavior report written on the day of the incident states that Plaintiff had "a lunch tray in his hand," it does not mention that Plaintiff was holding an eating utensil in his left hand. *Id.* It was not until he prepared an incident report two weeks later that Defendant Walborn mentioned the eating utensil. (Dkt. No. 39–4 at 9.) Indeed, no report prepared on the day of the incident mentions the utensil. (Dkt. No. 39–5 at 9 (Radell report); Dkt. No. 39–5 at 15 (Purcell report); Dkt. No. 39–5 at 11 (Campanello report).) However, several of the reports written two weeks later do mention the utensil. (Dkt. No. 39–5 at 12 (Babcock report); Dkt. No. 39–5 at 18 (Gleason report).)

**\*4** Sometime after Defendant Walborn filed the misbehavior report, Plaintiff was "required to appear at a disciplinary hearing without any prior notice of the disciplinary hearing." (Dkt. No. 1 at ¶ 14.) At the hearing, Plaintiff asked to call other prisoners to testify as eyewitnesses, but the hearing officer denied the request. (Dkt. No. 1 at ¶ 22–23.) Plaintiff was then "kept in solitary confinement status for a couple of months." (Dkt. No. 1 at ¶ 23.) In his opposition to the motion for summary judgment, Plaintiff states that he was in solitary confinement for sixty to ninety days. (Dkt. No. 43 at 8.) The record does not include any other information about Plaintiff's disciplinary hearing and subsequent disciplinary confinement.

Plaintiff filed his complaint in this action on November 2, 2007, claiming that Defendants violated his rights under the United States Constitution and New York state law. (Dkt. No. 1 at 1.) Plaintiff alleges that he still suffers great pain and stiffness and believes that he risks permanent disability in his left shoulder if he is not promptly provided with physical therapy. (Dkt. No. 1 at ¶¶ 27, 29.) He requests 10 million dollars in damages. (Dkt. No. 1 at 7.)

On January 15, 2009, I recommended that Plaintiff's state law claims be dismissed as barred by the statute of limitations and that Plaintiff's medical care claims against Defendants Walborn and Outhouse be dismissed for lack of personal involvement. (Dkt. No. 21.) On June 10, 2009, Judge Sharpe adopted my recommendation in part and ordered that Plaintiff's state law claims and the medical care claim against Defendant Walborn be dismissed. He found, however, that the complaint adequately alleged that Defendant Outhouse was personally involved in the alleged denial of medical care and therefore ordered that the claim survive Defendants' motion to dismiss. (Dkt. No. 27.)

Thus, the following claims proceeded to discovery: (1) an excessive force claim against Defendant Walborn; (2) a procedural due process claim against Defendant Walborn; and (3) a medical care claim against Defendant Outhouse. Discovery closed on November 12, 2009. (Dkt. No. 36.)

On January 11, 2010, Defendants moved for summary judgment of the remaining claims. (Dkt. No. 39.) On February 10, 2010, Plaintiff requested, and I granted, an extension of time in which to respond to the motion. Plaintiff's extension request did not mention a need for further discovery. (Dkt. No. 40.) On March 1, 2010, Plaintiff wrote to the Court seeking assistance with obtaining discovery from Defendants in order to oppose the motion for summary judgment. Specifically, Plaintiff requested an order directing the warden of U.S.P. Canaan to take pictures of his shoulder, an order directing the psychology department to release Plaintiff's records, and an order directing the medical department to give Plaintiff copies of his medical records. (Dkt. No. 42.) On March 12, 2010, I issued an order directing Plaintiff to respond to four portions of Defendants' motion for summary judgment without receiving further discovery: (1) the argument that Plaintiff failed to exhaust his administrative remedies; (2) the argument that there are no triable issues of fact regarding Plaintiff's procedural due process claim; (3) the argument that Defendant Outhouse was not personally involved in any alleged constitutional violation; and (4) the argument that Defendants are entitled to qualified immunity.

**\*5** On March 25, 2010, Plaintiff filed his opposition papers. (Dkt. No. 43.) Plaintiff's opposition responds to all of Defendants' arguments, not simply the four that I directed him to address. *Id* .

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment1

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c) (2). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only

after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material [8] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

## B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise General Transatlantique,* 405 F.2d 270, 273–74 (2d Cir.1968) (citations omitted); *accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U .S. 544, 570 (2007))

(emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

**\*6** "In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

## III. ANALYSIS

### A. Exhaustion of Administrative Remedies

Defendants argue that this action must be dismissed because Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 39–8 at 2.) I find that Plaintiff has raised a triable issue of fact that Defendants are estopped from asserting this affirmative defense.

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones v. Bock,* 549 U.S. 199, 218 (2007). If a prisoner fails to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford v. Ngo,* 548 U.S. 81, 90–91 (2006).

Here, Plaintiff did not exhaust his administrative remedies regarding his medical care and due process claims. The current Sheriff of Cayuga County declares that although Plaintiff filed a grievance complaining of excessive force, he never filed a grievance complaining that he had been denied due process or medical treatment. (Dkt. No. 39–6 ¶¶ 11–14.) Although the copies of Plaintiff's grievance that have been submitted to the Court are not entirely legible, this assertion appears to be accurate. (Dkt. Nos. 39–5 at 22, 43 at 14.) In his opposition, Plaintiff admits that he did not fully exhaust his administrative remedies regarding due process and medical care. (Dkt. No. 43 at 2.)

Plaintiff's failure to exhaust does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).[9]

**\*7** First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

A prison official's refusal to accept or forward a prisoner's grievance is conduct that hinders a plaintiff's ability to pursue administrative remedies, and thus estops prison officials from asserting an exhaustion defense. *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008). Here, Plaintiff states that he submitted a grievance form regarding due process and medical care, but that he never received a response. He "questioned staff about this [g]rievance and was told he had to file another [g]rievance [and] that the only [g]rievance they had on file was the first [g]rievance." (Dkt. No. 43 at 2.) Plaintiff "then submitted a second [g]rievance form and this [g]rievance never made it to [its] destination." *Id.* Plaintiff

"then decided that if he filed another [g]rievance it would be lost or destroyed." *Id.*[10] Although this bald assertion would be insufficient if he were represented by counsel, I must afford Plaintiff special solicitude as an unrepresented civil rights litigant. Therefore, I recommend that the Court find that Plaintiff has raised a triable issue of fact that Defendants are estopped from asserting an exhaustion defense.

**B. Physical Injury Requirement**

The Prison Litigation Reform Act of 1995, 42 U.S.C. § 1997(e), provides that prisoners cannot bring federal civil actions "for mental or emotional injury suffered while in custody without a prior showing of physical injury." Defendants argue that Plaintiff has not made a prior showing of physical injury, and that therefore his claims should be dismissed. (Dkt. No. 39–8 at 2–3.) Defendants' argument is without merit. The undisputed facts show that Plaintiff suffered abrasions, cuts, and swelling as a result of the incident. (Dkt. No. 39–3 ¶¶ 7, 9.) Therefore, I find that Plaintiff's claims are not barred by the PLRA's physical injury requirement.

**C. Excessive Force**

Plaintiff claims that Defendant Walborn used excessive force in restraining him. (Dkt. No. 43 at 3–7.) Defendants argue that Plaintiff has failed to raise a triable issue of fact because the undisputed evidence shows that Plaintiff suffered only *de minimis* injuries and that Defendant Walborn applied force in a good-faith effort to maintain discipline. (Dkt. No. 39–8 at 3–8.) Defendants are correct.

**\*8** As noted above, the complaint alleges that Plaintiff was a pretrial detainee at the time of the incident (Dkt. No. 1 ¶ 5), while Defendants assert without citation to evidence that Plaintiff was "a convicted inmate" (Dkt. No. 39–8 at 3). Excessive force claims involving pretrial detainees implicate the Fourteenth Amendment, whereas excessive force claims involving convicted inmates implicate the Eighth Amendment. However, both types of claims are analyzed under the framework of *Hudson v. McMillian,* 503 U.S. 1 (1992). *United States v. Walsh,* 194 F.3d 37, 48 (2d Cir.1999). Under that framework, when prison officials are "accused of using excessive physical force ... the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson,* 503 U.S. at 6–7. The extent of any injury suffered by the inmate "is one factor that may suggest whether the use of force could plausibly have been thought

necessary in a particular situation or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id.* at 7 (citation and quotation marks omitted).

> In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response. The absence of serious injury is therefore relevant to the ... inquiry, but does not end it.

*Id.* (citation and quotation marks omitted). Force may be considered excessive, even where the prisoner does not suffer a serious or significant injury, if the force used is more than *de minimis* or is of a type that is "repugnant to the conscience of mankind." *Walsh,* 194 F.3d at 48 (quoting *Hudson,* 503 U.S. at 9–10).

Here, upon viewing the video of the incident, no reasonable juror could conclude that Defendant Walborn acted maliciously and sadistically to cause harm. It is true that the video does not precisely comport with Defendant Walborn's description of the incident. A reasonable juror might find it noteworthy that the first descriptions of the incident by Defendant Walborn and the other officers did not mention that Plaintiff was holding a utensil in his left hand. However, even when viewed in the light most favorable to Plaintiff, the evidence shows that Defendant Walborn used no more than *de minimis* force and that the force he used was not of a type repugnant to the conscience of mankind. The entire incident lasted less than a minute. Plaintiff admits that he was violating a facility rule. Defendant Walborn never struck or kicked Plaintiff. The force lasted only long enough to place handcuffs on Plaintiff and bring him to his feet. Therefore, I recommend that the Court grant Defendants' motion and dismiss the excessive force claim against Defendant Walborn.

### D. Procedural Due Process

**\*9** Plaintiff claims that his due process rights were violated when he received no prior notice of his disciplinary hearing and the hearing officer refused to allow him to call witnesses. (Dkt. No. 1 ¶¶ 14, 22–23; Dkt. No. 43 at 8.) Defendants argue

that they are entitled to summary judgment in their favor on this claim because Plaintiff was not deprived of any liberty interest. (Dkt. No. 39–8 at 8–12.) Defendants are correct.

In order to succeed on a procedural due process claim, a plaintiff must prove that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000). An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). Regarding the first prong of this test, "[i]t is undisputed ... that New York state law creates a liberty interest in not being confined" in a segregated housing unit. *Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004). The issue, then, is whether Plaintiff's confinement in the RHU imposed "an atypical and significant hardship on [him] in relation to the ordinary incidents of prison life."

In the Second Circuit, determining whether disciplinary confinement constituted an "atypical and significant hardship" requires examining "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation compared to discretionary confinement." *Palmer,* 364 F.3d at 64 (quoting *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)). Where, as here, a prisoner has served less than 101 days in disciplinary segregation, the confinement constitutes an "atypical and significant hardship" only if "the conditions were more severe than the normal SHU conditions [11] ." *Palmer,* 364 F.3d at 65.

Here, the current Sheriff of Cayuga County and Lt. Mack each declare that conditions in the RHU are "not significantly different from those of the general population. Only three major differences exist in the RHU: inmates' cells are searched on a daily basis; inmates eat inside their cells; and cell doors are transparent rather than barred. All other RHU conditions are similar to the general population. For example, inmates confined to RHU receive the same opportunities for exercise (one hour per day), similar clothing and bedding, similar food, and similar opportunities to wash and bathe. Inmates in RHU are permitted to bathe three days per week. Additionally, cell size is comparable." (Dkt No. 39–5 ¶ 11; Dkt. No. 39–6 ¶ 10.) Plaintiff has not submitted any evidence

that contradicts Defendants' version of conditions in the RHU. The conditions described in Defendants' papers are not more severe than normal SHU conditions. Therefore, Plaintiff was not deprived of a liberty interest. Accordingly, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's procedural due process claim.

## E. Medical Care

**\*10** Plaintiff alleges that Defendant Outhouse violated his right to adequate medical care.[12] (Dkt. No. 1 ¶ 33.) Defendants argue that this claim should be dismissed because Plaintiff has not raised a triable issue of fact that his medical condition was sufficiently serious, Defendants were not deliberately indifferent, and there is no evidence that Defendant Outhouse was personally involved. (Dkt. No. 39–8 at 12–16.) Plaintiff concedes that Defendant Outhouse should "be removed from suit without prejudice." (Dkt. No. 43 at 12.) Even if Plaintiff had not made this concession, I would find that Plaintiff has failed to raise a triable issue of fact as to his medical care claim.

There are two elements to a prisoner's claim that prison officials violated his right to receive adequate medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and punctuation omitted).[13] "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003).

A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702–03.

Here, Plaintiff's medical records show that Plaintiff suffered a small abrasion over his right eye, a very small scratch on his right wrist, a small scratch on his left upper inner arm, a small scratch on the back of his neck, and minimal jaw swelling as a result of the incident. (Dkt. No. 39–3 ¶ 7–8.) Nurse Chadwick did not find these injuries worthy of treatment. (Dkt. No. 39–3 ¶ 11.) Even if one credits Plaintiff's assertion that his lip was "busted," he has not established the existence of a serious medical condition. Courts considering similar injuries have found them to be insufficiently serious to satisfy the objective prong. *See Benitez v. Straley,* No. 01–CV–0181, 2006 U.S. Dist. LEXIS 6382, at \*8, 10, 33, 2006 WL 5400078, at \*3, 4, 12 (S.D.N.Y. Feb. 16, 2006) (cut on plaintiff's lips, cut on plaintiff's head, and "severe cuts" to plaintiff's wrists-none of which required stitches-did not constitute a medical condition that was sufficiently serious for purposes of Eighth Amendment, even if plaintiff's allegations were assumed to be true); *Hickey v. City of New York,* No. 01–CV–6506, 2004 U.S. Dist. LEXIS 23941, at \*53–54, 2004 WL 2724079, at \*16 (S.D .N.Y. Nov. 29, 2004) (cuts and bruises do not constitute sufficiently serious medical needs); *Decayette v. Goord,* No. 06–CV–0783, 2009 U.S. Dist. LEXIS 48127, at \* 3–4, 2009 WL 1606753, at \*1 (N.D.N.Y. June 8, 2009) (McAvoy, J.); *Rodriguez v. Mercado,* No. 00–CV–8588, 2002 U.S. Dist. LEXIS 16057, at \*8, 24, 2002 WL 1997885, at \*3, 8 (S.D.N.Y. Aug. 28, 2002) (bruises to plaintiff's head, back and wrists, accompanied by back pain and migraines but no loss of consciousness, did not constitute a medical condition that was sufficiently serious for purposes of Eighth Amendment.[14]

**\*11** Even if Plaintiff had sustained a sufficiently serious injury as a result of the incident, I would recommend that his medical care claim be dismissed because he has not raised a triable issue of fact that his condition was met with deliberate indifference. Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d, 698, 703 (quoting *Hathaway,* 99 F.3d at 553). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer v. Brennan,* 511 U .S. 825, 837 (1994); *Chance,* 143 F.3d at 702–703. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. 825, 835; *Ross v.*

*Giambruno,* 112 F.3d 505 (2d Cir.1997). Here, there is no evidence that either Defendant Outhouse or any medical care provider was aware of any facts from which the inference could be drawn that Plaintiff had a serious medical need. Plaintiff was treated twice in the month after the incident. At that time, no serious injuries were noted. Plaintiff's scratches and swelling did not require treatment, and he had full range of motion in his shoulder. (Dkt. No. 39–3 ¶¶ 11, 13.) Plaintiff did not seek treatment again while he was confined at Cayuga County Jail. [15] (Dkt. No. 39–3 ¶ 14.) Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's medical care claim.

### F. Doe Defendants

Plaintiff's complaint includes claims against Doe Defendants. These Does appear to be the officers who were in the mess hall at the time of the incident and the officer who conducted Plaintiff's disciplinary hearing. Plaintiff has never amended his complaint to name these officers. Even if Plaintiff had named the officers, he has not raised a triable issue of fact as to any of his claims, as discussed above. Therefore, I recommend that the Court dismiss the Doe Defendants.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 39) be **GRANTED;** and it is further

**RECOMMENDED** that all claims against the Doe Defendants be dismissed; and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of *Hickey v. City of New York,* No. 01–CV–6506, 2004 U.S. Dist. LEXIS 23941, 2004 WL 2724079 (S.D.N.Y. Nov. 29, 2004); *Decayette v.. Goord,* No. 06–CV–0783, 2009 U.S. Dist. LEXIS 48127, 2009 WL 1606753 (N.D.N.Y. June 8, 2009); and *Rodriguez v. Mercado,* No. 00–CV–8588, 2002 U.S. Dist. LEXIS 16057, 2002 WL 1997885 (S.D.N.Y. Aug. 28, 2002) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**\*12** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

### All Citations

Not Reported in F.Supp.2d, 2010 WL 3862082

### Footnotes

1    Plaintiff also named former United States Attorney General Alberto Gonzalez and Director of the Bureau of Prisons Harley G. Lappin as defendants. (Dkt. No. 1.) This Court *sua sponte* dismissed those defendants upon initial review of the complaint. (Dkt. No. 5.)

2    Defendants assert, without citation to evidence, that Plaintiff was "a convicted inmate at the time of the incident." (Dkt. No. 39–8 at 3.)

3    Plaintiff admits that he was hiding salt packets. At his deposition, Plaintiff was asked if he knew why Defendant Walborn asked him to leave the lunch room. Plaintiff testified that "I guess I was putting salt packages under the table, 'cause that's what I was doing." (Dkt. No. 39–2 at 19:3–6.) Plaintiff testified that at the time of the incident he was not aware of that there was a policy against putting salt under the table. (Dkt. No. 39–2 at 19:17–21.) He was aware of a rule prohibiting inmates from taking food to their cells, which was why he stuck the salt in the table rather than taking it to his cell. (Dkt. No. 39–2 at 20:14–15.)

4    In a memorandum written on the day of the incident, Sgt. Morgan Radell estimated that the cart rolled ten or fifteen feet. (Dkt. No. 39–5 at 9.)

5    On April 21, 2010, Defendants sought permission to file a copy of the video evidence. (Dkt. No. 44.) On April 26, 2010, I granted Defendants' request, noting that the Court would determine at a later date whether or not the proffered video constituted admissible evidence. (Dkt. No. 45.) On April 28, 2010, Defendants submitted the video, supported by a declaration from Lt. Mack, the custodian of records at Cayuga County Jail, regarding its admissibility as a business record. (Dkt. No. 46.) On June 1, 2010, Plaintiff filed objections to the Affidavit of John Mack. (Dkt. No. 49.) Plaintiff argues that Lt. Mack's affidavit is not based on personal knowledge. (Dkt. No. 49 at 1–2.) I recommend that the Court,

for the purposes of this motion, overrule Plaintiff's objections and find the video evidence admissible pursuant to Federal Rule of Evidence 901.

6    Indeed, it appears that no one present at the time of the incident believed at the time that Plaintiff was "brandishing" a utensil. As discussed further below, none of the reports written on the day of the incident mention that Plaintiff was holding, much less "brandishing," a utensil.

7    According to a memorandum written by Lt. Mack, Defendant Walborn told Lt. Mack after the incident that he thought he may have pulled some muscles or injured his back. He received chiropractic care and was excused from work for at least two days to recuperate from strained back muscles. (Dkt. No. 43 at 31.) This fact also supports Defendant Walborn's contention that he did not intend to move the cart.

8    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

9    The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford,* 548 U.S. 81. *Chavis v. Goord,* No. 07–4787–pr, 2009 U.S.App. LEXIS 13681, at *4, 2009 WL 1803454, at *1 (2d Cir. June 25, 2009). I will assume for the purposes of this motion that *Hemphill* remains good law.

10    None of these statements were made under penalty of perjury. Rather, they are merely asserted in Plaintiff's opposition brief.

11    "Normal" SHU conditions include being kept in solitary confinement for 23 hours per day, provided one hour of exercise in the prison yard per day, and permitted two showers per week. *Ortiz v. McBride,* 380 F.3d 649, 655 (2d Cir.2004).

12    Any claim that Defendant Walborn violated Plaintiff's right to adequate medical care was dismissed with leave to amend because Plaintiff failed to allege facts plausibly suggesting that Defendant Walborn was personally involved in the alleged violation. (Dkt. No. 27.) Plaintiff did not amend his complaint.

13    The same standard applies to pretrial detainees' claims under the Fourteenth Amendment and convicted inmates' claims under the Eighth Amendment. *Caiozzo,* 581 F.3d at 69–72.

14    The Court will provide Plaintiff with a copy of these unpublished decisions in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

15    It appears that Plaintiff may have sought treatment for his shoulder after he transferred out of the Cayuga County Jail. In a letter to this Court dated February 25, 2010, Plaintiff requested, *inter alia,* an order directing the medical department of his current facility to provide him with copies of his records. (Dkt. No. 42.) Plaintiff asserted that these documents were relevant to the summary judgment motion, but did not explain why. Discovery in this case closed on November 12, 2009. Although I might exercise discretion to allow Plaintiff, an unrepresented civil rights litigant, to pursue discovery after the discovery cut-off, I decline to do so here. Plaintiff has not asserted any reason why the records are relevant. He does not argue, for instance, that these later medical records would raise a triable issue of fact that he suffered injuries so severe that Defendants' failure to note or treat them constituted deliberate indifference. Defendants state that they have provided Plaintiff with all of the medical records in their possession. (Dkt. No. 50.) Therefore, I deny Plaintiff's request.

2009 WL 236060
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

George M. CHAVIS, Plaintiff,
v.
S. VONHAGN, et al., Defendants.

No. 02–CV–0119(Sr).
|
Jan. 30, 2009.

West KeySummary

<table>
<tr><td>1</td><td>**Prisons**<br>👉 Particular Conditions and Treatments<br>**Sentencing and Punishment**<br>👉 Medical care and treatment</td></tr>
</table>

No genuine issue of material fact existed regarding whether prison medical staff violated a prisoner's Eighth Amendment rights by being deliberately indifferent to the prisoner's medical needs to preclude summary judgment. The evidence indicated that the prisoner was seen on eighteen occasions during December 1999 because the prisoner complained of ear problems. The prison medical staff examined the prisoner on those occasions, noted that it was not an ear infection, and advised the prisoner to stop putting foreign objects into his ears. The evidence further indicated that the prison medical staff administered Advil, ear drops, ear wash, and over-the-counter medication, such as skin cream, lip balm, and Sudafed, to the prisoner as he requested and needed it. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

4 Cases that cite this headnote

**Attorneys and Law Firms**

George M. Chavis, Dannemora, NY, pro se.

Delia Dianna Cadle, New York State Attorney General's Office, Buffalo, NY, for Defendants.

*DECISION AND ORDER*

H. KENNETH SCHROEDER, JR., United States Magistrate Judge.

**\*1** Pursuant to 28 U.S.C. § 636(c), the parties have consented to have the undersigned conduct any and all further proceedings in this case, including entry of final judgment. Dkt. # 42.

Plaintiff filed this *pro se* action seeking relief pursuant to 42 U.S.C. § 1983. Dkt.1 and 9. Plaintiff alleges that while an inmate at the Southport Correctional Facility, his rights pursuant to the First, Eighth, and Fourteenth Amendments to the United States Constitution were violated. *Id.* Currently before the Court is defendants' motion for summary judgment. Dkt. # 79. For the following reasons, defendants' motion for summary judgment is granted in its entirety.

*BACKGROUND*

Plaintiff, proceeding *pro se,* filed this action on or about February 11, 2002, seeking "dismissal" (expungement) of each "disciplinary ticket" (hereinafter referred to as "Misbehavior Report") addressed in the amended complaint, termination of each defendant's employment with the New York Department of Correctional Services, and compensatory and punitive damages for violations of his rights under the First, Eighth and Fourteenth Amendments to the United States Constitution. [1] *Id.* The following claims remain and are presently before this Court on defendants' motion for summary judgment: (1) in or about December 1999, defendants Brandt and vonHagn denied plaintiff emergency medical care and defendant Brandt denied plaintiff medication in or about January 2001; (2) defendants Brandt and vonHagn retaliated against plaintiff because plaintiff had filed grievances against defendants Brandt and vonHagn; (3) defendants Donahue, Gilmore, Irizarry, Quinn, Ryan, Selsky, Sheahan and Wilcox violated plaintiff's due process rights under the Fourteenth Amendment in connection with disciplinary hearings and appeals handled by each of the defendants; (4) defendant Gardner interfered

with plaintiff's legal mail and denied plaintiff permission to take a religious correspondence course in violation of the First Amendment; and (5) defendants Corcoran and Weingartner violated plaintiff's First Amendment right of access to the New York Court of Claims.

### A. Deliberate Indifference Claim

At all times relevant to the allegations in the amended complaint, defendants Sabrina vonHagn, R.N. and Robert Brandt, R.N. were employed by the New York State Department of Correctional Services ("DOCS") at the Southport Correctional Facility ("Southport"). Dkt. # 82, ¶ 1; Dkt. # 83, ¶ 1. Plaintiff's deliberate indifference claim against defendant vonHagn states, in part:

> On the date [sic] of 12–16–99 to 12–22–99, S. VonHagan [sic], inside of this Southport Prison, while acting under State color [sic], in her individual and official [2] capacities, had [sic] knowingly, intentionally, and wilfully denied me 'emergency' medical care for a serious—extremely painful ear infection resulting in my total loss of hearing ability in my ear for a time period of two weeks.

**\*2** Dkt. # 9, p. 5. Similarly, plaintiff's deliberate indifference claim against defendant Brandt states, in part:

> Additionally, on the date [sic] of 12–16–99 to 12–22–99, this same defendant [Brandt], who is the medical staff co-worker and morning partner of defendant S. VonHagan [sic] (para # 1), had done [sic] SHU–AM cell visits on these dates above and knowingly, wilfully, and intentionally 'aided' in the *denial* of my receiving [sic] 'emergency' medical care for my ear infection resulting in extreme pain and loss in hearing ability for a two week time period.

*Id.* at p. 5–B (emphasis in original). Plaintiff also alleges (as part of his retaliation claim) that defendant Brandt "violated my right to proper medication" in January 2001. Dkt. # 9, p. 5–A.

In or about December 2004, defendant vonHagn had been a licensed registered nurse for approximately 28 years and had been employed as a registered nurse at Southport since 1994. Dkt. # 83, ¶ 1. Also in or about December 2004, Defendant Brandt had been a licensed registered nurse for approximately 25 years and had been employed as a registered nurse at Southport since 1992. Dkt. # 82, ¶ 1. At all times relevant to the claims alleged in the amended complaint, John Alves, M.D. was the Facility Health Services Director of the Medical Services Unit at Southport and held that position since 1995. Dkt. # 81, ¶ 1. As of December 2004, Dr. Alves had been licensed to practice medicine for approximately 25 years. *Id.*

### 1. December 1999

Plaintiff was transferred to Southport on or about March 24, 1999. Dkt. # 81, ¶ 6. During December 1999, plaintiff's ambulatory health records reveal that he had eighteen encounters with medical staff. Dkt. # 81, ¶ 7. Indeed, prior to December 16, 1999, plaintiff was seen by medical staff on the following nine occasions, December 2 (Brandt), December 3 (vonHagn), December 4 (vonHagn), December 7 (vonHagn—twice), December 10 (vonHagn), December 13 (Brandt), and December 14 (Brandt and Hearn). Dkt. # 81, ¶¶ 7–11; Dkt. # 82, ¶ 9; Dkt. # 83, ¶¶ 8–9. On December 16, 1999, plaintiff was seen by defendant Brandt during morning sick call. Dkt. # 81, ¶ 12; Dkt. # 82, ¶ 10. During this sick call, plaintiff requested an ear check and stated that he could not hear. *Id.* On or about December 16, 1999, defendant Brandt made the following notations in plaintiff's medical records, "ear ✓ some wax noted drum visible canal mildly irritated from inmate using pen cap paper [sic] for cleaning ear." *Id.;* Dkt. # 70, p. 0843. Defendant Brandt advised plaintiff of his findings and plaintiff demanded ear drops. *Id.* Defendant Brandt further advised plaintiff that ear drops were not indicated and defendant Brandt noted that plaintiff was "very verbal, screaming, banging on cell bars." *Id.* Defendant Brandt again saw plaintiff on December 17, 1999, wherein plaintiff again demanded ear drops and complained of a headache. *Id.* Defendant Brandt again advised plaintiff against cleaning his ears with foreign objects and provided plaintiff with Advil. *Id.*

**\*3** Plaintiff was seen by defendant vonHagn on December 18, 1999, during morning sick call. Dkt. # 70, p. 0843; Dkt. # 81, ¶ 13; Dkt. # 83, ¶ 10. At that time, plaintiff demanded a second ear check and stated that he could not hear out of both ears. *Id.* Defendant vonHagn advised plaintiff that she would schedule an ear examination with Dr. Alves, if possible, and noted in plaintiff's medical records for plaintiff

to follow up with the block RN. *Id.* Defendant vonHagn further noted that, despite complaints that he could not hear, plaintiff heard her statements. *Id.* Plaintiff began demanding an ear examination immediately. *Id.* Defendant vonHagn also saw plaintiff during morning sick call on December 19 and 20, 1999. Dkt. # 70, p. 0842; Dkt. # 81, ¶ 14; Dkt. # 83, ¶ 11. On December 19, 1999, plaintiff requested Advil, however, defendant vonHagn noted that plaintiff had received Advil on December 17, 1999 and it could not be refilled until December 20, 1999. *Id.* Notwithstanding the foregoing, defendant vonHagn provided plaintiff with Advil and as reflected in plaintiff's medical records, advised plaintiff that he was on the MD list for an ear examination. *Id.*

On December 20, 1999, plaintiff continued to complain of ear blockage and an infection. Dkt. # 70, p. 0842; Dkt. # 81, ¶ 15; Dkt. # 83, ¶ 12. In plaintiff's medical records, defendant vonHagn noted that plaintiff's ear examination was rescheduled, and that an ear examination was conducted in the office. *Id.* Defendant vonHagn also made the following notes in plaintiff's medical records: "ear ✓ in office left ear cereum [sic] impaction seen, right ear some impaction seen, no visualization of tm (tampanic [3] [sic] membrane) seen in either ear." *Id.* According to both Dr. Alves and defendant vonHagn, "visualization" is a sign of an ear infection and as noted, defendant vonHagn did not observe any visualization. Dkt. # 81, ¶ 15; Dkt. # 83, ¶ 12. Defendant vonHagn further noted that she provided plaintiff with debrox (ear drops) daily for seven days and ear wash and noted to schedule a follow up. Dkt. # 70, p. 0842; Dkt. # 81, ¶ 15; Dkt. # 83, ¶ 12.

It was not until December 23, 1999, that plaintiff again requested morning sick call. Dkt. # 70, p. 0842; Dkt. # 81, ¶ 16; Dkt. # 82, ¶ 11. Plaintiff was seen by defendant Brandt and requested over-the-counter medication for general use and defendant Brandt provided him with skin cream, lip balm and Sudafed. Dkt. # 70, p. 0842; Dkt. # 81, ¶ 16; Dkt. # 82, ¶ 11. Notably, plaintiff made no complaint of ear pain on December 23, 1999. *Id.* Plaintiff next requested a morning sick call on December 27, 1999, at which time he was seen by defendant Brandt. Dkt. # 70, p. 0841; Dkt. # 81, ¶ 17; Dkt. # 82, ¶ 12. Defendant Brandt noted in plaintiff's medical records that plaintiff wrote the following on his sick call request, "c/o [complains of] ears and ear drops." *Id.* Defendant Brandt further noted that he stopped at plaintiff's cell to do an ear check and plaintiff refused an ear examination, was extremely verbal, nasty and confrontational and stated, "get the fuck away from me white boy you fucking piece of racist homo shit. Leave me alone and stick those [ear

drops] up your white homo asshole." *Id.* Thereafter, defendant Brandt terminated plaintiff's sick call, provided ear drops to plaintiff and made a note in plaintiff's medical records to follow up by afternoon sick call, if plaintiff was more compliant and less confrontational. *Id.*

**\*4** Two days later on December 29, 1999, plaintiff again requested morning sick call and plaintiff was seen by defendant Brandt. Dkt. # 70, p. 0841; Dkt. # 81, ¶ 18; Dkt. # 82, ¶ 13. Plaintiff complained of his ears and requested over-the-counter medications. *Id.* Defendant Brandt attempted to check plaintiff's ears but plaintiff refused, stating, "fuck you white homoboy." *Id.* Defendant Brandt made the following additional notations in plaintiff's medical records, "balm, AF, MD callout." *Id.* Nurse vonHagn next saw plaintiff on December 31, 1999, during morning sick call. Dkt. # 70, p. 0841; Dkt. # 81, ¶ 19; Dkt. # 83, ¶ 13. At that time, plaintiff requested Eucerin cream and when asked to show defendant vonHagn his dry skin, plaintiff refused and became verbally abusive. *Id.* In addition, plaintiff requested and was provided with Sudafed. *Id.* On January 4, 2000, plaintiff refused to see Dr. Alves during the MD callout and Dr. Alves noted plaintiff's refusal in plaintiff's medical records. Dkt. # 70, p. 0840; Dkt. # 81, ¶ 20. Defendant Brandt also noted plaintiff's refusal to see Dr. Alves in plaintiff's medical records and further noted that when he tried to speak to plaintiff, plaintiff stated "F you + your Dr to check my ear assholes." Dkt. # 70, p. 0840; Dkt. # 81, ¶ 21; Dkt. # 82, ¶ 15.

**2. January and February 2000**[4]
Plaintiff was next seen at morning sick call on January 8, 2000 by Nurse Whedon who noted that plaintiff requested refills of certain medications, however, Nurse Whedon noted that plaintiff did not have any symptoms of a cold, cough or congestion. Dkt. # 70, p. 0840; Dkt. # 81, ¶ 22. Plaintiff made no complaint on January 8, 2000 about his ears. *Id.* On January 12, 2000, plaintiff was seen during morning sick call by defendant Brandt wherein plaintiff complained of a cold and a sore throat. Dkt. # 70, p. 0839; Dkt. # 81, ¶ 23; Dkt. # 82, ¶ 16. Plaintiff requested hydrocortisone cream and Eucerin, but plaintiff refused to show a need for the cream and became verbally abusive. *Id.* Plaintiff did not make any complaints about his ears on January 12, 2000. *Id.*

Defendant vonHagn next saw plaintiff on January 14, 2000 during morning sick call, wherein plaintiff signed for his eyeglasses and became verbally abusive to defendant vonHagn.[5] Dkt. # 70, p. 0839; Dkt. # 81, ¶ 24; Dkt. #

83, ¶ 15. Plaintiff did not make any complaints about his ears on January 14, 2000. *Id.* On January 18, 2000, plaintiff requested morning sick call and was seen by defendant Brandt. Dkt. # 70, p. 0839; Dkt. # 81, ¶ 25; Dkt. # 82, ¶ 17. At that time, plaintiff refused his tuberculosis test and became verbally abusive; plaintiff did not, however, complain about his ears. *Id.* According to plaintiff's medical records, plaintiff requested morning sick call on January 24, 25, and 29, 2000 and February 6, 2000. Dkt. # 70, pp. 0838–0837. Plaintiff was not seen by either defendant Brandt or defendant vonHagn on the three remaining dates in January 2000 or on February 6, 2000 and according to plaintiff's medical records, plaintiff did not complain about his ears during any of those visits. *Id.;* Dkt. # 81, ¶ 26. Thereafter, plaintiff was transferred from Southport to Coxsackie Correctional Facility ("Coxsackie") on or about February 7, 2000. Dkt. # 81, ¶ 27. Plaintiff remained at Coxsackie until in or about May 2000 at which time he was returned to Southport. *Id.*

### 3. May–December 2000

**\*5** For the period May 2000 through December 2000, plaintiff had thirty-eight encounters with medical staff. [6] Dkt. # 70, pp. 0754–0763 and pp. 0815–0817; Dkt. # 81, ¶¶ 28–49. Plaintiff was seen by defendant Brandt on May 25, 2000, at which time plaintiff demanded Eucerin cream. Dkt. # 70, p. 0817; Dkt. # 81, ¶ 28. Because no need for the cream was demonstrated, defendant Brandt denied plaintiff's request. *Id.* Plaintiff was seen by defendant vonHagn on July 6, 2000, at which time plaintiff requested a plastic basin and Epsom salts to soak his feet because his toes were bothering him. Dkt. # 70, p. 0763; Dkt. # 81, ¶ 30. Plaintiff did not show defendant vonHagn his toe nails and defendant vonHagn noted in plaintiff's medical records that there should be follow up with the block nurse to cut plaintiff's toe nails. *Id.* When plaintiff was seen by defendant vonHagn on September 29, 2000, he again requested Epsom salts, Sudafed and athlete's foot cream. Dkt. # 70, p. 0760; Dkt. # 81, ¶ 32. Defendant vonHagn noted that because there was no order from the doctor for a foot soak, she only provided plaintiff with Sudafed and athlete's foot cream. *Id.* On October 10, 2000, plaintiff was seen by defendant Brandt wherein plaintiff requested over-the-counter skin cream and he was provided with athlete's foot cream and Eucerin. Dkt. # 70, p. 0760; Dkt. # 81, ¶ 34. Plaintiff was also seen by defendant Brandt on October 23, 2000, wherein plaintiff requested a laxative; defendant Brandt provided plaintiff with Fleet enemas. Dkt. # 70, p. 0759; Dkt. # 81, ¶ 36. During November 2000, plaintiff was seen by both defendant vonHagn and defendant Brandt. Dkt. # 70, p. 0758;

Dkt. # 81, ¶ 38–39. On November 3, 2000, plaintiff was seen by defendant vonHagn and requested Epsom salt, Sudafed and Eucerin cream. *Id.* Defendant vonHagn provided plaintiff with Sudafed. *Id.* Thereafter, plaintiff was seen by defendant Brandt on November 29, 2000 and requested Eucerin cream. *Id.* Defendant Brandt noted that plaintiff was provided with Eucerin cream on October 10, 2000 and was not due for a refill until January 10, 2001. *Id.* Defendant Brandt provided plaintiff with balm and Sudafed. *Id.*

Plaintiff was seen by defendant vonHagn on December 13, 20, 24 and 26, 2000. Dkt. # 70, pp. 0755–0757; Dkt. # 81, ¶¶ 42–45. On December 13, 2000, plaintiff again requested Eucerin and athlete's foot cream. Dkt. # 70, p. 0757; Dkt. # 81, ¶ 42. Plaintiff was provided with athlete's foot cream and balm and it was noted again in plaintiff's medical records that plaintiff was not due for more Eucerin until January 10, 2001. *Id.* On December 20, 2000, plaintiff requested and was provided with Sudafed. Dkt. # 70, p. 0756; Dkt. # 81, ¶ 43. Plaintiff requested Advil, a laxative and to have a toe nail removed on December 24, 2000 when he was seen by defendant vonHagn. Dkt. # 71, p. 0756; Dkt. # 81, ¶ 44. Defendant vonHagn provided plaintiff with Advil and Fleet enemas. *Id.* Again on December 26, 2000, plaintiff requested Advil and laxative and defendant vonHagn provided both to plaintiff. Dkt. # 70, p. 0755; Dkt. # 81, ¶ 45. Defendant Brandt saw plaintiff on December 27 and 28, 2000. Dkt. # 70, p. 0755; Dkt. # 81, ¶¶ 46–47. On December 27, 2000, plaintiff requested and was provided with Advil. *Id.* On December 28, 2000, plaintiff complained of a rash and was provided with hydrocortisone cream. *Id.* Plaintiff requested sick call on December 29, 2000 and when defendant vonHagn went to plaintiff's cell, plaintiff did not respond to defendant vonHagn's inquiries. Dkt. # 70, p. 0754; Dkt. # 81, ¶ 48. Finally, on December 30, 2000, plaintiff was seen by defendant Brandt wherein plaintiff requested and was provided with laxative and Advil. Dkt. # 70, p. 0754; Dkt. # 81, ¶ 49.

### 4. January 2001

**\*6** Plaintiff had twelve encounters with medical staff during January 2001. Dkt. # 70, pp. 0750–0754; Dkt. # 81, ¶ 50. Plaintiff was seen by defendant Brandt on January 2, 9, 10, 22, 23 and 24, 2001. Dkt. # 70, pp. 0752–0754; Dkt. # 81, ¶¶ 51–56. On January 2, 2001, plaintiff complained of his sinuses and requested band-aids for his toes. Dkt. # 70, p. 0753; Dkt. # 81, ¶ 51. Defendant Brandt provided plaintiff with Sudafed and band-aids. *Id.* On January 9, 2001, plaintiff complained of a sore throat and of his toes; defendant Brandt provided

plaintiff with throat lozenges and band-aids. Dkt. # 70, p. 0753; Dkt. # 81, ¶ 52. Plaintiff complained of a headache and a sore throat on January 10, 2000 and defendant Brandt provided him with Advil and throat lozenges. Dkt. # 70, p. 0753; Dkt. # 81, ¶ 53.

On January 14, 2001, plaintiff was seen by Nurse Whedon during morning sick call and requested Sudafed for sinus congestion, hydrocortisone cream and "mom." Dkt. # 70, p. 0753. On January 22, 2001, plaintiff complained of a rash and defendant Brandt provided him with athlete's foot cream and hydrocortisone cream. Dkt. # 70, p .0752; Dkt. # 81, ¶ 54. Plaintiff was seen by defendant Brandt on January 23, 2001 and defendant Brandt noted in plaintiff's medical records that plaintiff threw hydrocortisone cream at defendant Brandt and stated, "next time I'll spit + shit on you." Dkt. # 70, p. 0752; Dkt. # 81, ¶ 55. The sick call was terminated and defendant Brandt issued a Misbehavior Report. [7] *Id.* The following day, on January 24, 2001, plaintiff was again seen by defendant Brandt and plaintiff requested over-the-counter medication for general use. Dkt. # 70, p. 0752; Dkt. # 81, ¶ 56. Defendant Brandt provided plaintiff with throat lozenges and Motrin. *Id.* On January 26, 2001, plaintiff was seen by defendant vonHagn and plaintiff requested hydrocortisone cream and Sudafed. Dkt. # 70, p. 0751; Dkt. # 81, ¶ 57. Defendant vonHagn noted in plaintiff's medical records, "no ointment while on level 1" and further noted that plaintiff had received hydrocortisone cream on January 23, 2001 . [8] *Id.* Accordingly, defendant vonHagn provided plaintiff with Sudafed. *Id.*

Plaintiff was again seen by Nurse Whedon on January 27 and 28, 2001. Dkt. # 71, p. 0751; Dkt. # 81, ¶¶ 59–60. On January 27, 2001, plaintiff requested hydrocortisone ointment and laxative. *Id.* Nurse Whedon noted in plaintiff's medical records "no ointment on level 1" and provided plaintiff with a laxative. *Id.* On January 28, 2001, plaintiff requested analgesic balm for sore muscles and hydrocortisone ointment. *Id.* Nurse Whedon provided plaintiff with analgesic balm. *Id.* Plaintiff requested sick call on January 29 and 31, 2001 and defendant Brandt attempted to see plaintiff on both days, however on January 29, 2001, plaintiff refused to get out of bed and refused to answer defendant Brandt. *Id.* Similarly, on January 31, 2001, plaintiff refused to acknowledge defendant Brandt. *Id.*

**5. February 2001**

*7 During February 2001, plaintiff had fifteen encounters with medical staff. Dkt. # 70, pp. 0745–0750; Dkt. # 81, ¶ 63. Plaintiff was seen by defendant vonHagn on February 1, 4, 8, 9, and 13, 2001. Dkt. # 70, pp. 0748–0750; Dkt. # 81, ¶¶ 64 and 66–68. On February 1, 2001, plaintiff requested hydrocortisone on the call out slip, however, plaintiff refused to answer defendant vonHagn and refused to get out of bed. Dkt. # 70, p. 0750; Dkt. # 81, ¶ 64. On February 3, 2001, plaintiff was seen by Nurse Whedon and requested hydrocortisone ointment and throat lozenges, plaintiff was provided with only throat lozenges. Dkt. # 70, p. 0749; Dkt. # 81, ¶ 65. Plaintiff requested hydrocortisone ointment for his scalp from defendant vonHagn on February 4, 2001. Dkt. # 70, p. 0749; Dkt. # 81, ¶ 66. Plaintiff's medical records reveal that plaintiff refused to answer defendant vonHagn and refused to show any medical need (by examination) for the ointment. *Id.* Plaintiff was again seen by defendant vonHagn on February 8, 2001 and plaintiff refused to answer when he was called for sick call. Dkt. # 70, p. 0749; Dkt. # 80, ¶ 67. According to the sick call request, plaintiff requested Eucerin, Sudafed and hydrocortisone cream. *Id.* Defendant vonHagn provided plaintiff with Sudafed and hydrocortisone cream. *Id.* According to plaintiff's medical records plaintiff was not eligible to receive additional Eucerin until March 13, 2001. *Id.* Finally, plaintiff was seen by defendant vonHagn on February 9, 2001 and requested hydrocortisone ointment and Eucerin. Dkt. # 70, p. 0748; Dkt. # 81, ¶ 68. Defendant vonHagn once again noted that plaintiff was not due for Eucerin until March 13, 2001 and that plaintiff failed to respond to her requests to demonstrate a medical need for hydrocortisone ointment. *Id.*

On February 11, 2001, plaintiff was seen by Nurse Whedon who noted that plaintiff submitted a sick call slip threatening to sue Nurse Whedon if he wasn't provided with hydrocortisone ointment. Dkt. # 70, p. 0748; Dkt. # 81, ¶ 69. Nurse Whedon noted in plaintiff's medical records that there was no medical need shown for hydrocortisone ointment and that plaintiff would not acknowledge the sick call and remained in bed. *Id.* Plaintiff was seen by defendant vonHagn on February 13, 2001 and he requested balm, hydrocortisone ointment and Motrin. Dkt. # 70, p. 0748; Dkt. # 81, ¶ 70. Defendant vonHagn noted in plaintiff's medical records that no tubes or envelopes were returned. [9] Plaintiff requested morning sick call on February 14, 2001, however, defendant Brandt noted in plaintiff's medical records that plaintiff refused to get up for sick call. Dkt. # 70, p. 0747; Dkt. # 81, ¶ 71.

Plaintiff was seen on February 18, 2001 by Nurse Brink at which time he requested and was provided with athlete's foot cream and analgesic balm for sore muscles. Dkt. # 70, p. 0747; Dkt. # 81, ¶ 72. Plaintiff was seen by Nurse Whedon on February 19, 2001 and complained of chronic constipation and requested a high fiber diet; Nurse Whedon recommended a fiber laxative, plaintiff refused stating that they don't work. Dkt. # 70, p. 0747; Dkt. # 81, ¶ 73. Nurse Whedon also noted in plaintiff's medical records that plaintiff continues to request hydrocortisone ointment and showed Nurse Whedon scaly patches on his scalp. *Id.* On February 22, 2001, plaintiff was seen by Nurse DeMeritt and requested minor surgery for his right toenail and noted that plaintiff had a left toenail removed in December 2000. Dkt. # 70, p. 0746; Dkt. # 81, ¶ 74. Nurse DeMeritt submitted a request for right toenail surgery. *Id.*

**\*8** Plaintiff was seen by Nurse Whedon on February 24, 2001, wherein plaintiff requested hydrocortisone ointment, Sudafed for congestion and a natural laxative. Dkt. # 70, p. 0746; Dkt. # 81, ¶ 75. Nurse Whedon noted in plaintiff's medical records that his request for hydrocortisone ointment was denied, plaintiff refused a fiber laxative and plaintiff was provided with Sudafed. *Id.* Plaintiff was seen again by Nurse DeMeritt on February 26 and 28, 2001. Dkt. # 70, p. 0745; Dkt. # 81, ¶¶ 76–77. On February 26, 2001, plaintiff requested foot cream and hydrocortisone cream and Nurse DeMeritt noted that plaintiff returned the empty tubes and also noted "tinea pedis/uticaria" (athlete's foot) to be treated with over-the-counter medication. *Id.* Plaintiff was provided with mycelex and hydrocortisone cream. *Id.* Plaintiff requested a laxative "to clean his system out" on February 28, 2001, however, Nurse DeMeritt did not note any distress and recommended treatment with over-the-counter medication and fluids and provided plaintiff with Fleet enemas. *Id.*

Dr. Alves, as the Facility Health Services Director of the Medical Services Unit at Southport, reviewed plaintiff's medical records and based upon his review, Dr. Alves concluded that defendants Brandt and vonHagn were not deliberately indifferent to plaintiff's medical complaints about ear pain in December 1999. Dkt. # 81, ¶ 78. Moreover, Dr. Alves concluded that neither defendant Brandt nor defendant vonHagn refused to treat plaintiff's complaints of ear pain. *Id.* Indeed, Dr. Alves further concluded that defendants Brandt and vonHagn treated plaintiff's complaints of ear pain, provided him with debrox, scheduled and performed ear examinations and referred plaintiff to the MD callout as

necessary. *Id.* Although plaintiff at times refused the debrox, Dr. Alves found that plaintiff did not require any treatment other than debrox and that debrox was the appropriate medication to treat his complaints of ear pain. *Id.* at ¶ 80. Dr. Alves further opined that plaintiff did not suffer any hearing loss in December 1999 or at anytime related to his treatment of ear pain during December 1999. *Id.* at ¶ 79. Notably, Dr. Alves stated that plaintiff did not complain of ear pain at any time after January 2000. *Id.* at ¶ 84. Finally, Dr. Alves determined that nothing in plaintiff's medical records indicated that either defendant vonHagn or defendant Brandt, either prior to or after issuing a Misbehavior Report regarding plaintiff, refused or failed to provide plaintiff with medical care for the period December 1999 through February 2001. *Id.* at ¶¶ 82–83.

**B. Retaliation Claim**

The amended complaint alleges that on or about January 25, 2000 and on or about December 13, 2000, defendant vonHagn issued Misbehavior Reports against plaintiff in retaliation for his complaints about her. Dkt. # 9, pp. 5 to 5–A. Similarly, plaintiff further alleges in the amended complaint that on or about January 23, 2001, defendant Brandt issued a Misbehavior Report against plaintiff in retaliation for plaintiff's complaints about him. *Id* . at pp. 5–A to 5–B. With respect to the hearings held on the allegedly retaliatory Misbehavior Reports issued by defendants vonHagn and Brandt, plaintiff separately alleges that his due process rights were violated by the hearing officers who presided over the hearings. Dkt. # 9. Those claims of due process violations will be separately addressed below. *See generally* pp. 30–65 *infra*. Specifically, as against defendant vonHagn, plaintiff alleges:

> **\*9** Additionally, on the date of 1–25–00, this defendant [vonHagn] 'retaliated' against me with a ticket after my *prior* inmate grievances against her on 'numerous' occasions for denying me proper medical care for many illness'es [sic] I suffered with/from. Furthermore, on the date of 12–13–00 (hearing date of 12–29–00), this same defendant [vonHagn] again retaliated upon [sic] me with a ticket *after* my inmate grievances against her.

Dkt. # 9, pp. 5–5A (emphasis in original). As against defendant Brandt, the amended complaint states:

This defendant [Brandt] on the date on 1–23–01, inside of this Southport Prison, while acting under state color, in his individual and official [10] capacities, had knowingly, wilfully, and intentionally retaliated against me with a ticket after my inmate grievance against him on date of 1–22–01, after his violation of my right to proper medication.

Dkt. # 9, p. 5A.

### 1. "January 25, 2000" Misbehavior Report—Defendant vonHagn

Defendant vonHagn did not file a Misbehavior Report against plaintiff on January 25, 2000. Dkt. # 83, ¶ 19. Defendant vonHagn did, however, issue a Misbehavior Report against plaintiff on January 14, 2000 (Dkt.# 44, p. 0029) and the hearing with respect to the January 14, 2000 Misbehavior Report was held on January 25, 2000 (Dkt.# 44, p. 0026). [11] The January 14, 2000 Misbehavior Report charging violations of rules 107.10 (verbal interference) and 107.11 (verbal harassment) states:

At approx 7:35/am the writer of this report [defendant vonHagn] stopped at B–10–20 cell to deliver inmate Chavis, G 91A3261 glasses [sic] Before the writer of this report could say anything inmate Chavis G told the writer to move on. The writer of this report was able to convince inmate Chavis to sign for glasses so they could be delivered. He was asked not to tear copy away [sic] both needed to be returned to eye glass clinic coord. Patient asked if he wished a copy he could write the nurse adm. Inmate Chavis 91A3261 B–10–20 then said, "you are a stupid asshole." "You want 25¢ to give me a fucking copy of my glasses receipt." "I'll take your fucking money in court. I'll tear you apart in court" [sic] "I'm not as fucking stupid as you are." "You stupid fucking asshole." "Get the fuck away from my cell you asshole." This continued abuse made continuing [sic] sick call on B–10 gallery difficult to hear B–10–17 cell for sick call.

Dkt. # 44, p. 0029. The Tier 2 [12] disciplinary hearing was held on January 25, 2000 and conducted by defendant Lieutenant ("Lt.") Ryan. [13] During the disciplinary hearing, plaintiff advised Lt. Ryan that he believed that the January 14, 2000 Misbehavior Report was written by defendant vonHagn in retaliation for complaints plaintiff had previously filed against defendant vonHagn. Dkt. # 44, pp. 0032–0038; Dkt. # 83, ¶ 23. Specifically, plaintiff stated, "I'm objecting to the ticket and I'm objecting to the hearing. That ticket is retaliatory and uh let the record also reflect that uh this here uh write up [sic], who happens to be a medical female staff aid, uh has been violating my natural rights since I've entered this here facility." Dkt. # 44, pp. 0032–0038. In the amended complaint, plaintiff alleges that the January 14, 2000 Misbehavior Report issued by defendant vonHagn was in retaliation for the prior grievances filed by plaintiff against defendant vonHagn. Dkt. # 9, pp. 5–5A. On or about December 30, 1999, plaintiff filed a grievance against unspecified persons, Grievance No. SPT–17707–99. Dkt. # 65, pp. 0433–0444; Dkt. # 83, ¶ 36. Grievance No. SPT–17707–99 is discussed in greater detail below. *See* pp. 21–23 *infra*. Correction Officer R. Martino testified at the hearing that he was present on January 14, 2000 when defendant vonHagn attempted to give plaintiff his eyeglasses and when plaintiff was verbally abusive toward defendant vonHagn. Dkt. # 44, pp. 0032–0038. Notwithstanding plaintiff's claim of retaliation and relying upon the testimony of Officer Martino, Lt. Ryan found plaintiff guilty of verbal interference and verbal harassment. *Id.*

### a. Grievance No. SPT–17707–99

**\*10** In Grievance No. SPT–17707–99, plaintiff asserts that:

(1) On this date above [Dec. 27, 1999] (after submitting a sick call slip last night (12–26–99), the same old white ill-minded white fool who denied me emergency ear examination and ear drops for infection (12–14–99) had [sic] done nothing for my continual inability to hear when he visited my cell, and after I requested outside expert medical attention, he put (wrote) down "refusal" on his sick call log instead of provid [sic] me with proper medical help outside of this place!! (2) On that date of 12–25–99, the officer (KKK racist), in the control room had deliberately turned off the T.V. hole after that 10–g (illegible) had asked for NBA sports station!

Dkt. # 65, p. 0438. In support of defendants' motion for summary judgment, defendant vonHagn, in her affidavit, summarized the assertions in Grievance No. SPT–17707–99 as follows,

> In Grievance No. SPT–17707–99, plaintiff asserted that on or about December 26, 1999, Nurse Brandt denied his request for outside medical treatment for his complaints of ear pain; that Nurse Brandt indicated that plaintiff refused treatment; that on December 14, 1999, Nurse Brandt denied him an emergency ear examination and ear drops; and that from December 14, 1999 to December 21, 1999, Nurse Brandt and I [defendant vonHagn] denied him medical treatment for an ear infection.

Dkt. # 83, ¶ 37. [14]

On December 13 and 14, 1999, plaintiff was seen by defendant Brandt during morning sick call. Dkt. # 70, p. 0844; Dkt. # 80, ¶ 12. Defendant Brandt noted in plaintiff's medical records that plaintiff requested a refill of hydrocortisone cream for a rash and lip balm and further that plaintiff complained about his sinuses and refused a PPD test. *Id.* Defendant Brandt provided plaintiff with hydrocortisone cream and Sudafed. *Id.* For a complete discussion of the medical treatment provided to plaintiff by defendants Brandt and vonHagn for the period December 16–31, 1999, please refer to pp. 4–8 *supra,* which is incorporated by reference herein.

In response to Grievance No. SPT–17707–99, Nurse Felker and defendant Brandt advised the Inmate Grievance Review Committee ("IGRC") that defendant Brant delivered ear medication to the plaintiff; that plaintiff began verbally harassing defendant Brandt and refused to accept the medication. Dkt. # 65, p. 0444. Accordingly, the Superintendent dismissed plaintiff's grievance, finding that the medical staff had stated that medication was delivered to plaintiff for ear pain, however, plaintiff began to verbally harass the nurse [defendant Brandt] and refused the medication. The Central Office Review Committee ("CORC") upheld the Superintendent's determination. Dkt. # 65, pp. 0433–0434. CORC advised plaintiff to follow the treatment plan outlined by health services staff and noted that

there was no medical need for an outside consultant at that time. *Id.*

Thus, defendant vonHagn submits that she did not file the January 14, 2000 Misbehavior Report in retaliation for Grievance No. SPT–17707–99 filed by plaintiff on or about December 30, 1999, or any other grievance filed by plaintiff. Dkt. # 83, ¶ 42. Rather, defendant vonHagn submits she filed the January 14, 2000 Misbehavior Report because of plaintiff's harassing language on that date. Dkt. # 83, ¶ 43; *see* pp. 19–21 *supra.* Moreover, as discussed above, defendant vonHagn contends that notwithstanding plaintiff's claim of retaliation, which Lt. Ryan received, Lt. Ryan found plaintiff guilty of the violations (verbal interference and verbal harassment) based on the testimony of Officer Martino who was present during the January 14, 2000 incident.

### 2. December 13, 2000 Misbehavior Report—Defendant vonHagn

**\*11** Plaintiff further alleges in the amended complaint against defendant vonHagn that, "on the date of 12–13–00 (hearing date of 12–29–00), this defendant [vonHagn] again retaliated upon [sic] me with a ticket *after* my inmate grievances against her." Dkt. # 9, pp. 5–5A (emphasis in original).

### a. Grievance No. SPT–20137–00

Plaintiff filed a grievance, Grievance No. SPT–20137–00, against both defendant Brandt and defendant vonHagn on or about December 11, 2000 alleging that defendants Brandt and vonHagn failed to provide plaintiff with a refill of skin cream and that defendants Brandt and vonHagn were racist and biased toward him. Dkt. # 44, pp. 0228–0239; Dkt. # 83, ¶¶ 50–51. Specifically, plaintiff alleged in Grievance No. SPT–20137–00 that:

> On the prior date of 12–6–00 I submitted a sick call slip, and on the next am morning no [sic] medical staff PA visited my cell (S.VonHagn), to inquire about my illnesses! This continual violation in total disregard by most medical staff of character vindictiveness [sic] and KKK corruption for forcing severe suffering on black SHU prisoner is still being allowed by Michael McGinnis, Dr. Alves, O'Bremski [sic], and you

James Meck—and Sgt Decker in yourselves [sic] concealing inmate grievances of theft by officers/racism by medical staff (S. VonHagn [sic] Brandt and Ms. Peter).

Dkt. # 44, p. 0233.

In response to Grievance No. SPT–20137–00, Nurse Administrator Obremski advised the IGRC that plaintiff's medical records do not indicate that a sick call request was ever submitted by plaintiff on December 6, 2000. Dkt. # 83, ¶ 52. Plaintiff's medical records do indicate, however, that on December 13, 2000, plaintiff requested a skin cream refill but plaintiff was not due for a refill until January 1, 2001 and that plaintiff was advised of that fact. *Id.* Finally, Nurse Administrator Obremski stated that, absent any evidence, plaintiff's allegations of racism and corruption were unfounded. *Id.;* Dkt. # 44, p. 0237. The Superintendent denied plaintiff's grievance, and the CORC upheld the Superintendent's determination that the Nurse Administrator indicated that plaintiff received medication refills on the appropriate dates and received proper medical care. Dkt. # 44, pp. 0228–0229; Dkt. # 83, ¶ 53.

After the filing of the aforementioned grievance, defendant vonHagn next saw plaintiff on December 13, 2000, at which time she noted that plaintiff had received a 90 day supply of Eucerin on October 10, 2000 which was not to be refilled until after January 10, 2001. Moreover, on December 13, 2000, defendant vonHagn provided plaintiff with athlete's foot cream and balm. Dkt. # 83, ¶ 54. On that same date, defendant vonHagn issued a Misbehavior Report based on plaintiff's threats to her and to the male assists. Dkt. # 83, ¶ 29. The December 13, 2000 Misbehavior Report states,

> While making rounds on B Block 3 Gallery this nurse [defendant vonHagn] stopped to see Inmate Chavis, G. 91A3261 B–3–19 for sick call. He requested refills. He was asked about old containers. He immediately got an attitude and said, 'He wasn't every other inmate and just get him what he wanted.' As this nurse walked away from his cell, inmate Chavis, G. says [sic] 'I'm going to hit that white bitch in her head with a baseball bat.' C.O. Stamp told inmate Chavis, G 91A3261 that statement was not necessary. Inmate Chavis, G. then said, shut up you fuck ass white mother fucker, I'll kill you too after I kill her. Inmate Chavis, G. continued to threaten this nurse and Correctional Officer until we left gallery area.

**\*12** Dkt. # 44, p. 0104; Dkt. # 83, ¶ 31.

A Tier 3 disciplinary hearing was held on December 26, 2000 (and continued on December 29, 2000) by Lt. Sheahan in relation to the December 13, 2000 Misbehavior Report.[15] Dkt. # 44, pp. 0160–0199. During the hearing, plaintiff advised Lt. Sheahan that defendant vonHagn wrote the December 13, 2000 Misbehavior Report in retaliation for grievances filed by plaintiff. Dkt. # 83, ¶ 32. Lt. Sheahan received plaintiff's evidence of complaints against defendant vonHagn, but nevertheless found plaintiff guilty of making threats against defendant vonHagn and other staff. *Id.* Indeed, Lt Sheahan found that the evidence submitted by plaintiff of past grievances against defendant vonHagn and other medical staff did not establish that the December 13, 2000 Misbehavior Report was retaliatory. *Id.* at ¶ 33. Moreover, Lt. Sheahan indicated that the disposition was given to plaintiff to impress upon him that threats to staff will not be tolerated. Dkt. # 44, p. 0102; Dkt. # 83, ¶ 33.

Following the December 13, 2000 Misbehavior Report, and during the balance of December 2000, January and February 2001, defendant vonHagn saw plaintiff a total of ten times, December 20, 24, 26, and 29, 2000, January 26, 2001, February 1, 4, 8, 9, and 13, 2001. Dkt. # 81, ¶¶ 43–77. For a complete discussion of the medical treatment provided to plaintiff by defendant vonHagn on the preceding dates, *see* pp. 10–17 *supra.* At each time after the December 13, 2000 Misbehavior Report, defendant vonHagn continued to provide plaintiff with appropriate care and treatment. Dkt. # 81, ¶ 82; Dkt. # 83, ¶ 35.

### 3. January 23, 2001 Misbehavior Report—Defendant Brandt

In the amended complaint, plaintiff alleges that defendant Brandt, in retaliation for the grievances filed against him by plaintiff, issued a retaliatory Misbehavior Report on January 23, 2001. Dkt. # 9, p. 5–A. During the time period relevant to the allegations in the amended complaint, plaintiff filed three grievances against defendant Brandt, December 30, 1999 (Grievance No. SPT–17707–99), May 24, 2000 (Grievance No. SPT–18746–00) and December 11, 2000 (Grievance No. SPT–20137–00). Plaintiff was seen by defendant Brandt on January 23, 2001 and defendant Brandt noted in plaintiff's medical records that plaintiff threw hydrocortisone cream at defendant Brandt and stated, "next time I'll spit + shit on you." Dkt. # 70, p. 0752; Dkt. # 81, ¶ 55. The sick call

was terminated and defendant Brandt issued a Misbehavior Report. *Id.*

The Misbehavior Report charged plaintiff with violating rule 102.10 (threats) and states, "[w]hile conducting sick call rounds this writer [defendant Brandt] stopped at Inmate Chavis 91A3261 cell to deliver medication. He asked what it was I told him hydrocortisone cream. He got up slid it back under the door and stated 'I want ointment and the next time you do this I'll spit on you + then throw shit on you.' " Dkt. # 44, p. 0115. A Tier 2 disciplinary hearing was held on January 29, 2001 and was conduced by Lt. Donahue. [16]

 *13 During plaintiff's Tier 2 disciplinary hearing, plaintiff advised Lt. Donahue that he believed that the January 23, 2001 Misbehavior Report was written by defendant Brandt in retaliation for complaints which plaintiff filed against defendant Brandt and/or the medical staff at Southport. Dkt. # 44, pp. 0124–0128; Dkt. # 82, ¶ 27. Lt. Donahue received plaintiff's testimony and notwithstanding plaintiff's claim of retaliation, found plaintiff guilty of making threatening statements to defendant Brandt. *Id.*

#### a. Grievance No. SPT–17707–99
A thorough discussion of Grievance No. SPT–17707–99 is set forth in the preceding section at pp. 21–23 and is incorporated by referenced herein.

#### b. Grievance No. SPT–18746–00
With respect to Grievance No. SPT–18746–00 filed on or about May 24, 2000, plaintiff claimed that on or about May 21, 2000:(1) defendant Brandt refused to provide him with medical care; (2) defendants vonHagn and Brandt were racist; (3) defendant Brandt told other members of the nursing staff not to treat plaintiff; (4) plaintiff had previously grieved defendant Brandt's and defendant vonHagn's failure to treat his ear infection in December 1999; and, (5) defendant Brandt refused to provide plaintiff with skin cream. Dkt. # 82, ¶ 36; Dkt. # 83, ¶ 46.

With respect to Grievance No. SPT–18746–00, Nurse Felker advised the IGRC that plaintiff had been seen several times for his skin condition, that plaintiff does not have a skin condition that required the skin cream requested and that the medical staff advised that plaintiff is verbally abusive on a regular basis, *to wit,* whenever he is seen by the medical staff. Dkt. # 65, p. 0419; Dkt. # 83, ¶ 47. On or about May 26, 2000, the IGRC recommended that plaintiff's grievance be

dismissed and on or about June 12, 2000, the Superintendent agreed. Dkt. # 65, p. 0414 and 0417; Dkt. # 83; ¶ 48. Upon the recommendation of the Division of Health, on or about August 2, 2000, CORC upheld the Superintendent's determination. Dkt. # 65, p. 0409; Dkt. # 83, ¶ 48. In so finding, CORC noted that plaintiff had been issued skin cream on June 5, 2000 and that his allegations against the staff had not been substantiated. *Id.*

#### c. Grievance No. SPT–20137–00
The third grievance filed by plaintiff against defendant Brandt during the time period relevant to the allegations in the amended complaint was filed on or about December 11, 2000 (Grievance No. SPT–20137–00). A thorough discussion of Grievance No. SPT–20137–00 is set forth in the preceding section at pp. 24–26 and is incorporated by reference herein.

### C. Due Process Claims—Hearing Officers
The amended complaint alleges several causes of action against defendants Donahue, Gilmore, Irizarry, Quinn, Ryan and Sheahan premised on the theory that the defendants denied plaintiff his due process rights during ten disciplinary hearings under the Eighth and Fourteenth Amendments to the United States Constitution.

### 1. Defendant Lieutenant Donahue
 *14 During the relevant time period alleged in the amended complaint, plaintiff claims that defendant Lt. Donahue conducted six Tier 2 disciplinary hearings concerning plaintiff: January 11, 2000 (December 31, 1999 Misbehavior Report); January 25, 2000 (this disciplinary hearing was in fact conducted by defendant Ryan, see pp .59–62 *infra.*); November 20, 2000 (November 12, 2000 Misbehavior Report); December 21, 2000 (December 12, 2000 Misbehavior Report); January 29, 2001 (January 23, 2001 Misbehavior Report); and, March 7, 2001 (February 29, 2001 Misbehavior Report). Dkt. # 9.

As against defendant Donahue, the amended complaint states as follows:

> This defendant [Donahue], on the dates of 3–7–01, 1–29–01, 12–21–00, 11–29–00, 1–25–00, and 1–21–00, inside of this Southport Prison, while acting under state color [sic], in his individual and official [17] capacities, had *violated* my 'due process' rights *in each one* of these separate tier hearing [sic] by 'denying' me *all* witnesses

in each hearing stated above. Additionally, my 'requested' need for 'assistance' during and prior to these separate hearings, had been *denied* by this defendant, *and each* separate *disposition* had [sic] sentenced me to 30–days cell confinement (30 x 6 = 180 days cell confinement), after knowingly and intentionally [sic]

I suffered more 'extended' SHU-punative [sic] segregation time (see para # 5), for ticket, I *never* received but [sic] a hearing I attended with my right to due process *violated* due to deliberate indifference, and racism. Finally, I had appealed each disposition (stated), in bias—partiality, however, *each one* of my appeals were 'ignored' and these 'retaliatory' dispositions affirmed (by defendant W. Wilcox—see para # 9).

Dkt. # 9, pp. 6–D to 6–E (emphasis in original). Additionally, plaintiff alleges that at the conclusion of the December 21, 2000 Tier 2 disciplinary hearing, defendant Donahue issued a retaliatory Misbehavior Report for conduct that occurred as plaintiff was being transported back to his cell after the hearing. Dkt. # 9. Defendant Donahue contends that the December 21, 2000 Misbehavior Report was not issued for retaliatory reasons. Specifically, plaintiff alleges:

> Furthermore, on the date of 12–21–00, immediately after conducting a tier hearing against me, after violating my due process rights knowingly and vindictively, this defendant had verbally discriminated against me this date after hearing completion [sic], and proceeded to retaliate against me with another misbehavior ticket on this 12–21–00 date, for alleged verbal threats I had [sic] *not* been guilty of; as this retaliatory ticket against me, by this defendant had resulted after my contacts in numerous official complaints against this defendant (after his direct orders to SHU escort officers to physically assault me, while I be [sic] in full restraints *un* able to protect myself and further his referring to me during several separate hearings as a 'piece of shit' and a 'boy') resulting in a *nine month* Albany investigation by the top DOCS officials *and* the Inspector Generals [sic] office!. I have valid official

exhibits from Albanys [sic] DOCS top officials to prove this claim.

**\*15** Dkt. # 9, pp. 6–D to 6–E (emphasis in original)

Defendant Donahue, a Lieutenant at Southport, has held that position since 1998 and has been an employee of DOCS since 1984. Dkt. # 84, ¶ 1. From time to time, defendant Donahue's duties include conducting inmate disciplinary hearings as the Superintendent's designee pursuant to 7 N.Y.C.R.R. § 254.1. *Id.* at ¶ 3.

#### a. January 11, 2000 Tier 2 Disciplinary Hearing

The January 11, 2000 Tier 2 disciplinary hearing was conducted following the issuance of a Misbehavior Report on December 31, 1999 by Sergeant Kerbein charging plaintiff with violating Rules 107.11 (harassment) and 102.10 (threats). Dkt. # 84, ¶ 9. The Misbehavior Report states:

> DSS Morse received a letter from you dated 12–29–99 and addressed to Supt. McGinnis or Deputy Superintendent in which you called them/state 'and the vindictiveness of your racist, bias and extremely prejudice/rotton [sic] character!!'. [sic] Another statement you state 'well, DOCS employee of redneck and corrupted character are you satisfied now!". [sic] Your final statement was 'I sincerely hope you're just as strong after you do [sic] receive your New Years [sic] present from me, as I believe it'll be a suitable gift for you and you will receive [sic] it in soon [sic] time arriving [sic].'

Dkt. # 44, p. 0013; Dkt. # 84, ¶ 9. According to defendant Donahue, the regulations (7 N.Y.C.R.R. §§ 251–2.2(2); 251–4.1(a) and (b); 253.4) provide that where, as here, an inmate is charged with a violation warranting a Tier 2 disciplinary hearing, the inmate is not entitled to an employee assistant for purposes of that hearing. Dkt. # 84, ¶ 10. Rather, the hearing officer, in his discretion, may offer an inmate the opportunity to select an inmate assistant, where such assistance would enable the inmate to comprehend the case in order to respond to the charges. *Id.* at ¶ 11.

According to the Tier Assistance Selection Form, plaintiff was served with a copy of the December 31, 1999 Misbehavior Report and on January 2, 2000, plaintiff requested and received a copy of DOCS Directive No. 4932, Chapter V, Standards, Behavior & Allowances (7 N .Y.C.R.R. Part 251 C). Dkt. # 44, p. 0016; Dkt. # 84, ¶ 13. The Tier Assistance Selection Form also indicates that no assistance is required for the hearing and further that plaintiff refused

to sign the form. *Id.* At the outset of the hearing, plaintiff objected stating that he had not been served with a copy of the Misbehavior Report. Dkt. # 44, pp. 0002–0007; Dkt. # 84, ¶ 14. After defendant Donahue read the Misbehavior Report, defendant Donahue asked plaintiff to enter his plea to the charges; plaintiff refused, stating, "I told you I never received the ticket. I don't have anymore to say here." Dkt. # 44, p. 0003. Accordingly, defendant Donahue entered a plea of not guilty on plaintiff's behalf and proceeded with the hearing. Dkt. # 44, p. 0003; Dkt. # 84, ¶ 14.

**\*16** In response to plaintiff's objection, defendant Donahue indicated that he was going to attempt to locate Officer Comfort who served plaintiff with a copy of the Misbehavior Report. Dkt. # 44, p. 0003. Plaintiff objected to Officer Comfort's anticipated testimony. *Id.* Due to Officer Comfort's unavailability, the disciplinary hearing was adjourned and continued on January 21, 2000. *Id.* Over plaintiff's objections, Officer Comfort did in fact testify that he served plaintiff with a copy of the Misbehavior Report. *Id.* at p. 0005; Dkt. # 84, ¶ 16. Thereafter, plaintiff indicated that he did not have any questions for Officer Comfort. *Id.* Plaintiff further objected to the hearing on the grounds that he was not provided with any assistance. Dkt. # 44, p. 0005; Dkt. # 84, ¶ 17. Defendant Donahue explained to plaintiff that pursuant to the applicable regulations, plaintiff was not entitled to any assistance on a Tier 2 disciplinary hearing. *Id.* Plaintiff continued to object to the hearing, insisting that he did not receive the Misbehavior Report and further, that defendant Donahue had previously threatened his life and health. Dkt. # 44, p. 0006; Dkt. # 84, ¶ 19. Specifically, plaintiff stated, "Let the record reflect that at, that at uh, uh at a previous time my life and health was threatened by this Lt. Donahue here. After he had flipper [sic] off the cassette he ordered the escort officer to uh escort this piece of shit back to his cell and bounce him on his head." Dkt. # 44, p. 0006.

Thereafter, defendant Donahue asked whether plaintiff had any evidence to present related to the Misbehavior Report and plaintiff responded, "I don't know what you are talking about." Dkt. # 44, p .0006. Stating that plaintiff was being uncooperative, defendant Donahue concluded the hearing to consider his decision. *Id.* Defendant Donahue based his decision on the Misbehavior Report which he found to be credible and on plaintiff's December 28, 1999 letter (the basis for the December 31, 1999 Misbehavior Report). Dkt. # 44, p. 0014; Dkt. # 84, ¶ 20. As reflected on the Disciplinary Hearing Disposition Rendered form, defendant Donahue relied upon "[t]he written report of Sgt Kerbein which I find

to be credible. Also the threatening letter written by inmate Chavis which I have examined. This inmate makes harassing and threatening statements in a letter sent to the Supt or DSS." Dkt. # 44, pp. 0008–0009; Dkt. # 84, ¶ 21. In addition, defendant Donahue noted that the reasons for his disposition were to serve as a deterrent of future misconduct by plaintiff and others and further, defendant Donahue noted that this type of conduct will not be tolerated at Southport. *Id.* Defendant Donahue imposed a penalty of 30 days keeplock confinement (7/18/00–8/17/00) which was modified to run from January 21, 2000 through February 20, 2000. *Id.* Plaintiff did not appeal defendant Donahue's determination. Dkt. # 84, ¶ 23; Dkt. # 86, Exhibit A.

### b. November 29, 2000 Tier 2 Disciplinary Hearing

**\*17** Defendant Donahue conducted a Tier 2 disciplinary hearing on November 29, 2000 in relation to a Misbehavior Report issued on November 12, 2000. Dkt. # 84, ¶ 26. The November 12, 2000 Misbehavior Report charged plaintiff with violating Rule 107.10 (interference with employee) and Rule 102.10 (threats). Dkt. # 44, p. 0072. The Misbehavior Report prepared by Sergeant ("Sgt.") Cleveland states:

> On the above date and time [11/12/00 6:45 a.m.], I received a copy of a letter that was authored by the above inmate (Chavis 91A3261 D–5–21) from Lt. Sheehan [sic]. Upon my review of this letter I identified that it had been sent from inmate Chavis to Dep. Commissioner L. LeClaire on 10/3/00. The content of this letter was harassing in nature and contained insolent and abusive language directed towards Mr. LeClaire and Commissioner Goord. Inmate Chavis also stated in his letter, "you respect me, and I'll respect you, because after release *you and whoever else WILL* be respecting me". [sic] I interpreted this comment to be an implied threat to Mr. LeClaire. A copy of this letter was placed in the Captains [sic] office contraband file as evidence.

Dkt. # 44, p. 0072; Dkt. # 84, ¶ 27. At the outset of the hearing, plaintiff was advised by defendant Donahue that he had the right to present witnesses on his own behalf and that he should present any oral or documentary evidence he wished to be considered during the hearing. Dkt. # 44, p. 0064–0068. Plaintiff responded that he understood his rights. *Id.* With respect to the service of the charges, plaintiff stated that he didn't know if he was served with a copy because he was asleep and when he woke up there was a Misbehavior Report on his gate. *Id.* Thereafter, defendant Donahue noted that there had been an extension granted to complete the hearing

because plaintiff had been out to court and the extension was granted to complete the hearing within twelve days of plaintiff's return from court and plaintiff returned from court on November 27, 2000. *Id.*

In response to defendant Donahue's inquiry as to how he intended to plead to the charges, plaintiff stated "[a]t this particular time I'm going to object to the hearing." Dkt. # 44, p. 0066. Plaintiff objected on the following grounds, "[t]he fact that on the date of September 8th I had sent the letter to uh Commissioner Gord [sic] with a complaint against you and uh Lt. Ryan, for your misconduct during the tier hearing process while I been in the facility here." *Id.* Accordingly, defendant Donahue entered a plea of not guilty to the charges on plaintiff's behalf. *Id.* Plaintiff also voiced an objection to the entry of a plea of not guilty and requested that the hearing be adjourned and another hearing officer be assigned. *Id.* at pp. 0066–0067. Plaintiff's objections to the hearing and the hearing officer were noted on the record and plaintiff did not offer any evidence or any statement with respect to the Misbehavior Report. *Id.*

**\*18** Thereafter, defendant Donahue concluded the hearing and contemplated his decision. The plaintiff chose to return to his cell before defendant Donahue read his decision. *Id.* Defendant Donahue found plaintiff guilty of charge 107.10 (interference) and guilty of 102.10 (threats). *Id.* at p. 0068. Defendant Donahue imposed a penalty of 30 days keeplock confinement to run from September 5, 2001 to October 5, 2001. *Id.* In his statement of evidence relied upon, defendant Donahue stated that he relied upon the written report of Sgt. Cleveland and his examination of the letter in evidence and further that he found Sgt. Cleveland's report to be credible. Dkt. # 44, p. 0070. Defendant Donahue stated that the reasons for his disposition were to serve as a deterrent for future misconduct by the plaintiff and that "threats towards employees of this department will not be tolerated." *Id.* On or about December 11, 2000, Captain Wilcox affirmed defendant Donahue's determination. Dkt. # 86, Exhibit A.

### c. December 21, 2000 Tier 2 Disciplinary Hearing

Defendant Donahue conducted a Tier 2 disciplinary hearing involving plaintiff on December 21, 2000. Dkt. # 44, pp. 0081–0100; Dkt. # 84, ¶ 41. The December 21, 2000 disciplinary hearing related to a Misbehavior Report issued on December 12, 2000 by Correction Officer Gary Morse and charged plaintiff with a violation of Rule 102.10 (threats). Dkt. # 44, p. 0090; Dkt. # 84, ¶ 42. The December 12, 2000 Misbehavior Report states:

On the above date [12–12–00], inmate Chavis, George 91A3261 sent a grievance to the Inmate Grievance office. This grievance contained a number of threatening statements. These statements include: 'However, if he attempts to disregard my handicap again, I'll exit my cell and compel him to regard me the next shower time so he had better be prepared next shower. Sgt. Mulvern had been informed of this and P. Jayne needs to seriously beware.' Chavis goes on to state, 'Emergency ambulance after P. Jayne disregards my handicap again on scheduled shower day. The ambulance will be for him not me'. [sic] 'I have surgical scars on my right wrist, and P. Jayne better realize it or suffer a penalty.' These threats are aimed at C.O. P. Jayne who is a shower officer.

Dkt. # 44, pp. 0090 and 0092.

At the outset of the hearing, defendant Donahue advised plaintiff that he had the right to have witnesses testify on his behalf, that plaintiff should present any oral or documentary evidence that he wishes to have considered at the hearing and that plaintiff should raise any procedural objections during the hearing. Dkt. # 44, pp. 0081–0086. Thereafter, plaintiff indicated that he understood his rights and that he had received a copy of the charges. *Id.* After defendant Donahue read the charges and asked plaintiff how he plead to the charges, plaintiff objected to defendant Donahue serving as the hearing officer on the grounds that there was a pending investigation into defendant Donahue's conduct as it related to plaintiff. [18] *Id.;* Dkt. # 44, ¶ 43. Moreover, plaintiff objected stating, "[l]et the record also reflect that uh that's a grievance. And uh Section uh 6 Letter B states that no inmate shall, shall suffer deprivals [sic] because of a grievance." Dkt. # 44, p. 0083; Dkt. # 84, ¶ 45.

**\*19** Defendant Donahue entered a plea of not guilty on plaintiff's behalf and asked whether plaintiff had any testimony or evidence to present. Dkt. # 44, p. 0084; Dkt. # 84, ¶ 46. Plaintiff indicated that he wished to call Thomas C. Egan, CORC Director and Commissioner "Gordon" [Goord] as witnesses. Dkt. # 44, p. 0084; Dkt. # 84, ¶ 47. On the grounds that neither Director Egan nor Commissioner Goord had any knowledge of the Misbehavior Report or of plaintiff's grievance, defendant Donahue denied plaintiff's request to call them as witnesses during the disciplinary hearing. Dkt. # 44, pp. 0084–0085; Dkt. # 84, ¶ 48. In response to this denial, plaintiff objected stating that defendant Donahue's denial illustrated that he is biased and racist. Dkt. # 44, p. 0084; Dkt. # 84, ¶ 43.

Defendant Donahue noted that plaintiff was returned to his cell because he was being disruptive and for making threats. Dkt. # 44, p .0085; Dkt. # 84, ¶ 52. Thereafter, defendant Donahue found plaintiff guilty of violating Rule 102.10 (threats) and imposed 30 days keeplock confinement as the penalty to run from October 5, 2001 to November 4, 2001. Dkt. # 44, p. 0085; Dkt. # 84, ¶ 53. According to the transcript of the hearing and the disposition record, in reaching his determination, defendant Donahue relied on the written report of Correction Officer Morse which he found to be credible and his examination of the threatening letter written by plaintiff to the Inmate Grievance Office. Dkt. # 44, pp. 0085 and 0088; Dkt. # 84, ¶ 53. Defendant Donahue stated the following as his reasons for the disposition, "[t]he disposition is given to serve as a deterrent of future misconduct for this inmate as well as others. Threats toward staff will not be tolerated at the facility, including in the form of written grievances." Dkt. # 44, p. 0088; Dkt. # 84, ¶ 53.

### d. December 21, 2000 Misbehavior Report

Following the December 21, 2000 disciplinary hearing (*see* pp. 37–40 *supra* ), defendant Donahue issued a Misbehavior Report based on plaintiff's threatening and harassing language as he was being escorted back to his cell after the hearing. Dkt. # 84, ¶ 89. As discussed above, plaintiff was returned to his cell prior to hearing defendant Donahue's determination because he was being disruptive and was making threats. *Id.* at ¶ 90. A Tier 3 disciplinary hearing was held on January 4, 2001 concerning the December 21, 2000 Misbehavior Report and was conducted by defendant Irizarry. *Id.* at ¶ 91. A complete discussion of plaintiff's claims against defendant Irizarry concerning the January 4, 2001 disciplinary hearing, including a discussion of the charges, is set forth below. *See* pp. 49–53 *infra.*

### e. January 29, 2001 Tier 2 Disciplinary Hearing

On January 29, 2001, defendant Donahue conducted a Tier 2 disciplinary hearing arising from a Misbehavior Report dated January 23, 2001. Dkt. # 84, ¶ 61. In the January 23, 2001 Misbehavior Report, Nurse Brandt charged plaintiff with violating Rule 102.10 (threats) stating, "[w]hile conducting sick call rounds this writer stopped at Inmate Chavis 91A3261 cell to deliver medication. He asked what it was I told him hydrocortisone cream. He got up slid it back under the door stated [sic] 'I want ointment and the next time you do this I'll spit on you + then throw shit on you.' " Dkt. # 44, p. 0115; Dkt. # 84, ¶ 62. Plaintiff refused to sign the Tier Assistance

Selection Form, however, as discussed above, because this was a Tier 2 disciplinary hearing, plaintiff was not entitled to any assistance. Dkt. # 44, p. 0116; Dkt. # 84, ¶ 63. In addition, a review of the hearing transcript reveals that plaintiff did not request any assistance during the hearing. Dkt. # 44, pp. 0124–0128; Dkt. # 84, ¶ 64.

**\*20** As reflected in the hearing transcript, defendant Donahue advised plaintiff that he was entitled to have witnesses testify on his behalf, that he should present any oral or documentary evidence that he wished to be considered during the hearing and that he should raise any procedural questions during the hearing so that they may be considered. Dkt. # 44, pp. 0124–0128; Dkt. # 84, ¶ 65. Thereafter, plaintiff indicated that he understood his rights and plaintiff entered a plea of not guilty to the charges. *Id.* During the hearing, plaintiff did not request to have any witnesses testify on his behalf. Dkt. # 84, ¶ 66. Plaintiff testified during the hearing that the incident did not occur as recited in the Misbehavior Report. Dkt. # 44, pp. 0124–0128; Dkt. # 84, ¶ 67. Specifically, plaintiff stated,

> Uh everything is totally uh different from what he has on the ticket. Uh I [sic] been down [sic] for thirteen years already and I've never done anything hy, unhygienic to anybody, whether officer or inmate, so he is basically lying there. I wrote up a grievance against him on um the 22nd. And on three prior separate occasions that grievance [sic], that recent grievance, I had uh written to Albany in complaint [sic] about the, the type of improper medical care that I'm receiving here. And uh D. [sic] Brandt came to my cell and he brought me the wrong medication. I suffer with uh, a severe uh psoriasis skin condition from my stem to uh my body. The reason why you don't see it too clear is because I have uh creams all over my head and all over my body and stuff like that. And uh this guy is just, is constantly not giving me what, what I need you know.... So this is a thing where they constantly [sic] not giving me what I need and, and my skin is just messing up. It it's just one ticket after another.

Dkt. # 44, p. 0126, Dkt. # 84, ¶ 67. Plaintiff further stated that he took the medication and shoved it through the door and that "he [Nurse Brandt] had me active a little bit but rather than take it and throw [sic] out to react this time, I just took it and shoved it under the door. I didn't want him to uh talk about [sic] I tried to attack him and stuff like that, so I just took it and slid it underneath the door." Dkt. # 44, p. 0126; Dkt. # 84, ¶ 68. In addition, plaintiff stated that he had copies of the complaint letter that he had sent to Albany in his cell, defendant Donahue stated that he would accept plaintiff's testimony that he had filed several complaints against Nurse Brandt. Dkt. # 84, ¶ 69.

Plaintiff chose to return to his cell before defendant Donahue read his determination. Dkt. # 84, ¶ 70. Thereafter, defendant Donahue found plaintiff guilty of violating Rule 102.10 (threats) and imposed the penalty of 30 days keeplock confinement to begin February 4, 2003 through March 6, 2003. Dkt. # 44, p. 0127. As set forth in the hearing transcript and the Hearing Disposition Sheet, defendant Donahue relied on the Misbehavior Report of Nurse Brandt which he found to be credible. Dkt. # 44, pp. 0113, 0125–0128; Dkt. # 84, ¶ 71. Defendant Donahue noted that the penalty imposed, 30 days keeplock confinement, was imposed to serve as a deterrent for future misconduct by plaintiff and other inmates. *Id.* Finally, defendant Donahue noted that plaintiff had been found guilty of threats on many previous occasions. *Id.*

### f. March 7, 2001 Tier 2 Disciplinary Hearing

**\*21** On March 7, 2001, defendant Donahue conducted a Tier 2 disciplinary hearing in relation to a February 28, 2001 Misbehavior Report. Dkt. # 44, pp. 0129–0131; Dkt. # 84, ¶ 78. The February 28, 2001 Misbehavior Report charged plaintiff with violating Rules 118.33 (flooding) and 106.10 (refusing a direct order) stating:

> On the above date and approximate time [2–28–01 7:15 p.m.] while making rounds I observed water on B–1 Gallery. As I continued the rounds I observed Chavis # 91A3261 repeatedly flushing his toilet. I ordered Chavis to stop and he refused by continuing to flush his toilet. I then left the gallery and went to the pipe chase to turn his water off. I then contact [sic] the area sergeant.

Dkt. # 44, pp. 0129–0131. Defendant Chavis refused to attend the March 7, 2001 disciplinary hearing and refused to sign the Waiver Form. Accordingly, the disciplinary hearing was conducted in his absence and at the outset of the hearing, defendant Donahue entered a plea of not guilty on plaintiff's behalf. *Id.;* Dkt. # 84, ¶¶ 80 and 83. According to the hearing transcript, when Sgt. Gagliardi went to plaintiff's cell to bring him to the hearing, plaintiff was sleeping and when Sgt. Gagliardi woke him and informed him that he had a disciplinary hearing and that defendant Donahue was conducting the hearing, plaintiff said "I'm not going, I'm not going to attend the hearing with him [defendant Donahue]." Dkt. # 44, pp. 0129–0131. Defendant Donahue conducted the hearing, considered the evidence (the Misbehavior Report of Correction Officer Kamas) and determined that plaintiff had indeed violated Rules 118.33 (flooding) and 106.10 (refusing a direct order). Dkt. # 44, pp. 0129–0131; Dkt. # 84, ¶ 84. Defendant Donahue imposed a penalty of 30 days keeplock confinement as a deterrent of future misconduct on the part of plaintiff and other inmates. *Id.* Plaintiff did not appeal defendant Donahue's determination. Dkt. # 86, Exhibit A.

### 2. Defendant Lieutenant Gilmore

Plaintiff claims that defendant Lt. Gilmore conducted a Tier 2 disciplinary hearing on July 18, 2000 with respect to a July 9, 2000 Misbehavior Report and during the course of that hearing, Lt. Gilmore denied plaintiff due process. Dkt. # 9. Specifically, in the amended complaint, plaintiff alleges against defendant Gilmore:

> This defendant [Gilmore], on the date of 7–18–00, inside of this Southport Prison, while acting under state color in his individual and official [19] capacities, had conducted a hearing, and in his doing so had intentionally, knowingly, and wilfully *violated* my due process rights by finding me guilty [sic] for a violation that I had not been charged with on the retaliatory ticket. Additionally, no other officer had endorsed the retaliatory ticket nor had any testified against me of the several SHU-officers present at the incident of which I had not been the aggressor (my two eye witness'es [sic] had confirmed my defense however, this defendant had found me guilty

anyway, than [sic] sentenced me to a 10–day sentenced [sic]. Soon after, I did appeal on 7–18–00. However, the defendant W. Wilcox (para—# 9), had affirmed the sentence in bias against me.

**\*22** Dkt. # 9, pp. 6–F to 6–G. During the time period alleged in the amended complaint, defendant Gilmore was a Lieutenant at Southport and had held that position from June 1999 to June 2001. Dkt. # 86, ¶ 1. As part of his duties, defendant Gilmore conducted inmate disciplinary hearings as the Superintendent's designee pursuant to 7 N.Y.C.R.R. § 254.1. Dkt. # 85, ¶ 3.

The July 9, 2000 Misbehavior Report, authored by Correction Officer Burgett and endorsed by Sgt. Parish, charged plaintiff with violating Rule 107.10 (interference), Rule 107.11 (harassment) and Rule 106.10 (refusal to obey a direct order). Dkt. # 85, ¶ 6. In the Misbehavior Report, Officer Burgett described that plaintiff aggressively questioned the duration of his shower at the two minute warning and again at the termination of his shower. Dkt. # 44, p. 0042; Dkt. # 85, ¶ 6. Officer Burgett further stated that he informed plaintiff that his shower was the required duration, plus one minute and that plaintiff accused Officer Burgett of lying. *Id.* As Officer Burgett began to counsel plaintiff about harassing employees, plaintiff became extremely loud and verbally aggressive, stating "you aint [sic] telling me nothing [sic] because youre [sic] an asshole, I'll have you in a penitentiary wearing handcuffs in a week, bet that, you aint [sic] scaring nobody with your ticket." *Id.* Thereafter, Officer Burgett stated that he issued a direct order for wrist restraints to be applied in order to escort plaintiff and plaintiff refused to come out of the shower. *Id.* Officer Burgett then issued two more orders for plaintiff to put out his hands for wrist restraints and plaintiff again refused and stated he would not come out of the shower. *Id.* After Sgt. Parish responded to the scene, plaintiff complied with the wrist restraints and was escorted to his cell. *Id.*

According to the Tier Assistance Selection Form, plaintiff was served with a copy of the Misbehavior Report on July 10, 2000 and did not request a copy of DOCS Directive No. 4932, Chapter V, Standards, Behavior & Allowances and that plaintiff refused to sign the form. Dkt. # 44, p. 0043; Dkt. # 85, ¶ 7. Notwithstanding the foregoing, at the disciplinary hearing, plaintiff claimed that he had requested and never received a copy of DOCS Directive No. 4932,

Chapter V. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 8. Defendant Gilmore immediately gave plaintiff a copy of DOCS Directive No. 4932, Chapter V. However, plaintiff declined defendant Gilmore's offer of a few minutes to review the document. *Id.* Plaintiff was advised at the outset of the hearing that he may have witnesses testify on his behalf, that nothing said by plaintiff would be used against him in a criminal proceeding, that plaintiff should present any oral or documentary evidence he wished defendant Gilmore to consider during the hearing and that any procedural objection or claims should be made during the hearing. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 9. Plaintiff indicated that he understood his rights. *Id.* Thereafter, plaintiff plead not guilty to the charges and requested to have inmates Lopez and Wilson testify as witnesses. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 10.

**\*23** As a threshold matter, plaintiff objected to the Misbehavior Report on the grounds that the copy he had received had not been endorsed by Sgt. Parish. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 11. Defendant Gilmore showed plaintiff the original July 9, 2000 Misbehavior Report which contained the endorsement by Sgt. Parish and noted plaintiff's objection for the record. *Id.* Thereafter, plaintiff further objected to the Misbehavior Report on the grounds that it was fabricated by Officer Burgett. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 12. Plaintiff denied calling Officer Burgett an asshole and stated that it was Officer Burgett who called him an asshole. *Id.* Plaintiff further asserted that he had requested the presence of Sgt. Parish because Officer Burgett threatened him and that he had refused to come out of the shower because of Officer Burgett's threatening behavior, including brandishing a night stick. *Id.* Plaintiff admitted that he told Officer Burgett that if he hit him with a baton, plaintiff would have Officer Burgett arrested. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 13. Plaintiff further admitted to calling Officer Burgett a scumbag. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 14. Finally, plaintiff stated that after Sgt. Parish came to the shower, he cooperated with the wrist restraints and was escorted back to his cell. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 15.

Since plaintiff's requested witnesses Lopez and Wilson were confined to SHU, they could not be in the same room as plaintiff. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 16. Accordingly, defendant Gilmore advised plaintiff that plaintiff could instruct defendant Gilmore as to what questions to ask each witness and that he, Gilmore, would question the witnesses and then play the testimony back for plaintiff. *Id.* Plaintiff requested that defendant Gilmore ask

inmates Lopez and Wilson whether plaintiff called Officer Burgett an asshole?, how long plaintiff was in the shower?, and why plaintiff requested Sgt. Parish to come to the shower area?. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 17. Thereafter, both inmates Lopez and Wilson testified outside the presence of plaintiff, stating, in part, that Officer Burgett had called plaintiff an asshole, that the shower had lasted less than ten minutes and that plaintiff had requested the Sergeant because the officers were brandishing their night sticks/holding their batons in their hands. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶¶ 19–26. Following the testimony of inmates Lopez and Wilson, the recorded testimony was played for plaintiff and plaintiff stated that he was satisfied with their testimony and that he could hear and understand their testimony. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 28.

Plaintiff then presented a copy of a grievance he filed against Officer Burgett and stated that there were numerous other grievances that had been filed by other inmates against Officer Burgett. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 29. Defendant Gilmore reviewed the consolidated grievance written on July 9, 2000 by plaintiff and filed on July 10, 2000 listing problems with the shower officer. At plaintiff's request, defendant Gilmore read the grievance into the record. *Id.* Thereafter, plaintiff reiterated his objection to the Misbehavior Report and stated that he had nothing further to offer in response to the charges. Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 30. Defendant Gilmore, relying on the Misbehavior Report authored by Officer Burgett, as well as plaintiff's testimony, found plaintiff not guilty of violating Rule 107.10 (interference) and not guilty of violating Rule 106.10 (refusing a direct order). Dkt. # 44, pp. 0045–0063; Dkt. # 85, ¶ 31. Defendant Gilmore did, however, find plaintiff guilty of violating Rule 107.11 (harassment) because he concluded that the plaintiff had participated in a verbal confrontation with Officer Burgett (plaintiff admitted to calling Officer Burgett a scumbag) and imposed a penalty of 10 days keeplock confinement. *Id.* Plaintiff appealed defendant Gilmore's determination and Captain Wilcox affirmed the determination on or about July 30, 2000. Dkt. # 85, ¶ 33; Dkt. # 86, Exhibit A.

### 3. Defendant Hearing Officer Irizarry

**\*24** Defendant Hearing Officer Irizarry conducted a Tier 3 disciplinary hearing on January 4, 2001 with respect to a December 21, 2000 Misbehavior Report issued by defendant Donahue following a Tier 2 disciplinary hearing conducted by defendant Donahue on December 21, 2000. Dkt. # 9. Plaintiff claims that defendant Irizarry denied him due process by

denying him assistance prior to the hearing, denying plaintiff his right to call expert witnesses during the hearing, denying plaintiff the right to present evidence during the hearing and threatening to reprimand plaintiff during the hearing for making objections. Dkt. # 9, pp. 6–B to 6–D. Moreover, plaintiff claims that because defendant Selsky modified the hearing determination, that his due process rights were violated. [20] *Id.* In addition, plaintiff claims that he never received a copy of the December 21, 2000 Misbehavior Report. *Id.* Specifically, as against defendant Irizarry, the amended complaint states, in part,

> This defendant [Irizarry], on the date of 12–21–00 (note: this defendant had *personally dated* his hearing disposition 1–4–00), inside of this Southport Prison, while acting under state color, in his individual and official [21] capacities, had knowingly, wilfully, and intentionally *violated* my right to due process, by denying me 'assistance' prior to himself conducting the hearing, by also denying my right to call expert witness'es [sic] of which I had only two, and verbally threatening to reprimand me, due to my *un* ceasing 'objections' to this defendants [sic] misconduct durring [sic] this hearing, and *no* threat to institutional safety or correctional goals, had been stated in this defendants [sic] disposition of 1–4–00. I 'suffered' a finding in [sic] guilt, and sentenced to nine (9) months extended SHU-punative [sic] segregation ...

Dkt. # 9, pp. 6–B to 6–C (emphasis in original). Defendant Irizarry (incorrectly identified as Irrizarry in the amended complaint) is the Food Service Administrator at Southport and has held that position since 1990. Dkt. # 86, ¶ 1. From time to time, defendant Irizarry's duties included conducting inmate disciplinary hearings as the Superintendent's designee pursuant to 7 N.Y.C.R.R. § 254.1.

On December 21, 2000, following a Tier 2 disciplinary hearing, defendant Donahue issued a Misbehavior Report charging plaintiff with violating Rules 102.10 (threats) and 107.11 (harassment). Dkt. # 65, p. 0664; Dkt. # 86, ¶ 6. The Misbehavior Report states:

> While exiting B-block first floor hearing room from a Tier 2 hearing on the above date and time, inmate Chavis, 91A3261 became verbally abusive. Chavis stated, 'you're a bitch Lt. Donahue. I'll have you in handcuffs and leg irons and I'll fuck you up, you bitch.' Inmate Chavis continued to yell obscenities and make threats as he was escorted back to his cell. These threats included Chavis stating, 'I'll murder

your ass, you punk ass mother fucker.' Inmate Chavis was secured in his cell without further incident.

**\*25** Dkt. # 65, p. 0664. As a threshold matter, plaintiff claims that defendant Irizarry denied him an assistant to prepare for the hearing. Dkt. # 9. On December 23, 2000, plaintiff was served with a copy of the Misbehavior Report and indicated on the Tier Assistance Selection Form that he waived his right to an assistant and plaintiff refused to sign the Tier Assistance Selection Form. Dkt. # 65, p. 0667; Dkt. # 98, pp. 5–18. During the hearing, plaintiff claimed that despite what is reflected on the Tier Assistance Selection Form, he did not refuse an assistant. Rather, plaintiff stated during the hearing that he was sleeping when the Misbehavior Report was delivered to him. Dkt. # 98, pp. 5–18. Defendant Irizarry found plaintiff's claim not to be true because the officer who served plaintiff with a copy of the Misbehavior Report, Officer McIntosh, testified that plaintiff was awake when he was served and simply refused to sign or pick an assistant. *Id;* Dkt. # 86, ¶ 12.

Plaintiff further alleges that defendant Irizarry refused to allow him to call witnesses to testify during the hearing. Dkt. # 9. During the hearing, plaintiff requested that DOCS' Commissioner Goord and Associate Commissioner W. Chapman testify as witnesses on his behalf. Dkt. # 65, p. 0666; Dkt. # 98, pp. 5–18. In response to defendant Irizarry's question concerning why plaintiff requested Commissioner Goord and Associate Commissioner Chapman as witnesses, plaintiff stated, "[b]ecause they have everything to do with this ticket. And they have everything to do with the conduction of that [sic] hearing." Dkt. # 98, p. 16. Plaintiff's request was denied by defendant Irizarry on the grounds that their testimony was not relevant to the hearing as neither Commissioner Goord nor Associate Commissioner W. Chapman were present or in the facility at the time of the alleged incident. Dkt. # 65, p. 0666; Dkt. # 86, ¶ 15; Dkt. # 98, p. 16. Defendant Irizarry maintains that according to policy, an inmate's request for administrative, supervisory or staff personnel to testify does not mean that the staff member is automatically called to testify. Dkt. # 86, ¶ 16. If, according to defendant Irizarry, every inmate was granted the right to call every staff member selected, it would be extremely disruptive of facility operations, especially where, as here, an inmate requests Commissioner Goord and Associate Commissioner Chapman to testify. *Id.* In addition, 7 N.Y.C.R.R. § 254.5(a) provides that where the testimony of a requested witness would be immaterial, duplicative or unnecessary, as defendant Irizarry determined Commissioner Goord's and Associate Commissioner Chapman's testimony

would be, the hearing officer may exercise his/her discretion to deny the request. *Id.*

After hearing the testimony and based on the Misbehavior Report, defendant Irizarry found plaintiff guilty of violating Rules 102.10 (threats) and 107.11 (harassment). Dkt. # 65, pp. 0661–0662; Dkt. # 86, ¶ 19. Defendant Irizarry imposed a penalty of nine months confinement in SHU commencing June 27, 2001 through March 23, 2002. *Id.* In reaching the determination, defendant Irizarry noted on the Hearing Disposition Sheet that he had relied upon the written Misbehavior Report of Lt. Donahue and the testimony of Officer Bennett who was present at the time of the incident. Dkt. # 65, p. 0662; Dkt. # 86, ¶ 20. Defendant Irizarry further noted that a review of plaintiff's disciplinary record revealed that plaintiff had been charged and found guilty of sixteen charges of threats and twelve charges of harassment. Dkt. # 65, p. 0662; Dkt. # 86, ¶ 22. In addition, defendant Irizarry noted that none of the previous sanctions imposed upon plaintiff as a result of those determinations had helped to modify plaintiff's behavior. *Id.* Thus, defendant Irizarry noted that the penalty of nine months confinement in SHU was a just disposition. Dkt. # 65, p. 0662; Dkt. # 86, ¶ 23. Thereafter, defendant Selsky modified the penalty to six months SHU confinement. Dkt. # 86, ¶ 24 and Exhibit A. As will be discussed in greater detail below, plaintiff contends that because defendant Selsky modified the penalty imposed, defendant Irizarry denied plaintiff due process. Dkt. # 86, ¶ 18.

### 4. Defendant Lieutenant Quinn

**\*26** In the amended complaint, plaintiff alleges that on February 5, 2001, defendant Lt. Donald Quinn violated his due process rights by denying him assistance prior to a Tier 3 disciplinary hearing, denied him the right to have witnesses testify on his behalf and denied plaintiff the right to attend the hearing to its conclusion. Dkt. # 9. Specifically, plaintiff's claim against defendant Quinn states, in part:

> This defendant—Quinn, on the date of February 5, 2001, while acting under state color, inside of this Southport Prison, in his individual and official [22] capacities, had knowingly violated my right to due process, intentionally and wilfully by denying me assistance prior to this hearing, and furthermore my witness'es [sic]. Also, I was denied my right to attend this hearing upon

[sic] it's [sic] conclusion, and the right
to [sic] disposition. I was found guilty,
sentenced to 12–months SHU punative
[sic] segregation suffering [sic] ...

Dkt. # 9, p. 6. At all times relevant to the allegations in the amended complaint, defendant Quinn was a Lieutenant at Southport and held that position from December 14, 2000 to February 8, 2001. Dkt. # 87, ¶ 1. From time to time, defendant Quinn's responsibilities included conducting disciplinary hearings as the Superintendent's designee pursuant to 7 N.Y.C.R.R. § 254.1.

Defendant Quinn conducted a disciplinary hearing beginning on January 31, 2001 and continuing on February 5, 2001, arising from a January 27, 2001 Misbehavior Report charging plaintiff with violating Rules 107.11 (harassment) and 102.10 (threats). Dkt. # 87, ¶ 6. The Misbehavior Report, authored by Officer Hodge stated,

I was given a letter by Lt. Sheahan, the watch commander to review. This letter, dated January 8, 2001, was written to Mr. Anthony Annucci, Deputy Commissioner, by Inmate George Chavis 91A3261. In this letter, Inmate Chavis uses several obscene words and phrases, calling several staff members, including but not limited to Supt. McGinniss [sic], Lt. Donahue, and RN S. VonHagn, 'KKK bitches." He also takes Mr. Annucci to task for 'believing all the lying bullshit your prison staff feeds you.' He also complains that Mr. McGinnis 'doesn't do a gatdamn (sic) things,' and promises to 'sue all you KKK asses.' He closes with a statement that he is 'tired of the KKK bullshit, and sooner or later I'll terminate all of it.' Inmate Chavis also states that 'then, the personal retaliation occurs ... no one is getting away with violating me in life (?) and assume I'll be your good ole nigger. I'll teach a lot of the KKK in uniform here respect.'

Dkt. # 68, p. 0710. According to the Tier Assistance Selection Form, plaintiff was served with a copy of the Misbehavior Report on January 17, 2001 and indicated on the form that he requested an employee assistant for the Tier 3 disciplinary hearing. Dkt. # 68, p .0712; Dkt. # 87, ¶ 7. The form reveals that plaintiff identified G. Powers as his first choice for an assistant and J. Morton and P. Nardi as his second and third choices respectively. Dkt. # 68, p. 0712. It appears, however, that plaintiff refused to sign the form. Dkt. # 68, p. 0712; Dkt. # 87, ¶ 8.

**\*27** The disciplinary hearing began on January 31, 2001 at which time plaintiff objected to the hearing claiming that he had not received assistance. Dkt. # 87, ¶ 9. At the outset of the hearing, plaintiff stated that he had chosen G. Powers as his assistant and that despite the fact that G. Powers was available, Sgt. Morton was assigned to serve as his assistant. Dkt. # 98, pp. 20–33. During the hearing, plaintiff insisted that notwithstanding what is indicated on the Tier Assistance Selection Form, he did not select J. Morton and P. Nardi as his second and third choices for an assistant, plaintiff claimed that he chose *only* G. Powers. Dkt. # 68, p. 0712; Dkt. # 98, pp. 20–33. Indeed, plaintiff stated during the hearing that he had witnesses who would testify concerning G. Powers' availability to serve as his assistant. Dkt. # 98, pp. 20–33. Defendant Quinn advised plaintiff during the hearing that G. Powers was not available to serve as his assistant. *Id.* In fact, there is a notation on the Tier Assistance Selection Form next to G. Powers' name stating, "off list". Dkt. # 68, p. 0712. Thereafter, plaintiff and defendant Quinn discussed at length whether plaintiff had in fact refused J. Morton's assistance to prepare for the hearing. Dkt. # 98, pp. 20–33.

Plaintiff requested to have Sgt. Morton and Deputy Commissioner Annucci called as witnesses. *Id.* Plaintiff continuously objected to the hearing because he claimed he had not received assistance. Dkt. # 98, pp. 20–33. Thereafter, defendant Quinn adjourned the hearing so that he could verify with Sgt. Morton that plaintiff had been offered assistance and that plaintiff had refused that assistance. *Id.* The hearing was reconvened on February 5, 2001 and plaintiff refused to attend the hearing.[23] Dkt. # 87, ¶ 10. The hearing was conducted outside of plaintiff's presence. Dkt. # 98, pp. 20–33. Moreover, Sgt. Morton testified telephonically that plaintiff had refused his assistance. Dkt. # 68, p. 0711; Dkt. # 87, ¶ 15. Defendant Quinn denied plaintiff's request to have Deputy Commissioner Annucci testify, finding that Deputy Commissioner Annucci's testimony would have no bearing on the outcome of the hearing. Dkt. # 68, p. 0711; Dkt. # 87, ¶ 11. As with previous administrative, supervisory or staff personnel witnesses identified by plaintiff to testify at other disciplinary hearings, Deputy Commissioner Annucci is located in Albany, New York and to have Deputy Commissioner Annucci testify in every hearing as requested would be extremely disruptive. Dkt. # 87, ¶ 12. Moreover, because defendant Quinn reviewed the January 8, 2001 letter to Deputy Commissioner Annucci during the hearing, he was able to make a determination as to the threatening, obscene and abusive language therein. *Id.* at ¶ 14. Based on the foregoing, defendant Quinn determined that Deputy

Commissioner Annucci's testimony was not necessary. *Id.* Accordingly, defendant Quinn maintains that it was in the exercise of his discretion that he denied plaintiff's request to have Deputy Commissioner Annucci testify at the hearing. *Id.* at ¶ 13. Notwithstanding the fact that plaintiff refused to attend the hearing and did not avail himself of the opportunity to present a defense at the hearing, plaintiff claims that Deputy Commissioner Annucci would have testified that "no such letter of alleged threat existed" and further, that no letter was physically produced during the hearing. Dkt. # 96, p. 8. It should be noted that at no time when plaintiff was present at the January 31, 2001 commencement of the disciplinary hearing did he deny that he wrote the January 8, 2001 letter to Deputy Commissioner Annucci. Dkt. # 98, pp. 20–33.

 **\*28** At the conclusion of the hearing, defendant Quinn rendered his determination and found plaintiff guilty of violating Rules 107.11 (harassment) and 102.10 (threats) and imposed a penalty of twelve months keeplock confinement in SHU beginning September 27, 2002 and continuing through September 27, 2003. *Id.* at ¶ 16. In reaching this determination, defendant Quinn noted that he relied on the Misbehavior Report and the handwritten letter from plaintiff, wherein plaintiff made harassing statements to Deputy Commissioner Annucci. *Id.* at ¶ 17. Defendant Quinn further noted that the penalty was imposed to serve as a deterrent to plaintiff and others and to reinforce that threatening and harassing employees will not be tolerated. *Id.*

Thereafter, plaintiff alleged that he never received a copy of the hearing disposition and he commenced an Article 78 proceeding in New York State Supreme Court, Chemung County challenging the February 5, 2001 disposition. Dkt. # 87, ¶ 18. In his petition, plaintiff admitted that he did not attend the February 5, 2001 hearing, but maintained that he did not refuse to attend the hearing. *Id.* Plaintiff further claimed that he did not learn of the disposition until June 26, 2001 when he reviewed a copy of the SHU readout sheet. *Id.* On February 25, 2002, Justice Castellino determined that plaintiff never received a copy of the February 5, 2001 determination and granted plaintiff leave to file an administrative appeal. *Id.* at ¶ 19.

By letter dated March 8, 2002, plaintiff submitted an administrative appeal of defendant Quinn's February 5, 2001 determination to defendant Selsky. *Id.* at ¶ 20. Plaintiff argued in his appeal that defendant Quinn denied him an employee assistant, denied him the right to attend the hearing and refused to call Deputy Commissioner Annucci as a witness.

*Id.* Plaintiff further alleged that defendant Quinn was biased, refused to let plaintiff see the January 8, 2001 correspondence (the letter authored by plaintiff that formed the basis for the January 27, 2001 Misbehavior Report) and that because he never received a copy of the disposition, he was unaware of the penalty imposed. *Id.* On April 26, 2002, defendant Selsky reversed defendant Quinn's February 5, 2001 determination because the record did not clearly establish that plaintiff received a copy of the disposition within 24 hours and because defendant Quinn failed to interview a requested witness who may have provided relevant testimony. *Id.* at ¶ 21. Notably, defendant Selsky reversed defendant Quinn's determination several months before plaintiff was ordered to serve his penalty. *Id.* at ¶ 22. As discussed above, the penalty of twelve months confinement in SHU was to commence on September 27, 2002 and continue through September 27, 2003. *Id.* at ¶ 23.

### 5. Defendant Lieutenant Ryan

Plaintiff alleges that defendant Lieutenant Ryan denied him due process during a Tier 2 disciplinary hearing held on January 25, 2000 with respect to a January 14, 2000 Misbehavior Report. Specifically, plaintiff alleges that:

> **\*29** This defendant [Ryan], on the date of 1–25–00, inside of this Southport State Prison, while acting under state color, in his individual and official [24] capacities, had knowingly, wilfully, and intentionally *violated* my due process, while his [sic] conducting a hearing. This defendant had personally used his own ink pen (*prior* to turn on the recorder), for 'signing' (endorsing), the retaliatory ticket against me (forgery), on behalf of the medical escort officer who showed 'reluctance' to sign the ticket himself, and further had *never* cared to appear at the hearing personally—*no* assistance [sic] been issued [sic] me prior to the hearing though I stated the ticket was *not* understood by me on several occasions. Furthermore, a voice phone had been used, over my *un* ceasing 'objections'. I had been forced from the partial hearing and than [sic] found guilty, and sentenced to 30–days keeplock cell confinement. Soon after,

I did appeal on 1–25–00, however, the defendant W. Wilcox (para—# 9), had affirmed the due process violation against me, of a charge *not* even part of the incident and clearly *not* written in the retaliatory ticket!

Dkt. # 9, pp. 6–G to 6–H (emphasis in original). At all times relevant to the allegations in the amended complaint, defendant Ryan was a Lieutenant at Southport and held that position from 1987 to 2000. Dkt. # 93, ¶ 1. From time to time, defendant Ryan's duties included conducting disciplinary hearings as the Superintendent's designee pursuant to 7 N.Y.C.R.R. § 254.1. *Id.* at ¶ 3.

The Tier 2 disciplinary hearing conducted by defendant Ryan was held on January 25, 2000 and was in relation to a January 14, 2000 Misbehavior Report which charged plaintiff with violating Rules 107.10 (verbal interference) and 107.11 (verbal harassment). Dkt. # 44, p. 0026. The Misbehavior Report was written by defendant Nurse vonHagn for an incident that took place when she attempted to deliver eyeglasses to plaintiff. A complete discussion of the incident that gave rise to the Misbehavior Report is set forth at pp .19–21 *supra.*

At the outset of the hearing, defendant Ryan advised plaintiff that he may have witnesses testify on his behalf and that nothing he said during the course of the hearing could be used against him in a criminal proceeding. Dkt. # 44, pp. 0032–0038; Dkt. # 93, ¶ 11. Plaintiff indicated that he understood his rights. *Id.* Thereafter, plaintiff objected to the Misbehavior Report as retaliatory and noted for the record that he had, at that time, approximately fifteen grievances filed against defendant vonHagn, as well as an Article 78 pending against her. Dkt. # 44, pp. 0032–0038; Dkt. # 93, ¶ 17. Plaintiff did not, however, contrary to the claims made in the amended complaint, claim during the hearing that defendant Ryan denied him an assistant or denied him the ability to have witnesses testify on his behalf. *Id.;* Dkt. # 93, ¶ 7. Moreover, as is reflected in the hearing transcript, over plaintiff's objection, Officer Martino, who endorsed the Misbehavior Report, testified by telephone at the hearing and unequivocally stated that he had witnessed the incident involving defendant vonHagn and plaintiff. Dkt. # 44, pp. 0032–0038.

**\*30** Just prior to Officer Martino's testimony, plaintiff became increasingly disruptive, objecting to the hearing

because it was "bias and partial." *Id.* Accordingly, plaintiff requested to return to his cell for the balance of the hearing and was, therefore, not present for the remainder of the hearing. *Id.* Following Officer Martino's testimony, defendant Ryan found plaintiff guilty of violating Rules 107.10 (interference) and 107.11 (harassment) and imposed a penalty of 30 days keeplock confinement beginning July 18, 2000 and continuing until August 17, 2000. *Id.* In reaching his determination, defendant Ryan relied on the January 14, 2000 Misbehavior Report and the testimony of Officer Martino who witnessed the incident. Dkt. # 93, ¶ 29. Defendant Ryan further stated that he imposed the penalty to serve as a reminder that the type of behavior exhibited towards defendant vonHagn will not be tolerated. *Id.* Plaintiff appealed defendant Ryan's determination and Captain Wilcox affirmed defendant Ryan's determination finding that there was no evidence of retaliatory acts committed by defendant vonHagn, that defendant Ryan properly called Officer Martino to testify, that plaintiff was not confined pending the hearing, that there was no evidence of partiality, bias, racism, vindictiveness, threats or misconduct on the part of defendant Ryan and that a witness may testify by telephone. Dkt. # 44, p. 0024; Dkt. # 92, ¶ 31. Following plaintiff' appeal, defendant Ryan's determination was affirmed by defendant Wilcox on or about January 28, 2000. Dkt. # 86, Exhibit A.

### 6. Defendant Captain Sheahan

Finally, plaintiff alleges in the amended complaint that defendant Captain Sheahan denied plaintiff due process in connection with a Tier 3 disciplinary hearing that began on December 26, 2000 and was continued on December 29, 2000 concerning a December 13, 2000 Misbehavior Report. Dkt. # 9. In short, plaintiff alleges that defendant Sheahan denied plaintiff his right to witnesses, improperly found him guilty at the conclusion of the hearing, and was biased against plaintiff. *Id.* As against defendant Sheahan, plaintiff specifically alleges:

This defendant [Sheahan], on the date of 12–29–00, inside of this Southport prison, while acting under state color in his individual and official [25] capacities, had conducted a hearing, and knowingly, intentionally, and wilfully violated my due process rights repeatedly by 'denying' my right [sic] witness'es [sic] (only one expert witness having a full indepth [sic] and personal knowledge

of my situations [sic] in [sic] suffering with the defendant—author of the retaliatory ticket—para # 1), over my repeated 'objections'. [sic] Additionally, this defendant (Shehan [sic] ), had stated no valid reason on [sic] disposition, in [sic] respect to the threat of any institutional or correctional goals as is necessary to deny witness'es [sic]. I suffered a finding in [sic] guilt, and sentenced to six (6) months further SHU-punative [sic] segregation, an [sic] I appealed on 12–31–00, however, the defendant (D. Selskey [sic] ), affirmed the bias, partial disposition against me, in further violation of my due process rights.

**\*31** Dkt. # 9, pp. 6–A to 6–B (emphasis in original). During the time period relevant to the allegations in the amended complaint, defendant Michael Sheahan was a Captain at Southport and has held that position since June 2003. Dkt. # 88, ¶ 1. As with the other hearing officers named as defendants, defendant Sheahan's duties included conducting inmate disciplinary hearings as the Superintendent's designee. Dkt. # 88, ¶ 3. The underlying facts relating to the December 13, 2000 Misbehavior Report issued by defendant vonHagn are discussed at length above. *See* pp. 23–27 *supra.*

Plaintiff was advised at the outset of the hearing that he had the right to have witnesses testify on his behalf, that nothing plaintiff said would be used against him in a criminal proceeding, that plaintiff should present any oral or documentary evidence during the hearing and that any procedural objections or claims should be made promptly during the hearing. Dkt. # 44, pp. 00160–0199; Dkt. # 88, ¶ 7. Plaintiff responded that he understood his rights. *Id.* Plaintiff objected that he did not receive the employee assistant that he had requested and had not received copies of the grievances he requested to support his claim that defendant vonHagn issued the December 13, 2000 Misbehavior Report in retaliation for complaints plaintiff filed against her. Dkt. # 88, ¶ 8. After considerable discussion concerning plaintiff's selections for an employee assistant, defendant Sheahan adjourned the hearing to further investigate plaintiff's assertions. *Id.* at ¶ 9. The Tier 3 disciplinary hearing reconvened on December 29, 2000. *Id.* During the continuation of the hearing, plaintiff agreed that

he had been provided with an assistant, Officer Carpenter, that Officer Carpenter had met with plaintiff on December 26, 2000 and further, that the assistance he had received was acceptable. *Id.* Although plaintiff testified that he had not received all of the grievances that he had requested, plaintiff stated that the data he had received was satisfactory for the hearing. *Id.* at ¶ 10. Finally, although plaintiff agreed that when he met with Officer Carpenter he had not requested any witnesses, plaintiff advised defendant Sheahan that he did want Thomas Egan, Director of CORC to testify with respect to "certain verifications concerning the grievances." *Id.* at ¶ 11.

Plaintiff plead not guilty to the charges in the Misbehavior Report and objected to the Misbehavior Report on the grounds that: it was retaliatory; he had written at least twenty to twenty-five complaints against defendant vonHagn; he had one witness who would testify that plaintiff never threatened defendant vonHagn; Officer Stamp threatened plaintiff; defendant vonHagn had been violating plaintiff's right to medical care since March 1999; defendant vonHagn is racist, biased and unprofessional; and defendant vonHagn had written retaliatory Misbehavior Reports against plaintiff on prior occasions. *Id.* at ¶ 12. In support of some of his objections, plaintiff submitted copies of the grievances for defendant Sheahan's consideration. *Id.* Defendant Sheahan advised plaintiff that he accepted the grievances as evidence of his claim that defendant vonHagn had submitted the December 13, 2000 Misbehavior Report in retaliation for plaintiff's grievances. *Id.* at ¶ 13.

**\*32** As noted above, plaintiff requested that Director Egan testify that the grievances submitted by plaintiff were "exhausted." *Id* . at ¶ 14. Defendant Sheahan denied plaintiff's request to have Director Egan testify because, as noted above, he accepted the grievances submitted by plaintiff and determined that any testimony by Director Egan would have been redundant. *Id.* Following defendant Sheahan's denial of plaintiff's request to have Director Egan testify, plaintiff's objection was noted for the record and plaintiff indicated that he had nothing further to submit with respect to the Misbehavior Report. *Id.* at ¶ 17. Thereafter, defendant Sheahan rendered his determination. *Id.*

Defendant Sheahan found plaintiff guilty of violating Rules 107.11 (harassment) and 102.10 (threats) and imposed a penalty of six months confinement in SHU. *Id.* at ¶ 18. In reaching this determination, defendant Sheahan relied upon the December 13, 2000 Misbehavior Report and stated that

in his opinion, the evidence of past grievances submitted by plaintiff did not establish that the Misbehavior Report issued by defendant vonHagn was retaliatory in nature. *Id.* Further, defendant Sheahan stated that the disposition was rendered to impress upon plaintiff that threats to staff would not be tolerated. *Id.* Plaintiff appealed defendant Sheahan's determination and defendant Selsky affirmed the determination on or about February 9, 2001. *Id.* at ¶ 20.

### D. Due Process Claims—Appeals

The amended complaint alleges a cause of action against defendants Selsky and Wilcox premised on the theory that the defendants denied plaintiff his due process rights in connection with plaintiff's appeals of certain disciplinary hearing determinations. Dkt. # 9. According to plaintiff, because the hearing officers violated plaintiff's constitutional rights, defendants Wilcox and Selsky must also be liable for violating plaintiff's constitutional rights because they affirmed the determinations of the hearing officers. Dkt. # 9, pp. 6–H to 6–I. Similarly, plaintiff claims that where defendant Selsky modified a hearing officer's determination, such modification also constituted a violation of plaintiff's constitutional rights. *Id.* at p. 6–I.

Against defendant Wilcox, plaintiff alleges, "on the separate date's [sic] of 1–21–00, 1–25–00, 7–18–00, 7–30–00, 11–29–00, 12–31–00, 12–22–00, 3–8–01, 1–30–01[26], inside of this Southport State Prison, while acting under state color in his individual and official[27] capacities, had intentionally, knowingly, and wilfully *violated* my right to 'due process' ..." Dkt. # 9, p. 6–H (emphasis in original). Based on a review of plaintiff's disciplinary history, a copy of which is attached as Exhibit A to defendant Irizarry's affidavit (Dkt.# 86), defendant Wilcox decided appeals involving plaintiff on the following dates: January 28, 2000 (January 25, 2000 determination); July 30, 2000 (July 18, 2000 determination); December 11, 2000 (November 29, 2000 determination); December 28, 2000 (December 21, 2000 determination) and February 5, 2001 (January 29, 2001 determination). Dkt. # 86, Exhibit A.

**\*33** Similarly, as against defendant Selsky, plaintiff claims on February 21, 2001, defendant Selsky "knowingly, intentionally, and wilfully *violated* my right under [sic] 'due process' by "modifying a disposition dated 1–4–00 (not 1–4–01), and I suffered a 6–month SHU-punative [sic] segregation sentence ..." Dkt. # 9, p. 6–I (emphasis in original). Additionally, plaintiff claims that on February

9, 2001, defendant Selsky violated his due process rights by "affirming a bias [sic] disposition, where I suffered *no* witnesses, *nor* had all of my evidence been allowed at the partial *un* fair hearing. I suffered *another* 6–months SHU-punative [sic] segregation sentence." Dkt. # 9, p. 6–I (emphasis in original). At all times relevant to the allegation in the amended complaint, Donald Selsky was the Director of the Special Housing/Inmate Disciplinary Program (Dkt.# 80, ¶ 123) and defendant Wilcox was a Captain at Southport.

### 1. "1–21–00"—Defendant Wilcox

As discussed at length above, a disciplinary hearing was held on January 11, 2000 concerning an incident that occurred on December 31, 1999. *See* pp. 32–35 *supra.* Defendant Lt. Donahue presided over the January 21, 2000 Tier 2 disciplinary hearing wherein he found plaintiff guilty of violating Rules 107.11 (harassment) and 102.10 (threats) and imposed a penalty of 30 days keeplock confinement. *Id.* Contrary to plaintiff's allegations, plaintiff did not appeal defendant Lt. Donahue's January 21, 2000 determination. Dkt. # 86, Exhibit A.

### 2. "1–25–00"—Defendant Wilcox

On January 25, 2000, defendant Lt. Ryan presided over a Tier 2 disciplinary hearing concerning a January 14, 2000 Misbehavior Report by defendant vonHagn alleging that plaintiff violated Rules 107.10 (interference) and 107.11 (harassment). As discussed above, defendant Ryan found plaintiff guilty and imposed a penalty of 30 days keeplock confinement and 30 days loss of packages, commissary and phone privileges. *See* pp. 59–62 *supra.* Plaintiff appealed Lt. Ryan's determination alleging that: the Misbehavior Report was retaliatory in nature; defendant Ryan "manipulated" the Misbehavior Report by endorsing it; plaintiff was improperly confined in connection with the Misbehavior Report for eleven days without an extension; defendant Ryan exhibited "partiality, bias, racism, vindictiveness and Klu [sic] Klux Klan mentality" in the conduct of the disciplinary hearing; and, defendant Ryan improperly received testimony over the telephone. Dkt. # 44, p. 0025. On January 28, 2000, defendant Wilcox affirmed defendant Ryan's determination stating,

> 1. There is no evidence of any retaliatory acts committed by RN VonHagn [sic]. 2. Hearing Officer properly called the Escort Officer to the Hearing as a witness. 3. You were not confined pending this Hearing. 4.

There is no evidence of any partiality, biasness [sic], racism, vindictiveness, threats, or official misconduct by the Hearing Officer at this Hearing. The Hearing Officer may receive testimony from a witness via speaker phone when that person cannot report to the Hearing to testify in person.

**\*34** Dkt. # 44, p. 0024.

### 3. "7–18–00"—Defendant Wilcox

According to plaintiff's disciplinary history, on July 30, 2000, defendant Wilcox affirmed defendant Gilmore's July 18, 2000 determination. Dkt. # 86, Exhibit A. As discussed above, on July 18, 2000, defendant Lt. Gilmore found plaintiff not guilty of violating Rules 107.10 (interference with employee) and 106.10 (refusing direct order) and guilty of violating Rule 107.11 (harassment) and imposed a penalty of 10 days keeplock confinement. *See* pp. 44–49 *supra.*

### 3. "7–30–00"—Defendant Wilcox

A review of plaintiff's disciplinary history (Dkt. # 86, Exhibit A) and the documents produced by defendants during the course of discovery (Dkt.44, 65, 68, and 70), do not reveal a separate disciplinary hearing that occurred on July 30, 2000, except for the appeal of the July 18, 2000 determination that was decided on July 30, 2000, as discussed above. Accordingly, for purposes of deciding defendants' motion for summary judgment, the Court will treat plaintiff's allegations concerning a July 30, 2000 disciplinary hearing as a second, duplicative reference to the July 18, 2000 hearing determination.

### 5. "11–29–00"—Defendant Wilcox

A Tier 2 disciplinary hearing was conducted by defendant Donahue on November 29, 2000. Dkt. # 44, p. 0069; Dkt. # 86, Exhibit A. Following the hearing, defendant Donahue found plaintiff guilty of violating Rules 107.10 (interference) and 102.10 (threats) and imposed a penalty of 30 days keeplock confinement. *Id.* Plaintiff filed an appeal of defendant Donahue's determination on November 29, 2000 stating that, (1) he had objected to the hearing being conducted by "this discriminiata [sic]/bias officer due to his previous verbal threats upon me back in January, and also, due to a prior grievance exhaustion [sic] against him for both these valid reasons" and (2) defendant Donahue was the subject of

an official complaint by plaintiff to the DOCS Commissioner. Dkt. # 44, pp. 0378–0379. On December 11, 2000, defendant Wilcox affirmed defendant Donahue's determination stating, "No evidence Hearing Officer was bias [sic]. Hearing Officer was appropriately assigned to conduct Hearing." Dkt. # 44, p. 0377.

### 6. "12–31–00"—Defendant Wilcox

A review of plaintiff's disciplinary history (Dkt. # 86, Exhibit A) and the documents produced by defendants during the course of discovery (Dkt.44, 65, 68, and 70), do not, with respect to defendant Wilcox, reveal a disciplinary hearing or appeal that was held, filed or decided on or about December 31, 2000. As will be discussed below, the record before the Court does, however, reveal that plaintiff appealed a December 29, 2000 determination of a Tier 3 disciplinary hearing and that determination was affirmed by defendant Selsky on February 9, 2001.

### 7. "12–22–00"—Defendant Wilcox

On December 22, 2000, plaintiff appealed a December 21, 2000 determination by defendant Donahue. Dkt. # 44, pp. 0365–0366. In his December 22, 2000 appeal, plaintiff stated that: (1) he objected to defendant Donahue as the hearing officer because of plaintiff's prior grievances filed against defendant Donahue; (2) he objected to defendant Donahue's "misconduct" by entering a plea on plaintiff's behalf over plaintiff's objections; (3) plaintiff objected to the Misbehavior Report as being retaliatory in nature; and, (4) defendant Donahue erroneously denied plaintiff's request for two expert witnesses ("Mr. Glen Goord/Thomas G. Eagen [sic]"). *Id.* Thereafter, on December 28, 2000, defendant Wilcox affirmed defendant Donahue's December 21, 2000 determination stating, "Hearing Officer was appropriate. No evidence Misbehavior Report was retaliatory in nature. Witnesses appropriately denied and reasons documented. No evidence Hearing Officer acted improperly ." Dkt. # 44, p. 0364.

### 8. "3–8–01"—Defendant Wilcox

**\*35** Plaintiff alleges that defendant Wilcox violated his due process rights on March 8, 2001. However, a review of plaintiff's disciplinary history (Dkt. # 86, Exhibit A) and the documents produced by defendants during the course of discovery (Dkt.44, 65, 68, and 70), do not, with respect to defendant Wilcox, reveal a disciplinary hearing or appeal that was held, filed or decided on or about March 8, 2001.

To the contrary, plaintiff's disciplinary history reveals that a Tier 2 disciplinary hearing was conducted on March 7, 2001 by defendant Donahue with respect to a Misbehavior Report issued by Correction Officer Kamas on February 28, 2001. Dkt. # 86, Exhibit A. Plaintiff did not appeal this determination.

### 9. "1–30–01"—Defendant Wilcox

On January 30, 2001, plaintiff appealed the determination of a Tier 2 disciplinary hearing held on January 29, 2001. The January 29, 2001 disciplinary hearing was conducted by defendant Donahue and at the conclusion of the hearing, defendant Donahue found plaintiff guilty of violating Rule 102.10 (threats) and imposed a penalty of 30 days keeplock. Dkt. # 44, p. 0112. In his appeal, plaintiff stated that: (1) the Misbehavior Report was retaliatory in nature because it was written by defendant Brandt against whom plaintiff had filed a grievance; (2) "the hearing officers [sic] disposition in [sic] bias/partiality, due to *no evidence nor endorsement* ..."; (3) defendant Donahue had been "under investigation" by DOCS officials; and, (4) defendant Donahue's actions are retaliatory in nature. Dkt. # 44, pp. 0121–0123 (emphasis in original). Defendant Wilcox reviewed the January 29, 2001 determination and affirmed it stating, in part, "HO [Hearing Officer] was appropriate and not biased. No evidence Misbehavior Report was retaliatory." Dkt. # 44, p. 0120.

### 10. "2–21–01"—Defendant Selsky

On or about February 21, 2001, defendant Selsky modified the penalty imposed by defendant Irizarry following a Tier 3 disciplinary hearing conducted on January 4, 2001. Dkt. # 86, Exhibit A. Following the January 4, 2001 disciplinary hearing, defendant Irizarry found plaintiff guilty of violating Rules 102.10 (threats) and 107.11 (harassment) and imposed a penalty of nine months confinement in SHU. Dkt. # 65, p. 0661. Defendant Selsky modified the penalty to six months SHU confinement. Dkt. # 86, Exhibit A. Defendant Selsky did not, however, overturn defendant Irizarry's determination nor did defendant Selsky find that the hearing was procedurally improper. Dkt. # 80, ¶¶ 246 and 304–306.

### 11. "2–9–01"—Defendant Selsky

Following the disciplinary hearing which commenced on December 26, 2000 and concluded on December 29, 2000, defendant Sheahan found plaintiff guilty of violating Rules 107.11 (interference) and 102.10 (threats) and imposed a penalty of six months SHU confinement. Dkt. # 44, p. 101. On February 9, 2001, defendant Selsky affirmed the December 29, 2000 hearing determination of defendant Lt. Sheahan. [28] Dkt. # 44, p. 100; Dkt. # 86, Exhibit A.

### E. Denial of Religious Correspondence Course Claim

**\*36** In his amended complaint, plaintiff alleges that in or about November and December 1999, defendant, Deane M. Gardner, "knowingly and intentionally *violated* my legal right to study religeon [sic] from a Christian order in my own Catholic faith. However, after deliberately violating my right, soon after, this very same bible study course in [sic] correspondence is now implemented here in Southport prison, and still I have been denied a right to take this correspondence course in Christian belief." Dkt. # 9, p. 5–C (emphasis in original). At all times relevant to the allegations in the amended complaint, defendant Gardner was employed as the Senior Mail and Supply Clerk at Southport. Dkt. # 94, ¶ 1.

In connection with his claim that defendant Gardner denied him his right to take a religious correspondence course, plaintiff filed Grievance No. SPT–17423–99 on or about November 16, 1999. Dkt. # 44, p. 0250. In this grievance, plaintiff states in part, "on the date of Nov. 2nd, I received an information packet concerning religeous [sic] training or studies, however, the senior mailroom clerk—D. Gardner, informed me that I could not take any correspondences [sic] courses either religeous [sic] or college!" Dkt. # 44, p. 0250. Moreover, plaintiff alleges that an item paid for by plaintiff and sent to plaintiff by an outside vendor had been stolen by the mail room staff. *Id.* Finally, plaintiff claims that he had been denied level 3 phone call privileges. *Id.* In response to the grievance, the IGRC recommended,

> [p]er recent CORC decisions, the grievant may not participate in any correspondance [sic] courses/ programs while at Southport. Grievant is advised to contact the educational supervisor once he is transferred to a general confinement facility. Regarding the item from an outside vendor which the grievant alleges was stolen by mailroom staff, no facts have been submitted. The grievant needs to provide proof of this claim. Finally regarding his telephone call, he is advised to address this issue with his area supervisor.

Dkt. # 44, p. 0251. As noted above, Southport is an all SHU facility and all inmates housed at Southport are assigned to SHU confinement. Dkt. # 94, ¶ 9.

On December 1, 1999, the Superintendent concurred with the recommendation of the IGRC and stated, in part, "[t]here are no provisions in either the facility policy or departmental directive # 4933 that allows SHU inmates to participate in any correspondence courses. Any desire to learn more about religious practices should be directed to staff in religious services." Dkt. # 44, p. 0254. Thereafter, plaintiff appealed to CORC on December 6, 1999 stating that he has a constitutional right to study religion in prison. Dkt. # 44, p. 0255. CORC issued its determination on or about January 19, 2000 wherein it concurred with the Superintendent's determination. Dkt. # 44, p. 0246. In support of its determination, CORC cited its prior decision in SPT–14519–98 dated August 26, 1998 wherein CORC stated, in part, "[t]here are no outside correspondence courses allowed in this facility." *Id.* Moreover, CORC further cited its decision in SPT–7594–94 rendered on September 15, 1994, which states, in part, "CORC concurs with the Superintendent in that the grievant may not participate in any correspondence course due to the logistical problems related to housing in Southport C.F." *Id.*

**\*37** With respect to plaintiff's claim of stolen property, CORC indicated that it had not been presented with sufficient evidence to support his allegation that staff stole his property. *Id.* CORC advised that plaintiff nevertheless retained his right to pursue such a claim through the inmate claims mechanism as set forth in Departmental Directive # 2733, Inmate Personal Property Claim. *Id.* Finally, with respect to plaintiff's appeal, CORC advised plaintiff to address his concerns regarding religious study to the facility chaplain. *Id.*

In support of her motion for summary judgment, defendant Gardner claims that in her position as Senior Mail and Supply Clerk, she had no authority to set any policy for DOCS or Southport and further, had no authority to determine whether an inmate may take a correspondence course or otherwise engage in educational or religious activities. Dkt. # 94, ¶ 16. Defendant Gardner further states that she made no determination with regard to plaintiff's desire to take a religious correspondence course. *Id.* at ¶ 17. Moreover, defendant Gardner states that she did not interfere with any of plaintiff's constitutional rights or deny plaintiff the right to exercise any constitutional right. *Id.*

## F. Interference with Legal Mail Claim

In addition to his claim that defendant Gardner denied him the right to take a religious correspondence course, plaintiff further claims that defendant Gardner interfered with his legal mail. Dkt. # 9, p. 5–B. Specifically, plaintiff alleges: "[t]his defendant [Gardner], in the months of November and December of 1999, inside of this Southport Prison, while acting under state color, in her individual and official [29] capacities, had knowingly, wilfully, and intentionally violated my incoming legal mail ... (my legal mail had been opened, examined and censored out of my presence and had arrived to my SHU-punative [sic] segregation cell opened ..." Dkt. # 9, p. 5–B to 5–C.

On or about October 28, 1999, plaintiff filed Grievance No. SPT–17276–99 alleging that his incoming legal mail had been opened by the mail room clerk and censored, despite the fact that, according to plaintiff, the envelope was clearly marked "Legal Mail ." Dkt. # 44, p. 0262. In the grievance, plaintiff requested that the following action be taken, "the request is clearly obvious (no employee of D.O.C.S. is supposed to violate federal law by opening a prisoners [sic] incoming legal mail!), and a legal retaliation [sic] will be activated soon enough." Dkt. # 44, p. 0262. On or about October 29, 1999, K. Washburn, Mailroom Clerk, submitted a response to Grievance No. SPT–17276–99 to the IGRC stating,

> Grievant is only partially correct by stating that legal mail which is clearly marked as such, and is from an attorney, is not to be opened by the mailroom. However, this was not the case. The letter in question arrived in an envelope which was completely handwritten, unlike normal mail from attorneys. The senders [sic] name was also illegible. Since the senders [sic] name could not be verified as a legitimate, legal entity, the mail was opened. Mailroom staff have also stated that whenever legal mail is opened in error, the enveloped is stamped by the mailroom to let the addressee know it was opened in error.

**\*38** Dkt. # 44, p. 0268. Thereafter, the IGRC advised plaintiff of the results of the investigation by reiterating K. Washburn's response. *Id.* at p. 0263. The Superintendent concurred with the IGRC recommendation and advised

plaintiff that despite his allegations, facility staff acted within Department policy. *Id.* at p. 0266. CORC sustained the Superintendent's determination and concurred with the IGRC recommendation, stating that facility staff acted within department policy and "[c]ontrary to the grievant's assertions, CORC has not been presented with sufficient evidence to substantiate any malfeasance by the employees referenced in this instant complaint." *Id.* at p. 0259.

As set forth in Grievance No. SPT–17276–99 and as provided in 7 N .Y.C.R.R. §§ 721.2(2) and 721.3(b)(1) and (2), legal mail which is clearly marked as such and is from an attorney is not to be opened by the mailroom outside the presence of the inmate. If privileged correspondence is opened in error outside the presence of the inmate, documentation of such error should be maintained. Dkt. # 94, ¶ 26; 7 N.Y.C.R.R. §§ 721.2(2) and 721.3(b)(1) and (2). General correspondence, however, between an inmate and someone other than a person approved for legal correspondence, will be opened, outside the presence of the inmate, and inspected for cash, checks, money orders, printed or photocopied materials or contraband. Dkt. # 94, ¶ 27; 7 N.Y.C.R.R. 720.2(b) and 720.4(a). Here, because, as described above, plaintiff's correspondence was not readily identified as legal mail, it was opened and thereafter stamped as opened in error. Dkt. # 94, ¶ 28.

## G. Access to the Courts Claims

Plaintiff claims that on or about September 13, 2000, Superintendent Corcoran violated his constitutional right of access to the courts when he denied plaintiff access to vouchers and certified mailed receipts contained in plaintiff's sealed property bags. Dkt. # 9, p. 5–D. As a result, plaintiff further alleges that Claim No. 98329, a matter pending before the New York State Court of Claims, was dismissed on or about December 20, 2000. *Id.* During the time period alleged in the amended complaint, Michael P. Corcoran was the Deputy Superintendent for Administrative Services at Southport. Dkt. # 90, ¶ 1.

Plaintiff also claims that on or about June 12, 2001, Deputy Superintendent Weingartner violated his constitutional right of access to the courts when he denied plaintiff's "advanced certified mailing request" for legal mail to the Attorney General in relation to Claim No. 99509 pending before the New York State Court of Claims. Dkt. # 9, p. 5–E. In addition, plaintiff further claims that the manilla envelope containing the material had been kept from him "until the expiration of my time to respond by certified mail—

return receipt—requested to the Attorney General." *Id.* As a result, plaintiff alleges that his claim was dismissed. *Id.* During the time period alleged in the amended complaint, defendant Lawrence W. Weingartner was the Assistant Deputy Superintendent for Program Services at Southport. Dkt. # 91, ¶ 1.

### 1. Defendant Michael P. Corcoran

**\*39** As a threshold matter, defendant Corcoran has no recollection of plaintiff's claim that he denied plaintiff access to the Court of Claims by denying plaintiff access to vouchers and/or certified mailing receipts sealed in plaintiff's stored property bags. Dkt. # 90, ¶ 7. With respect to plaintiff's claim against defendant Corcoran, plaintiff was transferred from Southport to Coxsackie in or about February 2000 and plaintiff remained at Coxsackie until in or about May 2000, at which time he was transferred back to Southport. Dkt. # 90, ¶ 9. A Personal Property Transferred Form was completed on or about May 16, 2000 listing plaintiff's personal property transferred from Coxsackie to Southport. Dkt. # 90, ¶ 12 and Exhibit A. As set forth on the Personal Property Transferred Form (which plaintiff refused to sign), plaintiff was advised not to leave active legal case material behind and was instructed to include all active legal material in his 4–bag limit. *Id.* Upon transfer to Southport, the property bags of SHU inmates are reviewed with the incoming inmate. *Id.* at ¶ 17. The incoming inmate is advised that if he has any active legal matters, he should take all active legal material with him to his cell. *Id.* "Due to the restrictions on the amount of property which SHU inmates are allowed to have in their cells, any personal property of SHU inmates that exceeds the SHU cell property limits are placed in storage, to be returned to the inmate upon his release from SHU confinement. *Id.*

On or about May 25, 2000, plaintiff completed an Inmate Claim Form concerning certain property that plaintiff alleged had been stolen. Dkt. # 90, ¶ 10 and Exhibit A. Notably, plaintiff did not claim that any legal documents, vouchers or certified mail receipts were stolen or missing. *Id.* at ¶ 11. On or about June 16, 2000, defendant Corcoran advised plaintiff that he had received his claim, that all claims must be supported by purchase invoices or package room receipts to establish proof of ownership and that a failure to establish proof of ownership may result in denial of his claim. *Id.* at ¶ 13. Moreover, defendant Corcoran advised plaintiff that his claim would be sent to Security staff for investigation and that he would be notified of a decision upon completion of the investigation. *Id.* at ¶ 14. On or about August 3, 2000, defendant Corcoran advised plaintiff that his accusations

were without merit and further, that because plaintiff had failed to provide receipts for any of the articles, plaintiff had failed to establish ownership and his claim was rejected. Dkt. # 90, ¶ 16 and Exhibit A.

Thereafter, plaintiff corresponded with defendant Corcoran on or about September 11, 2000 and in response, defendant Corcoran sent plaintiff a memorandum dated September 13, 2000. Dkt. # 90, ¶ 19 and Exhibit B. Defendant Corcoran's September 13, 2000 memorandum addressed plaintiff's September 11, 2000 note and stated in pertinent part, "I have again received another demeaning and insolent note from you. This is the last time that I will respond to [sic]. I will not authorize you access to your property bags, since you've already determined that we have broken into your bags to destroy your receipts." *Id.*

**\*40** As described above, plaintiff claims that as a result of defendant Corcoran's conduct, Claim No. 98329, a matter pending before the New York State Court of Claims, was dismissed on or about December 20, 2000. Dkt. # 9, p. 5– D. Contrary to plaintiff's assertions, Claim No. 98329 was dismissed by Judgment dated January 2, 2001.[30] Dkt. # 90, ¶ 21 and Exhibit B. As set forth in the Judgment, plaintiff filed Claim No. 98329 on May 15, 1998 seeking damages in the amount of $350,000 for mental anguish arising out of events which occurred while he was an inmate at Attica Correctional Facility. *Id.* The Judgment further noted that the matter came on to be heard by Honorable Edgar C. NeMoyer, Judge, Court of Claims and that the Court, having heard the "proofs [sic] and allegations of the parties and having duly made and filed its decisions in which it dismissed this claim," Claim No. 98329 was dismissed. *Id.* Thus, in support of his motion for summary judgment, defendant Corcoran argues that "to the extent plaintiff's Claim No. 98329 was dismissed, as established by the Judgment in Claim No. 98329, such dismissal was had after the Court heard the proofs and allegations of the parties, and not, as plaintiff claims, because I prevented him access to receipts or vouchers or otherwise prevented him from accessing the Court of Claims." Dkt. # 90, ¶ 22.

## 2. Defendant Lawrence W. Weingartner

As a threshold matter, defendant Weingartner states that he has no recollection of plaintiff's claim that he denied him access to the Court of Claims. Dkt. # 91, ¶ 6. Defendant Weingartner states that counsel for defendants received a packet of documents from plaintiff in connection with

discovery in this matter and that included in those documents was a copy of a letter from Mark C. Davison, Court Clerk Specialist, New York State Supreme Court, Appellate Division, Fourth Department to plaintiff dated July 27, 2001. *Id.* at ¶ 7. In his July 27, 2001 letter, Mr. Davison advised plaintiff that in response to plaintiff's July 2, 2001 letter, there was nothing that Mr. Davison could do with respect to the alleged failure of Southport to forward papers to the Attorney General in connection with Claim No. 99509. *Id.* at ¶ 8. Mr. Davison advised plaintiff that to obtain permission to file or serve an untimely notice of appeal, plaintiff must make a motion under CPLR 5520. *Id.*

Also included in the documents supplied by plaintiff was a Notice dated June 18, 2001 to plaintiff from the Southport mailroom. *Id.* at ¶ 9. In that Notice, plaintiff was advised that a piece of legal mail was being returned to him pursuant to the Directive governing the inmate correspondence program and that plaintiff should see the item checked on the Notice and where applicable, correct and resubmit the item for processing. *Id.* at ¶ 10. In the box designated "other," plaintiff was advised that his request for special handling had been denied by defendant Weingartner because it did not meet the guidelines for special handling as outlined in DOCS Directive No. 4421. *Id.* at ¶ 11. DOCS Directive Nos. 4421, Privileged Correspondence (7 N.Y.C.R.R. Part 721) and 4422, Inmate Correspondence Program (7 N.Y.C.R.R. Part 720) set forth DOCS policy regarding inmate mail correspondence. *Id.* at ¶ 12. DOCS Directive No. 4421 provides that advances for "special handling" (e.g., certified mail, return receipt, express mail, etc.) will not be approved unless required by a statute, court rule or court order. *Id.* at ¶ 13. Moreover, on the June 18, 2001 Notice to plaintiff, the box marked "Advances for Special Handling" states that advances for special handling "may not be used to pay for any special handling charges such as for certified, return-receipt, express mail, etc., unless such mail services are required by statute or court order. Advances for special handling for filing a Claim or Notice of Intention on the Attorney General [sic] Office must be specified on the approved Advance Request form for postage. You must state why you are requesting special handling on the advance form or provide a copy of court order. (4421)." *Id.* at ¶ 14.

**\*41** According to defendant Weingartner, because plaintiff's request for special handling did not meet the guidelines for special handling, his request was denied. *Id.* at ¶ 15. Indeed, defendant Weingartner further stated that plaintiff's request for special handling for mailing a notice of appeal to the Attorney General did not meet the guidelines for special

handling because plaintiff was not filing a Claim or Notice of Intention on the Attorney General's Office. *Id.* There is nothing in the record to suggest that after plaintiff received the June 18, 2001 Notice, he submitted to the mailroom staff any court order or statute showing that his correspondence to the Attorney General was required to be mailed by certified mail, return receipt requested. *Id.* at ¶ 16. Lastly, in further support of his motion for summary judgment, defendant Weingartner states that to the extent that any appeal concerning Claim No. 99509 was untimely, plaintiff was advised by Mr. Davison that to obtain permission to file or serve an untimely notice of appeal, plaintiff must make a motion for leave to file an untimely notice pursuant to CPLR 5520. *Id.* at ¶ 17. There is nothing in the record to suggest that plaintiff submitted any such motion pursuant to CPLR 5520. *Id.* at ¶ 18.

## DISCUSSION AND ANALYSIS

Defendants argue that they are entitled to summary judgment because plaintiff has failed to establish violations of the First, Eighth and Fourteenth Amendments to the United States Constitution. Specifically, with respect to his deliberate indifference claim, plaintiff failed to establish that he suffered from a sufficiently serious medical condition and that defendants Brandt and vonHagn were deliberately indifferent to his medical needs. With respect to plaintiff's retaliation claim against defendants Brandt and vonHagn, plaintiff is unable to establish retaliatory motive. Even if plaintiff could establish such retaliatory motive, the record before the Court clearly establishes that there were proper, non-retaliatory reasons for the punishment imposed on plaintiff.

Plaintiff's claims of deprivation of due process against defendants Donahue, Gilmore, Irizarry, Quinn, Ryan, Sheahan, Wilcox and Selsky fail as a matter of law because plaintiff received all the process he was due during the course of each disciplinary hearing and appeal. With respect to plaintiff's denial of right to take a religious correspondence course claim against defendant Gardner, that claim must fail because contrary to plaintiff's assertions, defendant Gardner was not personally involved in the decision. Plaintiff's second claim against defendant Gardner, interference with legal mail, also fails as a matter of law because plaintiff cannot under any circumstances demonstrate that he suffered actual injury. Finally, plaintiff's claims of interference with access to the Courts claims against defendants Corcoran and Weingartner fail as a matter of law because with respect to defendant Corcoran, plaintiff cannot demonstrate that he suffered any

injury and with respect to defendant Weingartner, plaintiff cannot establish that any conduct on the part of defendant Weingartner caused the dismissal of Claim No. 99509 pending before the Court of Claims. Because, for the reasons set forth below, the Court agrees that defendants are entitled to judgment as a matter of law, the Court need not reach the issue of whether defendants are entitled to qualified immunity.

### Summary Judgment

 **\*42** Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a *pro se* plaintiff." *Thomas v. Irvin,* 981 F.Supp. 794, 798 (W.D.N.Y.1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Catanzaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *see Bryant v. Maffucci,* 923 F.2d 979 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant,* 923 F.2d at 982 (internal citations omitted). A party seeking to defeat a motion for summary judgment

> must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial.

*Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

### Deliberate Indifference to Serious Medical Needs Claims Against Defendants vonHagn and Brandt

In *Estelle v. Gamble,* the United States Supreme Court determined that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment" to the United States Constitution. 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). To establish an unconstitutional denial of medical care that rises to the level of an Eighth Amendment violation, a plaintiff (prisoner) must prove, beyond mere conclusory allegations, that the defendant acted with "deliberate indifference to [his] serious medical needs." *Estelle,* 429 U.S. at 104. More specifically, the prisoner must demonstrate both that the alleged deprivation is, in objective terms, "sufficiently serious," and that, subjectively, the defendant is acting with a "sufficiently culpable state of mind." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). Both the objective and subjective components must be satisfied in order for a plaintiff to prevail on his claim. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

### Objective Component

**\*43** Under the objective component, in assessing whether a medical condition is "sufficiently serious," the Court considers all relevant facts and circumstances, including whether a reasonable doctor or patient would consider the injury worthy of treatment; the impact of the ailment upon an individual's daily activities; and, the severity and persistence of pain. *See Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). A serious medical condition exists where the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. *Id.* Indeed, the Second Circuit has held that the alleged deprivation must be "sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). "[I]n most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Smith v. Carpenter,* 316 F.3d 178, 187 (2d Cir.2003).

The types of conditions which have been held to meet the constitutional standard of serious medical need include: the failure to treat a painful and disfiguring facial keloid, *Brock v. Wright,* 315 F.3d 158, 160 (2d Cir.2003); refusal to treat a cavity at risk of "acute infection [ ], debilitating pain and tooth loss" unless prisoner consented to extraction of another diseased tooth, *Harrison v. Barkley,* 219 F.3d 132, 136–37 (2d Cir.2000); untreated dental problems that resulted in chronic pain for a period of six months resulting in tooth degeneration, *Chance,* 143 F.3d. at 702; failure to treat a ruptured Achilles tendon which resulted in swelling and pain, *Hemmings,* 134 F.3d at 106–07; confiscation of prescription eyeglasses necessary to correct serious vision problem and subsequent denial of medical treatment resulting in loss of vision in one eye, *Koehl v. Dalsheim,* 85 F.3d 86, 87–88 (2d Cir.1996); failure to remove broken hip pins from prisoner's hip for over three years despite prisoner's complaint of persistent pain, *Hathaway,* 37 F.3d at 64–65; and, loss of an ear where doctor threw away prisoner's ear and stitched up the stump, *Williams v. Vincent,* 508 F.2d 541, 543 (2d Cir.1974).

Here, plaintiff's chief complaint, that he suffered from an "extremely painful ear infection resulting in my total loss of hearing ability in my ear for a time period of two weeks" is far from resembling the foregoing serious medical problems. Dkt. # 9, p. 5. In opposition to defendants' motion for summary judgment on his deliberate indifference claim, plaintiff offers nothing more than bald, conclusory allegations that he suffered from an extremely painful ear infection and further, that the ear infection resulted in a temporary (two week) loss of hearing. Dkt. # 96. Plaintiff's claims are belied by the medical records which unmistakably demonstrate that plaintiff was repeatedly seen by defendants Brandt and vonHagn, as well as others on the medical staff and further, that plaintiff received proper and adequate medical treatment. Moreover, there is nothing whatsoever in plaintiff's medical records that supports plaintiff's claim of hearing loss.

**\*44** Beginning on December 16 and continuing through December 31, 1999, plaintiff was seen by the medical staff at Southport nine times. Plaintiff was seen by defendant Brandt on December 16, 17, 23, 27 and 29, 1999. Plaintiff was seen by defendant vonHagn on December 18, 19, 20 and 31, 1999. On December 16, 1999, defendant Brandt noted some wax in ear and some mild irritation of the canal due to plaintiff inserting foreign objects into his ear. Dkt. # 70, p. 0843; Dkt. # 81, ¶ 12; Dkt. # 82, ¶ 10. Plaintiff was also seen by defendant Brandt on December 17, 1999, wherein plaintiff again demanded ear drops and defendant Brandt

again advised plaintiff against cleaning his ears with foreign objects. Dkt. # 81, ¶ 12; Dkt. # 82, ¶ 10. Plaintiff was seen by defendant vonHagn on December 18, 1999 during morning sick call and plaintiff demanded a second ear check and claimed he could not hear out of both ears. Dkt. # 70, p. 0843; Dkt. # 81, ¶ 13; Dkt. # 83, ¶ 10. At that time, defendant vonHagn advised plaintiff that she would schedule an ear examination with Dr. Alves. *Id.* Although plaintiff was seen by defendant vonHagn on December 19, 1999, he did not complain of ear pain at that time. *Id.*

On December 20, 1999, defendant vonHagn examined plaintiff's left ear and noted "left ear cereum impaction seen, right ear some impaction seen, no visualization of tampanic [sic] membrane seen in either ear." Dkt. # 70, p. 0842; Dkt. # 81, ¶ 15; Dkt. # 83, ¶ 12 Thus, defendant vonHagn saw no signs of infection and provided plaintiff with debrox (ear drops) and ear wash to be used for seven days. *Id.* Plaintiff's next complaint concerning his ears was not until December 27, 1999, when he requested sick call and he was to be seen by defendant Brandt. Dkt. # 70, p. 0841; Dkt. # 81, ¶ 17; Dkt. # 82, ¶ 12. When defendant Brandt went to see plaintiff, plaintiff refused and was extremely verbal, nasty and confrontational. *Id.* As a result, defendant Brandt terminated the sick call. *Id.* Plaintiff again complained of his ears on December 29, 1999 and plaintiff was to be seen by defendant Brandt. Dkt. # 70, p. 0841; Dkt. # 81, ¶ 18; Dkt. # 82, ¶ 13. Plaintiff refused to have defendant Brandt check his ears, stating, "fuck you white homoboy." *Id.* Thereafter, despite his complaints, plaintiff repeatedly refused to allow anyone, including Dr. Alves, to check his ears. After January 4, 2000 (when plaintiff refused to see Dr. Alves on an MD callout) and continuing until his transfer to Coxsackie in May 2000, plaintiff made no complaints whatsoever about his ears. Dkt. # 81, ¶¶ 21–26.

At most, plaintiff asserts that he suffered from "extreme pain." However, plaintiff's amended complaint and opposition to defendants' motion for summary judgment fail to offer any specificity with respect to the "extreme pain" that he claims he suffered. Moreover, the record before the Court is utterly devoid of any mention by plaintiff of any impact on his daily activities, or the severity or persistence of pain. Indeed, neither plaintiff nor defendants make any mention that plaintiff's alleged hearing loss affected his ability to communicate with the medical staff. Conversely, defendant vonHagn noted on December 18, 1999 that plaintiff heard her statements. Dkt. # 70, p. 0843; Dkt. # 81, ¶ 13; Dkt. # 83, ¶ 10. Upon his review of plaintiff's medical records, Dr.

Alves concluded that there was nothing to support plaintiff's assertion that he suffered hearing loss. Dkt. # 81, ¶ 79. Absent any evidence to support a conclusion that plaintiff suffered a serious medical condition as a result of defendant Brandt's and defendant vonHagn's alleged failure to provide medical care and treatment in December 1999, other than plaintiff's allegations that he suffered from extreme pain, plaintiff fails to satisfy the objective element of his deliberate indifference claim.

### Subjective Component

**\*45** The subjective component for the establishment of a claim of deliberate indifference to a serious medical need requires that the plaintiff establish that the defendant acted with a "sufficiently culpable state of mind" so as to violate the Eighth Amendment's cruel and unusual punishment clause. *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). "[A] prison official does not act in a deliberately indifferent manner unless that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Hathaway,* 37 F.3d at 66, *quoting Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In *Estelle,* the Supreme Court ruled that deliberate indifference may manifest itself in a doctor's refusal to administer needed treatment, a prison guard's intentional denial or delay in granting an inmate access to medical care, or intentional interference with prescribed treatment. *Estelle,* 429 U.S. at 104–05.

"The subjective element of deliberate indifference 'entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.' " *Hathaway,* 99 F.3d at 553, *citing Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003), *cert. denied,* 543 U.S. 1093, 125 S.Ct. 971, 160 L.Ed.2d 905 (2005). The Supreme Court further stated in *Estelle* that, "an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind .' " *Estelle,* 429 U.S. at 105–06. Thus, the Supreme Court added,

> [a] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a

valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id.* at 106; *see also Chance,* 143 F.3d at 703 (stating "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation").

Where, as here, the prisoner has received some (extensive) medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgment. Rather, "[p]rison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates [and] courts have repeatedly held that a prisoner does not have the right to the treatment of his choice." *Ross v. Kelly,* 784 F.Supp. 35, 44–45 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (internal citations omitted).

**\*46** In their motion for summary judgment, defendants Brandt and vonHagn assert that, "[p]laintiff's allegations ... is [sic] at most negligence or malpractice and does [sic] not rise to the level of a constitutional violation." Dkt. # 92, p. 15. Nevertheless, defendants Brandt and vonHagn maintain that the record establishes that they were neither negligent nor that their conduct could be characterized as medical malpractice. *Id.* Accordingly, they ask this Court to find, as a matter of law, that plaintiff is unable to establish that, (1) he suffered from a serious medical condition and (2) that defendants Brandt and vonHagn were deliberately indifferent to plaintiff's medical needs. The Court agrees with the defendants that the record is devoid of any evidence to support a finding that plaintiff suffered from a serious medical condition as a result of the care and treatment he received in or about December 1999. Moreover, the Court agrees with the defendants that plaintiff also fails to satisfy the subjective component of the deliberate indifference standard.

Plaintiff claims that defendant vonHagn "knowingly, intentionally, and wilfully denied [plaintiff] 'emergency' medical care ..." and that defendant Brandt "knowingly, wilfully and intentionally 'aided' in the denial of [plaintiff's]

'emergency' medical care...." Dkt. # 9. However, there is nothing in the record to establish any intent on the part of either defendant vonHagn or defendant Brandt. To the contrary, the undisputed record unequivocally establishes that defendant vonHagn and Brandt made every effort to comply with plaintiff's requests and to provide plaintiff with appropriate treatment, medications and examinations. Moreover, Dr. Alves, the Facility Health Services Director of the Medical Services Unit at Southport, concluded that defendants properly treated plaintiff's complaints with the appropriate medication and referred plaintiff to Dr. Alves for examination and further, that defendant vonHagn appropriately scheduled and performed ear examinations on plaintiff. In addition, Dr. Alves' review of plaintiff's medical records indicates that plaintiff did not suffer any hearing loss in December 1999 or at anytime related to the treatment of his complaints of ear pain during December 1999. Finally, Dr. Alves calculates that during the period, December 1999 through January 2001, plaintiff had approximately 92 encounters with medical staff concerning a multitude of complaints, including, ear pain. Notably, however, plaintiff made no complaints of ear pain after January 2000.

The record clearly establishes that defendants vonHagn and Brandt made every effort to treat plaintiff's complaints of ear pain with an appropriate course of treatment and medication, and that despite their efforts, plaintiff refused several of their attempts to examine his ears and refused to be seen by Dr. Alves. Additionally, there is nothing in the record to support plaintiff's claim that he suffered from a total loss of hearing for a period of two weeks or that the care and treatment provided to plaintiff by defendants was in any way related to plaintiff's claim of hearing loss. Finally, the Court agrees with the defendants that plaintiff's allegations are, at most, claims of negligence or medical malpractice and thus, do not create a cause of action that rises to the level of a constitutional violation. Therefore, the Court finds that plaintiff's claim of deliberate indifference by the defendants is without merit.

### Retaliation Claims Against Defendants vonHagn and Brandt

**\*47** In support of their motion for judgment as a matter of law on plaintiff's retaliation claim, defendants vonHagn and Brandt argue that plaintiff cannot satisfy his burden and establish that the actions of defendants vonHagn and Brandt were the result of a retaliatory motive. Dkt. # 92, p. 18. In response to defendants' motion, plaintiff summarily states, without elaboration, that "defense counsel continually makes

claims of *un* disputed facts pge # 6, no. # 22, however, plaintiff notes that *no* undisputed facts, can be evident by counsel when what [sic] no truth is in them such as the case here in 90 to 95% of counsels [sic] compilation." Dkt. # 96, p. 75 (emphasis in original). Moreover, plaintiff asserts in conclusory fashion that defendants vonHagn and Brandt retaliated against him by issuing Misbehavior Reports following the filing of plaintiff's grievances against them. Plaintiff's conclusory allegations, without more, are insufficient to create a material issue of fact.

> An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right, such as the filing of a grievance, states a claim under § 1983. A plaintiff alleging retaliatory punishment bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff. The burden then shifts to the defendant to show that the plaintiff would have received the same punishment even absent the retaliatory motivation. The defendant can meet this burden by demonstrating that there is no dispute that the plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report.

*Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002) (internal quotations and citations omitted). For the reasons set forth below, plaintiff cannot meet his heavy burden of establishing retaliatory motive on the part of defendants vonHagn and Brandt. However, even assuming retaliatory motive, defendants vonHagn and Brandt are entitled to summary judgment because there are "proper, non-retaliatory reasons for his punishment." *Graham v. Henderson,* 89 F.3d 75, 81 (2d Cir.1996).

Here, plaintiff alleges that defendants vonHagn and Brandt wrote Misbehavior Reports against him in retaliation for his complaints (grievances) about them.

**January 23, 2001 Misbehavior Report**

Plaintiff alleges that defendant Brandt, in retaliation for plaintiff's filing of grievances, issued a retaliatory Misbehavior Report on January 23, 2001. Dkt. # 9, p. 5–A. As the undisputed record before the Court demonstrates, defendant Brandt saw plaintiff at sick call on January 23, 2001, at which time plaintiff refused hydrocortisone cream and told defendant Brandt, "next time I'll spit + shit on you." Thereafter, defendant Brandt issued a Misbehavior Report. Dkt. # 82, ¶¶ 23–25. A Tier 2 disciplinary hearing was conducted by Lt. Donahue on January 29, 2001. *See generally,* Dkt. # 44, pp. 0112–0128. During the January 29, 2001 disciplinary hearing, plaintiff advised Lt. Donahue that he believed that the Misbehavior Report was written by defendant Brandt in retaliation for complaints plaintiff filed and defendant Brandt and/or the medical staff at Southport. *Id.* Notwithstanding plaintiff's claims of retaliation, Lt. Donahue found plaintiff guilty of making threatening statements directed to defendant Brandt. *Id.*

**\*48** During the time period relevant to the allegations in the amended complaint, plaintiff filed three grievances against defendant Brandt, Grievance No. SPT–17707–99 (December 30, 1999), Grievance No. SPT–18746–00 (May 24, 2000) and Grievance No. SPT–20137–00 (December 11, 2000). Thus, the first grievance filed by plaintiff against defendant Brandt was filed over thirteen months *before* the alleged retaliatory Misbehavior Report was issued on January 23, 2001. Although, "the temporal proximity of an allegedly retaliatory misbehavior report to a grievance may serve as circumstantial evidence of retaliation," the significant passage of time between the last grievance filed by plaintiff against Brandt and the allegedly retaliatory Misbehavior Report stretches even the most liberal construction of the applicable case law beyond its limits. *Gayle v. Gonyea,* 313 F.3d 677, 683 (2d Cir.2002), *citing Colon,* 58 F.3d at 872.

In Grievance No. SPT–17707–99, filed on or about December 30, 1999, plaintiff asserted that, (1) on or about December 26, 1999, defendant Brandt denied his request for outside medical treatment for his complaints of ear pain, (2) defendant Brandt indicated that plaintiff refused treatment, (3) on December 14, 1999, defendant Brandt denied him an emergency ear examination and ear drops and (4) from December 14–21, 1999, defendants Brandt and vonHagn denied him medical treatment for an ear infection. Dkt. # 65, p. 438; Dkt. # 82, ¶ 30; Dkt. # 83, ¶ 37. The Superintendent dismissed plaintiff's grievance finding that medication was delivered to plaintiff for ear pain, but plaintiff began to verbally harass the nurse and thereafter, refused the medication. Dkt. # 65,

p. 0434; Dkt. # 82, ¶ 32; Dkt. # 83, ¶ 39. CORC upheld the Superintendent's determination on or about March 8, 2000 and advised plaintiff to follow the treatment plan outlined by health services staff and noted there was no medical need for an outside consultant at that time. Dkt. # 65, p. 0433; Dkt. # 82, ¶ 32; Dkt. # 83, ¶ 39.

In Grievance No. SPT–18746–00, filed on or about May 24, 2000, plaintiff asserted that, (1) on or about May 21, 2000, defendant Brandt refused to provide him with medical care, (2) defendants Brandt and vonHagn were racist, (3) defendant Brandt told other nursing staff not to treat plaintiff, (4) plaintiff had previously grieved defendant Brandt's and vonHagn's alleged failure to treat his ear infection in December 1999 and (5) defendant Brandt refused to provide plaintiff with skin cream. Dkt. # 65, p. 0415; Dkt. # 82, ¶ 36; Dkt. # 83, ¶ 46. The IGRC recommended dismissal of plaintiff's grievance and the Superintendent concurred. Dkt. # 65, pp. 0416–0417; Dkt. # 82, ¶ 38; Dkt. # 83, ¶ 48. On or about August 2, 2000, based upon the recommendation of Division of Health Services, the Superintendent's determination was upheld by CORC. Dkt. # 65, p. 0409; Dkt. # 82, ¶ 38; Dkt. # 83, ¶ 48. Indeed, CORC noted that plaintiff was issued skin cream on June 5, 2000 and that his allegations against staff had not been substantiated. *Id.*

**\*49** Finally, in Grievance No. SPT–20137–00 filed on or about December 11, 2000, plaintiff asserted that defendants vonHagn and Brandt failed to provide him with a refill of skin cream and were racist and biased towards him. Dkt. # 44, p. 0225, Dkt. # 82, ¶ 41; Dkt. # 83, ¶ 51. The Superintendent denied plaintiff's grievance and CORC upheld the Superintendent's determination on or about February 14, 2001, finding that the Nurse Administrator indicated that plaintiff had received medication refills on the appropriate dates and had received proper medical care. Dkt. # 44, p. 0228–0229; Dkt. # 82, ¶ 43; Dkt. # 83, ¶ 53.

**"January 25, 2000" Misbehavior Report and December 13, 2000 Misbehavior Report**
Specifically, plaintiff alleges that defendant vonHagn issued a retaliatory Misbehavior Report on January 25, 2000 because of the grievances plaintiff had filed against her. Defendant vonHagn did not issue a Misbehavior Report on January 25, 2000, rather, she issued one on January 14, 2000. Defendant vonHagn maintains, however, that the January 14, 2000 Misbehavior Report was issued as a result of plaintiff's threatening and harassing language. The Misbehavior Report states in pertinent part, "[p]atient asked if he wished a

copy [receipt for glasses] he could write the Nurse Adm. Inmate Chavis 91A3261 B–10–20 then said 'you are a stupid asshole.' 'You want 25¢ to give me a fucking copy of my glasses receipt.' 'I'll take your fucking money in court. I'll tear you apart in Court.' 'I'm not as fucking stupid as you are.' "You stupid fucking asshole.' 'Get the fuck away from my cell you asshole.' " Dkt. # 44, p. 0029.

A Tier 2 disciplinary hearing was conducted by Lt. Ryan on January 25, 2000. Dkt. # 44, pp. 0024–0038; Dkt. # 83, ¶ 22. Plaintiff advised Lt. Ryan during the hearing that he believed the January 14, 2000 Misbehavior Report was written by defendant vonHagn in retaliation for complaints filed by plaintiff. Dkt. # 44, pp. 0032–0038; Dkt. # 83, ¶ 23. Following the hearing, Lt. Ryan found plaintiff guilty of using harassing language against defendant vonHagn. Dkt. # 44, pp. 0024–0038; Dkt. # 83, ¶ 24. On January 28, 2000, the guilty determination was affirmed by Captain Wilcox. Dkt. # 44, p. 0024.

On December 13, 2000, defendant vonHagn issued a Misbehavior Report stating,

> While making rounds on B Block Gallery this nurse [defendant vonHagn] stopped to see Inmate Chavis, G. 91A3261 B–3–19 for sick call. He requested refills. He was asked about old containers. He immediately got an attitude and said, 'He wasn't every other inmate and just get him what he wanted.' As this nurse walked away from his cell, inmate Chavis, G. says 'I'm going to hit that white bitch in her head with a baseball bat.' C.O. Stamp told inmate Chavis, G 91A3261 that statement was not necessary. Inmate Chavis, G. Then said, Shut up you fuck ass white mother fucker, I'll kill you too after I kill her. Inmate Chavis, G. continued to threaten this nurse and correctional officer until we left gallery area.

**\*50** Dkt. # 44, p. 0104; Dkt. # 83, ¶ 31. A Tier 3 disciplinary hearing was conducted on December 26, 2000 by Lt. Sheahan. During the hearing, plaintiff advised Lt. Sheahan that defendant vonHagn had written the December 13, 2000 Misbehavior Report in retaliation for complaints filed by plaintiff against defendant vonHagn. Dkt. # 83, ¶ 32. Thereafter, Lt. Sheahan found plaintiff guilty of using threatening and harassing language towards defendant vonHagn and Lt. Sheahan's determination was affirmed by defendant Donald Selsky, Director, Special Housing/Inmate Disciplinary Program. Dkt. # 44, pp. 0100–0111 and 0160–0199. Indeed, Lt. Sheahan found that the evidence submitted by plaintiff of past grievances against defendant vonHagn

and other medical staff did not establish that the December 13, 2000 Misbehavior Report was retaliatory. Moreover, Lt. Sheahan indicated that the disposition was given to plaintiff to impress upon him that threats will not be tolerated. Dkt. # 44, p. 0102.

With respect to the "January 25" (January 14), 2000 and December 13, 2000 Misbehavior Reports, during the time period relevant to the allegations in the amended complaint (December 1999 through January 2001), plaintiff filed three grievances against defendant vonHagn, Grievance No. SPT–17707–99 (filed December 30, 1999), Grievance No. SPT–18746–00 (filed May 24, 2000) and Grievance No. SPT–20137–00 (filed December 11, 2000). Each of the aforementioned grievances were filed against defendants Brandt and vonHagn and have been discussed above in connection with the January 23, 2001 Misbehavior Report. *See* pp. 21–29 *supra.*

The January 23, 2001 Misbehavior Report issued by defendant Brandt allegedly in retaliation for the grievances (Grievance Nos. SPT–17707–99, SPT–18746–00 and SPT–20137–00) filed by plaintiff was issued as a result of plaintiff's threatening language, "next time I'll spit + shit on you," and not in retaliation for any grievance filed by plaintiff. Significantly, plaintiff was found guilty of the violation charged in the Misbehavior Report. Moreover, plaintiff's medical record unequivocally establishes that defendant Brandt properly treated all of plaintiff's medical complaints and provided plaintiff with the appropriate care.

The January 14, 2000 and December 13, 2000 Misbehavior Reports issued by defendant vonHagn were likewise issued as a result of plaintiff's harassing and threatening language and not in retaliation for any grievance submitted by plaintiff. As with the January 23, 2001 Misbehavior Report, plaintiff was found guilty of the violations enumerated in the January 14, 2000 and December 13, 2000 Misbehavior Reports. Moreover, plaintiff's medical records establish that at no time did defendant vonHagn refuse to treat plaintiff, in fact, the records reveal that defendant vonHagn treated plaintiff's medical complaints and provided him with proper care and treatment.

Thus, the Court agrees with defendants Brandt and vonHagn that plaintiff cannot meet his heavy burden of establishing retaliatory motive on the part of defendants vonHagn and Brandt. Additionally, even if plaintiff could establish a retaliatory motive, there is nothing in the record before this Court to suggest that there was anything improper about the Misbehavior Reports generated by defendants Brandt and vonHagn. With respect to each of the Misbehavior Reports, the hearing officer found that plaintiff engaged in harassing and threatening behavior and each such determination was later upheld. Accordingly, there were "proper, non-retaliatory reasons for his punishment." *Graham v. Henderson,* 89 F.3d 75, 81 (2d Cir.1996).

### Deprivation of Due Process Claims Against Defendants Donahue, Gilmore, Irizarry, Quinn, Ryan, Sheahan, Wilcox and Selsky

**\*51** To state a cognizable § 1983 due process claim, a plaintiff must demonstrate that he possessed a protected liberty or property interest and that he was deprived of that interest without due process. *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996); *Frazier v. Coughlin,* 81 F.3d 313, 316 (2d Cir.1996). Each of the defendants assert that plaintiff received all the process he was due during the course of each of the ten disciplinary hearings addressed in the amended complaint. Dkt. # 92, pp. 25–48.

### Liberty Interest

"A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004), *quoting Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). In assessing whether the discipline imposed rises to this level, the Court of Appeals for the Second Circuit has directed the district courts to consider both the conditions of confinement and their duration, "since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Id., quoting Sealey v. Giltner,* 197 F.3d 578, 586 (2d Cir.1999). In light of this standard, the Court of Appeals has "explicitly avoided a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights" and has "explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions ... or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Id.* at 64–65.

Notwithstanding the foregoing, courts in this Circuit "generally require that the duration of confinement be at least

100 days" to be categorized as constituting an "atypical and significant hardship." *Palmer v. Goss,* No. 02 Civ 5804(HB), 2003 WL 22327110, at * 6 (S.D.N.Y. Oct. 10, 2003), *aff'd, Palmer v. Richards,* 364 F.3d 60 (2d Cir.2004); *Smith v. Taylor,* No. 03–0202, 2005 WL 2019547 (2d Cir. Aug.23, 2005) (determining that 45 days disciplinary confinement in SHU, absent evidence of conditions more onerous than those generally present in the SHU, was insufficient to establish a protected property interest); *Sims v. Artuz,* 230 F.3d 14, 24 (2d Cir.2003) (vacating dismissal of, *inter alia,* procedural due process claims, stating, during little more than a 4½ month period, Sims was sentenced to SHU for a total of nearly 3½ years); *Durran v. Selsky,* 251 F.Supp.2d 1208, 1214 (W.D.N.Y.2003), *quoting, Tookes v. Artuz,* No. 00CIV4969, 2002 WL 1484391, at * 3 (S.D.N.Y. July 11, 2002) ("[c]ourts in this Circuit routinely hold that an inmate's confinement in special housing for 101 days or less, absent additional egregious circumstances, does not implicate a liberty interest."); *Colon v. Howard,* 215 F.3d 227, 232 (2d Cir.2000) (instructing district courts to develop detailed factual records "in cases challenging SHU confinements of durations within the range bracketed by 101 days and 305 days"); *cf. Prince v. Edwards,* No. 99CIV8650, 2000 WL 633382 (S.D.N.Y. May 17, 2000) (suggesting that any period of segregation of one year or less affords no protected liberty interest).

### *Procedural Safeguards*

**\*52** In *Wolff v. McDonnell,* the Supreme Court enumerated certain procedural safeguards that must be afforded to an inmate during the course of a prison disciplinary proceeding in order to ensure that the minimum requirements of procedural due process are satisfied. 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Specifically, the Supreme Court identified the following procedures: advance written notice of the claimed violation or charges; a written statement by the fact finder of the evidence relied upon and the reasons for the disciplinary action taken; the opportunity for an inmate to call witnesses and present documentary evidence in his/her defense, provided that such a process would not jeopardize institutional safety. *Id.* at 563–66. Moreover, although not specifically required by *Wolff,* plaintiff was provided with an opportunity to appeal each determination and he did in fact exercise that right to appeal on several occasions and with respect to each appeal taken, enumerated specific grounds for his appeal.

Plaintiff claims that defendants Donahue, Gilmore, Irizarry, Quinn, Ryan and Sheahan violated his Fourteenth Amendment right to due process during the disciplinary hearings each conducted with respect to Misbehavior Reports issued against plaintiff. For each defendant, plaintiff alleges a multitude of reasons why the defendants violated his due process rights. Plaintiff claims that in connection with the five Tier 2 disciplinary hearings conducted by defendant Donahue, he was: denied assistance to prepare for the hearings; denied production of certain witnesses to testify at those hearings; erroneously found guilty of the charges; improperly subject to a sentence of 30 days cell confinement at the conclusion of those hearings; and was prejudiced by defendant's bias and issuance of a retaliatory Misbehavior Report following one of the disciplinary hearings. Dkt. # 9, pp. 6–D to 6–F.

As against defendant Gilmore, plaintiff claims that at his July 18, 2000 Tier 2 disciplinary hearing, defendant Gilmore improperly found him guilty of a violation for which he had not been charged, the Misbehavior Report was not endorsed by a witness; there was no testimony against plaintiff during the hearing and plaintiff's witnesses confirmed plaintiff's defense. Dkt. # 9, pp. 6–F to 6–G. Plaintiff claims that at his Tier 3 disciplinary hearing conducted on January 4, 2001 by defendant Irizarry, defendant Irizarry denied him assistance to prepare for the hearing, denied his request to have certain witnesses testify at the hearing, and improperly found him guilty of the charges since defendant Selsky later modified the hearing determination. Dkt. # 9, pp. 6–B to 6–C. Plaintiff alleges that defendant Quinn denied him due process at his Tier 3 disciplinary hearing conducted on February 5, 2001 by denying: his request for assistance to prepare for the hearing; his request to have Deputy Commissioner Annucci testify at the hearing; his right to attend the hearing; and by failing to provide plaintiff with a copy of the hearing disposition, and improperly finding him guilty of the charges following the hearing. Dkt. # 9, pp. 6 to 6–A.

**\*53** Plaintiff claims that defendant Ryan denied him due process at his January 25, 2000 Tier 2 disciplinary hearing because he improperly endorsed the Misbehavior Report; denied plaintiff an assistant to prepare for the hearing; allowed a witness to testify telephonically; and forced plaintiff to leave the hearing. Dkt. # 9, pp. 6–G to 6–H. Finally, plaintiff claims that defendant Sheahan denied him due process at his December 26, 2000 (December 29, 2000) Tier 3 disciplinary hearing because he denied plaintiff his right to witnesses; incorrectly found him guilty at the conclusion of the hearing; and was biased against plaintiff. Dkt. # 9, pp. 6–A to 6–B.

## Employee Assistance—The Tier 2 and 3 Disciplinary Hearings

As discussed above, *Wolff* requires that an inmate be provided with at least 24 hours advance written notice before the hearing "to inform [the inmate] of the charges and to enable him to marshal the facts and prepare a defense." *Wolff, 418 U.S. at 563–64*. Institutional concerns have generally operated as a bar to inmates obtaining retained or appointed counsel. *Wolff, 418 U.S. at 570; Silva v. Casey, 992 F.2d 20, 22 (2d Cir.1999)*. Inmates do, however, have a "limited" right to assistance. *Silva, 992 F.2d at 22.* Indeed, the Second Circuit has held that "in certain circumstances an inmate will be unable to 'marshal evidence and present a defense' without some assistance." *Id.* (internal citations omitted). "[A] prison inmate facing a disciplinary hearing is only entitled to assistance from a fellow inmate or a prison employee under certain circumstances. For example, when the inmate is illiterate or the issues extremely complex." *Eng v. Coughlin, 858 F.2d 889, 897 (2d Cir.1988).*

*7 N.Y.C.R.R. § 251–4.1* provides that an inmate shall be entitled to employee assistance for purposes of a disciplinary hearing if: "(1) the inmate is either illiterate or non-English speaking; (2) the inmate is sensorially disabled ...; (3) the inmate is charged with drug use as a result of a urinalysis test; or (4) the inmate is confined pending a disciplinary hearing to be conducted pursuant to Part 254 of this Title." Thus, according to DOCS' disciplinary procedure, an inmate charged with a violation for which a Tier 2 disciplinary hearing is warranted is not entitled to an employee assistant. *7 N.Y.C.R.R. § 251–4.1.* In addition, DOCS' regulations provide that a hearing officer may, in his or her "absolute discretion," offer an inmate the opportunity to select an assistant where the assistance would enable the inmate to adequately comprehend the case in order to respond to the charges. *7 N.Y.C.R.R. § 251–4.1(b).*

As a threshold matter, there is no dispute that plaintiff is neither illiterate nor sensorially disabled. Moreover, none of the disciplinary hearings that are the subject of plaintiff's claims charged plaintiff with drug use as a result of a urinalysis test. Similarly, none of the issues considered at the Tier 2 disciplinary hearings discussed in plaintiff's amended complaint were so complex that plaintiff was unable to "marshal evidence and prepare a defense." To the contrary, the record before the Court establishes that in each of the Tier 2 disciplinary hearings discussed above, plaintiff was indeed able to present evidence (and often did), both oral and documentary, in his own defense. Accordingly, plaintiff's claims that he was denied an employee assistant to prepare for any of the aforementioned Tier 2 disciplinary hearings must fail because such assistance was neither required nor necessary. *Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).*

**\*54** Both the Second Circuit case law and DOCS' regulations provide for an inmate to receive employee assistance when that inmate is charged with an offense warranting SHU confinement. *Silva, 992 F.2d at 22; Eng, 858 F.2d at 898; 7 N.Y.C.R.R. § 251–4.1(b).* In the amended complaint, plaintiff complains that with respect to three Tier 3 disciplinary hearings conducted by defendants Sheahan (December 26 and 29, 2000), Irizarry (January 4, 2001), and Quinn (February 5, 2001) each defendant denied him his right to assistance. For the following reasons, plaintiff's claims that he was denied assistance in connection with the December 26 and 29, 2000, January 4, 2001 and February 5, 2001 Tier 3 disciplinary hearings must fail as a matter of law.

## Defendant Sheahan—December 26, 2000 Tier 3 Hearing

Plaintiff alleges that defendant Sheahan denied him due process at his December 26, 2000 Tier 3 disciplinary hearing because defendant Sheahan, *inter alia,* denied him an employee assistant and because he did not receive copies of the grievances he had requested. Dkt. # 9, pp. 6–A to 6–B. Plaintiff's claims are wholly unsupported by the record before this Court. After considerable discussion concerning plaintiff's selections for an employee assistant, defendant Sheahan adjourned the December 26, 2000 hearing to further investigate plaintiff's assertions of denial of an assistant, and the Tier 3 disciplinary hearing reconvened on December 29, 2000. *Id.* at ¶ 9. During the continuation of the hearing, plaintiff agreed that he had been provided with an assistant, Officer Carpenter; that Officer Carpenter had met with plaintiff on December 26, 2000; and further that the assistance he had received was acceptable. *Id.* Although plaintiff testified that he had not received all of the grievances that he had requested, he stated that the data he had received was satisfactory for the hearing. *Id.* at ¶ 10. Based on plaintiff's statements, defendant Sheahan proceeded with the disciplinary hearing. Thus, the undisputed record before this Court reveals that plaintiff did receive assistance prior to the December 29, 2000 continuation of the Tier 3 disciplinary hearing commenced on December 26, 2000. Moreover, with respect to plaintiff's claim that he did not receive copies of the grievances he requested for the hearing, the record before the Court is clear. Although plaintiff did not receive all of

the requested grievances, he unequivocally stated during the hearing that the data he did receive was satisfactory.

### Defendant Irizarry—January 4, 2001 Tier 3 Hearing

As part of his claim against defendant Irizarry, plaintiff alleges that defendant Irizarry denied his request for a staff assistant to help him prepare for the January 4, 2001 Tier 3 disciplinary hearing. Dkt. # 9, pp. 6–B to 6–D. The record before the Court establishes that on December 23, 2000, plaintiff was served with a copy of the Misbehavior Report wherein it was indicated that he waived his right to an assistant and refused to sign the Tier Assistance Selection Form. Dkt. # 65, p. 0667. However, the Superintendent's & Disciplinary Hearings—Witness Interview Sheet dated January 4, 2000 indicates that plaintiff claimed during the hearing that he did not refuse an assistant. Dkt. # 65, p. 0665. Moreover, the hearing transcript reveals that plaintiff claimed that he was sleeping when the Misbehavior Report was served on him and further, that he did not refuse an assistant. Dkt. # 98, pp. 5–18. Defendant Irizarry, found, however, that plaintiff's claims that he was sleeping and that he did not refuse an assistant were not true because the officer who served plaintiff with a copy of the Misbehavior Report (Officer McIntosh) testified during the disciplinary hearing that plaintiff was awake when he was served and simply refused to sign the form or select an assistant. *Id.;* Dkt. # 86, ¶ 12.

### Defendant Quinn—January 31, 2001 Tier 3 Hearing

 *55  Plaintiff also claims in his amended complaint that defendant Quinn denied him his right to a staff assistant during his Tier 3 disciplinary hearing that began on January 31, 2001 and continued on February 5, 2001. Dkt. # 9, pp. 6 to 6–A. According to the Tier Assistance Selection Form, plaintiff was served with a copy of the Misbehavior Report on January 27, 2001 and indicated on the form that he requested an employee assistant for the Tier 3 disciplinary hearing. Dkt. # 68, p. 0712; Dkt. # 87, ¶ 7. The form reveals that plaintiff identified G. Powers as his first choice for an assistant and J. Morton and P. Nardi as his second and third choices respectively. Dkt. # 68, p. 0712. It appears, however, that plaintiff refused to sign the form. Dkt. # 68, p. 0712; Dkt. # 87, ¶ 8. Notwithstanding the foregoing, in support of his motion for summary judgment, defendant Quinn maintains that the Tier Assistance Selection Form indicates that plaintiff refused to have Sgt. Morton act as his employee assistant. Dkt. # 87, ¶ 8.

The disciplinary hearing began on January 31, 2001 at which time plaintiff objected to the hearing and plead not guilty to both charges. Dkt. # 87, ¶ 9; Dkt. # 98, pp. 20–33. Plaintiff requested to have Sgt. Morton and Deputy Commissioner Annucci to be called as witnesses. *Id.* Thereafter, defendant Quinn adjourned the hearing so that the witnesses could be located. *Id.* The hearing was reconvened on February 5, 2001 and plaintiff refused to attend the hearing. Dkt. # 87, ¶ 10; Dkt. # 98, pp. 20–33. Plaintiff also refused to sign the Waiver of Right to Attend Disciplinary Hearing Form advising plaintiff that a disposition of the charges would be made in his absence. Dkt. # 68, p. 0713; Dkt. # 87, ¶ 10. The hearing was conducted outside of plaintiff's presence and Sgt. Morton testified at the hearing. Dkt. # 87, ¶ 15; Dkt. # 98, pp. 20–33. Defendant Quinn denied plaintiff's request to have Deputy Commissioner Annucci testify, finding that Deputy Commissioner Annucci's testimony would have no bearing on the outcome of the hearing. Dkt. # 68, p. 0711; Dkt. # 87, ¶ 11; Dkt. # 98, pp. 20–33. Moreover, because defendant Quinn reviewed the January 8, 2001 letter to Deputy Commissioner Annucci during the hearing and was able to make a determination as to the threatening, obscene and abusive language therein, defendant Quinn determined that Deputy Commissioner Annucci's testimony was not necessary. Dkt. # 87, ¶ 14. Accordingly, defendant Quinn maintains that it was in the exercise of his discretion that he denied plaintiff's request to have Deputy Commissioner testify at the hearing. *Id.* at ¶ 13.

In opposition to defendant Quinn's motion for summary judgment, plaintiff argues that because he was not provided with assistance prior to the Tier 3 disciplinary hearing, he was unable to obtain evidence from two witnesses prior to the hearing and therefore unable to prepare a defense to the charges. Dkt. # 96, p. 6. Plaintiff further insists that he had selected Mr. G. Powers to serve as his assistant, however, according to plaintiff defendant Quinn "repeatedly badger[ed]" him to select another member of the prison staff, for example, Sgt. Morton, to serve as his assistant for purposes of the hearing. *Id.* at p. 7. Plaintiff's arguments in opposition to defendant Quinn's motion for summary judgment are belied by the clear record before the Court. Specifically, plaintiff claims that because he was not provided with assistance, he was unable to obtain evidence from the two witnesses he requested at the outset of the hearing, Sgt. Morton, who he allegedly refused to have serve as his assistant, and Deputy Commissioner Annucci. [31] Despite this claim, defendant Quinn adjourned the hearing on January 31, 2001 in order to locate the witnesses. When the hearing

reconvened on February 5, 2001, plaintiff refused to attend and as a result was not present when Sgt. Morton testified.

**\*56** Thus, the record before the Court unmistakably establishes that with respect to the Tier 3 disciplinary hearings, plaintiff either received the required assistance, refused the assistance or refused to attend the hearing. With respect to the Tier 2 hearings, plaintiff was not entitled to assistance and the circumstances presented in the hearings were not so complex that plaintiff was not able to marshal evidence and prepare a defense. Accordingly, it was unnecessary for the hearing officers in the Tier 2 disciplinary hearings to exercise their discretion and offer plaintiff the opportunity to select an assistant. For the foregoing reasons, defendants' motion for summary insofar as it relates to plaintiff's claims that he was denied employee assistance during his disciplinary hearings is granted.

**Impartiality of Hearing Officer**

"An inmate subject to a disciplinary hearing is entitled to an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996); *see Wolff v. McDonnell* 418 U.S. 539, 570–71, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Russell v. Selsky,* 35 F.3d 55, 59 (2d Cir.1994). An impartial hearing officer "is one who, *inter alia,* does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 569–70 (2d Cir.1990); *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard").

It is well recognized, however, "that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen,* 100 F.3d at 259; *see Francis,* 891 F.2d at 46 ("Because of the special characteristics of the prison environment, it is permissible for the impartiality of such officials to be encumbered by various conflicts of interest that, in other contexts, would be adjudged of sufficient magnitude to violate due process."). For example, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Allen,* 100 F.3d at 259; *see Francis,* 891 F.2d at 46. A hearing officer may satisfy the standard of impartiality if there is "some evidence in the record" to support the findings of the hearing. *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985).

**Defendant Donahue**

As alleged in the amended complaint, defendant Donahue conducted disciplinary hearings in connection with Misbehavior Reports issued to plaintiff on the following dates: January 11, 2000; November 29, 2000; December 21, 2000; January 29, 2001 and March 7, 2001. Dkt. # 9, pp. 6–D to 6–F. The Court's review of the transcripts of each disciplinary hearing conducted by defendant Donahue does not reveal any evidence of bias. Dkt. # 44, pp. 0001–0007 (January 11, 2000); Dkt. # 44, pp. 0064–0068 (November 29, 2000); Dkt. # 44, pp. 0081–0086 (December 21, 2000); Dkt. # 44, pp. 0124–0128 (January 29, 2001); Dkt. # 44, pp. 0129–0131 (March 7, 2001). Specifically, with respect to the disciplinary hearing commenced on January 11, 2000 and continued on January 21, 2000, defendant Donahue permitted plaintiff to voice his objections to the hearing, afforded plaintiff the opportunity to testify or to present evidence in his defense, and set forth sufficient evidence in his disposition to support his determination of guilt, including a copy of the letter to Deputy Superintendent Morse from plaintiff. Dkt. # 44, pp. 0001–0007. Defendant Donahue stated that he relied upon the report of Sgt. Kerbein which he found to be credible and on the threatening letter written by plaintiff. *Id.* Defendant Donahue further stated that his reasons for the disposition were that it was to serve as a deterrent of future misconduct by plaintiff and others and that the conduct exhibited by plaintiff would not be tolerated. *Id.* Plaintiff did not appeal defendant Donahue's determination. Dkt. # 86, Exhibit A.

**\*57** Similarly, during the disciplinary hearing conducted by defendant Donahue on November 29, 2000, defendant Donahue afforded plaintiff the same opportunity to present testimony or evidence and plaintiff repeatedly exercised his right to object to the hearing. Dkt. # 44, pp. 0064–0068. Plaintiff waived his right to testify or to present evidence and returned to his cell before defendant Donahue rendered his determination. *Id.* At the close of the hearing, defendant Donahue set forth the evidence on which he relied to support his determination of guilt. *Id.* Specifically, he relied upon the Misbehavior Report which he found to be credible, as well as the letter by plaintiff to Deputy Commissioner LeClaire. *Id.* Similar to the January 11, 2000 (continued on January 21, 2000) disciplinary hearing presided over by him, defendant Donahue stated that his reasons for his disposition were that it was to serve as a deterrent of future misconduct by plaintiff and others and to reiterate that threats towards employees would not be tolerated. *Id.*

Defendant Donahue conducted a third disciplinary hearing concerning plaintiff on December 21, 2000. The Misbehavior

Report related to a December 11, 2000 grievance authored by plaintiff and received by the Inmate Grievance Office. As set forth in the Misbehavior Report, the grievance contained a number of threatening statements. As with the prior two disciplinary hearings conducted by defendant Donahue, plaintiff was given and did exercise his right to object to the hearing. Dkt. # 44, pp. 0081–0086. Moreover, defendant Donahue provided plaintiff with the opportunity to call witnesses to testify during the hearing, other than CORC Director Egan and DOCS Commissioner Goord. *Id.* Defendant Donahue found that neither Director Egan nor Commissioner Goord would have any information bearing on the allegations in the Misbehavior Report. *Id.* Notably, at no time during the hearing did plaintiff deny that he wrote the December 11, 2000 grievance. *Id.* In reaching his determination, defendant Donahue set forth sufficient evidence in his disposition to support his determination of guilt. *Id.* Specifically, he relied upon the Misbehavior Report by Officer Morse which he found to be credible and his examination of the grievance containing threats by plaintiff and submitted to the Inmate Grievance Office. *Id.* Again, defendant Donahue stated, "[t]he disposition is given to serve as a deterrent of future misconduct for this inmate as well as others. Threats towards staff will not be tolerated at this facility, including in the form of written grievances." *Id.*

Defendant Donahue next conducted a disciplinary hearing involving plaintiff on January 29, 2001. Dkt. # 44, pp. 0124–0128. During the hearing, he honored plaintiff's request to testify and accepted plaintiff's testimony that he had filed several complaints against Nurse Brandt. As in previous hearings, plaintiff chose to return to his cell before defendant Donahue rendered his decision. *Id.* As set forth in the hearing transcript and on the Hearing Disposition Sheet, defendant Donahue relied on the written report of Nurse Brandt which he found to be credible. *Id.* In addition, he noted that during the hearing, plaintiff admitted that he got "active" because Nurse Brandt did not bring him the medication that he wanted. *Id.* Defendant Donahue again noted that "[t]he [d]isposition is given to serve as a deterrent of future misconduct for this inmate as well as others. Inmate Chavis has been found guilty of threats many times previously." *Id.* Defendant Donahue's determination was affirmed by defendant Wilcox on February 5, 2001. Dkt. # 86, Exhibit A.

**\*58** Finally, on March 7, 2001, defendant Donahue conducted a hearing with respect to a Misbehavior Report issued to plaintiff on February 28, 2001. Plaintiff refused to attend the hearing. Thereafter, defendant Donahue noted that plaintiff waived his right to attend the hearing, entered a plea of not guilty on plaintiff's behalf and conducted the hearing in plaintiff's absence. Dkt. # 44, pp. 0129–0131. At the conclusion of the disciplinary hearing, defendant Donahue found plaintiff guilty of violating Rules 118.33 (flooding) and 106.10 (refusing a direct order) and imposed the penalty of 30 days keeplock confinement. *Id.* In reaching his determination, he relied upon the Misbehavior Report of Officer Kamas which he found to be credible and noted that the disposition was given to serve as a deterrent of future misconduct by plaintiff and others. *Id.* Plaintiff did not appeal defendant Donahue's determination. Dkt. # 86, Exhibit A.

**Defendant Gilmore**

Defendant Gilmore conducted one Tier 2 disciplinary hearing involving plaintiff on July 18, 2000. Plaintiff testified at length during the hearing and defendant Gilmore honored plaintiff's request to call two inmate witnesses to testify during the hearing. Dkt. # 44, pp. 0045–0063. In addition, defendant Gilmore honored plaintiff's request and read into the record a grievance filed by plaintiff against the Correction Officer involved in the incident that precipitated the Misbehavior Report. *Id.* At the conclusion of the hearing, defendant Gilmore found plaintiff not guilty of violating Rules 107.10 (interference) and Rule 106.10 (refusing a direct order) and guilty of violating Rule 107.11 (harassment). *Id.* Defendant Gilmore imposed a penalty of 10 days keeplock confinement. *Id.*

Defendant Gilmore noted both on the record and on the Hearing Disposition Sheet that in reaching his determination, he relied upon the written report of Officer Burgett as well as the testimony of plaintiff provided during the hearing. Dkt. # 44, p. 0040 and p. 0062. In addition, defendant Gilmore stated among his reasons for the disposition, that plaintiff deserved credit for "the cooperative spirit he displayed during [the] hearing." Dkt. # 44, pp. 45–63. Moreover, defendant Gilmore explained to plaintiff that he found plaintiff not guilty of the charge of disobeying a direct order because he did not believe that plaintiff disobeyed a direct order without just cause, since plaintiff felt threatened and chose not to come out of the shower. *Id.* Thereafter, defendant Gilmore noted that plaintiff requested a sergeant and once the sergeant was present, plaintiff obeyed the direct order and came out of the shower. *Id.* In addition, defendant Gilmore found plaintiff not guilty of the charge of interference because he felt that plaintiff did what he had to do to protect himself and that he did not interfere with an employee. *Id.* Defendant Gilmore did, however, find plaintiff guilty of harassment because

plaintiff admitted during the hearing that he called Officer Burgett "a scum bag." *Id.* at p. 0051.

**\*59** In opposition to defendants' motion for summary judgment, plaintiff argues that defendant Gilmore prejudged the evidence because he found plaintiff guilty of harassment based on a fact that was not alleged in the Misbehavior Report, rather, defendant Gilmore found plaintiff guilty based on an admission plaintiff made during the hearing. Dkt. # 96, p. 30. Specifically, plaintiff argues that the Misbehavior Report alleges that plaintiff called Officer Burgett "an asshole" whereas during the hearing plaintiff testified that he called Officer Burgett "a scum bag." Dkt. # 44, p. 0042 and p. 0051. Accordingly, plaintiff contends that he should not have been found guilty and that defendant Gilmore's finding of guilt must have been based on "predetermination, bias and undeniably [sic] favoritism for a coworker." Dkt. # 96, p. 30. As reflected in the disciplinary hearing transcript, defendant Gilmore explained at length the evidence he relied upon and the reasons for his disposition and this Court finds that the record is devoid of any evidence of bias or predetermination. Defendant Gilmore's determination was affirmed by defendant Wilcox on July 30, 2000. Dkt. # 86, Exhibit A.

**Defendant Irizarry**

Defendant Irizarry conducted a Tier 3 disciplinary hearing on January 4, 2001 concerning a Misbehavior Report issued to plaintiff following the December 21, 2000 disciplinary hearing conducted by defendant Donahue. Dkt. # 98, pp. 5–18. Defendant Irizarry found plaintiff guilty of violating Rules 102.10 (threats) and 107.11 (harassment) and imposed a penalty of nine months confinement in SHU. Dkt. # 65, p. 0661; Dkt. # 98, pp. 5–18. In reaching this determination, defendant Irizarry relied on the Misbehavior Report of defendant Donahue and the testimony of Officer Bennett. Dkt. # 65, p. 0662. Defendant Irizarry stated that the reason for the disposition was, "[ ] after finding you guilty, I reviewed your Disciplinary Record and found that you have been charged with, and found guilty, of 16 charges of Threats and 12 charges of Harassment. None of these sanctions helped to modify your behavior. And [ ] I feel this to be a just Disposition." Dkt. # 98, pp. 5–18. Thereafter, on or about February 21, 2001, defendant Selsky modified the penalty imposed to six months SHU confinement. Dkt. # 86, Exhibit A. In opposition to defendants' motion for summary judgment, plaintiff states, without elaboration, that defendant Irizarry was not impartial. This Court finds that there is simply nothing in the record before it to support such a

conclusion and without more, plaintiff's opposition does not create a material issue of fact for trial.

**Defendant Quinn**

Defendant Quinn commenced a Tier 3 disciplinary hearing on January 31, 2001 involving a Misbehavior Report issued to plaintiff by Officer Hodge. Dkt. # 68, p. 0710; Dkt. # 98, pp. 20–33. The hearing was adjourned and reconvened on February 5, 2001, but plaintiff refused to attend the hearing. Dkt. # 68, p. 0709; Dkt. # 98, pp. 20–33. Plaintiff also refused to sign the Waiver of Right to Attend Disciplinary Hearing Form advising plaintiff that a disposition of the charges would be made in his absence. Dkt. # 68, p. 0713. Thereafter, the hearing was conducted in plaintiff's absence and as set forth on the Hearing Disposition Sheet, defendant Quinn found plaintiff guilty of violating Rules 107.11 (harassment) and 102.10 (threats) and imposed a penalty of 12 months SHU confinement. Dkt. # 68, p. 0708; Dkt. # 98, pp. 20–33. In reaching his determination, defendant Quinn relied on the written report of Officer Hodge and the handwritten letter from plaintiff to Deputy Commissioner Annucci wherein defendant Quinn found that plaintiff made harassing statements. *Id.* As his reasons for the disposition, defendant Quinn stated, "[t]his Disposition is given to serve notice that threatening employees and harassing them will not be tolerated. This Disposition is given to punish this inmate for threatening employees and should also act as a deterrent to others." Dkt. # 98, pp. 20–33. Plaintiff's opposition to defendants' motion for summary judgment states, in conclusory fashion, that defendant Quinn's failure to interview witnesses with relevant information is illustrative of defendant Quinn's undeniable bias, racism and partiality. Dkt. # 96.

**\*60** During the disciplinary hearing, plaintiff requested to have inmate Smith and Deputy Commissioner Anthony J. Annucci testify on his behalf. Dkt. # 98, pp. 20–33. Plaintiff claimed that Inmate Smith would testify concerning his selection of an assistant and that plaintiff did not refuse an assistant, rather, he did not select J. Morton as his assistant. *Id.* Plaintiff also testified on January 31, 2001 that he requested to have Deputy Commissioner Anthony J. Annucci as a witness. Deputy Commissioner Annucci was the intended recipient of the January 8, 2001 letter authored by plaintiff that was the subject of the January 27, 2001 Misbehavior Report. As the hearing transcript reveals, because plaintiff was being uncooperative at the outset of the hearing and was insisting on an assistant despite the fact that he had purportedly refused the assistant prior to the hearing, the hearing was

adjourned. Thereafter, plaintiff refused to attend the hearing which resumed on February 5, 2001. During the February 5, 2001 continuation of the hearing, Sgt. Morton testified that he had been assigned to assist plaintiff and plaintiff refused. Because plaintiff refused to attend the hearing, although he had previously indicated he had two witnesses to testify, there were no other witnesses to interview, thus, plaintiff's claim that defendant Quinn's failure to interview witnesses was illustrative of his bias, racism and partiality is wholly without merit.

### Defendant Ryan

Defendant Ryan conducted a Tier 2 disciplinary hearing on January 25, 2000 in connection with a January 14, 2000 Misbehavior Report issued by defendant vonHagn. Dkt. # 44, p. 0026. At the conclusion of the hearing, defendant Ryan found plaintiff guilty of violating Rules 107.10 (interference) and 107.11 (harassment) and imposed a penalty of 30 days keeplock confinement, 30 days loss of packages, commissary and phone privileges. *Id.* In reaching his determination, defendant Ryan relied on the Misbehavior Report and the testimony of Officer Martino who witnessed the January 14, 2000 incident. *Id.* at p. 0027. Defendant Ryan explained that he had imposed the penalty to serve as a reminder that the type of behavior plaintiff exhibited towards defendant vonHagn would not be tolerated. Dkt. # 44, pp. 0153–0159. In support of his motion for summary judgment, defendant Ryan notes that plaintiff did not deny that he used abusive language toward defendant vonHagn or that he threatened defendant vonHagn. Dkt. # 44, pp. 0032–0038. Plaintiff argues in opposition to defendants' motion for summary judgment that defendant Ryan endorsed (forged) the name of the officer (Officer Martino) on the Misbehavior Report because, plaintiff alleges, Officer Martino refused to do so. Dkt. # 96, pp. 30–34. In stark contrast to plaintiff's allegation, Officer Martino testified via telephone at the disciplinary hearing that he had indeed witnessed the incident and at no time did Officer Martino state that he had refused to endorse the Misbehavior Report. Dkt. # 44, pp. 0153–0159. Defendant Captain Wilcox affirmed defendant Ryan's determination, finding that there was no evidence of retaliatory acts committed by defendant vonHagn; that defendant Ryan properly called Officer Martino to testify; that plaintiff was not confined pending the hearing; that a witness may testify by telephone; and most notably, that there was no evidence of partiality, bias, racism, vindictiveness, threats or misconduct on the part of defendant Ryan. Dkt. # 44, p. 0024; Dkt. # 92, ¶ 31. Thus, plaintiff's assertions that defendant Ryan was biased or impartial because he had

allowed Officer Martino to testify via telephone and that defendant Ryan endorsed the Misbehavior Report because Officer Martino had refused are unsupported by the record before this Court.

### Defendant Sheahan

**\*61** The Tier 3 disciplinary hearing conducted by defendant Sheahan began on December 26, 2000 and continued on December 29, 2000. Dkt. # 44, pp. 0160–0199. At the outset of the hearing, plaintiff plead not guilty and objected to the Misbehavior Report on the ground that it was issued in retaliation for the 20 to 25 grievances he had filed against defendant vonHagn. *Id.* During the hearing, plaintiff submitted copies of the grievances he filed against defendant vonHagn, as well as copies of correspondence to Superintendent McGinnis, Deputy Commissioner Annucci and Commissioner Goord. *Id.* Defendant Sheahan accepted the grievances as evidence of plaintiff's allegations of retaliation and accordingly, found that the testimony of Director Egan, as requested by plaintiff, would have been redundant. *Id.* At the conclusion of the hearing, defendant Sheahan found plaintiff guilty of violating Rules 107.11 (harassment) and Rule 102.10 (threats) and imposed a penalty of six months SHU confinement. Dkt. # 44, p. 0101. In reaching this determination, defendant Sheahan relied upon the December 13, 2000 Misbehavior Report and determined that the evidence submitted by plaintiff did not establish that the Misbehavior Report issued by defendant vonHagn was retaliatory. Dkt. # 44, pp. 0160–0199. Defendant Sheahan imposed a penalty of six months confinement in SHU and stated that the penalty was imposed to impress upon plaintiff that threats to staff would not be tolerated. Dkt. # 44, pp. 0160–0199. Thereafter, defendant Selsky affirmed defendant Sheahan's determination. Dkt. # 86, Exhibit A. In support of his motion for summary judgment, defendant Sheahan states that plaintiff did not deny that he used abusive language toward defendant vonHagn. *Id.* In opposition to defendant's motion for summary judgment, plaintiff claims that defendant Sheahan's denial of his requested witness, CORC Director Egan and defendant Sheahan's finding that the grievances submitted by plaintiff did not establish a retaliatory motive are illustrative of defendant Sheahan's bias. Dkt. # 96, pp. 18–24. As the record before this Court unmistakably demonstrates, defendant Sheahan accepted the grievances submitted by plaintiff as evidence of his claim of retaliation and found that the proposed testimony of Director Egan, that the grievances submitted by plaintiff were "exhausted," would have been redundant. Thus, plaintiff's claim that defendant Sheahan's

denial of plaintiff's witness demonstrates defendant Sheahan's bias is wholly without any basis in fact.

Here, plaintiff's bare, conclusory allegations of bias and prejudgment, without more, are insufficient to defeat defendants' motion for summary judgment. As reflected in the Hearing Disposition Sheets and hearing transcripts, each of the hearing officers based their determinations on the Misbehavior Reports, testimony of plaintiff, testimony of witnesses present during the incidents, and the documentary evidence, often including letters written by plaintiff. Additionally, as noted above, the hearing officers' determinations were frequently based on plaintiff's admissions made during the hearing or plaintiff's failure to deny that he had used the abusive, threatening or harassing language charged in the Misbehavior Reports.

 **\*62** The record before the Court unequivocally establishes that defendants Donahue, Gilmore, Irizarry, Quinn, Ryan and Sheahan were neither biased nor prejudged the evidence. To the contrary, each hearing officer based his finding of guilt on the credible evidence presented during the hearing and each made an objectively reasonable determination based on the evidence. Thus, the Court agrees with defendants that plaintiff has failed to meet his burden of demonstrating that defendants Donahue, Gilmore, Irizarry, Quinn, Ryan and Sheahan were so partial so as to violate plaintiff's due process rights. Accordingly, defendants' motion for summary judgment on plaintiff's due process claims based on bias, prejudgment and impartiality is granted.

**Denial of Witness Testimony**

In *Wolff v. McDonnell,* the Supreme Court of the United States determined that,

> [an] inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals.

*418 U.S. at 566.* In reaching this conclusion, the Court recognized that,

> [p]rison officials must have the necessary discretion to keep the hearing within reasonable limits and

> to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence.

*Id.* In exercising that discretion, prison officials must be able to,

> explain, in a limited manner, the reason why witnesses were not allowed to testify, ... either by making the explanation a part of the 'administrative record' in the disciplinary proceeding, or by presenting testimony in court if the deprivation of a 'liberty' interest is challenged because of that claimed defect in the hearing. In other words, the prison officials may choose to explain their decision at the hearing, or they may choose to explain it 'later.'

*Ponte v. Real,* 471 U.S. 491, 497, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985). A hearing officer may rationally exclude witnesses or documents when they would be irrelevant or unnecessary to a determination of the issues in the disciplinary hearing. *Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999). The burden is on the prison official to demonstrate "the rationality of his position." *Fox v. Coughlin,* 893 F.2d 475, 478 (2d Cir.1990).

During several of the disciplinary hearings discussed above, plaintiff claims that he was denied due process because his requests to have certain witnesses testify during the hearings were denied. Specifically, plaintiff claims that: (1) defendant Donahue during the December 21, 2000 disciplinary hearing denied plaintiff's requests to have CORC Director Thomas Egan and DOCS' Commissioner Goord testify; (2) during the December 26, 2000 disciplinary hearing, defendant Sheahan denied plaintiff's request to have CORC Director Egan testify; (3) during the January 4, 2001 disciplinary hearing, defendant Irizarry denied plaintiff's requests to have DOCS' Commissioner Goord and Associate Commissioner Chapman testify; and, (4) defendant Quinn denied plaintiff's request to have Deputy Commissioner Annucci testify during a February 5, 2001 disciplinary hearing.

### Defendant Donahue

**\*63** During plaintiff's December 21, 2000 Tier 2 disciplinary hearing, defendant Donahue denied plaintiff's request to call CORC Director Thomas Egan and DOCS' Commissioner Goord as witnesses. The hearing transcript does not provide any insight as to why plaintiff requested to have Director Egan and Commissioner Goord testify, because plaintiff refused to elaborate on his statements that both witnesses had "a lot or everything to do with the ticket." Dkt. # 44, pp. 0081–0086. The gravamen of the Misbehavior Report was statements made in a grievance filed by plaintiff. Neither Director Egan nor Commissioner Goord were mentioned in the grievance; neither were present at Southport when the grievance was received nor had any knowledge of plaintiff's grievance. Dkt. # 92, p. 29. Accordingly, defendant Donahue denied plaintiff's request and properly prepared a Witness Interview Sheet noting the reason for denying the request, "Mr. Egan [and] Commissioner Goord denied as not having material testimony." Dkt. # 44, p. 0091.

### Defendant Sheahan

Defendant Sheahan conducted a Tier 3 disciplinary hearing that began on December 26, 2000 and continued on December 29, 2000. During the hearing, plaintiff requested to have Director Egan testify that the grievances submitted by plaintiff were "exhausted." Dkt. # 44, p. 0105. Defendant Sheahan denied plaintiff's request because he had previously accepted the grievances submitted by plaintiff as evidence and acknowledged that some of the grievances had been exhausted and based on the foregoing, determined that Director Egan's testimony would be redundant. *Id.* Defendant Sheahan properly prepared a Witness Interview Sheet detailing plaintiff's request and the reasons for his denial. *Id.* Specifically, the Witness Interview Sheet states,

> T. Eagen [sic] IGRC—Albany —(Requested by Inmate). For verification of past submitted Grievances that he he [sic] has submitted concerning inadequate medical care by the facility and requests to have RN S. VonHagn kept away from [sic]. This hearing officer accepted the inmates [sic] evidence (grievances) that he brought to the hearing as being submitted and determined that Mr. Eagans [sic] testimony would be redundant as

> I have already accepted what the correlation [sic] that the (illegible) was received in retaliation of these grievances.

Dkt. # 44, p. 0105.

### Defendant Irizarry

During the Tier 3 disciplinary hearing conducted on January 4, 2001, defendant Irizarry denied plaintiff's request to have Commissioner Goord and Associate Commissioner Chapman testify on his behalf. The hearing resulted from a Misbehavior Report issued by defendant Donahue following the December 21, 2000 disciplinary hearing. Dkt. # 65, p. 0664. Defendant Irizarry denied plaintiff's request because neither Commissioner Goord nor Associate Commissioner Chapman were present at Southport at the time of the incident and accordingly, their testimony was not relevant to the hearing. *Id.* at p. 0666. Defendant Irizarry properly prepared a Witness Interview Sheet setting forth his reasons for denying plaintiff's request, "[y]our witnesses, G. Goord Commissioner and W. Chapman Asso. Comm. were denied because their testimony is not relevant to this hearing they were neither present nor in this facility at the time of this [sic] charges was [sci] written or when this incident happened." Dkt. # 65, p. 0666.

### Defendant Quinn

**\*64** Defendant Quinn conducted a Tier 3 disciplinary hearing concerning plaintiff on February 5, 2001. Dkt. # 98, pp. 20–33. During the hearing, plaintiff requested to have Sgt. Morton and Deputy Commissioner Annucci testify. *Id.* Sgt. Morton testified telephonically. However, as discussed above, plaintiff refused to attend the hearing. *Id.; see also* pp. 55–59 *supra.* With respect to Deputy Commissioner Annucci, defendant Quinn denied plaintiff's request to have him testify because, according to defendant Quinn, his testimony would have no bearing on the outcome of the hearing. Dkt. # 68, p. 0711. Prior to rendering his decision, defendant Quinn reviewed the correspondence from plaintiff to Deputy Commissioner Annucci which was the subject of the Misbehavior Report. Dkt. # 68, pp. 0716–0718. After reviewing the letter, defendant Quinn determined that the letter indeed contained threatening, obscene and abusive language and that testimony from Deputy Commissioner Annucci was not necessary to determine whether plaintiff's correspondence contained threats, abusive or harassing language. Dkt. # 87, ¶ 14.

In the instant case, as detailed above, defendants Donahue, Sheahan, Irizarry and Quinn informed plaintiff of their respective decisions for denying plaintiff's requests for testimony. The decisions by defendants Donahue, Sheahan, Irizarry and Quinn to deny the requested testimony were reasonable. With respect to defendant Donahue and defendant Quinn, the issue to be decided at the disciplinary hearing was whether plaintiff wrote the grievance/letter and whether they contained threats, abusive and/or harassing language. Thus, in the case of defendant Donahue, unspecified testimony from Director Egan and Commissioner Goord, who were neither mentioned in the grievance nor present at Southport when the grievance was received, is irrelevant. Similarly, with respect to defendant Quinn, testimony from Deputy Commissioner Annucci, the intended recipient of the letter, is equally irrelevant.

Plaintiff's complaint against defendant Sheahan, that his request to have Director Egan testify that the grievances submitted by plaintiff were exhausted was improperly denied, must also fail. As reflected in the Witness Interview Sheet completed by defendant Sheahan, defendant Sheahan found that such testimony would be redundant because he had accepted the grievances submitted by plaintiff as evidence and acknowledged that some of the grievances had been exhausted. Finally, defendant Irizarry properly denied plaintiff's request to have Commissioner Goord and Associate Commissioner Chapman testify because such testimony would not be relevant. Neither Commissioner Goord nor Associate Commissioner Chapman were at Southport at the time of the incident alleged in the Misbehavior Report. Accordingly, plaintiff's claim that because defendants Donahue, Sheahan, Irizarry and Quinn improperly denied his requests to have certain witnesses testify during the disciplinary hearings, his due process rights were violated must fail as a matter of law.

### Ejection from Hearing

**\*65** An inmate does not possess a constitutional right to confront or cross-examine witnesses in prison disciplinary hearings. *Wolff,* 418 U.S. at 567–68; *Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999); *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993). Thus, "[p]rison inmates do not possess a constitutional right [32] to be present during the testimony of witnesses during a disciplinary proceeding." *Francis v. Coughlin,* 891 F.2d 43, 48 (2d Cir.1989); *Bogle v. Murphy,* No. 98–CV–6473 CJS, 2003 WL 22384792 (W.D.N.Y.

Sep.9, 2003) (plaintiff's ejection from his disciplinary hearing was not a due process violation). On more than one occasion as discussed above, plaintiff was removed from a disciplinary hearing, voluntarily requested to leave a disciplinary hearing before its conclusion or refused to attend a disciplinary hearing. To the extent that buried within one of plaintiff's many claims is a claim that his voluntary or involuntary removal from a disciplinary hearing constituted a denial of his due process rights, that claim must fail. On those occasions when plaintiff was involuntarily removed from the disciplinary hearing by the hearing officer because he was being disruptive and uncooperative during the hearing, such a circumstance does not give rise to a due process claim. On the other occasions where plaintiff either refused to attend the disciplinary hearing or elected to leave the hearing before its conclusion that likewise does not give rise to a due process claim. Thus, this Court finds that to the extent plaintiff is claiming that his absence from a disciplinary hearing, whether voluntary or involuntary, violated his right to due process, such a claim must fail as a matter of law.

### Reversal of Determination Not Indicative of Due Process Violation

Plaintiff has alleged that he was denied due process by defendant Quinn at his February 5, 2001 Tier 3 disciplinary hearing because defendant Quinn's determination was later overturned by defendant Selsky. Dkt. # 9, p. 6–I. The February 5, 2001 Tier 3 disciplinary hearing, discussed at length above, *see* pp. 55–59 *supra,* was a continuation of a hearing that commenced on January 31, 2001. Dkt. # 87, ¶ 9. After entering a plea of not guilty to both charges, plaintiff requested to have two witnesses testify and the hearing was adjourned to locate one of the witnesses. *Id.* When the hearing was reconvened on February 5, 2001, plaintiff refused to attend the hearing and refused to sign the Waiver of Right to Attend Disciplinary Hearing Form which advised him that a disposition of the charges would be made in his absence. *Id.* at ¶ 10. Thereafter, the hearing was conducted outside of plaintiff's presence. *Id.* at ¶ 11.

Following the hearing, defendant Quinn found plaintiff guilty of violating Rules 107.11 (harassment) and 102.10 (threats) and imposed a penalty of twelve months SHU confinement to run from September 27, 2002 to September 27, 2003. *Id.* at ¶ 16. In reaching this determination, defendant Quinn relied on the Misbehavior Report and on the hand-written letter from plaintiff, wherein he made harassing statements to Deputy Commissioner Annucci. *Id.* at ¶ 17. As discussed above, plaintiff alleged that he never received a copy of the

hearing disposition and commenced an Article 78 proceeding in New York Supreme Court, Chemung County challenging the February 5, 2001 disposition. *Id.* ¶ 18. In his petition, plaintiff admitted that he did not attend the February 5, 2001 hearing, but stated that he did not refuse to attend the hearing and did not learn of the disposition until June 26, 2001. *Id.* On February 25, 2002, Justice Castellino determined that plaintiff never received a copy of the February 5, 2001 determination and granted plaintiff leave to file an administrative appeal. *Id.* at ¶ 19.

**\*66** By letter dated March 8, 2002, plaintiff submitted an administrative appeal of defendant Quinn's February 5, 2001 determination to defendant Selsky. *Id.* at ¶ 20. Plaintiff argued in his appeal that defendant Quinn denied him an employee assistant; denied him the right to attend the hearing; and refused to call Deputy Commissioner Annucci as a witness. *Id.* Plaintiff further alleged that defendant Quinn was biased and refused to let plaintiff see the January 8, 2001 correspondence. Since he never received a copy of the disposition, he was unaware of the penalty imposed. *Id.* On April 26, 2002, Defendant Selsky reversed defendant Quinn's February 5, 2001 determination because the record did not clearly establish that plaintiff received a copy of the disposition within 24 hours and because of defendant Quinn's failure to interview a requested witness who may have provided relevant testimony. *Id.* at ¶ 21. Notably, defendant Selsky reversed defendant Quinn's determination several months *before* plaintiff was ordered to begin serving his penalty. *Id.* at ¶ 22. Thus, plaintiff did not serve a single day of the penalty imposed by defendant Quinn.

It is well-settled that where, as here, a disciplinary determination has been reversed and expunged before an inmate begins to serve the penalty imposed, the inmate's due process rights have not been violated. *Young v. Hoffman,* 970 F.2d 1154, 1156 (2d Cir.1992) *(per curiam* ), *cert. denied,* 510 U.S. 837, 114 S.Ct. 115, 126 L.Ed.2d 80 (1993). Following a disciplinary hearing, Young had been found guilty of violating certain prison rules and a penalty of 180 days SHU confinement, suspension of commissary and package privileges was imposed by the hearing officer and the hearing officer further recommended a loss of six months good time. Young appealed the hearing officer's determination and Director Selsky reversed the determination, vacated the penalty and recommended loss of good time and ordered the hearing records be expunged. Thereafter, Young commenced a section 1983 suit against the hearing officer alleging a denial of due process because he was (1) barred from his disciplinary hearing; (2) prevented from calling witnesses on his behalf; and (3) denied an impartial hearing officer. The District Court found that plaintiff had been denied his right to call witnesses at a disciplinary hearing and awarded plaintiff nominal damages of one dollar. In addition, the District Court granted the hearing officer's motion for summary judgment with respect to Young's claims that he was improperly excluded from the hearing and that the charges were not heard by an impartial hearing officer. The Second Circuit reversed finding that the determination rendered at the disciplinary hearing had been reversed and expunged before Young had even begun to serve his penalty. In making this finding, the Second Circuit reasoned that, "on account of the administrative reversal of [the hearing officer's] decision, Young was never penalized on the charges .... Therefore, he suffered no interference with a liberty interest and has no valid claim for relief." *Id.*

**\*67** Accordingly, following the same reasoning set forth in *Young,* because defendant Quinn's determination was reversed and expunged before plaintiff began serving the penalty imposed, plaintiff suffered no interference with a liberty interest and any claim that defendant Quinn denied him due process must fail as a matter of law.

### Administrative Appeal

In his amended complaint, plaintiff claims that defendants W. Wilcox and D. Selskey [sic], violated his due process rights under the Fourteenth Amendment to the United States Constitution. Dkt. # 9, pp. 6–H to 6–I. Specifically, plaintiff claims that on January 21, 2000, January 25, 2000, July 18, 2000, July 30, 2000, November 29, 2000, December 22, 2000, December 31, 2000, January 30, 2001 and March 8, 2001, defendant Wilcox violated his due process rights in connection with his appeal of each of the hearing officer's determinations. Plaintiff claims that as a result he suffered 270 days of cell confinement and a loss of $45 ($5 each for each finding of guilt). Similarly, as against defendant Selsky, plaintiff alleges that on February 21, 2001, defendant Selsky violated his due process rights by "modifying a disposition dated 1–4–00 (*not* 1–4–01)" and as a result, plaintiff suffered "a 6–month SHU-punative [sic] segregation sentence." Dkt. # 9, pp. 6–H to 6–I. In addition, plaintiff alleges that defendant Selsky violated his due process rights on February 9, 2001 because he affirmed a "bias [sic] disposition, where [plaintiff] suffered *no* witnesses, *nor* had all of my evidence been allowed at partial (*un* fair) hearing." *Id.*

In the amended complaint, plaintiff alleges that in connection with his administrative appeals of eleven hearing determinations, defendants Wilcox and Selsky violated his federal constitutional right to due process. Specifically, plaintiff alleges that on January 21, 2000, January 25, 2000, July 18, 2000, July 30, 2000, November 29, 2000, December 31, 2000, December 22, 2000, March 8, 2001 and January 30, 2001, defendant Wilcox violated his due process rights. As discussed above, a review of plaintiff's disciplinary history (Dkt. # 86, Exhibit A) and the documents produced by defendants during the course of discovery (Dkt.44, 65, 68, and 70), do not reveal a disciplinary hearing or appeal that was held, filed or decided on July 30, 2000, December 31, 2000, and March 8, 2001 [33]. Each of the other dates correspond to either a hearing date or an appeal date, January 21, 2000 (hearing date) (hearing commenced on January 11, 2000), (defendant Donahue); January 25, 2000 (hearing date, defendant Ryan); July 18, 2000 (hearing date, defendant Gilmore); November 29, 2000 (hearing date, defendant Donahue); December 22, 2000 (appeal date), (December 21, 2000 hearing date, defendant Donahue); and January 30, 2001 (appeal date), (January 29, 2001 hearing date, Donahue). Each of the aforementioned hearings was discussed at length above and none of the defendant hearing officers violated plaintiff's constitutionally protected due process rights. Accordingly, because none of the hearing officers violated plaintiff's due process rights in conducting the Tier 2 and Tier 3 disciplinary hearings, the Court agrees with defendants that there can be no basis for concluding that defendant Wilcox violated plaintiff's due process rights by affirming the hearing determinations.

**\*68** With respect to defendant Selsky, plaintiff claims that on February 9, 2001, defendant Selsky violated his due process rights by affirming a December 29, 2000 determination by defendant Sheahan. Dkt. # 9, p. 6–I. For the reasons stated above concerning plaintiff's claims against defendant Wilcox and because there is nothing in the record to support the conclusion that defendant Sheahan violated plaintiff's due process rights in conducting the December 26 and 29, 2000 disciplinary hearing, plaintiff's claim against defendant Selsky simply because he affirmed the determination issued by defendant Sheahan fails as a matter of law. Similarly, plaintiff's claim against defendant Selsky because he modified the penalty imposed following a January 4, 2001 disciplinary hearing conducted by defendant Irizarry must also fail. The disciplinary hearings conducted by defendants Sheahan and Irizarry have been discussed at length above. There is nothing in the record before

this Court to support the conclusion that either defendant Sheahan or defendant Irizarry violated plaintiff's due process rights. Accordingly, defendant Wilcox's decisions affirming the hearing officers' determinations and defendant Selsky's decisions affirming or modifying the results of the disciplinary hearings do not, standing alone, establish a federal constitutional violation. *See Hameed v. Mann,* 57 F.3d 217, 224 (2d Cir.1995) (Selsky entitled to dismissal of claims where plaintiff failed to establish constitutional violations at disciplinary hearing).

### Denial of Right to Take Religious Correspondence Course Claim

It is well settled that the personal involvement of defendants in an alleged constitutional deprivation is a prerequisite to an award of damages under *§ 1983. Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060,1065 (2d Cir.1989).* Personal involvement may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation; (2) was informed of the violation and failed to remedy the wrong; (3) created or permitted the continuation of a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating unconstitutional acts were occurring. *Colon,* 58 F.3d at 873, *citing Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994).

In the instant case, plaintiff alleges that on or about November 2, 1999, he received an information packet concerning religious training and that defendant Gardner informed him that he could not take any correspondence courses. Dkt. # 9, pp. 5–B to 5–C; Dkt. # 94, ¶ 7. As a result, plaintiff filed Grievance No. SPT–17423–99 on or about November 16, 1999. Dkt. # 44, p. 0250. In response to the Grievance, the IGRC advised plaintiff that pursuant to recent decisions by CORC, plaintiff may not participate in any correspondence courses/programs while at Southport and further advised plaintiff to contact the education supervisor once he is transferred to a general confinement facility. Dkt. # 94, ¶ 8; Dkt. # 44, p. 0251. Thereafter, the Superintendent concurred with the IGRC recommendation stating that there are no provisions in either the facility policy or DOCS Directive No. 4933 that allow SHU inmates to participate in any correspondence courses. Dkt. # 44, p. 0254; Dkt. # 94, ¶

10. Plaintiff appealed to CORC which issued its decision concurring with the Superintendent on or about January 19, 2000. Dkt. # 44, p. 0246; Dkt. # 94, ¶ 11. In its determination, CORC cited its prior decision in SPT–14519–98 dated August 26, 1998 which stated in part, "[t]he present policy will remain [sic] effect. There are no outside correspondence courses allowed in this facility." Dkt. # 44, p. 0254; Dkt. # 94, ¶ 12. CORC also cited its decision in SPT–7594–94 issued September 15, 1994, which states in part, "CORC concurs with the Superintendent in that the grievant may not participate in any correspondence course due to the logistical problems related to housing in Southport C.F." *Id.*

**\*69** Thus, defendant Gardner did not deny plaintiff the right to take a religious correspondence course. Rather, any such denial was the result of DOCS policy as set forth by the Superintendent and CORC. As the Senior Mail and Supply Clerk, defendant Gardner "had no authority to set any policy for DOCS or Southport and no authority to determine whether an inmate may take any correspondence course or otherwise engage in educational or religious activities." Dkt. # 92, p. 53. Accordingly, because defendant Gardner did not make any policy preventing plaintiff from taking a religious correspondence course, plaintiff's claim against her must fail as a matter of law.

### Interference with Legal Mail Claim

DOCS Directive Nos. 4421 (Privileged Correspondence), 7 N.Y.C.R.R. Part 721 and 4422 (Inmate Correspondence Program), 7 N.Y.C.R.R. Part 720, set forth DOCS' policy regarding inmate mail correspondence. Dkt. # 94, ¶ 25. Legal mail which is clearly marked as such and is from an attorney is not to be opened by the mailroom outside the presence of the inmate. If, however, privileged correspondence is opened in error outside the presence of the inmate, documentation of the error should be maintained. 7 N.Y.C.R.R. §§ 721.2(2), 721.3(b)(1) and (2). Pursuant to 7 N.Y.C.R .R. §§ 720.2(b), 720.4(a), general correspondence between an inmate and someone other than a person approved for legal correspondence will be opened and inspected for cash, checks, money orders, printed or photocopied materials or contraband. An inmate is not required to be present during the inspection of incoming general mail. 7 N.Y.C.R.R. §§ 720.2(b), 720.4(a).

It is accepted that a prisoner must be present when, for whatever reason, legal mail (clearly marked as such) is opened by prison officials ... and th[e] Constitution guarantees a prisoner [ ] 'reasonable access to the courts.'

*Standley v. Lyder,* 99 Civ 4711, 2001 WL 225035, at *2 (S.D.N.Y. March 6, 2001) (internal citation omitted) *(citing Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986)) *(citing Bounds v. Smith,* 430 U.S. 817, 821–23, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). In order '[t]o prevail on a claim of interference with legal mail, a plaintiff must show that a pending or anticipated legal action was prejudiced by the alleged interference.' *Standley,* 2001 WL 225035, at *2 (quoting *Morgan v. Montanye,* 516 F.2d 1367, 372 (2d Cir.1975) and *Herrera v. Scully,* 815 F.Supp. 713, 725 (S.D.N.Y.1993)).

*Govan v. Campbell,* 289 F.Supp.2d 289, 297 (N.D.N.Y.2003). Moreover, the Second Circuit has dismissed claims where only sporadic interference with mail was alleged and further, where a plaintiff does not allege actual prejudice to his ability to vindicate his legal claim. *Stanley v. Lyder,* 99 Civ 4711, 2001 WL 225035, at *2 (S.D.N.Y. Mar.7, 2001); *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986).

Plaintiff claims that in or about November 1999 and December 1999, defendant Gardner interfered with and opened his legal mail. Dkt. # 9, pp/5–B to 5–C. Plaintiff filed Grievance No. SPT–17276–99 alleging that his incoming legal mail was censored and opened by the mail room clerk even though the envelope was marked "Legal Mail." Dkt. # 44, p. 0262. In response, K. Washburn, Mailroom Clerk, informed the IGRC that legal mail which is clearly marked and from an attorney, is not to be opened by the mailroom. Dkt. # 44, p. 0268; Dkt. # 94, ¶ 20. As explained by Ms. Washburn, the letter that is the subject of Grievance No. SPT–17276–99 was in an envelope that was completely handwritten (unlike mail from attorneys), the sender's name was illegible and that because the sender's name could not be verified as a legitimate legal entity, the mail was opened. *Id.* Ms. Washburn further stated that whenever legal mail is opened in error, the envelope is stamped by the mailroom to let the inmate know that it was opened in error. *Id.* The Superintendent denied plaintiff's grievance and CORC concurred with the Superintendent's determination, stating that contrary to plaintiff's allegations, facility staff had acted consistent with department policy. Dkt. # 44, p. 0259; Dkt. # 94, ¶ 23.

**\*70** Plaintiff's amended complaint is devoid of any claim that he suffered actual injury as a result of alleged interference with his legal mail. Thus, in the absence of any facts to demonstrate that his access to the courts was impaired or that he was otherwise prejudiced by the opening of a single

envelope, plaintiff's claim against defendant Gardner must fail as a matter of law.

### Interference with Access to the Courts Claim

Although prisoners retain the constitutional right to meaningful access to the courts, prisoners alleging a violation of this right in the context of a section 1983 action must demonstrate actual harm, e.g., that a "nonfrivolous legal claim had been frustrated or was being impeded." *Lewis v. Casey,* 518 U.S. 343, 353, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (footnotes omitted); *see Bounds v. Smith,* 430 U.S. 817, 823, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). Here, plaintiff claims that on September 13, 2000 and June 12, 2001, defendants Corcoran and Weingartner respectively, violated his constitutional right of access to the courts. Dkt. # 9, pp. 5–D to 5–E. Plaintiff alleges that defendant Corcoran denied plaintiff access to vouchers and certified mail receipts contained in plaintiff's sealed property bags. *Id.* at p. 5–D. As a result, plaintiff alleges that Claim No. 98329, a matter pending before the New York State Court of Claims, was dismissed. *Id.* As against defendant Weingartner, plaintiff alleges that he was denied an "advanced certified mailing request" for legal mail to the Attorney General in relation to Claim No. 99509 pending before the New York State Court of Claims. *Id.* at p. 5–E. Plaintiff further claims that a "manila envelope containing the material" had been kept from him "until the expiration of my time to respond by certified mail-return receipt-requested to the Attorney General." Dkt. # 9, p. 5–E.

### Defendant Michael P. Corcoran

As a threshold matter, defendant Corcoran has no recollection of plaintiff's claim that he denied plaintiff access to the Court of Claims by denying plaintiff access to vouchers and/or certified mailing receipts sealed in plaintiff's stored property bags. Dkt. # 90, ¶ 7. In his affidavit in support of his motion for summary judgment, defendant Corcoran recounts an incident where, after plaintiff's transfer to Southport from Coxsackie in May 2000, plaintiff submitted a claim concerning certain property that was missing. Dkt. # 90, ¶¶ 8–19. On or about May 25, 2000, plaintiff submitted a claim that certain property had been stolen. Dkt. # 90, ¶ 10 and Exhibit A. The record before this Court establishes that plaintiff made no claim that any legal papers or receipts were missing from his property bags when plaintiff was transferred to Southport from Coxsackie in or about May 2000. *Id.* at ¶ 11. Notably, however, plaintiff did not claim that any legal documents, vouchers or certified mail receipts were stolen or missing. *Id.*

at ¶ 11. Defendant Corcoran advised plaintiff that all claims must be supported by purchase invoices or package room receipts to establish proof of ownership and that failure to establish proof of ownership may result in denial of his claim. *Id.* at ¶ 13.

**\*71** On or about August 3, 2000, defendant Corcoran advised plaintiff that his accusations were without merit and further, that because plaintiff had failed to provide receipts for any of the articles, plaintiff had failed to establish ownership and his claim was rejected. *Id.* at ¶ 16. Thereafter, plaintiff corresponded with defendant Corcoran on or about September 11, 2000 and in response, defendant Corcoran sent plaintiff a memorandum dated September 13, 2000. Dkt. # 90, ¶ 19 and Exhibit B. Defendant Corcoran's September 13, 2000 memorandum addressed plaintiff's September 11, 2000 note and stated, in pertinent part, "I have again received another demeaning and insolent note from you. This is the last time that I will respond to [sic]. I will not authorize you access to your property bags, since you've already determined that we have broken into your bags to destroy your receipts." *Id* .

At the time of plaintiff's transfer, plaintiff was advised not to leave active case material behind and plaintiff was further instructed to include all active legal material in his 4–bag limit. Dkt. # 90, ¶ 12 and Exhibit A. Plaintiff refused to sign the Personal Property Transferred Form. *Id.* Plaintiff claims that as a result of defendant Corcoran's conduct, Claim No. 98329, a matter pending before the New York State Court of Claims, was dismissed on or about December 20, 2000. Dkt. # 9, p. 5–D. Contrary to plaintiff's assertions, Claim No. 98329 was dismissed by Judgment dated January 2, 2001. Dkt. # 90, ¶ 21 and Exhibit B. As set forth in the Judgment, plaintiff filed Claim No. 98329 on May 15, 1998 seeking damages in the amount of $350,000 for mental anguish arising out of events which occurred while he was an inmate at Attica Correctional Facility. *Id.* The Judgment further notes that the matter came on to be heard by the Honorable Edgar C. NeMoyer, Judge, Court of Claims and that the Court, having heard the "proofs and allegations of the parties and having duly made and filed its decisions in which it dismissed this claim", Claim No. 98329 was dismissed. *Id.* Thus, the Judgment dismissing Claim No. 98329 makes clear that the matter was dismissed after the parties had submitted "proofs and allegations" and makes no mention whatsoever of dismissal because of plaintiff's failure to submit certain vouchers or receipts. Accordingly, because plaintiff has failed to establish that he suffered any injury, his claim against defendant Corcoran must fail as a matter of law.

**Defendant Lawrence W. Weingartner**

Similar to defendant Corcoran, defendant Weingartner, in support of his motion for summary judgment, states that he has no recollection of plaintiff's claim that he denied him access to the Court of Claims. Dkt. # 91, ¶ 6. Based on a review of the documents produced by plaintiff in connection with this action, defendant Weingartner has concluded that plaintiff's claim relates to a June 18, 2001 Notice advising plaintiff that a piece of legal mail was being returned to him pursuant to the Directive governing the inmate correspondence program. *Id.* at ¶ 10. The Notice directed plaintiff's attention to the item checked and where applicable, advised plaintiff to correct and resubmit the item for processing. *Id.* In the box designated "other", plaintiff was advised that his request for special handling had been denied by defendant Weingartner because it did not meet the guidelines for special handling as outlined in DOCS Directive No. 4421. *Id.* at ¶ 11. DOCS Directive Nos. 4421, Privileged Correspondence (7 N.Y.C.R.R. Part 721) and 4422, Inmate Correspondence Program (7 N.Y.C.R.R. Part 720) set forth DOCS policy regarding inmate mail correspondence. *Id.* at ¶ 12. DOCS Directive No. 4421 provides that advances for "special Handling" (e.g., certified mail, return receipt, express mail, etc.) will not be approved unless required by a statute, court rule or court order. 7 N.Y.C.R.R. 3(a)(3)(v). Moreover, on the June 18, 2001 Notice to plaintiff, the box marked "Advances for Special Handling" states that advances for special handling,

> **\*72** may not be used to pay for any special handling charges such as for certified, return-receipt, express mail, etc., unless such mail services are required by statute or court order. Advances for special handling for filing a Claim or Notice of Intention on the Attorney General [sic] Office must be specified on the approved Advance Request form for postage. You must state why you are requesting special handling on the advance form or provide a copy of court order. (4421).

*Id.* at ¶ 14.

According to defendant Weingartner, because plaintiff's request for special handling did not meet the applicable guidelines, his request was denied. *Id.* at ¶ 15. Indeed, defendant Weingartner further states that a request for special handling for mailing a notice of appeal to the Attorney General does not meet the guidelines for special handling because plaintiff was not filing a Claim or Notice of Intention on the Attorney General's Office. *Id* . In addition, there is nothing in the record to suggest that after he received the June 18, 2001 Notice, that plaintiff submitted any court order or statute to the mailroom showing that his correspondence to the Attorney General was required to be mailed by certified mail, return receipt requested. *Id.* at ¶ 16. Lastly, in further support of his motion for summary judgment, defendant Weingartner states that to the extent that any appeal concerning Claim No. 99509 was untimely, plaintiff was advised by the Court (Mr. Davison) that to obtain permission to file or serve an untimely notice of appeal, plaintiff must make a motion for leave to file an untimely notice pursuant to CPLR 5520. *Id.* at ¶ 17. There is nothing in the record to suggest plaintiff submitted any such motion pursuant to CPLR 5520. *Id.* at ¶ 18. Thus, because plaintiff cannot establish that defendant Weingartner interfered with his right of access to the Court of Claims or that any conduct on the part of defendant Weingartner caused the dismissal of Claim No. 99509 or prevented plaintiff from appealing the dismissal of Claim No. 99509, plaintiff's claim against defendant Weingartner must fail as a matter of law.

## *CONCLUSION*

For the foregoing reasons, defendants' motion for summary judgment (Dkt.# 79) is in all respects **GRANTED.**

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a) (3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 236060

Footnotes

1   Plaintiff filed his original complaint together with a motion to proceed *in forma pauperis* on or about February 11, 2002. Dkt.1 and 2. By Order filed March 7, 2002, United States District Judge Charles J. Siragusa granted plaintiff permission to proceed *in forma pauperis* and dismissed all but two of plaintiff's original claims. Dkt. # 3. Plaintiff was granted leave to amend his complaint with respect to certain of his dismissed claims. *Id.* Plaintiff filed an amended complaint on or about May 31, 2002. Dkt. # 9. Thereafter, by Order filed July 1, 2002, United States District Judge David G. Larimer dismissed certain of plaintiff's claims and terminated certain of the defendants. Dkt. # 10. Specifically, Judge Larimer dismissed plaintiff's official capacity claims against all defendants, plaintiff's interference with non-legal mail claim against defendant Gardner and all claims against defendant Hazelton. *Id.*

2   As noted in footnote 1 *supra,* Judge Larimer dismissed plaintiff's official capacity claims against all defendants.

3   Tympanic membrane.

4   As noted elsewhere, although plaintiff's deliberate indifference claims against defendants vonHagn and Brandt allege wrongdoing in December 1999 and January 2001, plaintiff's amended complaint also alleges retaliation claims against these same defendants. Accordingly, a further discussion of plaintiff's medical care for the period January 2000 through February 2001 is appropriate for the purpose of demonstrating that at no time relevant to the allegations in the amended complaint were defendants vonHagn and Brandt deliberately indifferent to plaintiff's medical needs and to address plaintiff's claims that defendants refused or failed to provide plaintiff with medical care.

5   A discussion of the verbal abuse endured by defendant vonHagn on January 14, 2000 and the resulting Misbehavior Report issued by defendant vonHagn against plaintiff is discussed in detail in the section entitled Retaliation Claim. *See* pp. 19–21 *infra.*

6   Only those instances where plaintiff was seen by either defendant Brandt or defendant vonHagn are described in greater detail below.

7   The circumstances surrounding the issuance of the Misbehavior Report and plaintiff's claim of retaliation are discussed in greater detail below at pp. 27–28 *infra.*

8   New York State Department of Correctional Services Division of Health Services Policy 3.03 provides that registered nurses may distribute non-prescription medication under an established protocol to allow for distribution of limited supplies of non-prescription or over-the-counter medications by nurses at sick call. A list of the medications for distribution is attached to the policy as Exhibit A and hydrocortisone cream is not among the over-the-counter medications that may be distributed without prescription authorization. Dkt. # 81, ¶ 58 and Exhibit A.

9   "Inmates are required to return to medical staff [sic] tube or envelope in which Motrin was originally provided to verify that inmate has completed [sic] dose of Motrin previously provided." Dkt. # 81, ¶ 70.

10   *See* footnote 2 *supra.*

11   A review of defendant vonHagn's motion for summary judgment and supporting documentation submitted therewith, reveals that for purposes of the motion for summary judgment, defendant vonHagn has assumed that the Misbehavior Report to which plaintiff is endeavoring to refer in the amended complaint is in fact the January 14, 2000 Misbehavior Report for which the hearing was held on January 25, 2000. Nothing in plaintiff's opposition to defendants' motion for summary judgment suggests that defendants' assumption was incorrect. Accordingly, for purposes of deciding defendant vonHagn's motion for summary judgment, this Court will make the same assumption and treat plaintiff's allegation concerning a "January 25, 2000" Misbehavior Report as a reference to the January 14, 2000 Misbehavior Report.

12   New York conducts three types of disciplinary hearings for its inmates. Tier 1 hearings address the least serious infractions and have as their maximum punishment loss of privileges such as recreation. Tier 2 hearings address more serious infractions and may result in 30 days of confinement in a Special Housing Unit ("SHU"). Tier 3 hearings concern the most serious violations and may result in unlimited SHU confinement (up to the length of the sentence) and recommended loss of "good time" credits. *Hynes v. Squillace,* 143 F.3d 653 (2d Cir.1998), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246, 142 L.Ed.2d 202 (1998).

13   Lt. Ryan is a named defendant in this action and how Lt. Ryan conducted the January 25, 2000 disciplinary hearing is the subject of a separate due process claim. The claims against defendant Ryan and defendant Ryan's motion for summary judgment will be separately discussed in greater detail below. *See* pp. 59–62 *infra.*

14   For purposes of deciding defendants' motion for summary judgment on plaintiff's retaliation claim, as it relates to grievances filed prior to the January 14, 2000 Misbehavior Report, the Court will rely on defendant vonHagn's summary of plaintiff's December 30, 1999 grievance, Grievance No. SPT–17707–99.

**15**    Lt. Sheahan is a named defendant in this action and how Lt. Sheahan conducted the December 26, 2000 (December 29, 2000) disciplinary hearing is the subject of a separate due process claim and will be separately discussed below. *See* pp. 62–65 *infra.*

**16**    Lt. Donahue is a named defendant in this action and the claims against defendant Donahue, including a due process claim relating to the January 29, 2001 disciplinary hearing, will be discussed in greater detail below. *See* pp. 30–44 *infra.*

**17**    *See* footnote 2 *supra.*

* * *

**18**    With the exception of plaintiff's self-serving statements made throughout plaintiff's opposition to defendants' motion for summary judgment concerning "an investigation" into defendant Donahue, plaintiff offers no independent evidence (e.g. grievances or letters) to corroborate this assertion. Accordingly, this Court will not separately address these assertions.

**19**    *See* footnote 2 *supra.*

**20**    Director Selsky is a named defendant in this action and the claims against defendant Selsky will be separately discussed in greater detail below. *See* pp. 66–74 *infra.*

**21**    *See* footnote 2 *supra.*

**22**    *See* footnote 2 *supra.*

**23**    In opposition to defendants' motion for summary judgment, plaintiff claims that he did not refuse to attend the hearing, rather, plaintiff claims that no one came to escort him to the hearing. Dkt. # 96, p. 9. The hearing transcript, Dkt. # 98, pp. 20–33, reflects the testimony of Sgt. Mulhearn and Correction Officer Manzo who testified that they attempted to escort plaintiff to the February 5, 2001 continuation of his disciplinary hearing and plaintiff refused. Moreover, Sgt. Mulhearn testified that he requested plaintiff to sign the Waiver of Right to Attend Disciplinary Hearing advising plaintiff that a disposition of the charges would be made in his absence and plaintiff refused. Dkt. # 68, p. 0713; Dkt. # 87, ¶ 10; Dkt. # 98, pp. 20–33.

**24**    *See* footnote 2 *supra.*

**25**    *See* footnote 2 *supra.*

**26**    It is unclear from the language in the amended complaint whether the dates alleged are the dates when plaintiff's appeals were decided, the dates of the hearing determinations, or some other unknown date. Notwithstanding the dates enumerated in plaintiff's amended complaint, in support of their motion for summary judgment, defendants addressed the following determination/appeal dates: January 11, 2000 determination (December 29, 1999 Misbehavior Report); November 20, 2000 determination; December 21, 2000 determination; January 29, 2001 determination; March 7, 2001 determination; July 18, 2000 determination; January 4, 2001 determination; February 5, 2001 determination; January 25, 2000 determination; and December 29, 2000 determination. In those instances where the dates alleged in the amended complaint do not match with either the hearing date, the appeal date, or the date addressed by defendants, the Court will note the discrepancy and identify the approximate date.

**27**    *See* footnote 2 *supra.*

**28**    Plaintiff's disciplinary record (Dkt. # 86, Exhibit A) erroneously indicates that the hearing officer who presided over the hearing was defendant Donahue. According to all other documents relating to the December 26 and 29, 2000 hearing, it was defendant Sheahan who presided over the Tier 3 disciplinary hearing.

**29**    *See* footnote 2 *supra.*

**30**    In opposition to defendants' motion for summary judgment, plaintiff concurs that his claim was dismissed on January 2, 2001. Dkt. # 96, p. 63.

**31**    As discussed above, defendant Quinn exercised his discretion and denied plaintiff's request to have Deputy Commissioner Annucci testify during the hearing.

**32**    Although N.Y.Comp.Codes R. & Regs. tit. 7, § 254.5 affords inmates the right to "be present at the hearing unless he refuses to attend, or is excluded for reason of institutional safety or correctional goals," state rules and regulations do not necessarily support viable due process claims under § 1983. *See Davis v. Scherer,* 468 U.S. 183, 194, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984); *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995); *Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.), *cert. denied,* 484 U.S. 896, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987); *Dawes v. Leonard,* 885 F.Supp. 375, 377–78 (N.D.N.Y.), *aff'd* 71 F.3d 406 (1995).

**33**    As discussed above, a disciplinary hearing did take place on March 7, 2001, however, plaintiff did not appeal that determination.

**End of Document**        © 2016 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone, New
York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York, New
York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

**\*1** The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary judgment
and dismissing the amended complaint, and United States
Magistrate Judge James C. Francis IV having issued a report
and recommendation, dated August 20, 1999, recommending
that the motion be granted, and upon review of that report and
recommendation together with plaintiff's letter to this Court,
dated August 28, 1999, stating that plaintiff does "not contest
the dismissal of this action", it is

ORDERED that the attached report and recommendation of
United States Magistrate Judge James C. Francis IV, dated
August 20, 1999, is adopted in its entirety; and it is further

ORDERED that defendant Pflueger's motion for summary
judgment is granted, and the amended complaint is dismissed;
and it is further

ORDERED that the Clerk of the Court shall enter judgment
accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42 U.S.C.
§ 1983. Mr. Cole alleges that the defendant Richard Pflueger,
a corrections officer, violated his First Amendment rights
by refusing to allow him to attend religious services. The
defendant now moves for summary judgment pursuant to
Rule 56 of the Federal Rules of Civil Procedure. For the
reasons set forth below, I recommend that the defendant's
motion be granted.

*Background*

During the relevant time period, Mr. Cole was an inmate
in the custody the New York State Department of
Correctional Services ("DOCS"), incarcerated at the Green
Haven Correctional Facility. (First Amended Complaint
("Am.Compl.") ¶ 3). From June 21, 1993 to July 15, 1993,
the plaintiff was in keeplock because of an altercation with
prison guards. (Am.Compl.¶¶ 17–25). An inmate in keeplock
is confined to his cell for twenty-three hours a day with
one hour for recreation. (Affidavit of Anthony Annucci
dated Dec. 1, 1994 ¶ 5). Pursuant to DOCS policy, inmates
in keeplock must apply for written permission to attend
regularly scheduled religious services. (Reply Affidavit of
George Schneider in Further Support of Defendants' Motion
for Summary Judgment dated September 9, 1996 ("Schneider
Aff.") ¶ 3). Permission is granted unless prison officials
determine that the inmate's presence at the service would
create a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green Haven
is for the captain's office to review all requests by inmates
in keeplock to attend religious services. (Schneider Aff. ¶ 3).
Written approval is provided to the inmate if authorization
is granted. (Affidavit of Richard Pflueger dated April 26,
1999 ("Pflueger Aff.") ¶ 5). The inmate must then present the
appropriate form to the gate officer before being released to
attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request
to attend the Muslim services on July 2, 1993. (Request
to Attend Scheduled Religious Services by Keep–Locked
Inmate dated June 28, 1993 ("Request to Attend Services"),

attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

### A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material

fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at *3 (S.D .N.Y. July 22,

1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at [*] 5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*'s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being

released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

Footnotes

1    In light of this finding, there is no need to consider the defendant's qualified immunity argument.

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1681833
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

William CRENSHAW, Plaintiff,

v.

Sgt. G. KORBAR, DSP J. Thompson, Supt.
J. Bergery, James Hooge, Defendants.

No. 09–CV–6167L.
|
April 17, 2013.

**Attorneys and Law Firms**

William Crenshaw, Dannemora, NY, pro se.

J. Richard Benitez, Attorney General's Office, Rochester, NY, for Defendants.

*DECISION AND ORDER*

DAVID G. LARIMER, District Judge.

**\*1** Plaintiff, William Crenshaw, appearing *pro se,* commenced this action pursuant to 42 U.S.C. § 1983. Plaintiff, an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), alleges that the defendants, who at all relevant times were employed by DOCCS, have violated his rights under the First, Eighth and Fourteenth Amendments to the United States Constitution.

Defendants Korbar, Berbary and Thompson have moved pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing all of plaintiff's claims, and defendant Hooge (who was added as a defendant in September 2010, *see* Dkt. # 72) has moved to dismiss plaintiff's claims against him pursuant to Rule 12(b)(6). For the reasons that follow, the motions are granted, and the complaint is dismissed. [1]

**BACKGROUND**

The record shows that in September 2007, plaintiff and another inmate, Kareem Lundy, were transferred to Collins Correctional Facility, from Great Meadow and Wende Correctional Facilities, respectively. At that time, both plaintiff and Lundy were serving administrative sentences of confinement in the Special Housing Unit ("SHU"), based on misbehavior charges of which they had been found guilty, in separate and unrelated proceedings at their previous facilities. Upon arrival at Collins, plaintiff and Lundy were assigned to the Collins SHU, and were double bunked, *i.e.,* placed in the same cell.

On September 29, defendant Sgt. Korbar, as the supervisor on duty, was summoned to plaintiff's cell by another officer. When she arrived, Korbar saw through the cell door window that plaintiff was lying on the cell floor, tied up with a bedsheet. Lundy was standing nearby.

Korbar asked plaintiff, through the cell door, if he was all right, but he did not respond. Lundy, however, stated that he had choked plaintiff and tied him up. At Korbar's direction, staff then entered the cell and removed Lundy and plaintiff. Plaintiff remained uncooperative and uncommunicative, refusing initially to stand, and then refusing to answer questions about what had happened.

Plaintiff was taken to a local hospital, and then to the Erie County Medical Center for a mental examination. He was found to be unharmed, and there was no evidence of a sexual assault, nor was there any physical evidence that plaintiff had been choked.

During Korbar's investigation of the incident, Lundy admitted to her that he had tied plaintiff up so that he, Lundy, would be given a single cell. Plaintiff continued to refuse to answer questions about what had happened.

Korbar concluded that plaintiff and Lundy had staged this incident, in the hope that they would be separated and each given an individual cell. She then wrote a misbehavior report charging plaintiff with refusing a direct order, interference, and creating a disturbance.

After a Tier III hearing conducted by defendant Thompson, plaintiff was found guilty of the charges against him in October 2007, and sentenced to ninety days' SHU confinement, sixty days of which were suspended. The entire sentence was deferred until March 17, 2008, and on December 14, 2007, Thompson's determinations were reversed on administrative appeal, on the ground that the "circumstances depicted in [the] misbehavior report

do not support [the] charges and [the] hearing officer failed to indicate how [the] mental health testimony was considered...." Bove Decl. (Dkt.# 81) Ex. E. Because plaintiff was still serving his SHU sentence on other charges, which are not at issue in this action, he never served any SHU time as a result of Korbar's charges against him stemming from the September 29 incident.

**\*2** Based on these facts, plaintiff has sued Korbar, Thompson, Collins Superintendent James Berbary, and Lt. Hooge, who apparently reviewed Korbar's misbehavior report before passing it on for further action. As stated, plaintiff asserts claims under the First, Eighth and Fourteenth Amendments, as described in more detail below.

## DISCUSSION

### I. First Amendment Claim

Plaintiff's First Amendment claim, which appears to be asserted only against Korbar, asserts that plaintiff "had a right to freedom of speech that included the right to remain silent," and that "Sgt. Korbar retaliated against plaintiff by writing a false misbehavior report." Complaint at 9 ¶ 6. Apparently, plaintiff alleges that Korbar retaliated against him because he refused to speak about what had happened between him and Lundy prior to Korbar's arrival at the cell.

In order to prevail on a claim of unconstitutional retaliation, plaintiff must allege, and ultimately prove, that (1) he engaged in constitutionally protected speech or conduct, (2) defendants took adverse action against him, and (3) there was a causal connection between the protected activity and the adverse action. *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Crenshaw v. Herbert,* 445 F.Supp.2d 301, 303 (W.D.N.Y.2006).

Courts approach prisoner retaliation claims "with skepticism and particular care," however, because "virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dawes,* 239 F.3d at 491. *See also Graham,* 89 F.3d at 79 (noting that "[r]etaliation claims by prisoners are 'prone to abuse' since prisoners can claim retaliation for every decision they dislike") (quoting *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

Assuming *arguendo* that plaintiff's refusal to speak could be deemed protected conduct, *see Powell v. Wilner,* No. 06–cv–00545, 2009 WL 840756, at *1 (D.Colo. Mar.30, 2009) ("Plaintiff's alleged refusal to confess constituted protected conduct"), this claim nevertheless fails, primarily because plaintiff has not alleged facts or presented evidence of any causal connection between his protected activity and the alleged retaliatory act, *i.e.,* Korbar's issuance of a misbehavior report. Although the disposition of guilty was ultimately reversed, the record shows that Korbar had a reasonable basis for the charges, and plaintiff has presented no evidence to suggest that she had any particular motive to retaliate against him. The mere fact that the misbehavior report was issued contemporaneously with plaintiff's refusal to speak is hardly remarkable, as the report and plaintiff's silence both occurred in connection with the same underlying incident involving plaintiff and Lundy.

**\*3** Furthermore, plaintiff never did suffer any actual harm as a result of the misbehavior report. As stated, the disposition was reversed before plaintiff began serving his SHU sentence on that report. Thus, the report could hardly have given rise to any concrete harm, nor could it have tended to have a chilling effect for First Amendment purposes. *See Bilal v. White,* 494 Fed.Appx. 143, 147 (2d Cir.2012) (First Amendment claim failed where there was no showing of actual harm to inmate).

### II. Eighth Amendment Claim

Plaintiff asserts that defendants violated his rights under the Eighth Amendment by failing to protect him against injury at the hands of his cellmate, Lundy. This claim fails as well.

The Eighth Amendment imposes a duty on prison officials "to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996) (citing *Farmer v. Brennan,* 511 U.S. 825, 832–33, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). A failure-to-protect claim requires a showing that prison officials acted with "deliberate indifference" to the inmate's safety. *Morales v. New York State Dep't of Corr.,* 842 F.2d 27, 30 (2d Cir.1988). In order to demonstrate such deliberate indifference, the plaintiff must show that "he [wa]s incarcerated under conditions posing a substantial risk of serious harm" and that prison officials had "knowledge that [the] inmate face[d] a substantial risk of serious harm and ... disregard[ed] that risk by failing to take reasonable measures to abate the harm." *Hayes,* 84 F.3d at 620.

The evidence here fails to demonstrate that defendants deliberately ignored any known risk to plaintiff's safety when they assigned him to share a cell with Lundy. Lundy had previously been found guilty of fighting and engaging in violent conduct, but nothing in his record indicated that he would pose any particular danger to plaintiff. The evidence shows that both inmates' backgrounds were checked before they were assigned to the same cell, and I see nothing in the record to indicate that defendants turned a blind eye to a known or obvious risk in doing so. Were *any* history of violent behavior to prevent individual inmates from being required to share a cell, prison officials' discretion would be severely hamstrung. That is not what the Constitution requires. *See Veney v. Wyche,* 293 F.3d 726, 733 (4th Cir.2002) ("decisions relating to the accommodation of inmates, such as cell assignments, are the type of day-to-day judgments that rest firmly in the discretion of prison officials"). [2]

### III. Fourteenth Amendment Claims

Plaintiff alleges that his due process rights under the Fourteenth Amendment were violated because Korbar issued a false misbehavior report, and because Thompson found him guilty of the charges in that report.

To make out a valid Fourteenth Amendment claim for a denial of due process, plaintiff must show that defendants deprived him of a protected liberty interest. Plaintiff can make no such showing, for the simple reason that he never served any time on the charges brought by Korbar. As stated, Thompson's disposition was reversed before plaintiff began serving that sentence. Thus, even assuming that he had a liberty interest in avoiding SHU confinement, he was not deprived of any such interest here. *See Young v. Hoffman,* 970 F.2d 1154, 1155 (2d Cir.1992) (since inmate's "penalty [was] vacated and ... Young never served a day of the penalty," he "suffered no interference with a liberty interest and ha[d] no valid claim for relief") (per curiam); *Jackson v. Goord,* No. 06–CV–6172, 2011 WL 4829850, at *17 (W.D.N.Y. Oct. 12, 2011) ("the Court finds that Defendants are entitled to summary judgment on the due process claims involving the hearings conducted by Dougherty and Monin, since Plaintiff never served any disciplinary sentence as a result of either hearing"). [3]

**\*4** Plaintiff also makes the conclusory allegation that Korbar and Thompson conspired to deprive him of his constitutional rights. Complaint at 10 ¶ 8. Construing this as a claim under 42 U.S.C. § 1985, I find that it must be dismissed, as it falls woefully short of the kind of allegations necessary to make out a civil rights conspiracy claim. *See Zulu v. Botta,* 613 F.Supp.2d 391, 393 (W.D.N.Y.2009) (citing *Walker v. Jastremski,* 430 F.3d 560, 564 n. 5 (2d Cir.2005), *cert. denied,* 547 U.S. 1101, 126 S.Ct. 1887, 164 L.Ed.2d 573 (2006)) (additional citations omitted).

### IV. Claims against Berbary and Hooge

In addition to the grounds for dismissal outlined above, I find that the claims against Berbary and Hooge would have to be dismissed in any event, due to their lack of personal involvement in the alleged violations. Liability under § 1983 requires a showing of the individual defendant's personal involvement in the alleged constitutional violation. Personal involvement may be shown where the defendant directly participated in the violation, or, if the defendant was a supervisory employee or official, where the defendant: failed to remedy the violation after it was brought to his attention; created or fostered a policy or custom that allowed or caused such violations to occur; was grossly negligent in supervising subordinates who committed the violation; or showed deliberate indifference to the rights of others by failing to act on information that constitutional violations were occurring. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Henry v. Lempke,* 680 F.Supp.2d 461, 464 (W.D.N.Y.2010).

No such allegations or evidence has been presented here. The claims against Berbary are premised on his role as superintendent, and Hooge appears to have done nothing more than pass along Korbar's misbehavior report for further action. That is not enough to establish their liability. *See Rivera v. Lempke,* 810 F.Supp.2d 572, 576 (W.D.N.Y.2011) ("there is no *respondeat superior* liability in § 1983 cases").

### CONCLUSION

The motion for summary judgment by defendants Korbar, Berbary and Thompson, and to dismiss by defendant Hooge (Dkt.# 81) is granted, and the complaint is dismissed.

IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 1681833

Footnotes

1    As will be made clear below, disposition of Hooge's motion does not require reference to any materials outside the pleadings, and to the extent that the Court has considered any such materials, I have done so only with respect to the summary judgment motion brought by the other three defendants.

2    I also note that, aside from plaintiff's allegation that Lundy choked him, there is no evidence that he suffered any physical injury. A medical report prepared later on the day of the incident states that "no injuries [were] seen" on plaintiff's body. Dkt. # 1 at 15. Absent some physical injury, plaintiff may not recover damages for mental distress, or simply because, as he puts it, "[i]t's possible plaintiff could have been killed in a situation like this." Complaint at 13 ¶ 17. *See* 42 U.S.C. § 1997e(e) ("No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury").

3    I also note that even if plaintiff had served the sentence imposed by Thompson (90 days, 60 of which were suspended), it is doubtful that he could establish a due process claim, absent evidence that his conditions of confinement were unusually harsh. *See Davis v. Barrett,* 576 F.3d 129, 133 (2d Cir.2009) (in the absence of unusually harsh conditions, "restrictive confinements of less than 101 days do not generally raise a liberty interest warranting due process protection") (citation omitted).

---

**End of Document**                                              © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 767546
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Raymond GONZALES, Plaintiff,
v.
D. CARPENTER, et. al, Defendants.

No. 9:08–CV–629 (LEK/ATB).
|
Feb. 25, 2011.

**Attorneys and Law Firms**

Raymond Gonzalez, Marcy, NY, pro se.

Richard Lombardo, New York State Attorney General, Albany, NY, for Defendants.

### *DECISION and ORDER*

LAWRENCE E. KAHN, District Judge.

 **\*1** This matter comes before the Court following a Report–Recommendation filed on January 3, 2011 by the Honorable Andrew T. Baxter, United States Magistrate Judge, pursuant to 28 U.S .C. § 636(b) and L.R. 72.3 of the Northern District of New York. Report–Rec. (Dkt. No. 132). On February 23, 2011, after receiving multiple extensions of time by which to respond to the Report and Recommendation, Plaintiff Raymond Gonzales filed his objections ("Objections") to the Magistrate Judge's findings. Dkt. No. 137.

It is the duty of this Court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* This Court has considered the objections and has undertaken a *de novo* review of the record and has determined that the Report–Recommendation should be approved for the reasons stated therein.

Accordingly, it is hereby

**ORDERED,** that the Report–Recommendation (Dkt. No. 132) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendant's Motion to dismiss (Dkt. No. 120) is **GRANTED** and Plaintiff's Amended Complaint (Dkt. No. 106–1) is **DISMISSED in its entirety;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

### All Citations

Not Reported in F.Supp.2d, 2011 WL 767546

---

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 768990
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Raymond GONZALES, Plaintiff,

v.

D. CARPENTER, et al, Defendants.

No. 9:08–CV–629 (LEK/ATB).
|
Jan. 3, 2011.

**Attorneys and Law Firms**

Raymond Gonzales, pro se.

Richard Lombardo, Asst. Attorney General, for Defendants.

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter has been referred to me for Report and Recommendation by Senior U.S. District Judge Lawrence E. Kahn, pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). Plaintiff's amended complaint ("AC," Dkt. No. 110) seeks monetary damages, under 42 U.S.C. § 1983, for various alleged violations of his constitutional rights arising from his confinement by the New York State Department of Correctional Services ("DOCS") and the Office of Mental Health ("OMH"), between July 2007 and February 2008. Presently before this court is defendants' motion to dismiss the amended complaint for failure to state a claim, pursuant to FED. R. CIV. P. 12(b) (6). (Dkt. No. 120). Plaintiff has filed a memorandum of law, affidavit, and voluminous documentary exhibits in opposition to the defendants' motion. (Dkt. No. 129). This court recommends granting defendants' motion and dismissing the amended complaint in its entirety, for the following reasons.

### I. *Facts and Contentions* [1]

Plaintiff's current claims arise from events, between July 24, 2007 and February 13, 2008, relating to his transfers among and between the Special Housing Unit ("SHU") at Upstate Correctional Facility ("Upstate"), the SHU and the OMH satellite unit at Great Meadow Correctional Facility ("Great Meadow"), and the Central New York Psychiatric Center ("CNYPC"), which was operated by OMH. [2] The amended complaint names 14 defendants from DOCS and OMH. The DOCS defendants are Brian Kourofsky, a sergeant assigned to the SHU at Upstate; David Rock, the Superintendent at Great Meadow; David Carpenter, Deputy Superintendent for Programs and, for a time, the Acting Superintendent at Great Meadow; John Baisley, a lieutenant assigned to Great Meadow; Mark Cleveland, James Rando, and Richard Reynolds, sergeants assigned to the SHU at Great Meadow; and Gary DeFranco, a correction officer at Great Meadow. The OMH defendants are Hasan Rahman, Kalyana Battu, and Jose Gonzalez, psychiatrists assigned to Great Meadow; Pamela Roberts, a psychiatrist's assistant assigned to Great Meadow; Donald Sawyer, Executive Director at CNYPC; and Rajeshwar Kartan, a psychiatrist assigned to CNYPC.

The defendant's memorandum of law fairly and cogently sets forth the factual allegations of plaintiff's lengthy, and not entirely comprehensible, amended complaint. (Defs.' Memo. of Law at 2–13, Dkt. No. 120–1 at 4–15). This court will briefly summarize and supplement the pertinent facts here, and will provide relevant details, as necessary, in the analysis of plaintiff's claims below.

From at least 2001, plaintiff was confined in various DOCS facilities in the Northern and Western Districts of New York. Between 2001 and 2009, plaintiff filed eight civil rights actions in federal court and two cases in the New York Court of Claims relating to various complaints arising from his confinement. (AC ¶¶ 20–29). Two of the more recent civil rights complaints included allegations regarding plaintiff's confinement at Upstate in 2006 and early 2007, although Brian Kourofsky—the only defendant from Upstate in this action-was not named as a defendant in the prior actions. (9:06–CV–1424, 2/22/2010 Decision and Order of Hood, DJ, Dkt. No. 95 at 1–5 [3] ; 9:07–CV–406, Complaint ¶¶ 27–168, Dkt. No. 1). In July 2007, while he was confined at Upstate, and thereafter, to the extent allowed, plaintiff was working on perfecting an appeal of a state conviction involving an alleged assault on a DOCS employee at Attica Correctional Facility ("Attica"), in Wyoming County, in the Western District of New York. (AC ¶¶ 60–61).

**\*2** Throughout the amended complaint, plaintiff consistently and vehemently denies that he suffered from mental illness or needed mental health treatment. However, beginning in July 2007, DOCS began a series of steps which subjected plaintiff to unwanted evaluations and treatment

for mental illness. In support of a certification stating that plaintiff was suffering from a mental illness requiring involuntary treatment, psychiatrist Hasan Rahman concluded that plaintiff was suffering from chronic delusional disorder. Defendant Rahman noted that:

> [Gonzales] has been ... putting underwear on top of his head with the belief that chemicals or poisons [are] coming through the roof and [he is] smearing feces ... in SHU as well as in OBS. He is having many tickets for bizarre and unhygenic behaviors.

(AC, Ex. H, Dkt. No. 110–2 at 20). [4]

Plaintiff was confined in the OMH mental health satellite unit at Great Meadow, and examined by various of the defendant psychiatrists, between July 24 and August 1, 2007 and, later, between September 24th and October 1st of the same year. [5] On or about October 1, 2007, plaintiff was transferred to CNYPC. Eventually, OMH took plaintiff to court and obtained orders involuntarily committing him to CNYPC for up to six months (AC, Ex. M, Dkt. No. 110–2 at 30), and allowing plaintiff's treating psychiatrists to involuntarily medicate him (AC, Ex. Q, Dkt. No. 110–2 at 41–42). Plaintiff was released from CNYPC and returned to a DOCS facility on February 13, 2008.

Liberally construed, the amended complaint claims that plaintiff's constitutional rights were violated in connection with his confinement by DOCS and OMH between July 2007 and February 2008 in the following ways. Plaintiff alleges that his transfers to the OMH satellite unit at Great Meadow, his involuntary confinement and treatment at CNYPC, and various other alleged adverse actions were taken against him, as part of a conspiracy to retaliate for the exercise of his First Amendment rights—his right to pursue civil rights and other actions against DOCS, as well as his appeal of his conviction involving the alleged assault on a DOCS employee at Attica. Plaintiff claims that his transfers and other actions taken by DOCS were also carried out pursuant to a conspiracy to deny him access to courts, in particular, by interfering with his ability to perfect the appeal of his criminal conviction. Plaintiff also contends that his classification as mentally ill, and the conditions of his confinement and the involuntary treatment he suffered at the satellite unit at Great Meadow and CNYPC violated his rights under N .Y. Correction Law § 402, as well as his Fourteenth Amendment right to due process and

his Eighth Amendment right not to be subjected to cruel and unusual conditions of confinement, or deliberate indifference to his medical and basic needs.

Defendants argue that plaintiff's various claims are frivolous, irrational, and incredible, and fail to state viable causes of action under Section 1983. This court agrees that plaintiff's conclusory claims of retaliation are insufficient to establish a plausible link between activity protected by the first amendment—*e.g.,* filing civil rights complaints against DOCS—and any adverse actions taken against him. The documents attached to the motion papers of both sides establish that the actions of the defendants were not the cause of any concrete harm to plaintiff in connection with the pursuit of his criminal appeal, thereby undermining plaintiff's claim that defendants unconstitutionally interfered with his right of access to courts. The transfers and involuntary treatment and medication of plaintiff for perceived mental illness were not carried out in such a way that violated plaintiff's due process rights; and, even if procedures under N.Y. Correc. Law § 402 were not properly followed, that would not support a constitutional claim under Section 1983. Finally, plaintiff fails to state a plausible claim that the conditions of his confinement or the conduct of any of the named defendants against him constituted deliberate indifference to his serious medical needs or cruel and unusual punishment. [6] Accordingly, this court will recommend that defendants' motion to dismiss be granted and the amended complaint dismissed in its entirety.

## II. *Motion to Dismiss*

**\*3** To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v.. Twombly,* 550 U.S. 544, 570 (2007)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. *Id.* (citing *Bell Atl. Corp.,* 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant " 'fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp.,* 550 U.S. at 555 (citation omitted).

When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel.*

*Co.,* 62 F.3d 69, 71 (2d Cir.1995). The court must heed its particular obligation to treat *pro se* pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment). In this case, plaintiff attached a significant number of documents to his amended complaint that this court has considered in making its recommendation. In the case of a motion to dismiss involving a *pro se* plaintiff, the court may look beyond the complaint to plaintiff's opposition papers. *See Locicero v. O'Connell,* 419 F.Supp.2d 521, 525 (S.D.N.Y.2006) (citation omitted). [7]

A court should dismiss an *in forma pauperis ("IFP")* case [8] at any time if the court determines, *inter alia,* that the action is frivolous. 28 U.S.C. § 1915(e)(2)(B)(I). In determining whether a case is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact. *Neitzke v. Williams,* 490 U.S. 319, 325 (1989). "[T]he *in forma pauperis* statute, unlike Rule 12(b)(6), 'accords judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless.' " *Denton v. Hernandez,* 504 U.S. 25, 32 (1992) (quoting *Neitzke,* 490 U.S. at 327). Dismissal of an IFP action is proper, for example, when the allegations are the product of delusion or fantasy. *Id.* (quoting *Neitzke,* 490 U.S. at 328); *Livingston v. Adirondack Beverage Co.,* 141 F.3d 434, 437 (2d Cir.1998).

## III. Retaliation

### A. Legal Standards

**\*4** While "[a] prisoner has no liberty interest in remaining at a particular correctional facility, prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights .... " *Davis v. Kelly,* 160

F.3d 917, 920 (2d Cir.1998). [9] In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). The plaintiff must establish a causal connection between the protected conduct or speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002)).

The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), *superseded by* 2003 U.S.App. LEXIS 13030 (2d Cir. Feb. 10, 2003)) (omission in the original). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

Claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Bennett,* 343 F.3d at 137 (citation omitted). Accordingly, a plaintiff must set forth non-conclusory allegations to state a viable claim of retaliation. *Id.* [10]

In order to support a claim for conspiracy pursuant to section 1983, there must be "(1) an agreement ...; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. County of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002); *Cusamano v. Sobek,* 604 F.Supp.2d 416, 468 (N.D.N.Y.2009). An agreement must be proven with specificity, as bare allegations of a conspiracy supported only by allegations of conduct easily explained as individual action is insufficient. *See Iqbal v. Hasty,* 490 F.3d 143, 177 (2d Cir.2007), *overruled on other grounds sub nom. Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. 1937 (2009); *see also Gyadu v. Hartford Ins. Co.,* 197 F.3d 590, 591 (2d Cir.1999). "A complaint containing only conclusory, vague, or general allegations of a conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.).

## B. Application

Plaintiff appears to allege that all 14 defendants, who worked at three different New York state facilities, conspired to retaliate against him for filing prior civil law suits, and for pursuing an appeal of his conviction for assaulting a DOCS employee at Attica. (AC, Claims for Relief A–E). Plaintiff claims that his transfers to the OMH satellite unit at Great Meadow (AC ¶¶ 46, 95), the delay of his legal papers after his move to Great Meadow SHU in September 2007 (AC ¶¶ 66–69), and his transfer to CNYPC and the applications for court orders to have him committed and involuntarily medicated (AC ¶¶ 121, 126), were all the result of a retaliatory conspiracy.

**\*5** The plaintiff's prior legal actions (AC ¶¶ 20–29) were constitutionally protected activity for a prisoner. And this court will assume, for the purposes of this motion, that the various transfers and involuntary treatment and medication of plaintiff constituted "adverse action" against him. *See, e.g., Morales v. Mackalm,* 278 F.3d 126, 131–32 (2d Cir.2002) (the allegation that defendants transferred inmate plaintiff to a psychiatric facility must be construed as describing an adverse action), *abrogated on other grounds sub nom. Porter v. Nussle,* 534 U.S. 516, 532 (2002). However, the plaintiff's conclusory allegations of retaliation do not establish a plausible claim that there was any causal connection between his protected activity and any alleged adverse actions taken against him. With one exception, discussed further below, the amended complaint does not set forth any specific factual allegations that support plaintiff's claim that he was the subject of intentional retaliation by any of the defendants. Plaintiff's conclusory and frivolous charges of pervasive and collusive retaliation against him do not support a plausible inference that the defendants retaliated against him, for filing various lawsuits and pursuing a criminal appeal, by transferring him to facilities where he received involuntary mental health treatment and medication.

There is no indication that any of the defendants named in this action were involved in any of plaintiff's prior litigation. (AC ¶¶ 20–29). Plaintiff's appeal for an assault conviction, and most of his civil rights complaint against DOCS involved facilities other than Upstate, Great Meadow, and CNYPC, where the named defendants in this action were assigned.

Four of plaintiff's prior civil rights actions involved alleged prior incidents at Upstate, where only one of the named defendants in this action (Sgt.Kourofsy) worked. [11] The only allegation against defendant Kourofsky in the amended complaint in this action was that he advised plaintiff, on July 24, 2007, that, as a result of orders from "Albany," plaintiff was being transferred from Upstate to Great Meadow. (AC ¶¶ 31–41). The first alleged retaliatory adverse action about which plaintiff complains involves his confinement and mental health treatment in the OMH satellite unit at Great Meadow. Plaintiff alleges nothing to support a plausible inference that a correctional sergeant, with no connection to the DOCS or OMH medical staff, could have caused the inmate's transfer for a mental health evaluation, [12] even if Sgt. Kourofsky knew of plaintiff's various prior lawsuits and was inclined to retaliate against him (which plaintiff also does not allege in the amended complaint). [13] Nor does the amended complaint set forth any factual allegations which would suggest that Sgt. Kourofsky at Upstate would have had any control over the conditions of plaintiff's confinement at Great Meadow [14] or any influence over the treatment provided to plaintiff at the OMH satellite unit. [15] Accordingly, defendant Kourofsky could not have been personally involved in how plaintiff was treated at Great Meadow, and could not be liable under Section 1983, even if plaintiff's constitutional rights were violated at that facility. [16]

**\*6** The only factual allegation in the amended complaint that supports an inference that any defendant harbored a retaliatory motive against plaintiff involves defendant Rando, a sergeant assigned to the Great Meadow SHU. After he was transferred back to Great Meadow (on August 30, 2007), plaintiff was visited (on September 4th) by attorneys assigned to assist him in several civil rights suits he filed in the Western District of New York (involving facilities other than Great Meadow and Upstate, which are in the Northern District of New York). (AC ¶ 68). Plaintiff alleges that, on September 11, 2007, he asked Sgt. Rando about obtaining his legal papers, and defendant Rando said that plaintiff would not get his papers because he had five lawsuits filed. (AC ¶ 69). Notwithstanding this alleged "retaliatory" comment, plaintiff received his legal papers a week later (on September 18th), from defendant Cleveland. (AC ¶ 70).

Cases in this circuit have held that the theft, confiscation, or destruction of an inmate's legal documents can constitute "adverse action" for the purposes of a retaliation claim. *See, e.g., Smith v. City of New York,* 03 Civ. 7576, 2005 WL 1026551, at \*3 (S .D.N.Y. May 3, 2005); *Smith v. Maypes–Rhynders,* 07 Civ. 11241, 2009 WL 874439, at \*5 (S.D.N.Y.

Mar. 31, 2009). However, a mere delay in the transfer of plaintiff's legal papers, even if motivated by retaliation, would appear to be the type of *de minimis* action that would not be considered "adverse." *See, e.g., Rivera v. Pataki,* No. 04 Civ. 1286, 2005 WL 407710, at *19 (S.D.N.Y. Feb. 7, 2005) (several temporary incidents of actively preventing plaintiff from mailing his legal documents were not sufficiently serious to constitute "adverse action"). Moreover, it seems implausible that a DOCS employee at the Great Meadow SHU would be motivated to retaliate against an inmate who had been confined there for less than two weeks on the basis of law suits that did not involve defendant Rando, or anyone else at Great Meadow.

The fact that defendant Rando allegedly told plaintiff he would not get his legal papers back, but they were, in fact, delivered a week later by another sergeant, undercuts the inference that Sgt. Rando was the cause of the delay in plaintiff's receipt of his documents. *See, e.g., Key v. Toussaint,* 660 F.Supp.2d 518, 526 (S.D.N.Y.2009) (the fact that the inmate plaintiff's property was ultimately returned to him further suggests that the defendants did not intentionally lose or steal his personal property, notwithstanding the vague threats one defendant made to plaintiff). While plaintiff alleges that his legal papers were not delivered to him until 19 days after his return to Great Meadow, he was transferred from Upstate to Downstate to Great Meadow over the course of six days, which might be expected to cause delays in the transfer of papers and personal possessions. While the timing of defendant Rando's alleged remarks during the period while plaintiff's papers were delayed provides some support for an inference of retaliation, this court finds the plaintiff's allegations do not state a plausible claim against defendant Rando. *See, e.g., McQuilkin v. CNYPC,* 2010 WL 3765847, at *15 (the service of a summons on the prison superintendent, followed in short order by the seizure of the plaintiff's personal property, was an insufficient basis upon which a reasonable factfinder could find retaliation); *Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N .Y.2000) (although the temporal proximity of a protected activity and the alleged adverse action provides circumstantial evidence of retaliation, such evidence, without more, is insufficient to survive summary judgment) (citing *Ayers v. Stewart,* 101 F.3d 687 (Table), No. 96–2013, 1996 WL 346049, at *1 (2d Cir. June 25, 1996).

**\*7** Nothing else in the amended complaint provides any factual support for plaintiff's claim that all of the defendants conspired to retaliate against him by, *inter alia,* falsely labeling him as mentally ill and subjecting him to involuntary and unneeded mental health treatment and medication. As discussed further below, the records submitted by plaintiff, and the adjudication of issues relating to his mental health in two state court proceedings, demonstrate that many of the allegations in the amended complaint reflect plaintiff's delusions and paranoia, notwithstanding his vehement denials of mental illness. Plaintiff's claims in this and prior civil rights complaints indicate that he suffers from "a victimization fantasy." *Gonzales v. Wright,* 2010 WL 681323, at * 12 (as courts in the Second Circuit have consistently recognized, "it is utterly unjust to haul people into federal court to defend against, and disprove, delusions") (collecting cases). In that context, the court finds that all of plaintiff's allegations of retaliation, even if, in a few instances they might arguably survive under the standards of Rule 12(b)(6), are the results of plaintiff's delusions and fantasy, and are clearly without factual basis, and subject to dismissal as frivolous under 28 U.S.C. § 1915(e)(2)(B)(I). *Denton v. Hernandez,* 504 U.S. at 32 (citing *Neitzke,* 490 U.S. at 327–28).

## IV. Access to the Courts

### A. Legal Standards

"A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure." *Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986). In order to establish a claim that a prisoner's right of access to the courts has been abrogated, the plaintiff must establish that deliberate and malicious interference impeded his access to the courts, and that, as a result of that interference, the inmate suffered actual injury. *See Lewis v. Casey,* 518 U.S. 343, 349, 351 (1996); *Cancel v. Goord,* 00–CV–2042, 2001 WL 303713, at *4 (S.D.N.Y. March 29, 2001). *Lewis* also requires a showing of prejudice to an existing meritorious action involving a direct or collateral attacks on the inmate's conviction, or to a challenge to the conditions of confinement. 518 U.S. at 353, 355. "Mere 'delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.' " *Davis v. Goord,* 320 F.3d at 352 (citing *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995)).

### B. Application

Plaintiff alleges that all 14 defendants, from three different facilities, conspired to deprive him of access to the courts in

connection with his appeal of his conviction for assaulting a DOCS employee at Attica, and his various civil rights actions. (AC, Claims for Relief A–E). Plaintiff claims that his transfers to the OMH satellite unit at Great Meadow (AC ¶¶ 46, 49, 95), the delay of his legal papers after his move to Great Meadow SHU in September 2007 (AC ¶¶ 66–69), and his transfer to CNYPC and the applications for court orders to have him committed and involuntarily medicated (AC ¶¶ 121, 126, 128, 133), were all the result of the conspiracy to violate his First Amendment right of access to courts. As with the alleged conspiracy to retaliate against plaintiff, the conclusory allegations of a pervasive illegal agreement to deny him access to the courts are insufficient to state a valid cause of action for conspiracy under Section 1983. In any event, under the facts that plaintiff has asserted in opposition to this motion, he cannot establish a plausible claim that any of the named defendants actually prejudiced him by impeding his ability to pursue his criminal appeal or his civil rights actions.

**\*8** Plaintiff alleges that the defendants' purported conspiracy actually prejudiced him only with respect to his efforts to perfect his criminal appeal between July 24, 2007, when he was first transferred to Great Meadow, to February 13, 2008, when he was released from CNYPC. The motion papers of both the defendants and the plaintiff extensively describe and document the protracted period during which plaintiff was attempting to perfect this appeal. (Lombardo Dec., Dkt. No. 120–2; Pltf.'s Aff., Dkt. No. 129–2). For the purposes of deciding the instant motion as to the allegations in the amended complaint, it is not necessary to review the entire procedural history of plaintiff's appeal.

On May 21, 2007, the Supreme Court, Appellate Division, Fourth Department, granted plaintiff the last of several extensions, **until August 20, 2007,** to perfect his *pro se* appeal from his conviction involving the alleged assault of a DOCS employee. (Pltf.'s Aff ¶ 42; Ex. Q, Dkt. No. 129–3 at 48). By that time, plaintiff had drafted an appellate brief, assembled the record of the trial court proceedings needed for the appendix, and submitted these papers to the Clerk of the Appellate Division. (Pltf.'s Aff. ¶ 33). However, on January 26, 2007, the Clerk rejected this submission and returned plaintiff's papers because he failed to submit either a stipulation of all parties regarding the contents of the record, or an order of the trial court settling the contents of the record. (Pltf.'s Aff. ¶ 36; Ex. M, Dkt. No. 129–3 at 39).

Plaintiff was confined at the Great Meadow OMH satellite unit for the first time from July 24, 2007 until August 1st, when he was returned to Upstate. On August 14th, plaintiff requested another extension from the Appellate Division, because, despite numerous prior requests, he had not yet received a stipulation or order settling the record from the District Attorney or trial judge. (Pltf.'s Aff. ¶ 54).[17] Shortly thereafter, on August 17th, plaintiff received the executed, certified stipulation necessary to complete his appellate papers, and began preparations to perfect his appeal. (Pltf.'s Aff. ¶ ¶ 56, 57; Ex. Y, Dkt. No. 129–3 at 64–65). Plaintiff's affidavit does not explain why, despite the fact that he had all of the necessary papers in his cell at Upstate, he did not submit the documents necessary to perfect his appeal by the August 20, 2007 deadline.

On August 24, 2007, plaintiff was transferred to Downstate, and then was sent to Great Meadow on August 30th. (Pltf.'s Aff. ¶ 60). On September 18th, while in the SHU at Great Meadow, plaintiff received a notice from the Appellate Division that his request for a further extension of his appeal was denied; however, plaintiff was given leave to renew his motion upon a showing that his appeal had merit. (Pltf.'s Ex. ¶ 62; Ex. Z, Dkt. No. 129–3 at 67). On September 18, 2007, plaintiff received his transferred legal papers while still in the Great Meadow SHU. (Pltf.'s Aff. ¶ 65). Plaintiff claims that he was working on an application to renew his motion to perfect his appeal on September 24th, when he was removed to the satellite unit at Great Meadow, where he was not allowed to have his papers. From there, plaintiff was transferred to CNYPC, and was held there until February 13, 2008. Plaintiff alleges that he was unable to get access to his legal papers or work to perfect his appeal during the period he was confined at CNYPC. (Pltf.'s Aff. ¶¶ 66–68).

**\*9** On April 18, 2008, a month after his release from CNYPC, plaintiff submitted another application to the Appellate Division in an apparent effort to get permission to belatedly perfect his appeal. On May 14, 2008, the Appellate Division denied his application, again "with leave to renew upon a showing of sufficient facts to demonstrate a meritorious appeal." (Pltf.'s Aff, Ex. 1, Dkt. No. 129–3 at 70). Plaintiff complains, in his affidavit, that he was unable to make any further submission to the Appellate Division because his legal papers were not returned to him. (Pltf.'s Aff. ¶ 68). However, the attachments to plaintiff's affidavit in opposition to defendant's motion includes a copy of his appellate brief (Ex. W, Dkt. No. 129–4 at 1–47), his proposed appendix (Ex. X, Dkt. No. 129–6 at 1–80), and the executed

stipulation as to the contents of the record (Ex. Y, Dkt. No. 129–3 at 64–65).

The facts acknowledged by plaintiff and the documents that he has submitted in opposition to defendants' motion, establish that the conduct of the defendants, in transferring him to Great Meadow and them committing him to CNYPC, was not the cause of his failure to perfect his appeal. The District Attorney and the trial judge in plaintiff's criminal case (neither of whom are defendants here) delayed in providing the requested stipulation as to the contents of the record, thereby preventing plaintiff from perfecting his appeal before August 17, 2007. Plaintiff provides no explanation as to why he did not submit, to the Appellate Division, the necessary paperwork, all of which he had at the Great Meadow SHU between August 17th and August 24th, when he was transferred to the satellite unit. In any event, after plaintiff was released from CNYPC in February 2008, he was in the same position with respect to his appeal as he was after August 20, 2007—he could renew his motion to perfect his appeal upon a showing that his appeal had merit. Plaintiff's stated excuse for not renewing his motion and making a showing of merit—that his legal papers were not returned to him after his release from CNYPC—is clearly baseless given that he has attached those very papers to his affidavit in opposition to the instant motion.

This court finds that plaintiff's failure to perfect his appeal was not caused by any action of the defendants in this action; plaintiff either concluded that he could not establish that his appeal had merit or he failed, without excuse, to take available steps to perfect his appeal. Either way, based on the authority cited above, plaintiff's claim that the defendants maliciously impeded him in pursuing a meritorious action, in violation of his First Amendment right of access to courts, must fail.

## V. Confinement at the OHM Satellite Unit at Great Meadow

Plaintiff asserts that he was unlawfully confined to the OMH satellite unit at Great Meadow for two periods in 2007 by defendant Kourofsky, a corrections sergeant at Upstate; defendants Rock, Carpenter, Baisley, Cleveland, Rando, Reynolds, and DeFranco, on the administrative or corrections staff at Great Meadow; defendant Roberts, an OMH psychiatrist's assistant at Great Meadow; and defendants Rahman, Battu, and Gonzalez, OMH psychiatrists assigned to Great Meadow. While the amended complaint is not entirely clear about which of plaintiff's constitutional rights were allegedly infringed by his confinement in the

satellite unit, this court will consider possible due process and Eighth Amendment violations.

**\*10** The court concludes that the short-term confinement of plaintiff in a prison mental health clinic for observation did not implicate a liberty interest triggering due process protection. Nothing involving plaintiff's stay at the OMH satellite unit subjected him to cruel and unusual punishment under the Eighth Amendment. Accordingly, this court recommends dismissal of the claims involving plaintiff's confinement at the Great Meadow satellite unit.

### A. Due Process

Plaintiff was confined in the satellite unit at Great Meadow, for psychiatric observation and treatment, from July 24 through August 1, 2007, and again, from September 24th through October 1st, when he was moved to CNYPC. The amended complaint contains very few factual allegations about the conditions of plaintiff's confinement in the satellite unit. Plaintiff complains that he was "confined in the satellite unit naked only with a gown for person crazy [sic]," (AC ¶ 43) and that he was asked a lot of "stupid" questions by the defendant psychiatrists (AC ¶¶ 44, 48, 90). Although plaintiff alleges that at least one of the psychiatrists at the Great Meadow satellite unit prescribed him unwanted medication (AC ¶ 52), he does not claim he was actually involuntarily medicated at Great Meadow, and the psychiatrist's report indicates that plaintiff resisted treatment and refused all medication. (AC, Ex. H, Dkt. No. 110–2 at 20).

Plaintiff has consistently claimed that he was not mentally ill, and did not require or want mental health treatment. The psychiatrists who observed plaintiff at the satellite unit all ultimately concluded that plaintiff was in need of involuntary care and treatment in an inpatient hospital for the mentally ill, and that, as a result of his mental illness, plaintiff posed a substantial threat of harm to himself and others. (AC, Ex. H & I, Dkt. No. 110–2 at 18–22). As discussed below, the conclusion that plaintiff was mentally ill and required treatment and medication was subsequently validated by several other psychiatrists and two state court judges.

To establish a claim based on a violation of due process, a plaintiff must establish a constitutionally protected liberty or property interest that a plaintiff was denied without due process. *See, e.g., Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). A state prisoner generally has no liberty interest in being housed in a particular facility. *Montanye v. Haymes,* 427 U.S. 236, 243 (1976); *Matiyn v. Henderson,*

841 F.2d 31, 34 (2d Cir.1988). "[A] prisoner's restricted confinement within a prison does not give rise to a liberty interest, warranting procedural due process protection, unless the conditions 'impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Sealey v. Giltner,* 197 F.3d 578, 583 (2d Cir.1999) (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). Atypicality in a *Sandin* inquiry is normally a question of law. *Colon v. Howard,* 215 F.3d 227, 230–31 (2d Cir.2000); *Sealey,* 197 F.3d at 585. When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. *See Sealey,* 197 F.3d at 586; *Arce v. Walker,* 139 F.3d 329, 335–36 (2d Cir.1998).

**\*11** It is clear that a prisoner's transfer to a mental hospital is "qualitatively different" from the punishment characteristically suffered by a person convicted of crime, and implicates a liberty interest protected by the Due Process Clause. *Sandin v. Conner,* 515 U.S. at 479 n. 4, 484 (citing *Vitek v. Jones,* 445 U.S. 480, 493–94 (1980)). However, this court does not equate plaintiff's relatively brief period of observation and treatment in the Great Meadow satellite unit with a transfer to a mental hospital. *See, e.g., Cabassa v. Gummerson,* 9:01–CV–1039, 2008 WL 4416411, at \*11 (N.D.N.Y. Sept. 24, 2008) (distinguishing confinement in a prison infirmary for, *inter alia,* mental health problems, and commitment to a "mental hospital," and finding that a total confinement of 101 days in the infirmary plus 60 days in segregated housing did not implicate a liberty interest). This court concludes that temporary confinement of an inmate with clear mental health problems for a total of less than 30 days [18] for observation and evaluation in the psychiatric unit within a prison does not implicate a liberty interest. *See, e.g., Gay v. Turner,* 994 F.2d 425, 427 (8th Cir.1993) (five temporary transfers to the mental health unit for evaluation did not implicate Due Process Clause); *Jefferson v. Helling,* 324 Fed. Appx. 612, 613 (9th Cir.2009) (plaintiff's emergency transfer to, and short-term detention in a prison's mental health unit did not entitle inmate to a prior hearing); *Anderson v. Banks,* 06–CV–0625 (GLS/ DRH), 2008 WL 3285917, at \*7–8 (N.D.N.Y. Aug. 7, 2008) (transfer of inmate to mental health unit for monitoring and observation for three days was justified and did not constitute an undue hardship given plaintiff's mental health history and current symptoms); *Nwaokocha v. Sadowshi,* 369 F.Supp.2d 362, 373–74 (E.D.N.Y.2005) (finding that, where a prisoner is mentally ill and displaying "significant warning signs" of an altered mental state, "time of segregation on a justified

suicide watch" falls within the purview of discretionary confinement decisions made by the corrections department and normally expected by a prisoner, implicating no liberty interest). The conclusion that due process protection would not apply to plaintiff's temporary confinements in the OMH satellite unit is reinforced by the observation of the court in *Nwaokocha,* which was echoed by Judges Homer and Sharpe in *Anderson v. Banks:*

> Given the emotional and psychological challenge that prison imposes on mentally ill inmates, and the sometimes severe effects that can result-including, but not limited to, inmate suicides and harm to others-it is important that prison officials be encouraged to attend to mental health considerations rather than be penalized for having done so. *Nwaokocha,* 369 F.Supp. at 374 (citations omitted); *Anderson v. Banks,* 2008 WL 3285917, at \*2, 7 n. 7.

**B. Eighth Amendment**

**1. Conditions of Confinement**

**\*12** The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). To establish an Eighth Amendment claim based on unsafe or medically inappropriate living conditions, a plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. *See Farmer,* 511 U.S. at 834.

Conditions of confinement are not cruel and unusual for Eight Amendment purposes simply because they are "restrictive and even harsh." *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985). Rather, many unpleasant aspects of prison life "are part of the penalty that criminal offenders pay for their offenses against society." *Id.* (citation omitted). Plaintiff's complaints about the conditions of confinement in the Great Meadow satellite unit were limited to his objection that he was clothed only in a hospital gown, like a "crazy" person. (AC ¶ 43). Being required to wear a hospital gown for a mental health evaluation hardly constitutes cruel and unusual conditions of confinement that would violate

plaintiff's Eighth Amendment rights. *See, e.g., Salahuddin v. Dalsheim,* 94 CIV. 8730, 1996 WL 384898, at *14 (S.D.N.Y. July 9, 1996) (an inmate who claimed that he was deprived "of his belt, shoe laces, and personal property for seven days, subjected to 24–hour observation, placed with mentally ill inmates, denied a change of 'Greens,' and otherwise subjected to the regulations governing inmates in the [Mental Health Unit]" did not establish an objectively serious deprivation).[19] *Cf. Borges v.. McGinnis,* 03–CV–6375, 2007 WL 1232227, at *4–6 (W.D.N.Y. Apr. 26, 2007) (keeping inmate, clothed only in paper gown and slippers, with a thin mattress and no blanket, in a room with an open window that reduced the temperature to approximately 50 degrees, for three days, did not meet the objective element of an Eighth Amendment violation)

## 2. Allegedly Inadequate Medical Care

Deliberate indifference to a convicted prisoner's serious medical needs constitutes cruel and unusual punishment, in violation of the Eighth Amendment, as made applicable to the states through the Fourteenth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id* .

**\*13** The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' *Bellotto v. County of Orange,* 248 Fed. Appx. 232, 236 (2d Cir.2007) (quoting *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id.* at 185. The standard for determining when a deprivation or delay in a prisoner's medical need is sufficiently serious, contemplates a condition of urgency that may result in degeneration of the patient's condition or

extreme pain. *Bellotto v. County of Orange,* 248 Fed. Appx. at 236 (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) and *Smith v. Carpenter,* 316 F.3d at 187 (actual medical consequences are highly relevant)).

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847 (1994). A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837.

In this case, plaintiff clearly disagreed with the medical judgment of the OMH psychiatrists that he required mental health observation, treatment, and medication. However, a difference of opinion between a prisoner and prison doctors regarding medical treatment does not, as a matter of law, constitute deliberate indifference. *Chance v. Armstrong,* 143 F.3d at 703. Even if the defendants had been negligent in diagnosing or treating plaintiff's mental health conditions, that would not constitute "deliberate indifference." *Farmer v. Brennan,* 511 U.S. at 835. Because plaintiff's claims amount to mere disagreement regarding treatment, or perhaps, allegations of medical malpractice, they are not actionable under Section 1983. *Ross v. Kelly,* 784 F.Supp. 35, 44–45 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (1992) (table); *Kellam v. Hunt,* 9:04–CV–1225 (LEK/GJD), 2007 WL 2764814, at *6 (N.D.N.Y. Sept. 20, 2007) (disagreements over medications, diagnostic techniques, forms of treatment, and the timing of their intervention implicate medical judgments and not the constitutional standards for medical care).[20]

## 3. Excessive Force

**\*14** The amended complaint alleges that, on September 24, 2007, defendants Cleveland, Rando, Reynolds, and DeFranco forcibly removed plaintiff from his SHU cell at Great Meadow when he admittedly refused to come out to be evaluated by defendant Battu, an OMH psychiatrist. (AC ¶ 88). Plaintiff does not claim that he was the victim of excessive force, or that he was injured, and his factual allegations are insufficient to state a cause of action under the Eighth Amendment.

The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain ." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To sustain a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

In order to satisfy the objective element of the constitutional standard for excessive force, the defendants' conduct must be " 'inconsistent with the contemporary standards of decency.' " *Whitley v. Albers,* 475 U.S. 312, 327 (1986) (citation omitted); *Hudson,* 503 U.S. at 9. "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7).

Plaintiff's allegation that the defendants knocked him down, grabbed him, and placed him in handcuffs in order to remove him from his cell (AC ¶ 88) are not sufficient to satisfy the objective prong of the Eighth Amendment analysis. *See, e.g., Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997) (allegations that an inmate was "bumped, grabbed, elbowed, and pushed ..." by correction officers are "not sufficiently serious or harmful to reach constitutional dimensions ..."). Moreover, the amended complaint do not provide any factual support for a claim that the defendant correction officers did not make a good faith effort to maintain and restore discipline in the face of plaintiff's refusal to obey direct orders. When an inmate refuses to comply with an order to exit his cell, reasonable force may be used to enforce the directive. *See, e.g., Harris v. Ashlaw,* 9:07–CV–0358 (LEK/DEP), 2007 WL 4324106, at *7 (N.D.N.Y. Dec. 5, 2007) (citing *Brown v. Busch,* 954 F.Supp. 588, 594–97 (W.D.N.Y.1997) (prison officials did not use excessive force against inmate who had refused to comply with a direct order, where officials forced inmate back into his cell by allegedly pushing, shoving, and striking him)); *James v. Coughlin,* 13 F.Supp.2d 403, 408–10 (W.D.N.Y.1998) (alleged conduct of corrections officer in pushing inmate back into his cell when inmate refused to comply with order to remain silent and became loud, boisterous, and disorderly did not involve a violation of eighth amendment).

## VI. Involuntary Confinement and Medication at CNYPC

**\*15** Plaintiff alleges that he was involuntarily confined and treated at CNYPC between October 1, 2007 and February 13, 2008 (AC ¶¶ 107, 148), in violation of various rights under the U.S. Constitution and N.Y. Correc. Law § 402. [21] Although it is not entirely clear from the amended complaint, it appears the intended defendants for this claim are defendants Rock and Carpenter, the Superintendent and Acting Superintendent of Great Meadow; defendants Roberts, Rahman, Battu, and Gonzalez—on the OMH mental health staff at Great Meadow; and defendants Sawyer and Kartan of CNYPC. [22] Plaintiff alleged that he experienced a significant change in his living conditions and was housed together with mentally ill prisoners, which placed his life in danger. (AC ¶¶ 108–109). The amended complaint does not provide any further factual allegations regarding how plaintiff's life was placed in danger at CNYPC.

N.Y. Correc. Law § 402(9) authorizes the admission of an inmate to a mental hospital on an emergency basis, pending the filing of a commitment petition, upon the certification of two physicians that the inmate suffers from a mental illness which is likely to result in serious harm to himself or others. Such certifications were made by defendant Rahman on October 1, 2007 (AC, Ex. H, Dkt. No. 110–2 at 19–20) and defendant Battu on September 28, 2007 (AC, Ex. I, Dkt. No. 110–2 at 22). On October 1, 2007, defendant Carpenter, as Acting Superintendent of Great Meadow, applied to the New York Supreme Court, Oneida County to cause an examination of the plaintiff by two physicians. (AC, Ex. G, Dkt. No. 110–2 at 17). By order dated October 4, 2007 (AC, Ex. F, Dkt. No. 110–2 at 15), Supreme Court Justice Robert F. Julian designated two psychiatrists, Drs. Sangani and Kamath to examine the plaintiff. On October 14, 2007, Drs. Sangani and Kamath signed a certificate, stating that the plaintiff was mentally ill and in need of care and treatment. (AC, Ex. L, Dkt. No. 110–2 at 28).

On October 15, 2007, defendants Sawyer and Carpenter filed a notice and petition, pursuant to N.Y. Correc. Law § 402(3), seeking an order committing the plaintiff to CNYPC. (AC, Exs. J & K, Dkt. No. 110–2 at 24, 26). Plaintiff received the notice on October 24th (AC ¶ 129), and a lawyer from Mental Hygiene Legal Services was appointed to represent him in connection with the court hearing. (AC ¶ 134). At the hearing on the application to commit him, plaintiff made statements and submitted documents (AC ¶ 137), and defendant Kartan testified in support of the application (AC ¶ 138). Following the hearing, on October 24, 2007, Justice Anthony F. Shaheen committed plaintiff to the custody of CNYPC for a period not to exceed six months. (AC ¶ 139; Ex. M, Dkt. No. 110–2 at 30).

On October 16, 2007, defendant Kartan notified plaintiff that he intended to seek court authorization to medicate plaintiff over his objections. (AC ¶ 140; Ex. N, Dkt. No. 110–2 at 32). On November 27th, plaintiff was provided with a notice and a copy of a petition dated November 13th, advising him of a court hearing at which CNYPC would seek permission to involuntarily medicate plaintiff. (AC ¶ 141; Exs. O & P, Dkt. No. 110–2 at 34–35, 37–39; Lombardo Dec., Ex. 8 (sealed), Dkt. No. 120–2). Plaintiff was provided with legal representation from Mental Hygiene Legal Services in connection with the hearing, on December 6th, to determine whether he would be involuntarily medicated. (AC ¶¶ 142–43). Following the hearing, Supreme Court Justice John W. Grow entered an order finding that plaintiff lacked the capacity to make a reasoned decision regarding his own treatment and authorizing CNYPC to administer medication to him, over his objection. (AC, Ex. Q, Dkt. No. 110–2 at 41–42).

**\*16** Plaintiff alleges that the various mental health professionals, who attested to his mental illness and his need for treatment and medication, provided false diagnoses, as part of a conspiracy with other defendants. (AC ¶¶ 126, 130, 133,138, 144). Plaintiff originally named Drs. Sangani and Kamath as defendants, but requested that they be dismissed from the action, with prejudice. (Dkt.Nos.103, 104). By order dated June 20, 2008, Senior District Judge Lawrence E. Kahn held that any testimony provided by defendant Kartan in state court proceedings supporting the commitment and involuntary medication of plaintiff would be absolutely privileged under New York state law, and could not support a claim under section 1983. (Dkt. No. 4 at 4–5).

While it is not entirely clear which constitutional rights plaintiff alleges were violated by his involuntary commitment and treatment to CNYPC, this court will consider possible claims under the Due Process Clause and the Eighth Amendment. The court concludes that, although plaintiff was entitled to due process protection in connection with his commitment to CNYPC and involuntary medication, he received more-than-adequate process under New York state procedures. Even if the applicable state procedures were not followed to the letter, this would not support a federal constitutional due process claim. This court further finds that the conditions of plaintiff's confinement at CNYPC and his treatment and medication did not violate his Eighth Amendment rights. Accordingly, the court concludes that plaintiff's claims relating to his commitment and treatment at CNYPC do not state viable causes of action under section 1983 and should be dismissed.

### A. Due Process and N.Y. Correction Law § 402

A prisoner's transfer to a mental hospital, and the corresponding loss of liberty and "stigmatizing consequences," trigger Due Process protection. *Vitek v. Jones,* 445 U.S. at 491–92, 493–94. "When a person's liberty interests are implicated, due process requires at a minimum notice and an opportunity to be heard." *Mental Hygiene Legal Service v. Spitzer,* 07 Civ. 2935, 2007 WL 4115936, at \*5 (S.D.N.Y. Nov. 16, 2006) (citing *Hamdi v. Rumsfeld,* 542 U.S. 507, 533 (2004) (plurality opinion). The Supreme Court has approved the use of involuntary confinement where where there has been a determination that the person in question currently suffers from a "mental abnormality" and is likely to pose a future danger to the public. *Abdul–Matiyn v. Pataki,* 9:06–CV–1503 (DNH/DRH), 2008 WL 974409, at \*10 (N.D.N.Y. Apr. 8, 2008) (citing *Kansas v. Hendricks,* 521 U.S. 346, 371 (1997)). [23]

Similarly, involuntary medication with psychotropic drugs "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," thereby creating a protected liberty interest. *Sandin v. Conner,* 515 U.S. at 479 n. 4, 484 (citing *Washington v. Harper,* 494 U.S. 210, 221–222 (1980). A state may treat a prisoner with anti-psychotic drugs against his will if an administrative determination concludes he is "dangerous to himself or to others and the treatment is in the inmates' medical interest." *Washington v. Harper,* 494 U.S. at 225–227. The Second Circuit has held that "due process requires an opportunity for hearing and review of a decision to administer antipsychotic

medication—but such a hearing need not be judicial in nature." *Project Release v. Prevost,* 722 F.2d 960, 981 (2d Cir.1983)). Moreover, due process does not require a guarantee that a physician's assessments in their commitment evaluation be correct. *Rodriguez City of New York,* 72 F.3d 1051, 1062 (2d Cir.1995).

**\*17** As outlined above, the amended complaint and supporting documents establish that plaintiff was committed to CNYPC only after notice and a judicial hearing, with the assistance of counsel, pursuant to N.Y. Correc. Law § 402. The order committing plaintiff to CNYPC for care and treatment was based on the finding of at least two examining psychiatrists that, as a result of his mental illness, plaintiff posed a substantial threat of harm to himself or others. (AC, Ex. L, Dkt. No. 110–2 at 28). It is clear, from the face of the complaint and the attached exhibits, that plaintiff received adequate procedural due process in connection with his commitment to CNYPC. *McQuilkin v. CNYPC,* 2010 WL 3765847, at *20.

In connection with his involuntary medication, plaintiff again received notice, and participated in a judicial hearing, with assistance of counsel. The court, which ordered that medication be administered to plaintiff over his objection, relied on psychiatric reports that plaintiff posed a danger to himself and others (Lombardo Dec., Ex. 8 (sealed), Dkt. No. 120–2), ruled that plaintiff lacked the "capacity to make a reasoned decision concerning his own treatment," and found that "the proposed treatment is appropriate, narrowly tailored to the needs of the patient, and is in the patient's best interests ..." (AC, Ex. Q, Dkt. No. 110–2 at 41–42). Plaintiff received procedural protection under New York law that exceeded what was required by the Due Process Clause. *Sheridan v. Dubow,* 92 Civ. 6024, 1993 WL 336946, at *3 (S.D.N.Y. Sept. 3, 1993) (in New York State, a patient who refuses to consent to the administration of anti-psychotic drugs is entitled to a *de novo* judicial determination where the patient is afforded representation by counsel, exceeding the federal due process requirements of *Washington v. Harper* ) (citing *Rivers v. Katz,* 67 N.Y.2d 485, 496 (1983)).

To the extent that plaintiff argues that defendants failed to follow the procedures outlined in the Section 402 or other New York statutes, his challenge to his commitment and involuntary medication would still fail. Section 1983 imposes liability for violations of rights protected by the Constitution and laws of the United States, and not for violations arising solely out of state or common law

principles. *See, e.g., Pollnow v. Glennon,* 757 F.2d 496, 501 (2d Cir.1985); *Cusamano v. Sobek,* 604 F.Supp.2d 416, 482 (N.D .N.Y.2009) ("A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983.") (collecting cases). For this reason, even if defendants had failed to follow the letter of the New York provisions with regard to his confinement and treatment, that failure would not provide the basis a cognizable section 1983 claim. *McQuilkin v. CNYPC,* 2010 WL 3765847, at *20 n. 20.

Plaintiff argues that the state judges and the defendants responsible for his commitment to CNYPC and involuntary medication were wrong and/or malicious; he claims he was not mentally ill and did not require mental health treatment and medication. Defendants argue, persuasively, that plaintiff is precluded from a factual challenge to the basis for his commitment and involuntary medication, determined in a prior state court proceedings, in which he had a full and fair opportunity to try to establish that he was not mentally ill or in need of treatment. (Defs.' Memo. of Law at 21) (citing *Kulak v. City of New York,* 88 F.3d 63, 71–72 (2d Cir.1996) (issue preclusion bars Section 1983 claim based upon involuntary commitment where state court, in a habeas proceeding, had previously held that plaintiffs confinement to mental hospital was lawful.) [24] *See also Harvey v. Sawyer,* 09–CV–598 (FJS/DRH), 2010 WL 3323665, at *4–5 (N.D.N.Y. July 22, 2010) (Report–Recommendation) (plaintiff was collaterally estopped from pursuing Eighth Amendment or Due Process claims relating to his confinement and involuntary medication at CNYPC because he had a full and fair opportunity to participate in prior court hearings which resulted in the confinement and involuntary medication, and which determined, *inter alia,* that he was mentally ill, in need of treatment for his own health and safety, and incompetent to make decisions about his own care), adopted, 2010 WL 3323669 (N.D.N.Y. Aug. 20, 2010).

**\*18** Magistrate Judge Peebles and District Judge McAvoy, in this district, have held the *Rooker–Feldman* doctrine [25] precludes an inmate plaintiff from basing a 1983 action on injuries allegedly resulting from confinement in a mental hospital and involuntary medication that resulted from prior state court rulings. *McQuilkin v. CNYPC,* 2010 WL 3765847, at *18–19 (Report–Recommendation) adopted, 2010 WL 3765715. In any event, plaintiff received adequate due process under federal constitutional standards in connection with his commitment and involuntary medication, and his claims that he was not mentally ill or in need of treatment are clearly the result of delusions. For all of these reasons,

plaintiff's challenge to his commitment and treatment, based on the Due Process Clause and N.Y. Correc. Law § 402, are frivolous, fail to state a claim, and should be dismissed.

**B. Eighth Amendment**

Based on the authority cited in Sections V.B. 1. and 2., any Eighth Amendment challenge to plaintiff's confinement and treatment at CNYPC should be dismissed. Plaintiff's only complaint about the conditions of confinement at CNYPC was that he was confined with mentally ill prisoners, which, he claims, without any supporting factual allegations, endangered him. Plaintiff fails to state a plausible claim that the conditions at CNYPC subjected him to a substantial risk of serious harm. With respect to his medical treatment, plaintiff relies solely on his disagreement with the medical judgment of the mental health professionals about his diagnosis and treatment. Such disagreement, or even a claim that the defendants committed medical malpractice, would not support a constitutional claim based on inadequate care. *McQuilkin v. CNYPC,* 2010 WL 3765847, at *17.

**VII. Qualified Immunity**

The defendants have asserted that they are entitled to qualified immunity in connection with plaintiff's claims. In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201(2001), modified by *Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 818 (2009) (holding

that, "while the sequence set forth [in Saucier] is often appropriate, it should no longer be regarded as mandatory in all cases"). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier,* 533 U.S. at 201. This court need not address qualified immunity with respect to plaintiff's various causes of action because, as discussed above, he has not established any alleged violations of his constitutional rights. [26]

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion to dismiss (Dkt. No. 120) be **GRANTED,** and that plaintiff's amended complaint be **DISMISSED IN ITS ENTIRETY.**

**\*19** Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 768990

Footnotes

1    On June 16, 2008, plaintiff commenced this civil rights action by filing a complaint (Dkt. No. 1) against 29 defendants. By order dated June 20, 2008 (Dkt. No. 4), Judge Kahn dismissed six of those defendants. On April 24, 2009, the New York State Attorney General's Office filed a motion to dismiss the complaint on behalf of 20 of the remaining defendants. (Dkt. No. 76). By order dated August 28, 2009, Judge Kahn granted plaintiffs request to dismiss this action with prejudice as against two of the remaining defendants (not represented by the Attorney General). (Dkt. No. 104). On January 22, 2010, plaintiff filed a motion for leave to file an amended complaint. (Dkt. No. 106). By order dated March 31, 2010, Judge Kahn granted plaintiff's motion to amend and denied the pending motion to dismiss the original complaint as moot. (Dkt. No. 109). The current motion to dismiss was filed by the Attorney General's Office on June 23, 2010, on behalf of all 14 defendants named in the amended complaint. On July 9, 2010, plaintiff filed a letter requesting permission to again amend his complaint, rather than respond to the defendant's motion to dismiss. (Dkt. No. 122). By text order dated July 12, 2010, this court denied plaintiff's motion to amend his complaint again, and provided him with an extension of time to file his opposition to the motion to dismiss.

2    Plaintiff was also briefly confined at Downstate Correctional Facility ("Downstate"), although his stay there does not figure into his various claims.

3    Judge Hood's decision is reported as *Gonzales v. Wright,* 9:06–CV–1424 (JMH), 2010 WL 681323, at *1–2 (N.D.N.Y. Feb. 23, 2010).

4   Sealed Ex. 8 to defense attorney Lombardo's declaration (Dkt. No. 120–2) describes, in more detail, some of the behaviors of plaintiff at Upstate which caused the defendant psychiatrists to conclude that plaintiff was suffering from serious mental illness and required treatment. At least one of plaintiff's prior civil rights complaints alleged that DOCS employees at Upstate subjected him to "infections harmful chemical substances" by placing the substances in the ventilation system and burned him with laser beams shot through the lights in his cell. (9:06–CV–1424, Dkt. No. 95 at 2–3 & n. 3, 2010 WL 681323, at *1).

5   Plaintiff was discharged from the Great Meadow OMH satellite unit and returned to the Upstate SHU on August 1, 2007. On August 24, 2007, plaintiff was transferred to Downstate Correctional Facility, and then sent back to the SHU at Great Meadow on August 30, 2007. On September 24, 2007, plaintiff was returned to the satellite unit at Great Meadow.

6   The defendants also advance arguments that particular defendants were not personally involved in alleged constitutional violations and, hence, cannot be liable for damages. As discussed briefly below, to the limited extent it is necessary to address the personal involvement arguments, they further support dismissal of plaintiff's amended complaint. Defendants also assert that they should be protected by qualified immunity, which the court will address briefly at the end of this report-recommendation.

7   In support of the motion to dismiss, the defense attorney filed a supporting declaration, which included a limited number of supporting documents, one of which was filed under seal (Ex. 8). (Dkt. No. 120–2). All of the documents submitted by the defendants, with the exception of Ex. 8, were also attached to plaintiff's affidavit in opposition to the defense motion. Ex. 8 includes the papers supporting the petition to allow CNYPC to administer medication to plaintiff over his objection. Plaintiff attached the petition to his amended complaint (Ex. P, Dkt. No. 110–2 at 37–39), but not the supporting papers referenced in the petition. (Lombardo Decl. ¶¶ 9–11).

8   Plaintiff was granted IFP status in the instant case. (Dkt. No. 4).

9   It is well-established that convicted prisoners have no right to choose the prison in which they are housed. *Montanye v. Haymes,* 427 U.S. 236, 243 (1976). Prison authorities are entrusted with unfettered discretion to transfer prisoners from one institution to another. *Pugliese v. Nelson,* 617 F.2d 916, 922–23 (2d Cir.1980).

10  Even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the same action even in the absence of the protected conduct. *Id.* (citing, inter alia, *Mount Healthy Sch. Dist. v. Doyle,* 429 U.S. 274, 287 (1977)).

11  One of those cases dated back to 2001 (AC ¶ 20; Dkt. No. 9:01–CV–1811, Dkt. No. 47) and one was a suit against federal agents (AC ¶ 26; 9:07–CV–458, Dkt. No. 1).

12  *See, e.g., McQuilkin v. Central New York Psychiatric Center,* 9:08–CV–975 (TJM/DEP), 2010 WL 3765847, at *15 (N.D.N.Y. Aug. 27, 2010) (Report–Recommendation) (plaintiff's claim that he was transferred to CNYPC in retaliation for serving a notice of summons on the prison superintendent fails because the record reflects that the transfer decision was made by OHM care providers following an evaluation of plaintiff's mental status), adopted, 2010 WL 3765715 (N.D.N.Y. Sept. 20, 2010).

13  Perhaps to bolster the conclusory claims of retaliation in his amended complaint, plaintiff makes additional allegations with respect to defendant Kourofsky in his papers opposing defendants' motion. Plaintiff claims that Sgt. Kourofsky "ordered" at least two searches of plaintiff's cell in the Fall of 2006, during which officers damaged the legal papers relating to plaintiff's appeal. (Pltf.'s Aff. ¶¶ 21, 25, Dkt. No. 129–2). The supporting documents that plaintiff provides concerning these cell searches, do not mention Sgt. Kourofsky, nor do they reference any legal papers. (Ex. G, Dkt. No. 129–3 at 22; Ex. J, Dkt. No. 129–3 at 29). Moreover, in a prior complaint in which plaintiff alleges a retaliatory cell search at Upstate, during the same time period, that damaged the papers relating to plaintiff's criminal appeal, plaintiff does not implicate Sgt. Kourofsky. (9:06–CV–1424, Dkt. No. 1 ¶¶ 126, 134–42; Dkt. No. 95 at 3–4, 27–28, 2010 WL 681323, at *1, 13). In any event, even if plausible, these allegations are not part of the amended complaint in this case and do not provide any support for an inference that Sgt. Kourofsky caused plaintiff's transfer for a psychiatric evaluation in July 2007.

14  *See, e.g., Green v. Bauvi,* 792 F.Supp. 928, 941–942 (S.D.N.Y.1992) (inmate may recover damages for unconstitutional conditions of confinement only from persons who created or were responsible for those conditions).

15  *Smith v. Woods,* 9:05–CV–1439 (LEK/DEP), 2008 WL 788573 at *9 (N.D.N.Y. March 20, 2008) (social worker and psychologist in prison had no authority to override the decision of the treating psychiatrist regarding appropriate treatment of an inmate/patient and could not be liable for the doctor's medical decisions). *See also Cuoco v. Moritsugu,* 222 F.3d 99, 111 (2d Cir.2000) (the failure of non-doctors at a prison to intercede in the medical treatment of an inmate is not unreasonable, because they lack the authority to intervene in medical decisions).

16  *See, e.g., Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (personal involvement is a prerequisite to the assessment of damages in a section 1983 case); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

17    In his affidavit in opposition to plaintiff's motion, plaintiff alleges that, on August 4, 2007, defendant Kourofsky ordered a search of his cell, during which two officers "did spread some liquid and stain a lot of pages of several copies of the briefs of his appeal." (Pltf.'s Aff. ¶ 52). These allegations were not made in the amended complaint, and plaintiff does not allege, even in his later affidavit, that the alleged cell search was the cause of his failure to submit his appeal by the August 20th deadline.

18    In the absence of a detailed factual record, cases in this circuit typically affirm dismissal of due process claims in cases where the period of time spent in segregated housing was short—e.g., 30 days—and there was no indication that the plaintiff endured unusual conditions. *Palmer v. Richards,* 364 F.3d 60, 65–66 (2d Cir.2004). (collecting cases). While this authority is not dispositive in the context of confinement in a prison mental health unit, it supports the conclusion that plaintiff's confinement was, in the absence of any allegations of unusual conditions of confinement, sufficiently short to avoid due process scrutiny.

19    Unlike the plaintiff in this case, Salahuddin did not have a mental health designation which would have supported his confinement in the mental health unit. *Salahuddin,* 1996 WL 384898, at *3.

20    It should be noted that, even if plaintiff's treatment in the satellite unit constituted a constitutional violation, only the psychiatrists, who determined the duration of his confinement and the course of his treatment, would be personally involved and liable under Section 1983. See notes 12 & 14–16 above. *See also Brock v.. Wright,* 315 F.3d 158, 164 (2d Cir.2003) (prison superintendent with no medical training who deferred completely to a prison doctor in ruling on a grievance regarding medical care, while perhaps negligent, was not "deliberately indifferent"); *Greenwaldt v. Coughlin,* No. 93 Civ. 6551(LAP), 1995 WL 232736, at *4 (S.D.N.Y. Apr. 19, 1995) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."). Accordingly, defendants Kourofsky, Rock, Carpenter, Baisley, Cleveland, Rando, Reynolds, DeFranco, and Roberts would be entitled to dismissal on plaintiff's claims regarding his confinement and treatment in the satellite unit even his constitutional rights had been violated.

21    Under Section 402, the superintendent of a correctional facility, upon receiving a report from a physician that an inmate is, in his or her opinion, mentally ill, must apply to the court for designation of two examining physicians. The two physicians, after conducting a personal examination, may certify that the inmate is mentally ill and in need of care and treatment, if deemed appropriate. N.Y. Correc. Law § 402. In the event that certification is made by the two examining physicians, the superintendent must then apply to an appropriate state court judge for an order of commitment, with notice to the affected inmate, as well as any known relative. N.Y. Correc. Law § 402(3). The inmate thereafter may request a hearing, and the court additionally may request one of its own initiative. N.Y. Correc. Law § 402(5). In the event the court determines that the person is mentally ill and in need of care and treatment, the court may order him or her committed for a period not to exceed six months so that the inmate may be transferred into an OMH facility. *Id.*

22    Defendants argue that certain of the defendants would not be liable under Section 1983, even if plaintiff's constitutional rights were violated in connection with his commitment to, and treatment at CNYPC, because they were not personally involved in those actions. (Defs.' Memo. of Law at 21). In the context of a motion to dismiss, at least defendant Rock would be entitled to dismissal on this basis, under the authority cited in notes 12 and 15, above.

23    The discussion of the applicable due process standards draws heavily on Magistrate Judge Peeble's analysis in *McQuilkin v. CNYPC,* 2010 WL 3765847, at *19–20.

24    Under the Full Faith and Credit Statute, 28 U.S.C. § 1738, the federal court must afford a prior state court judgment the same preclusive effect that the judgment would be given in the courts of the state in which it was decided. *Giakoumelos v. Coughlin,* 88 F.3d 56, 59 (2d Cir.1996) (citing *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 466 (1982)). Pursuant to New York law, the doctrine of collateral estoppel applies when a litigant in a prior proceeding asserts an issue of fact or law in a subsequent proceeding and the issue has been necessarily decided in the prior action, is decisive of the present action, and the litigant had a full and fair opportunity in the prior action to contest the decision. *Id.* (citing *Schwartz v. Public Administrator,* 24 N.Y.2d 65, 71 (1969))

25    "Where a federal suit follows a state suit, the former may be prohibited by the so-called Rooker–Feldman doctrine in certain circumstances." *Hoblock v. Albany County Board of Elections,* 422 F.3d 77, 83 (2d Cir.2005). A federal district court "has no authority to review final judgments of state court judicial proceedings." *District of Columbia v. Feldman,* 460 U.S. 462, 482 (1983). "To do so would be an exercise of appellate jurisdiction ..." which only the Supreme Court possesses over state court judgments. *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 416 (1923). In order for the Rooker–Feldman doctrine to apply, plaintiff must have lost in the state court; he must complain of injuries caused by the state court judgment; he must invite the federal court to review and reverse the judgment; and the state court judgment must

have been rendered prior to the filing of the federal district court proceeding. *Hoblock v. Albany County Bd. of Elections,* 422 F.3d at 85.

26     In general, "the defense of qualified immunity cannot support the grant of a ... 12(b)(6) motion for failure to state a claim upon which relief can be granted." *Green v. Maraio,* 722 F.2d 1013, 1018 (2d Cir.1983). This is so because qualified immunity is an affirmative defense that must be pleaded by the official claiming it. *Stachell v. Dilworth,* 745 F.2d 781, 784 (2d Cir.1984) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 815 (1982). Dismissal for failure to state a claim is thus generally appropriate only where the complaint itself sets up on its face the qualified immunity defense. *See, e.g., Green v. Maraio,* 722 F.2d at 1019. There may well be some defendants who would be entitled to qualified immunity based solely on the allegations in the complaint and supporting documents—*e.g.* the defendants without medical qualifications who deferred to the decisions of treating physicians with respect to plaintiff's mental health treatment. See, e.g., *Cuoco v. Moritsugu,* 222 F.3d 99, 111 (2d Cir.2000) (non-doctors, whose failure to intercede in the medical treatment of an inmate was, even if wrongful, not objectively unreasonable, were entitled to summary judgment on qualified immunity grounds).

---

**End of Document**            © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 651919
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kenneth Carl GROVES, Sr., Plaintiff,

v.

Brett DAVIS, Secure Care Treatment Aid; David
W. Sill, Secure Care Treatment Aid; Thomas
Nicolette, RN, Ward Nurse; Charmaine Bill,
Treatment Team Leader; Jill E. Carver, Social
Worker, Primary Therapist; Edwin Debroize,
Psychologist Assist; Jeff Nowicki, Chief of Mental
Health Treatment Serv.; Terri Maxymillian,
Ph.D., Dir. of Mental Health Serv.; Sgt. Sweet,
Security Services, CNYPC; Michael Hogan,
Comm'r, Dep't of Mental Health, Defendants.

No. 9:11–CV–1317 (GTS/RFT).
|
Feb. 28, 2012.

**Attorneys and Law Firms**

Kenneth Carl Groves, Sr., Marcy, NY, pro se.

*MEMORANDUM DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil rights
action filed by Kenneth Carl Groves, Sr. ("Plaintiff"), against
numerous employees of New York State or the Central
New York Psychiatric Center ("Defendants"), are Plaintiff's
motion to proceed *in forma pauperis*, his motion for a
temporary restraining order and preliminary injunction, and
his motion for appointment of counsel. (Dkt.Nos.2, 3, 4.) [1]
For the reasons set forth below, Plaintiff's motion to proceed
*in forma pauperis* is granted; his motion for a preliminary
injunction is denied; his motion for appointment of counsel is
denied; Plaintiff's claims of deliberate indifference to his
mental health needs against Defendants Bill, Carver, and
DeBroize are *sua sponte* dismissed with prejudice; Plaintiff's
claims against Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, and Hogan arising from their alleged personal
involvement in the August 8, 2011 assault are *sua sponte*
dismissed without prejudice and with leave to amend in this

action in accordance with Fed.R.Civ.P. 15; Sgt. Sweet is *sua
sponte* dismissed without prejudice as a Defendant in this
action; the Clerk is directed to issue summonses, and the U.S.
Marshal is directed to effect service of process on Defendants
Davis, Sill, and Nicolette.

**I. RELEVANT BACKGROUND**
On November 7, 2011, Plaintiff commenced this action
*pro se* by filing a civil rights Complaint, together with a
motion to proceed *in forma pauperis*. (Dkt. Nos.1, 2.) [2]
Liberally construed, Plaintiff's Complaint alleges that the
following constitutional violations against him occurred
during his confinement at Central New York Psychiatric
Center ("CNYPC"): (1) Defendants Davis and Sill used
excessive force against him under the Eighth and/or
Fourteenth Amendments; (2) Defendant Nicolette knew of
and failed to take action to protect Plaintiff from the
assault under the Eighth and/or Fourteenth Amendments;
(3) Defendants Bill, Carver, and DeBroize were deliberately
indifferent to his mental health needs under the Eighth and/
or Fourteenth Amendments; and (4) Defendants Bill, Carver,
DeBroize, Nowicki, Maxymillian, Bosco, and Hogan failed to
"adequately train the staff under their supervision" and to take
appropriate action in response to the incident. (*See generally*
Dkt. No. 1.) For a more detailed description of Plaintiff's
claims, and the factual allegations giving rise to those claims,
the reader is referred to Part III.B of this Decision and Order.

**II. MOTION TO PROCEED *IN FORMA PAUPERIS***
Because Plaintiff sets forth sufficient economic need, the
Court finds that Plaintiff may properly commence this action
*in forma pauperis*. (Dkt. No. 2.)

**III. *SUA SPONTE* REVIEW OF PLAINTIFF'S
COMPLAINT**
In light of the foregoing, the Court must now review the
sufficiency of the allegations that Plaintiff has set forth in
his Complaint in light of 28 U.S.C. § 1915(e)(2)(B). This is
because Section 1915(e)(2)(B) directs that, when a plaintiff
seeks to proceed *in forma pauperis*, "(2) ... the court shall
dismiss the case at any time if the court determines that—...
(B) the action ... (i) is frivolous or malicious; (ii) fails to state a
claim on which relief may be granted; or (iii) seeks monetary
relief against a defendant who is immune from such relief."
28 U.S.C. § 1915(e)(2)(B). [3]

## A. Governing Legal Standard

**\*2** It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n .17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp .2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft*

*v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id .* at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

**\*3** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief." *Id.* at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12. [4] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [5] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28 [citations omitted]. [6]

**B. Analysis of Plaintiff's Complaint**

The Court prefaces its analysis of Plaintiff's Complaint by noting that, although Plaintiff is a civilly committed sex offender and no longer a prisoner, the Court will look to cases addressing prisoner's rights in analyzing Plaintiff's claims, because "confinement of civilly committed patients is similar to that of prisoners." *Holly v. Anderson,* 04–CV–1489, 2008 WL 1773093, at *7 (D.Minn. Apr.15, 2008); *see also Morgan v. Rabun,* 128 F.3d 694, 697 (8th Cir.1997) ("The governmental interests in running a state mental hospital are similar in material aspects to that of running a prison."). Thus, whereas claims of excessive force by convicted criminals are analyzed under the Eighth Amendment to the United States Constitution, because Plaintiff is a civilly committed sex offender and no longer a prisoner, his substantive rights to be free from unsafe conditions of confinement arise under the Due Process Clause of the Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Court stated "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional [under the Due Process Clause] to confine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Youngberg,* 457 U.S. at 315–16. As have numerous other courts which have considered the issue, this Court has found that "the standard for analyzing a civil detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard." *Groves v. Patterson,* 09–CV–1002,

Memorandum–Decision and Order at *15–16 (N.D.N.Y. filed Nov. 18, 2009). [7]

**1. Excessive Force Claims Against Defendants Davis, Still and Nicolette**

**\*4** Plaintiff alleges that on August 8, 2011, Defendant Davis entered Plaintiff's dorm room at CNYPC and "viciously attacked and brutally assaulted and battered" him. (Dkt. No. 1 at 4.) During the course of this assault, Defendant Sill is alleged to have entered Plaintiff's room and "jump[ed] on the plaintiff's legs holding and pinning them as Defendant Davis [continued to beat Plaintiff]." (*Id.*) As alleged in the Complaint, although Defendant Nicolette knew in advance that this assault was planned, he "remained in the Nurses Station" and "did nothing to interceed [sic] or stop the brutal attack on the plaintiff." (*Id.* at 5.)

To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must allege the following: (1) subjectively, that the defendants acted wantonly and in bad faith; and (2) objectively, that the defendants' actions violated "contemporary standards of decency." *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotation marks omitted) (citing *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Here, construing the factual allegations of Plaintiff's Complaint with special leniency, the Court finds that Plaintiff appears to have alleged facts plausibly suggesting that he was subjected to excessive force by Defendants Davis and Sill. In addition, by alleging that Defendants Davis, Sill and Nicolette discussed the assault in advance of it occurring, and that Nicolette was in the vicinity of Plaintiff's room and had an opportunity to intervene to prevent it, the Complaint sufficiently alleges that Defendant Nicolette was personally involved and/or failed to protect Plaintiff from the assault. *See Bhuiyan v. Wright,* 06–CV–0409, 2009 WL 3123484, at *7 (N.D.N.Y. Sept.29, 2009) (Scullin, J.) ("The fact that defendant Davis was not in the room, but was acting as a 'lookout' so that no one came into the room while plaintiff was being beaten, would not absolve him from liability for the assault. An officer's failure to intervene during another officer's use of excessive force can itself constitute an Eighth Amendment violation unless the assault is "sudden and brief," and the defendant had no real opportunity to prevent it."); *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003) (holding that an officer may be personally involved in the use of excessive force if he either directly participates in the

assault or if he was present during the assault, yet failed to intervene on behalf of the victim, even though the officer had a reasonable opportunity to do so).

As a result, a response to these claims is required from Defendants David, Sill, and Nicolette. In so ruling, the Court expresses no opinion as to whether Plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

### 2. Deliberate Indifference Claims Against Defendants Bill, Carver and DeBroize

Plaintiff alleges that on August 9, 2011, the day after the alleged assault, he attempted to "discuss the incident and what transpired" with Defendants Bill and Carver. (Dkt. No. 1 at 5.) Plaintiff alleges that Defendant Bill told him, "I don't want to discuss this Mr. Groves, we're too busy for your foolishness and the matter is being investigated." (*Id.*) Plaintiff's effort to explain that he was frightened by the incident was rebuffed by Defendant Bill, who told Plaintiff to "grow up." (*Id.* at 5–6.) The following day, Plaintiff attempted to discuss the incident with Defendant Carver, his primary therapist, again without success. A further attempt at discussion later that day was met with Defendant Carver "stating to the plaintiff in a snotty tone 'grow the hell up!' " (*Id.* at 6.) On August 10, 2011, Plaintiff attempted to discuss the incident "and his current fears and feelings," during his Monday afternoon "Process Group," which is facilitated by Defendant DeBroize. As alleged, Defendant DeBroize told Plaintiff and the other group members that the matter was under investigation "so no one could discuss the incident with anyone." (*Id.* at 6.)

**\*5** To state a claim of deliberate indifference to a serious medical and/or mental health need under the Eighth Amendment, a plaintiff must first allege facts plausibly suggesting that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06). The "deliberate indifference standard embodies both an objective and a subjective prong," both of which the plaintiff must establish. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "First, the alleged deprivation must be, in objective terms, 'sufficiently

serious.' " *Id.* (citations omitted). Second, the defendant "must act with a sufficiently culpable state of mind." *Id.*

With regard to the first element, generally, to be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway,* 37 F.3d at 66; *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).). [8] Under the subjective component, a plaintiff must also allege facts plausibly suggesting that the defendant acted with "a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66. The requisite culpable mental state is similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A physician's negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a Section 1983 action. *Estelle,* 429 U.S. at 105–06; *Chance,* 143 F.3d at 703. [9]

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting that Defendants Bill, Carver, and DeBroize acted with deliberate indifference to Plaintiff's serious mental health condition when they declined to discuss the incident of August 8, 2011. There is nothing in the Complaint that even remotely suggests that the requested conversations were integral to Plaintiff's treatment as a convicted sex offender involuntarily committed to CNYPC, or that Defendants' refusal to discuss the incident with Plaintiff when he requested to do so caused Plaintiff to suffer any harm or worsening of his condition. In addition, Plaintiff does not allege that any of these Defendants acted with the requisite culpable state of mind.

Moreover, the statements made by Defendants Bill and Carver that he should "grow up," even if construed as verbal harassment, do not give rise to a cognizable claim that may be pursued under Section 1983. Allegations of verbal harassment are insufficient to support a Section 1983 claim. *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001); *see also Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) ("[A]llegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged .").

**\*6** For these reasons, Plaintiff's deliberate indifference claims against Defendants Bill, Carver, and DeBroize are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and

Fed.R.Civ.P. 12(b)(6). Moreover, because the Court cannot imagine how Plaintiff might correct this claim through better pleading, he is not granted leave to attempt to do so in an amended pleading. [10] Rather, this claim is hereby dismissed with prejudice.

### 3. Failure to Supervise Claims Against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan

To prevail on a claim under 42 U.S.C. § 1983, a defendant must be personally involved in the plaintiff's constitutional deprivation. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Generally, for purposes of 42 U.S.C. § 1983, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. [11]

Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. *McKinnon,* 568 F.2d at 934. Rather, a plaintiff must demonstrate " 'a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* 04–CV–7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar.31, 2008) (quoting *Bass v. Jackson,* 790 F.2d 260, 263 [2d Cir.1986] ) (other citation omitted). An official's failure to respond to grievance letters from inmates, however, "does not establish supervisory liability." *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997). [12] Moreover, "the law is clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *Pine v. Seally,* 9–CV–1198, 2011 WL 856426, at *9 (N.D.N.Y. Feb.4, 2011). [13]

In his Complaint, Plaintiff alleges in wholly conclusory terms that Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan failed to "adequately train the staff under their supervision and fail[ed] to act within the scope and training of the position and job title they hold." (Dkt. No. 1 at 8.) Plaintiff alleges that he submitted a letter of complaint to Defendant Hogan and wrote to Defendant Nowicki on several occasions expressing concern his complaint had not been responded to, only to be advised that in September, 2011 that an investigation was ongoing. (*Id.* at 6–7.) Plaintiff does

not allege that any of these Defendants personally participated in the alleged assault on August 8, 2011.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting any personal involvement in these Defendants in the alleged used of excessive force on August 8, 2011. As a result, Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from this incident are *sua sponte* dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). This dismissal is without prejudice to Plaintiff's right to file an Amended Complaint that corrects the above-described pleading defects, and states a viable claim against these Defendants. The Court notes that, at this early stage of the case, Plaintiff has the right—without leave of the Court—to file an Amended Complaint within the time limits established by Fed.R.Civ.P. 15(a)(1)(B). However, if he seeks to file an Amended Complaint after those time limits, he must file a motion for leave to file an Amended Complaint in accordance with Fed.R.Civ.P. 15(a)(2). In either event, Plaintiff is advised that *any Amended Complaint must be a complete pleading that will replace and supersede the original Complaint in its entirety, and that may not incorporate by reference any portion of the original Complaint. See* N.D.N.Y. L.R. 7.1(a) (4).

**\*7** Finally, although Plaintiff names Sgt. Sweet as a Defendant in the caption of the complaint and in the listing of the parties, he has not set forth in the Complaint any allegations of fact regarding the conduct of this Defendant complained of. (*See generally* Dkt. No. 1.) As a result, the Complaint fails to state a claim upon which relief may be granted and Sgt. Sweet is dismissed from this action without prejudice to Plaintiff's right to file an Amended Complaint as set forth above.

### IV. MOTION FOR INJUNCTIVE RELIEF

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986). In most cases, to warrant the issuance of a preliminary injunction, a movant must show (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits, and a balance of hardships tipping decidedly in favor of the moving party. *D.D. ex rel. V.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an

opportunity to rule on the ... merits.' " *Candelaria v. Baker,* 00–CV–912, 2006 WL 618576, at *3 (W.D.N.Y. Mar.10, 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 [8th Cir.1994] ). Preliminary injunctive relief " 'should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *Moore v. Consolidated Edison Co. of New York, Inc.,* 409 F.3d 506, 510 (2d Cir.2005) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 [1997] ). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore,* 409 F.3d at 510 (citing *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). The same standards govern consideration of an application for a temporary restraining order. *Perri v. Bloomberg,* 06–CV–0403, 2008 WL 2944642, at *2 (E.D.N.Y. Jul.31, 2008) [citation omitted]. The district court has broad discretion in determining whether to grant a preliminary injunction. *Moore,* 409 F.3d at 511.

"The Second Circuit has defined 'irreparable harm' as 'certain and imminent harm for which a monetary award does not adequately compensate,' noting that 'only harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief.' " *Perri,* 2008 WL 2944642, at *2 (citing *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.,* 339 F.3d 101, 113–14 [2d Cir.2003] ); *see also Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir.2002) ("To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.") (internal quotation omitted). Speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons,* 461 U.S. 95, 111–12, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *see also Hooks v. Howard,* 07–CV–0724, 2008 WL 2705371, at *2 (N.D.N.Y. Jul.3, 2008) (citation omitted) ("Irreparable harm must be shown to be imminent, not remote or speculative, and the injury must be such that it cannot be fully remedied by monetary damages.").

**\*8** Plaintiff has submitted a document entitled "Order to Show Cause for Preliminary Injunction and Tempor[ary] Restraining Order." (Dkt. No. 3.) Construed liberally, Plaintiff's submission seeks a temporary restraining order and injunctive relief enjoining Defendants from "submitting and filing false and untrue statements and reports" regarding the August 11, 2011 incident, and to "stop all retaliatory actions against the plaintiff ...." (*Id.* at 1.) Plaintiff also seeks an

"Order of Separation [sic]" directing that Defendants Davis, Sill, Nicolette, Bill, Carver and DeBroize be "restrained from being within 100 feet from the plaintiff in any form or matter." (*Id.* at 2.)

The Court has reviewed Plaintiff's motion papers thoroughly and considered the claims asserted therein in the light most favorable to Plaintiff, as a *pro se* litigant. Based upon that review, the Court finds that the harm Plaintiff alleges is purely speculative and, therefore, not "irreparable." Plaintiff's motion is supported only by a recitation of the alleged assault in August, 2011. (*Id.* at 1–4.) Plaintiff has not supported the claims of ongoing misconduct set forth in his motion papers with any factual allegations, such as the dates on which the misconduct occurred, the nature of the injuries he claims to have suffered, the identities of the persons responsible for the conduct he seeks to enjoin, or the relationship between those actions and the claims asserted in his Complaint. Simply stated, Plaintiff's alleged fear of future wrongdoing by the Defendants is not sufficient to warrant the extraordinary remedy of preliminary injunctive relief.

The Court further notes that the requested injunctive relief cannot be granted unless there is also proof that Plaintiff has a likelihood of succeeding on the merits of his claim, or evidence that establishes sufficiently serious questions going to the merits of his claim and a balance of hardships tipping decidedly toward him. *See Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). Plaintiff has failed to submit *proof or evidence* that meets this standard. Plaintiff's allegations, standing alone, are not sufficient to entitle him to preliminary injunctive relief. *See Ivy Mar Co. v. C.R. Seasons Ltd.,* 907 F.Supp. 547, 561 (E.D.N.Y.1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); *Hancock v. Essential Resources, Inc.,* 792 F.Supp. 924, 928 (S.D.N.Y.1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."). Without evidence to support his claims that he is in danger from the actions of anyone at CNYPC, the Court will not credit Plaintiff's conclusory allegations that he will be retaliated against or harmed in the future.

Plaintiff has failed to establish either of the two requisite elements discussed above. As a result, Plaintiff's request for a temporary restraining order and/or injunctive relief is denied.

**V. MOTION FOR APPOINTMENT OF COUNSEL**

**\*9** Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent

party. *Hendricks v. Coughlin,* 114 F.3d 390, 392–93 (2d Cir.1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion:

> [T]he district judge should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 [2d Cir.1986] ). This is not to say that all, or indeed any, of these factors are controlling in a particular case. [14] Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Hodge,* 802 F.2d at 61).

Upon due consideration, the Court finds that the relevant factors weigh decidedly against granting Plaintiff's motion at this time. For example, the Court finds as follows: (1) the case does not present novel or complex issues; (2) it appears to the Court as though, to date, Plaintiff has been able to effectively litigate this action; (3) while it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial, as is the case in many actions brought under 42 U.S.C. § 1983 by *pro se* litigants, "this factor alone is not determinative of a motion for appointment of counsel," *Velasquez,* 899 F.Supp. at 974; (4) if this case survives any dispositive motions filed by Defendants, *it is highly probable that this Court will appoint trial counsel at the final pretrial conference;* (5) this Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination of this litigation; and (6) Plaintiff's motion for counsel is not accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

For these reasons, Plaintiff's motion for the appointment of counsel is denied without prejudice. After the Defendants have responded to the allegations in the Complaint which survive *sua sponte* review, and the parties have undertaken discovery, Plaintiff may file a second motion for the appointment of counsel, at which time the Court may be better able to determine whether such appointment is warranted in this case. Plaintiff is advised that any second motion for appointment of counsel must be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

**\*10 ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion to proceed *in forma pauperis* (Dkt. No. 2) is *GRANTED;* [15] and it is further

**ORDERED** that Plaintiff's motion for injunctive relief (Dkt. No. 3) is *DENIED;* and it is further

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 4) is *DENIED* **without prejudice;** and it is further

**ORDERED** that Plaintiff's claims of deliberate indifference against Defendants Bill, Carver and DeBroize are *sua sponte DISMISSED* **with prejudice** pursuant to 28 U.S.C. § 1915(e)(2) (B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from their alleged personal involvement in the August 8, 2011 incident are *sua sponte DISMISSED* **without prejudice and with leave to amend** in this action in accordance with Fed.R.Civ.P. 15 (as described above in Part III.B.3. of this Decision and Order), pursuant to 28 U.S.C. § 1915(e)(2)(B) (ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Defendant Sweet is *sua sponte DISMISSED* **without prejudice and with leave to be reinstated** as a Defendant in this action in accordance with Fed.R.Civ.P. 15, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is otherwise accepted for filing (i.e., as to the claims against Defendants Davis, Sill, and Nicolette arising from the August 8, 2011 incident); and it is further

**ORDERED** that Plaintiff provide a summons, USM–285 form and a copy of the complaint for Defendant Davis, Sill and Nicollette for service, and upon receipt from Plaintiff of the documents required for service of process, the Clerk shall (1) issue summonses and forward them, along with copies of the Complaint to the United States Marshal for service upon the remaining Defendants, and (2) forward a copy of the summons and Complaint by mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED** that, after service of process on Defendants, a response to the Complaint shall be filed by the Defendants or their counsel as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261–7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be stricken from the docket .** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to so may result in the dismissal of this action.** All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 651919

---

**Footnotes**

1   This is the fourth civil rights action filed by Plaintiff in this District. Generally, two of these actions arose out of Plaintiff's refusal to consent to a strip search and the subsequent actions taken against Plaintiff as a result of his refusal. *See Groves v. New York,* 09–CV–0406, Decision and Order (N.D.N.Y. filed May 11, 2009) (Hurd, J.) (*sua sponte* dismissing complaint pursuant to 28 U.S.C. § 1915[e][2][B] ); *Groves v. The State of New York,* 9:09–CV–0412, Decision and Order (N.D.N.Y. filed Mar. 26, 2010) (Sharpe, J.) (granting defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12[b][6] ). The third action alleged numerous violations of Plaintiff's constitutional rights during the period July 23, 2009, and August 26, 2009, and was dismissed without prejudice upon Plaintiff's request in October, 2010. *See Groves v. Maxymillian,* 9:09–CV–1002, Decision and Order (N.D.N.Y. filed Oct. 8, 2010) (Suddaby, J.). As a result, it does not appear that the current action is barred because of res judicata, collateral estoppel, and/or the rule against duplicative litigation.

2   At that time, Plaintiff also filed motions for injunctive relief and for appointment of counsel. (Dkt.Nos.3, 4.)

3   The Court notes that, similarly, Section 1915A(b) directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b).

4   *See Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

5   *See Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

6   It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific facts are not necessary"* to successfully state a claim under Fed.R.Civ.P. 8(a) (2). *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Twombly*—that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must

---

still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

7    *See Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) ("[W]hile the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner."); *Walton v. Breeyear,* 05–CV–0194, 2007 WL 446010, at *8, n. 16 (N.D.N.Y. Feb.8, 2007) (Peebles, M.J.) (noting that pretrial detainees enjoy protections under the due process clause of the Fourteenth Amendment parallel to those afforded to sentenced prisoners by the Eighth Amendment); *Vallen v. Carrol,* 02–CV–5666, 2005 WL 2296620, at ——8–9 (S.D.N.Y. Sep.20, 2005) (finding that the Eighth Amendment standard of "deliberate indifference" is the correct one for Section 1983 claims brought by involuntarily committed mental patients based on alleged failures to protect them that violated their substantive due process rights); *Bourdon v. Roney,* 99–CV–0769, 2003 WL 21058177, at *10 (N.D.N.Y. Mar.6, 2003) (Sharpe, M.J.) ("The standard for analyzing a pretrial detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard.").

8    Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "reasonable doctor or patient would find important and worthy of comment or treatment," a condition that "significantly affects" a prisoner's daily activities, or "the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702.

9    Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under Section 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester Cnty. Dept. of Corr.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008). In addition, "disagreements over medications, diagnostic techniques (e .g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

10   The Court notes that, generally, leave to amend pleadings shall be freely granted when justice so requires. Fed.R.Civ.P. 15(a). However, an opportunity to amend is not required where amendment would be futile. *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d Cir.1994). *John Hancock Mut. Life Ins. Co.,* 22 F.3d at 462. The Second Circuit has explained that "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993); *see Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with [Plaintiff's] cause of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."). This rule is applicable even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103.

11   *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323–324 (2d Cir.1986) (setting forth four prongs).

12   *See also Gillard v. Rosati,* 08–CV–1104, 2011 WL 4402131, at *7 (N.D.N.Y. Aug.22, 2011) (Peebles, J.) ("It is well-established that without more, 'mere receipt of letters from an inmate by a supervisory official regarding a medical claim is insufficient to constitute personal liability." [internal quotation marks and brackets omitted] ); *Greenwald v. Coughlin,* 93–CV–6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) ("it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."); *Clark v. Coughlin,* 92–CV 0920, 1993 WL 205111, at *5 n. 2 (S.D.N.Y. Jun.10, 1993) ("Courts in this jurisdiction have consistently held that an inmate's single letter does not constitute the requisite personal involvement in an alleged constitutional deprivation to trigger the Commissioner's liability.")

13   *See also Bernstein v. N.Y.,* 591 F.Supp.2d 448, 460 (S.D.N.Y.2008) ("Courts within the Second Circuit have determined that there is no constitutional right to an investigation by government officials." [internal quotation marks, brackets and ellipsis omitted] ).

14   For example, a plaintiff's motion for counsel must always be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector, and such a motion may be denied solely on the failure of the plaintiff to provide such documentation. *See Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994); *Cooper v. Sargenti Co., Inc.,* 877 F.2d 170, 172, 174 (2d Cir.1989) [citation omitted].

15    Plaintiff should note that he will still be required to pay fees that he may incur in this action, including but not limited to copying and/or witness fees.

**End of Document**    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 71770
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jeffrey HAMM, Plaintiff,

v.

Richard HATCHER, and City
of New York, Defendants.

No. 05 Civ. 503(ER).
|
Jan. 7, 2013.

**Attorneys and Law Firms**

Jeffery Hamm, East Elmhurst, NY, pro se.

Kimberly D. Conway, Esq., New York City Law Department, Office of the Corporation Counsel, New York, NY, for Defendants.

***OPINION AND ORDER***

RAMOS, District Judge.

 **\*1** *Pro se* Plaintiff Jeffrey Hamm ("Hamm" or "Plaintiff") brings this action pursuant to 42 U.S.C. § 1983 against Defendants Richard Hatcher ("Hatcher")[1] and the City of New York (the "City," and collectively, "Defendants"). Plaintiff alleges that while he was incarcerated in Rikers Island, Defendants violated his rights under the Fourteenth Amendment to the U.S. Constitution when they suspended his antidepressant medications. Defendants now move for summary judgment pursuant to Federal Rule of Civil Procedure 56 as to all of Plaintiff's claims. For the reasons set forth below, Defendants' motion is GRANTED.

**I. Background**

**A. Undisputed Facts**

Plaintiff is a 52 year-old man with a long history of substance addiction and criminal activity.[2] (Conway Decl. Ex. F ("Hamm Dep.") 9:19–23, 31:15–21, 36:24–37:6.) After serving in the military from 1980–1982, (*id.* 10:24–11:2, 35:2–8), Plaintiff and his ex-wife divorced. (*Id.* 35:15–17.) At that time, he became addicted to crack cocaine and remained

addicted through 2000, (*id.* 9:20–10:2, 10:24–11:6), when he completed a twenty-day rehabilitation program and enrolled in New York City College of Technology. (*Id.* 10:4–8.) In December of 2001, on his second day of college, Plaintiff was arrested and released. (*Id.* 11:24–12:2, 13:12–14.) He struggled with substance abuse at that time, and continued to relapse into early 2002. (*Id.* 11:7–17.)

Plaintiff was again arrested in March 2002. (*Id.* 13:15–17.) He was immediately taken into custody at the Manhattan Detention Center. (*Id.* 13:18–25.) On March 15, 2002, while incarcerated there, Plaintiff was issued two antidepressant medication prescriptions for fourteen days each—one for forty milligrams daily of Paxil and the other for fifty milligrams daily of Trazodone. (First Unnumbered Exhibit to the Third Amended Complaint ("TAC") at first unnumbered page.) Plaintiff states that he had been taking antidepressant medications before his arrest, as well.[3] (Hamm Dep. 15:22–16:8; Pl.'s Mem. Opp. Mot. Summ. J. ("Pl.'s Mem.") at first unnumbered page.)

In or about June 2002, Plaintiff was transferred to another detention facility,[4] but remained there for less than two months due to an incident involving an assault.[5] (*Id.* 14:11, 21–25 .) After this incident, in or about August 2002, he was transferred to segregated housing in the Central Punitive Segregation Unit of the Otis Bantum Correctional Center ("OBCC") on Rikers Island. (Conway Decl., Ex. A at 1, 2; Hamm Dep. 14:22–15:2). On August 14, 2002, a mental health clinician, Michele Garden, Ph.D. ("Garden") evaluated Plaintiff, and reported that he presented antisocial behavior, mood changes, persistent anger, and withdrawal symptoms. (Conway Decl., Ex A at 1.) Garden diagnosed Plaintiff with early onset dysthymic disorder, dependent personality disorder, and polysubstance dependence, and directed that Plaintiff was to undergo biweekly clinician visits. (*Id.* at 1, 2.) On August 14, 2002, Plaintiff was also seen by a psychiatrist, Roberto Caga–Anan, M.D. ("Caga–Anan") at OBCC, who noted that Plaintiff stated, "I am ok," and observed that he did not present a danger to himself or to others. (Conway Decl, Ex. B at 1.) Caga–Anan prescribed Plaintiff with forty milligrams daily of Paxil and fifty milligrams daily of Atarax. (*Id.*) Both prescriptions were to last for fourteen days. (*Id.,* Ex. C.)

 **\*2** On August 22, 2012, Garden and Caga–Anan again observed and evaluated Plaintiff. (Conway Decl., Ex. E.) They confirmed their prior observations, and diagnosed him with opioid dependence and adjustment disorder with

depressed mood. (*Id.* at 1.) They again directed that he was to undergo biweekly clinician and psychiatrist visits. (*Id.* at 2.) On August 28, 2002, Caga–Anan renewed Plaintiff's Paxil prescription and issued him an additional prescription for fifty milligrams of Trazadone daily. (*Id.,* Ex. C.) Caga–Anan discontinued Plaintiff's Atarax prescription. (*Id.*) Again, both prescriptions were to last Plaintiff for fourteen days-until September 11, 2002.[6] (*Id.*)

## B. Facts in Dispute

In early September 2002, Plaintiff was transferred from segregated housing at OBCC to the George Motchan Detention Center ("GMDC") on Rikers Island. (Hamm Dep. at 15:18–21.) It is at this point where Plaintiff's and Defendants' versions of facts diverge.

### 1. Defendant's Version of Facts

Defendants assert that on September 12, 2002–the day after Plaintiff's prescriptions were due to expire—Vivia Francois, M.D. completed a Consultation Request form on Plaintiff's behalf and referred him to the Mental Health Department at GMDC. (Conway Decl., Ex. G.) There is no evidence in the record, however, that his prescriptions were renewed at that time. On September 13, 2002, Plaintiff was admitted to the Mental Health Department and screened by S. Hernandez ("Hernandez"), a clinical social worker. (*Id.*) Hernandez completed a mental health intake form for Plaintiff, and noted that he had a history of mental illness and that he was taking medication for depression. (*Id.,* Ex. I.) There is no evidence in the record that Plaintiff's prescriptions were renewed at that time, either.

On September 16, 2002, a clinical supervisor reported that Plaintiff's case had been assigned to Hernandez and that a psychological assessment had been scheduled to determine whether Plaintiff was "on the proper medication with the proper dosage." (*Id.,* Ex. J.) On the same day, Hatcher[7] first evaluated Plaintiff in the Mental Health Clinic at GMDC. (Conway Decl., Ex. K.) Hatcher reported that Plaintiff stated he had not received Paxil for *five* days, that he felt mildly to moderately depressed at times due to his "legal problems and not recently getting his scheduled medications," and that Plaintiff stated, "I know I need the medication because as soon as I stop it I start feeling anxious, irritable and depressed." (*Id.*) However, Hatcher also noted that Plaintiff stated "I'm doing alright," that he denied experiencing any hallucinations or side effects of his medications, that he

denied any suicidal or homicidal ideations, that his mood was calm and stable, that he was eating and sleeping well, and that he did not present any paranoia. (*Id.*) Hatcher diagnosed Plaintiff with Dysthymic Disorder, and stated that he would "re-start [Plaintiff's] regimen at 'start doses.' " (*Id.*)

**\*3** Hatcher prescribed Plaintiff twenty milligrams daily of Paxil for depression and fifty milligrams daily of Trazodone for sleep. (*Id* .) Hatcher issued prescriptions for one immediate dose of both of medications on September 16, 2002, (*id.,* Ex. L), and an additional prescription for both medications to being immediately thereafter and to last for fourteen days. (*Id.*) Thus, according to the prison medical records submitted by Defendants, Plaintiff was without his prescribed medications from September 11, 2002 through September 15, 2002–a total of five days.

On September 19, 2002, Hernandez evaluated Plaintiff again. (*Id.,* Ex. N.) A Clinical Assessment and Comprehensive Treatment Plan noting Plaintiff's symptoms, diagnosis, and treatment plan was completed and signed by Hernandez, Gerard Derisse, a psychiatrist, and Gilberto Matta, C.S.W., a clinical supervisor. (*Id.*) Plaintiff was thereafter periodically treated for his psychiatric conditions; the last record of his treatment submitted to the Court is dated January 1, 2003. (Third, Fourth, and Fifth Unnumbered Exhibits to TAC.)

### 2. Plaintiff's Version of Facts[8]

Plaintiff stated in his deposition testimony that when he was transferred from segregated housing at OBCC to GMDC in September 2002 and was first seen by Hatcher, Hatcher told him that GMDC maintained a policy that newly transferred inmates were required to wait ten days before receiving any medical prescriptions. (*Id.* 17:21–25, 22:2–7.) Hatcher then took Plaintiff off of Paxil and Trazadone for ten days despite Plaintiff's statements to Hatcher that he needed the medication.[9] (*Id.* 17:16–18, 22:2–13.)

Plaintiff further stated in his deposition testimony that once he stopped taking his medication, he began to experience the "side effects of withdrawal." (Hamm Dep. 23:2–4.) These symptoms included exacerbated depression, nightmares, hopelessness, and suicidal thoughts. (*Id.* 23:5–16.) He avers that he made frequent attempts to alert the mental health staff to the side effects he experienced while not taking his medication[10]-including filing a grievance at GMDC, (*id.* 41:23–42:8, 42:22–43:4; TAC at 4)-but that he remained without his medication for the duration of his first ten days

there. (Hamm Dep. 23:17–24:2, 24:10–11.) When the ten days expired, Plaintiff testified that Hatcher prescribed him half of his regular dosage of Paxil and his full dosage of Trazodone. (*Id.* 18:1–3, 28:1–8.) Hatcher later prescribed Risperidone to Plaintiff for impulse control. (*Id.* 29:4–8.)

Plaintiff testified in his deposition that he did not tell Hatcher the full extent of the symptoms he was experiencing as a result of going off of his medications. (*Id.* 19:10–14, 21:13–22, 24:8–19.) He believed that because he had recently come out of segregated housing as a result of his involvement in an assault, if he were to explain the nature and degree of his symptoms, he would be placed on suicide watch, be forcibly sedated, or be placed in segregated housing. (*Id.* 21:21–22:1, 24:8–19.)

### 3. The Criminal Prosecution of Plaintiff

 **\*4** Pursuant to Plaintiff's guilty plea, he was convicted on February 6, 2003 of attempted criminal sale of a controlled substance in the third degree, and was sentenced to three to six years' imprisonment. (First Unnumbered Exhibit to Second Amended Complaint ("SAC") at 12.) Plaintiff later attempted to withdraw his guilty plea, arguing that he was impaired by his state of withdrawal from medication. (SAC ¶ 6.) On February 6, 2003, Judge Ronald A. Zweibel of the Supreme Court of the State of New York, New York County denied Plaintiff's motion to withdraw his plea, and the Supreme Court, Appellate Division, First Department affirmed the denial of Plaintiff's motion on April 5, 2005. (First Unnumbered Exhibit to SAC at 12–13.) In its Decision and Order, the Appellate Division stated that the record established that Hamm's plea "was knowing, intelligent, and voluntary, and [the record failed] to support his claim that he was incompetent to plead guilty because he had not received his antidepressant medication." (*Id.*) The Appellate Division also noted that the Plaintiff had "freely admitted his guilt, demonstrated his understanding of the terms and consequences of his plea, and specifically denied using any drugs or medication," and that the trial court had "relied on its own recollection of [Hamm's] lucidity at the time of the plea" in rejecting his motion to withdraw his plea. (*Id.*) On June 18, 2005, the Court of Appeals of the State of New York denied Plaintiff's application for leave to appeal. (Second Unnumbered Exhibit to SAC at first unnumbered page.)

### II. Procedural History

Plaintiff filed suit on May 17, 2004 in the Northern District of New York, from where this action was transferred to the

Southern District of New York on January 14, 2005. (Doc. 1.) Then–Chief Judge Michael B. Mukasey determined that the Complaint was facially insufficient and ordered Plaintiff to amend, (*id.*), and Plaintiff filed an Amended Complaint on March 28, 2005. (Doc. 2.) The case was subsequently reassigned to the Honorable Colleen McMahon. (Doc. 3.) Plaintiff filed a Second Amended Complaint on July 31, 2006. (Doc. 9.) The case was again reassigned to the Honorable Kenneth M. Karas on August 6, 2007. (Doc. 18.) Plaintiff, who by that time had completed his prison term, moved for default judgment as to Hatcher on December 6, 2007. (Doc. 24.) On September 5, 2008, Defendants filed a motion to dismiss the Second Amended Complaint, (Doc. 22), and on September 8, 2008, Judge Karas denied Plaintiff's motion for default judgment. (Doc. 27.) On May 5, 2009, Judge Karas issued an Opinion and Order granting in part and denying in part Defendants' motion to dismiss, and granting Plaintiff leave to amend the complaint.[11] (Doc. 31.) On August 7, 2009, Plaintiff filed a Third Amended Complaint. (Doc. 33.) On January 23, 2012, this matter was reassigned to the undersigned, and on June 21, 2012, Defendants filed the instant motion. (Docs. 61, 63 .)

### III. Applicable Legal Standards

### A. Summary Judgment

 **\*5** Summary judgment is only appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.,* 812 F.Supp.2d 454, 467 (S.D.N.Y.2011) (citing *SCR Joint Venture L.P. v. Warshawsky,* 559 F.3d 133, 137 (2d Cir.2009)). A fact is "material" if it might affect the outcome of the litigation under the relevant law. *Id.*

The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Cordiano v. Metacon Gun Club, Inc.,* 575 F.3d 199, 204 (2d Cir.2009) (citing *Celotex Corp.,* 477 U.S. at 322–23). "In that event, the nonmoving party must come forward

with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.,* 706 F.Supp.2d 494, 504 (S.D.N.Y.2010) (internal quotation marks omitted) (quoting *Jaramillo v. Weyerhaeuser Co.,* 536 F.3d 140, 145 (2d Cir.2008)). "Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.' " *Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir.2002) (quoting *Celotex Corp.,* 477 U.S. at 322).

In deciding a motion for summary judgment, the Court must " 'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.' " *Brod v. Omya, Inc.,* 653 F.3d 156, 164 (2d Cir.2011) (quoting *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 126 (2d Cir.2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise. *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). A motion for summary judgment cannot be defeated on the basis of mere denials or unsupported alternative explanations of facts. *Senno,* 812 F.Supp.2d at 467. The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts." *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). "[T]he non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor ." *Senno,* 812 F.Supp.2d at 467–68 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256–57 (1986)).

## B. Local Rule 56.1 and *Pro Se* Litigants

**\*6** Under Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1"), a party moving for summary judgment pursuant to Fed.R.Civ.P. 56, must submit a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local R. 56.1(a). In answering a motion for summary judgment, litigants in this District are required to specifically respond to the assertion of each purported undisputed fact by the movant and, if controverting any such fact, to support its position by citing to admissible evidence in the record. Local Rule 56.1(b), (d); *see also* Fed.R.Civ.P. 56(c) (requiring

reliance on admissible evidence in the record in supporting or controverting a purported material fact). If the moving party seeks summary judgment against a *pro se* litigant, it is also required to notify the *pro se* litigant of the requirements of Federal Rule of Civil Procedure 56 and Local Rule 56.1. Local R. 56.2. Once served with a statement pursuant to Local Rule 56.2, "[p]ro se litigants are then not excused from meeting the requirements of Local Rule 56. 1." *Wali v. One Source Co.,* 678 F.Supp.2d 170, 178 (S.D.N.Y.2009) (citing *Vt. Teddy Bear Co. v. 1–800–BEARGRAM Co.,* 373 F.3d 241, 246 (2d Cir.2004)). Each factual statement set forth in the moving party's Rule 56.1 statement "will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Local R. 56.1(c); *see also T.Y. v. N.Y. City Dep't of Educ.,* 584 F.3d 412, 418 (2d Cir.2009) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible."), *cert. denied,* 130 S.Ct. 3277 (2010).

In the instant case, the Defendants have complied with their obligations by submitting a Local Rule 56.1 Statement and providing Plaintiff with notice, pursuant to Local Rule 56.2, of his obligations. (Docs.63, 66.) Plaintiff has failed to submit an appropriate response. Instead, he filed an unsworn, handwritten memorandum of law in opposition to the instant motion with several exhibits attached. (Doc. 60.) However, as the Second Circuit has made clear, "special solicitude should be afforded *pro se* litigants generally, when confronted with motions for summary judgment," *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988) (quoting *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988)), and "where a *pro se* plaintiff fails to submit a proper [Local] Rule 56.1 statement in opposition to a summary judgment motion, the Court retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." *Wali,* 678 F.Supp.2d at 178 (citing *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001)). Moreover, courts are to read a *pro se* litigant's submissions "liberally and interpret them 'to raise the strongest arguments that they suggest.' " *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)).

**\*7** Therefore, this Court has endeavored to discern from the record if there is any evidentiary support for the assertions contained in Plaintiff's opposition papers and the documents attached thereto, and to determine if there are any other

material issues of fact based on the evidence in the record. *Geldzahler v. N.Y. Med. Coll .,* 746 F.Supp.2d 618, 620 n. 1 (S.D.N.Y.2010). The Court has considered the present motion in light of the entirety of the record to afford Plaintiff the special solicitude to which he is entitled, *Burke v. Royal Ins. Co.,* 39 F.Supp.2d 251, 257 (E.D.N.Y.1999), as well as the unsworn statements in his opposition papers-but only to the extent that they are based on personal knowledge or supported by other admissible evidence in the record—on the assumption that if his allegations were sufficient to raise an issue of fact, Plaintiff would be given an opportunity to submit an affidavit properly attesting to those allegations. *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 603 n. 1 (S.D.N.Y.2004). However, even in light of Plaintiff's *pro se* status, the Court cannot rely on any assertions for which he has failed to offer proper support. *Goenaga,* 51 F.3d at 18.

### IV. Discussion

### A. Plaintiff's Claim Against Hatcher

### 1. Cruel and Unusual Punishment

The Eighth Amendment to the U.S. Constitution guarantees convicted prisoners the right to be free from cruel and unusual punishment. U.S. Const. amend. VIII. A prisoner's Eighth Amendment rights are violated when he is denied adequate medical care due to a prison official's deliberate indifference to a substantial risk of serious harm. *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (quoting *Farmer v. Brennan,* 511 U.S. 825, 828 (1994)). Because the Eighth Amendment only applies where there has been a "formal adjudication of guilt," a pretrial detainee—such as Plaintiff, whose cause of action arose before he was convicted—enjoys a right to adequate medical care pursuant to the Due Process Clause rather than the Eighth Amendment. *City of Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 244 (1983). Nevertheless, the analysis is the same under the Due Process Clause and the Eighth Amendment in this Circuit, because "an unconvicted detainee's rights are at least as great as those of a convicted prisoner." *Weyant,* 101 F.3d at 856; *Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir.2000) (noting that the Second Circuit has "often applied the Eighth Amendment deliberate indifference test to pre-trial detainees bringing actions under the Due Process Clause of the Fourteenth Amendment"). Thus, an "official custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." *Weyant,* 101 F.3d at 856.

The standard for a cruel and unusual punishment claim under both the Eighth Amendment and the Due Process Clause includes an objective and a subjective component. *E.g., Mitchell v. Prison Health Services, Inc.,* 07 Civ. 8267(PKC), 2008 WL 5069075, at *3 (S.D.N.Y. Nov. 20, 2008). First, the objective component requires the alleged deprivation of medical care to be sufficiently serious. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). A deprivation of medical care is sufficiently serious if two prongs are satisfied: (1) the prisoner was actually deprived of adequate medical care; and (2) the inadequacy in medical care was sufficiently serious. *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006). An actual deprivation of adequate medical care occurs only if a prison official denies an inmate reasonable medical care, *Id.* (citing *Farmer,* 511 U.S. at 844–47), and it is sufficiently serious if "a condition of urgency ... that may produce death, degeneration, or extreme pain" is present. *Johnson v. Wright,* 412 F.3d 398, 403 (2d Cir.2005) (internal quotation marks and citations omitted). Relevant factors to this inquiry include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks, brackets, and citation omitted).

**\*8** Second, the subjective component requires the defendant to "act with a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66 (citing *Wilson,* 501 U.S. at 298). An official acts with the requisite deliberate indifference when he or she "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837. This is the "equivalent to the familiar standard of 'recklessness' as used in criminal law." *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Phelps v. Kapnolas,* 308 F.3d 180, 186 (2d Cir.2002)).

In the instant case, Plaintiff is unable to satisfy both the subjective and objective components.

### 2. Plaintiff Did Not Sustain a Sufficiently Serious Deprivation of Medical Care.

When a prisoner alleges a complete denial of adequate medical care, courts must evaluate the seriousness of the

prisoner's underlying medical condition. *Bellotto v. Cnty. of Orange,* 248 F. App'x 232, 236 (2d Cir.2007) (citing *Smith,* 316 F.3d at 184–86 .) Alternatively, when—as in the instant case—a prisoner alleges a temporary delay or interruption in the provision of otherwise adequate medical treatment, the seriousness inquiry is "narrower," *Salahuddin,* 467 F.3d at 280, and focuses on the particular risk of harm that resulted from the delay or interruption in treatment rather than the severity of the prisoner's underlying medical condition. *Id.* (citing *Smith,* 316 F.3d at 185); *see also Hill v. Dekalb Reg'l Youth Det. Ctr.,* 40 F.3d 1176, 1188–89 (11th Cir.1994) (explaining that the seriousness of a delay in medical treatment may be decided "by reference to the *effect* of delay in treatment .... [considering] the seriousness of the medical need [and] deciding whether the delay worsened the medical condition") (emphasis in original)). In the latter scenario, the court must examine all relevant facts and circumstances when determining whether a delay in treatment is sufficiently serious. *DiChiara v. Wright,* 06 Civ. 6123(KAM)(LB), 2011 WL 1303867, at *7 (E.D.N.Y. Mar. 31, 2011) (quoting *Smith,* 316 F.3d at 187). Accordingly, because Plaintiff's claim against Hatcher is based on a short-term interruption in the treatment that is otherwise unchallenged,[12] the court must focus on the risk of harm from the challenged delay in analyzing whether the alleged deprivation was sufficiently serious.

"Courts have repeatedly held that treatment of a psychiatric or psychological condition may present a serious medical need." *Cuoco,* 222 F.3d at 106 (internal quotation marks and citation omitted). It is also true that "[f]requently missed doses [of medication] could readily result in adverse medical events." *Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438 (E.D.N.Y.2009). Such a delay or interruption in treatment, however, only gives rise to a violation of a prisoner's constitutional rights if it "reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment." *Amaker v. Coombe,* No. 96 Civ. 1622, 2002 WL 523388, at *8 (S.D.N.Y. Mar. 29, 2002). Although adverse medical effects are not required to prove a constitutional violation, "the absence of ... physical injury will often be probative," and "in most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Smith,* 316 F.3d at 187, 188.

**\*9** Plaintiff contends that he was deprived of adequate medical care because his access to his medication was interrupted for ten days when he was transferred from OBCC to GMDC. (TAC at 3; Hamm Dep. 18:20–25.) He further avers that the delay was the result of a policy at GMDC that prevented all newly transferred inmates from taking any medication for their first ten days of detention there.[13] (TAC at 3; Hamm Dep. 17:21–25, 21:13–15, 22:2–7.) Plaintiff relies exclusively on the alleged statement made by Hatcher to establish the existence of the ten-day policy. However, he cannot demonstrate that such a purported policy, as applied to him, caused a sufficiently serious deprivation of adequate medical care.

As a result of the delay in access to his medication, Plaintiff avers that he began to experience the "side effects of withdrawal," including exacerbated depression, nightmares, hopelessness, and suicidal thoughts. (Hamm Dep. 23:1–4, 6–16.) Even assuming that Plaintiff's averments were substantiated by admissible evidence, the psychological consequences he alleges to have suffered are insufficient to show that he was subjected to a significant risk of serious harm.[14] Courts have repeatedly refused to find constitutional violations where the harm alleged as a result of a delay in medical care is similar to that alleged here. *Bellotto,* 248 F. App'x at 237 (plaintiff who alleged missed medication dosages and inadequate monitoring of medications did not sustain a constitutional violation "because the risk of harm [he] faced as a result of the alleged treatment was not substantial," and because the only medical consequence he alleged was an "anxiety attack," which resulted in no physical injuries or acute distress); *Barnard v. Beckstrom,* No. 07–CV–19, 2008 WL 4280007, at *16 (E.D .Ky. Sept. 17, 2008) (doctor's affidavit found no merit in plaintiff's claim that a ten-day delay in making alterations to psychiatric medication rose to the level of a serious medical need as he did not "suffer from any physical injury as the result of any alleged or actual delay in treatment"); *Caldwell v. McEwing,* No. 00–CV–1319, 2006 WL 2796637, at *11 (C.D.Ill. Sept. 28, 2006) (granting summary judgment to defendants where plaintiff saw a doctor for psychiatric assessments, refused to take psychiatric medication, and no physical harm resulted); *cf. Bilal v. White,* 10–4594–PR, 2012 WL 3734376, at *2 (2d Cir. Aug. 30, 2012) (plaintiff who suffered from epilepsy and arthritis—"arguably ... serious underlying conditions"- but failed to demonstrate that his condition worsened due to the delay, was unable to establish a sufficiently serious medical need); *Smith,* 316 F.3d at 181–82 (two separate delays of several days each in provision of medication to

inmate with HIV-positive status—an indisputably serious medical condition—did not cause sufficiently serious injury where plaintiff suffered temporary itching, severe headaches, as well as stress due to the missed medication, but his HIV infection and overall health did not worsen).

 **\*10** The relevant case law makes clear that a greater showing of harm is required in order to meet the high standard of a constitutional violation within the context of a delay in treatment. *Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (dentist's one-year delay in treating a cavity—a condition tending to cause acute pain if left untreated—precluded summary judgment in defendant's favor because of the severity of the risk of harm involved); *Demata v. N .Y. State Corr. Dept. of Health Servs.,* No. 99–0066, 198 F.3d 233 (Table), 1999 WL 753142, at \*2 (2d Cir. Sept. 17, 1999) (a delay in providing necessary medical care may rise to the level of a constitutional violation, but the Second Circuit has reserved such a classification for cases involving deliberate delay of treatment as a form of punishment, disregard for a life-threatening and fast-degenerating condition, and extended delay of a major surgery) (collecting cases); *Hathaway,* 37 F.3d at 67 (plaintiff found to have serious medical need where he suffered from a degenerative hip condition that caused him to have difficulty walking and significant pain over an extended period of time, and corrective surgery was delayed over two years); *Silvera v. Conn. Dept. of Corr.,* 726 F.Supp.2d 183, 191–92 (D.Conn.2010) (plaintiff who suffered from severe mental health issues and was an acute suicide risk, and ultimately committed suicide due to acts and omissions of prison medical staff, was found to have demonstrated a sufficiently serious medical need). The absence of any physical injury to Plaintiff as a result of the ten-day delay underscores the Court's finding. *Smith,* 316 F.3d at 187.

There is no indication in the record that Hatcher's conduct "significantly increased [Plaintiff's] risk for medical injury or similar serious adverse consequences." *Wright v. Genovese,* 694 F.Supp.2d 137, 159 (N.D.N.Y.2010) *aff'd,* 415 F. App'x 313 (2d Cir.2011). Accordingly, Defendants' motion for summary judgment may be granted on this basis alone.

### 3. Hatcher Did Not Act With Deliberate Indifference.

However, even assuming *arguendo* that Plaintiff had been subjected to a "sufficiently serious" deprivation of medical care, his claim for cruel and usual punishment against Hatcher would still fail because he cannot prove that Hatcher acted with deliberate indifference. As discussed above, *see supra*

Part IV.A.1, a prison official cannot be found to have acted with deliberate indifference unless a plaintiff can demonstrate that the official "knew of and disregarded the plaintiff's serious medical needs." *Chance,* 143 F.3d at 703 (citing *Farmer,* 511 U.S. at 837). "The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result," but he must be subjectively aware that his conduct creates a substantial risk of harm. *Salahuddin,* 467 F.3d at 280. Mere negligence, however, even if it gives rise to a medical malpractice claim, is insufficient to sustain a constitutional claim. *Salahuddin,* 467 F.3d at 280; *Hathaway,* 37 F.3d at 68. Thus, in order to establish liability, Plaintiff must demonstrate the Hatcher knew of and disregarded an excessive risk to his safety in delaying Plaintiff's access to his medication for ten days.

 **\*11** While Plaintiff alleges that he was "severely depressed" when Hatcher first evaluated him, (First Unnumbered Exhibit to TAC, second unnumbered page), by his own testimony he never communicated that to Hatcher. (Hamm Dep. 19:10–15.) Indeed, Plaintiff admits that he *purposely* withheld the full extent of his symptoms from Hatcher in order to avoid being placed in segregated housing, on suicide watch, or being sedated. (Hamm Dep. 21:18–22:1, 24:8–21.) Rather, Plaintiff told Hatcher that he was "doing alright," that he was eating and sleeping well, and that he felt only "mild[ly] to moderately depressed due to his legal problems and not recently getting his scheduled medications." (Conway Decl., Ex K.) Hatcher noted that Plaintiff's mood was "calm and stable" at that time. (*Id.*) Therefore, Plaintiff has set forth no facts tending to prove that Hatcher knew of any risk to Plaintiff's health resulting from the short-term delay in his treatment, much less that he disregarded any such risk. Accordingly, any potential risk to Plaintiff's health as a result of the delay in receiving antidepressant medication would not be actionable, because Plaintiff did not properly advise Hatcher of his actual psychological condition.

As there is no evidence in the record before the Court that Hatcher acted with deliberate indifference by failing to prescribe Plaintiff his medications for the first ten days of his detention at GMDC, Plaintiff's claim against Hatcher would fail the subjective test, as well.

### B. Plaintiff's Claim Against the City ("*Monell* Claim")

The Court need not reach the merits of Plaintiff's *Monell* claim. As the Second Circuit has stated, "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a

municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir.2006) (emphasis in original). When a district court concludes that there is "no underlying constitutional violation," it need not address "the municipal defendants' liability under *Monell." Id.* Therefore, the Court GRANTS Defendants summary judgment on Plaintiff's *Monell* claim against the City.

## V. Conclusion

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED. The Court certifies,

pursuant to 28 U.S.C. § 1915(a)(3), that any appeal taken from this Order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge V. United States,* 369 U.S. 438, 444–45 (1962). The Clerk of the Court is respectfully directed to teminate this motion (Doc. 63), enter judgment in favor of Defendants, and close this case.

It is SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 71770

Footnotes

1   Plaintiff has named "Richard Hatcher" as a Defendant in this action. It appears from Defendants' papers, however, that his correct name is "Richard Fletcher." Because the caption of this case names "Richard Hatcher" as a Defendant, the Court will continue to refer to him by what seems to be an incorrect name.

2   Plaintiff, by his own estimation, has been arrested at least 100 times and has been convicted of a crime at least fifty times. (Hamm Dep. 36:24–37:3.) Most of his arrests have been for the possession or sale of marijuana. (*Id.* 37:4–6.)

3   Plaintiff was first diagnosed with depression and anxiety by a psychiatrist in the Department of Corrections, though he does not specify when. (Hamm Dep. 16:8–9.) He believes he suffered from these psychological conditions for many years prior to his diagnosis and that they caused him to begin using narcotics in the first place. (*Id.* 16:10–14.)

4   Plaintiff refers to this detention facility as the "Beacon facility." (Hamm Dep. 14:1–4.)

5   The details of this assault are unclear in Plaintiff's deposition testimony, but it appears to have involved corrections officers. (Hamm Dep. 14:11, 24–25.)

6   Plaintiff states that he was medicated for the entire duration of his detention in segregated housing at OBCC. (Hamm Dep. 15:13–17.)

7   Hatcher's position is unclear from the record. According to a Progress Note and a Medication Order Sheet he completed upon treating Plaintiff, it appears Hatcher may be a Nurse Practitioner, as indicated by his signature "Richard Fletcher NP." (Conway Decl., Exs. K, L.) However, during Hamm's deposition, Defendants' attorney repeatedly referred to Hatcher as "Dr. Fletcher." (*E.g.* Hamm Dep. 17:16.)

8   As set forth more fully below, the Court finds that all such disputed facts are not material, and even construing the facts in a light most favorable to Plaintiff, he cannot defeat Defendants' motion.

9   Plaintiff's evidence regarding the time during which he went without his medication is inconsistent. In his memorandum of law in opposition to the instant motion, he states that he "hadn't had [his] medication in 5 days" when he was first transferred to GMDC and met with Hatcher. (Pl.'s Mem. second unnumbered page.) He further states that Hatcher "took it upon himself to lower [his] dosage" after learning of the five-day delay in receiving treatment. (*Id.*) The Court discusses these inconsistencies below. *See infra* n. 13.

10  Plaintiff's testimony is also inconsistent in this regard. For example, he also stated in his deposition testimony that he did *not* ask to speak to anyone on the mental health staff in his first ten days at GMDC when he was not medicated. (Hamm Dep. 25:25–26:3, 26:22–25, 27:17–19.)

11  In his opinion, Judge Karas dismissed Plaintiff's Fourteenth Amendment claim against Hatcher to the extent that it was based on allegations that Plaintiff received a lower dose of Paxil than he requested. (Doc. 31 at 21.) Accordingly, this Court only addresses herein the portion of Plaintiff's Fourteenth Amendment claim that has survived the motion to dismiss, i.e., that Defendants violated his constitutional rights by depriving him of antidepressant medication for some period of time.

12  To the extent that Plaintiff has argued that Hatcher prescribed him a dosage of Paxil that was too low—and thus inadequate—after the ten-day delay, such a claim has already been addressed and dismissed by Judge Karas. *See supra* n. 11.

**13**     As noted above, *see supra* n. 9, Plaintiff's evidence of GMDC's adherence to this policy is inconsistent. First, in his Third Amended Complaint, dated August 7, 2009, and again in his deposition testimony, dated December 30, 2009, Plaintiff stated that due to a GMDC policy, he was unable to receive his medications for the first ten days after being transferred there. In his opposition papers, dated October 17, 2011, however, Plaintiff states that after not receiving his medication for *five* days upon his transfer to GMDC-with no mention of a prison policy-Hatcher lowered his Paxil dosage. While the Court is well aware that on summary judgment, it may not resolve issues of credibility, it is also well settled that "a party cannot attempt to defeat a summary judgment motion by contradicting factual allegations in his complaint" or in prior sworn testimony. *Rojas v. Roman Catholic Diocese of Rochester,* 783 F.Supp.2d 381, 407 (W.D.N.Y.2010) *aff'd,* 660 F.3d 98 (2d Cir.2011) (citing *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.,* 757 F.2d 523, 528–529 (2d Cir.1985).

The Court is not required to accept Plaintiff's assertion that he was deprived of the medication for ten days, as opposed to five, given that his statements are both equivocal, *see id.,* and unsupported by admissible evidence, *see Wali,* 678 F.Supp.2d at 178 (citing *Holtz,* 258 F.3d at 73.), and in light of the uncontroverted documentary evidence submitted by Defendants. *See Celotex Corp.,* 477 U.S. at 322. However, because the allegations fail even if the Court accepts Plaintiff's assertion that the delay lasted ten days, the Court will analyze the claim based on that version of the facts.

**14**     Although the Court would have greatly benefitted from an affidavit from Hatcher or other medical professionals employed by the City's Department of Corrections—and is perplexed why Defendants failed to submit one—"summary judgment may not properly be based on an absence of a statement from an expert that the care given was [or was not] grossly negligent when inferences drawn from the record could support such a finding." *Pellum v. Burtt,* 9:05–3339–JFA–GCK, 2008 WL 759084, at *33 (D.S.C. Mar. 20, 2008) (citing *Miltier v. Beorn,* 896 F.2d 848, 852 (4th Cir.1990)).

---

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 2761339
Only the Westlaw citation is currently available.
United States District Court,
N.D. California.

Ernest S. HARRIS, Plaintiff,

v.

Robert A. HOREL, et al., Defendants.

No. C 06–7761 SBA (PR).
|
Docket Nos. 34, 45, 49, 53.
|
Aug. 31, 2009.

## Attorneys and Law Firms

Earnest S. Harris, Crescent City, CA, pro se.

Emily L. Brinkman, CA Attorney General, San Francisco, CA, for Defendants.

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

SAUNDRA BROWN ARMSTRONG, District Judge.

### INTRODUCTION

**\*1** Plaintiff Ernest Harris is a state prisoner who is proceeding pro se in this civil rights action brought under 42 U.S.C. § 1983, in which he alleges that officers and employees of Pelican Bay State Prison ("PBSP") violated his constitutional rights. Defendants have filed have a motion for summary judgment. For the reasons set forth below, the Court finds that Plaintiff has not shown that there are genuine issues as to any material fact as to his claims against Defendants. Accordingly, the Court GRANTS the motion for summary judgment as to all claims against all Defendants. [1]

### BACKGROUND

The following facts appear to be undisputed, unless otherwise noted. This action arises from the punishments Plaintiff received from April 2005 to December 2006 for violating the rules of the Indecent Exposure Pilot Program ("IEPP") at

PBSP. According to Defendants, in 2004 PBSP gave notice to inmates that in 2005 it would implement the IEPP "to address the management of indecent exposure incidents at Pelican Bay." (Pls.' Mot. for Summ. J. ("MSJ") ¶ 5.) Plaintiff disputes that proper notice was given. The disciplinary sanctions that PBSP can impose under the IEPP include the deprivation of canteen and yard privileges, property, and guest visitations. (*Id.* ¶ 6.) IEPP's security precautions include a yellow covering attached to the front of a cell to alert staff that an inmate has a propensity to commit acts of indecent exposure or sexual disorderly conduct, and the wearing of a "behavior modification suit," or "Exposure Control Jumpsuit" ("ECJ") that prevents an inmate from exposing himself. (*Id.* ¶ 7.) Only inmates who have a history of exposing themselves while outside their cell are required to wear the suit, and the inmate is not required to wear it while in his cell. (*Id.*)

Plaintiff, who is housed in the Security Housing Unit ("SHU") at PBSP, was found to have committed two acts of indecent exposure in 1999, three in 2004, two in 2005, and one in 2006. (*Id.* ¶ 26.) As punishment for the 1999 violation, Plaintiff received ninety days of lost credit for the first violation. For the 2004 violations, Plaintiff was given 180 days of lost credit, was denied canteen privileges, was required to wear the ECJ, and the yellow placard was placed on the front of his cell. For the 2005 violations, Plaintiff lost a total of 180 days of credit. In 2006, Plaintiff lost canteen, mail, and personal property privileges for 180 days. (*Id.*)

Plaintiff alleges that his Eighth Amendment rights against cruel and unusual punishment rights were violated when Defendants (1) failed to provide adequate notice that the IEPP would be imposed; (2) suspended canteen and personal property privileges; (3) restriction of various privileges without time limits on the length of the restriction; threatened his safety; and (5) required him to wear the ECJ.

### DISCUSSION

#### I. *Standards of Review*

##### A. *Summary Judgment*

**\*2** Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106

S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Cattrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. But on an issue for which the opposing party will have the burden of proof at trial, as is the case here, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P. 56(e).* The court is only concerned with disputes over material facts and "factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248. It is not the task of the court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allen,* 91 F.3d 1275, 1279 (9th Cir.1996). The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Id.* If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Celotex,* 477 U.S. at 323.

## II. *Analysis*

### A. Alleged Lack of Notice

Plaintiff claims that Defendants failed to provide adequate notice that PBSP would implement the IEPP procedures.

Due process requires fair notice of prohibited conduct before a sanction can be imposed. *See Newell v. Sauser,* 79 F.3d 115, 117 (9th Cir.1996). This principle applies within the prison setting. *See id.* at 117–18 (prison regulation prohibiting possession of "anything not authorized for retention or receipt by the prisoner" did not give inmate-law librarian notice that he could not possess draft legal documents to assist other inmates pursuing litigation. Accordingly, a prisoner may not be disciplined without having committed a violation of known policy or procedure.

Based on a review of the record, the Court concludes that Plaintiff has not shown evidence that precludes summary judgment. Assuming, *arguendo,* that Plaintiff's factual allegations are true, Plaintiff has not shown that his due process rights were violated. Specifically, Plaintiff knew of and was subject to identical punishments before the imposition of IEPP as he was after the imposition of the program. In 2004, for example, before the implementation of the IEPP, Plaintiff, as punishment for acts of indecent exposure, lost day credits and canteen privileges, was required to wear the ECJ, and his cell was marked with the yellow covering. Because Plaintiff had notice of these punishments under the system preceding IEPP, he has not shown that the alleged lack of notice of the implementation of IEPP violated his right to due process. More specifically, if Plaintiff had no notice that a new program was being implemented, he would assume that the old program was in place, a program that prescribed the same punishments as the new system. On this record, the Court concludes that Petitioner has failed to set forth specific facts that show that there is a genuine issue for trial. Accordingly, the Court GRANTS Defendants' motion for summary judgment as to this claim.

### B. Deprivation of Canteen and Personal Property Privileges

**\*3** Plaintiff claims that the deprivation of his canteen and personal property privileges was cruel and unusual punishment, and therefore a violation of his Eighth Amendment rights. In particular, Plaintiff alleges that the deprivation of hygiene products (such as shampoo, lotion, deodorant), items such as a television and reading material, and paper violated the Eighth Amendment.

The Eighth Amendment imposes duties on prison officials, who must provide all prisoners with the basic necessities of life such as food, clothing, shelter, sanitation, medical care and personal safety. *See Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). A prison official violates the Eighth Amendment when two requirements are met: (1) the deprivation alleged must be, objectively, sufficiently serious, *see Farmer,* 511 U.S. at 834 (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)), and (2) the prison official possesses a sufficiently culpable state of mind, i.e., the offending conduct was wanton, *id.* (citing *Wilson,* 501 U.S. at 297).

In determining whether a deprivation of a basic necessity is sufficiently serious to satisfy the objective first component

of an Eighth Amendment claim, a court must consider the circumstances, nature, and duration of the deprivation. The more basic the need, the shorter the time it may be withheld. *See Johnson v. Lewis,* 217 F.3d 726, 731 (9th Cir.2000).

Substantial deprivations of shelter, food, drinking water or sanitation for four days, for example, are sufficiently serious to satisfy the objective component of an Eighth Amendment claim. *See id.* at 732–733; *see, e.g., Hearns v. Terhune,* 413 F.3d 1036, 1041–42 (9th Cir.2005) (allegations of serious health hazards in disciplinary segregation yard for a period of nine months, including toilets that did not work, sinks that were rusted and stagnant pools of water infested with insects, and a lack of cold water even though the temperature in the prison yard exceeded 100 degrees, enough to state a claim of unconstitutional prison conditions); *Anderson v. County of Kern,* 45 F.3d 1310, 1314 (9th Cir.1995) ("[A] lack of sanitation that is severe or prolonged can constitute an infliction of pain within the meaning of the Eighth Amendment.").

The requisite state of mind to establish an Eighth Amendment violation in prison-conditions cases, the necessary state of mind is one of "deliberate indifference." *See, e.g., Farmer,* 511 U.S. at 834 (inmate safety); *Helling v. McKinney,* 509 U.S. 25, 32–33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (inmate health); *Wilson,* 501 U.S. at 302–03 (general conditions of confinement); *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (inmate health).

Neither negligence nor gross negligence will constitute deliberate indifference. *See Farmer,* 511 U.S. at 835–36 & n. 4. A prison official cannot be held liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the standard for criminal recklessness is met, i.e., the official knows of and disregards an excessive risk to inmate health or safety. *Id.* at 837. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *See id.*

**\*4** Applying the Eighth Amendment legal principles to the instant matter, the Court concludes that Petitioner has not shown evidence that precludes summary judgment. Petitioner simply has not shown that the alleged deprivations of canteen access and personal property are sufficiently serious under *Farmer.* Plaintiff has not alleged, nor shown, that Defendants failed to provide the basic necessities of life such as food, clothing, shelter, sanitation, medical care and personal safety,

or that the denial of canteen access or of personal property constituted such a deprivation. Nor has Plaintiff shown that the canteen contained items he needed to enjoy life's necessities, or that a piece of personal property denied him was necessary to his health or safety. In sum, Plaintiff's being denied access to such canteen products as writing paper or hygiene items is not a deprivation that implicates his Eighth Amendment rights. *See, e.g., Keenan v. Hall,* 83 F.3d 1083, 1092 (9th Cir.1996) (holding that there is no constitutional right to such canteen items as birthday cards).

Furthermore, Plaintiff's assertion that he did not have access to paper is contradicted by the fact that he was able to file complaints against PBSP while he was in prison. Nor has Plaintiff has shown that being deprived of his personal property items of a television and reading material was a denial of life's basic necessities.

Also, Plaintiff has not met second *Farmer* element, viz., he has not shown that Defendants knew of and disregarded a risk to his health or safety by denying canteen access or by denying him his personal property. Again, Petitioner has not identified any item in the canteen or a piece of personal property the denial of which Defendants knew created a risk to Plaintiff's health or safety.

Accordingly, the Court GRANTS Defendants' motion for summary judgment as to this claim.

## C. Allegedly Limitless Restrictions

Plaintiff claims that the punishments imposed under IEPP— having to wear the suit, for example—are without limitation, and therefore constitute cruel and unusual punishment.

Based on a review of the record, the Court concludes that Plaintiff has not shown evidence that precludes summary judgment. Defendants have submitted evidence that the restrictions "have specific time limitations." (MSJ at 16.) According to Defendants, a first offense can result in a loss of privileges of up to ninety days, while a second offense can result in a 180–day loss of privileges. The suit is worn only by inmates who have a history of indecent exposure, and only when the inmate is outside of his cell. "The suit restriction remains in place for 90 days for a first offense and then six months for subsequent offenses with continued review" by prison authorities. (MSJ at 17–18.) Plaintiff has not presented countering evidence, nor does it appear that he disputes Defendants' assertions.

As for yard restrictions, Plaintiff has not shown evidence that he had less yard time than before the punishments were imposed, but rather that he is required to wear the suit when he is outside of his cell.

**\*5** Furthermore, Plaintiff would have received notice of any allegations made against him, as well as notice of hearing before any punishment were imposed. At these hearings, Plaintiff could challenge the charges, and, if found guilty, could appeal them.

Based on this record, the Court concludes that Plaintiff has failed to make the requisite showing to defeat a motion for summary judgment. Accordingly, the Court GRANTS Defendants' motion for summary judgment as to this claim.

### D. Alleged Threat to Plaintiff's Safety

Plaintiff claims that making his cell with the yellow covering alerts other prisoners as to his status, thereby making him the object of attacks by other prisoners. Plaintiff also claims that the lack of natural light, which is caused by the yellow covering, has caused him severe depression and has caused him to contemplate suicide.

As to his first claim, Plaintiff has alleged that some inmates will not speak to him, and that assaults on other prisons under similar restrictions as Plaintiff have occurred. However, Plaintiff has not alleged or presented evidence that he has been attacked by other prisoners, or even that he has been threatened by other inmates because he has been identified as having a history of committing acts of indecent exposure. Plaintiff, then, has not set forth specific facts showing that there is a genuine issue for trial. Accordingly, the Court GRANTS Defendants' motion for summary judgment as to this claim.

As to his second claim, Plaintiff has not shown that Defendants were deliberately indifferent to Plaintiff's mental health. Rather, the record shows that Defendants were aware of mental health risks and had a program through which Plaintiff's mental health concerns could be addressed. Specifically, Defendants have presented evidence undisputed by Plaintiff that PBSP repeatedly examines inmates subject to IEPP and those who are housed in SHU to determine their mental health. Specifically, inmates under IEPP are monitored for any psychological issues which would require treatment for exhibitionism or paraphilia. Before an inmate is placed in SHU, he is examined by a psychologist to ensure that the inmate does not have a mental health problem that would "exclude their placement in SHU." (MSJ at 20.) Also, inmates can at any time request to see a psychologist for treatment or an assessment. (*Id.*) On this record, Plaintiff has not shown that Defendants were deliberately indifferent to his serious psychological needs. Plaintiff, then, has not set forth specific facts that show a genuine issue for trial. Accordingly, the Court GRANTS Defendants' motion for summary judgment as to these claims.

### E. The Behavioral Modification Suit

Plaintiff claims that having to wear the suit is a violation of his Eighth Amendment rights because the ECJ is dirty, does not get washed, stinks, and "is like a padded suit with straps in the back like a straightjacket." (Compl. at 3.)

**\*6** Applying the above legal principles to the instant matter, the Court concludes that Plaintiff has not presented evidence that precludes summary judgment. Specifically, Plaintiff's allegations that he has to wear a dirty and restrictive suit for the hour or so that he is allowed out of his cell, do not, without more, rise to the level of an Eighth Amendment violation. Temporary placement in unsanitary and malodorous conditions does not rise constitute a constitutional violation. *See Anderson,* 45 F.3d at 1314–15 (temporary placement in safety cell that was dirty and smelled bad did not constitute infliction of pain). Accordingly, the Court GRANTS Defendants' motion for summary judgment as to this claim.

### *CONCLUSION*

For the foregoing reasons, Defendants' motion for summary judgment (Docket No. 34) is GRANTED as to all claims. Plaintiff shall take nothing by way of his complaint.

Plaintiff's motion for reconsideration of the Court's dismissal of his First Amendment claim (Docket No. 45) is DENIED.

Defendants' motion to stay discovery (Docket No. 49) is DENIED AS MOOT.

Plaintiff's motion for discovery (Docket No. 53) is DENIED AS MOOT.

This order terminates Docket Nos. 34, 45, 49 & 53.

The Clerk of the Court shall enter judgment in favor of Defendants, terminate all pending motions, and close the file.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2761339

Footnotes

1  Defendants assert that they are immune from suit as to all claims under the doctrine of qualified immunity. (MSJ at 21.) Because the Court has determined that Plaintiff has not shown evidence that precludes summary judgment, the Court need not address the question of qualified immunity.

**End of Document**                                                      © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 907316
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

John JAMISON, Plaintiff,

v.

Mr. HAYDEN, Psychologist, Clinton Correctional
Facility; Mr. Bushi, Correctional Counselor,
Clinton Correctional Facility; Brown, Capt. of
Security, Clinton Correctional Facility; Planto, CO,
Sergeant for Security, Clinton Correctional Facility;
Turner, Ms., Assistant Deputy of Programs, Clinton
Correctional Facility; Zinnerman, Mr., Correctional
Counselor, Attica Correctional Facility; Thorn,
Mr., Correctional Counselor, Elmira Correctional
Facility; Cerio, Mr., Deputy Superintendent of
Programs, Elmira Correctional Facility, Defendants.

No. 9:03-CV-913 (FJS/DRH).
|
March 31, 2008.

**Attorneys and Law Firms**

John Jamison, Attica, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of
New York, Steven H. Schwartz, Esq., Michael G. McCartin,
Esq., Assistant Attorneys General, of Counsel, Albany, NY,
for Defendants.

## ORDER

SCULLIN, Senior District Judge.

**\*1** In a Report-Recommendation and Order dated August 7,
2007, Magistrate Judge Homer recommended that this Court
grant Defendants' motion for summary judgment. *See* Dkt.
No. 77. Plaintiff filed objections to this recommendation. *See*
Dkt. No. 79.

In his objections, Plaintiff raises many of the same arguments
that he did in opposition to Defendants' motion for summary
judgment. In addition, to support his claim that Defendants
violated his right to equal protection, he lists the names of four
inmates, who were transferred under various circumstances;
however, he does not indicate how those inmates are similarly
situated to him or how Defendants' treatment of those inmates
demonstrates that Defendants violated his rights to equal
protection. Finally, although Plaintiff continues to assert that
Defendants placed him in imminent danger when they moved
him from one facility to another and did not immediately grant
his request to be placed in voluntary protective custody, he
does not assert that he suffered any physical injury as a result
of Defendants' actions.

The Court has reviewed the file in its entirety and finds that
Plaintiff has not come forward with any evidence to show
that there is a genuine issue for trial with respect to any of
his claims that Defendants violated his constitutional rights.
Therefore, the Court hereby

**ORDERS** that Magistrate Judge Homer's August 7, 2007
Report-Recommendation and Order is **ADOPTED IN ITS
ENTIRETY for the reasons stated therein;** and the Court
further

**ORDERS** that Defendants' motion for summary judgment is
**GRANTED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in
favor of Defendants and close this case.

**IT IS SO ORDERED.**

## REPORT-RECOMMENDATION AND ORDER [1]

DAVID R. HOMER, United States Magistrate Judge.

Plaintiff pro se John Jamison ("Jamison"), an inmate in the
custody of the New York State Department of Correctional
Services ("DOCS"), brings this action pursuant to 42 U.S.C.
§ 1983 alleging that defendants, eight DOCS employees,
violated his constitutional rights under the First, Eighth,
and Fourteenth Amendments. *See* Compl. (Docket No.
1). Presently pending is defendants' motion for summary
judgment pursuant to Fed.R.Civ.P. 56. Docket No. 71.
Jamison opposes the motion. Docket No. 73. For the
following reasons, it is recommended that defendants' motion
be granted.

### I. Background

The facts are presented in the light most favorable to Jamison as the non-moving party. *See Ertman v. United States,* 165 F.3d 204, 206 (2d Cir.1999).

In February 2002, Jamison was incarcerated at Clinton Correctional Facility ("Clinton") and participated in the Merle Cooper program.[2] *See* Turner Decl. (Docket No. 71) at ¶ 4. On February 27, 2002, Jamison requested protective custody[3] form. *See* Hayden Decl. (Docket No. 71), Ex. A; *see also* Compl. at ¶¶ 21-24. No action was taken on the request. Between March 8 and April 2, 2002, Jamison was incarcerated at various DOCS facilities. *See* Turner Decl., Ex A. On April 5, 2002, Jamison was transferred to Attica Correctional Facility ("Attica") and placed in general population. *Id.; see also* Compl. at ¶¶ 32-33. On April 7, 2002, Jamison requested that he be placed into voluntary protective custody. *See* Compl. at ¶¶ 33-34; *see also* Zimmerman Dec. (Docket No. 71), Ex. B. Shortly thereafter, defendant Zimmerman interviewed Jamison and endorsed Jamison's request to be placed into voluntary protective custody. *See* Zimmerman Decl., Ex. B; *see also* Compl. at ¶ 34. On April 17, 2002, Jamison's request for protective custody was approved by Attica's Superintendent. *Id.*

**\*2** On or about August 2, 2002, Jamison was transferred to Elmira Correctional Facility ("Elmira") and was placed in general population. *See* Compl. at ¶ 36; *see also* Turner Decl., Ex. A. Shortly thereafter, Jamison requested protective custody, but his request was denied by defendant Thorn. *See* Compl. at ¶ 36. However, on September 6, 2002, Jamison's request for protective custody was granted. *See* Compl. at ¶ 40. This action followed.

## II. Discussion

Jamison asserts four causes of action against each defendant, alleging that they violated his due process and equal protection rights under the Fourteenth Amendment and failed to protect him from inmate assaults in violation of the Eighth Amendment. Jamison also contends that defendants failed to provide him with a typewriter in violation of the First Amendment. Defendants seek judgment on all claims.

### A. Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223-24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988). When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Id.; see also Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U .S. at 247-48.

### B. Failure to Protect

Jamison contends that by leaving him in general population at Attica and Elmira for ten and thirty-five days respectively following his requests for protective custody, defendants knew of and disregarded an excessive risk to his safety. *See* Compl. at ¶¶ 32, 35; *see also* Compl (Part II)[4] (Docket No. 1) at ¶ 2.

**\*3** Prison officials have a duty to protect inmates from violence by other inmates. *See Farmer v. Brennan,* 511 U.S. 825, 833 (1994). When asserting a failure to protect claim, an inmate must establish that he was "incarcerated under conditions posing a substantial risk of serious harm" and that the defendants acted with deliberate indifference

to the inmate's safety. *Id.* at 834. Deliberate indifference is established when the official knew of and disregarded an excessive risk to inmate health or safety. *Id.* at 837. However, "the issue is not whether [a plaintiff] identified his enemies by name to prison officials, but whether they were aware of a substantial risk of harm to [him]." *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 621 (2d Cir.1991).

Jamison contends that by leaving him in general population at Attica and Elmira, defendants placed his life "in a prevasive [sic] risk of injury." *See* Compl. at ¶ 32. On April 5, 2002, Jamison arrived at Attica and was placed in general population. *See* Turner Decl., Ex. A. On April 7, 2002, Jamison requested protective custody and was interviewed by defendant Zimmerman on April 11. *See* Zimmerman Decl., Ex. B; *see also* Compl. at ¶ 34. The superintendent granted Jamison's request ten days later on April 17, 2002. *Id.* On or about August 1, 2002, Jamison was transferred from Attica to Elmira. *See* Compl. at ¶ 36; see *also* Turner Decl., Ex. A. Upon arrival at Elmira, Jamison requested protective custody status. *See id.* Defendant Thorn initially denied Jamison's request, but Jamison's request was ultimately granted thirty-five days later on September 6, 2002. *See* Compl. at ¶¶ 36-40.

Here, Jamison's contention that defendants were deliberately indifferent to his safety is without merit. At both Attica and Elmira, defendants granted Jamison's requests for protective custody status, albeit not as quickly as Jamison would have preferred. Further, Jamison fails to allege any injury that resulted from being temporarily housed in general population. The law is clear that an inmate must demonstrate an "actual injury" when alleging a constitutional violation. *See Brown v. Saj,* No. Civ. 06-6272(DGL), 2007 WL 1063011, at *2 (W.D.N.Y. Apr. 5, 2007) (citing *Lewis v. Casey,* 518 U.S. 343, 349 (1996)). Jamison simply contends that he suffered "severe stress" as a result of being housed in general population. *See* Pl. Reply Statement of Facts (Docket No. 76) at ¶ 29.[5] However, "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e) (2003); *see also Thompson v. Carter,* 284 F.3d 411, 417 (2d Cir.2002) (holding that § 1997e(e) "applies to claims in which a plaintiff alleges constitutional violations so that the plaintiff cannot recover damages for mental or emotional injury for a constitutional violation in the absence of a showing of actual physical injury").

**\*4** Thus, because Jamison has failed to demonstrate any actual injury from defendants' delay in granting protective custody, Jamison has failed to state a claim under the Eighth Amendment. *See Brown,* 2007 WL 1063011, at *2 (dismissing inmate's failure to protect claim for failure to demonstrate an actual injury); *Cruz v. Hillman,* No. Civ. 01-4169 (DAB/DF), 2002 WL 31045864, at *8-9 (S.D.N.Y. May 16, 2002) (holding that an inmate's fear that defendants' refusal to place him in protective custody would subject him to assaults by his enemies was insufficient to state a claim under the Eighth Amendment); *Hudson v. Greiner,* No. Civ. 99-12339(LAP), 2000 WL 1838324, at *6-7 (S.D.N.Y. Dec. 13, 2000) (holding that fear of assault, without any actual injury, was insufficient to state a claim).[6]

Therefore, it is recommended that defendant's motion on this ground be granted.

### C. Due Process

Jamison contends that defendants violated his due process rights when they removed him from the Merle Cooper Program without cause. *See* Compl. at ¶ 49. Jamison also contends that defendants failed to provide him due process before placing him in protective custody. *Id.* at ¶ 47.

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. *See Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483-84 (1995). This standard requires a prisoner to establish that the deprivation was atypical and significant in relation to ordinary prison life. *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Jamison contends that although he requested protective custody on February 27, 2002, he was misled about the true nature of the document he signed by "sergeant Plattno." *See* Compl. at ¶ 22; *see also* Pl. Reply Statement of Facts at ¶ 15. However, even assuming that Jamison was somehow coerced into signing the voluntary protective order, he has failed to establish a constitutional deprivation because he requested, and was granted, release from protective custody on March 11, 2002. *See* Turner Decl., Ex. A.

A confinement of such limited duration fails to establish an atypical or significant hardship under *Sandin. See Jackson v. Mahoney,* No. Civ. 92-3405(LAP), 1996 WL 509677, at *7-8 (S.D.N.Y. Sept. 9, 1996) (holding that inmate's placement in involuntary protective custody for approximately forty-five days did not constitute an atypical or significant hardship); *see also Hynes v. Squillace,* 143 F.3d 653, 657-58 (2d Cir.1998); *Smart v. Goord,* 441 F.Supp.2d 631, 640 (S.D.N.Y.2006). Moreover, as to Jamison's contention that he was removed from the Merle Cooper Program without due process, he has failed to establish a constitutional violation because inmates do not enjoy a protected liberty interest in being assigned to a particular program or job while incarcerated. *See, e.g., Hall v. Unknown Named Agents of N.Y. State Dep't for Corr. Servs. for APPU Unit at Clinton Prison,* 825 F.2d 642, 645-46 (2d Cir.1987) (no protected liberty interest in assignment to the Assessment Program and Preparation Unit ("APPU")); *Frazier,* 81 F.3d at 318 ("no protected liberty interest in a particular job assignment").

**\*5** Accordingly, it is recommended that defendants' motion on this ground be granted.

### D. Access to Courts

Liberally construed, Jamison's complaint alleges that he was denied access to the courts while at Elmira. *See* Compl. (Part II) at ¶¶ 5-7.

All persons have a constitutional right of access to the courts. *Lewis,* 518 U.S. at 350; *Monsky v. Moraghan,* 127 F.3d 243, 246 (2d Cir.1997). To establish a violation of the right of access to the courts, a prisoner must demonstrate that his or her efforts to pursue a legal claim were impeded. *Lewis,* 518 U.S. at 351; *Bourdon v. Loughren,* 386 F.3d 88, 92-93 (2d Cir.2004). A plaintiff must demonstrate not only that a defendant's conduct was deliberate and malicious but also that this conduct caused an actual injury such as the "dismissal of an otherwise meritorious legal claim." *Cancel v. Goord,* No. Civ. 00-2042(LMM), 2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001) (citing *Lewis,* 518 U.S. at 351). Here, Jamison contends that defendants' failure to supply him with a typewriter resulted in his "denial of entry in to the court of last resort." Compl. (Part II) at ¶ 7. However, inmates, as a matter of law, do not have a constitutional right to a typewriter. *See Walton v. Waldron,* 886 F.Supp. 981, 986 (N.D.N .Y.1995); *see also Taylor v. Coughlin,* 29 F.3d 39,

40 (2d Cir.1994). Thus, as a matter of law, Jamison's claim must fail.

Therefore, it is recommended that defendants' motion as to Jamison's access to courts claim be granted.

### E. Equal Protection

Jamison contends that defendants violated his equal protection rights under the Fourteenth Amendment.

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). "In order to establish an equal protection violation, the plaintiffs must show that they were treated differently than other people in similar circumstances and must establish that such unequal treatment was the result of intentional and purposeful discrimination." *Myers v. Barrett,* No. Civ. 95-1534(RSP/GJD), 1997 WL 151770, at *3 (N.D.N.Y. Mar. 28, 1997). In addition, a valid equal protection claim may be brought by a "class of one" "where the plaintiff alleges that she [or he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *See Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000); *Neilson v. D'Angelis,* 409 F.3d 100, 105 (2d Cir.2005).

Here, Jamison makes only vague and conclusory allegations that he was denied the equal protection of the laws and thus has failed sufficiently to show an equal protection violation. *See De Jesus v. Sears Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996). Equally significant here is that the complaint contains no allegation as to which inmates in a similar situation were treated differently than Jamison. *Oliver v. Cuttler,* 968 F.Supp. 83, 88 (E.D.N.Y.1997). Thus, Jamison has failed to raise any triable question of fact as to this claim.

**\*6** Therefore, it is recommended that defendants' motion on this ground be granted.

### F. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability insofar as their

conduct does not violate clearly established constitutional law of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229 (N.D.N.Y.2002), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). A court must first determine that if plaintiff's allegations are accepted as true, there would be a constitutional violation. Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, as discussed *supra,* accepting all of Jamison's allegations as true, he has not shown that defendants violated his constitutional rights.

Therefore, in the alternative, defendants' motion for summary judgment on this ground should be granted.

### III. Conclusion [7]

For the reasons stated above, it is hereby

**RECOMMENDED** that defendants' motion for summary judgment (Docket No. 71) be **GRANTED** as to all claims and all defendants.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

### All Citations

Not Reported in F.Supp.2d, 2008 WL 907316

### Footnotes

1   This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2   The Merle Cooper program is a therapeutic program for inmates and is housed in the Clinton Annex. *See Griffin v. Coughlin,* 743 F.Supp. 1006, 1010 (N.D.N.Y.1990). "Inmates in the ... program are granted the following amenities: wood shop; gym; movies; cooking facilities; refrigerators; color television; communication meetings and group therapy." *Id.; see also* Compl. at ¶ 2.

3   An inmate qualifies for voluntary protective custody if he or she "is a potential victim or a witness likely to be intimidated, or who lacks the ability to live in the general facility community and who may for good cause be restricted from communication with the general inmate population, and who voluntarily accepts admission into protective custody." N.Y. Comp. codes R. & Regs., tit. 7, § 330.2(a) (2007).

4   Complaint (Part II) refers to the second half of Jamison's complaint entitled "Part Two of Complaint Defendants in Violation of DOCS Directive, No. 4948." *See* Docket No. 1.

5   Notably, Jamison does not contest the defendants' contention that he did not suffer any physical injury while incarcerated at Attica. *See* Pl. Reply Statement of Facts at ¶ 27.

6   Jamison also contends that while in general population at Elmira, he was denied meals on two separate occasions. *See* Compl. at ¶¶ 36, 39. However, in the instant action, he fails to name any of the officers who allegedly denied him his meals. It is also undisputed that the meals were available to Jamison as part of the general population but that he declined to leave his cell for the meals. For both reasons, defendants are entitled to judgment as to Jamison's claims regarding the meals.

7   Defendants also contend that Jamison failed to exhaust his available administrative remedies. *See* Defs. Mem. of Law (Docket No. 71) at 3-5. However, it is recommended herein that defendants' motion should be granted as to all of Jamison's claims on other grounds. Thus, this argument need not be addressed.

---

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works.   5

2013 WL 5175588
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Nate MYERS, Plaintiff,

v.

Colleen DOLAC, et al., Defendants.

No. 09–CV–6642P.
|
Sept. 12, 2013.

**Attorneys and Law Firms**

Nate Myers, Comstock, NY, pro se.

Michael J. Pacifico, Buffalo, NY, for Defendants.

*DECISION & ORDER*

MARIAN W. PAYSON, United States Magistrate Judge.

***PRELIMINARY STATEMENT***

**\*1** Plaintiff Nathaniel Myers ("Myers") has sued defendants Colleen Dolac ("Dolac"), Robert Koch ("Koch"), Timothy Howard ("Howard"), Michael Reardon ("Reardon"), John Anthony ("Anthony"), Kathleen Davidson ("Davidson"), Thomas Diina ("Diina"), Rebecca Calhoun ("Calhoun"), Susan Wilkie ("Wilkie") and the County of Erie (the "County") (collectively, "defendants"), asserting various federal and state claims arising from his incarceration in the Erie County Holding Center in 2009.[1] (Docket # 91). Currently before the Court is defendants' motion for summary judgment. (Docket # 100).

Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a magistrate judge. (Docket # 36). For the reasons discussed below, defendants' motion for summary judgment is granted in part and denied in part.

*Summary of Parties' Arguments*

Defendants seek dismissal of Myers's complaint in its entirety under 42 U.S.C. § 1997e(e) on the grounds that he has failed to allege a physical injury. (Docket # 100–6 at 5–8). With respect to his claims against Dolac asserting violations of

constitutional privacy rights and HIPAA, defendants contend that Myers has no constitutionally protected confidentiality in his medical condition (Hepatitis C[2]) and that HIPAA does not authorize a private right of action. (*Id.* at 8–9). Defendants also seek summary judgment on Myers's deliberate indifference claim against Dolac on the grounds that Myers was not suffering from a serious medical need and, even if he had been, Dolac's conduct did not rise to the level of deliberate indifference. (*Id.* at 10–17).

With respect to Myers's claims against Calhoun, Wilkie, Howard and Koch for interference with his legal mail and access to the courts, defendants maintain that Myers has failed to raise a triable issue of fact that the alleged interference impeded his litigation. (*Id.* at 20). Defendants also argue that Howard and Koch are entitled to summary judgment because they were not personally involved in the alleged opening of Myers's legal mail and that Myers has failed to establish the existence of an unlawful policy or practice permitting the opening of his legal mail.[3] (*Id.* at 17–20).

Myers maintains that 42 U.S.C. § 1997e(e) does not warrant dismissal of his complaint because he seeks nominal and punitive damages, as well as injunctive relief. (Docket # 102 at 5–6). Myers contends that he does have a constitutionally protected privacy interest in his medical condition, that Hepatitis C does constitute a serious medical need and that Dolac deliberately denied him treatment for the disease. (*Id.* at 7–8). Finally, Myers argues that summary judgment should be denied on his mail interference claim because the seizure of his legal mail impeded his ability to effect service of the summons in this lawsuit.[4] (*Id.* at 10–11).

**A.** *Factual Background*

In support of their motion for summary judgment, defendants have submitted no affidavits of anyone with personal knowledge of the events described in Myers's complaint. Instead, defendants support their motion with a Local Rule 56(a) Statement of Undisputed Material Facts (Docket # 100–1), which attaches Myers's Third Amended Complaint (Docket # 100–1 at Exhibit ("Ex.") B), transcripts of the two depositions of Myers (Docket # 100–1 at Exs. A and D), and an affidavit of Edwin Heidelberger, M.D., which attaches Myers's medical records (Docket # 100–1 at Ex. C).

**\*2** In opposition, Myers has submitted a Rule 56(a) Statement of Disputed Facts (Docket # 102 at 13–19), his own affidavit (*id.* at 20–24), an affidavit of an inmate who

purportedly witnessed some of the events described in the Third Amended Complaint (Docket # 103 at 2–3), several grievances (Docket # 102 at 37–38; Docket # 103 at 4–7, 16–18) and medical records (Docket # 103 at 8–15).

The following facts are undisputed except where otherwise noted. Myers was incarcerated at the Erie County Holding Center ("ECHC") from 2008 through 2010. (Docket # 100–1 at ¶ 10 and Ex. A at 35; Docket # 102 at 15, ¶ 10). Myers contends that during his incarceration he was bitten by another inmate who was infected with the Hepatitis C virus. (Docket # 91 at ¶¶ 19, 49–51). On or before October 15, 2009, [5] Myers was diagnosed with Hepatitis C infection. (*Id.* at ¶ 21; Docket # 103 at 11). According to Myers, prior to his incarceration at ECHC, he had not been exposed to the virus. (Docket # 91 at ¶ 22).

On October 15, 2009, Myers was seen by a physician at the Erie County Medical Center ("ECMC") in order to follow up on his laboratory results related to his Hepatitis C diagnosis. (Docket # 100–4 at 60). During that visit, the physician instructed Myers to have a blood sample taken for additional testing as soon as possible in order to begin "immediate" treatment. (*Id.* at 60–62; Docket # 100–1 at Ex. A at 7–8 and Ex. D at 8–9, 35). In addition, the doctor told Myers that he needed to be seen by a gastrointestinal ("GI") physician prior to treatment. (Docket # 100–1 at Ex. A at 25–26 and Ex. D at 11; Docket # 100–4 at 60–62). The medical records documenting Myers's appointment with the ECMC physician contain a notation that Myers would be "refer[red] to GI for evaluation for Interferon/Ribavirin." (Docket # 103 at 12; Docket # 100–4 at 60–62). They also contain a "Gastroenterology Referral Form" referring Myers to the GI clinic to be "evaluate[d] for treatment." (Docket # 103 at 13).

On October 16, 2009, Myers approached Dolac, a registered nurse employed by the Erie County Department of Health who worked at ECHC, while she was distributing medication on Myers's cellblock. (Docket # 100–1 at ¶ 4 and Ex. A at 7–8). As Myers approached Dolac and asked, "Ms. Colleen, is there any type of way that you can get me upstairs to take my blood for ECMC, they said they need ASAP blood." (*Id.* at Ex. A at 9). Myers claims that Dolac screamed in response, "Yeah, Myers I'm the person who gave you hepatitis C." (*Id.* at 7). According to Myers, Dolac repeated the statement as she walked through the cellblock. (*Id.* at 7–10, 12). Myers contends that approximately thirteen other inmates who were on the block that day overheard Dolac's statements. (*Id.* at 11–12, 14).

Myers has submitted a sworn affidavit of Richard Buster ("Buster"), an inmate who was present on October 16, 2009. (Docket # 103 at 2–3). The affidavit asserts:

> **\*3** I heard "Mr. Myers" ask the "nursu" [sic] collen" [sic] about his [b]lood work from E.C.M.C. than [sic] she reacted unprofessinaly [sic] by calling at the "top of her lungs" and "screaming" "[y]es" Mr. Myers" I'm the one who gave you the "hep" C." She then [r]epeated the above statment [sic] servil [sic] times up and down the unit of brovo long low side at the E.C.H .C. there was 14[i]nmates on the [b]lock who heard the same thinging [sic] I heard coming from "nursu" [sic] "collen dolac."

(*Id.*). Myers contends that he immediately requested a grievance form. (Docket # 100–1 at Ex. A at 12–13; Docket # 102 at 37–38). In addition to submitting a grievance about the incident, he also submitted a grievance complaining that he was not receiving treatment for his Hepatitis C condition. (Docket # 100–1 at Ex. A at 21–22; Docket # 103 at 4).

Myers contends that he was disciplined as a result of the incident and sentenced to six months of keeplock confinement. (Docket # 100–1 at Ex. A at 16, 19–20). After serving approximately twenty days, Myers alleges, he was approached by a corrections officer who threatened him in order to obtain Myers "sign off" on the grievances relating to the incident. (*Id.* at 20–22). Myers contends that after he "signed off," he was released from keeplock. (*Id.;* Docket # 100–1 at Ex. D at 20–21). Myers also maintains that other inmates, including Buster, stopped associating with him as a result of Dolac's disclosure about his condition. (Docket # 102 at 22, ¶¶ 7–8).

Myers claims that after the October 16, 2009 incident, Dolac ignored or refused Myers's sick call requests. (Docket # 100–1 at Ex. D at 29–32). Further, Myers contends that Dolac told him that she would not respond to his sick call requests. (*Id.* at 32) ("she told me that, specifically, I am not putting in nothing for him. She said that."). In addition, Myers contends that he was never given a treatment plan for Hepatitis C. (*Id.* at 12). Although Myers's blood was drawn, Myers contends that he was never permitted to see a GI physician, was never given any medication for Hepatitis C or advised why treatment,

which the ECMC physician had stated was necessary, was in fact unnecessary. (Docket # 100–1 at Ex. A at 24–27 and Ex. D at 12–13, 32–35). ECMC records dated November 4, 2009 indicate that Myers was "[a]waiting GI referral for [prescription] (Interferon)." (Docket # 100–4 at 65).

Myers filed multiple grievances about the lack of treatment. (Docket # 103 at 4–7). Davidson responded in October 2009 stating, "We the staff have followed up [with] ECMC [and] you will be seen as per their schedule." (*Id.* at 4). The latest grievance in the record, dated December 2009, states:

> [I] would like to know when I will be getting treated for Hepitias [sic] C Infection or if any is going to be given. I don't want this virus to become chronic and its been three months since I am notified that I do indeed have this virus.

**\*4** (*Id.* at 7).

As of April 1, 2011, Myers still had not received medication for Hepatitis C. (Docket # 100–1 at Ex. A at 25). According to Myers, the Hepatitis C "was causing degeneration of his physical health." (Docket # 102 at 22, ¶ 8). Specifically, Myers alleged that he suffered "chronic diarrhea" and the failure to obtain treatment left him "scared for [his] life." (Docket # 100–1 at Ex. A at 27, 39).

In support of their motion for summary judgment, defendants have submitted an affidavit of Edwin Heidelberger, M.D. ("Heidelberger"). According to Heidelberger, the care and treatment Myers received was appropriate and consistent with "the accepted standard of care." (Docket # 100–1 at Ex. C at ¶¶ 5–6). Heidelberger's affidavit, however, does not explain the information contained in the medical records, which are simply attached to the affidavit, or why the treatment or lack of treatment was appropriate for Myers's medical condition. (*Id.*).

In January 2010, Calhoun and Wilkie, both employees in the mail room at ECHC, allegedly opened Myers's legal mail that had been sent to him by the United States Department of Justice. (Docket # 100–1 at ¶¶ 7–8; Docket # 91 at ¶¶ 56–59). Myers testified that on January 8, 2010, a corrections officer delivered Myers's mail to him in his cell. (Docket # 100–1 at Ex. D at 23). Myers contends that the mail consisted of an envelope addressed to him from the United States Marshal's Service which related to service of process upon Dolac in this litigation. (Docket # 100–1 at Ex. A at 29–31). Myers claims that he was handed a blank piece of paper that contained only his name, DIN number and the name of the facility, which was stapled to an envelope addressed to him. (*Id.*). Myers believes that the envelope contained additional documents that were improperly seized. (*Id.* at 30–31; Docket # 100–1 at Ex. D at 24–25).

Myers grieved the alleged opening of his legal mail. (Docket # 103 at 16–18). After the January 8, 2010 incident, Myers testified that he generally received his legal mail, although it was occasionally delivered with tape on the envelope. [6] (Docket # 100–1 at Ex. D at 25–28). Myers conceded in his deposition that the opening of his legal mail did not prevent him from commencing this lawsuit and that he did not suffer any injury as a result of the opening of his legal mail. (Docket # 100–1 at Ex. A at 33–34, 42–43). In contrast to that testimony, Myers now claims in conclusory fashion that the mail incident "did impede timely service of the instant litigation upon the defendants." (Docket # 102 at 23, ¶ 11).

**B. Discussion**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In reaching this determination, the court must assess whether there are any disputed material facts and, in so doing, must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.,* 933 F.2d 162, 166–67 (2d Cir.1991). A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248; *Konikoff v. Prudential Ins. Co. of Am.,* 234 F.3d 92, 97 (2d Cir.2000). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *see also Konikoff v. Prudential Ins. Co. of Am.,* 234 F.3d at 97.

**\*5** The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, after which the non-moving party must come forward with sufficient evidence to support a jury verdict in its favor; the motion will not be defeated based upon conjecture, surmise or the existence of "metaphysical doubt" concerning the facts. *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991) (citing *Matsushita Elec. Indus., Ltd. v. Zenith Radio Corp.,* 475

U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).
The party seeking to avoid summary judgment "must do
more than make broad factual allegations and invoke the
appropriate statute. The [party] must also show, by affidavits
or as otherwise provided in Rule 56 ..., that there are specific
factual issues that can only be resolved at trial." *Colon v.
Coughlin,* 58 F.3d 865, 872 (2d Cir.1995); *see also Driscoll
v. Townsend,* 60 F.Supp.2d 78, 80 (W.D.N.Y.1999).

As the Second Circuit has explained:

> [T]he trial court's task at the summary
> judgment motion stage of the litigation
> is carefully limited to discerning
> whether there are any genuine issues of
> material fact to be tried, not to deciding
> them. Its duty, in short, is confined
> at this point to issue-finding; it does
> not extend to issue-resolution.... [I]t
> must be kept in mind that only by
> reference to the substantive law can
> it be determined whether a disputed
> fact is material to the resolution of the
> dispute.

*Gallo v. Prudential Residential Serv., Ltd. P'ship,* 22 F.3d
1219, 1224 (2d Cir.1994).

### 1. *Physical Injury Requirement of 42 U.S.C. § 1997e(e)*

Section 1997e(e) of Title 42 limits a prisoner's ability
to recover damages for mental and emotional injuries.
Specifically, it provides:

> No Federal civil action may be brought
> by a prisoner confined in a jail,
> prison or other correctional facility,
> for mental or emotional injury suffered
> while in custody without a prior
> showing of physical injury.

42 U.S.C. § 1997e(e). Section 1997e(e) applies to all
federal civil actions, including actions asserting constitutional
violations. *See Thompson v. Carter,* 284 F.3d 411, 417 (2d
Cir.2002) ("Section 1997e(e) applies to claims in which a
plaintiff alleges constitutional violations so that the plaintiff
cannot recover damages for mental or emotional injury for
a constitutional violation in the absence of a showing of
actual physical injury"). Although Section 1997e(e) prohibits
a claim for compensatory damages for emotional injury where
there is no physical injury, "it does not restrict a plaintiff's

ability to recover compensatory damages for actual injury,
nominal or punitive damages, or injunctive and declaratory
relief." *Id.* at 416; *see also Lee v. DelFavero,* 2005 WL
2387820, *6 (N.D.N.Y.2005) ("[t]he absence of physical
injury does not totally bar claims by inmates ... [because]
[S]ection 1997e(e) does not preclude claims for nominal
damages, punitive damages, or declaratory or injunctive
relief").

**\*6** Defendants seek dismissal of Myers's complaint on
the grounds that he has failed to establish that he suffered
a physical injury. (Docket # 100–6 at 6–8). Specifically,
defendants contend that Myers has not alleged any physical
injury as a result of the disclosure of his Hepatitis C
diagnosis, the denial of treatment for Hepatitis C or the
opening of his legal mail. [7] (*Id.* at 6–8). This argument
ignores Myers's assertions and testimony that he suffered
from "chronic diarrhea," that the failure to treat the Hepatitis
C "caus[ed] degeneration" to Myers's "physical health" and
that he contracted Hepatitis C after being bitten by another
inmate. (Docket # 91 at ¶¶ 49–51; Docket # 100–1 at Ex. A
at 27; Docket # 102 at 22, ¶ 8).

In any event, each cause of action asserted by Myers seeks,
in addition to compensatory damages, punitive and nominal
damages, as well as injunctive relief. [8] (Docket # 91 at ¶¶
47, 54, 62, 68, 74). Accordingly, Section 1997e(e) does not
bar Myers's claims. *See Thompson v. Carter,* 284 F.3d at
418 (even in the absence of physical injury, Section 1997e(e)
does not bar claims seeking injunctive or declaratory relief
or claims for nominal or punitive damages); *Garcia v. Watts,*
2009 WL 2777085, *20 (S.D.N.Y.2009) ( "[i]f, however,
the plaintiff alleges the violation of a constitutional right,
the action is not entirely barred and the plaintiff may obtain
injunctive or declaratory relief, and nominal or punitive
damages, but not compensatory damages irrespective of
any physical injury if [he] proves that violation") (quoting
*Lipton v. Cnty. of Orange, New York,* 315 F.Supp.2d 434,
457 (S.D.N.Y.2004)); *Mastroianni v. Reilly,* 602 F.Supp.2d
425, 440–41 (E.D.N.Y.2009) ("[t]he plaintiff is not required
to establish an actual physical injury ... [;][i]f inadequate
medical care created a serious risk of harm and rose to a
violation of the plaintiff's civil rights, he is entitled to recover
nominal damages even if the plaintiff sustained no injury").

### 2. *Disclosure of Myers's Medical Condition*

Defendants contend that they are entitled to summary
judgment dismissing Myers's claims arising from Dolac's

alleged disclosure of Myers's Hepatitis C condition. First, defendants contend that Myers does not have a constitutionally protected privacy right with respect to his Hepatitis C status. (Docket # 100–6 at 9–10). Second, defendants contend that Myers's HIPAA claim must be dismissed because HIPAA does not authorize private rights of action.

### a. Constitutional Privacy Rights

An inmate's right to prevent the unwanted disclosure of his personal health information is protected by the Fourteenth Amendment's Due Process Clause. *Davidson v. Desai,* 817 F.Supp.2d 166, 191 (W.D.N.Y.2011) (citing *Doe v. City of New York,* 15 F.3d 264, 267 (2d Cir.1994) (Fourteenth Amendment right to privacy encompasses the "right to protection regarding information about the state of one's health")). The right to confidentiality, however, is not absolute. *See Powell v. Schriver,* 175 F.3d 107, 112 (2d Cir.1999). First, "the interest in the privacy of medical information will vary with the condition." *Id.* at 111. Second, although "[p]rison inmates do not shed all fundamental protections of the Constitution at the prison gates," inmates retain only "those constitutional rights that are not inconsistent with their status as prisoners or with the legitimate penological objectives of the corrections systems." *Id.* at 112 (internal quotations omitted). Thus, "[p]rison officials may impinge upon [an inmate's right to confidentiality] only to the extent that their actions are 'reasonably related to legitimate penological interests.' " *Harris v. Howard,* 2009 WL 537550, *15 (N.D.N.Y.2009) (quoting *Powell v. Schriver,* 175 F.3d at 112).

**\*7** Myers alleges, and defendants have not refuted, that Dolac disclosed his diagnosis to an entire cellblock of inmates. "[G]ratuitous disclosure of an inmate's confidential medical information as humor or gossip ... is *not* reasonably related to a legitimate penological interest." *Powell,* 175 F.3d at 112. The salient question is whether Hepatitis C is the type of condition that warrants constitutional protection.

Whether an inmate is entitled to constitutional protection against disclosure of a particular medical condition is determined on a case-by-case basis. *Matson v. Bd. of Educ. of City Sch. Dist. of New York,* 631 F.3d 57, 66 (2d Cir.2011) ("[i]n considering claims that a constitutional right of privacy attaches to various serious medical conditions, we also proceed on a case-by-case basis"). A medical condition that is both serious in nature and the type that is " 'excruciatingly private and intimate in nature' such as those 'likely to

provoke ... an intense desire to preserve one's medical confidentiality merits constitutional protection.' " *Id.* at 64 (omission in original) (quoting *Powell,* 175 F.3d at 111). Those conditions warranting constitutional protection are defined by "narrow parameters" dictated by society's views of those diseases. *Id.* at 66. Thus, when determining whether a particular condition justifies constitutional protection, courts must determine whether the disease is "contagious ... or attributed in any way to socially repugnant conduct and whether it could be said that society as a whole views [the disease] as directly associated with any disease which might conceivably be characterized as loathsome." *Id.* (omission and alteration in original) (internal quotation omitted). In the prison context in particular, the constitutional right to confidentiality in a medical condition applies only to "unusual medical condition[s] which, if disclosed unnecessarily, would likely expose an inmate to ridicule, discrimination, or even potentially violence, particularly when the word of the condition is likely to spread through humor or gossip." *Williams v. Perlman,* 2009 WL 1652193, *11 (N.D.N.Y.) (citing *Powell,* 175 F.3d at 112), *report and recommendation adopted in part,* 2009 WL 1652188 (N.D.N.Y.2009).

Courts within this Circuit have accorded constitutional privacy protection to a handful of medical conditions only, including HIV, transsexualism and sickle cell anemia. *See Powell,* 175 F.3d at 112 (transsexualism); *Doe v. City of New York,* 15 F.3d at 267(HIV); *Fleming v. State Univ. of New York,* 502 F.Supp.2d 324, 343 (E.D.N.Y.2007) (sickle cell anemia). On the other hand, courts have declined to recognize constitutional protection for many other medical conditions, including fibromyalgia, arthritis and sleep apnea. *See Matson v. Bd. of Educ. of City Sch. Dist. of New York,* 631 F.3d at 68 (fibromyalgia); *Barnes v. Abdullah,* 2013 WL 3816586, *8 (S.D.N.Y.2013) ( arthritis); *Ross v. Westchester Cnty. Jail,* 2012 WL 86467, *9 (S.D.N.Y.2012) (sleep apnea); *see also Hamilton v. Smith,* 2009 WL 3199531, *15 & n. 18 (N.D.N.Y.) (rejecting plaintiff's Eighth and Fourteenth Amendment claims for disclosure of Hepatitis A condition finding Hepatitis A was not "serious medical need" and disclosures were "necessary to investigate ... pending grievances"), *report and recommendation adopted as modified by,* 2009 WL 3199520 (N.D.N.Y.2009); *Wilson v. Brock,* 2008 WL 4239564, *5 (N.D.N.Y.2008) (no constitutionally protected confidentiality in parolee's participation in mandated drug or alcohol rehabilitation program). Of the three courts within the Circuit to address whether Hepatitis C merits constitutional protection, two courts did not reach the issue

and the other determined that the condition did not warrant protection.[9] *See Alsaifullah v. Furco,* 2013 WL 3972514, *7–8 (S.D.N.Y.2013) (dismissing privacy claim because disclosure was reasonably related to a legitimate penological interest irrespective of whether Hepatitis C status warranted constitutional protection); *Watson v. Wright,* 2010 WL 55932, *1 & n. 1 (N.D.N.Y.2010) ("[t]his Court finds no basis in *Powell* and its progeny for holding that, in a prison setting, plaintiff's Hepatitis C condition is the type of condition that gives rise to constitutional protection"); *see Makas v. Miraglia,* 2007 WL 724603, * 15 (S.D.N.Y.2007) (dismissing privacy claim because inmate failed to sufficiently allege personal involvement, but stating that "syphilis or hepatitis [are] conditions which arguably could subject [inmate] to opprobrium"), *aff'd in part and vacated in part on other grounds,* 300 F. App'x 9 (2d Cir.2008), *cert. denied,* ––– U.S. ––––, 129 S.Ct. 1917, 173 L.Ed.2d 1055 (2009).

**\*8** Hepatitis C is plainly a serious medical condition. *See Hilton v. Wright,* 2013 WL 873826, *10 (N.D.N.Y.2013) ("[i]t is well-established that [Hepatitis C] is a serious medical condition") (citing *Hatzfeld v. Eagen,* 2010 WL 5579883, *10 (N.D.N.Y.2010) (collecting cases), *report and recommendation adopted,* 2011 WL 124535 (N.D.N.Y.2011); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002) ("[c]ase law also recognizes that Hepatitis C qualifies as a serious condition") (collecting cases); *see also Ellis v. Mohenis Servs., Inc.,* 1998 WL 564478, *3 n. 2 (E.D.Pa.1998) (explaining that Hepatitis C virus remains in the blood and accounts for large percentage of cirrhosis, liver failure and liver cancer cases) (citing *Downs v. Hawkeye Health Servs., Inc.,* 148 F.3d 948, 1998 WL 348201, *3 (8th Cir.1998) (citing *Stedman's Medical Dictionary* 784 (26th ed.1995)). Hepatitis C "is not a disease, but a virus that can cause liver disease, and over time, liver damage ... [and] can be spread through IV drug use, sexual contact, needle stick injury, tattooing, body piercing, or any other means of transferring blood." *Bennett v. Corr. Med. Servs., Inc.,* 2008 WL 2064202, *2 (D.N.J.2008).

According to the Centers for Disease Control and Prevention ("CDC"), "[t]oday, most people become infected with the Hepatitis C virus by sharing needles or other equipment to inject drugs." Hepatitis C Information for the Public, CDC, http://www.cdc.gov/hepatitis/C/index.htm (last visited September 9, 2013). Similar to HIV, Hepatitis C is a condition which is associated with stigma and discrimination because it can be transmitted through sexual contact or intravenous drug use. *See EW v. New York Blood Ctr.,* 213 F.R.D.

108, 112 (E.D.N.Y.2003) (plaintiff had substantial privacy concern in her Hepatitis B status; "the prejudice identified by plaintiff, of embarrassment and fear of stigmatization because she has [Hepatitis B], which is, like AIDS a sexually and blood transmitted disease, is real"); *see also* Hepatitis C Virus Infection in Young Persons Who Inject Drugs, U.S. Department of Health and Human Services, Office of the Assistant Secretary for Health, Office of HIV/AIDS and Infections Disease Policy (under contract with Altarum Institute) at 11, *available at,* http://aid s.gov/ pdf/hcv-and-young-pwid-consultation-report.pdf (last visited September 9, 2013) ("[t]he stigma against drug users, especially injectors, serves as a barrier to HCV testing"). Indeed, Myers has alleged that the inmates on his cellblock stopped associating with him after learning of his Hepatitis C diagnosis. (Docket # 102 at 22, ¶ 8; Docket # 100–1 at Ex. A at 40–42).

Considering the stigma that may attach to an inmate diagnosed with Hepatitis C, Myers's allegations that he actually suffered opprobrium as a result of the disclosure, and the allegedly gratuitous manner in which Dolac disclosed Myers's medical condition, defendants have not demonstrated that Myers has no constitutionally protected right to confidentiality in his Hepatitis C diagnosis. Accordingly, defendants are not entitled to summary judgment dismissing this claim. *See Fleming v. State Univ. of New York,* 502 F.Supp.2d at 343 (reviewing history of societal discrimination against individuals with sickle cell anemia as reported in law journal articles and concluding that the condition was likely to "provoke discrimination and intolerance" and thus deserving of constitutional protection).

**b. *HIPAA***

**\*9** I reach a different conclusion with respect to Myers's HIPAA claim. "Although HIPAA generally provides for the confidentiality of medical records, ... an individual cannot sue for its enforcement or for damages caused by disclosures." *Ross v. Westchester Cnty. Jail,* 2012 WL 86467 at *9 (citing 42 U.S.C. §§ 1320d–1 to d–7 and *Warren Pearl Constr. Corp. v. Guardian Life Ins. Co. of Am.,* 639 F.Supp.2d 371, 377 (S.D.N.Y.2009) (collecting cases)). Accordingly, Myers's claim asserting a violation of his confidentiality rights under HIPAA is dismissed.[10] *See id.* (dismissing HIPAA claim for disclosure of inmate medical information); *see Williams v. Perlman,* 2009 WL 1652193, *12 (N.D.N.Y.) (recommending dismissal of HIPAA claim for disclosure of inmate medical information), *report and recommendation*

*adopted in part,* 2009 WL 1652188 (N.D.N.Y.2009); *Warren Pearl Constr. Corp. v. Guardian Life Ins. Co. of Am.,* 639 F.Supp.2d at 376 ("[o]nly the Secretary of Health and Human Services or other government authorities may bring a HIPAA enforcement action").

### 3. *Deliberate Indifference*

Issues concerning medical treatment for inmates suffering from Hepatitis C have been heavily litigated within the Second Circuit. *See Ippolito v. Goord,* 2009 WL 3764194, *1 (W.D.N.Y.2009)* ("Hepatitis C has been a not infrequent subject of litigation in courts in the Second Circuit"). Although defendants devote nearly eight pages of their memorandum of law to the deliberate indifference claim, they have failed inexplicably to cite any authority addressing deliberate indifference and Hepatitis C. *See id.* ("[i]t is shocking to the Court that any litigant would make a summary judgment motion on an important matter without any citation to germane legal authority, especially when there is considerable case authority to cite on the precise issue ... [;] [w]ith such ample authority available, it appears that an appropriate motion would deal with and cite the relevant cases and indicate their relevance to this case based on the specific facts set forth in the supporting affidavits and declarations"). Indeed, not a single case cited by defendants involved an inmate suffering from Hepatitis C. (Docket # 100–6 at 10–17). Despite the glaring omission of pertinent authority on the issue of deliberate indifference claims involving inmates diagnosed with Hepatitis C, this Court will address the motion on its merits.

To establish a claim under Section 1983, a plaintiff must demonstrate that the challenged conduct (1) was "committed by a person acting under color of state law"; and (2) "deprived [the plaintiff] of rights, privileges or immunities secured by the Constitution or laws of the United States." *Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994). Section 1983 creates no substantive rights; instead, it provides a "procedure for redress for the deprivation of rights established elsewhere." *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999). In this case, no genuine dispute exists that Dolac was acting under color of state law. Rather, the dispute is whether her actions violated Myers's constitutional rights.

**\*10** "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain.' " *Estelle v. Gamble,* 429 U.S. 97, 101, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "In order to establish an Eighth

Amendment [11] claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Smith v. Carpenter,* 316 F.3d 178, 183 (2d Cir.2003) (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). This standard contains both a subjective and an objective component. *Id.*

### a. *Objective Component*

The objective component asks "whether there has been a sufficiently serious deprivation of the prisoner's constitutional rights." *Sowell v. Chappius,* 695 F.Supp.2d 16, 20 (W.D.N.Y.2010); *Smith v. Carpenter,* 316 F.3d at 184 ("a prisoner must first make a threshold showing of serious illness or injury"). "A medical need is 'serious' for constitutional purposes if it presents 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Sowell v. Chappius,* 695 F.Supp.2d at 20 (quoting *Chance v. Armstrong,* 143 F.3d at 702). The objective inquiry is highly fact-specific, but factors to consider include "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment'; (2) whether the medical condition significantly affects daily activities; and (3) 'the existence of chronic and substantial pain'." *Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003) (quoting *Chance,* 143 F.3d at 702).

In cases involving a delay or interruption in the provision of medical treatment, "the seriousness inquiry is 'narrower,' ... and focuses on the particular risk of harm that resulted from the delay or interruption in treatment rather than the severity of the prisoner's underlying medical condition." *Hamm v. Hatcher,* 2013 WL 71770, *8 (S.D.N.Y.2013) (quoting *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006)). Under such circumstances, "it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract that is relevant for Eighth Amendment purposes." *Smith,* 316 F.3d at 186.

Considering the above standards, the first question is whether this case involves a delay in medical treatment or a denial of treatment. *See Ippolito v. Goord,* 2012 WL 4210125, *9 (W.D.N.Y.2012) ("Eighth Amendment cases regarding inadequate medical care generally fall into two categories: denial of treatment and delay in treatment [and ... ] the analyses are subtly different"). In this case, it is undisputed that Myers was diagnosed with Hepatitis C by October 15, 2009. At that time, the doctor at ECMC told Myers that he

needed to have blood drawn and to be seen by a GI doctor to be evaluated for treatment for the disease. A review of Myers's medical records submitted in support of the motion, however, reveals that Myers did not receive any additional treatment for his Hepatitis C condition. Myers contends that although a blood sample was eventually drawn, he did not receive a treatment or monitoring plan, was not given any medication to treat the Hepatitis C and was not evaluated by a GI doctor.

**\*11** The defendants argue that "[w]hile incarcerated at the Erie County Holding Center, inmate Myers was evaluated and treated for medical issues not limited to his Hepatitis C status." (Docket # 100–6 at 16). However, defendants have not proffered any facts to demonstrate or even suggest that Myers received treatment for Hepatitis C. To the extent that they rely on Heidelberger's affidavit, which merely attaches pages of medical records without any explanation as to their meaning, such reliance is unavailing; the conclusory assertions contained in the affidavit are simply insufficient to establish that Myers received treatment for Hepatitis C. *See Kelsey v. City of New York,* 2007 WL 1352550, \*5 (E.D.N.Y.2007) ("[c]onclusory affidavits, even from expert witnesses, do not provide a basis upon which to grant or deny motions for summary judgment") (internal quotation and citation omitted), *aff'd,* 306 F. App'x 700 (2d Cir.2009).

On this record, I conclude that this case involves a denial of medical care claim. *See Hilton v. Wright,* 2013 WL 873826 at \*10 ("[b]ecause the alleged deprivation is that defendants failed to provide *any* treatment for [plaintiff's] medical condition, the focus must be on the nature of his medical condition"); *Ippolito v. Goord,* 2012 WL 4210125 at \*9–10 (claim properly characterized as denial of treatment as opposed to delay in treatment where plaintiff was originally treated for Hepatitis C, but subsequent treatments were denied); *Hatzfeld v. Eagen,* 2010 WL 5579883 at \*10–11 (claim properly treated as a denial of medical care where plaintiff was not "regularly receiving treatment for his underlying condition"). Thus, the objective inquiry should focus upon the nature of Myers's medical condition. *See Hilton,* 2013 WL 873826 at \* 10.

"It is well-established that [Hepatitis C] is a serious medical condition." *See id.* (citing *Hatzfeld,* 2010 WL 5579883 at \* 10 (collecting cases)); *Johnson v. Wright,* 234 F.Supp.2d at 360 ("[c]ase law also recognizes that Hepatitis C qualifies as a serious condition for purposes of an Eighth Amendment analysis") (collecting cases). Accordingly, on the facts before

this Court, defendants have failed to establish that Myers did not suffer from a serious medical condition.

**b. *Subjective Component***

The subjective component requires the court to consider "whether the deprivation was brought about by defendants in wanton disregard" of the plaintiff's constitutional rights. *Evans v. Manos,* 336 F.Supp.2d 255, 260 (W.D.N.Y.2004) (citing *Wilson v. Seiter,* 501 U.S. 294, 298–99, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). In other words, the subjective prong addresses the question whether the defendant has acted "with a sufficiently culpable state of mind." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citations omitted), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). Culpability depends on proof that the defendant "knows of and disregards an excessive risk to inmate health or safety; [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

**\*12** As to the subjective component, mere negligence is insufficient, as the Eighth Amendment does not contemplate medical malpractice claims; rather, "[a]n official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety.' " *Smith,* 316 F.3d at 184. This standard is equivalent to recklessness in criminal law. *Id.* "[M]ere negligence is not actionable." *Sowell,* 695 F.Supp.2d at 20. "Rather, the plaintiff must allege conduct that is 'repugnant to the conscience of mankind' ... or 'incompatible with the evolving standards of decency that mark the progress of a maturing society." *Id.* (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06). Thus, deliberate indifference requires a plaintiff to demonstrate conduct that is "more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Murphy v. Corr. Med. Servs.,* 2006 WL 367842, \*5 (D.Vt.2006).

The facts before the Court, viewed in the light most favorable to non-movant Myers, present an issue of fact whether Dolac was deliberately indifferent to Myers's medical condition. Myers contends that Dolac was aware of Myers's Hepatitis C status as evidenced by the alleged exchange during which Myers informed Dolac of ECMC's request for an additional blood sample from Myers and by Dolac's alleged broadcast of his condition to the entire cellblock. Myers also filed multiple grievances complaining about Dolac's behavior and

the facility's failure to treat him for Hepatitis C. On this record, Myers clearly has raised a genuine issue of fact as to whether Dolac was aware of his diagnosis. Moreover, Myers contends that after the October 2009 cellblock incident, Dolac purposefully impeded Myers's treatment for Hepatitis C by ignoring or destroying his sick call requests. Myers has testified that he received no treatment for his Hepatitis C condition. These factual assertions, if proved at trial, are sufficient for a reasonable jury to conclude that Dolac knew of Myers's medical condition and acted deliberately to deny him treatment. *See Lainfiesta v. Livermore,* 2013 WL 2404021, *9 (N.D.N.Y.2013) (issue of fact existed where plaintiff contended that he informed defendant of his medical condition and that defendant instructed other officers to prevent plaintiff from attending sick-call); *Hatzfeld,* 2010 WL 5579883 at *12 ("[t]he Second Circuit has found that deliberate indifference may lie where prison officials ignore a physician's recommendation to provide hepatitis treatment even where prison officials do so in accordance with policy").

Defendants attempt to characterize Myers's claim as a mere disagreement over the appropriate treatment for Hepatitis C. (Docket # 100–6 at 14–17). According to defendants, Heidelberger's affidavit establishes that the "impression, diagnosis and treatment rendered to [Myers] at EC[HC], based upon the clinical findings documented in th[e] [medical] records, was reasonable, appropriate and within the accepted standard of care." (*Id.* at 16–17). Thus, defendants continue, because mere disagreement over the proper course of treatment does not amount to a constitutional claim, and because Heidelberger concludes that the treatment provided was adequate, Dolac is entitled to summary judgment.

**\*13** Defendants' characterization of Myers's claims, however, is inconsistent with the facts asserted in this motion. As discussed above, nothing in the record supports the contention that Myers received *any* care for his Hepatitis C condition, much less adequate care. Nor is there any evidence to suggest that the particular nature of Myers's disease did not require treatment. As discussed above, Heidelberger's conclusory assertions that the medical care received by Myers was "reasonable, appropriate and within the accepted standard of care" are inadequate to justify summary judgment in favor of defendants.

### 4. *Interference with Legal Mail*

Myers's complaint asserts claims against Calhoun, Wilkie, Howard and Koch arising out of the alleged opening of his legal mail outside of his presence. As to this claim, defendants

move for summary judgment on the grounds Myers has failed to raise an issue of fact whether he suffered any injury as a result of the alleged interference with his legal mail. In addition, defendants contend that Howard and Koch are entitled to judgment in their favor because they may not be held liable as supervisors.

"Interference with legal mail implicates a prison inmate's right to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). A plaintiff claiming that his access to the courts has been infringed as a result of interference with his legal mail "must allege that the defendant 'took or was responsible for actions that hindered [a plaintiff's] efforts to pursue a legal claim.' " *Id.* (alteration in original) (quoting *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997)) (internal quotation omitted). Thus, the plaintiff must establish that the interference resulted in an actual injury to one of his legal claims. *See id.; see Cancel v. Goord,* 2001 WL 303713, *4 (S.D.N.Y.2001) ("in order to survive a motion to dismiss a plaintiff must allege not only that the defendant's alleged conduct was deliberate and malicious, but also that the defendant's actions resulted in actual injury to the plaintiff such as the dismissal of an otherwise meritorious legal claim"). To constitute actual injury, the interference with or harm to the legal claim must be more than mere delay. *See Davis v. Goord,* 320 F.3d at 352 ("[m]ere delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation") (internal quotation omitted).

In addition to access to the courts, inmates have the "right to the free flow of incoming and outgoing mail"—a right that is protected by the First Amendment. *See id.* at 351. Thus, "a prisoner has a right to be present when his legal mail is opened." *Id.* (citing *Wolff v. McDonnell,* 418 U.S. 539, 574–76, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). "An isolated incident of mail tampering is usually insufficient to establish a constitutional violation." *Id.*

**\*14** Under this authority, to prove a constitutional violation, the plaintiff must establish (1) "an ongoing practice of censorship unjustified by a substantial government interest, or (2) ... [that] the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received." *Solana v. NYC Dep't of Corr.,* 2012 WL 5466425, *5 (E.D.N.Y.2012) (quoting *Davis,* 320 F.3d at 351). Stated another way, to establish a constitutional

violation arising from the handling of inmate legal mail, the plaintiff must adduce facts that demonstrate either an actual injury to a legal claim or facts from which a factfinder could "infer a pattern of censorship" on the part of the defendants. *See id.*

Reviewing the facts most favorably to Myers, I conclude that he has failed to adduce sufficient facts to create a triable issue of fact as to whether he suffered any actual harm resulting from defendants' tampering with his legal mail. First, Myers conceded at his deposition that he did not suffer any actual injury as a result of the opening of his legal mail. Second, although Myers now contends that his ability to serve defendants in this action was delayed as a result of the opening of his legal mail, such conclusory allegations of harm are insufficient to establish a constitutional violation. *See Davis,* 320 F.3d at 352 ("[m]ere delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation") (internal quotation omitted); *Lewis v. Johnson,* 2010 WL 3785771, *14 (N.D.N.Y.) ("claim relating to the opening and possible destruction of two items of legal mail, without any showing of how plaintiff was prejudiced in a legal proceeding, does not support a viable First Amendment claim"), *report and recommendation adopted,* 2010 WL 3762016 (N.D.N.Y.2010); *Hudson v. Greiner,* 2000 WL 1838324, *5 (S.D.N.Y.2000) ("[p]laintiff's conclusory statement that defendant's actions caused a 'delay of action in discoveries which was fatal to my disposition' is not enough to prevent this claim from being dismissed"); *see also Walton v. Waldron,* 886 F.Supp. 981 (N.D.N.Y.1995) (granting summary judgment where plaintiff failed to make "the requisite showing of harm").

In addition, Myers has failed to set forth any facts to suggest an ongoing practice of censoring of his legal mail. Myers has identified only one instance in which he alleges that his mail was impermissibly opened outside of his presence, which is insufficient to state a constitutional violation. *See Solana v. NYC Dep't of Corr.,* 2012 WL 5466425 at *6 ("the test contemplates at least *two* incidents of mail

tampering to trigger an inquiry into whether a constitutional violation occurred"). Although Myers testified that on several occasions his legal mail had tape on the envelope when it was delivered to him, such conclusory allegations are insufficient to suggest a pattern of censorship. *See Deleon v. Hoffman,* 2012 WL 75805, *9 (W.D.N.Y.2012) (granting summary judgment where plaintiff offered nothing more than "wholly conclusory allegations, speculation and conjecture," which failed to demonstrate that "his mail was tampered with at all") (internal quotation omitted); *Solana,* 2012 WL 5466425 at *6 (conclusory assertions that mail had been opened "many, many times" were not "facts from which this court could infer a pattern of censorship"); *Cancel v. Goord,* 2001 WL 303713 at *7 (plaintiff's complaint deficient where he alleged "only two instances [of] opening of incoming legal mail with no indication that such practices [were] ongoing ... [and]w]ithout alleging additional facts to establish a pattern and practices that rises to the level of constitutionally impermissible censorship").

**\*15** Accordingly, defendants are entitled to summary judgment dismissing this claim. [12]

### CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (**Docket # 100**) is **GRANTED in part and DENIED in part.** A *trial date status conference* will be held with the undersigned at 2310 U.S. Courthouse, 100 State Street, Rochester, New York 14614 on **November 7, 2013,** at **10:00 a.m.** The Court will make the necessary arrangements with the correctional facility for plaintiff to participate by telephone for the conference.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2013 WL 5175588

Footnotes

1    Specifically, the complaint asserts the following federal causes of action under 42 U.S.C. § 1983:(1) a claim against Dolac, Davidson and Koch for violation of Myers's privacy rights and deliberate indifference to his medical needs, in violation of the First, Eighth, and Fourteenth Amendments to the United States Constitution and in violation of the Health Insurance Portability and Accountability Act ("HIPAA") (Count One); (2) a claim against Howard, Koch, Dolac and Davidson for failing to protect Myers by placing him in a population that contained contagious diseases or viruses, in violation of the Eighth and Fourteenth Amendments to the United States Constitution (Count Two); (3) a claim against Calhoun, Wilkie, Howard

and Koch for interfering with Myers's legal mail and access to the courts, in violation of the First, Fourth, Eighth and Fourteenth Amendments to the United States Constitution (Count Three); (4) a claim against Reardon, Anthony, Koch, Diina and Howard for interference with Myers's ability to file and appeal grievances, in violation of the First, Fifth, Eighth and Fourteenth Amendments to the United States Constitution (Count Four); and, (5) a municipal liability claim against the County (Count Five). The complaint also purports to assert various state common law and constitutional claims.

**2** "Hepatitis C[is] a chronic viral liver disease that can increase the risk of liver cancer and can lead to inflammation, scarring, and cirrhosis of the liver. Cirrhosis ultimately can lead to liver failure and death." *Pabon v. Wright, 459 F.3d 241, 246 (2d Cir.2006).*

**3** Defendants do not seek summary judgment on Counts Two, Four and Five or on any state law claims (other than to request dismissal of the complaint in its entirety under 42 U.S.C. § 1997e(e)). Nor do they seek judgment on Myers's privacy and deliberate indifference claims asserted against Koch and Davidson.

**4** Myers also requests that the Court strike defendants' Statement of Material Facts on the grounds that it fails to comply with Federal Rule of Civil Procedure 11(a), which requires that every pleading, written motion or other paper contain a signature of at least one attorney of record. (Docket # 102 at 5.) A review of defendants' Statement of Material Facts reveals that it contains an electronic signature of Michael J. Pacifico, Esq. (Docket # 100–1 at 7); electronic signatures comply with the Administrative Procedures Guide for the Western District of New York. *See* Western District of New York Administrative Procedures Guide § 2(g). Accordingly, Myers's request is denied.

**5** A review of the medical records suggests that the Hepatitis C diagnosis may have occurred as early as September 2009. (Docket # 103 at 9; Docket # 100–4 at 24.) At his deposition, Myers testified that he learned of the diagnosis in approximately August 2009. (Docket # 100–1 at Ex. A at 16.)

**6** During his first deposition, Myers testified that his legal mail was opened outside of his presence on at least seven to nine different occasions. (Docket # 100–1 at Ex. A at 32.) At his second deposition, Myers testified that his legal mail was opened outside of his presence only one time and that his legal mail had tape on the envelope on a number of occasions. (Docket # 100–1 at Ex. D at 25–26.) The complaint contains allegations relating to only one instance of the opening of his legal mail. (Docket # 91 at ¶¶ 55–62.)

**7** Although defendants' motion seeks dismissal of the complaint in its entirety, defendants have not addressed whether Myers adequately alleged a physical injury with respect to Counts Two, Four and Five.

**8** Whether Myers may seek injunctive relief or punitive damages against each of the named defendants is not an issue currently before the Court.

**9** Two cases outside of this Circuit have found that inmates who alleged the improper disclosure of their HIV and Hepatitis status adequately pled a constitutional violation. *See Alfred v. Corr. Corp. of Am., 437 F. App'x 281, 285–86 (5th Cir.2011)* (claim alleging improper disclosure of inmate's HIV and Hepatitis B status was "not wholly baseless and ... not frivolous as a matter of fact or law"); *Newman v. Poquette, 2012 WL 487116, *2–3 (C.D.Cal.)* (inmate adequately pled constitutional violation arising from disclosure of his HIV and Hepatitis status), *report and recommendation adopted, 2012 WL 487089 (C.D.Cal.2012).* Finally, one court has held that Hepatitis C status does not merit constitutional protection. *See Perez v. Sheriff of Tangipahoa Parish, 2011 WL 1226482, *9–10 (E.D.La.)* (inmate diagnosed with Hepatitis C failed to state a claim for violation of constitutional right to privacy because plaintiff "ha[d] no extremely sensitive medical condition, such as HIV, that might entitle him to the very limited constitutional protection recognized in two circuits, but not the Fifth Circuit"), *report and recommendation adopted, 2011 WL 1212940 (E.D.La.2011).*

**10** The complaint is unclear whether Myers purports to assert a HIPAA claim against Davidson and Koch, as well as Dolac. Assuming it may be read that way, because no private right of action exists under HIPAA, the claim is dismissed as to all defendants.

**11** It is not clear from the record whether Myers was being held in ECHC as a pretrial detainee at the time of the alleged wrongful conduct. If so, his constitutional claims for deliberate indifference would arise under the Fourteenth Amendment. *See Caiozzo v. Koreman, 581 F.3d 63, 69–70 (2d Cir.2009).* In any event, deliberate indifference claims, whether arising under the Fourteenth or Eighth Amendment, are analyzed under the same standard. *See id.* at 72.

**12** Having concluded that the claim should be dismissed on its merits, the Court does not reach the question of supervisory liability as to Koch and Howard. *See Elek v. Inc. Village of Monroe, 815 F.Supp.2d 801, 808 (S.D.N.Y.2011)* ("[a]bsent an underlying constitutional violation, there is no cognizable claim for supervisor liability") (quoting *Bryant v. Wright, 2010 WL 3629443, *9 n. 1 (S.D.N.Y.2010)).*

2014 WL 1202693
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Ralph Buck PHILLIPS, Plaintiff,
v.
T. LAVALLEY, et al., Defendants.

No. 9:12–CV–609 (NAM/CFH).
|
Signed March 24, 2014.

**Attorneys and Law Firms**

Ralph Buck Phillips, Malone, NY, pro se.

Eric T. Schneiderman, Attorney General for the State of New York, Richard Lombardo, Esq., Assistant Attorney General, The Capitol, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

Hon. NORMAN A. MORDUE, Senior District Judge.

**\*1** In this *pro se* inmate civil rights action, defendants move (Dkt. No. 33) for dismissal pursuant to Fed.R.Civ.P. 12(b)(6). Plaintiff did not submit opposition to the motion. Upon referral pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c), United States Magistrate Judge Christian F. Hummel issued a Report–Recommendation and Order (Dkt. No. 35) recommending that the motion be granted in part and denied in part.

Neither party has submitted an objection. The docket reflects that plaintiff has twice refused service of the Report–Recommendation and Order (Dkt. No. 36). "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point." *Cephas v. Nash,* 328 F.3d 98, 107 (2d Cir.2003). A *pro se* litigant must be given notice of this rule, *see Frank v. Johnson,* 968 F.2d 298, 299 (2d Cir.1992); here, however, the Report–Recommendation and Order provides the proper notice, and any failure to receive notice is due to plaintiff's conduct. [1]

The Court has reviewed Magistrate Judge Hummel's Report–Recommendation and Order—which thoroughly addresses

this 60–page handwritten complaint—and accepts it in its entirety.

It is therefore

ORDERED that the Report–Recommendation and Order (Dkt. No. 35) is accepted; and it is further

ORDERED that defendants' Rule 12(b)(6) motion (Dkt. No. 33) is granted in part and denied in part as follows:

Dismissal is denied as to:

- Plaintiff's Eighth Amendment excessive force claims against defendants James and Lee;

- Plaintiff's Eighth Amendment deliberate indifference claims regarding his mental health treatment against defendants Waldron, Berggren, and Savage; and

- Plaintiff's Eighth Amendment deliberate indifference claims regarding his medically approved insoles against defendants Boudrieau, and Martin; and

Dismissal is otherwise granted as to all other claims and defendants; and it is further

ORDERED that the following defendants are dismissed from the case: T. LaValley; W. Allan; Menard; E. Bouissey; B. Tucker; D. Amo; Bezio; C. Delutis; J. Delisle; P. Hutti; C. Trudeau; and Susan M. Rocque; and it is further

ORDERED that the Clerk of the Court is directed to serve copies of this MemorandumDecision and Order in accordance with the Local Rules of the Northern District of New York.

IT IS SO ORDERED.

**REPORT–RECOMMENDATION AND ORDER**

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff pro se Ralph Buck Phillips, ("Phillips"), an inmate in the custody of the New York State Department of Corrections and Community Services ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that the defendants, all employees of Clinton Correctional Facility, violated his constitutional rights under the First and Eighth Amendments. Compl. (Dkt. No. 1). Presently pending is defendants' motion

to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) as to all claims against all defendants. Dkt. No. 33. Phillips has not responded to the motion. For the following reasons, it is recommended that defendants' motion be granted in part denied in part.

## I. Background

**\*2** According to the lengthy and at times confusing complaint, Plaintiff Phillips claims to have experienced a multitude of constitutional violations while he was housed at Clinton Correctional Facility (hereinafter "Clinton"). The facts are related herein in the light most favorable to Phillips as the non-moving party. *See* subsection II(A) *infra.*

### 1. LaValley

In the 4th Cause of Action, Defendant Lavalley is accused of denying Plaintiff use of ear plugs for a "serious medical need." As a result, Plaintiff is constantly deprived of any restful sleep and fails to experience peace at any time. Defendant LaValley allegedly did this in a "malicious context" because he is aware of the excessive noise. Compl. ¶¶ 20–21.

In the 9th Cause of Action, Plaintiff claims he filed a grievance against LaValley which caused him to retaliate against Plaintiff and take photos off the Plaintiff's cell wall, which Plaintiff was previously allowed to have. Compl. ¶¶ 44–45.

### 2. Allan

The 3rd and 21st Causes of Action accuse Defendant Allan of tampering with Plaintiff's legal mail. Compl. ¶¶ 17–19, 76–77. Plaintiff filed grievances against Defendant Allan, which Plaintiff claims caused Defendant Allan to tamper with his legal mail. Defendant Allan's tampering led to Plaintiff not being able to answer the motion to dismiss in this case. *Id.*

In the 10th Cause of Action, Plaintiff filed a grievance against Defendant Allan for harassment and retaliation for what Plaintiff claims were malicious and excessive cell frisks. Compl. ¶ 49. It appeared to Plaintiff that someone entered his cage and "just scattered his paper work and property around to create a mess" in retaliation for filing grievances. *Id.*

The 20th Cause of Action is both a retaliation claim and conditions of confinement claim. Compl. ¶ 124. Plaintiff broke his cell door, so five days later Defendant Allan, along with Defendant Menard, put him in # 13 cage [described in paragraph 70 as not being swept or mopped and having loose and broken screws in the light fixture] which was unsanitary in retaliation for "making his cell gate malfunction." *Id.*

### 3. Menard

The 1st Cause of Action in which Plaintiff describes how Defendant Menard threatened him has been dismissed. Compl. ¶ 9.

The 20th Cause of Action is both a retaliation claim and conditions of confinement claim. Compl. ¶ 124. Plaintiff broke his cell door, so five days later Defendant Menard, along with Defendant Allan, put him in # 13 cage (as described above and in paragraph 70) which was unsanitary in retaliation for "making his cell gate malfunction." *Id.*

### 4. Boudrieau & Martin

In the 8th Cause of Action, Plaintiff claims both defendants confiscated the medically approved insoles for Plaintiff's medical boots by falsely making the metal detection device beep over his boots. Compl. ¶¶ 38, 40. Plaintiff claims this was done to harass and retaliate against Plaintiff for a sarcastic comment he made to Defendant Martin. *Id.* ¶¶ 40, 42. Without the insoles in his boots, Plaintiff got blisters and had "significant pain" in his heels and arches because his boots, no longer fit properly. *Id.* ¶ 42.

### 5. Delutis

**\*3** In the 19th Cause of Action, Plaintiff claims that Defendant Delutis should have given direction to someone to clean the cells since they are "not being adequately cleaned" and he is the SHU supervisor. Compl. ¶ 70.

In the 22nd Cause of Action, Plaintiff claims his Eighth Amendment rights were violated when Delutis fabricated a scenario to harm plaintiff by placing him in an unsanitary cell while overseeing a cell frisk. Compl. ¶ 126. Plaintiff describes the cell as "smelling like a zoo" and "generally filthy," with the sink appearing to "not have been cleaned in months." *Id.*

¶ 82. Plaintiff states that "approximately an hour elapsed" between when he was taken out of this cell, placed in the unsanitary cell and ultimately brought to another cell. Compl. ¶ 83. Phillips contends that within the new cell the "pillow and mattress were both fouled" and it "smelled bad." *Id.* ¶ 84. Plaintiff tore the pillow and blanket to pieces and advised the facility Captain [1] of his mattress conditions. *Id.* ¶¶ 84–85. The Captain, once made aware of the cell conditions, provided Plaintiff with a new mattress. *Id.* ¶ 45. Defendant Delutis, the area supervisor of The Special Housing Unit ("SHU") [2] was asked by Plaintiff to inspect Defendant Delisle while he conducted the cell frisk. Plaintiff heard both Defendants "whispering in his cage and then brief laughter." *Id.* ¶ 79. Defendant Delutis told Plaintiff the frisk was going according to rules and regulations and that he "will not tell staff how to conduct a cell frisk, they do as they want, you don't like it, you know what you gotta do." *Id.* ¶ 79.

### 6. Delisle [3]

In the 22nd Cause of Action, as described in the paragraph above, Defendant Delisle is accused of fabricating a scenario to harm Plaintiff with Defendant Delutis by placing him in an unsanitary cell during the cell search. Compl. ¶¶ 78, 81–82, 84.

### 7. Tucker [4]

In the 11th Cause of Action, Plaintiff claims Defendant Tucker retaliated against him for a previous comment Plaintiff made the night before, which spurred a retaliatory cell frisk. Compl. ¶ 51. Plaintiff claims his property was strewn about and someone spit tobacco juice into Plaintiff's bread. Plaintiff also claims this was cruel and unusual punishment. *Id.* ¶¶ 52–53.

In the 12th Cause of Action, Plaintiff filed a grievance against Tucker for stealing his pillow and not receiving a replacement for multiple weeks. Compl. ¶ 55.

### 8. James

In the 2nd Cause of Action, Plaintiff claims his Eighth Amendment rights were violated when Defendant James yanked the chain holding Plaintiff's handcuffs which caused "blistering fire" in his wrists and his hands "felt numb and fuzzy." Compl. ¶ 12. Plaintiff contends James "appeared to be really attempting to snap plaintiff's wrists" by putting all of his weight onto the chain. *Id.* ¶ 12. James later roughly shoved Plaintiff into the wall "in an attempt to ram his face into the wall." *Id.* ¶ 13. James then put Plaintiff back in his cell, removed the cuffs, and slapped Plaintiff's hands "hard." *Id.* ¶ 14.

### 9. Bouissey [5]

**\*4** The 5th Cause of Action claims Defendant Bouissey violated Plaintiff's Eighth Amendment rights by denying him use of the restroom. Compl. ¶ 23. Plaintiff says he was deliberately ignored when he requested use of the bathroom on the monitoring camera while out in the exercise yard and therefore relieved himself in a drain ditch, which caused him to receive a "false" behavior report [6]. *Id.* ¶ 22.

### 10. Lee [7]

In the 13th Cause of Action, Plaintiff claims Defendant Lee gave him his kosher meal with dirty gloves and when Plaintiff objected to it, Lee slammed the hatch down on Plaintiff's hand, "applying his weight down in an effort to harm plaintiff and keep him pinned." Compl. ¶¶ 57–58. After this exchange, Lee did not give Plaintiff the rest of his meal. *Id.* ¶ 58.

The 16th Cause of Action alleges an Eighth Amendment violation when Lee denied Plaintiff outside exercise on one occasion. Compl. ¶ 64.

### 11. Bezio [8]

In the 17th Cause of Action, Defendant Bezio denied Plaintiff his outside recreation time for "running his mouth." Compl. ¶ 66.

### 12. Amo & Rocque

In the 14th Cause of Action, Plaintiff contends his Eighth Amendment rights were violated when the Defendants (the Food Service Administrator and Head Cook) gave Plaintiff a contaminated kosher tray that had a cockroach on it and was

missing 2 jellies. Compl. ¶ 60. Plaintiff was denied another tray. *Id.*

### 13. Trudeau

In the 25th Cause of Action, Plaintiff contends Defendant Trudeau delivered a regular meal to Plaintiff instead of a kosher meal while Plaintiff was housed in OBS. Compl. ¶ 99. Plaintiff claims it was "obvious he was being denied his meal purposely since all concerned were aware he was in OBS." *Id.* Plaintiff asked Trudeau to get his kosher breakfast and was denied his meal. *Id.*

### 14. Hutti [9]

In the 24th Cause of Action, Defendant Hutti allegedly placed Plaintiff in a secure area (2–company shower) and kept him there for two hours while Hutti and plumbers were in Plaintiff's cell due to flooding from "action by Defendant and/or civilian plumbers which caused the flooding." Compl. ¶ 93. After being taken from the shower, Plaintiff was taken to a new cell and noticed "there was no mat nor pillow [and] the cage was disgusting." *Id.* ¶ 94. Plaintiff also notes the sink and toilet had not been cleaned for some time and the sink gave off a strong smell "like sewage." *Id.* Hutti brought Plaintiff his kosher meal in that cage and Plaintiff told Hutti to put the kosher meal in his usual cell because "he had no intentions of attempting to consume food in such an obviously foul cage." *Id.* ¶ 95. Plaintiff then "heard his tray being tossed in the trash can." *Id.* Plaintiff claims he was in this cell for one hour before being returned to his regular cell. *Id.* ¶ 96.

### 15. Waldron & Berggren

In the 6th Cause of Action, Plaintiff stopped Defendant Waldron during her weekly round to tell her that he needed to privately speak with her about his mental health because he was experiencing "severe mental and emotional issues for which he had not previously been subjected to." [10] Compl. ¶ 24. Defendant Waldron replied there was nothing she could do for Plaintiff because he was in administrative segregation status and she could not help him. *Id.* ¶ 25. Plaintiff filed requests with Defendants Waldron and Berggren to receive mental health services and was ignored. *Id* . ¶ 26. Plaintiff also sent identical mental health requests to outside agencies

and his requests were met with negative responses. *Id.* ¶ 27. According to Plaintiff, "many responses were evidently constructed in a fashion as to 'cover' themselves as well as the facility at Clinton." *Id.*

### 16. Savage

 **\*5**  The 7th Cause of Action claims that Defendant Savage was walking around and Plaintiff stopped him to ask some questions about his mental health file. Compl. ¶ 31. Plaintiff claims he talked with Savage who told him, "you know how things 'work' when it concerns you." *Id.* Plaintiff claims Savage approached him a few months later and asked him if he wanted to come out of his cell to "talk." *Id.* ¶ 33. Plaintiff claims this was the last time he had a "bonafide interview" regarding his mental health and during this time. Plaintiff explained all of the symptoms he was experiencing. *Id.* Savage told Plaintiff he may have a "legitimate anxiety issue" and said he would get Plaintiff an opportunity to speak to Dr. Berggren personally. *Id.* Such opportunity never occurred. *Id.* ¶ 34.

This action followed.

## II. Discussion

### A. Legal Standard

A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure calls upon a court to gauge the facial sufficiency of that pleading using a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 554, 555 (2007)). Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, "a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.' " *Iqbal,* 556 U.S. 677–78 (quoting Fed.R.Civ.P. 8(a)(2)). While modest in its requirements, that rule commands that a complaint contain more than mere legal conclusions. *See id.* at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

In deciding a *Rule 12(b)(6)* dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (citing *Twombly,* 550 U.S. at 555–56); *see also Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); *Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 300 (2d Cir.2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). However, the tenet that a court must accept as true all of the allegations contained in a complaint does not apply to legal conclusions. *Iqbal,* 556 U.S. at 678.

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 570); *see also Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2007) (alterations omitted).

**\*6** When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant, whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson,* 551 U.S. at 94 (" '[A] pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' " (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)) (internal citation omitted)); *Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191 (2d Cir.2008) ("[W]hen a plaintiff proceeds *pro se,* a court is obliged to construe his pleadings liberally." (internal quotation marks and alterations omitted)); *Kaminski v. Comm'r of Oneida Cnty. Dep't of Soc. Servs.,* 804 F.Supp.2d 100, 104 (N.D.N.Y.2011) (Hurd, J.) ("A *pro se* complaint must be read liberally.").

## B. First Amendment

Phillips alleges that his First Amendment rights were violated when he was denied kosher meals intermittently while incarcerated at Clinton Correctional Facility.

The First Amendment protects the right to free exercise of religion. *See generally Cutter v. Wilkinson,* 544 U.S. 709, 719, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). This right is not absolute and can be limited due to the inmate's "incarceration and from valid penological objectives—including deterrence of crime, rehabilitation of prisoners, and institutional security." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (citations omitted); *see also Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) ("The governing standard is one of reasonableness, taking into account whether the particular regulation ... is reasonably related to legitimate penological interests.") (citations omitted).

The Turner Court determined that the four factors to be considered are: 1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest. *Benjamin,* 905 F.2d at 574 (citing *Turner v. Safely,* 483 U.S. 78, 89–91 (1987).

### 1. Failure to Provide Kosher Meals

The Second Circuit has held "that prison authorities must accommodate the right of prisoners to receive diets consistent with their religious scruples." *Kahane v. Carlson,* 527 F.2d 492, 495 (2d Cir.1975). This includes providing kosher food to those of the Jewish faith. *Bass v. Coughlin,* 800 F.Supp. 1066, 1071 (N.D.N.Y.1991) (citing *Kahane,* 527 F.2d 492). Therefore, to "deny prison inmates the provision of food that satisfies the dictates of their faith ... unconstitutionally burden[s] their free exercise rights." *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir.2004). "Courts, however, are reluctant to grant dietary requests where the cost is prohibitive, or the accommodation is administratively unfeasible." *Benjamin,* 905 F.2d at 579.

**\*7** The denial of three kosher meals, on three separate occasions, did not constitute more than a *de minimus* burden. *See McEachin,* 357 F.3d at 203 n. 6 (holding that, "[t]here may be inconveniences so trivial that they are most properly

ignored ... [thus] the time-honored maxim *'de minimis non curat lex'* [11] applies."); *see also Rapier v. Harris,* 172 F.3d 999, 1006 n. 4 (7th Cir.1999) ("*De minimis* burdens on the free exercise of religion are not of constitutional dimension.") (citations omitted); *Thomas v. Picio,* No. 04–CV–3174, 2008 WL 820740, at *6 n. 8 (S.D.N.Y. Mar.26, 2008) (finding that the denial of all kosher meals for one or two days was "not a substantial burden" which was actionable) (Ex. A). [12] Similar to the plaintiff in *Thomas,* Phillips was denied three individual meals on three separate days, with no other complaints of meal problems thereafter. Such denials resulted in a *de minimis* burden on Phillips' religious practice.

Furthermore, the cessation of the diet was based mostly upon a miscommunication between defendants and Phillips, or by Phillips denying his meal. This behavior was, at worst, negligence on behalf of the staff which is insufficient to establish liability under § 1983. *Davidson v. Cannon,* 474 U.S. 344, 347, 106 S.Ct. 668, 88 L.Ed.2d 677, (1986) (holding "that § 1983 provides no remedy for the ... negligence found in this case") (internal quotation marks and citations omitted); *Poe v. Leonard,* 282 F.3d 123, 145 (2d Cir.2002) ("[M]ere negligence is insufficient as a matter of law to state a claim under section 1983.") (citations omitted). As such, he has failed to state a First Amendment claim.

Accordingly, defendants' motion as to Defendant's Lee, Trudeau and Hutti under this claim should be granted.

## 2. Access to Courts and Legal Mail

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). In order" [to state a claim for denial of access to the courts, including those premised on] interference with legal mail ... a plaintiff must allege [that a defendant caused 'actual injury,' i.e.] took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim." *Id.* (citations and internal quotation marks omitted). Such injury must affect "a non-frivolous legal claim [which] had been frustrated or was being impeded due to the actions of prison officials." *Warburton v. Underwood,* 2 F.Supp .2d 306, 312 (W.D.N.Y.1998) (citations and internal quotation marks omitted); *Shine v. Hofman,* 548 F.Supp.2d 112, 117–18 (D.Vt.2008) (explaining that actual injury "is not satisfied by just any type of frustrated legal claim because the

Constitution guarantees only the tools that inmates need in order to attack their sentences ... and ... challenge the conditions of their confinement.") (internal quotation marks and citations omitted). Accordingly, without identification of the underlying action which was prejudiced, actual injury, and by extension a First Amendment violation, cannot be established. *See Christopher v. Harbury,* 536 U.S. 403, 415, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002) ("[T]he underlying cause of action ... is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation.").

**\*8** Phillips alleges in his first claim that defendant Allan began impeding his access to the courts in 2006 when Allan took over mail watch duties. However, Phillips has failed to plead with any specificity what the underlying action was that had supposedly been prejudiced or what hindrance resulted to Phillips' underlying legal claim. Accordingly, defendant's motion as to this claim should be granted.

In Phillips second claim, he alleges that in 2011 an Article 78 claim was not received by the courts until approximately one month after it was sent. Phillips broadly contends that "there was no reason why plaintiff's document should have been delayed." In the same claim, plaintiff states he believes Allan also prevented the filing of his "motion in opposition" to defendant's motion to dismiss which resulted in the Article 78 being dismissed for failure to reply. However, Phillips has failed to identify with any sort of specificity the underlying legal claim or demonstrate that it was meritorious. Therefore, because conclusory assertions are insufficient to state a claim under 42 U.S.C. § 1983, defendants' motion as to this claim should be granted.

## 3. Retaliation

Courts have been cautioned to approach First Amendment retaliation claims by prisoners with skepticism and particular care. *See e.g., Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds by *Swierkiewicz v. Sorema,* NA, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). However, that does not mean that such claims are automatically to be dismissed. Such a claim can survive a defendant's motion to dismiss, but only if plaintiff alleges facts tending to establish that (1) the speech or conduct that led to the allegedly retaliatory conduct is the sort of speech or conduct that is protected by the Constitution; (2)

defendant(s) took adverse action against the plaintiff; and (3) there is a causal connection between the protected speech or activity and the adverse action. *See Jones v. Harris,* 665 F.Supp.2d 384, 398 (S.D.N.Y.2009). These allegations may not be conclusory; they must have some basis in specific facts that are not inherently implausible on their face. *See Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); *South Cherry Street LLC v. Hennessee Group LLC,* 573 F.3d 98, 110 (2d Cir.2009).

Furthermore, '[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his ... constitutional rights constitutes an adverse action[;] ... [if a] retaliatory act is ... *de minimis,* ... [it falls] outside the ambit of constitutional protection." *Davis,* 320 F.3d at 353 (citing *Dawes,* 239 F.3d 489). In this regard, prisoners may be required to tolerate more than public employees or average citizens before a purportedly retaliatory action taken against them is considered adverse, *Thaddeus–X v. Blatter,* 175 F.3d 378, 392–93 (6th Cir., 1999).

### a. LaValley

**\*9** Phillip's alleges that defendant LaValley retaliated against him after Phillip's filed a grievance regarding a prior incident with LaValley. Defendant LaValley supposedly forced Plaintiff to remove photos off of his cell wall that he was previously allowed to have. While filing of grievances is protected conduct, the adverse action of removing photos off of a cell wall is so *de minimis,* that it "falls outside the ambit of constitutional protection." *Davis,* 320 F.3d at 353 (citing *Dawes,* 239 F.3d 489). Therefore, defendants' motion as to this claim should be granted.

### b. Allan

The facts as to the alleged retaliation by defendant Allan are somewhat unclear, however it appears that after Plaintiff filed a grievance against Allan and then Plaintiff returned to his cell and found his paperwork and property scattered around "to create a mess ." It appears that Plaintiff is alleging defendant Allan is responsible for the state of his cell.

Plaintiff alleges that Allan's retaliatory searches [13] resulted in the seizure of some of his property and the "trashing" of his cell. While the filing of grievances is protected conduct,

the cell search does not appear to establish adverse action. Plaintiff may be

> suggesting that these searches were unusually punitive and so were out of the ordinary[. However,] plaintiff alleges no facts tending to show that, in an ordinary random cell search, property is not seized and cells are not turned upside down and inside out. It is to be expected that cell searches will disrupt, not only the prisoner's life, but also the living conditions inside the cell; and since one purpose of a cell search is to locate and recover contraband, the court cannot turn a blind eye to the fact that prisoner property is sometimes seized when cells are searched."

*Jones v. Harris,* 665 F.Supp.2d 384, 398 (S.D.N.Y.2009). Phillips has failed to allege any facts demonstrating that the searches (regardless of who conducted or ordered them or how disruptive they were) were so much a departure from the norm as to be greater than a *de minimis* disruption, or to qualify as conduct that would deter an individual of ordinary firmness from exercising his constitutional rights. *Id.* Accordingly, defendants' motion as to this claim should be granted.

### c. Menard

Defendant Menard is accused of putting Plaintiff in an "unsanitary cell" in retaliation for Phillip's making his cell gate malfunction five days prior. Plaintiff fails to meet his burden of demonstrating the first prong of a plausible claim, because destruction of prison property is not a constitutionally protected action. [14] Accordingly, defendants' motion as to this claim should be granted.

### d. Boudrieau & Martin

Defendants Boudrieau and Martin are jointly accused of removing Plaintiff's medically approved insoles from his boots, which caused him blistering and "significant pain" in retaliation for a sarcastic comment made by Plaintiff to defendant Martin. However, making sarcastic comments to Correctional Officers is not conduct protected by the Constitution [15], therefore defendants' motion as to this claim should be granted.

### e. Tucker

**\*10** Plaintiff claims that he made a comment to defendant Tucker which caused him to retaliate against Plaintiff by doing a cell frisk the following evening which caused Plaintiff's property to become "strewn about," and "someone" supposedly spit tobacco juice into his bread. Plaintiff does not meet the burden of proof here because he has not established an engagement in protected conduct. "Inmates have no reasonable expectation of privacy in their prison cells[; therefore Phillips] ha[s] no constitutional right to be free from cell searches of any kind, including retaliatory cell searches." *See Rodriguez v. McClenning*, 399 F.Supp.2d 228 at 239 (2005). Accordingly, defendants' motion as to this claim should be granted.

### C. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. Eighth Amendment obligations include the duty to protect prisoners from other known harms. *Farmer v. Brennan*, 511 U.S. 825, 829, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1970); *Matthews v. Armitage*, 36 F.Supp.2d 121, 124 (N.D.N.Y.1999) (citations omitted). It also includes the provision of medical care. *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir.1994). The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. *Farmer,* 511 U.S. at 834. Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

### 1. Conditions of Confinement

"The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer,* 511 U.S. at 832. This includes the right to "receive adequate food, clothing, shelter, and medical care...." *Id.* (citations omitted). As with other

Eighth Amendment claims, a "plaintiff must satisfy both an objective ... and subjective test." *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996) (citations omitted). Thus, "a prisoner may prevail only where he proves both an objective element —that the prison officials' transgression was sufficiently serious—and a subjective element—that the officials acted, or omitted to act, with a sufficiently culpable state of mind ...." *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir.2002) (internal quotation marks and citations omitted).

> The objective prong can be satisfied by conditions of confinement ... [which] in combination [constitute an Eighth Amendment violation] when each would not do so alone ... [such as] when the conditions have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise —for example, a low cell temperature at night combined with a failure to issue blankets.

**\*11** *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005) (citations omitted). However, "[n]othing so amorphous as overall conditions can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.* (citing *Wilson v. Seiter,* 501 U.S. 294, 304–05, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). The subjective prong requires "a prison official [to] have a sufficiently culpable state of mind ..., of deliberate indifference to inmate health or safety." *Farmer,* 511 U.S. at 834 (citations omitted).

### a. Allan and Menard

Defendant's Allan and Menard are accused of placing Plaintiff in an unsanitary cell in retaliation for breaking his cell door. However, the allegations do not supply any more detail explaining what made the cell unsanitary, let alone a substantial risk of serious harm. *See Hamilton v. Fischer,* No. 10–CV–1066 (MAD/RFT), 2012 WL 987374, at \*8 (N.D.N.Y. Feb.29, 2012) ("allegations of unsanitary conditions that are general in nature and do not specify any particularized facts regarding the level of hygiene do not state a claim upon which relief can be granted.") (internal quotation marks and citations omitted) (Ex. B). Additionally, no facts were alleged that suggest either Defendant Allan or Menard acted with deliberate indifference to Phillips' safety.

Accordingly, defendants' motion as to this claim should be granted.

#### b. Delutis and Delisle

Defendant's Delutis and Delisle are accused of placing Plaintiff in an unsanitary cell which Plaintiff describes as "smelling like a zoo" and "generally filthy," with the sink appearing to "not have been cleaned in months." Plaintiff states that "approximately an hour elapsed" when he was taken out of this cell and brought to another cell. Phillips contends that in the new cell he was brought to the "pillow and mattress were both fouled" and it "smelled bad." Plaintiff tore the pillow and blanket to pieces and advised the facility Captain of his mattress conditions. The Captain, once made aware of these conditions, provided Plaintiff with a new mattress.

In this case, Plaintiff was held in these conditions for approximately one hour. "The Eighth Amendment is generally well recognized ... where unsanitary conditions are temporary." *Ortiz v. Department of Correction of the City of New York,* No. 08–CV–2195 (RJS)(HBP), 2011 WL 2638137, at \*7 (S.D.N.Y.Arp.29, 2011) (Ex. C) (quoting *Kee v. Hasty,* No. 01–CV2123 (KMW)(DF), 2004 WL 807071 at \*26 n. 24 (S.D.N.Y. Apr. 14, 2004) (Freeman, M.J.) (Report and Recommendation) (Ex. D)), *see also McNatt v. Unit Manager Parker,* No. 99–CV1397 (AHN), 2000 WL 307000 at \*4 (D.Conn.2000) (Ex. E); *Whitnack v. Douglas County,* 16 F.3d 954, 955–58 (8th Cir.1994) (reversing jury verdict for plaintiff and finding no violation based on 24 hour exposure to vomit in sink, dried feces on toilet seat and dried urine puddles on floor before cleaning supplies were made available); *Prellwitz v. Anderson,* No. 07–CV–2120 (PAM/JSM), 2007 WL 2033804 at \*2–\*3 (D.Minn. July 12, 2007) (granting motion to dismiss under 28 U.S.C. § 1915A(b) where waste water on cell floor lasted only three hours and odor of inoperable toilet lasted six hours) (Ex. F); *Odom v. Keane,* No. 95–CV–9941 (SS), 1997 WL 576088 at \*5 (S.D.N.Y. Sept.17, 1997)[19] (Sotomayor, D.J.) (condition where toilet failed to flush between 9 p.m. and 7 a.m. for several months "does not amount to cruel and unusual punishment") (Ex. G); *Evans v. Fogg,* 466 F.Supp. 949, 950 (S.D.N.Y.1979) (Lasker, D.J.) ("To be kept in a refuse-strewn cell for 24 hours and in a flooded cell (a condition resulting from [plaintiff's own acts) for two days is a rough experience, but, since neither condition persisted for more than a limited period of time, it cannot be said that the condition amounted to cruel and unusual punishment.")). Thus, even crediting Plaintiff's allegations as true, because he only spent an hour

in that cell has failed to satisfied the objective prong of the analysis.

**\*12** Additionally, a plaintiff cannot succeed on an Eighth Amendment claim where there is no genuine issue of fact that defendants were deliberately indifferent. *See Ortiz* 2011 WL 2638137, at \*8. In this case, Plaintiff was provided with a new mattress when he informed staff about his need for a new one. This behavior does not indicate deliberate indifference to Phillips' condition and therefore based on the above, defendants' motion as to this claim should be granted.

#### c. Amo & Roque

Defendants Amo and Roque are accused of providing Plaintiff with a "contaminated" Kosher tray that was missing two jellies but included a cockroach. Plaintiff then claims that he requested and was denied receiving a different tray. Plaintiff has failed to allege any harm or deprivation of a singular human need. According, these allegations are insufficiently serious to sustain an Eighth Amendment conditions of confinement claim. *See Govan v. Campbell,* 289 F.Supp.2d 289, 296–97 (N.D.N.Y.2003) (allegations that shower stalls had rust bubbles, birds were permitted to fly within the cells, and that the prison had "cockroach problems" were insufficient to state an Eighth Amendment claim, especially since plaintiff failed to identify how he was harmed by such conditions). Defendants' motion as to this claim should be granted.

#### d. Hutti [16]

Defendant Hutti is accused of moving Plaintiff to a secure area after he allegedly flooded the company. Plaintiff was taken to this location for two hours and claims the area he was being held in began to flood due to actions by "defendant and/or civilian plumbers." Plaintiff was taken from this location and moved to # 7 cage where he noticed "there was no mat or pillows" and "the cage was disgusting." Plaintiff also states that the sink and toilet "had not been cleaned in some time" and dirty water in the sink gave off "a strong stench not unlike sewage." Other descriptions of the cell include it being "generally filthy" and Plaintiff did not believe the floor had been swept in weeks because there were "dust bunnies."

Conditions that create "temporary inconveniences and discomforts" or that make "confinement in such quarters

unpleasant" are insufficient to state an Eighth Amendment claim. *Adams v. Pate,* 445 F.2d 105, 108–09 (7th Cir.1971). In *Adams,* the court of appeals did not find a constitutional violation when an inmate alleged that his cell was filthy and stunk, the water faucet from which he drank was only inches above the toilet, and the ventilation was inadequate. *Id.* The *Adams* holding, while only persuasive, is still instructive to this case given the factual similarities such that in both cases the inmates alleged having "filthy" cells among other issues. The *Adams* court did not find those conditions to be adverse enough as to rise to the level of an Eighth Amendment violation, despite them being arguably more unpleasant than the circumstances as described here. For this reason, defendants' motion as to this claim should be granted.

## 2. Denial of a Basic Human Need

**\*13** Defendants LaValley, Tucker and Bouissey are accused of denying Plaintiff of what he claims are "basic human needs" under the Eighth Amendment. In three separate and unrelated instances, Phillips alleges he was denied (1) ear plugs by defendant LaValley; (2) a pillow by defendant Tucker; and (3) use of the restroom while in the exercise yard by defendant Bouissey.

However, even assuming the truth of these factual allegations, they are the type of *de minimis* deprivations that fail to state a constitutional claim. *Phelan v. Zenzen,* No. 10–CV6704 CJS, 2012 WL 5420423, at \*5 (W.D.N.Y. Nov.6, 2012) (stating that the denial of a pillow for several nights did not violate Eighth Amendment) (Ex. H); *see also, Gillard v. Rovelli,* No. 09–CV–0431 (TJM/DEP), 2010 WL 5149277 at \*5 (N.D.N.Y.Aug.30, 2010) (collecting cases concerning razors) (Ex. I); *Williams v. DeTella,* No. 95–CV–6498, 1997 WL 603884 at \*2 (N.D.Ill. Sep.23, 1997) ("Clothing is one of the necessities of civilized life ... and while prisoners are not entitled to a daily change of clothes, at some point the denial of clean clothes could be a deprivation of constitutional magnitude ... The same goes for bedding ... although the court emphasizes that the limit is set by decency and hygiene, not comfort. Pillows need not be provided.") (Ex. J) (citations omitted); *Loadholt v. Lape,* No. 09–CV–0658 (LEK/RFT), 2011 WL 1135934 at \*4 (N.D.N.Y.Mar.3, 2011) ("[C]ourts in this Circuit have found the deprivations of better pain medicine, a cane, a mattress, a pillow, or better shoes, as the Plaintiff has alleged, do not meet, neither singularly nor collectively, the objective standard under the Eighth Amendment.") (Ex. K); *Smith v. Arnold,* No. CV 07–

1353–PHX–DGC (MEA), 2008 WL 5331754 at \*4 (D.Ariz. Dec.22, 2008) ("[A] restriction on possessing a television, a radio/cassette player, headphones, a fan, an electric shaver, and tapes does not rise to the level of a significant and atypical hardship that creates a liberty interest.") (Ex. L).

As to the denial of Plaintiff's use of the bathroom, "case law has established that temporary denial of a bathroom does not establish the existence of an objective injury for purposes of an Eighth Amendment claim." *Jones v. Marshall,* No. 08–CV–0562, 2010 WL 234990, at \*3 (S.D.N.Y. Jan.19, 2010) (Ex. M); *see also Whitted v. Lazerson,* No. 96–CV2746(AGS), 1998 WL 259929, at \*1–2 (S.D.N.Y. May 21, 1998) (no objective injury where plaintiff had to wait ninety minutes to use the bathroom, during which time he "was forced to hold his bowel movement at painful levels, and at times partially urinated and defecated in his clothing") (Ex. N); *Odom v. Keane,* No. 95–CV9941 (SS), 1997 WL 576088, at \*5 (S.D.N.Y. Sept.15, 1997) (no objective injury where plaintiff's toilet did not function for a ten-hour period between 9 p.m. and 7 a.m.) (Ex. G); *Rogers v. Laird,* No. 07–CV–668 (LEK/RFT), 2008 WL 619167, at \*3 (N.D.N.Y. Feb.8, 2008) ("The temporary deprivation of restroom privileges for a three hour period does not constitute an extreme deprivation of life's necessities.") (citation omitted) (Ex. O); *Bourdon v. Roney,* No. 99–CV–0769 (LEK)(GLS), 2003 WL 21058177, at \*10–11 (N.D.N.Y. Mar. 6, 2003) (three hour deprivation of bathroom privileges did not constitute Eighth Amendment violation) (Ex. P). Consistent with this case law, Plaintiff's temporary deprivation of access to bathroom facilities while he was outside during recreation are similarly insufficient to establish a constitutional violation. Defendants' motion as to these claims should be granted for failure to state a claim.

## 3. Denial of Outdoor Recreation

**\*14** Defendants Lee and Bezio are each accused of denying Plaintiff outdoor recreation time on two separate and unrelated occasions. As previously stated by the Western District, "[a]lthough the Second Circuit has approved one hour of outdoor recreation per day, it has not held that to be the constitutional minimum". *Phelan,* No. 10–CV–6704 CJS, 2012 WL 5420423, at \*5 (W.D.N.Y. Nov.6, 2012) (citations and quotations omitted) (Ex. H). Instead, deprivations of exercise for relatively brief periods of time are usually upheld. *Ford v. Phillips,* No. 05–CV–6646 (NRB), 2007 WL 946703, at \*9 (S.D.N.Y. Mar.28, 2007) (finding that, "as a matter of law, minor and temporary deprivations

of property, showers and recreation ..." in no way involved the severity of treatment which must be shown to make out a case of cruel and unusual punishment.") (citations omitted) (Ex. Q); *see, e.g., Branham v. Meachum,* 77 F.3d 626, 630–31 (2d Cir.1996) (finding that keeping inmate on lockdown and "full restraint" status without outdoor exercise for a period of approximately twenty-two days was insufficient to satisfy the subjective prong and therefore does not violate the Eighth Amendment); *Houston v. Goord,* No. 03–CV–1412 (GTS/ DEP), 2009 WL 890658, at \*15 (N.D.N.Y.Mar.31, 2009) (declaring Eighth Amendment claim without merit because denial of opportunity to exercise outdoors for less than two weeks was *de minimis* ) (Ex. R); *Dumpson v. Goord,* No. 00– CV–6039–CJS, 2011 WL 4345760 at \*9 (W.D.N.Y.Sep.15, 2011) (citing cases) (Ex. S). Here, Phillips does not allege that he was deprived of all exercise. Instead, Plaintiff alleges that on only two separate occasions was he deprived of exercise in the prison yard. Such allegations fail to state an Eighth Amendment claim, and defendants' motion as to these claims should be granted.

### 4. Excessive Force

Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983. *Hudson v. McMillian,* 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." *Hudson,* 503 U.S. at 9 (internal citations omitted); *Blyden,* 186 F.3d at 262. However, "the malicious use of force to cause harm constitute [s][an] Eighth Amendment violation per se" regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing Hudson, 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the

conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (quotation omitted).

**\*15** The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Sims,* 230 at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant [;] ... the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (internal quotation marks and citations omitted).

### a. James

Phillips alleges that Defendant James yanked the chain holding Plaintiff's handcuffs and according to Plaintiff "he appeared to be really attempting to snap Plaintiff's wrists." Phillips also asserts that James later roughly shoved him into the wall in what Phillips believed was "an attempt to ram his face into the wall." After this incident James supposedly placed Plaintiff back in his cell, removed his handcuffs and "slapped his hands hard."

As the complaint is read in a light most favorable to the Plaintiff, this conduct while potentially not objectively serious, seems to have been done solely to cause harm. Thus, pursuant to *Blyden,* such a malicious use of force, intended solely cause harm, is sufficient to establish a plausible Eighth Amendment violation. Therefore defendants' motion as to this claims should be denied.

### b. Lee

Plaintiff claims that Defendant Lee gave him his Kosher meal with dirty gloves, which Plaintiff objected to, causing Lee to

slam the hatch down on Plaintiff's hand, "applying his weight down in an effort to harm Plaintiff and keep him pinned."

In this situation also, the complaint is being read in a way most favorable to the Plaintiff and since this conduct does not appear to be in a good-faith effort to maintain or restore discipline but instead to solely cause harm, it is sufficient to establish a plausible Eighth Amendment violation. Accordingly, Defendants' motion as to this claims should be denied.

### 5. Meals

The Eighth Amendment "require[s] that prisoners be served nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and wellbeing of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983). "While no court has held that denial of food is a *per se* violation of a prisoner's Eighth Amendment rights, under certain circumstances a substantial deprivation ... may well be recognized as being of constitutional dimension." *Id.* (citations omitted). However, the deprivation must be sufficient to create a serious danger to the health of the inmate. *See, e.g., Beckford v. Portuondo,* 151 F.Supp.2d 204, 213 (N.D.N.Y.2001) (finding deprivation of two of three meals per day for eight days created an issue of material fact sufficient for Eighth Amendment claim to survive summary judgment); *Moss v. Ward,* 450 F.Supp. 591, 596–597 (W.D.N.Y.1978) (finding denial of food for four consecutive days and reduced food for three days thereafter sufficient to violate prisoner's Eighth Amendment rights).

**\*16** As addressed earlier, Phillips claims defendant's Lee, Trudeau, and Hutti caused him to miss three meals on separate and unrelated occasions. The scope of the deprivation of food required to constitute cruel and unusual punishment is significantly greater than the deprivation present here. Missing a single meal on three separate occasions represents a *de minimus* injury which did not deny Plaintiff the minimal civilized measure of life's necessities. *Beckford,* 151 F.Supp.2d at 213; *Moss,* 450 F.Supp. at 596–97. While no doubt this was more than likely unpleasant, it is insufficient to establish an Eighth Amendment claim. Accordingly, defendants' motion on this ground should be granted.

### 6. Medical Care

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. This includes the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need. *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Hathaway,* 37 F.3d at 66. More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan,* 511 U.S. 825, 844, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

" 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson,* 503 U.S. at 9). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance,* 143 F.3d at 703. Thus, "disagreements

over medications, diagnostic techniques (e.g., the need for Xrays), forms of treatment, or the need for specialists ... are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001).

### a. Waldron & Berggren

**\*17** Plaintiff claims that Defendants Waldron and Berggren were deliberately indifferent to his serious medical needs when he disclosed to Defendant Waldron that he was experiencing "severe mental and emotional issues for which he had not previously been subjected to" and Defendant Waldron replied that there was nothing she could do for him. Plaintiff also claims he filed requests to see Defendant's Waldron and Berggren and was ignored. Plaintiff claims he sent requests to outside agencies as well but was met with negative responses which Plaintiff claims were fashioned to " 'cover' themselves as well as the facility at Clinton."

As to Phillips' claims regarding his mental health, "treatment of mental disorders of mentally disturbed inmates is ... a serious medical need" as contemplated by *Estelle. Guglielmoni v. Alexander,* 583 F.Supp. 821, 826 (D.Conn.1984). Thus, considering all of Phillips' various complaints concerning his mental health, it is clear that he has alleged facts sufficient to allege an objective medical need as a result of his mental illnesses.

Moreover, Phillips also contends that defendants have deliberately precluded him from speaking to mental health personnel by ignoring his requests and dismissing his complaints, despite his various attempts to do so. Reading the facts in the light most favorable to Plaintiff, this constitutes deliberate indifference to Phillips' mental health needs. Therefore, it is recommended that the defendants' motion on this ground be denied.

### b. Savage

Defendant Savage was walking around and Plaintiff stopped him to ask some questions regarding his mental health file. Plaintiff claims Defendant Savage told him "you know how things 'work' when it concerns you." Plaintiff also claims Defendant Savage approached him a few months later and asked if he was to come out of his cell to talk. Plaintiff claims this was the last "bonafide interview" he received and after

hearing all of Phillips' symptoms told him he may have "a legitimate anxiety issue." Plaintiff claims Defendant Savage was deliberately indifferent to his medical need since Phillips' never had an opportunity to speak with Dr. Berggren, though Savage told Plaintiff he would.

For the same reasons as stated above, Phillips has succeeded in alleging a serious medical need. Moreover, Savage's actions of speaking to Plaintiff, identifying that he probably needed help for a legitimate mental health need, and continuing to fail to arrange for such treatment constitutes a plausible claim of deliberate indifference. Thus, it is recommended that defendants' motion on this ground be denied.

### c. Boudrieau & Martin

Defendants Boudrieau and Martin are jointly accused of removing Plaintiff's medically approved insoles from his boots during a security screening, which caused him blistering and "significant pain" in retaliation for a sarcastic comment made by Plaintiff to defendant Martin.

Construing Phillips' allegations as true, it appears that Phillips' has established a plausible claim that defendants acted with deliberate indifference to Phillips' unnamed medical condition. Phillips contends that defendants intentionally interfered with his treatment by denying him use of his medically approved boot insoles. Viewing the facts in the light most favorable to Phillips, the fact that he had medically provided insoles indicates that he received treatment from a medical professional regarding a medical need. Accordingly, such indicates a plausibly objectively serious medical condition. Moreover, construing the facts in the light most favorable to Phillips, defendants actions in intentionally causing the security device to malfunction and knowingly taking away medically indicated and approved insoles indicates deliberate indifference. Therefore, defendant's motion to dismiss on this ground should be denied.

### D. Qualified Immunity

**\*18** Defendants claim that even if Phillips' constitutional claims against them are substantiated, they are nevertheless entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar

as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), aff'd, 80 F. App'x 146 (2d Cir.2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230.

Here, the second prong of the inquiry must only be discussed with regard to Phillips' Eighth Amendment right to medical care and the infliction of excessive force. It is wellsettled that during Phillips' stay at Clinton, the Eighth Amendment protected an inmate from the infliction of cruel and unusual punishment, which extends to the provision of medical care (*Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)) and prohibition against excessive force (*Hudson v. McMillian,* 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). Therefore, it would not be objectively reasonable to conclude that indifference to various medical conditions and excessive force would fail to violate this right. Thus, accepting all of Phillips' allegations as true, qualified immunity cannot be granted to defendants for their alleged misconduct. Accordingly, defendants' motion on this ground should be denied.

### E. Injunctive Relief

To the extent that Phillips requests declaratory and injunctive relief, such requests are moot as he has been transferred from Clinton and is now housed at Upstate Correctional Facility. *See Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) ("It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility.") (citations omitted). Accordingly, to the extent that Phillips seeks declaratory and injunctive relief, those claims for relief should be dismissed as moot.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion to dismiss (Dkt. No. 33) should be:

**\*19** 1. **DENIED** as to:

  A. Phillips' Eighth Amendment excessive force claims against defendants James and Lee;

  B. Phillips' Eighth Amendment deliberate indifference claims regarding his mental health treatment against defendants Waldron, Berggren, and Savage; and

  C. Phillips' Eighth Amendment deliberate indifference claims regarding his medically approved insoles against defendants Boudrieau and Martin; and

2. **GRANTED** as to all other claims and defendants.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

Dated: Dec. 2, 2013

**All Citations**

Slip Copy, 2014 WL 1202693

### Footnotes

1   Although the Report–Recommendation and Order sets forth plaintiff's address as Clinton Correctional Facility (plaintiff's place of incarceration when the complaint was filed), this is merely a clerical error. It is clear from the docket (see Dkt. No.

36) that the Report–Recommendation and Order was properly mailed to plaintiff at Upstate Correctional Facility, where he has been housed since no later than August 1, 2012 (see docket entry for August 1, 2012; also see *Phillips v. La Valley,* 9:12–CV–610, Dkt. No. 20.)

1    Captain Lacy is named in the description of events, however he is not a named party to this action.

2    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b) (2007). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

3    Defendant Delisle is also accused of stealing all of Plaintiff's property (Compl.¶¶ 78), however that claim has been dismissed.

4    Defendant Tucker is also accused of destruction of Plaintiff's legal documents, stealing property, and an illegal cell frisk (Compl.¶¶ 51), however these claims have been dismissed.

5    In the 15th Cause of Action, Defendant Bousissey is accused of threating Plaintiff, however that claim has been dismissed.

6    Claims of false misbehavior reports have also been dismissed.

7    Defendant Lee was also accused of harassment, however that claim has been dismissed.

8    Defendant Bezio was also accused of harassment, however that claim has been dismissed.

9    Defendant Hutti is accused of violating Plaintiff's Fourth and Fourteenth Amendment rights, however those claims have been dismissed and only the remaining Eighth Amendment claims will be analyzed.

10    Plaintiff notes in Complaint ¶¶ 30 that he has been required to "self-diagnose" his mental issues, and has diagnosed himself as having severe anxiety, blackouts, chronic fatigue and nervousness.

11    This phrase translates as "the law does not concern itself with trifles." *Gottlieb Dev. LLC v. Paramount Pictures Corp.,* 590 F.Supp.2d 625, 632 (S.D.N.Y.2008).

12    All unpublished decisions are attached to this Report and Recommendation.

13    In Plaintiff's complaint, he uses the wording "cell frisks" implying more than one, however the complaint only addresses and describes one instance. While Plaintiff filed a grievance against Defendant Allan for this cell search, Plaintiff's complaint does not specify who searched his cell, only that "someone entered his cage" while he was gone. Compl. ¶¶ 49.

14    While the court could not find this enumerated in any cases, it is apparent to the court that destruction of property is not conduct protected by the Constitution.

15    While the court could not find this enumerated in any cases, it is apparent to the court that sarcastic comments to Corrections Officers is not conduct protected by the Constitution.

16    Fourth and Fourteenth amendment claims against Defendant Hutti have previously been dismissed and only the Eighth amendment claim will be addressed in this report.

---

**End of Document**                            © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 2401574
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Nicholas ROBLES, Plaintiff,
v.
Warden S. KHAHAIFA, et al., Defendants.

No. 09CV718.
|
June 25, 2012.

**Attorneys and Law Firms**

Nicholas Robles, Albion, NY, pro se.

Kim S. Murphy, NYS Attorney General's Office, Buffalo, NY, for Defendants.

**Order**

HUGH B. SCOTT, United States Magistrate Judge.

**\*1** Before the Court is defendants' motion for summary judgment dismissing this action (Docket No. 37[1]). Responses to this motion were due by April 3, 2012, and any reply was due by April 16, 2012 (Docket No. 47). After denying (Docket No. 53) plaintiff's motions (Docket No. 47) for appointment of counsel and to stay the defense summary judgment motion (Docket No. 50), responses were due by May 14, 2012, and replies by May 25, 2012 (id.). The parties consented to proceed before the undersigned as Magistrate Judge on August 15, 2011 (Docket No. 30).

Plaintiff filed a renewed motion to stay the defense motion (Docket No. 57); that motion is **denied.**

**BACKGROUND**

Plaintiff, proceeding *pro se,* commenced this action alleging that defendants were deliberately indifferent to his medical condition while he was incarcerated at the Orleans Correctional Facility ("Orleans") in 2009 (Docket No. 14, Am. Compl.; Docket No. 39, Defs. Statement ¶¶ 1, 3). The Amended Complaint alleges claims against Superintendent S. Khuhaifa, Dr. Winston Douglas and Dr. Dwight Lewis,

inmate grievance supervisor Fitts, Sergeant Austin, and corrections officer Wilson (Docket No. 14, Am. Compl.). He claims that Drs. Douglas and Lewis exhibited deliberate indifference to plaintiff's right shoulder from February 2009 to June 2010 by failing to treat his shoulder and depriving plaintiff of pain medication. He alleges that the original injury arose from a prison assault while he was at Fishkill Correctional Facility, but he alleges here only claims arising in this District surrounding the treatment he received (or did not receive) while at Orleans (id. ¶¶ 16–17). Since plaintiff did not receive what he believed to be adequate pain medication, he substituted illegal marijuana to self-medicate his pain and was disciplined for marijuana possession (id. ¶ 20). Plaintiff moved for leave to proceed *in forma pauperis* (Docket Nos. 2, 5) and leave was granted (Docket No. 7).

*Defense Motion for Summary Judgment*

According to defendants' Statement of Undisputed Facts (Docket No. 39), plaintiff alleges that defendants were deliberately indifferent to the condition of his right shoulder, alleging that Superintendent Khahaifa instituted a policy which forbade prescribing narcotics to inmates (Docket No. 39, Defs. Statement ¶ 3; *see also* Docket No. 14, Am. Compl. ¶ 21). Superintendent Khahaifa states that, because medical decisions are delegated to medical personnel, he disclaims any influence over that decision making and denies that a no antinarcotic policy exists at Orleans (Docket No. 39, Defs. Statement ¶ 4; Docket No. 42, Khahaifa Decl. ¶ 6). Narcotic pain medication is prescribed on a case-by-case basis as needed by an inmate patient (Docket No. 39, Defs. Statement ¶ 5). Khahaifa received five letters and numerous grievances from plaintiff regarding his medical treatment which he forwarded to appropriate office or, with the grievances, he considered the appeal and affirmed denial of relief, with these appealed grievances then appealed to Department of Corrections and Community Supervision ("DOCCS") Albany central office (id. ¶ 9; Docket No. 42, Khahaifa Decl. 12).

**\*2** Defendant Fitts was employed as an inmate grievance resolution program supervisor at Orleans (Docket No. 39, Defs. Statement ¶ 11; Docket No. 41, Fitts Decl. ¶ 1). Plaintiff claims that Fitts circumvented the grievance process (Docket No. 39, Defs. Statement ¶ 12), but Fitts claims that all grievances were filed and processed pursuant to DOCCS directives (id. ¶ 13).

Defendant Austin was a sergeant at Orleans during this time and plaintiff alleges that he mislead and misinformed

unnamed DOCCS officials in Albany by incorrectly telling them that he saw plaintiff lift weights (*id.* ¶¶ 17–18). Austin denies contacting Albany about plaintiff and he disclaims ever seeing plaintiff exercise (*id.* ¶¶ 22, 23).

Defendant Wilson is a corrections officer at Orleans (*id.* ¶ 25) and plaintiff claims that Wilson interfered with plaintiff's medical care by collaborating with nursing staff and Sergeant Austin in misinforming Albany officials about plaintiff's ability to lift weights (*id.* ¶ 26). When Wilson was questioned by medical staff about plaintiff, Wilson told them that he saw plaintiff lift weights daily (*id.* ¶¶ 27–28). A member of medical staff then went to the gym but missed plaintiff because he finished there (*id.* ¶ 29). Wilson never contacted Albany about plaintiff; had such contact been made, it would have been memorialized in a memorandum (*id.* ¶ 31).

Plaintiff alleges that Dr. Douglas, Facility Health Services Director at Orleans, refused to prescribe narcotics to plaintiff and instead chose to treat plaintiff's shoulder differently (*id.* ¶ 35). Dr. Douglas was plaintiff's primary physician at Orleans (*see* Docket No. 43, Dr. Lewis Decl. ¶ 4). Dr. Douglas explains that plaintiff made repeated demands for Percocet and other narcotics that were not medically necessary and plaintiff was not compliant with medical instructions (Docket No. 39, Defs. Statement ¶ 39; *see id.* ¶¶ 36–38, 40–41; Docket No. 48, Dr. Douglas Decl. ¶¶ 17, 18, 15, 20). Knowing plaintiff's history of drug abuse and his medical condition, Dr. Douglas changed plaintiff's medication (Docket No. 39, Defs. Statement ¶ 40; Docket No. 48, Dr. Douglas Decl. ¶ 20). Plaintiff was prescribed a sling and physical therapy as treatment for his shoulder (Docket No. 39, Defs. Statement ¶ 43), but plaintiff did not regularly wear the sling or attend physical therapy sessions, seeking instead imaging of the shoulder (*id.* ¶¶ 44, 42). Plaintiff also lifted weights (*id.* ¶ 45; Docket No. 48, Dr. Douglas Decl. ¶¶ 12–13), despite being told by medical staff to refrain from lifting weights (Docket No. 48, Dr. Douglas Decl. ¶ 12). On plaintiff's almost daily sick calls, medical staff noted plaintiff's "bulky well defined deltoids and bicep muscles, which are signs indicative of continued exercise" (*id.*). Defendants point to plaintiff's failed November 2008 surgery by outside surgeon Dr. Stegamann at Erie County Medical Center as the cause for plaintiff's rotator cuff damage (Docket No. 39, Defs. Statement ¶ 46; Docket No. 48, Dr. Douglas Decl. ¶ 24, Ex. A, at Bates No. 311).

*3 Plaintiff charges that Dr. Lewis, a facility physician at Orleans, was deliberately indifferent (Docket No. 39, Defs. Statement ¶¶ 49–50). Dr. Lewis asserts that plaintiff was

given proper medical care for his shoulder while at Orleans, he was prescribed pain and antiinflammatory medicines, physical therapy, and a sling (*id.* ¶ 51; Docket No. 43, Dr. Lewis Decl. ¶ 3), as well as monitoring images of his shoulder and examinations by outside consulting physicians (Docket No. 39, Defs. Statement ¶ 52; Docket No. 43, Dr. Lewis Decl. ¶ 3).

Defendants argue that both the subjective and objective elements of a deliberate indifference claim are not met here. Subjectively, they argue that plaintiff has not proven a culpable state of mind for any of the defendants (Docket No. 38, Defs. Memo. at 8–13). Objectively, defendants contend that plaintiff was scheduled for shoulder surgery in 2007 but was released and that surgery was never performed. Plaintiff was again incarcerated in 2008 and had two surgeries on his shoulder (Docket No. 48, Dr. Douglas Decl. ¶ 6). In 2009, plaintiff was deemed not to be a candidate for surgery, and was prescribed anti-inflammatory medication instead. Plaintiff, however, was not compliant with medical advice. Plaintiff worked out extensively, with one routine on May 7, 2009, videotaped showing plaintiff lifting weights, punching a heavy bag, and playing basketball, despite medical instruction to avoid such strenuous activity (Docket No. 45, Defs. Atty. Decl. ¶¶ 5–10, Ex. A (videotape) [2]). Defendants conclude that plaintiff's complaints did not rise to the level of serious medical need to meet the objective prong of the deliberate indifference claim (Docket No. 38, Defs. Memo. at 5–7).

Defendants each deny conspiring against plaintiff (Docket No. 39, Defs. Statement ¶¶ 10, 16, 24, 33, 48, 54; Docket No. 38, Defs. Memo. at 19–21) and deny any deliberate indifference on their part to plaintiff's condition (*see* Docket No. 39, Defs. Statement ¶ 54). They also argue that plaintiff fails to establish the personal involvement of Superintendent Khahaifa, Austin, Fitts, or Wilson in plaintiff's medical care (Docket No. 38, Defs. Memo. at 13–19). Defendants alternately argue that they are entitled to qualified immunity if a constitutional violation is found here (*id.* at 21–23).

Plaintiff responds that he complains that he continues to suffer pain in that shoulder due to not being prescribed pain medication (Docket No. 54, Pl. letter response dated Apr. 11, 2012, at 1–2), although he has not amended his Complaint to allege continuous liability. He was prescribed Ibuprofen 800 mg., but plaintiff states that he could not tolerate this medicine in his stomach (*id.* at 1). Plaintiff previously argued that there is conflicting testimony (Docket No. 51, Pl. Memo. in support

of motion for appointment of counsel and stay of defense motion ¶¶ 2, 5) but does not identify these conflicts. Plaintiff denies that he alleges any conspiracy among the defendants (Docket No. 52, Pl. Aff. in support of appointment motion ¶ 3).

**\*4** Plaintiff also complains about an assault that allegedly occurred on April 4, 2012, seeking to have this Court and prison grievance official review videotape of the incident (Docket No. 54, Pl. letter, at 1–2). That incident and others he raises in his papers (some discussed below), however, are beyond the scope of this pending action [3].

In his "Affidavit of Truth" (Docket No. 55), plaintiff describes the injury to his shoulder that lead to the surgeries and pain he suffers (Docket No. 55, Pl. Aff., FACTS ONE, TWO, FOUR, Ex. B; Docket No. 57, Pl. Amend. ¶¶ 7–8) and complains that physical therapy ended with his transfer to Fishkill Correctional Facility prior to his imprisonment at Orleans (Docket No. 55, Pl. Aff., FACT SIX). He faults Dr. Douglas for relying upon other medical personnel in plaintiff's medical record rather than his own assessment (*id.* FACT TEN), in fact plaintiff claims that Dr. Douglas used a purported assessment of plaintiff from Erie County Medical Center in January or February 2011 which claimed that plaintiff was in the Attica Correctional Facility but plaintiff was not confined there at that time (*id.* FACT NINE). Plaintiff states that due to "the medical malpractice of Winston Douglas," plaintiff had undergone severe and excruciating pain (*id.* FACT ELEVEN). He claims that he was denied proper medical assistance at Orleans (*id.* FACT SEVEN) and that a Jane Doe, a nurse administrator at Orleans but not named as a defendant here, violated HIPAA [4] by having security personnel investigate plaintiff's medical claims (*id.* FACT EIGHT). Plaintiff then alleges that, on April 11, 2012, he was assaulted by prison guards during a cell search (*id.* FACT 14).

He submits Junior Cepeda's "Affidavit of Truth" about medical staff disregarding plaintiff's complaints on March 28, 2012 (Docket No. 55, Cepeda Aff. of Truth). Cepeda states that he saw unnamed medical personnel "refuse to listen" to plaintiff on March 28 to his complaints, stating that plaintiff would always "complain about the same right shoulder all the time and everyday" (*id.* FACT 3). Cepeda states that he overhead medical staff talking about plaintiff's medical condition with security personnel at Orleans (*id.* FACT 4). Cepeda also witnessed plaintiff being assaulted by security personnel on April 11, 2012 (*id.* FACT 6).

Because plaintiff was refused pain medication, he claims that he took marijuana and then plead guilty in a disciplinary proceeding to marijuana use when caught (Docket No. 57, Pl. Amend. ¶ 9). He states that he declined what he termed an experimental surgical procedure by Dr. Stegamann in January of 2011 (*id.* [first] ¶ 10). Plaintiff alleges that since his reassignment to Orleans, defendants has been denied appropriate pain medication (*id.* [second] ¶ 10; *see id.* ¶ 11). Plaintiff's condition worsened when he injured his right knee and was then denied pain medication (*id.* ¶ 12).

**\*5** In their reply, defendants note that plaintiff made "numerous irrelevant references (Docket No. 58, Defs. Atty. Reply Decl. ¶¶ 4, 6) and submitted an unsworn witness statement (*cf.* Docket No. 55, Cepeda Aff. of Truth) that he saw medical personnel walk from plaintiff on March 28, 2012 (Docket No. 58, Defs. Atty. Reply Decl. ¶ 5). Defendants argue that this statement is too vague and conclusory to create a material issue of fact, it does not identify any defendant as the medical personnel involved, and is outside the time period (2009–10) for this action (*id.*). They conclude that plaintiff has failed to raise a material issue of fact to preclude summary judgment (*id.* ¶ 7).

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits or declarations show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003); Fed.R.Civ.P. 56(a), (c)(1) (effective Dec. 2010). The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant. *Ford, supra,* 316 F.3d at 354. "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1535 (2d Cir.) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)), *cert. denied,* 522 U.S. 864 (1997). While the moving party must demonstrate the absence of any genuine factual dispute,

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the party against whom summary judgment is sought, however, "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original removed); *McCarthy v. American Intern. Group, Inc.,* 283 F.3d 121, 124 (2d Cir.2002); *Marvel Characters v. Simon,* 310 F.3d 280, 285–86 (2d Cir.2002). The opponent to summary judgment may argue that he cannot respond to the motion where it shows, by affidavit, "that, for specified reasons, it cannot present facts essential to justify its opposition," Fed.R.Civ.P. 56(d).

The Local Civil Rules of this Court require that movant and opponent each submit "a separate, short, and concise" statement of material facts, and if movant fails to submit such a statement it may be grounds for denying the motion, W.D.N.Y. Loc. Civ. R. 56(a) (1), (2) (effective Jan. 1, 2011). The movant is to submit facts in which there is no genuine issue, *id.* R. 56(a)(1), while the opponent submits an opposing statement of material facts as to which it is contended that there exists a genuine issue to be tried, *id.* R. 56(a)(2). Each numbered paragraph in the movant's statement will be deemed admitted unless specifically controverted by a correspondingly numbered paragraph in the opponent's statement, *id.* Each statement of material fact is to contain citations to admissible evidence to support the factual statements and all cited authority is to be separately submitted as an appendix to that statement, *id.* R. 56(a)(3).

**\*6** The pleading of a *pro se* plaintiff, however, is to be liberally construed, *see Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam).

> "Federal Rule of Civil Procedure 8(a) (2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only " 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atlantic Corp. v. Twombly,* [550 U.S. 544, 555], 127 S.Ct. 1955, 1964, (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In addition, when ruling on a

defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint. *Bell Atlantic Corp., supra,* at [555], 550 U.S. 544, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929, (citing *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 508, n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989); *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974))."

*Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (per curiam). In *Erickson,* the Court held that the Tenth Circuit departed from the liberal pleading standards of Rule 8(a)(2) by dismissing a *pro se* inmate's claims.

> "The Court of Appeals' departure from the liberal pleading standards set forth by Rule 8(a)(2) is even more pronounced in this particular case because petitioner has been proceeding, from the litigation's outset, without counsel. A document filed *pro se* is 'to be liberally construed,' [*Estelle v. Gamble,* 429 U.S., 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ], and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers,' *ibid.* (internal quotation marks omitted). *Cf.* Fed. Rule Civ. Proc. 8(f) ("All pleadings shall be so construed as to do substantial justice").

551 U.S. at 94; *see Boykin v. KeyCorp,* 521 F.3d 202, 213–14 (2d Cir.2008). Thus, the *pro se* plaintiff's complaint has to be construed "more liberally" than one filed by counsel, *Boykin, supra,* 521 F.3d at 214.

"An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made with personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated," Fed.R.Civ.P. 56(c)(4) (2010) (formerly Rule 56(e)).

## II. Deliberate Indifference Standard

Under the Eighth Amendment, in order to state a claim for inadequate medical treatment, plaintiff must allege that defendants acted with "deliberate indifference to [a] serious

medical need," *LaGrange v. Ryan,* 142 F.Supp.2d 287, 293 (N.D.N.Y.2001); *see Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *see also Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (the Eighth Amendment prohibits infliction of "cruel and unusual punishments" which includes punishments that "involve the unnecessary and wanton infliction of pain.") (citations omitted); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied sub nom. Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "To establish an unconstitutional denial of medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Hathaway, supra,* 37 F.3d at 66 (quoting *Estelle, supra,* 429 U.S. at 104). Mere negligent treatment or malpractice upon a suspect, however, does not create an Eighth Amendment violation, *see Corby v. Conboy,* 457 F.2d 251, 254 (2d Cir.1972). This claim has two elements, an objective component, that the deprivation must be sufficiently serious; and a subjective component, that the defendant official must act with sufficiently culpable state of mind. *Hathaway, supra,* 37 F.3d at 66. "Sufficiently serious" for the objective component contemplates "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting) (quoted in *Hathaway, supra,* 37 F.3d at 66). Plaintiff needs to prove that defendants wantonly intended to cause him to suffer. *Wilson v. Seiter, supra,* 501 U.S. at 302.

## III. Application

### A. Procedural Grounds

**\*7** Here, plaintiff did not submit his counterstatement of facts providing a point-by-point refutation or adoption of the defense statement of facts. Instead, plaintiff provides in moving papers an attempt to stay the hearing of this motion and in other documents alleging generally that there were contested issues of fact (Docket Nos. 51, 52) or stating specific facts (contested or not) that he is now asserting in response to the motion (Docket Nos. 55, 57). He lists various facts in the latter instances without clearly indicating which fact is material to this motion. Despite his *pro se* status, the fact plaintiff did not state what facts were contested (even if not in a formal counterstatement) and compels this Court to look exclusively at defendants' statement as the conceded facts in this case. Plaintiff does point to some minor discrepancies in facts (for example, Dr. Douglas relying upon medical findings in 2011 while plaintiff was in another facility, Docket No. 55, Pl. Aff. FACT NINE; *but cf.* Docket No. 48, Dr. Douglas Decl. ¶ 11, Ex. A Bates No. 277

(consultation with Dr. Stegamann occurred in *2010* )) but these are not material to oppose the defense motion.

First, plaintiff submits his own and a witness's "Affidavit of Truth" (Docket No. 55), but both are unsworn and not witnessed statements, *cf.* 10B Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2738, at 362–63 (Civil 3d ed.1998) (affidavits submitted for or opposing a summary judgment motion need not be notarized, they may be made under penalty of perjury, but unsworn statements will be rejected). Plaintiff certified and swore "to my unlimited commercial liability that the testimony I give before this court is, to the best of knowledge and understanding, true, correct, and complete, not misleading, the truth, the whole truth, and nothing but the truth, so help me God," and concluded that he declared "under the Laws of the Constitution of the United States of America that the above stated facts are true, correct, and complete to the best of my knowledge and belief. So help me God" (Docket No. 55, Pl. Aff. of Truth at pages 1 of 3 and 3 of 3). Witness Cepeda, a "sovereign American," submits a similar "Affidavit of Truth," declaring that "the facts stated/ listed below are true, correct, and complete to the best of my understanding and belief so help me God," concluding that he "declares under the laws of the constitution of the United States of America (1787) as amended (1791) by the Bill of Rights that the above is true, correct, and complete, to the best of my belief and knowledge. And does declare that notary assistance was not possible upon time and date of submitting this Affidavit of Truth. So help me God" (*id.,* Cepeda Aff. of Truth). The handwriting for both Affidavits is similar as is the verbiage. Neither document is a declaration stating expressly that they were made under penalty of perjury, *cf.* 28 U.S.C. § 1746.

**\*8** Nevertheless, given that plaintiff is an inmate proceeding *pro se* and, as indicated by Cepeda, may have lacked notary assistance with these documents, this Court will consider them as part of the opposition to summary judgment. But even considering these papers, Cepeda's Affidavit of Truth is not admissible for the information it contains since it discusses events in 2012 that are beyond the scope of this action as currently plead, *see* 10B Wright, Miller & Kane, *supra,* § 2738, at 330, 341 (court excludes summary judgment affidavit if its irrelevance is clear). As currently plead, this case involves defendants' deficient treatment of plaintiff in 2009–10; plaintiff has not sought to amend this Complaint again to allege continuing harm. Further, Cepeda's statement accuses an unnamed medical staffer for ignoring plaintiff's

pleas for treatment on his shoulder without any connection of that unnamed employee to the named defendants in this case.

Next, this Court addresses the substance of defense arguments.

## B. Deliberate Indifference

As for the objective element of a deliberate indifference Eighth Amendment claim, at worst plaintiff alleges medical malpractice (if that) in not prescribing the medication he desired. He sought narcotic medication while the facility medical staff prescribed Ibuprofen. That allegation is not sufficient to state a constitutional deprivation. Mere negligent treatment or malpractice upon a prisoner does not create an Eighth Amendment violation. *Estelle, supra,* 429 U.S. at 106; *Corby, supra,* 457 F.2d at 254. Plaintiff also exercised his shoulder, engaging in weight lifting and hitting a heavy bag, stressful and strenuous activities on an injured rotator cuff. Defendants' motion for summary judgment on this ground is **granted.**

As for subjective element, plaintiff has not suggested that defendants wantonly wished to cause him to suffer or lay out that defendants had the sufficiently culpable state of mind to establish this element. On this ground, defendants' motion is also **granted.**

## C. Personal Involvement

As alternative ground, defendants motion is **granted** as to certain supervisory defendants because plaintiff fails to establish the personal involvement of supervisory officials retired Superintendent Khahaifa, Austin, Fitts, or Wilson in the denial of the sought medical care. The medical decisions were made by medical staff, in particular defendant Doctors Douglas and Lewis. The administrators named here merely considered grievances raised by plaintiff regarding this care.

To state a § 1983 claim, plaintiff must allege the manner in which defendant was personally involved in depriving plaintiff of his rights, *see Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). There are several ways to allege personal involvement: plaintiff could claim that defendant had direct participation in the event; plaintiff could claim that defendant failed to remedy the violation after it was noticed; defendant created the policy which lead to the violation or allowed the policy to continue; defendant was grossly negligent in managing subordinates which caused the

violation to occur; or defendant exhibited gross negligence or deliberate indifference to plaintiff's rights by failing to act on information indicating that unconstitutional acts were taking place, *Wright, supra,* 21 F.3d at 501. An allegation of personal involvement is a prerequisite for damages under a § 1983 claim in this Circuit, *e.g., Provost v. City of Newburgh,* 262 F.3d 146, 154 (2d Cir.2001).

**\*9** Plaintiff here has not alleged any of these bases for personal involvement of the supervisory defendants. Plaintiff merely claims that they failed to intervene or grant his grievance regarding the quality of medical care he received or that the superintendent had a no narcotics policy for the inmates. He does not refute defendants' contention that the supervisory defendants had no role in the medical decision making for plaintiff's treatment or Khahaifa's denial of having a policy regarding prescribing narcotics to inmates. Defendants' motion for summary judgment on this ground is **granted.**

## D. Qualified Immunity

When confronted by a claim of qualified immunity, one of the first questions for the Court to resolve is do the facts, taken in the light most favorable to the party asserting the injury, show the official's conduct violated a constitutional right. *See Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Under *Saucier,* this Court first considers the constitutional question, then considers the qualified immunity question, *id.* But the Supreme Court, in *Pearson v. Callahan,* 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009), overruled *Saucier* in mandating the order in which trial courts are to consider qualified immunity claims. In *Pearson,* the Court recognized that district and circuit courts had the discretion to determine the order of the *Saucier* steps they would consider first (either the substance of the constitutional claim or the immunity claim), 555 U.S. at 232.

Government officials performing discretionary functions generally are shielded by qualified immunity from liability in their individual capacities, *see Frank v. Reilin,* 1 F.3d 1317, 1327 (2d Cir.1993), "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "If it was objectively reasonable for the defendant to believe that his act did not violate the plaintiff's constitutional rights, the defendant may nevertheless be entitled to qualified immunity." *Anderson v. Creighton,* 483

U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 568–69 (2d Cir.1996).

Given that no constitutional violation was found, this Court **need not address** defendants' alternative contention that they deserve qualified immunity for their actions.

IV. Post Script—2012 Allegations

During the pendency of this action, plaintiff has been transferred, first from Orleans to Attica Correctional Facility then to Groveland Correctional Facility and later back to Orleans. Plaintiff has written two letters to this Court and to the grievance officials complaining about conditions following his last transfer to Orleans (letter of plaintiff to Chambers, Apr. 30, 2012; letter of plaintiff to Chambers, Apr. 30, 2012). In these letters (and in other papers he submitted in response to defendants' motion, Docket No. 54; *see also* Docket No. 57), plaintiff claims that he was harassed and beaten by prison guards when he refused to lift his arms for a frisk due to his shoulder injuries. He also alleges that medical staff at Orleans refused to treat him in 2012. In his responding papers, he discusses an April 2012 incident that he seeks the Court to investigate (Docket No. 54; *see also* Docket No. 57).

 **\*10** Since these letters and papers allege incidents that occurred in February 23, 2012, and April of that year, well after the incidents alleged in this pending action and unrelated to those in this action, this Court **declines** plaintiff's implied request to amend the Complaint to add these new allegations. Since plaintiff also sent these letters to the grievance authorities, any potential claims may not have been administratively exhausted.

CONCLUSION

For the reasons stated above, defendants' motion for summary judgment (Docket No. 37) is **granted.** Plaintiff's renewed motion to stay consideration of defendants' motion (Docket No. 57) is **denied** and plaintiff's attempted motion for leave to amend the Complaint to assert claims arising from the April 2012 incident is also **denied.**

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a) (3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

The Clerk of Court is instructed to close this case.

So Ordered.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 2401574

Footnotes

1    In support of this motion, defendants submitted their Memorandum of Law, Docket No. 38; their Statement of Facts, Docket No. 39; the declarations of defendants sergeant Darin Austin, Docket No. 40; inmate grievance resolution program supervisor Brian Fitts, Docket No. 41; retired Superintendent Sibatu Khuhaifa, Docket No. 42; Dr. Dwight Lewis, Docket No. 43; corrections officer Todd Wilson, Docket No. 44; and a declaration of their counsel, with exhibit (videotape of May 7, 2009), Docket No. 45; the declaration of Dr. Winston Douglas with exhibits, plaintiff's medical record, filed under seal, Docket No. 48; their attorney's reply Declaration, Docket No. 58.
      In opposition, plaintiff submits his motion to stay summary judgment and for appointment of counsel and its supporting papers, Docket Nos. 50, 51, 52; his letter to Chambers, dated Apr. 11, 2012, Docket No. 54; and his "Affidavit of Truth Amendment in Opposition to Respondents Summary Judgment," with enclosed Affidavit of Junior Lorenzo Cepeda and exhibit of a grievance, Docket No. 55; his amendment renewed motion for stay of defense motion, Docket No. 57.
2    Plaintiff reviewed the videotape, Docket No. 45, Defs. Atty. Decl., Ex. A, cover letter Feb. 13, 2012 (with written notation "tape reviewed: 2–16–12" and signed by plaintiff).
3    Plaintiff also sought production of his medical records from January 2012 to present, Docket No. 54, Pl. Letter at 3. Docket No. 48 is plaintiff's medical record during the relevant period for this action, from February 13, 2009, to June 1, 2010, *see* Docket No. 48, Dr. Douglas Decl. ¶ 4, Ex. A, at first page, cover letter of April 12, 2011; *see generally id.,* Ex. A.

4    Health Insurance Portability and Accountability Act, Pub.L. No. 104–191, 110 Stat.1936 (1996). As recently held by this Court, any violation of medical privacy under HIPAA is limited to enforcement by the Secretary of Health and Human Services, *Wright v. Szczur,* No. 11 CV 140, 2012 U.S. Dist. LEXIS 10872, at *15,2012 WL 268283 (W.D .N.Y. Jan. 30, 2012) (Skretny, Ch. J.). Thus, even if plaintiff were deemed to allege such a claim, it would have to be denied.

**End of Document**        © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 2095024
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Dwayne SINGLETON, Plaintiff,

v.

Correction Officer WILLIAMS, Defendant.

No. 12 Civ. 02021(LGS).
|
Signed May 20, 2014.

*OPINION AND ORDER*

LORNA G. SCHOFIELD, District Judge.

**\*1** Dwayne Singleton, pro se, brings this action pursuant
to 42 U.S.C. § 1983 against Defendant Correction Officer
Kimberly Williams, alleging interference with his mail
during his incarceration at the George R. Vierno Center
("GRVC") on Rikers Island, in violation of the First and
Fourteenth Amendments. Defendant moves for summary
judgment dismissing the Complaint in its entirety ("Motion").
Because Plaintiff has failed to adduce sufficient evidence to
permit a reasonable juror to return a verdict in his favor,
Defendant's Motion is granted.

## BACKGROUND

### I. Factual Background

The following facts are taken from Plaintiff's deposition,
Plaintiff's Complaint, Defendant's Statement pursuant to
Local Rule 56.1 ("56.1 Statement") and Defendant's other
filings in support of her Motion.

This case involves Plaintiff's allegations that his mail was
stolen or withheld while he was incarcerated at GRVC, from
December 2009 to May 2010, and from September 2011
to March 2012. While at GRVC, Plaintiff drafted letters
"everyday," usually "ten, fifteen letters in one shot." Plaintiff
corresponded with his mother, his cousins, an ex-girlfriend,
his lawyers, a friend named "Stacy," whose last name and
contact information is unknown to Plaintiff, and several other
women whose names he does not recall. Plaintiff also sent
letters to outpatient programs, drug programs, magazines,

and "businesses," including a record company and a film
company.

Plaintiff received "a lot of mail" while incarcerated at GRVC,
including from his mother, the ex-girlfriend, a social worker
and other individuals. Plaintiff also received money from his
mother and his cousins on numerous occasions. In addition
to personal mail, Plaintiff received legal mail, which was
recorded in a log. Plaintiff signed for legal mail on twelve
occasions between December 2011 and March 2012.

Plaintiff suspected he was not receiving all of his mail because
he "wrote to certain people and he didn't get [any] response
back [from] ... a few girls ... [and] businesses." In addition,
Plaintiff's friend "Stacy" told him that she had not received
any of the four or five letters Plaintiff had sent her, and
that she had sent him letters, which Plaintiff did not receive.
Plaintiff testified that no one except Stacy told him they had
sent mail that he had not received.

While Plaintiff was an inmate at GRVC, Defendant was the
primary mail officer on duty from Monday to Friday, and
frequently distributed Plaintiff's mail, usually after lunch.
When Defendant was unavailable, other correction officers
filled in and distributed mail to the inmates.

Plaintiff and Defendant offer conflicting evidence concerning
Defendant's alleged interference with Plaintiff's mail.
Plaintiff asserts that he first suspected that Defendant was
stealing his mail because she spoke to him disrespectfully.
Plaintiff testified that "[t]hings started to get out of hand when
[Plaintiff] suspected that [Defendant] was ... messing with
[his] mail." Plaintiff observed that Defendant was friendly
with some inmates and delivered their mail, but heard that she
was "playing with" the mail of inmates she did not like.

**\*2** According to Plaintiff, when he confronted her, she
"would look at [him] with the mail in her hand, and keep
walking." On March 5, 2012, Defendant made two statements
to Plaintiff, both of which he interpreted as admissions that
she was withholding his mail. Defendant made the statements
when Plaintiff was questioning or accusing Defendant about
his mail, apparently not for the first time, and she responded,
"[y]ou keep asking me stupid questions, you aint' getting
your f*ckin' mail." Defendant also said "you crazy, take ya'
medication, cause you got that right, you won't be getting
no f*ckin' mail from me." According to Plaintiff, he could
not "prove" that Defendant was interfering with his mail
until she made these statements. Plaintiff stated that during

this exchange he was being "volatile" and "probably having bipolar disorder." After that incident, Plaintiff did not recall receiving mail from Defendant again, although he did receive mail from other correction officers. Plaintiff was transferred out of GRVC approximately one week after the confrontation with Defendant.

According to Defendant, near the end of Plaintiff's incarceration at GRVC, he accused her of stealing his mail, spit on the glass separating them, and threatened to kill her, at which point Defendant gave Plaintiff's mail to a different correction officer for delivery. Defendant states that after this incident, Plaintiff would "yell and threaten [her]" and on multiple occasions, threatened to kill her and her family. Defendant denies withholding, tampering, or otherwise interfering with Plaintiff's mail.

## II. Procedural History

On December 19, 2013, Defendant filed her Motion, 56.1 Statement, and supporting papers, including excerpts from Plaintiff's deposition. On January 22, 2014, Plaintiff filed his opposition to the Motion ("Opposition"). Plaintiff's Opposition consisted of six declaratory sentences reiterating the assertions in his Complaint. Plaintiff filed no supporting affidavits or other evidence, and no opposition to Defendant's 56.1 Statement. On January 29, 2014, Defendant filed her reply to Plaintiff's Opposition. On March 17, 2014, Plaintiff filed a "response" to Defendant's reply, asserting that he "did overhear [Defendant] tell [him] with her own words that she was stealing [his] mail," and that "there are no witnesses because it was just [Defendant] in front of [Plaintiff's] cell."

## *STANDARD*

The standard for summary judgment is well established. Summary judgment is appropriate where the record before the court establishes that there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the initial burden of informing the court of the basis for the summary judgment motion and identifying those portions of the record that demonstrate the absence of a genuine dispute as to any material fact. Fed.R.Civ.P. 56(c); *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Koch v. Town of Brattleboro,* 287 F.3d 162, 165 (2d Cir.2002). The court must construe the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-moving party's favor. *See Anderson v. Liberty Lobby,*

*Inc.,* 477 U.S. 242, 255 (1986); *In re "Agent Orange" Prod. Liab. Litig.,* 517 F.3d 76, 87 (2d Cir.2008).

**\*3** If the non-moving party has the burden of proof on a specific issue, the moving party may satisfy its own initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim. *See, e.g., Celotex,* 477 U.S. at 322–23; *PepsiCo, Inc. v. Coca–Cola Co.,* 315 F.3d 101, 105 (2d Cir.2002). In other words, summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

"Although pro se plaintiffs are entitled to special latitude, when defending against summary judgment motions, absent a showing of concrete evidence from which a reasonable juror could return a verdict in [the non-moving party's] favor, summary judgment must be granted to the moving party." *Jermosen v. Coughlin,* 877 F.Supp. 864, 867 (S.D.N.Y.1999) (alteration in original) (citations omitted) (internal quotation marks omitted). "Evidence which is merely colorable, conclusory, speculative or not significantly probative is insufficient to withstand a summary judgment motion." *Id.* (internal quotation marks omitted).

Where the non-moving party fails to respond to a Rule 56.1 statement submitted by the moving party, the facts in the moving party's Rule 56.1 statement may be deemed admitted as a matter of law. S.D.N.Y.R. 56.1–56.2. In the Second Circuit, however, "[c]ourts ... typically forgive a pro se plaintiff's failure to file a Local Rule 56.1 Statement, and generally conduct their own independent review of the record." *Lloyd v. Holder,* No. 11 Civ. 3154, 2013 WL 6667531, at \*5 (S.D.N.Y. Dec. 17, 2013).

## *DISCUSSION*

The Complaint alleges a violation of "federal laws," including the First Amendment to the Constitution and "Section 1309 of the U.S. Postal Code" [1] on account of Defendant "stealing" "personal mail ... business mail and more," and asserts that jurisdiction is proper under 42 U.S.C. § 1983. Construing the Complaint broadly, Plaintiff has stated claims pursuant to 42 U.S.C. § 1983 for deprivation of Plaintiff's First Amendment rights on account of interference with non-legal mail, and deprivation of Plaintiff's First and Fourteenth Amendment rights on account of interference with legal mail. Because Plaintiff has failed to adduce evidence sufficient

for a reasonable juror to find that the alleged interference with his mail amounted to a constitutional violation, summary judgment is granted on all claims.

## I. Non–Legal Mail

An inmate has a First Amendment right to "the free flow of incoming and outgoing mail." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003); *Heimerle v. Attorney General,* 753 F.2d 10, 13 (2d Cir.1985). Restricting prisoners' right to mail is permissible only where it "further[s] one or more of the substantial governmental interests of security, order, and rehabilitation ... [and is] no greater than is necessary or essential to the protection of the particular governmental interest involved." *Ahlers v. Rabinowitz,* 684 F.3d 53, 64 (2d Cir.2012) (quoting *Davis,* 320 F.3d at 351). To establish a claim for interference with regular, non-legal mail in violation of the First Amendment, an inmate "must show a pattern and practice of interference that is not justified by any legitimate penological concern." *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, at *6 (S.D.N.Y. Mar. 29, 2001) (dismissing First Amendment claim where inmate identified only a "single instance" of interference with his regular mail). The Second Circuit has directed that "an isolated incident of mail tampering is usually insufficient to establish a constitutional violation." *Davis,* 320 F.3d at 351.

**\*4** Here, the evidence in the record is insufficient for a reasonable juror to find that Plaintiff has established interference with his incoming non-legal mail rising to the level of a First Amendment violation. Even construing the evidence in Plaintiff's favor, Plaintiff has alleged only one specific incident involving interference with his mail—that he attempted to exchange mail with his friend Stacy, whose last name and contact information he does not know, and that neither Plaintiff nor Stacy received each other's mail. Plaintiff's assertion that Defendant interfered with his mail is otherwise based upon three facts: (1) that he wrote numerous letters to individuals, businesses and organizations, and did not receive responses to all of his letters; (2) that approximately one week before Defendant was transferred from GRVC, Defendant responded to Plaintiff's allegations that she was stealing his mail by stating "you crazy, take ya' medication, cause you got that right, you won't be getting no f*ckin' mail from me" and "[y]ou keep asking me stupid questions, you' aint' getting your f*ckin' mail"; and (3) that he heard from "some other guys" that Defendant was "playing with the mail" of the inmates she did not like. These allegations are insufficient to "establish a pattern and practice of interference [with Plaintiff's mail]," particularly where

Plaintiff also testified that he otherwise received mail from "a lot of people" and that no other individuals told him that they had sent mail that he had not in fact received. Accordingly, Defendant's Motion as to Plaintiff's First Amendment claim for interference with non-legal mail is granted.

## II. Legal Mail

Interference with legal mail may constitute a violation of the right to free speech under the First Amendment and the right of access to the courts under the First and Fourteenth Amendments. *Davis,* 320 F.3d at 351; *Monsky v. Moraghan,* 127 F.3d 243, 246–47 (2d Cir.1997) (citing *Lewis v. Casey,* 518 U.S. 343 (1996)). As with interference with non-legal mail, interference with legal mail is permissible only where it "further[s] one or more of the substantial governmental interests of security, order, and rehabilitation ... [and is] no greater than is necessary or essential to the protection of the particular governmental interest involved." *Ahlers,* 684 F.3d at 64 (internal quotation marks omitted). Legal mail, however, is "afforded greater protection ... than ... non-legal mail." *Davis,* 320 F.3d at 351; *accord Cancel,* 2001 WL 303713, at *6. To establish a violation of the right to free speech, an inmate must still demonstrate that prison officials "regularly and unjustifiably interfered with the ... legal mail." *Cancel,* 2001 WL 303713, at *6 (citing *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986)). To establish a claim of denial of access to the courts, a plaintiff must show: (1) that the defendant acted deliberately and maliciously; and (2) that the plaintiff suffered actual injury in pursuing a legal claim. *Davis,* 320 F.3d at 351 (internal quotation marks omitted).

**\*5** The record does not contain sufficient evidence to permit a reasonable juror to find that Plaintiff has established that Defendant's conduct in respect of Plaintiff's legal mail amounted to a constitutional violation. First, Plaintiff has neither alleged nor produced evidence that his receipt or delivery of legal mail was impeded. Plaintiff testified that he "sent a lot of different pieces of mail" to his lawyers, that "legal mail is always recorded when you receive it," and that he "received mail from the lawyer."[2] The record indicates at least twelve occasions on which Plaintiff signed for legal mail for the period from December 2011 through March 2012. Second, there is no evidence that Plaintiff suffered any injury in pursuing his legal claims as a result of any interference with his legal mail. For example, when asked during his deposition whether his criminal case was affected in any way by the incident involving "[the] messing with [his] mail," Plaintiff responded "[o]nly in a mental way." Defendant's Motion for

summary judgment on Plaintiff's claims in respect of his legal mail is accordingly granted.

### *CONCLUSION*

For the reasons discussed above, Defendant's Motion for summary judgment dismissing all of Plaintiff's claims is hereby GRANTED.

The Clerk of Court is directed to close the motion at docket number 38, to close this case, and to mail a copy of this Opinion and Order to the pro se Plaintiff.

**All Citations**

Slip Copy, 2014 WL 2095024

Footnotes

1    Because no such legal provision exists, this claim will not be addressed.

2    Similarly, because Plaintiff has not alleged any interference with his access to counsel, nor did any of the evidence indicate as much, a Sixth Amendment claim would also fail on these facts.

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 4059977
Only the Westlaw citation is currently available.
United States District Court,
D. South Carolina.

Cass Franklin SMITH, Plaintiff,

v.

Ben CLARY, County Administrator;
Steven Mueller, Sheriff, Defendants.

C/A No. 9:12–1779–RBH–BM.
|
Aug. 16, 2012.

**Attorneys and Law Firms**

Cass Franklin Smith, Gaffney, SC, pro se.

### REPORT AND RECOMMENDATION

BRISTOW MARCHANT, United States Magistrate Judge.

**\*1** Plaintiff, Cass Franklin Smith, is a pretrial detainee in the Cherokee County Detention Center ("CCDC") in Gaffney, South Carolina. Plaintiff, who is proceeding *pro se* and *in forma pauperis* pursuant to 28 U.S.C. §§ 1915 and 1915A, brings this action under 42 U.S.C. § 1983, seeking monetary damages and injunctive relief.[1]

Under established local procedure in this judicial district, a careful review has been made of the *pro se* complaint pursuant to the procedural provisions of 28 U.S.C. § 1915; 28 U.S.C. § 1915A; the Prison Litigation Reform Act (PLRA), Pub.L. No. 104–134, 110 Stat. 1321 (1996); and in light of the following precedents: *Denton v. Hernandez,* 504 U.S. 25, 112 S.Ct. 1728, 118 L.Ed.2d 340 (1992); *Neitzke v. Williams,* 490 U.S. 319, 324–25, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989); *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *Nasim v. Warden, Md. House of Corr.,* 64 F.3d 951 (4th Cir.1995); and *Todd v. Baskerville,* 712 F.2d 70 (4th Cir.1983). Further, although this Complaint has been filed pursuant to 28 U.S.C. § 1915, which permits an indigent litigant to commence an action in federal court without prepaying the administrative costs of proceeding with the lawsuit, to protect against possible abuses of this privilege, the statute allows a district court to dismiss a case upon a finding that the action is "frivolous or malicious" or "fails to state a claim on which relief may be granted" or "seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B)(i), (ii), (iii). A finding of frivolity can be made where the complaint "lacks an arguable basis either in law or in fact," *Denton,* 504 U.S. at 31; and a claim based on a meritless legal theory may be dismissed *sua sponte* under 28 U.S.C. § 1915(e)(2)(B). *See Neitzke,* 490 U.S. at 319; *Allison v. Kyle,* 66 F.3d 71 (5th Cir.1995).

Finally, this Court is also required to liberally construe pro se documents, *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007); *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), holding them to a less stringent standard than those drafted by attorneys, *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980). This mandated liberal construction afforded to *pro se* pleadings means that if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so. However, the requirement of liberal construction does not mean that the court can ignore a clear failure in the pleading to allege facts which set forth a claim currently cognizable in a federal district court. *Weller v. Dep't of Soc. Servs.,* 901 F.2d 387 (4th Cir.1990).

### BACKGROUND

Plaintiff alleges that he "has been unfairly and discriminately (sic) segregated from other population in the jail by a classification system recently put in place by the Defendants." Complaint, Statement of Claim; ECF No. 1, p. 3. Plaintiff alleges that, since he was incarcerated in April 2010, he was housed in "medium-medium high security," until approximately thirty days before filing his Complaint, when the new classification system was implemented and Plaintiff was moved to "maximum-medium high security."[2] *Id.* Plaintiff alleges that he "has not had any disciplinary write ups or warnings since initially coming in to the jail [ ] but yet he has been sep[a]rated and punished when other inmates having the same charge as the [P]laintiff have not been sep[a]rated and punished." *Id.* Plaintiff alleges that he "has been discriminated against because the [D]efendants hold certain personal views against him and his alle[ ]ged crime." *Id.* Plaintiff alleges that he filed grievances "multiple times" with "none returned." Complaint, Place of Confinement; ECF No. 1, p. 2. Plaintiff seeks monetary and injunctive relief, *i.e.* "punitive damages of $1,000,000.00 (one million dollars)," and "legal fees incurred in filing and prosecuting this lawsuit," and "a temporary order from this court barring the new classification system at the jail in question from being

implemented any further." Complaint, Relief; ECF No. 1, p. 4.

**\*2** The caption and "list of parties" section of Plaintiff's Complaint names only Defendants Clary and Mueller. However, the body of the Complaint alleges that "[P]laintiff has had his constitutional rights violated by the [D]efendants Mueller, Padgett, Clary and Spencer." Complaint, Statement of Claim; ECF No. 1, p. 3. Plaintiff submitted proposed summonses and Forms USM–285 for Sheriff Mueller, County Administrator Clary, Major Robert E. Padgett and Tim Spencer. Plaintiff's proposed service documents refer to Defendant Spencer as "Chairman," as this Defendant is apparently the Chairman of the Cherokee County Council. Thus, the undersigned liberally construes Plaintiff's Complaint as an attempt to also state § 1983 claims against Major Padgett and Mr. Spencer.

## DISCUSSION

Claims concerning conditions of confinement imposed upon pretrial detainees are examined under the Due Process Clause of the Fourteenth Amendment as opposed to the cruel and unusual punishment prohibition of the Eighth Amendment, which applies to convicted inmates. *See Bell v. Wolfish,* 441 U.S. 520, 535–38, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The Fourteenth Amendment proscribes punishment of a detainee prior to an adjudication of guilt, without due process of law. *Id.* "However, not every hardship encountered during pretrial detention amounts to 'punishment' in the constitutional sense." *Hill v. Nicodemus,* 979 F.2d 987, 991 (4th Cir.1992) (citing *Bell* ). "And the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into 'punishment.' " *Bell,* 441 U.S. at 537. Therefore, "a court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose;" *Id.* at 538; and in considering this issue, it is important to remember that "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Id.* at 546.

As a practical matter, the contours of pretrial detainees' rights under the Due Process Clause are coextensive with

the Eighth Amendment protections applicable to convicted inmates. *See, e. g., Hill,* 979 F.2d at 991–92 (medical needs). However, incarcerated persons in general do not have a constitutionally recognized liberty interest in a particular security classification. *Hewitt v. Helms,* 459 U.S. 460, 468, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *Meachum v. Fano,* 427 U.S. 215, 224, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). Confinement in even administrative segregation for medical and security reasons does not violate a detainee's or prisoner's constitutional rights; no infringement on the prisoner's liberty interests has taken place because confinement, restriction of movement and/or access to privileges, and heightened security measures are quintessential to the nature of prison life. *See Sandin v. Conner,* 515 U.S. 472, 486, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). For instance, placement on administrative segregation is a common occurrence for inmates and detainees, "well within the terms of confinement ordinarily contemplated by a prison sentence." *Hewitt,* 459 U.S. at 468. *See also Beverati v. Smith,* 120 F.3d 500 (4th Cir.1997) (no liberty interest implicated in administrative segregation). Thus, Plaintiff's claims to a particular classification, or any classification other than the one to which he has been assigned under CCDC's new classification system, must fail, as no constitutional right of liberty was or is infringed upon by the decision of CCDC administrative staff to move Plaintiff from "medium-medium high security" to "maximum-medium high security."

**\*3** Therefore, to prevail on a conditions of confinement claim, Plaintiff must show either (1) an expressed intent to punish, or (2) lack of a reasonable relationship to a legitimate non-punitive governmental objective, from which a punitive intent may be inferred. *Hill,* 979 F.2d at 991 (citing *Martin v. Gentile,* 849 F.2d 863, 870 (4th Cir.1988)). Plaintiff's allegation that the Defendants "discriminated against [Plaintiff] because the [D]efendants hold certain personal views against him and his alle[ ]ged crime" does not state a plausible claim of violation of due process under 42 U.S.C. § 1983. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). This plausibility standard requires a plaintiff to demonstrate more than "a sheer possibility that a defendant has acted unlawfully." *Id.* Rather, it requires the plaintiff to articulate facts that, when accepted as true, "show" that the plaintiff has stated a claim entitling him to relief. *Francis v. Giacomelli,* 588 F.3d 186, 193 (4th Cir.2009) (quoting *Iqbal,* 556 U.S. at 678; *Twombly,* 550 U.S. at 557). At most, Plaintiff's allegations of "punishment" and "discrimination"

merely attribute, in purely conclusory fashion, alleged ill will to the Defendants because they believe the crimes with which he is charged (three (3) counts of murder) warrant a higher security classification under the new classification system. While Plaintiff makes the further claim that he has somehow or in some fashion been singled out, the court "need not accept the [plaintiff's] legal conclusions drawn from the facts," nor need it "accept as true unwarranted inferences, unreasonable conclusions, or arguments" without some specific factual allegations to support them. *Kloth v. Microsoft Corp.,* 444 F.3d 312, 319 (4th Cir.2006). *See also Walker v. Prince George's Cnty.,* 575 F.3d 426, 431 (4th Cir.2009) (citing *Semple v. City of Moundsville,* 195 F.3d 708, 712 (4th Cir.1999)). Plaintiff complains not about an individual or arbitrary action taken against him, but about the implementation of a new classification system which has resulted in a change in his classification.

While the purpose of pretrial confinement is to ensure the detainee's presence at trial, the detention center may impose restraints on the detainee that are reasonably related to the detention center's interest in maintaining the facility's security, even if the restraints "are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial." *Bell,* 441 U.S at 539–40. If a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." *Id.* at 539. Defendants have legitimate interests in the implementation and enforcement of a classification system, which stem from their need to manage the facility in which Plaintiff is detained. *Id.* at 540. There is nothing in Plaintiff's factual allegations to show a plausible claim that this new classification system was designed or implemented in order to "punish" the Plaintiff, who is after all being held on multiple counts of a serious, violent crime.

**\*4** Furthermore, there is a *de minimis* level of imposition with which the Constitution is not concerned. *Id.* at 539 n. 21. In order to prevail on a procedural due process claim, an inmate must first demonstrate that he was deprived of "life, liberty, or property" by governmental action. *Bevrati v. Smith,* 120 F.3d 500, 502 (4th Cir.1997). Although prisoners are afforded some due process rights while incarcerated, those liberty interests are limited to "the freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the

Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 484. Changes "in a prisoner's location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and the denial of privileges [are] matters which every prisoner can anticipate [and which] are contemplated by his original sentence to prison." *Gaston v. Taylor,* 946 F.2d 340, 343 (4th Cir.1991). Further, prisoners do not have a constitutionally recognized liberty interest in a particular security classification nor a constitutional right to be confined in a particular prison. *Meachum,* 427 U.S. at 224.

In this case, Plaintiff essentially claims that he has a right to be housed in the general population, and that his higher security status under the new classification system violates his right to due process. He additionally appears to claim that his higher security confinement under the new classification system constitutes cruel and unusual punishment. [3] Such claims are without merit in the carefully circumscribed atmosphere of a heavily populated detention center, in which numerous detainees with a broad range of pending criminal charges are housed in close quarters. If long-standing judicial deference to detention center and prison officials' administrative realities means anything, then the risk to others' safety and well being presented by a detainee who is charged with three counts of murder and attempted escape cannot be subservient to that person's liberty. *See, e.g., Anderson v. County of Kern,* 45 F.3d 1310, 1316 (9th Cir.1995) (prison officials have legitimate penological interests in administrative segregation, and they must be given "wide-ranging deference" with respect to their need to maintain order, discipline, and "institutional security"), reh'g denied, 75 F.3d 448 (9th Cir.1995), cert. denied *County of Kern v. Anderson,* 516 U.S. 916, 116 S.Ct. 306, 133 L.Ed.2d 210 (1995).

### RECOMMENDATION

Accordingly, it is recommended that the Court dismiss the Complaint in this case, without prejudice and without issuance and service of process.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 4059977

## Footnotes

1   Section 1983 is the procedural mechanism through which Congress provided a private civil cause of action based on allegations of federal constitutional violations by "person(s)" acting "under color of state law." *See Jennings v. Davis,* 476 F.2d 1271 (8th Cir.1973). The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails. *See McKnight v. Rees,* 88 F.3d 417(6th Cir.1996). In order to state a cause of action under 42 U.S.C. § 1983, a plaintiff must allege that: (1) individual defendant(s) deprived him of a federal right, and (2) did so under color of state law. *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *see Hall v. Quillen,* 631 F.2d 1154, 1155–56 (4th Cir.1980).

2   Plaintiff's Complaint was filed on June 28, 2012. The Cherokee County Detention Center's Inmate Search website indicates that Plaintiff has been confined since April 19, 2010 on three murder charges (warrant nos. M132330, 132331, and 132332), and that Plaintiff also has pending charges of assault upon a correctional employee (warrant no. M132339) and attempted escape (warrant no. M132340, date of arrest April 23, 2010). *See* http://www.cherokeecountysheriff.net/ detail.php?id=19184 (last visited Aug. 8, 2012). The Cherokee County Seventh Judicial Circuit Court Public Index shows that Plaintiff was indicted on the three murder charges (indictment nos. 2010–GS–11–0344, 0345, and 346) and on the attempted escape charge (indictment no. 2010–GS–11–0601, date of issue July 8, 2010). The Public Index shows that the charge against Plaintiff for assaulting a correctional officer was "dismissed not indicted" on June 8, 2012. *See* http:// publicindex.sccourts.org/cherokee/publicindex/PISearch.aspx (last visted Aug. 8, 2012). The undersigned takes judicial notice of the online records of Plaintiff's pending state court proceedings and CCDC's factual information concerning Plaintiff's custody status. *See Colonial Penn Ins. Co. v. Coil,* 887 F.2d 1236, 1239 (4th Cir.1989) ("We note that 'the most frequent use of judicial notice is in noticing the content of court records.' "); *Williams v. Long,* 585 F.Supp.2d 679, 685–89 (D.Md.2008) (noting that some courts have found postings on government websites to be inherently authentic or self-authenticating).

3   To state a claim that conditions of confinement violate constitutional requirements prohibiting cruel and unusual punishment, "a plaintiff must show both '(1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials.' " *Strickler v. Waters,* 989 F.2d 1375, 1379 (4th Cir.1993) (quoting *Williams v. Griffin,* 952 F.2d 820, 824 (4th Cir.1991)). Further, a plaintiff must demonstrate that he suffered a serious or significant physical or mental injury as a result of the challenged condition. *See Id.* at 1380–81. Plaintiff's Complaint makes no such factual allegations.

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 6169746
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Edward TREAT et al., Plaintiffs,

v.

CENTRAL NEW YORK PSYCHIATRIC
CENTER et. al, Defendants.

No. 9:12–cv–602 (GLS/DEP).
|
Nov. 20, 2013.

**Attorneys and Law Firms**

Edward Treat, Marcy, NY, pro se.

Larry Brown, Marcy, NY, pro se.

Myron Wright, Marcy, NY, pro se.

Richard Zimmer, Marcy, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney General, Douglas J. Goglia, Assistant Attorney General, of Counsel, Albany, NY, for the Defendants.

### *MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, Chief Judge.

### I. *Introduction*

**\*1** Plaintiffs *pro se* Edward Treat, Larry Brown, Myron Wright, and Richard Zimmer commenced this action against defendants Central New York Psychiatric Center (CNYPC), the New York Office of Mental Health, Michael F. Hogan, Maureen Bosco, Barbara Miller, Marianne Madia, Anthony Gonzalez, James Morgan, Jeff Nowicki, Terri Maxymillain, Elaine Dziadyk, and Miya Burt, pursuant to 42 U.S.C. § 1983, alleging deprivation of their rights under the Eighth [1] and Fourteenth Amendments of the United States Constitution, section 504 of the Rehabilitation Act, 29 U.S.C. § 794, the New York State Constitution, and the New York State Mental Hygiene Law. (Compl., Dkt. No. 1.) Defendants filed a motion for summary judgment in lieu of an answer, seeking dismissal of plaintiffs' claims as a matter of law. (Dkt. No. 27.)

In a Report–Recommendation and Order (R & R) dated August 28, 2013, Magistrate Judge David E. Peebles recommended that defendants' motion be granted, plaintiffs' federal claims be dismissed, and the court decline to exercise supplemental jurisdiction over the remaining state law claims. [2] (Dkt. No. 51.) Plaintiffs filed timely objections to the R & R. (Dkt. No. 52.) For the reasons that follow, the R & R is adopted in its entirety.

### II. *Background*

Plaintiffs are four convicted sex offenders who have been involuntarily committed to CNYPC for treatment under the Sex Offender Management and Treatment Act (SOMTA). (Compl.¶¶ 4, 10–17.) Plaintiffs primarily allege that the recently enacted bathroom and shower usage policies at CNYPC have deprived them of life's necessities and subjected them to overcrowding and inhumane conditions, in violation of their substantive due process rights under the Fourteenth Amendment. (*See generally* Compl.)

In May 2010, an emergency bathroom and shower policy was put in place due to several incidents occurring in the bathrooms, including voluntary and involuntary sexual activity, fights, and trafficking of contraband. (Dkt. No. 27, Attach. 4 ¶¶ 18–20.) Under the emergency policy, all of the bathrooms were monitored by Secure Treatment Care Aids (SCTAs) at all times, use of the bathrooms and shower rooms was restricted to one resident at a time, the bathroom in the treatment mall was to remain locked at all times when the SCTAs were unavailable to monitor, and residents were required to register in advance for fifteen minute shower time slots. (*Id.* ¶¶ 21–23.)

In July 2010, final "Resident Bathroom and Shower Policies" were implemented. (*Id.* ¶ 24.) These policies permitted multiple residents to use the bathrooms within the residential units between the hours of 7:00 a.m. and 11:00 p.m., but retained the single use practice during all other hours in the residential units and at all times in the treatment mall. (*Id.* ¶ 25.) The final policy also expanded the hours during which fifteen minute shower slots were available. (*Id.* ¶¶ 24, 26.)

### III. *Standard of Review*

**\*2** Before entering final judgment, this court routinely reviews all report and recommendation orders in cases it has referred to a magistrate judge. If a party has objected to specific elements of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations *de novo. See Almonte v. N.Y. State Div. of Parole,* No. Civ. 904CV484GLS, 2006 WL 149049, at \*3, \*5 (N.D.N.Y. Jan. 18, 2006). In those cases where no party has filed an objection, only vague or general objections are filed, or a party resubmits the same papers and arguments already considered by the magistrate judge, this court reviews the findings and recommendations of the magistrate judge for clear error.[3] *See id.* at \*4–5.

### IV. *Discussion*

Plaintiffs filed both general and specific objections to the R & R. Plaintiffs' specific objections can succinctly be summarized as follows: (1) Judge Peebles erroneously determined that the bathroom and shower policies only minimally inconvenienced plaintiffs, (Dkt. No. 52 at 1–2); (2) Judge Peebles misapplied the standard of review by reviewing plaintiffs' complaint in the light most favorable to defendants, and erroneously concluded that the policies were implemented due to a legitimate emergency giving rise to security concerns, (*id.* at 2–3); and (3) Judge Peebles failed to review plaintiffs' claims regarding defendants' downgrading of their complaints of abuse, (*id.* at 3). Additionally, plaintiffs filed one general objection, contending that Judge Peebles failed to review their deliberate indifference claim and claims of inhumane and unsanitary conditions, (*id.* at 3, 4). Plaintiffs objections are without merit, and the court addresses each in turn.

### A. *Specific Objections*

Plaintiffs filed three specific objections, which warrant *de novo* review. *Almonte,* 2006 WL 149049, at \*3, \*5.

### 1. Inconvenience Imposed By Bathroom and Shower Policies

First, plaintiffs dispute Judge Peebles' finding that the bathroom and shower policies were merely a modest imposition on plaintiffs. (Dkt. No. at 1, 3.) Specifically,

plaintiffs assert that, contrary to Judge Peebles' finding, they were required to wait longer than five or ten minutes to use the bathroom, and in several instances, they were required to wait twenty or forty minutes. (*Id.* at 1–2.) Additionally, plaintiffs argue that, also contrary to Judge Peebles' finding, they did claim that they were denied the right to shower daily, (*id.* at 2), and the new bathroom and shower policies caused "overcrowding conditions," (*id.* at 3). Whether plaintiffs waited five or forty minutes to use the bathroom, or showered every other day, rather than every day, however, plaintiffs have not pleaded facts that give rise to an unconstitutional deprivation of due process.[4]

Individuals in custody do not have a constitutional right to use the bathroom or to shower whenever they please. *See Odom v. Keane,* No. 95 Civ. 9941, 1997 WL 576088, at \*4–5 (S.D.N.Y. Sept. 17, 1997) (explaining that the plaintiff's claim that he was denied access to the bathroom for ten hours was not sufficient to survive summary judgment); *see also Davenport v. DeRobertis,* 844 F.2d 1310, 1316–17 (7th Cir.1988) (finding one shower per week for prisoners to be constitutionally sufficient); *Groves v. New York,* No. 9:09–CV–0412, 2010 WL 1257858, at \*8, n. 15 (N.D.N.Y. Mar. 1, 2010) (holding that CNYPC resident's two-hour lapse for request to use bathroom did not give rise to a constitutional violation); *Bourdon v. Roney,* No. 9:99–CV–0769, 2003 WL 2108177, at \*10–11 (N.D.N.Y. Mar. 6, 2003) (dismissing a pre-trial detainee plaintiff's claim where he was denied access to a bathroom for a maximum of three hours); *Beckford v. Portuondo,* 151 F.Supp.2d 204, 211 (N . D.N.Y.2001) ("Nowhere has it been held that prisoners are entitled to complete and unfettered access to water or showers."). Instead, state officials are required to provide housing under "humane conditions," and "adequate food, clothing, shelter, and medical care." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). Persons in custody are entitled to "[r]easonably adequate sanitation and the ability to eliminate and dispose of one's bodily wastes." *Odom,* 1997 WL 576088, at \*4–5.

**\*3** Here, plaintiffs allege that they were forced to wait up to forty minutes to use the bathroom, (Compl.¶ 69), and that there were an insufficient number of shower slots, causing plaintiffs to occasionally wait until the next day to shower, (*id.* ¶¶ 140–41). Given that ten hours without access to a bathroom has been held to be constitutionally sufficient, *Odom,* 1997 WL 576088, at \*4–5, and that one shower per week has been held to pass constitutional muster, *Davenport,* 844 F.2d at 1316–17, the CNYCP's bathroom and shower policies do not

violate plaintiffs' Fourteenth Amendment due process rights. Accordingly, plaintiffs have failed to allege a violation of their due process rights.

### 2. Application of the Standard of Review and Defendants' Legitimate Security Concerns

Second, plaintiffs contend that Judge Peebles misapplied the standard of review, and further object to Judge Peebles' finding that the bathroom and shower policies were the result of legitimate security concerns. (Dkt. No. 52 at 2, 3.) Plaintiffs' objections are without merit.

In analyzing the shower and bathroom policies, the court must balance plaintiffs' substantive rights against the state's interest in "maintaining institutional security and preserving internal order." *Ahlers v. Rabinowitz,* 684 F.3d 53, 61 (2d Cir.2012) (quoting *Bell v. Wolfish,* 441 U.S. 520, 546 (1979)). While individuals "who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than [prison inmates]," *Youngberg,* 457 U.S. at 321–22, "the state's interest in maintaining order and security is not punitive in purpose or character, and remains valid in institutions of civil confinement," *Ahlers,* 684 F.3d at 61. In balancing these competing interests, the defendants' decisions are afforded "a presumption of correctness." *Id.* (quotation marks omitted); *see Youngberg,* 457 U.S. at 324–25 ("The administrators, and particularly professional personnel ... should not be required to make each decision in the shadow of an action for damages.").

Here, defendants' reasons for implementing the bathroom and shower policies are compelling. Defendants stated that the policies were motivated by security concerns, including fighting, involuntary and voluntary sexual activity, and trafficking of contraband, such as tobacco, pornography, and weapons, in the bathrooms and showers. (Dkt. No. 27, Attach. 4 ¶¶ 18–20.) The Supreme Court has noted that policies designed to keep contraband out of jails and prisons have been upheld, *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington,* 132 S.Ct. 1510, 1516 (2012), and courts in this district have discussed the "societal interest in protecting the health, safety, and welfare of the patients and staff [in a state psychiatric center] who would be detrimentally affected without sufficient precautionary measures," *Aiken v. Nixon,* 236 F.Supp.2d 211, 232 (N.D.N.Y.2002).

**\*4** Given these compelling state interests, and given "the presumption of correctness" afforded to defendants in this Circuit, the bathroom and shower policies do not violate

the Constitution, and Judge Peebles did not err in his application of the standard of review. *Ahlers,* 684 F.3d at 61. Accordingly, plaintiffs have failed to allege a violation of their Fourteenth Amendment due process rights.

### 3. Downgrading of Plaintiffs' Complaints

Third, plaintiffs argue that Judge Peebles failed to review their claim that defendants denied them due process by repeatedly downgrading their complaints of abuse. (Dkt. No. 52 at 3.) Although the R & R does not address this claim, the claim fails nevertheless.

In the prison context, the law is well settled that inmates do not have a substantive constitutional right to grievance procedures. *Brown v. Hogan,* No. 9:07–CV–842, 2009 WL 3756595, at \*3–4 (N.D.N.Y. Nov. 6, 2009) (citing *Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003). Further, "a violation of the inmate grievance procedures does *not* give rise to a claim under section 1983." *Id.* at \*3. In *Brown,* the court held that "even assuming that [residents] at CNYPC have the same rights as those confined pursuant to criminal convictions, there is no constitutional right to any grievance procedure, and assuming that a grievance procedure exists, there is no constitutional right, protecting the plaintiff from defendants' violation of that procedure." *Id.* at \*4. Similarly, here, even accepting all of plaintiffs' allegations as true, there is no federal constitutional right protecting plaintiffs from defendants' violation of CNYPC's grievance procedure.[5] Accordingly, plaintiffs have failed to allege a violation of their Fourteenth Amendment due process rights.

### B. *Plaintiffs' General Objection*

Finally, plaintiffs object to the R & R on the basis that Judge Peebles failed to review their claim of deliberate indifference and failed to review their claims of inhumane and unsanitary conditions. (Dkt. No. 52 at 3, 4.) These are general objections, and the court reviews them for clear error. *Almonte,* 2006 WL 149049, at \*4–5.

Plaintiffs' objections are without merit. As an initial matter, Judge Peebles *did* address plaintiffs' claims that defendants acted with deliberate indifference and the conditions in which plaintiffs lived. (R & R at 14–20.) Further, because these objections merely raise arguments that plaintiffs previously addressed, these objections are general and do not warrant *de novo* review. *See Gusky v. Astrue,* No. 10–CV–00919MAT, 2013 WL 3776257, at \*3 (W.D.N.Y. July 2, 2013) ("[W]hen the objections simply reiterate previous arguments ... the

Court should review the report for clear error."); *Almonte, 2006 WL 149049, at \*4.* The court, having carefully reviewed the record, finds no clear error in the R & R.

After careful consideration of the arguments advanced by plaintiffs in their responses to defendants' summary judgment motion and in their objections to the R & R, Judge Peebles' conclusion that summary judgment is appropriate is correct largely for the reasons stated in the R & R.

### V. *Conclusion*

**\*5 WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge David E. Peebles' August 28, 2013 Report–Recommendation and Order (Dkt. No. 51) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 27) is **GRANTED;** and it is further

**ORDERED** that plaintiffs' complaint (Dkt. No. 1) is **DISMISSED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this MemorandumDecision and Order to the parties.

### IT IS SO ORDERED.

### *REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

*Pro se* plaintiffs Edward Treat, Larry Brown, Myron Wright, and Richard Zimmer, four convicted sex offenders who have been involuntarily committed to the Central New York Psychiatric Center ("CNYPC") for treatment, have commenced this action, pursuant to 42 U.S.C. § 1983, against the New York Office of Mental Health ("OMH") and several OMH employees alleging deprivation of their civil rights. While their complaint advances other claims, including those based upon the New York State Constitution and various state laws and regulations, plaintiffs primarily allege that they have been deprived of life's necessities by virtue of recently enacted bathroom and shower usage policies at the CNYPC,

in violation of their right to substantive due process under the Fourteenth Amendment to the United States Constitution. It is also alleged that employees at the CNYPC have violated section 504 of the Rehabilitation Act, 29 U.S.C. § 794, through the administration of a resident worker program.

In response to plaintiffs' complaint, defendants have filed a pre-answer summary judgment motion seeking dismissal of plaintiffs' claims as a matter of law. For the reasons set forth below, I recommend that the motion be granted, plaintiffs' federal claims be dismissed, and the court decline to exercise supplemental jurisdiction over the remaining state law claims.

### I. *BACKGROUND* [1]
The CNYPC is a mental health facility located in Marcy, New York, and operated by the OMH. Nowicki Decl. (Dkt. No. 27–4) at ¶ 2. Upon enactment of the Sex Offender Management and Treatment Act ("SOMTA"), which became effective on April 13, 2007, the CNYPC became designated as a "secure treatment facility" as defined under N.Y. Mental Hygiene Law ("MHL") §§ 7.18 and 10.03(o) for the purpose of administering a Sex Offender Treatment Program ("SOTP") under the SOMTA. *Id.* ¶¶ 4–6. Each SOTP participant at the CNYPC is an involuntarily committed, formerly incarcerated sex offender or violent offender who has committed a sexually motivated offense and has been found by a state court to be a dangerous sex offender requiring confinement. [2] *Id.* at ¶ 7.

Plaintiffs Edward Treat and Myron Wright are convicted felons who have been civilly committed to the CNYPC for the purpose of undergoing SOTP. Complaint (Dkt. No. 1) at ¶¶ 10, 14. Plaintiffs Larry Brown and Richard Zimmer are currently civil detainees at the Center, awaiting trial to determine whether they, too, should be detained for the purpose of participating in SOTP. *Id.* at ¶¶ 12, 16.

**\*6** OMH personnel and staff at the CNYPC assist SOTP-enrolled sex offenders in managing their deviant behavior, while at the same time insuring the operation of a secure facility that protects the community, the staff, and the residents themselves. Nowicki Decl. (Dkt. No. 27–4) at ¶¶ 8–9. SOTP participants are housed in seven residential units, each of which can accommodate approximately twenty-six patients. *Id.* at ¶ 14. Each residential unit includes a bathroom containing four toilet stalls and a urinal, and a residential shower room with two shower stalls, each equipped with a shower curtain. *Id.* at ¶ 15. In addition, there are bathrooms

located in the CNYPC treatment mall and activity center; the layouts of those bathrooms are similar to those in the residential wards. *Id.*

Between the hours of 7:00 a.m. and 11:00 p.m., each residential ward, with the exception of the Making a Pro–Social Stance ("MAPSS") unit, which houses residents with high psychopathy (and is therefore more extensively staffed), is monitored by three Secure Care Treatment Aids ("SCTAs").[3] Nowicki Decl. (Dkt. No. 27–4) at ¶ 16. During the remaining hours, between 11:00 p.m. and 7:00 a.m., there are two SCTAs stationed in the regular residential units. *Id.*

Prior to May 2010, a number of incidents occurred in SOTP bathrooms, including voluntary and involuntary sexual activities in the bathroom and shower stalls, as well as several fights. Nowicki Decl. (Dkt. No. 27–4) ¶¶ 18, 19. Staff at the CNYPC also observed that residents were using bathrooms and showers to hide and pass contraband, including weapons, pornography, and tobacco all of which were found hidden in toilet paper dispensers, behind toilets, in garbage cans, and above tiles in the drop ceilings. *Id.* at ¶ 20. To address these incidents, on May 19, 2010, the CNYPC implemented an emergency policy for SOTP units that required the bathrooms in both the residential portions of the facility, as well as those in the treatment mall and activity center, be monitored by SCTAs at all times. *Id.* at ¶ 21. In addition, the use of bathrooms and shower rooms within the SOTP was restricted to one resident at a time. *Id.* Under the emergency policy, the bathroom in the treatment mall was to remain locked while residents were in treatment, changing classrooms, being transported to and from the treatment mall, and at other times when SCTAs were unavailable to monitor the area. *Id.*

Shortly after implementation of the emergency policy, employees at the CNYPC determined that certain residents required greater access to bathrooms due to physical or medical problems, or mobility limitations. Nowicki Decl (Dkt. No. 27–4) at ¶ 22. For those residents, access to the bathrooms was allowed even if another resident was already present, provided that an SCTA remained present in the bathroom to continuously monitor the area. *Id.*

A similar emergency policy was implemented on May 24, 2010, governing access to the showers on the residential wards. Nowicki Decl. (Dkt. No. 27–4) at ¶ 23. Pursuant to that new, emergency policy, only one resident was allowed into the shower room at a time, and residents were required to register in advance for fifteen minute shower time slots during specified periods when SCTAs would be available to monitor the shower room, thus excluding meal times and periods and when medications were dispensed. *Id.*

**\*7** On July 13, 2010, final "Resident Bathroom and Shower Policies" were adopted at the CNYPC, replacing the emergency policies implemented in May 2010. Nowicki Decl. (Dkt. No. 27–4) at ¶ 24; Nowicki Decl. Exh. C (Dkt. No. 27–8). Under the new bathroom policy, multiple residents are permitted to simultaneously use the bathrooms within the residential units between the hours of 7:00 a.m. and 11:00 p.m. Nowicki Decl. (Dkt. No. 27–4) at ¶ 25. The single use practice, however, remains in effect under the new policy for the hours of 11:00 p.m. to 7:00 a.m. in the residential units, and at all times for the bathroom in the treatment mall. *Id.* Under the new policy, residents with medical issues who have obtained authorization from a CNYPC physician are allowed to access a bathroom, as needed, with staff approval. *Id.* The final shower policy expanded the hours during which fifteen-minute shower slots were available, including between 5:00 a.m. and 7:00 a.m., as well as during other times of the day when residents are not in programming, therapy, or meals. Nowicki Decl. (Dkt. No. 27–4) ¶¶ 24, 26; Nowicki Decl. Exh. D (Dkt. No. 27–9).

Unrelated to the bathroom and shower policies at the CNYPC are the opportunities available to SOTP residents to participate in a work program. Nowicki Decl. (Dkt. No. 27–4) at ¶¶ 29–35. Residents at the CNYPC who are undergoing SOTP may qualify for the work program when they advance to a specified point in their treatment and programming, and are referred into the program by their primary therapist. *Id.* at ¶ 33. The resident's physician must approve a work referral before it is submitted. *Id* .

Under the work program, SOTP residents may be assigned to work in the copy center, furniture repair, sewing, laundry, on-mall janitorial, on-unit janitorial, and the library. Nowicki Decl. (Dkt. No. 27–4) at ¶ 34. Participation in the worker program is privilege that residents earn, and, as such, is neither a right nor a requirement for treatment. *Id.* at ¶ 32. By regulation, when residents volunteer to work, they are guaranteed payment of at least the prevailing federal minimum wage. *Id.* at ¶¶ 28. The work program at the CNYPC is so popular among SOTP residents that there is a waiting list to fill program jobs, which are limited in number. *Id.* at ¶ 35.

In their complaint in this action, plaintiffs intimate that they have been forced to work in order to allow the CNYPC to be profitable. *See generally* Complaint (Dkt. No. 1). As a result of that allegation, plaintiffs were removed from the SOTP work program and relieved of their jobs following commencement of the action, although they have been informed that, should they wish to voluntarily participate in the work program in the future, they remain free to do so. Nowicki Decl. (Dkt. No. 27–4) at ¶ 36; *see also* Brown Decl. Exh. 22 (Dkt. No. 39) at 72.

Among the complaints lodged by the plaintiffs in this action is the alleged inadequacy of vocational programs, including the lack of computer training, at the Center. *See, e.g.,* Complaint (Dkt. No. 1) at ¶¶ 63–65, 110–116; Brown Aff. (Dkt. No. 1) at ¶ 30. Generally, however, SOTP residents at the CNYPC are not allowed to use computers. Nowicki Decl. (Dkt. No. 27–4) at ¶ 38. While at one point there was a computer laboratory where residents could receive training in computer skills, because certain residents were found to be making improper use of the computers, the program was abandoned. *Id.* at ¶¶ 39–41.

## II. *PROCEDURAL HISTORY*

**\*8** Plaintiffs commenced this action on April 10, 2012. Dkt. No. 1. Named as defendants in plaintiffs' complaint are the OMH; Michael F. Hogan, Commissioner of the OMH; Maureen Bosco, the Acting Executive Director of the CNYPC; Jeff Nowicki, the Chief of Mental Health Treatment Services for the SOTP at the CNYPC; Terri Maximillian, Director of Clinical Services for the SOTP at the CNYPC; Marianne Madia, a Nurse Administrator at the CNYPC; Anthony Gonzalez, Director of Risk Management at the CNYPC; James Morgan, Associate Director of Quality Management at the CNYPC; Elaine Dziadyk, Acting Deputy Director of Rehabilitative Services at the CNYPC; Miya L. Burt, Psychiatric Nurse and Ward Supervisor at the CNYPC; and Barbara Miller, CNYPC's Director for Administrative Services. *Id.* at ¶¶ 18–37. Each of the individual defendants is sued only in his or her official capacity. *Id.* at ¶¶ 19–37. Plaintiffs' complaint asserts several federal and state claims, including (1) violation of the substantive due process clause of the Fourteenth Amendment to the United States Constitution; (2) violation of the due process clause of the New York State Constitution; (3) deprivation of the rights guaranteed under Article XVI, Section 1 of the New York State Constitution; (4) violation of plaintiffs' right for equal protection under the Fourteenth Amendment (although plaintiffs identify this cause of action

as violating their rights under the Eighth Amendment); (5) violation of section 504 of the Rehabilitation Act; and (6) violation of New York State Mental Hygiene Law and corresponding rules and regulations. *Id.* at 26–33.

Following an initial review of plaintiffs' complaint and accompanying *in forma pauperis* ("IFP") applications, Chief District Judge Gary L. Sharpe issued an order on June 21, 2012, (1) granting plaintiffs' IFP applications; (2) dismissing any claims arising under section 504 of the Rehabilitation Act and asserted against defendants Dziadyk, Maximillian and Nowicki in their individual capacities; (3) construing plaintiffs' Eighth Amendment (identified in the complaint as plaintiffs' fourth claim for relief) as a cause of action arising under the Fourteenth Amendment in light of the plaintiffs' status as civil detainees; and (4) denying plaintiffs' motion for class certification, without prejudice to renewal. Dkt. No. 7.

In response to plaintiffs' complaint, defendants filed a pre-answer motion for summary judgment on September 28, 2012.[4] Dkt. No. 27. In their motion, defendants argue that no reasonable factfinder could conclude that plaintiffs' rights under the Fourteenth Amendment and section 504 of the Rehabilitation Act have been violated by their conduct, and further seek dismissal of any damage claims under section 504 based upon the Eleventh Amendment. *Id.* Plaintiffs have since responded in opposition to defendants' motion. Dkt. Nos. 38–40. Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U .S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *BACKGROUND*

### A. *Summary Judgement Standard*

**\*9** Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material

fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4; *Sec. Ins. Co.,* 391 F .3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

## B. *Plaintiff's Due Process Claim Arising Under the U.S. Constitution*

Plaintiffs' complaint asserts claims arising from alleged violations of their rights under a number of constitutional provisions, including the Eighth Amendment. Complaint (Dkt. No. 1) at 29–30.

When plaintiffs were released by the DOCCS into the CNYPC, they had finished serving their terms of imprisonment, and thus were no longer prison inmates. The Eighth Amendment, prohibiting cruel and unusual punishment of those convicted of crimes, therefore is not applicable under the circumstances, and plaintiff's claim arises instead under the Fourteenth Amendment. *See Youngberg v. Romeo,* 457 U.S. 307, 315 (1982) (holding that the respondent, who was involuntarily committed to a state institution for the mentally retarded, had constitutionally protected liberty interests under the due process clause of the Fourteenth Amendment). "The Supreme Court has explained that 'when the State takes a person into its custody and holds [him] there against [his] will, the Constitution imposes upon it a corresponding duty to assume some responsibility for [his] safety and general well-being.' " *Beck v. Wilson,* 377 F.3d 884, 889 (8th Cir.2004) (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189, 199–200 (1989)). In this case, plaintiffs' challenges to the various policies and practices referenced in their complaint must therefore be analyzed within the framework of the due process clause of the Fourteenth Amendment. *Sain v. Wood,* 512 F.3d 886, 893 (7th Cir.2008); *Dove v. City of New York,* No. 03–CV–5052, 2007 WL 805786, at *7 (E.D.N.Y. Mar. 15, 2007). [5]

**\*10** Because the due process clause requires that civilly committed patients be provided with protections at least as extensive as those to which convicted prisoners are entitled, however, the Eighth Amendment provides a suitable starting point for analysis of plaintiffs' claims. *Sain,* 512 F.3d at 893. Under the Eighth Amendment, state officials are required to provide convicted inmates with housing under "humane conditions," and to afford them "adequate food, clothing, shelter, and medical care." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994); *see also Sain,* 512 F.3d at 893. A claim alleging that conditions of confinement violate the Eighth Amendment must satisfy both an objective and subjective requirement. *Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 297 (1991)). The plaintiff must establish that the conditions are "sufficiently serious" from an objective point of view, and additionally that prison officials acted with "deliberate indifference." [6] *Leach,* 103 F.Supp.2d at 546; *Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J., *adopting report and recommendation by* Homer, M.J.); *see also Wilson,* 501 U.S. at 303. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837; *Leach,* 103 F.Supp.2d at 546; *Waldo,* 1998 WL 713809, a *2.

In analyzing the shower and bathroom policies at issue in this case, the court must balance plaintiffs' substantive rights against the state's interest in " 'maintaining institutional security and preserving internal order.' " *Ahlers v. Robinowitz,* 684 F.3d 53, 61 (2d Cir.2012) (quoting *Bell v. Wolfish,* 441 U.S. 520, 546 (1979)). It is true that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg,* 457 U.S. at 321–22. As the Second Circuit has noted, "[h]owever, the state's

interest in maintaining order and security is not punitive in purpose or character, and remains valid in institutions of civil commitment." *Ahlers,* 684 F.3d at 61. In determining whether a proper balance of those competing considerations has been struck, a court must afford the defendants' decisions a "presumption of correctness." *Id.* (quotation marks omitted).

In this instance, the interests of the state, cited by defendants as the genesis of the emergency bathroom and shower policies in May 2010, and the new, permanent policies that took effect in July of 2010, are compelling. According to Jeff Nowicki, the Chief of Mental Health Treatment Services for the SOTP at the CNYPC, the modification of policies was motivated by security concerns, including concerns about residents fighting, engaging in both involuntary and voluntary sexual activity, and trafficking of contraband inside the bathrooms and showers. These are legitimate security concerns that can justify the implementation of policies placing restrictions upon the use of bathroom and shower facilities within the Center. *See Bell,* 441 U.S. at 553 (finding a prison facility's policy prohibiting inmates from receiving packages from outside the facility containing food items or personal property justifiable based on evidence that the introduction of such packages would require an inordinate amount of time to inspect, increase the risk of inmate conflicts, and introduce a storage and sanitation problem into the facility); *accord, Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington,* 132 S.Ct. 1510, 1516 (2012) ("Policies designed to keep contraband out of jails and prisons have been upheld in cases decided since *Bell.*").

**\*11** Balanced against these legitimate concerns is the relatively modest imposition upon the plaintiffs. Plaintiffs do not allege that they are denied the right to shower daily resulting from the revised policies. Instead, they complain that the requirement to sign up for an available time slot to shower some how violates their constitutional rights. Similarly, while plaintiffs do not contend that they are deprived of the opportunity to utilize a bathroom, they suggest that, on the occasions that they are required to wait as long as five or ten minutes, their rights are violated.[7] These contentions, however, are not unsupported by any applicable legal authority. *See Odom v. Keane,* No. 95–CV–9941, 1997 WL 576088, at \*5 (S.D.N.Y. Sept. 17, 1997) (Sotomayor, J.) (finding that the plaintiff's conditions of confinement claim was legally deficient where there was evidence that his "toilet functioned approximately twelve hours every day, time enough to dispose of [his] bodily wastes"); *accord, McGee v. Pallito,* No. 10–CV–

0011, 2011 WL 6291954, at \*6 (D.Vt. Aug. 3, 2011). The constitution requires only "reasonably adequate sanitation and the ability to eliminate and dispose of one's bodily wastes without unreasonably risking contamination[.]" *Whitnack v. Douglas Cnty.,* 16 F.3d 954, 958 (8th Cir.1994). Having reviewed the record, I find that no reasonable factfinder could conclude that the CNYPC's bathroom and shower policies deprive the plaintiffs of the minimal civilized measure of life's necessities.[8] Accordingly, I recommend that plaintiffs' Fourteenth Amendment due process claim be dismissed.

### C. *Section 504 of the Rehabilitation Act*

Plaintiffs also assert a claim under the section 504 of the Rehabilitation Act. Complaint (Dkt. No. 1) at 30–31. In their motion, defendants request dismissal of this claim, arguing that plaintiffs' complaint fails to state a claim upon which relief may be granted, and the individual defendants are immune from suit under the Eleventh Amendment. Defs.' Memo. of Law (Dkt. No. 27–3) at 14–18.

### 1. *Failure to State a Claim Upon Which Relief May Be Granted*

Because a court "may dismiss for failure to state a cause of action upon motion for summary judgment," it is necessary to set forth the legal standard governing Rule 12(b)(6). *Schwartz v. Compagnie Gen. Transatlantique,* 405 F.2d 270, 273 (2d Cir.1968); *see also Katz v. Molic,* 128 F.R.D. 35, 39 (S.D.N.Y.1989) ("Therefore, that a summary judgment motion is being treated as a motion to dismiss for failure to state a claim does not require notice to the parties.").

A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading using a standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* 556 U.S. at 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 554, 555 (2007)). Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, "a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.' " *Iqbal,* 556 U.S. 677–78 (quoting Fed.R.Civ.P. 8(a)(2)). While modest in its requirements, that rule commands that a complaint contain more than mere legal conclusions. *See id.* at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

**\*12** In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citing *Twombly,* 550 U.S. at 555–56); *see also Cooper v. Pate,* 378 U.S. 546, 546 (1964); *Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 300 (2d Cir.2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). However, the tenet that a court must accept as true all of the allegations contained in a complaint does not apply to legal conclusions. *Iqbal,* 556 U.S. at 678.

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 570); *see also Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge plaintiffs' claims across the line from conceivable to plausible." *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570) (alterations omitted).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant, whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson,* 551 U.S. at 94 (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." (quoting *Estelle v. Gamble,* 429 U.S. 97, 106 (1976)) (internal citation omitted)); *Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191 (2d Cir.2008) ("[W]hen a plaintiff proceeds *pro se,* a court is obliged to construe his pleadings liberally." (internal quotation marks and alterations omitted)); *Kaminski v. Comm'r of Oneida Cnty. Dep't of Soc. Servs.,* 804 F.Supp.2d 100, 104 (N.D.N.Y.2011) (Hurd, J.) ("A pro se complaint must be read liberally.").

Turning to the legal authority governing plaintiffs' claims under the Rehabilitation Act, section 504 mandates that a person with a qualified disability may not be excluded from participation in, denied the benefits of, or otherwise discriminated against in connection with any program or activity receiving federal financial assistance.[9] 29 U.S.C. § 794; *see Bryant v. New York State Educ. Dep't,* 692 F.3d 202, 216 (2d Cir.2012). Pursuant to section 504, "reasonable

accommodations must be offered to ensure meaningful access to the [federally funded] program, [but] the statutes do not require that substantial changes be made to the program itself." *Zahran ex rel. Zahran v. New York Dep't of Educ.,* 306 F.Supp.2d 204, 213 (N.D.N.Y.2004) (Hurd, J.) (citing *J.D. ex rel. J.D. v. Pawlet Sch. Dist.,* 224 F.3d 60, 70 (2d Cir.2000)). To state a claim under section 504, a plaintiff's complaint must set forth allegations that plausibly suggest that (1) he is a person with a disability as defined under the Rehabilitation Act, (2) he has been denied the benefits of or excluded from participating in a federally funded program or special service, and (3) he was denied access based solely on his disability. *Bryant,* 692 F.3d at 216.

**\*13** In this case, plaintiffs' section 504 claim arises from allegations that they have received inadequate vocational training while confined at the CNYPC. More specifically, they allege that they each meet the definition of "disabled" as it is defined in the Rehabilitation Act because they have "been diagnosed with a mental disability within the meaning of 29 U.S.C. § 705." Complaint (Dkt. No. 1) at 31. Plaintiffs' complaint also alleges that CNYPC residents "have the right to vocational training services[ ] that will enable them to live as independently as possible[, but that] ... Defendants exploit [residents] for their labor[ ] by instituting workprograms that generates profits[,]" *Id.* at ¶ 6. Finally, it is alleged that "[t]he violations of Plaintiffs' rights by Defendants include, but not limited to the failure of the CNYPC–SOTP to provide Plaintiffs with adequate and appropriate vocational training services, that benefits other recipients of public programs and services." *Id.* Accordingly, although this is far from clear, I have construed plaintiffs' Rehabilitation Act claim to encompass two components. First, they complain of being exploited by the alleged requirement that they work in programs for the sole purpose of generating profits for the CNYPC. The second aspect of the Rehabilitation Act claim challenges defendants' failure to provide adequate rehabilitative and vocational services.

The allegation that plaintiffs are forced to work while at the CNYPC is not cognizable under section 504. It fails to plausibly suggest that they are denied access to the work program (assuming, without deciding, that it constitutes a federally funded program) based on a disability. Instead, it is alleged that defendants *force* plaintiffs to participate in the work program for the benefit of the CNYPC, which is antithetical to a section 504 claim.[10] Accordingly, I find that this allegation is insufficient to support a cognizable section 504 claim.

Plaintiffs' second basis for asserting a claim under the Rehabilitation Act fails for similar reasons. Assuming (without deciding) that plaintiffs satisfy the definition of disability under the Rehabilitation Act, none of the complaint's allegations plausibly suggest how defendants denied them access to the work program, or that they were denied access based on their disability. Moreover, the allegation that "others" receive benefits that plaintiffs are denied due to their alleged disability is conclusory and unsupported by any other allegations in the pleading. More specifically, plaintiffs fail to identify who the "others" are, or what benefits they receive that plaintiffs are denied. Accordingly, I find that these allegations are also insufficient to support a cognizable section 504 claim, and recommend that the claim be dismissed.

### 2. *Eleventh Amendment Immunity*

Because I find that plaintiff's section 504 claim fails to state a claim upon which relief may be granted, I will not address defendants' Eleventh Amendment immunity arguments.

### D. *Equal Protection*

**\*14** Liberally construed, plaintiffs' fourth claim for relief includes an equal protection claim arising under the Fourteenth Amendment. Complaint (Dkt. No. 1) at 31. While defendants have not challenged this cause of action, the court may, *sua sponte*, determine whether a plausible equal protection claim has been stated in light of plaintiffs' IFP status. *See* 28 U.S.C. § 1915(e) ("[T]he court shall dismiss the case at any time if [it] determines that ... the action ... fails to state a claim on which relief may be granted[.]").

The equal protection clause of the Fourteenth Amendment directs state actors to treat similarly situated people alike. *City of Cleburne, Texas v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). To state a cognizable equal protection cause of action, a plaintiff must allege sufficient facts that plausibly suggest that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995).

In this instance, plaintiffs compare themselves to convicted state prisoners, and allege that state prisoners experience more favorable conditions than CNYPC residents. Complaint (Dkt. No. 1) at 31. Even assuming (without deciding) that the two groups—CNYPC residents that are civilly confined,

and prison inmates penally confined—are similarly situated for purposes of an equal protection analysis, plaintiffs' complaint fails to allege facts that plausibly suggest any disparity in the conditions experienced by the two groups as a result of purposeful discrimination directed at an identifiable suspect class. *See Taylor v. New York State Dep't of Corr. Servs.,* No. 07–CV–1288, 2009 WL 3522781, at *2 (N.D.N.Y. Oct. 29, 2001) (Mordue, J.) ("[S]ex offenders do not comprise a suspect or quasi-suspect class for equal protection purposes [.]"). Under a Rule 12(b)(6) analysis, it is not enough to conclusorily allege that plaintiffs experience housing conditions that are "substantially inferior" to those of a state prisoner. Complaint (Dkt. No. 1) at 31. Such an allegation, on its own, does not provide defendants with adequate notice as to what conditions plaintiffs complain of, or how state prisoners experience more favorable conditions. Accordingly, I recommend that plaintiffs' equal protection claim be dismissed.

### E. *Supplemental Jurisdiction*

In the event this report is adopted, all of plaintiffs' federal cause of actions will be dismissed, and all that will remain are the claims asserted under the New York State Constitution and state law. Under those circumstances, I would recommend that the court decline to exercise supplemental jurisdiction over the remaining state claims, pursuant to 28 U.S.C. § 1367. *Stephenson v. Albany Cnty. Policymakers,* No. 09–CV–0326, 2009 WL 2922805, at *2 (N.D.N.Y. Aug. 14, 2009) (Treece, M.J.) (citing 28 U.S.C. § 1367(c)(3)).

### IV. *SUMMARY AND RECOMMENDATION*

**\*15** At the heart of plaintiffs' claims in this action is their challenge to new policies adopted at the CNYPC for those receiving sex offender treatment, governing the use of facility bathrooms and showers. Because the policies were implemented due to legitimate security concerns of facility staff and residents, and result in only minimal inconvenience to plaintiffs, I recommend dismissal of plaintiff's constitutional challenge to those policies.

Plaintiffs' complaint also asserts a claim of disability discrimination under section 504 of the Rehabilitation Act, based upon defendants' alleged failure to provide proper vocational and other training to the plaintiffs. The Rehabilitation Act, however, does not affirmatively mandate that programs be provided to the disabled but instead merely prohibits the denial of participation in programs and receipt of

benefits based upon disability. Since plaintiffs have failed to identify any programs of which they have been denied based upon their alleged disability, their Rehabilitation Act claims are also subject to dismissal.

Plaintiffs' complaint, liberally construed, also asserts an equal protection claim against defendants. That claim, however, is subject to dismissal because plaintiffs have failed to allege facts plausibly suggesting that they have been treated differently than other, similarly situated individuals based upon intentional or purposeful discrimination directed toward an identifiable or suspect class. Based upon the foregoing, and my recommendation that the court not exercise supplemental jurisdiction over the remaining state law and state constitutional claims, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 27) be GRANTED, and that plaintiffs' complaint in this action be DISMISSED in its entirety, without prejudice to their right to commence an action in a state court of competent jurisdiction.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; Roldan v. Racette, 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

### All Citations

Slip Copy, 2013 WL 6169746

## Footnotes

1   At the outset, it should be noted that, although plaintiffs bring their claims concerning their conditions of confinement under the Eighth Amendment, their claims arise under the Fourteenth Amendment because they are involuntarily committed residents of a state institution. *Youngberg v. Romeo,* 457 U.S. 307, 315 (1982) (holding that respondent, who was involuntarily committed to a state institution, had constitutionally protected liberty interests under the due process clause of the Fourteenth Amendment).

2   The Clerk is directed to link the R & R to this decision; familiarity therewith is presumed.

3   "[A] report is clearly erroneous if the court determines that there is a mistake of fact or law which is obvious and affects substantial rights." *Almonte,* 2006 W L 149048, at *6.

4   Fourteenth Amendment claims challenging the conditions of involuntary confinement have been analyzed in a manner similar to Eighth Amendment claims, under which the plaintiff must establish that the conditions are sufficiently serious, from an objective point of view, and that the official acted with "deliberate indifference." *Dove v. City of N.Y.,* No. 03–CV–5052, 2007 WL 805786, at *7–8 (E.D.N.Y. Mar. 15, 2007). Some courts, however, have applied a more narrow subjective standard, particularly against defendants who are "professionals," under which liability would attach only to conduct that constituted a "substantial departure from accepted professional judgment, practice, or standards." *Vallen v. Carrol,* No. 02–civ–5666, 2005 WL 2296620, at *8–9 (S.D.N.Y. Sept. 20, 2005) (quoting *Youngberg,* 457 U.S. at 323). The court, however, agrees with Judge Peebles that no reasonable factfinder could conclude that the bathroom and shower policies violate the Constitution under either standard, and it therefore is unnecessary to determine which standard should apply. (R & R at 16 n. 6.)

5   To the extent that these claims arise under New York State law, the court agrees with Judge Peebles and, after having disposed of all of the federal claims, declines to exercise supplemental jurisdiction over the remaining state law claims. (R & R at 28.)

1   In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

2   Under New York law, a "dangerous sex offender requiring confinement" is defined as a "detained sex offender suffering from a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that the person is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility." N.Y. MHL § 10.03(e). The MHL does not allow for indefinite confinement of a detained sex offender. Instead, the commissioner of the OMH is required to provide a civilly committed sex offender and his counsel with annual notice of the right to petition the court for discharge, and must assure that each person so confined receives an examination

for evaluation of his mental condition at least once a year, calculated from the date on which the court last ordered or confirmed the need for civil confinement. N.Y. MHL § 10.09(a)-(b). The law also includes a provision for annual court review in the form of an evidentiary hearing to determine the necessity of continued retention. N.Y. MHL § 10.09(d).

3   None of the plaintiffs reside in the MAPSS unit. Nowicki Decl. (Dkt. No. 27–4) at ¶ 16.

4   Unlike its Rule 12(b) dismissal motion counterpart, a summary judgment motion does not have the effect of automatically staying the requirement of answering a plaintiff's complaint. Compare Fed.R.Civ.P. 12(b)(6) with Fed.R.Civ.P. 56. In light of the fact that, by moving for summary judgment, defendants are actively defending against plaintiff's claims, and in order to avoid any argument that they have defaulted, in my discretion, I will *sua sponte* order a stay of defendants' time to answer plaintiff's complaint until twenty-one days after a final determination is issued with respect to defendants' motion, in the event that the action survives. *Snyder v. Goord,* No. 05–CV–1284, 2007 WL 957530, at *5 (N.D.N.Y. Mar. 29, 2007) (McAvoy, J., *adopting report and recommendation by* Peebles, M. J.).

5   Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

6   Applying the reasoning embodied in the Supreme Court's decision in *Youngberg,* some courts have applied a more narrow subjective standard, particularly against defendants who could be characterized as "professionals," under which liability would attach only to conduct that constituted a "substantial departure from accepted professional judgment, practice or standard" as distinct from the broader "deliberate indifference" standard. *Youngberg,* 457 U.S. at 323; *see Dove,* 2007 WL 805786, at *7–8; *Vallen v. Carrol,* No. 02–CV–5666, 2005 WL 2296620, at *8–9 (S.D.N.Y. Sept. 20, 2005). Like the courts in *Dove* and *Vallen,* however, I find it unnecessary to determine which of these standards of review should apply in the current action because I find that no reasonable factfinder could conclude that the policies challenged by plaintiffs in their complaint run afoul of the constitution under either.

7   The policy currently in place permits more than one CNYPC resident to utilize residential bathroom facilities, under supervision by an SCTA, between the hours of 7:00 a.m. and 11:00 p.m. In addition, the policy allows for accommodations for those residents with medical issues requiring more frequent bathroom breaks.

8   Additionally, although not dispositive of the inquiry, the CNYPC's resident bathroom policy was reviewed by the New York State Commission on Quality Care and Advocacy for Persons with Disabilities ("CQCAPD"), on request from the New York State Inspector General, and found it to be acceptable. Nowicki Decl. (Dkt. No. 27–4) at ¶ 27; Nowicki Decl. Exh. E (Dkt. No. 27–10). Based upon that review, the CQCAPD concluded that the CNYPC

   has a rationale [sic] and defensible argument for the creation of [the policy,] ... which individuals identified by the treatment team as needing increased monitoring, will have a physician's order that they must enter one at a time to the bathroom on the treatment mall and/or the activity center. [Another of the CNYPC policies, entitled] Sex Offender Treatment Program Resident Rights[,] indicates that the patient rights includes that basic human needs will be met and residents' personal privacy is protected within the necessary constraints dictated by the need for safety and security. Nowicki Decl. Exh. E (Dkt. No. 27–10) at 1.

9   Specifically, section 504 provides, in relevant part, that

   [n]o otherwise qualified individual with a disability ... solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]

   29 U.S.C. § 794(a).

10  Plaintiffs' submissions in opposition to the pending motion could be regarded as asserting a retaliation claim, based upon their removal from the facility's work program following commencement of this suit. Because it is clear that the defendants were dropped based upon their complaints of being subjected to forced labor, and that plaintiffs can request re-entry into the program at any time on a voluntary basis, it would be disingenuous for them to argue that adverse action has been taken against them, as required for a retaliation claim.

**Whitted v. Lazerson, Not Reported in F.Supp. (1998)**

1998 WL 259929

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** Hart v. City of New York, S.D.N.Y., November 18, 2013

1998 WL 259929
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Charles WHITTED, Plaintiff,

v.

Susan LAZERSON, Civilian Cook, Defendant.

No. 96 Civ. 2746(AGS).
|
May 21, 1998.

OPINION AND ORDER

SCHWARTZ, J.

**\*1** Plaintiff, who is currently incarcerated, brings this action pursuant to 42 U.S.C. § 1983, alleging that his Eighth Amendment right to be free from cruel and unusual punishment was violated when defendant denied him access to the bathroom at Green Haven Correctional Facility ("Green Haven"). Currently before the Court is defendant's motion for summary judgment. For the reasons stated, this motion is granted.

**FACTUAL BACKGROUND**

The following facts are undisputed, except as otherwise noted.

During the period of November–December 1994, plaintiff Charles Whitted ("Whitted") was incarcerated at Green Haven and was working as a baker in the Green Haven Kitchen. Defendant Susan Lazerson is a head civilian cook at Green Haven. During the time period covered in the complaint, she was stationed in the Green Haven kitchen where plaintiff was working as a baker. Pursuant to Green Haven policy, inmates are confined to a locked "baker's room" while baking. The baker's room is locked to prevent inmates from stealing flour, cake mix, or utensils that could be used as weapons. Correctional Officers assigned to the kitchen area are available to let the inmate out of the baker's room in order to use the bathroom.

Plaintiff alleges that during the time covered by the complaint, he repeatedly asked defendant to allow him out of the baker's room so that he could use the bathroom, but she refused. Defendant contends that she "constantly allowed plaintiff to go to the bathroom during his shifts" (Defendant's Statement Pursuant to Local Civil Rule 56.1 ("Def.56.1") at ¶ 19) but concedes that on some occasions she was "too busy to unlock the gate and would inform plaintiff that he would have to wait a few minutes until she was free, or else ask someone else to unlock the gate" (Def. 56.1 at ¶ 20).

Plaintiff contends that as a result of defendant's failure to unlock the baker's room upon his request, he "was forced to hold his bowel movement at painful levels, and at times partially urinated and defecated in his clothing." (Complaint at 5–6). As a result, plaintiff claims he suffered "mental, physical and emotional pain and suffering." (Complaint at 5). However, he never sought treatment at the Facility Health Center.

**DISCUSSION**

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Federal Rule of Civil Procedure ("Fed.R.Civ.P.") 56(c). The moving party bears the initial burden of showing the absence of a genuine issue of material fact, which can be effected by pointing to the lack of evidence supporting an essential element of the non-moving party's claim. *Celotex Corp. v.. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To avoid summary judgment, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 582, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Speculative and conclusory allegations are insufficient. *Allen v. Coughlin,* 64 F.3d 77, 80 (2d Cir.1995). When a plaintiff is proceeding pro se, the court must read his papers "liberally" and "interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). However, a party's "bald assertion," completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1995).

**\*2** A prisoner alleging that a certain prison condition constitutes cruel and unusual punishment in violation of

**Whitted v. Lazerson, Not Reported in F.Supp. (1998)**

1998 WL 259929

the Eighth Amendment must prove both an objective and a subjective element. *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). The objective element asks whether the seriousness of the prison condition rises to an unconstitutional level. The subjective element requires that the defendant act with a state of mind evincing "deliberate indifference" to the inmate's health or safety. *Id.* at 301.

With regard to the objective element, the Supreme Court has held that "[o]nly those deprivations denying the minimal measures of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* at 298. (quoting *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). Crucial considerations in the determination of whether a particular condition is so serious as to invoke the Eighth Amendment include the duration of the condition and the potential for serious physical harm. As the Court of Appeals for the Second Circuit recently held in *Chance v. Armstrong,* No. 97–2028, 1998 WL 228075, *3 (2d Cir. May 7, 1998),

> A prisoner who nicks himself shaving obviously does not have a constitutional right to cosmetic surgery. But if prison officials deliberately ignore the fact that a prisoner has a five-inch gash on his cheek that is becoming infected, the failure to provide appropriate treatment might well violate the Eighth Amendment.

In this case, plaintiff has failed to allege that the purportedly unconstitutional condition was of sufficient duration, or caused sufficiently serious injury, to state a viable claim under the Eighth Amendment. The complaint contains no allegation regarding the length of time plaintiff was prevented from using the toilet. In his deposition, plaintiff stated that he once had to wait "damn near hour and a half" at which point he urinated in his pants. (Affidavit of Evan A. Gordon ("Gordon Aff."), Ex. A at 21). He also testified that he once defecated in his pants, but expressed confusion as to whether that was on the same occasion that he urinated. (Gordon Aff., Ex. A at 21– 22). However, plaintiff also testified that he has no bladder problem at all and no problem holding his urine (Gordon Aff., Ex. A at 19).

With regard to the alleged injuries, plaintiff testified that he endured no emotional or physical problems as a result of the incident and stated that he was not affected by the incident today. (Gordon Aff., Ex. A at 25). [1] Plaintiff also testified that he suffers from no medical problems today other than migraine headaches. (Def. Ex. A at 9–10).

Even when read liberally, with all reasonable inferences drawn in plaintiff's favor, the facts alleged do not present a viable claim under § 1983. The temporary deprivation of the right to use the toilet, in the absence of serious physical harm or a serious risk of contamination, simply does not rise to the level of an Eighth Amendment violation. As Judge Sotomayor held in *Odom v. Keane,* No. 95 Civ. 9941, 1997 WL 576088, at *4–5 (S.D.N.Y. Sept.17, 1997), the absence of a working toilet in one's prison cell for approximately ten hours, absent an allegation that the prisoner risked contamination by contact with human waste, "does not rise to the level of cruel and unusual punishment." *See also Knop v. Johnson,* 977 F.2d 996, 1013–1014 (6th Cir.1992) (holding that prison did not violate the Eighth Amendment by failing to provide certain inmates "with regular access to bathroom facilities, forcing them to relieve themselves in their cells."). In this case, plaintiff has alleged that he was prevented from using the toilet for a period of approximately 90 minutes at most. He has not alleged that he suffered any serious injury, potential injury, or even risk of contamination, as a result thereof. In short, he has failed to allege that he was denied the "minimal measures of life's necessities" and has therefore failed to satisfy the objective element of a Section 1983 claim based on an alleged violation of the Eighth Amendment. Accordingly, I decline to reach the other issues presented by the parties' submissions.

## CONCLUSION

**\*3** For the reasons stated, defendant's motion for summary judgment is granted. The Clerk of Court is directed to close the case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1998 WL 259929

**Whitted v. Lazerson, Not Reported in F.Supp. (1998)**

1998 WL 259929

Footnotes

1       In his opposition to defendants' motion, plaintiff stated that he made "mistakes" in answering questions at his deposition
        and explained that he attempted to change his deposition testimony to reflect that he had answered "yes" when asked if
        had suffered any emotional problems as a result of the incident. (Plaintiff's Affidavit in Opposition at ¶¶ 13–14). Plaintiff
        has offered no explanation of this "mistake" other than to say that he was "upset and unprepared" on the day of his
        deposition. Moreover, "a party may not, in order to defeat a summary judgment motion, create a material issue of fact by
        submitting an affidavit disputing his own prior sworn testimony." *Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.,*
        *925 F.2d 566, 572–73 (2d Cir.1991). See also Mack v. United States,* 814 F.2d 120, 124–25 (2d Cir.1987) ("[A] party's
        affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment").

---

**End of Document**                                            © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 1033395
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

James Martin WITZENBURG, Plaintiff,

v.

Charles Herman JURGENS, individually and as
Executor of the Estate of Louise Jurgens, Defendant.

No. CV–05–4827 (SJF)(AKT).
|
April 14, 2009.

West KeySummary

**1**    **Executors and Administrators**

👉   Time for making distribution

In a dispute between relatives, the executor of the decedent's estate did not breach his fiduciary duties by failing to distribute estate assets on the ground that he was not required to distribute the assets under New York law until there was a final accounting. The executor made certain distributions to beneficiaries of the decedent's will. The executor had not made any distributions to himself or taken any fees. It was the conduct of the cousin bringing the suit, including his failure to pay the outstanding judgment that he owed to the estate totally over $750,000, that prevented the executor from conducting a final accounting and in turn making the final distributions under the will. McKinney's EPTL 11–1.5(c).

Cases that cite this headnote

**Attorneys and Law Firms**

James Martin Witzenburg, Kemah, TX, League City, TX, pro se.

**OPINION & ORDER**

FEUERSTEIN, District Judge.

**\*1** Before the Court are objections by plaintiff to a Report and Recommendation of United States Magistrate Judge A. Kathleen Tomlinson dated March 16, 2009 ("the Report") that recommends: (1) granting defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and dismissing plaintiff's amended complaint in its entirety; (2) denying plaintiff's motion to amend the amended complaint to add Patrick McCarthy, Esq. as a defendant; and (3) denying plaintiff's motion to compel discovery responses and to impose sanctions upon defendant. For the reasons stated herein, the Report of Magistrate Judge Tomlinson is accepted in its entirety.

I

Rule 72 of the Federal Rules of Civil Procedure permits magistrate judges to conduct proceedings on dispositive pretrial matters without the consent of the parties. Fed.R.Civ.P. 72(b). Any portion of a report and recommendation on dispositive matters, to which a timely objection has been made, is reviewed de novo. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b). The court, however, is not required to review the factual findings or legal conclusions of the magistrate judge as to which no proper objections are interposed. See, Thomas v. Arn, 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). To accept the report and recommendation of a magistrate judge to which no timely objection has been made, the district judge need only be satisfied that there is no clear error on the face of the record. See, Fed.R.Civ.P. 72(b); Baptichon v. Nevada State Bank, 304 F.Supp.2d 451, 453 (E.D.N.Y.2004), aff'd, 125 Fed.Appx. 374 (2d Cir.2005); Nelson v. Smith, 618 F.Supp. 1186, 1189 (S.D.N.Y.1985). Whether or not proper objections have been filed, the district judge may, after review, accept, reject, or modify any of the magistrate judge's findings or recommendations. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b).

II

Plaintiff contends that Magistrate Judge Tomlinson erred, inter alia, in: (1) not understanding that he is a "double first cousin once removed," to the decedent Louise Jurgens ("decedent"), (Plaintiff's Opposition to Report and Recommendation [Plf. Obj.], ¶ 1); (2) finding that the

purported false will was filed in New York Surrogate's Court, as opposed to New York Supreme Court, (Plf Obj., ¶ 2); (3) finding that plaintiff moved to Texas on or about April 17, 2002, when he actually moved on August 22, 2003, (*id.*); (4) failing to recognize that he was willing to be deposed in Texas, or by remote means, but not in New York because he has a "genuine fear for his safety [which] precluded [his] attendance in New York," (Plf.Obj., ¶ 3); (5) assuming that he had access to the records of the Suffolk County Supreme Court and received a copy of the final accounting, (Plf.Obj., ¶¶ 4, 11); (6) failing to recognize that he "moved in Federal court [for relief from the final accounting] as soon as [he] could," (Plf. Obj ., ¶ 5); (7) finding that defendant did not breach his fiduciary obligation to decedent's estate notwithstanding (a) that defendant did not require McCarthy, the guardian of decedent's property, to reconcile his final account with the inventory of assets prepared by defendant, which showed a monetary difference in excess of eight hundred thousand dollars ($800,000.00), and (b) that defendant did not account for and identify "the properties returned to the Estate from Federated Securities," (Plf.Obj., ¶¶ 6–8, 11); (8) finding that defendant "pays for the various law suits and the proceedings in which the estate is involved," (Plf.Obj., ¶ 7); (9) discounting the "Jurgens Conspiracy" theory he asserts in his amended complaint, (Plf.Obj., ¶ 9); (10) finding that because defendant had no authority to oversee or supervise McCarthy, as decedent's property guardian, he had a right to abandon his fiduciary duty to account for and locate assets of the estate, (Plf.Obj., ¶ 10); and (11) "rendering [her] decision on facts which are not proven, not evidence in this case and beyond the power of [the] court to consider under the doctrine of judicial notice but on figments of the Courts [sic] imagination," (Plf.Obj., ¶ 13).

 **\*2** Upon *de novo* review of the Report and consideration of plaintiff s objections and defendant's response thereto, plaintiff's objections are overruled and the Report is accepted in its entirety as an order of the Court. [1]

## II. Conclusion
Upon *de novo* review of the Report, plaintiff's objections are overruled, the Report is accepted in its entirety, defendant's motion for summary judgment is granted and the amended complaint is dismissed in its entirety with prejudice. Plaintiff's motions to amend the amended complaint and to compel discovery responses or to impose sanctions are denied. The Clerk of the Court is directed to enter judgment in favor of defendant and against plaintiff and to close this case.

SO ORDERED.

## *REPORT AND RECOMMENDATION*

A. KATHLEEN TOMLINSON, United States Magistrate Judge.

This action arises out of the role of Defendant Charles Herman Jurgens ("Defendant" or "Jurgens") as Executor of the Estate of Louise Jurgens ("Louise" or "Decedent"). Several motions are presently before the Court. Plaintiff James Martin Witzenburg ("Plaintiff" or "Witzenburg"), a beneficiary of Louise's estate, brought this action against Defendant for, *inter alia,* (1) breach of fiduciary duty, seeking to recover damages in the amount of his inheritance under Louise's Will, (2) alleged mismanagement and/or conversion of funds of Louise's estate, and (3) interest and costs. Defendant moves here for summary judgment seeking dismissal of the remaining claims. By separate motion, Plaintiff moves to add a party defendant, namely, Patrick McCarthy, Esq., who served as a court-appointed property guardian of Louise's property for thirteen months before her death. Finally, Plaintiff moves to compel Defendant to respond to outstanding document requests and interrogatories and for the imposition of sanctions. District Judge Feuerstein has referred these three matters to me for a Report and Recommendations.

## I. *BACKGROUND*

### A. *Factual Background*
The facts of this case are set forth in substantial detail in Judge Feuerstein's March 1, 2007 Order granting in part and denying in part Defendant's motion to dismiss [DE 73]. Only the facts necessary for the analysis contained in this Report will be recited here.

Plaintiff and Defendant are apparently both cousins, in varying degrees, of the Decedent Louise Jurgens ("Louise" or the "Decedent"). [1] In and around July 1999, Jurgens obtained a "full" power of attorney from Louise. On September 9, 1999, Defendant Jurgens commenced a guardianship proceeding on behalf of Louise in the Supreme Court, Suffolk County, pursuant to Article 81 of the New York Mental Hygiene Law (*Jurgens v. Jurgens,* Index No. 20414–99) (the

"Suffolk Supreme Court Action"). (Schmidt Decl. [2] ¶ 4.) On December 28, 1999, the Suffolk Supreme Court appointed non-party attorney Patrick McCarthy ("McCarthy") as guardian of Louise's property and named Jurgens as Louise's personal needs guardian (*id.;* Jurgens Aff. [3] ¶ 3; Def.'s 56.1 Stat. [4] ¶ 2). As Louise's personal guardian, Jurgens attended to her medical and personal needs. (Jurgens Aff. ¶ 3; Def.'s 56.1 Stat. ¶ 5.) However, during the period from December 1999 until Louise's death in January 2001 (the "guardianship period"), Jurgens did not have any control over Louise's finances or property, as those were under the control of Attorney McCarthy as the property guardian. (Jurgens Aff. ¶ 11; Schmidt Decl. ¶ 28; Def.'s 56.1 Stat. ¶ 5.) Moreover, Jurgens had no authority to oversee or supervise McCarthy's conduct as property guardian. (Jurgens Aff. ¶ 10; Schmidt Decl. ¶ 25; Def.'s 56.1 Stat. ¶ 25.)

**\*3** Pursuant to the April 14, 2000 order of the Supreme Court, Suffolk County, McCarthy retained two Smith Barney stockbrokers as independent financial consultants to advise McCarthy with respect to managing Louise's portfolio, among other things [DE 73 at 3]. In general, McCarthy's conduct as property guardian was supervised and reviewed by the Suffolk County Supreme Court. McCarthy accounted for his actions as property guardian in a formal accounting filed with that Court (the "McCarthy Accounting"), in which he was represented by counsel. That Accounting was reviewed by McCarthy's representatives, the attorney for the Estate, the Supreme Court's accounting department, the Supreme Court Examiner, and a bonding company. (Jurgens Aff. ¶ 10; Schmidt Decl. ¶ 26; Def.'s 56.1 Stat. ¶ 26.) Although Jurgens received a copy of McCarthy's Accounting, he had no role in its preparation. (Jurgens Aff. ¶ 10; Schmidt Decl. ¶ 27; Def.'s 56.1 Stat. ¶ 27.)

On January 6, 2001, Louise died and both guardianships ceased. (Jurgens Aff. ¶ 4; Schmidt Decl. ¶ 6; Def.'s 56.1 Stat. ¶ 6.) Jurgens was appointed Preliminary Executor of Louise's estate (the "Estate") on January 30, 2001, and was appointed Permanent Executor on December 30, 2001. (Jurgens Aff. ¶ 4; Def.'s 56.1 Stat. ¶ 9.) Thereafter, Jurgens filed Louise's Last Will and Testament dated October 16, 1995 and Codicil dated July 28, 1998 (together, the "Will") (Jurgens Aff. ¶ 13; Def.'s 56.1 Stat. ¶ 6.) Upon reviewing the Will, Witzenburg executed a Wavier and Consent thereto dated October 22, 2001. (Jurgens Aff. ¶ 13, Ex. A; Def.'s 56.1 Stat. ¶ 8.) The Will was admitted to probate by the Suffolk County Surrogate's Court on December 3, 2001. (Schmidt Decl. ¶ 6; Jurgens Aff. ¶ 13.)

In his capacity as Executor of Louise's Estate, Jurgens took steps to liquidate her assets and sell her house, all of which was accomplished within a few months. Thereafter, Jurgens continued to work to ensure that all bills and taxes, including personal, fiduciary and estate taxes were paid. (Jurgens Aff. ¶ 4; Def.'s 56.1 Stat. ¶ 10.) In the course of performing his duties as Executor, which included locating and accounting for various assets of the Estate, Jurgens discovered that Witzenburg had withheld certain of Louise's money and personal property valued at $789,039.04, which Witzenburg had obtained through specific withdrawals, transfers and check negotiations between March 1997 and June 2000. (Jurgens Aff. ¶ 5; Schmidt Decl. ¶ 7; Def.'s 56.1 Stat. ¶ 11.)

Following this discovery, on December 5, 2001, Jurgens, in his capacity as Executor, commenced a special proceeding in Suffolk County Surrogate's Court, pursuant to Section 2103 of New York Surrogate's Court Procedure Act, alleging that money and personal property belonging to Louise, valued at $789,039.04, had been withheld by Plaintiff (the "Surrogate's Court Action") (Jurgens Aff ¶ 5; Schmidt Decl. ¶ 7; Def.'s 56.1 Stat. ¶ 12.) On January 14, 2002, Jurgens filed an affirmation with the Surrogate's Court identifying the specific withdrawals, transfers and check negotiations in which Plaintiff had engaged between Marcy 1997 and June 2000. (Schmidt Decl. ¶ 7.)

**\*4** On June 13, 2003, Suffolk County Surrogate, Honorable John M. Czygier, Jr., granted Jurgens' motion (made on behalf of Louise's Estate) for summary judgment on the grounds that no triable issue of fact existed as to whether Witzenburg was in wrongful possession of specific assets belonging to the Estate. (Jurgens Aff ¶ 6; Schmidt Decl. ¶ 10; Def.'s 56.1 Stat. ¶ 17.) By Decree and Judgment entered on August 22, 2003 (the "Judgment"), Witzenburg was ordered to deliver such assets, if in his possession or control, or to pay Jurgens, as the Executor, $789,039.04, representing the total amount of withdrawals and transfers of Louise's assets resulting from the transactions conducted by Plaintiff between March 1997 and June 2000. (Jurgens Aff. ¶ 6; Schmidt Decl. ¶ 10, Ex. A; Def.'s 56.1 Stat. ¶ 17.) Moreover, in the Judgment granting the Estate's motion for summary judgment, Surrogate Czygier stated as follows:

> Sufficient concerns having been raised before this Court to question the nature of the subject transfers it is further ORDERED, ADJUDGED AND DECREED that the Clerk of the

Surrogate's Court is directed to serve a copy of the Court's decision upon the Suffolk County District Attorney for further investigation[.]"

(Schmidt Decl. ¶ 11, Ex. A; Def.'s 56.1 Stat. ¶ 18.) The Judgment is a final judgment and was not appealed by Witzenburg. (Schmidt Decl., Ex. A; Def.'s 56.1 Stat. ¶ 20.)

Jurgens alleges, upon information and belief, that Witzenburg left New York shortly after entry of the Judgment on August 22, 2003. (Schmidt Decl. ¶ 12.) To date, Witzenburg has not made any payment to satisfy the Judgment, and it is Jurgens' understanding that Witzenburg has resisted all efforts to enforce the Judgment. (Jurgens Aff. ¶ 6; Def.'s 56.1 Stat. ¶ 19.) However, once the Estate files its final accounting (which it cannot do until after resolution of the instant action), it will ultimately be able to offset the amount of the Judgment against Witzenburg's share. (Jurgens Aff. ¶ 12.; Schmidt Decl. ¶ 12.)

Since his preliminary appointment in January 2001 and continuing through the present date, Jurgens, in his capacity as Executor, avers that he has consistently acted in the interests of the Estate. (Jurgens Aff. ¶¶ 7, 15; Schmidt Decl. ¶¶ 22, 31; Def.'s 56.1 Stat. ¶ 22.) For example, Jurgens maintains the Estate accounts, files and pays fiduciary taxes, and assists and pays for the various lawsuits and proceedings in which the Estate is involved. (Jurgens Aff. ¶ 7; Def.'s 56.1 Stat. ¶ 23.) In addition, Jurgens oversaw certain distributions of Louise's Will to beneficiaries during the period December 2001 through January 2004, pending a final accounting in Surrogate's Court. Jurgens has not made any distribution to himself personally and has not taken any Executor fees. (Jurgens Aff. ¶ 7; Schmidt Decl. ¶¶ 23, 24.)

To date, the Estate remains open, pending the outcome of the instant action. Once this case is resolved, Jurgens intends to render a final accounting of the Estate's property (the proceeds of which are currently held in the Estate accounts at Citibank or Smith Barney) in Surrogate's Court. (Jurgens Aff. ¶ 16; Schmidt Decl. ¶ 16.) As part of the final accounting, Witzenburg's share of the Estate will be determined, against which the Suffolk County Judgment can be applied. Then, according to Jurgens, the Estate can render final distributions of the Estate property and he can close the Estate in Surrogate's Court and complete his duties as Executor. (Jurgens Aff. ¶¶ 8, 12, 16.)

### B. Procedural Background

**\*5** The procedural background of this action is also set forth in substantial detail in Judge Feuerstein's March 1, 2007 Order [DE 73] granting in part and denying in part Defendant's motion to dismiss. Only the procedural background germane to this Report will be repeated here.

On December 21, 2004, Plaintiff filed the instant action against Defendant Jurgens, individually and as Executor of the Estate, as well as against Merrill Lynch Pierce Fenner & Smith, Inc. (Merrill Lynch) and Solomon Smith Barney Citigroup ("Smith Barney") in the United States District Court for the Southern District of Texas. On April 27, 2005, Plaintiff filed a First Amended Verified Complaint (the "Amended Complaint"). With respect to Jurgens, Plaintiff alleges that Jurgens and his attorneys were a "corrupt enterprise" and that they depleted Louise's assets, converted assets, committed "frauds" and breached a "fiduciary duty." (Amended Complaint, dated April 27, 2005 ("Am.Compl."), at 4.) On September 15, 2005, Jurgens' motion to transfer venue was granted and the action was transferred to this Court [DE 45].

### 1. Defendant's Prior Motion To Dismiss

By motion dated February 3, 2006 [DE 62–65], Defendant Jurgens moved to dismiss the Complaint as against him on the grounds that the Court: (1) lacked subject matter jurisdiction under the *Rooker–Feldman* doctrine and the probate exception to diversity jurisdiction; or in the alternative, (2) should abstain from hearing this dispute because it concerns the administration of an estate; or in the alternative, (3) should dismiss the amended complaint for failure to comply with Rule 8 of the Federal Rules of Civil Procedure.

By Order dated March 1, 2007 [DE 73], Judge Feuerstein held that, "pursuant to the *Rooker–Feldman* doctrine, the Court lacks subject matter jurisdiction over plaintiff's claims relating to the alleged conversion or improper removal of assets from the Merrill Lynch, Federated Securities or First Securities Investors brokerage accounts and those claims are dismissed" [DE 73 at 8]. Moreover, Judge Feuerstein explained that, to the extent Plaintiff seeks damages resulting from a diminished inheritance, he lacks standing because "legatees and beneficiaries thereof have no independent cause of action either in their own right or in the estate to recover estate property." (*Id.* at 21 (citing cases).)

On the other hand, Judge Feuerstein did not dismiss Plaintiff's claims for breach of fiduciary duty and mismanagement of assets, holding that those claims were not directly addressed in the Surrogate's Court proceeding and are not "inextricably intertwined" with the prior state court determination and. thus, are not barred by the *Rooker–Feldman* doctrine. (*Id.* at 8–9.) In addition, Judge Feuerstein held that the probate exception to diversity jurisdiction does not apply to Plaintiff's breach of fiduciary duty claims. (*Id.* at 12). In sum, the Court found that to the extent Plaintiff requests damages "to the heirs of the estate of Louise" and for "the depletion of the estate of Louise" based upon causes of action for breach of fiduciary duty, mismanagement of assets and fraud, the probate exception does not deprive this Court of subject matter jurisdiction over those claims. (*Id.* at 12 (citing cases)).

**\*6** Likewise, the Court denied the portion of Jurgens' motion requesting that the federal court abstain from exercising jurisdiction on the grounds that, even if the Court were to assume the existence of parallel proceedings in this Court and Surrogate's Court, the balance of factors nonetheless weighs against abstention. (*Id.* at 14–17.)

The Court also denied the portion of Jurgens' motion seeking dismissal of the Amended Complaint pursuant to Rule 8 of the Federal Rules of Civil Procedure on the grounds that Plaintiff's *pro se* complaint, although "not a model of clarity or brevity," satisfied the requirements of Rule 8(a) by providing fair notice of what plaintiff's claims are and the grounds upon which they rest. (*Id.* at 17–19.)

With regard to Plaintiff's claims against Smith Barney and Citibank, the Court granted Smith Barney's motion and dismissed the Amended Complaint as against it in its entirety, and *sua sponte* dismissed the entirety of the Amended Complaint against Merrill Lynch for lack of subject matter jurisdiction. (*Id.* at 19–22, n .6.)

In sum, the only claim against Jurgens which is before this Court on summary judgment is whether Jurgens, in his capacities as power of attorney and executor, breached his fiduciary duties to Louise's Estate, including whether he mismanaged Louise's or the Estate's funds, thereby causing "the depletion of the estate of Louise" and causing harm "to the heirs of the estate of Louise" [DE 73 at 12].

## 2. *The Preclusion Order Against Plaintiff*
On multiple occasions during the course of the present action, specifically between October 2007 and February

2008, Plaintiff failed to appear for his properly-noticed deposition, despite the Court's denial of his two motions for protective orders [DE 90, 100] and several opportunities to appear. (Schmidt Decl. ¶ 19.) During this time, the Court explicitly warned Plaintiff as to the consequences of his failure to appear for deposition. By Order dated February 4, 2008 [DE 100], Judge Boyle cautioned Plaintiff that

> [s]hould he fail to be deposed in this action on or before February 27, 200 [8] he faces a preclusion order barring him from filing any affidavit in favor or in opposition to any motion for summary judgment, and further barring him from testifying at trial."

[DE 100.] Between February 4 and February 25, 2008, Defendant made several attempts to schedule Plaintiff's deposition, but Plaintiff nonetheless refused to appear. (DE 106, 107; Schmidt Decl. ¶ 21.) As a result, by Order dated March 4, 2008 (the "Preclusion Order") [DE 109], Judge Boyle held that

> [c]onsistent with the cautionary advice set forth in the order dated February 4, 2008, the *pro se* plaintiff, James Witzenburg, is hereby precluded from offering any affidavit in support of or in opposition to any motion for summary judgment and is also precluded from testifying at trial in this action unless, within ten (10) business days, he submits to a deposition at a mutually agreed date and time at the placed noticed by counsel for the defendants.

**\*7** [DE 109.]

On March 4, Defendant's counsel sent a letter to Plaintiff by fax, e-mail, and regular mail, enclosing a copy of the Court's March 4, 2008 Order, and offering to depose Plaintiff on March 7, 12, 14, 17, or 18, 2008. (Schmidt Decl. ¶ 22.) Plaintiff did not respond to the letter of Defendant's counsel in any traditional or electronic medium. Moreover, Plaintiff did not appear for his deposition by March 18 as directed by Judge Boyle's March 4 Order. (DE 106, 107; Schmidt Decl. ¶ 22; Def.'s 56.1 Stat. ¶ 33.) Accordingly, by operation of the March 4, 2008 Order, Plaintiff is precluded from offering any affidavit in opposition to the current summary judgment

motion and from offering any testimony at trial. Judge Boyle's decision on this issue is now the law of the case.

### C. *Summary Of Plaintiff's Allegations*

In the Amended Complaint, Plaintiff seeks monetary damages as follows: (1) $106,714.43 for funds converted by Jurgens, acting alone or in concert with others, and the Merrill Lynch and Smith Barney brokers, from a brokerage account allegedly owned by Plaintiff; (2) $2,293,225 for which Jurgens is liable "to the heirs of the estate of Louise Jurgens, including Plaintiff," for breach of fiduciary duties to the Estate and/or conversion of Louise's assets; (3) $1,299,175 for which Jurgens is liable because "[b]y placing an unwarranted guardianship on Louise ... Jurgens initiated the frenzy of activity that resulted in ... depletion of the estate of Louise ..." in that amount; (4) $350,000 in inheritance to which Plaintiff is allegedly entitled pursuant to Louise's "true will," including a $300,000 specific bequest and $50,000 which he claims is his share of the residual value of the Estate (his inheritance per stirpes via his mother's inheritance of 40% of the residual value of the Estate); and (5) interests and costs. (Am. Compl. at 33–34). [5]

As discussed above, in the Order granting in part Defendant's motion to dismiss, Judge Feuerstein found that "pursuant to the *Rooker–Feldman* doctrine, the Court lacks subject matter jurisdiction over plaintiff's claims relating to the conversion or improper removal of assets from the Merrill Lynch, Federated Securities or First Securities Investors brokerage accounts and those claims are dismissed." [DE 73 at 8.] Moreover, Judge Feuerstein explained that to the extent Plaintiff is seeking damages resulting from a diminished inheritance, he has no standing to do so because "legatees and beneficiaries thereof have no independent cause of action either in their own right or in the estate to recover restate property," [DE 73 at 21 (citing cases).] Accordingly, Plaintiff's claims for $106,714.43 for funds allegedly converted by Jurgens and the Merrill Lynch and Smith Barney brokers (No. (1) listed above) and $1,299,175 for depletion of Louise's assets during the guardianship period (No. (3) listed above) were dismissed pursuant to Judge Feuerstein's Order and need not be considered here. Likewise, Plaintiff's claim for $2,293,225 (No. (2) listed above) was dismissed to the extent it was based on alleged conversion of Louise's assets. The issues remaining before this Court are whether Jurgens breached his fiduciary duties to the Estate and is thus liable to Louise's heirs for $2,293,225 (No. (2) above), and whether Plaintiff is entitled to $350,000, or any

portion thereof, in inheritance, pursuant to Louise's "true will" (No. (4) listed above).

**\*8** Insofar as the allegations in the Amended Complaint relate to Defendant Jurgens and are currently before this Court, Plaintiff alleges that Jurgens, in his capacity as executor of Louise's Estate, "committed five separate acts of fraud and many breaches of fiduciary duty." (Am. Compl. at 20). These acts of fraud and breaches of fiduciary duty, as distilled by the Court from the Amended Complaint, are as follows:

- Jurgens knowingly filed a false Last Will and Testament of Louise, which was prepared by Jurgens' counsel in the Surrogate's Court Action, thereby causing the Suffolk Supreme Court Action and/or the Surrogate's Court Action to be "premised upon the filing of a false document which was a fraud on the court," as well as on Louise, her estate, and her beneficiaries, including Plaintiff. (*Id.* at 20–21, Exs. 7, 8.)

- McCarthy was not an independent property guardian and he, together with the Smith Barney experts, "mismanaged" Louise's assets, and filed a false final accounting in the Suffolk Supreme Court Action. (*Id.* at 21–22, Ex. 1.)

- Jurgens' counsel in the Surrogate's Court Action hired a forensic accounting firm to prepare "a report" for which the Estate paid a fee of $53,428.94. However, no such report appears in the files of the Suffolk County Supreme Court or Surrogate's Court Actions. Thus, the $53,428.94 "expense" "is a fraud and unlawful conversion against Louise Jurgens, Plaintiff, and all other heirs of the estate of Louise Jurgens." (*Id.* at 24.)

- Jurgens' counsel in the Surrogate's Court Action caused the final accounting prepared by McCarthy, which was sent by the Court to the forensic accounting firm, to be sent to a non-existent person at the firm so that the firm would not be in the position of having to approve McCarthy's fraudulent final accounting. (*Id.* at 24–25.)

- In arranging the Estate's sale of Louise's residence, Jurgens did not conduct the sale as an "arm's length" transaction; the only appraisal submitted was from a company allegedly "under the exclusive control of Patrick McCarthy, even though McCarthy was no longer actively serving as property manager." (*Id.* at 25.) Moreover, Jurgens submitted an affidavit to the Surrogate's Court affirming that the sale was an "arm's

length" transaction. (*Id.*) Jurgens' conduct constituted a breach of his fiduciary duty to Louise's Estate. (*Id.*)

- Jurgens filed a fraudulent bond with the Surrogate's Court and such bond does not actually exist, thereby conferring a fraud on the court and Louise's beneficiaries. (*Id.* at 25–26, Ex. 9.)

In addition, Plaintiff alleges that the difference of $897,115.27 between the listed value of assets contained in Jurgens' Inventory dated October 12, 2001 (filed on November 7, 2001) and McCarthy's Final Accounting (filed in August 2002), both of which pertain to the value of Louise's assets as of the date of her death (January 6, 2001), and Jurgens' alleged failure to address this discrepancy, reveal that Jurgens committed some type of unspecified fraud and that he "continues to act in concert with all parties ... to deplete and convert the assets of" Louise's Estate. (*Id.* at 9.) Finally, Plaintiff claims that Jurgens brought the Suffolk Supreme Court Action against him "to conceal and obfuscate the conversion of the property" of Louise and her Estate during the period in which Jurgens and McCarthy served as Louise's guardians. (*Id.*)

## II. *THE SUMMARY JUDGMENT MOTION*

### A. *Standard of Review*

**\*9** In reviewing a motion for summary judgment, the Court is guided by the tenets set forth in Federal Rule of Civil Procedure 56(c), which provides, in part:

> ... The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law ....

Fed.R.Civ.P. 56; *Globecom Group, LLC v. Hartford Fire Ins. Co. .,* 434 F.3d 165, 170 (2d Cir.2006); *Gray v. Lutheran Social Servs. of Metro. New York., Inc.,* No. 04–2843, 2006 WL 1982859, at *3 (E.D.N.Y. Jul.13, 2006). The moving party bears the burden of meeting this exacting standard. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In addition, to determine whether the moving party has satisfied this burden, the Court is required to view the evidence and all factual inferences arising from

that inference in the light most favorable to the non-moving party. *Id .* at 157; *Fischl v. Armitage,* 128 F.3d, 50, 55 (2d Cir.1997).

Where the movant shows prima facie entitlement to summary judgment, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord,* 467 F.3d 263, 273 (2d Cir.2006). "[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Id. See also McPherson v. N.Y. City Dep't Of Educ.,* 457 F.3d 211, 215 n. 4 (2d Cir.2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."); *Byrnie v. Town of Cromwell, Bd. Of Educ.,* 243 F.3d 93, 101 (2d Cir.2001) ("[e]ven where facts are disputed, in order to defeat summary judgment, the non-moving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor").

"If there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Fischl,* 128 F.3d at 56 (citing *Hetchkop v. Woodlawn at Grassmere, Inc.,* 116 F.3d 28, 33 (2d Cir.1997)). On the other hand, Rule 56 provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to material fact and that the movant is entitled judgment as a matter of law." *Fed.R.Civ.P. 56(e)(2).* In other words, summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Dobbs v. Dobbs,* No. 06 CV 6104, 2008 WL 3843528, at *5 (S.D.N.Y. Aug. 14, 2008) (the Court's goal should be to "isolate and dispose of factually unsupported claims ...").

**\*10** However, because Plaintiff is proceeding *pro se,* the Court is compelled to "read [*pro se* plaintiff's] supporting papers liberally, and ... interpret them to raise the strongest arguments they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Nevertheless, "the nonmoving party may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful." *Morris v. Lindau,* 196 F.3d 102, 109 (2d Cir.1999) (quotation omitted).

## B. Procedural Issues

On June 17, 2008, Defendant Jurgens served his motion for summary judgment on Plaintiff Witzenburg by e-mail and regular mail [DE 122]. With his summary judgment motion, Defendant also served Plaintiff with a cover letter providing the requisite Notice to *Pro Se litigant* which, in accordance with Local Rule of the Eastern District of New York 56.2, stated:

> [y]ou are required to serve any opposition papers on my office **within 10 days of my service of this motion,** without filing any of your opposition papers with the Court .... Accordingly, to the extent you intend to oppose this motion, please send me within the requisite 10 days a service copy of your papers as well as an additional copy of your papers for me to send to the Court.

[DE 126] Plaintiff did not file any opposition papers or attempt any communication with Defendant or the Court by the June 27, 2008 due date. By letters dated July 1 and July 14, 2008, Defendant asked the Court to grant the summary judgment motion without opposition [DE 128, 133].

By Order To Show Cause dated July 15, 2008, the Court gave Plaintiff one final opportunity to demonstrate why Defendant's motion for summary judgment should not be treated as unopposed. The Court directed Defendant (i) to submit a written explanation to the Court no later than August 6, 2008 setting forth good cause why Plaintiff had failed to oppose Defendant's summary judgment motion; and (ii) to file any opposition papers to Defendant's summary judgment motion no later than August 6, 2008 [DE 134].

Plaintiff served his opposition to Defendant's motion for summary judgment on August 5, 2008 [DE 136], but did not submit a written explanation why he had failed to file his opposition by the original due date. (Schmidt Reply Dec.[6] ¶ 2.) Plaintiff's opposition, styled "Plaintiff's Response in Opposition to Defendant Charles Jurgens' Motion for Summary Judgment" (the "Response"), is, in effect, an unsworn affidavit. Unsworn affidavits are not competent summary judgment evidence unless they meet the requirements of 28 U.S.C. § 1746 or, at minimum, "substantially compl[y] with the[ ] statutory requirements [of 28 U.S.C. § 1746] ...." *LeBoeuf, Lamb, Greene & MacRae,*

*LLP v. Worsham,* 185 F.3d 61, 65 (2d Cir.1999); *see also Nissho–Iwai Amer. Corp. v. Kline,* 845 F.3d 1300, 1306 (5th Cir.1988). Although Plaintiff signed the Response, it is not a sworn affidavit. Likewise, there is no statement that the contents are "true and correct" or made "under penalty of perjury" as required under 28 U.S.C. § 1746 and Second Circuit case law.

**\*11** Moreover, Plaintiff is precluded from submitting any affidavits in support of his opposition to Defendant's motion for summary judgment based upon Judge Boyle's March 4, 2008 Order, which the Court finds is law of the case on this issue. Under the "law-of-the-case doctrine, a court has discretion to re-examine an issue in certain circumstances." *Public Employees Retirement Association of New Mexico v. PriceWaterhouseCoopers LLP,* No. 07–3756–cv, 2009 WL 27704, at \* 3 (2d Cir. Jan.6, 2009). However, "[c]ourts are understandably reluctant to reopen a ruling once made, especially when one judge or court is asked to consider the ruling of a different judge." *Ali v. Mukasey,* 529 F.3d 478, 490 (2d Cior.2008) A court's decision whether to apply law-of-the-case is "informed principally by the concern that disregard of an earlier ruling not be allowed to prejudice the party seeking the benefit of the doctrine." *Prisco v. A & D Carting Corp.,* 168 F.3d 593, 607 (2d Cir.1999) (internal quotation marks omitted).

With regard to law-of-the-case doctrine, the Second Circuit has noted that

> [t]he law of the case doctrine ... while not binding, counsels a court against revisiting its prior rulings in subsequent stages of the same case absent cogent and compelling reasons such as an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.

*ATSI Communications, Inc. v. the Shaar Fund, Ltd.,* 547 F.3d 109, 112 n. 3 (2d Cir.2008) (citing *Ali v. Mukasey,* 529 F.3d at 490). I find that the law-of-the-case doctrine applies in the current circumstances. Plaintiff has provided no argument or rationale here that there has been some "intervening development of law or fact that renders reliance on [Judge Boyle's] earlier ruling inadvisable." *Calabrese v. CSC Holdings, Inc.,* No. 02–CV–5171, 2009 WL 425879, at \* 6 (E.D.N.Y. Feb. 19, 2009). Plaintiff has never presented any good faith reason for his failure to show up at his duly noticed

deposition, in the face of specific Orders from the court to do so. The law of the case will be disregarded "only when the court has a 'clear conviction of error' with respect to a point of law on which its previous decision was predicated." *Fogel v. Chestnutt,* 668 F.2d 100, 109 (2d Cir.1991) (quoting *Zdanok v. Glidden,* 327 F.2d 944, 953 (2d Cir.1964)). Here, Plaintiff presents no new evidence or facts to serve as any reasonable justification for his prior conduct or any basis whatsoever to disturb Judge Boyle's prior rulings.

In addition to the applicability of the law-of-the-case doctrine here, the Court also observes that because Plaintiff's Response constitutes an unsworn declaration, it is inadmissible for purposes of Rule 56 and cannot be considered by the Court in rendering a decision on the present motion. *Nissho–Iwai Amer. Corp.,* 845 F.3d at 1306; *Hale Propeller LLC v. Ryan Marine Prods. Pty., Ltd.,* 151 F.Supp.2d 183, 200–01 (D.Conn.2001) (disregarding affidavit where it failed to conform to the standard for unsworn declarations set forth by 28 U.S.C. § 1746); *compare LeBoeuf, Lamb, Greene & MacRae, LLP,* 185 F.3d at 65–66 (defendant's unsworn affidavit could be considered on summary judgment where it stated that "under penalty of perjury I make the statements contained herein" and was signed and dated). Accordingly, Plaintiff's Response cannot be considered on this motion.[7]

**\*12** In addition, Plaintiff did not include in the Response a contravention of Defendant's Statement of Undisputed Material Facts [DE 125] or a separate statement of additional material facts for which there exists a genuine dispute, as required under Local Civil Rule 56.1(b).[8] Pursuant to Local Rule 56.1(c), each numbered paragraph in the moving party's statement of material facts "will be deemed admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Accordingly, for purposes of this motion, the statements contained in Defendant's Statement of Undisputed Material Facts [DE 125] are hereby deemed admitted as unopposed.

Nevertheless, where, as here, the motion for summary judgment is unopposed, "the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law ." *Vermont Teddy Bear Co. v. Beargram Co.,* 373 F.3d 241, 242 (2d Cir.2004); *Layachi v. Minolta Bus. Sys., Inc.,* 00 Civ. 731, 2001 WL 1098008, at \*3 (S.D.N.Y. Sept.18, 2001) (where "non-moving *pro se* party has failed to submit papers in opposition, summary judgment should not

be granted automatically") (internal citations omitted). The Second Circuit has stated:

> the failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment. Instead, the district court must still assess whether the moving party has fulfilled its burden of demonstrating that there is no genuine issue of material fact and its entitlement to judgment as a matter of law.

*Vermont Teddy Bear Co.,* 373 F.3d at 244. Plaintiff's failure to oppose summary judgment in any legally meaningful way allows the Court to accept Defendant's factual assertions as true; however, the court "must be satisfied that the citation to evidence in the record supports the assertion." *Id.*

## C. *Breach of Fiduciary Duty Claims*
As discussed above, Plaintiff seeks monetary damages against Jurgens in the amount of $2,293,225 on the grounds that, in his role as executor of Louise's Estate, Jurgens breached his fiduciary duties through various acts, including mismanaging the Estate's assets. New York law vests executors of estates with broad powers to dispose of and manage the decedent's interests in real property. Specifically, under the Fiduciaries' Powers Act, "every fiduciary is authorized" *inter alia:*

- with respect to any property ... owned by an estate ... to sell the same at public or private sale, and on such terms as in the opinion of the fiduciary will be most advantageous to those interested therein;

- to employ any bank or trust company incorporated in New York, any national bank located in New York or any private banker duly authorized to engage in business in New York as custodian of any stock or other securities held as a fiduciary, and the cost thereof;

**\*13** • to cause any stock or other securities (together, "securities") held by any bank or trust company to be registered and held in the name of a nominee of such bank or trust company without disclosure of the fiduciary relationship; and to direct any bank or trust company incorporated in New York, any national bank located in New York or any private banker duly authorized to engage in business in New York to register

and hold any securities deposited with such bank, trust company or private banker in the name of a nominee of such bank; and

- to contest, compromise or otherwise settle any claim in favor of the estate, or in favor of third person and against the state.

*See* N.Y. EPTL § 11–1.1(5)(B), (9), (10), (13).

Notwithstanding this broad authority, the Fiduciaries' Powers Act also requires executors to strictly adhere to their fiduciary duties. The following is a brief review of executors' fiduciary duties as relevant to the present case.

Pursuant to the duties of loyalty, care and safekeeping, an executor must collect and preserve the assets of the estate. *In re Estate of Donner,* 82 N.Y.2d 574, 584, 606 N.Y.S.2d 137, 141, 626 N.E.2d 922 (N.Y.1993) (noting that the executors "were fiduciaries who owed a duty of undivided loyalty to the decedent and had a duty to preserve the assets that she entrusted to them") (citing *Meinhard v. Salmon,* 240, N.Y. 458, 464 (N.Y.1928)); *Bender v. City of Rochester,* 765 F.2d 7, 12 (2d Cir.1985) (administrator of an estate has "the legal duty to collect and preserve [decedent's] assets, [and] to pay [decedent's] debts"); *In re Estate of Skelly,* 284 A.D.2d 336, 725 N.Y.S.2d 666, 667 (2d Dep't 2001) (executor "has a duty to preserve the assets of the estate ....") (internal citation omitted). Likewise, an executor is prohibited from commingling estate assets with any other assets. *See* N.Y. EPTL § 11–1.6 ("[e]very fiduciary shall keep property received as fiduciary separate from his individual property"). The Fiduciary Powers Act authorizes an executor to protect the estate's assets by employing "any broker-dealer which is registered with the [SEC] and the department of law in the state of New York ... as a custodian for a fiduciary of any stock or other securities ... [and] to register such securities in the name of such broker." N.Y. EPTL § 11–1.10.

An executor's duty of diligence and prudence requires him to administer and manage the estate assiduously in the interest of the beneficiaries. This includes "employing such diligence and prudence in the care and management of the estate assets and affairs as would a prudent person of average discretion and intelligence." *In re Robinson,* 282 A.D.2d 607, 724 N.Y.S.2d 424, 426 (2d Dep't 2001) (finding no basis to deny executors' commissions where executors adequately explained reasons for waiting to sell decedent's property and objectant did not present any evidence to refute the explanations) (internal citations omitted); *In re Bello,* 227

A.D.2d 553, 554, 642 N.Y.S.2d 953, 954 (2d Dep't 1996) (concluding that executor met the standard of care under difficult circumstances); *In re Scott,* 234 A.D.2d 551, 651 N.Y.S.2d 592, 593 (2d Dep't 1996 (finding executors' delay in paying tax deficiencies, where resulting accrued interest exceeded amount earned by the estate, constituted breach of duty of diligence and care).

**\*14** The duties of diligence and prudence also relate to the executor's authority to invest the assets of an estate. Under the Prudent Investment Act,[9] the executor must make investment decisions pursuant to the prudent investor standard, which requires the executor to "exercise reasonable care, skill and caution to make and implement investment and management decisions as a prudent investor would for the entire portfolio, taking into account the purposes and terms and provisions of the governing instrument." N.Y. EPTL § 11–2.3(b)(2). The Prudent Investment Act sets out specific requirements for an executor's investment strategy. N.Y. EPTL § 11–2.3(b)(3). For example, executors are required to "pursue an *overall* investment strategy to enable the trustee to make appropriate present and future distributions to or for the benefit of the beneficiaries under the governing instrument, in accordance with risk and return objectives reasonably suited to the *entire* portfolio." *In re Heller,* 6 N.Y.3d 649, 653, 2006 Slip Op 3469, at \*3 (N.Y.2006) (emphasis in original) (quoting N.Y. EPTL § 11–2.3(b)(3)(A)). The statute also provides, in relevant part, as follows:

> [t]he prudent investor rule requires a standard of conduct, not outcome or performance. Compliance with the prudent investor rule is determined in light of facts and circumstances prevailing at the time of the decision or action of a trustee. A trustee is not liable to a beneficiary to the extent the trustee acted in substantial compliance with the prudent investor standard or in reasonable reliance on the express terms and provisions of the governing instrument.

N.Y. EPTL § 11–2.3(b)(1). Moreover, an executor is obligated to "diversify assets unless the trustee reasonably determines that it is in the interests of the beneficiaries not to diversify, taking into account the purposes and terms and provisions of the governing instrument." N.Y. EPTL § 11–2.3(b)(3)(C) (quoted in *In re Janes,* 90 N.Y.2d 41, 49, 659 N.Y.S.2d 165, 169, 681 N.E.2d 332 (N.Y.1997).

Also, under New York law, an executor has discretion whether to pay any testamentary disposition or distributive share before the completion of the publication of notice

to creditors or, if no such notice is published, before the expiration of seven months from the time letters testamentary or of administration are granted. Thereafter, the executor is required to pay any testamentary disposition or distributive share no more than seven months following the date the letters testamentary are granted. N.Y. EPTL § 11–1.5(a). If the executor fails to make such disposition, an heir may bring a proceeding against the executor. However, for the purpose of computing the time for the heir to commence the proceeding against the executor, the cause of action does not accrue until the executor's account "is judicially settled." N.Y. EPTL § 11–1.5(c).

Typically, the determination of whether the executor's conduct "measures up to the appropriate standards of prudence, vigilance, and care" is an issue of fact to be decided by the court. *Donner,* 82 N.Y.2d at 585, 606 N.Y.S.2d at 142, 626 N.E.2d 922; *Janes,* 90 N.Y.2d at 50, 659 N.Y.S.2d at 169, 681 N.E.2d 332 (internal citations omitted).

## III. *DISCUSSION*

**\*15** The issue to be decided by this Court is whether there exists any genuine issue of material fact which would preclude summary judgment in favor of Defendant on Plaintiff's claims that (1) Defendant, in his role as executor of Louise's estate, breached his fiduciary duties through various acts, including mismanaging the Estate's assets, thereby depleting the Estate's assets and harming Louise's heirs; and (2) Plaintiff is entitled to an inheritance in the amount of $350,000 pursuant to Louise's "true will."

In determining whether there are any genuine issues of material fact, the Court remains mindful of Judge Boyle's Preclusion Order which prohibited Plaintiff from submitting "any affidavit in support of or in opposition to any motion for summary judgment" [DE 109]. The Court is also cognizant that, based upon Plaintiff's failure to oppose Defendant's motion for summary judgment in a substantively meaningful way, including his failure to submit a Local Rule 56.1(b) statement contravening Defendant's statement of undisputed facts, Defendant's factual assertions must be accepted as true. *See* Local Rule 56.1(c).

### A. *Jurgens' Conduct As Executor*

Accepting Jurgens' Rule 56.1 Statement as admitted facts, as the Court must, the record shows that Jurgens fulfilled his fiduciary duties as executor of Louise's estate. Pursuant to the duties of loyalty, care and safekeeping, Jurgens was

required to collect and preserve the assets of the estate. *See, e.g. Donner,* 82 N.Y.2d at 584, 606 N.Y.S.2d at 141, 626 N.E.2d 922. Thus, following his appointment as Executor of Louise's Estate, Jurgens took steps to liquidate Louise's assets and sell her house, all of which were accomplished within a few months. Thereafter, Jurgens continued to work to ensure that all bills and taxes, including personal, fiduciary and estate taxes were paid. (Jurgens Aff. ¶ 4; Def.'s 56.1 Stat. ¶ 10.) In addition, since his appointment, Jurgens has continued to maintain the Estate accounts, has filed and paid fiduciary taxes, and has assisted and paid for the various lawsuits and proceedings involving the Estate. (Jurgens Aff. ¶ 7; Def.'s 56.1 Stat. ¶ 23 .)

Although Plaintiff alleges that Jurgens has breached his fiduciary duties by failing to distribute the assets of the Estate, Jurgens is not actually required to do so until there is a final accounting. Jurgens made certain distributions to beneficiaries of Louise's Will between December 2001 and January 2004. (Jurgens Aff. ¶ 7; Def.'s 56.1 Stat. ¶ 24.) Moreover, Jurgens has not made any distributions to himself or taken any Executor fees to date. (*Id.*)

Jurgens will only be required to distribute the Estate's assets when the Estate "is judicially settled." *See* N.Y. EPTL § 11–1 .5(c). In fact, it is Plaintiff's conduct, including the failure to pay the outstanding Surrogate's Court Judgment against him in the amount of $789,039.04, that has prevented Jurgens from conducting a final accounting and in turn making the final distributions under the Will. (Jurgens Aff. ¶ 8; Def.'s 56.1 Stat. ¶ 24.)

### B. *Breach Of Fiduciary Duty Claims*

#### 1. *The Purported False Will*

**\*16** Plaintiff alleges that Jurgens knowingly filed a false Last Will and Testament of Louise, thus committing fraud on the court, Louise, her estate, and her beneficiaries, including Plaintiff. (Am. Compl. at 20–21, Exs. 7, 8.) Furthermore, Plaintiff claims that pursuant to Louise's "true will," he is entitled to an inheritance in the amount of $350,000.

Contrary to Plaintiff's assertions, Defendant Jurgens states that in his role as executor of the Estate, following Louise's death, he duly filed Louise's Last Will and Testament dated October 16, 1995 as well as the Codicil dated July 28, 1998 (together, the "Will") (Jurgens Aff. ¶ 13; Def.'s 56.1 Stat. ¶ 6.) The Will was admitted to probate by the Suffolk County

Surrogate's Court on December 3, 2001. (Schmidt Decl. ¶ 6; Jurgens Aff. ¶ 13.)

Moreover, prior to the admission of the Will to probate, Plaintiff reviewed the Will and executed a Wavier and Consent thereto dated October 22, 2001. (Jurgens Aff. ¶ 13, Ex. A; Def.'s 56.1 Stat. ¶ 8.) The Waiver and Consent provides that Plaintiff "consents that the court admit to probate the decedent's Last Will and Testament dated October 16, 1995 (and codicils, if any, dated July 28, 1998), a copy of each which testamentary instrument has been received by me and that Letters Testamentary issue to Charles Jurgens." (Jurgens Aff., Ex. A.) Notably, at no time during the Surrogate's Court proceedings did Plaintiff raise any objection to the Will, despite having had ample opportunity to do so. Plaintiff raised this issue for the first time only upon bringing this action, long after the admission of the Will to probate.

If Plaintiff were seeking to withdraw his Waiver and vacate the decree admitting Louise's Will to probate in order to contest the Will (for which he has not so moved), such motion would have to be made before the Surrogate's Court, where the Waiver was entered. It is well-established that the jurisdiction to administer the probate of wills, including entry of waivers, falls within the ambit of the Surrogate's Court. *See Groman v. Cola,* 07 CV 2635, 2007 WL 3340922, at *4 (S.D.N.Y. Nov.7, 2007) (noting that federal jurisdiction is barred under the probate exception if the action requires "the probate or annulment of a will [or] the administration of a decedent's estate") (citing *Marshall v. Marshall,* 547 U.S. 293, 311–12, 126 S.Ct. 1735, 164 L.Ed.2d 480 (2006)); *Lefkowitz v. Bank of N.Y .,* 528 F.3d 102,106 (2d Cir.2007) (affirming dismissal of certain tort claims against executor because "[w]ith these claims, Plaintiff seeks to mask in claims for federal relief her complaints about the maladministration of her parent's estates, which have been proceeding in probate courts) (citation omitted); *see also* DE 73 at 10. Here, any request by Plaintiff to set aside his Waiver must properly be made before the Surrogate's Court and such request would be subject to the applicable statute of limitations in that court.

However, even if Plaintiff were to make such a motion, it is unlikely he would succeed based on the record currently before this Court. Under New York law, "[a] party seeking to set aside a probate decree entered upon his consent must show that such consent was obtained by fraud or overreaching, [or] was the product of misrepresentation or misconduct, or that newly-discovered evidence, clerical error or other sufficient cause justifies the reopening of the decree." *Moser v. Pollin,* 294 F.3d 335, 342 (2d Cir.2000) (overruled on other grounds by *Marshall v. Marshall,* 547 U.S. 293, 126 S.Ct. 1735, 164 L.Ed.2d 480 (2006)) (quoting *In re Hall,* 185 A.D.2d 322, 322, 586 N.Y.S.2d 285, 286 (2d Dep't 1992)); *In re Coccia,* 2008–0802, 2009 N.Y. Slip Op 1477, 2009 App. Div. LEXIS 1463, at *1 (citations omitted). In other words, the party challenging the probate decree must establish "sufficient cause ... to justify reopening the decree." *Coccia,* 2009 App. Div. LEXIS 1463, at *2 ("appellant's unsubstantiated and conclusory allegations that he did not appreciate or understand the significance of the waiver and consent were insufficient to satisfy this standard").

**\*17** Here, not only has Plaintiff not moved to set aside the Waiver, but he has not even addressed the fact that he submitted the Waiver to the Surrogate's Court. Moreover, based on the record now before this Court, no evidence has been introduced which would allow a court to determine that Jurgens had a fraudulent will admitted to probate. Nowhere does Plaintiff submit any evidence showing that he signed the Waiver as a result of fraud, overreaching, misrepresentation or misconduct on the part of any party involved in the Surrogate's Court proceeding. Neither has Plaintiff submitted newly-discovered evidence, or evidence of a clerical error or other sufficient cause which would justify the reopening of the decree. In fact, the extent of Plaintiff's assertions on this point, other than in the Amended Complaint, is found in his Summary Judgment Response, where he takes issue with Paragraph 6 of the Schmidt Declaration for, among other things, not addressing "the presence of 2 wills" which were annexed to the Amended Complaint. (Pl. Opp'n Summ. J. at 4.)

In sum, there no evidence that Plaintiff's Waiver was fraudulently obtained and should be withdrawn or that Jurgens had a false will admitted to probate. Accordingly, the Court finds that there is no genuine issue of material fact as to whether Defendant breached his fiduciary duty as Executor in regard to the admission of the Will to probate. Likewise, Plaintiff's claim that he is entitled to an inheritance in the amount of $350,000 under a will other than the Will that was admitted to probate in the Surrogate's Court Action is without merit.

### 2. McCarthy's Final Accounting

Plaintiff alleges that Jurgens breached his fiduciary duty because the court-appointed property guardian for Louise, Patrick McCarthy, was not functioning independently and McCarthy, together with the Smith Barney experts,

"mismanaged" Louise's assets, ultimately filing a false Final Accounting in the Suffolk Supreme Court Action. (Am. Compl. at 21–22.)

However, Jurgens has stated that he had "absolutely no authority to oversee, let alone supervise, [McCarthy's] actions while he served as Louise's property guardian." (Jurgens Aff. ¶ 10; Def.'s 56.1 Stat. ¶ 25.) Specifically, during the guardianship period, Jurgens did not have any control over Louise's finances or property. (Jurgens Aff. at ¶ 11; Def.'s 56.1 Stat. ¶ 28.) Moreover, at the conclusion of the guardianship period, McCarthy accounted for his actions as Louise's Property Guardian in a formal accounting which was approved by the Suffolk County Supreme Court. (Jurgens Aff. ¶ 10.) Despite having had ample opportunity to do so, Plaintiff at no time objected to McCarthy's Final Accounting and only raises this issue for the first time in the current action, several years after the entry of McCarthy's Final Accounting.

If Plaintiff had been seeking to challenge McCarthy's Final Accounting (for which he has not so moved), he would necessarily have had to bring that information to the attention of the Suffolk County Supreme Court, which previously approved the Final Accounting. *See, e.g., In re Hunter,* 4 N.Y.3d 260, 270, 794 N.Y.S.2d 286, 292, 827 N.E.2d 269 (N.Y.2005) (Explaining that res judicata principles "apply with equal force to judicially settled accounting decrees. As a general rule, an accounting decree is conclusive and binding with respect to all issues raised and as against all persons over whom Surrogate's Court obtained jurisdiction.") (citations omitted).

 **\*18** Notwithstanding these purported facts, however, this allegation does not pertain to Jurgens, as he played no role in McCarthy's conduct as guardian. (Jurgens Aff. ¶ 11.) In fact, the conduct at issue here occurred before Louise's death, and thus prior to Jurgens' appointment as executor of Louise's estate and prior to his undertaking the corresponding fiduciary duties which Plaintiff claims were breached. (*Id.*) Moreover, McCarthy is not a party to this action.

Because this allegation relates solely to events that occurred prior to Jurgens' appointment as executor of Louise's Estate, the Court finds that there is no genuine issue of material fact as to whether Defendant breached his fiduciary duties in regard to McCarthy's conduct as Property Guardian and/or McCarthy's Final Accounting.

### 3. The Purported Fraudulent Forensic Accounting Report

Plaintiff contends that, in either the Suffolk Supreme Court Action or the Surrogate's Court Action, Jurgen's attorney hired a forensic accounting firm to prepare "a report" for which Louise's Estate was billed $53,428.94. Plaintiff contends that no such report appears in the files of the Suffolk County Supreme Court or Surrogate's Court Actions and thus, Plaintiff argues, the $53,428.94 "expense" ... "is a fraud and unlawful conversion against Louise Jurgens, Plaintiff, and all other heirs of the estate of Louise Jurgens." (Am. Compl. at 24.)

At first glance, it is unclear whether Plaintiff is alleging that the fraudulent forensic accounting report was prepared during the guardianship period in the course of the Suffolk Supreme Court Action, or following Louise's death in the course of the Surrogate's Court Action. However, based on Plaintiff's assertion that the accountant who was hired to prepare this report informed Plaintiff's attorney (presumably in one of these earlier actions) that he did not know McCarthy, the Court concludes that the conduct alleged here occurred during the guardianship period, because that is the only time McCarthy was involved with Louise. Specifically, Plaintiff contends that the accountant stated that "he did not know the property manager Patrick McCarthy had never spoken with Patrick McCarthy, and was hired by James Klein." (Am. Compl. at 24.) Plaintiff also adds that the accountant made this statement "after he was paid" for the report. (*Id.*)

Insofar as this allegation pertains to the guardianship period, there is no claim against Jurgens and thus nothing for the Court to consider because this conduct occurred prior to Jurgens' appointment as executor of Louise's estate—and prior to his assuming the corresponding fiduciary duties which Plaintiff claims were breached. (*Id.*)

Even if the Court were to presume that this claim alleges conduct which occurred following Louise's death—and thus while Jurgens was the executor—there is no support, beyond Plaintiff's conclusory and unsubstantiated statements, to show that Jurgens fraudulently billed the Estate for an accounting report that was not received. Thus, the Court finds that there is no genuine issue of material fact whether Defendant caused his counsel to hire a forensic accounting firm to prepare a fraudulent report or to pay an impermissible fee to such firm.

### 4. The Alleged Non–Existent Forensic Accountant

 **\*19** Plaintiff alleges that in the Surrogate's Court Action, Jurgens, through his counsel, caused the Final Accounting prepared by McCarthy to be sent by the Court to a non-

existent person at a forensic accounting firm so that the accounting firm would not be in the position of having to approve McCarthy's fraudulent Final Accounting. (Am. Compl. at 24–25.) However, as noted above, Jurgens did not play any role in McCarthy's conduct as the property guardian. Moreover, beyond these conclusory and unsubstantiated allegations, the only evidence offered by Plaintiff is a copy of an envelope addressed to "Ernest Patrick Smith, CPA" at a street address in Melville. Contrary to Plaintiff's proffer, the envelope does not indicate that it is directed to the accounting firm of Callahan Nawrocki. (*Id.* at 25, 794 N.Y.S.2d 286, 827 N.E.2d 269.) Further, the envelope was returned by the post office bearing the stamped notation "Attempted Unknown" (not "addressee unknown" as stated by Plaintiff). (*Id*.; Am. Compl. Ex. 11.)

Because there is no evidence of Jurgens having played any role in this alleged conduct, the Court finds that Plaintiff has failed to raise a genuine issue of material fact to support his contention that Jurgens caused McCarthy's Final Accounting to be sent to a non-existent forensic accountant.

### 5. Sale Of Decedent's Residence As An Arm's Length Transaction

With regard to the sale of Louise's residence, Plaintiff alleges that Jurgens breached his fiduciary duties as executor because the only appraisal obtained for Louise's house was from a company allegedly "under the exclusive control of Patrick McCarthy, even though McCarthy was no longer actively serving as property manager[,]" and thus the sale was not an "arm's length" transaction. (Am. Compl. at 25.) As noted above, the New York Fiduciary Powers Act provides the executor with broad authority with regard to the sale of decedent's property. The applicable statutory provision authorizes an executor "with respect to any property ... owned by an estate ... to sell the same at public or private sale, and on such terms as in the opinion of the fiduciary will be most advantageous to those interested therein." N.Y. EPTL § 11–1.1(5).

Plaintiff's only support for his claim that Jurgens breached his fiduciary duty in the sale of the residence is his assertion that the appraisal was submitted by a company with whom McCarthy had ties, thereby resulting in a transaction which was not at arm's length. However, Plaintiff does not specify McCarthy's connection to that company or offer any proof to show that any unlawful conduct occurred as a result of this purported connection. Nor does Plaintiff offer any proof to

show that Jurgens knew or believed this sale was not "most advantageous" to Louise's beneficiaries, as required under New York law.

Significantly, by Order dated February 21, 2001, the Surrogate's Court granted Jurgens' application for permission to sell Louise's home in accordance with the terms of the contract which Jurgens had provided to the Court (Am.Compl., Ex. 9). In the Order, the Surrogate noted that Jurgens had "proffered a copy of a contract of sale for $270,000.00 and state[d] that the sale of the premises minimizes the estate's obligation to pay taxes and carrying charges on the property during the pendency of the probate proceeding." (*Id.*) The Surrogate found that Jurgens had satisfied his fiduciary duties with regard to the sale of Louise's home, and Plaintiff has not presented any evidence here to convince this Court otherwise. Accordingly, the Court finds there is no genuine issue of material fact regarding Defendant's conduct in the sale of Louise's home.

### 6. The "Fraudulent Bond" Allegation

 *20 Plaintiff maintains that Jurgens filed a fraudulent bond with the Surrogate's Court and that no true bond actually exists, thereby resulting in a fraud on the court and Louise's beneficiaries. (Am. Compl. at 25–26, Ex. 9.) In support of this allegation, Plaintiff claims that, pursuant to the order of the Surrogate's Court requiring Jurgens to file a bond on his performance, Jurgens filed "several unbound unexecuted pages purporting to represent an executor's performance bond underwritten by Fidelity and Deposit Company of Maryland" ("F & DC"), and that in 2003, an F & DC representative informed him that "no bond exists or ever existed on the performance of Charles H. Jurgens." (*Id.* at 25–26, 794 N.Y.S.2d 286, 827 N.E.2d 269.)

In his summary judgment motion, Jurgens explains that F & DC insured Louise's Estate for $3,353,000, based on Jurgens' preliminary estimate of the value of the Estate at the time he filed the Preliminary Executor's Bond with the Surrogate's Court. (Jurgens Aff. ¶ 14; Def.'s 56.1 Stat. ¶ 29.) The value of the Estate was ultimately determined to be higher than the face value of the bond. However, by the time that determination was made, the Will had already been admitted to probate and an increase in the bond was not necessary. (Jurgens Aff. ¶ 14; Def.'s 56.1 Stat. ¶ 30.)

In support of his allegation that Jurgens breached his fiduciary duties by filing a false bond, Plaintiff cites to Exhibit 9 annexed to the Amended Complaint. (Am. Compl. at 25–26.)

However, Exhibit 9 is neither the purported bond nor any document even suggesting that Jurgens fraudulently obtained the bond. Rather, Exhibit 9 consists of the FD & C's power of attorney dated August 25, 2000, F & DC's statement of financial condition dated May 24, 2000, and FD & C's New York State Insurance Certificate dated April 12, 2001. These documents do not in any way support Plaintiff's contention that Jurgens committed fraud in obtaining the bond, thereby breaching his fiduciary duties.

As a result, Defendant has provided no more than conclusory allegations here regarding the supposed fraudulent nature of the bond, and those allegations are not supported by the irrelevant papers included in Exhibit 9. Accordingly, the Court finds that Plaintiff has failed to carry his burden to establish a genuine issue of material fact regarding the bond filed by Jurgens with the Surrogate's Court.

### 7. *Purported Accounting Discrepancies*

Plaintiff alleges that the difference of $897,115.27 between the listed value of assets contained in Jurgens' Inventory dated October 12, 2001 (filed on November 7, 2001) and McCarthy's Final Accounting (filed in August 2002), both of which pertain to the value of Louise's assets as of the date of her death (January 6, 2001), and Jurgens' alleged failure to address this discrepancy, reveal that Jurgens committed some type of unspecified fraud and that he "continues to act in concert with all parties ... to deplete and convert the assets of" Louise's Estate. (Am. Compl. at 9.)

 **\*21** The conduct alleged here refers to actions taken during the guardianship period. As explained above, during this time, Jurgens had no authority over McCarthy, who was solely in charge of managing Louise's assets. Moreover, Plaintiff had ample opportunity to challenge McCarthy's accounting, including this alleged discrepancy, during the course of the Suffolk Supreme Court Action. Because this allegation relates solely to events that occurred prior to the commencement of Jurgens' role as executor of Louise's Estate, the Court finds that there is no genuine issue of material fact regarding any alleged breach by Jurgens of his fiduciary duties as Executor.

### 8. *Jurgens' Purported Improper Motives*

Finally, Plaintiff claims that Jurgens brought the Suffolk Surrogate's Court action against Plaintiff "to conceal and obfuscate the conversion of the property" of Louise and her Estate during the period in which Jurgens and McCarthy

served as Louise's guardians. (Am. Compl. at 9.) Plaintiff explained that, following his appointment as preliminary executor of Louise's estate in January 2001:

> In the course of performing my duties as executor, I attempted to locate and preliminarily account for various assets of the Estate. In that capacity, I learned that Plaintiff had withheld certain of Louise's money and personal property valued at $789,039.04, obtained through specific withdrawals, transfers and check negotiations in which Plaintiff engaged during the period prior to Louise's death from March 1997 through the time that Mr. McCarthy was appointed as Louise's property guardian. As a result, I commenced a special proceeding in Suffolk County Surrogate's Court in my capacity as Executor, seeking to discover property withheld by Plaintiff.

(Jurgens Aff. ¶ 5.)

On June 13, 2003, Suffolk County Surrogate, Honorable John M. Czygier, Jr. granted Jurgen's motion for summary judgment (made on behalf of Louise's Estate) on the grounds that no triable issue of fact existed as to whether Witzenburg was in wrongful possession of specific assets belonging to the Estate. (Jurgens Aff ¶ 6; Schmidt Decl. ¶ 10; Def.'s 56.1 Stat. ¶ 17.) By Decree and Judgment entered on August 22, 2003 (the "Judgment"), Witzenburg was ordered to deliver such assets, if in his possession or control, or to pay Jurgens, as the Executor, $789,039.04, representing the total amount of withdrawals and transfers of Louise's assets resulting from the transactions conducted by Plaintiff between March 1997 and June 2000. (Jurgens Aff. ¶ 6; Schmidt Decl. ¶ 10, Ex. A; Def.'s 56.1 Stat. ¶ 17.) Moreover, in the Judgment granting the Estate's motion for summary judgment, Surrogate Czygier stated as follows:

> sufficient concerns having been raised before this Court to question the nature of the subject transfers it is further ORDERED, ADJUDGED AND DECREED that the Clerk of the Surrogates' Court is directed to serve a copy of the Court's decision upon the

Suffolk County District Attorney for
further investigation[.]"

**\*22** (Schmidt Decl. ¶ 11, Ex. A; Def.'s 56.1 Stat. ¶ 18.)
The Judgment is a final judgment and was not appealed by
Plaintiff. (Schmidt Decl., Ex. A; Def.'s 56.1 Stat. ¶ 20.)

Jurgens believes that shortly after entry of the Judgment in
August 2003, Plaintiff left New York. (Schmidt Decl. ¶ 12.)
To date, Plaintiff has not made any payment to satisfy the
Judgment, and it is Jurgens' understanding that Plaintiff has
resisted all efforts to enforce the Judgment. (Jurgens Aff. ¶ 6;
Def.'s 56.1 Stat. ¶ 19.) However, once the Estate files its final
accounting (which it cannot do until after resolution of the
present action), it will ultimately be able to offset the amount
of the Judgment against Plaintiff's share. (Jurgens Aff. ¶ 12.;
Schmidt Decl. ¶ 12.)

Notwithstanding that the history of the Surrogate's Court
Action strongly suggests that Plaintiff brought the instant
case in an effort to further elude the Judgment entered in
Surrogate's Court, Jurgens, as Executor, was well within
his authority to bring that case against Plaintiff. The New
York Fiduciary Powers Act specifically provides that "every
fiduciary is authorized ... [t]o contest, compromise or
otherwise settle any claim in favor of the estate ...." N.Y.
EPTL § 11–1.1(13). Thus, once Jurgens obtained information
that Plaintiff had withheld funds which properly belonged to
Louise's Estate, he acted properly in brining the Surrogate's
Court Action against Plaintiff to recover those funds.

### C. Conclusion

For the foregoing reasons, Plaintiff has not provided any
evidentiary basis which would enable this Court to find that
Jurgens breached his fiduciary duties in his role as executor
of Louise's Estate and that Jurgens' actions caused Witzenburg
or any other beneficiary to incur damages. Accepting Jurgens'
Rule 56.1 Statement as admitted facts, as the Court must, the
record shows that Jurgens' conduct as executor "measures up
to the appropriate standards of prudence, vigilance, and care"
as required by New York law. *See Donner,* 82 N.Y.2d at 585,
606 N.Y.S.2d at 142, 626 N.E.2d 922.

Having reviewed all of the papers submitted in support of and
in opposition to Defendant's Motion for Summary Judgment
on the remaining claims in this action, and reviewing the
evidence in the light most favorable to Plaintiff as the non-
moving party, the Court concludes that Defendant has met
his burden of showing that there is no genuine issue of

material fact to be tried in this case regarding Plaintiff's claims
that Defendant breached his fiduciary duties to the Estate of
Louise Jurgens and that he mismanaged the Estate's assets.

Accordingly, I respectfully recommend to Judge Feuerstein
that Defendant's motion for summary judgment on the
remaining claims be GRANTED and that the Amended
Complaint be dismissed in its entirety.

### IV. *PLAINTIFF'S MOTION TO AMEND THE COMPLAINT*

Plaintiff Witzenburg also moves to amend the Amended
Complaint pursuant to Fed.R.Civ.P. 15 to add Patrick
McCarthy, Esq. as a party defendant. McCarthy served as
the court-appointed property guardian of Louise's property
for thirteen months before her death. Defendant's motion
papers [DE 117] do not include a proposed Second Amended
Complaint containing the requested changes. Counsel for
Patrick McCarthy filed a letter [DE 119] requesting
permission to oppose the motion and to extend the time
to submit his opposition. By Order dated June 20, 2008
[DE 120], Judge Boyle granted McCarthy's motion without
objection from Plaintiff and extended the deadline for the
opposition to July 15, 2008. Defendant Jurgens has not filed
papers in opposition to Witzenburg's motion to amend.

**\*23** Plaintiff seeks to amend his pleading for a second
time on the grounds that, as guardian of Louise's property,
McCarthy "created a false business document identified
as 'The Final Accounting,' and filed said false business
document with the New York State Supreme Court." [DE
117] Because the deadline to amend the pleadings has
expired, [10] the amendment is permissible only if it "relates
back" to the original Complaint as defined in Rule 15(c).
Under Rule 15(c)(1), an amendment "relates back" to the
original pleading when, *inter alia,*

> (B) the amendment asserts a claim or defense that arose
> out of the conduct, transaction, or occurrence set out—or
> attempted to be set out—in the original pleading; or

> (C) the amendment changes the party or the naming of
> the party against whom a claim is asserted, if Rule 15(c)
> (1)(B) is satisfied and if, within the period provided by
> Rule 4(m) for serving the summons and complaint, the
> party to be brought in by amendment:

(i) received such notice of the action that it will not be prejudiced in defending on the merits; and

(ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Thus, subsection (C) governs the relation back of newly added parties, as opposed to newly added claims and claims and defenses, which is governed by subsection (B) (although under the terms of (C), Plaintiff must also satisfy (B).) *See Sidney v. Wilson,* 228 F.R.D. 517, 520 (S.D.N.Y.2005).

In order for Plaintiff to amend the Amended Complaint to add McCarthy as a party Defendant, he must show that McCarthy originally would have been named as a defendant "but for a mistake concerning the proper party's identity." Under Second Circuit law, "a 'mistake' in identifying a defendant occurs for purposes of Rule 15(c) when it is the result of 'misnomer or misidentification' " or when a plaintiff omits the individual defendant altogether in the erroneous belief that suing a government department will suffice. *Messer v. Fahnestock & Co. Inc.,* 03–4989, 2008 WL 4934608, at *20 (E.D.N.Y. Nov.18, 2008) (internal citation omitted) (quoting *Barrow v. Wethersfield Police Dep't,* 66 F.3d 466, 469–70 (2d Cir .1995)); *Colombo v. S.C. Dep't of Soc. Servs.,* 221 F.R.D. 374, 376 (E.D.N.Y.2004). "However, the relation-back doctrine does not apply where defendants were not originally named merely 'because plaintiff did not know their identities.' " *Colombo,* 221 F.R.D. at 376 (quoting *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999)). Nor does the relation-back doctrine apply where plaintiff does not allege he would have sued the proposed defendant in the original complaint but for a mistake in identity. *See Cornwell v. Robinson,* 23 F.3d 694, 705 (2d Cir.1994) (amendment to add defendants did not relate back where plaintiff knew at the time of her original complaint the "identities of the ... employees who she contended had harassed and discriminated against her;" plaintiff's failure to name defendants thus "must be considered a matter of choice, not mistake"); *see also* Fed.R.Civ.P. 15(c) (3) [11] Advisory Committee's note (1991 Amendment) (this provision was revised to address "the problem of the misnamed defendant").

**\*24** In his motion papers, Plaintiff asserts that the proposed amendment "asserts a claim that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Plaintiff further contends that McCarthy will not be prejudiced because he "knew or

should have known that this action would have been brought against him but for a mistake concerning the proper party's identity ...." [DE 117] Other than these conclusory statements, however, Plaintiff gives no explanation as to any mistake on his part concerning McCarthy's identity. There is no evidence that Defendant's failure to name McCarthy as a defendant in the original Complaint was a result of a "misnomer or misidentification," as required under Second Circuit law. *See, e.g., Messer,* 2008 WL 4934608, at *20, *Colombo,* 221 F.R.D. at 376. In addition, given the history of the related Suffolk Supreme Court and Surrogates' Court Actions that occurred before Plaintiff filed the Complaint in the present case, it is implausible for Plaintiff to assert that he was uncertain of Patrick McCarthy's identity. Rather, Plaintiff chose not to name McCarthy as a defendant in the present action— a mistake which does not allow the proposed amendment to "relate back" to the Complaint. *See Cornwell,* 23 F.3d at 705 (amendment to add defendants did not relate back where plaintiff knew at the time of her original complaint the "identities of the ... employees who she contended had harassed and discriminated against her;" plaintiff's failure to name defendants thus "must be considered a matter of choice, not mistake").

Moreover, even if the Court were to accept Plaintiff's contention that McCarthy "knew or should have known that the action would have been brought against [him], but for a mistake concerning the proper party's identity [,]" Plaintiff must show that McCarthy received timely notice of this action so as to avoid prejudice in defense of the action on the merits. *See* Fed.R.Civ.P. 15(c)(2)(C) (ii); *Colombo,* 221 F.R.D. at 377. To this end, Plaintiff states:

> [a]t Patrick McCarthy was represented by Donald J. Farrinacci when he was the Guardian of Louise Jurgens' Property, as Donald J. Farrinacci had been employed at Cozin O'Conner and is an associate of Michael Schmidt, attorney for Charles H. Jurgens, Patrick McCarthy knew or should have know that this action would have been brought against him, but for a mistake concerning the proper party's identity ....'

[DE 117] The Court understands Plaintiff's assertion to mean that McCarthy was on notice of the present action, and therefore will not be prejudiced by being added as a defendant, because, for at least some portion of the time

he served as Louise's property guardian (December 1999–January 2001), he was represented by counsel who at one time had worked with Jurgens' current counsel.

Rule 15(c) requires a showing that the defendant who is to be added to the complaint "received such notice of the action that it will not be prejudiced in defending on the merits[.]" Rule 15(c) (2)(C)(ii). Knowledge of the pendency of the action may be imputed to a party to be added as a defendant to that action where there has been "some showing that the proposed defendant's attorney knew that the additional defendant would be added to the existing suit." Colombo, 221 F.R.D. at 377 (granting motion to add individual defendants under Rule 15(c) where county attorney's office represented the named defendants, including county police department and correctional facility, and was also counsel for the proposed defendants, including individual police and correction officers, the attorneys "should have known that, despite the deficiencies in the original complaint, these individual officers should have been named, and would be added when the mispleading became evident"); Gleason v. McBride, 869 F.2d 688, 693 (2d Cir.1989) (holding that notice of a lawsuit cannot be imputed to a proposed defendant based on sharing of counsel with a named defendant; "there must be some showing that the attorney(s) knew that the additional defendants would be added to the existing suit") (citation omitted).

**\*25** Plaintiff's allegation that McCarthy was on notice of the present action because he was, in a prior case, represented by counsel who had at one time worked with Jurgens' current counsel, is insufficient to constitute notice under Rule 15(c)(2)(C)(ii). Plaintiff does not provide the Court with any evidence regarding the relationship between McCarthy's attorney and Jurgens' former attorney. [12] Moreover, Plaintiff has not made any showing that McCarthy or his attorney knew that McCarthy would be added to the existing suit before Plaintiff filed this motion. For the foregoing reasons, Plaintiff has not satisfied the requirements of Rule 15(c) and therefore should not be permitted to amend his pleading for a second time for this purpose. Accordingly, I respectfully recommend to Judge Feuerstein that Plaintiff's motion to add Patrick McCarthy as a party defendant be DENIED.

## V. *PLAINTIFF'S MOTION TO COMPEL*

Plaintiff also moves to compel Defendant to respond to outstanding discovery requests. By motion dated June 26, 2008 [DE 130], Plaintiff requests an order requiring Defendant to respond to outstanding document requests and interrogatories, which Defendant has previously refused to answer on the grounds that the application of the *Rooker–Feldman* doctrine excused them from doing so. The motion is titled "Plaintiff's Motion & Notice of Motion For Sanctions," but nowhere in the body of the motion does Plaintiff request the imposition of sanctions or provide a legal basis for doing so. Accordingly, the Court will treat this request for relief as a motion to compel and to impose sanctions upon Defendant.

By letter dated July 8, 2008 [DE 131], Defendant states that, to the extent the meaning of Plaintiff's motion can be discerned, and to the extent the motion seeks to compel Defendant's further responses to discovery requests, Defendant opposes the motion on the grounds that (1) the Court had already denied an earlier motion to compel by Plaintiff, and (2) there is no basis for an award of sanctions against Defendant.

In a previous motion filed on January 31, 2008 [DE 95–97], Plaintiff moved to compel Defendant "to file adequate responses to Plaintiff's discovery requests." Specifically, Plaintiff objected to Defendant's responses to Interrogatories 4, 6, 13, and 14, and Requests for Admissions ("RFAs") numbered 1, 8, 9, 16, and 17 as being "incomplete," and requested that the Court order Defendant to respond further to the Interrogatories and to deem as admitted the specified RFAs [DE 96]. In opposition, Defendant filed the Declaration of Michael C. Schmidt, dated February 4, 2008 [DE 99], objecting to Plaintiff's motion to compel. By Order dated February 4, 2008 [DE 100], Judge Boyle ruled that, after reviewing the motion to compel, he found Defendant's response[s] "adequate." The Order also stated that the "plaintiff is advised that he may further pursue those request[s] which do not relate to dismissed parties and causes of action, at the deposition of defendant Jurgens."

**\*26** Thus, Judge Boyle unequivocally denied Plaintiff's motion to compel on the grounds that Plaintiff's responses were sufficient and any further information could be obtained by deposing Defendant. Plaintiff's current motion to compel is essentially a more vague repetition of his earlier motion. However, Plaintiff does not provide any basis, let alone a legally sufficient one, for reconsidering Judge Boyle's Order denying that motion, and the Court declines to do so. For all of the reasons stated previously in this Report, Judge Boyle's February 4, 2008 Order on this topic is also law-of-the-case and Plaintiff has not met any of the criteria to exempt that Order from such a finding.

To the extent Plaintiff's motion seeks the imposition of sanctions upon Plaintiff, the Court interprets the motion to be requesting sanctions for "Failure to Disclose, to Supplement an Earlier Response, or to Admit," under Rule 37(c). Here, Judge Boyle previously determined that Defendant's responses were adequate. Since that time, Plaintiff has not served any additional discovery requests and Defendant has not incurred any additional obligation to respond to the original discovery requests. Consequently, there is no basis for the Court to impose sanctions on Defendant.

For the foregoing reasons, I respectfully recommend to Judge Feuerstein that Plaintiff's motion to compel and for sanctions be DENIED.

## V. *CONCLUSION*

For the reasons discussed above, I respectfully recommend to Judge Feuerstein that: (1) Defendant's motion for summary judgment on the remaining claims be GRANTED and that Plaintiff's Amended Verified Complaint be dismissed in its entirety; (2) Plaintiff's motion to amend the Amended Complaint to add Patrick McCarthy, Esq. as a party defendant be DENIED; and (3) Plaintiff's motion to compel discovery responses and to impose sanctions upon Defendant be DENIED.

Pursuant to 28 U.S.C. § 636(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report and Recommendation to file written objections. *See also* Fed.R.Civ.P. 6(a), (e). Such objections shall be filed with the Clerk of the Court via ECF, *except in the case of a party proceeding pro se. Pro Se Plaintiff James Witzenberg must file his objections in writing with the Clerk of the Court within the prescribed time period noted above. A courtesy copy of any objections filed is to be sent to the chambers of the Honorable Sandra J. Feuerstein, and to my chambers as well. Any requests for an extension of time for filing objections must be directed to Judge Feuerstein prior to the expiration of the (10) day period for filing objections. Failure to file objections will result in a waiver of those objections for purposes of appeal.* Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); Beverly v. Walker, 118 F.3d 900, 901 (2d Cir.), cert. denied, 522 U.S. 883, 118 S.Ct. 211, 139 L.Ed.2d 147 (1997); Savoie v. Merchants Bank, 84 F.3d 52, 60 (2d Cir.1996).

 **\*27** Defendants' counsel is directed to serve a copy of this Report and Recommendation forthwith upon Plaintiff *Pro Se* by overnight mail and first class mail at Plaintiff's last known address. Defendant's counsel is further directed to file proof of service of the same upon ECF.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 1033395

## Footnotes

1    Plaintiff has not objected to the branches of Magistrate Judge Tomlinson's Report as recommended denying his motions to amend the amended complaint and to compel discovery responses or impose sanctions. Upon review of those branches of the Report, the Court is satisfied that the Report is not facially erroneous. Accordingly, the Court accepts and adopts those branches of the Report.

1    The record is unclear as to Plaintiff's exact relationship with Louise, as it is variously stated that he is her first cousin once removed (Compl. at 2; Jurgens Aff., Ex. A), her second cousin (Jurgens Aff. ¶ 1), or her nephew (Schmidt Decl. ¶ 4).

2    Citations to "Schmidt Decl." are to the June 17, 2008 Declaration of Michael C. Schmidt, Esq., in Support of Defendant Jurgens' Motion for Summary Judgment [DE 123].

3    Citations to "Jurgens Aff." are to the June 10, 2008 Affidavit of Charles Herman Jurgens in support of Motion for Summary Judgment [DE 124].

4    Citations to "Def.'s 56.1 Stat." are to the Defendant's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 [DE 125].

5    The Amended Complaint does not contain separately numbered paragraphs and does not identify specific "causes of action." Accordingly, citations are to page numbers within the Amended Complaint. Moreover, the Court affords the Amended Complaint, filed by *pro se* Plaintiff "as liberal a reading as circumstances permit." *Hardie v. Grenier,* No. 84 Civ. 4710, 1987 U.S. Dist. LEXIS 12664, at \*6 (S.D.N.Y. Jan. 15, 1988); *see also* Lerman v. Board of Elections in the City of N.Y., 232 F.3d 135, 140 (2d Cir.2000).

6    Citations to "Schmidt Reply Decl." are to the August 7, 2008 Reply Declaration of Michael C. Schmidt, Esq., in Further Support of Defendant Jurgens' Motion for Summary Judgment [DE 137].

7    Even if Plaintiff's Response were considered, the substance of the Response falls far short of the threshold necessary to support a showing of genuine issue of material fact with regard to the remaining claims. Rather, the Response contains conclusory and unsubstantiated statements, most of which purport to address "the numerous factual inaccuracies and misleading statements" in the Schmidt Declaration [DE 136 at 3], and none of which provide any evidentiary support for Plaintiff's claims.

8    Local Rule 56.1(b) provides: "The papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."

9    The Prudent Investor Act applies to investments "made or held" by a trustee on or after January 1, 1995, and thus applies to the present matter. *See In re Estate of Janes,* 90 N.Y.2d 41, 49, 659 N.Y.S.2d 165, 169, 681 N.E.2d 332 (N.Y.1997) (citing N.Y. EPTL § 11–2.3(b) (3)(C).)

10   Pursuant to the Scheduling Order [DE 22] in this action, the deadline to amend the pleadings was May 6, 2005.

11   Although numbered differently from the current version of Rule 15(c), the wording is the same.

12   In addition, the Court notes that, based on preliminary research, Plaintiff's statement appears to be incorrect. No attorney by the name of Donald J. Farrinacci presently works at the law firm of Cozen O'Connor, where Jurgens' attorney, Michael J. Schmidt, currently works. However, Schmidt's biography on the Cozen O'Connor website states that until 2005, Schmidt worked at Fischbein Badillo Wagner Harding, a firm that represented McCarthy for at least some portion of his tenure as guardian. *See* http://www.cozen.com/attorney_detail.asp?d=1 & atid=835.

---

**End of Document**                                                                  © 2016 Thomson Reuters. No claim to original U.S. Government Works.